THE UNITED STATES DISTRICT COURT
THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RYAN C. HENRY, individually and on behalf
of all other similarly situated employees,

        Plaintiffs,                Case No. 04-40346

vs.

                                  DISTRICT JUDGE PAUL V. GADOLA
                                  MAGISTRATE JUDGE STEVEN D. PEPE

QUICKEN LOANS, INC., a Michigan corporation,
and DANIEL B. GILBERT, personally and individually,

        Defendants.
_____/

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION
FOR RELIEF FROM COMPUTER FORENSICS EXPERT'S INVOICE (DKT. #492)
AND
<u>ORDER TO SHOW CAUSE</u>**

On December 17, 2007, Plaintiffs filed a "motion for relief from computer forensics expert's invoice" (Dkt. #492). This motion was referred for hearing and determination pursuant to 28 U.S.C. § 636 (b)(1)(A) (Dkt. #493). A hearing was held on February 11, 2008, in which all unresolved issues were heard. For the reasons indicated on the record and stated below, it is **ORDERED** that Plaintiffs' motion is **GRANTED**.

**I.    BACKGROUND FACTS**

This is a Fair Labor Standards Act ("FLSA") overtime collective action brought under 29 U.S.C. § 201 *et seq.*, involving approximately 422 Plaintiffs who worked as "loan consultants" for Defendants Quicken Loans and Daniel B. Gilbert. Plaintiffs allege that during their employment as loan consultants for Defendant Quicken Loans that Defendants unlawfully

1

withheld wages from Plaintiffs by denying them overtime pay for hours worked in excess of 40 hours per week in violation of §207(a)(1) of the FLSA. As a result of this alleged practice, Plaintiffs contend they suffered a loss of wages and ask for judgment against Defendants for an amount equal to Plaintiffs' unpaid back wages at the applicable overtime rate, an equal amount as liquidated damages and all costs and attorney fees incurred prosecuting this claim.

Defense counsel initially opposed Plaintiffs' requests to produce large numbers of e-mails by the several hundred individual Plaintiffs who opted in to this collective action and their 32 team leader managers. Plaintiffs were willing to limit the time period for the e-mails to be produced to the months of April, May and June of 2004. They proposed that after they reviewed all the e-mail and narrowed them down to those they thought were relevant, they would give Defendants an opportunity to review this reduced set of e-mails and raise any attorney client privilege or other objections they might have and retrieve items that should be protected. Because this "claw back" provision under the 2006 amendments to Fed. R. Civ. P. 26(b)(5)(B) and related agreements under Rule 16(b)(6) could in some state courts be deemed a waiver of the privilege,[1] defense counsel expressed reluctance to produce such back up tapes because of the exceedingly expensive process of defense counsel screening them for privilege before production.

Plaintiffs filed a motion to compel to resolve this discovery dispute regarding e-mails (Dkt. #387). A hearing was held on April 17, 2007 (Dkt. #492, Ex. A.). To accommodate the

---

[1] Absent further Congressional action, the Rules Enabling Act does not authorize modification of state privilege law. Thus, the clawback provisions in Fed. R. Civ. P. 26(b)(5)(B) and 16(b)(6), while respected in federal courts, might be deemed a common law waiver of privilege in state courts, not only for the document in question, but a broader waiver of attorney client privilege as to the subject matter involved.

defense concerns – which prevented open and unrestricted access to the e-mails on the back up tapes – a protocol was ordered that was intended to balance the concerns and needs of both sides at what was hoped to be manageable costs. Under the terms of this protocol the Plaintiffs' computer forensic expert, Mark Lanterman of Computer Forensic Services in Minnesota, was to retrieve from Defendants' computer back up tapes all of the e-mails for the months of April, May and June of 2004. Based on search terms and methods to be worked out by the attorneys for both sides, Mr. Lanterman, "at Plaintiffs' reasonable expense for his services and the electronic copying expenses," was to filter this database for the team leaders and hundreds of opt-in Plaintiffs (Order of April 18, 2007, Dkt. #396, as modified May 15, 2007, Dkt. #398). Under the order, Mr. Lanterman was to act under the "direction and control" of defense counsel in retrieving the requested e-mails from the backup tapes. *Id*. The searching and filtering of Defendants' database by Mr. Lanterman would be limited to the terms agreed upon by the parties (Dkt. #398). Mr. Lanterman was required to sign a declaration agreeing: (1.) to the agency relationship with and under the direction and control of defense counsel; (2.) to being bound by the Court's orders; (3.) to maintain confidentiality and; (4.) to submit to the jurisdiction of the United States District Courts for the Eastern District of Michigan and the District of Minnesota for any claims that arise at common law for violations of his agreement or to respond to any motions for contempt of the order (Dkt. #398; Dkt. #492, Ex. B).

While Plaintiffs' counsel agreed to pay the reasonable expenses of Mr. Lanterman, at the April 2007 hearing he expressed a desire to limit the costs to no more than what was needed and not to be giving defense counsel a "carte blanche" to run up the costs of the screening procedure at Plaintiffs' expense (April 17, 2007, hearing transcript, Dkt. #492, Exhibit A, at 54 & 60).

Pursuant to the Court's order, the parties met and conferred about the search terms and exclusionary terms to be used in the screening process (Dkt. #492, Srey Decl. ¶3, Ex. C). The parties agreed to Plaintiffs' search terms and Defendants' screening terms; the latter included the 14 names of legal personnel and certain "privileged" terms. *Id.* The search terms for the names of the persons in the legal department which was attached included the first and last name of each person (Dkt. #492, Ex. D). Defendants never proposed using first and last names of their legal personnel as separate exclusionary terms during any of the communications between counsel regarding screening terms (Dkt. #492, Srey Decl. ¶3, Ex. C). This was not discussed at the hearing nor did the orders indicate that the first and last names of legal personnel were to be used as separate screening terms.[2]

---

[2] At the April 17, 2007, hearing, after the discussion of why the Defendant did not want to turn over the back-up tapes of the e-mail without some screening for privilege, and the risks of other courts determining a waiver occurred if only a claw-back agreement was used, the thorough and thoughtful defense counsel, Robert Davis, mused about the screening. He noted there might be two "Richards," one an attorney the other a manager being screened (April 17, 2007, hearing transcript, at 55) (Richard Chyette is Defendant's Vice-President and heads the legal department and was one of the names screened. There was no manager involved named Richard). Nothing more came of this as Mr. Davis turned to discussing and conceding the reasonableness of Plaintiffs' request to screen in e-mails using the terms "overtime exempt" or "non-exempt."    Later having addressed the screening and waiver concerns of Defendants, I noted hypothetically of our screening system that if some state court in Missouri (later morphed into Mississippi) in a truth in lending or other claim was addressing whether Defendants had waived attorney client privilege in the Lanterman screening done in this case, the Defendants' attorneys would be able to argue to that state court judge that "we took every feasible means to screen out attorney/client privileges before anything was turned over to the plaintiffs." I then suggested that in addition to those Lanterman screening protocols the Defendants also had the "claw-back" (mis-transcribed as "call back") provisions to reduce the risks of waiver. *Id*. at 57. I awkwardly suggested that if an attorney wanted to challenge the adequacy of the screening because some document got through the screens because of how the name "Richard" was used (or not used), that attorney, under a protective order, would have to read all of the e-mails with the name "Richard" in them in order "to show the screening process wasn't adequate." I then indicated that an attorney actually doing that in a future case was not likely because of the expense. This was a poorly developed hypothetical "aside" at the hearing on what Defendants'

4

The parties' agreed-upon search and screening terms were sent to Mr. Lanterman in a July 10, 2007, letter from Defendants' attorney (Dkt. #492, Ex. D). This letter required Mr. Lanterman to work under the "direction and control" of defense counsel and "not turn to Plaintiffs' counsel for confirmation, additional instruction, or the final go-ahead to proceed with particular steps in this process." It set out the "specific parameters" for the screening process. Defendants also identified fourteen members of its legal department as personnel whose e-mails would be screened. *Id.* In outlining the steps for Mr. Lanterman to follow during the e-mail search and filtering process, the letter noted Mr. Lanterman was to screen out e-mails including "the names of identified company legal personnel" whose first and last names were attached in Exhibit 6 to the letter.[3] *Id.* The letter did not address screening the e-mails using the first and last names of these fourteen individuals as separate screening terms to omit an e-mail (Dkt. #492, Ex. D; Dkt. #497, Ex. B, Lanterman Dep. at 55-56). Nor did the letter suggest that attachments to e-mails, and e-mails within e-mails ("nested" e-mails), would be screened, regardless of the author or recipient (Dkt. #492, Ex. D). Again, the letter reiterated that Mr. Lanterman would be acting under the "direction and control" of defense counsel and was not to have any contact with Plaintiffs' counsel regarding his work.

Had the issue of using the first and last names of legal personnel as separate screening

---

attorneys could argue in some future state case to defend the screening in this case as being reasonably calculated to preserve attorney client confidentiality and thus maintain the privilege. It was not a license to defense counsel to take all "feasible" steps whether or not agreed to, in order to screen out ever more e-mails as defense counsel suggested at Lanterman's deposition (Dkt. #497, Ex. B, Lanterman Dep. at 15).

[3] I.e. Exhibit 6 attached to the July 20, 2007, letter uses names such as "William Sargent," and not "William Sargent, Sargent William, William, Sargent" or "William Sargent, or William, or Sargent, " or "William or Sargent."

5

terms been raised and analyzed at the hearing or later, it would have led to obvious problems of over-exclusion by: (1.) excluding all e-mails of Plaintiffs Amy Parker, Chris Gogos, Elizabeth Skomra and Richard Ikeh because of the use of the first names of attorneys Amy Bishop, Chris Toot, Elizabeth Lanciault, and Richard Chyette from the attorney list; (2.) excluding all e-mails of team leaders David Lee and William Pellow because of use of the first names of attorneys David Carroll and William Sargent; and (3.) excluding any other e- mails where the common first names of several of the attorneys were mentioned or were an e-mail correspondent.

After developing the data base from the back up tapes Mr. Lanterman did his initial screening on the team leader managers' e-mails (Dkt. #492, Ex. G). Plaintiffs paid Mr. Lanterman's $14,937.50 for this copying the backup tapes and restoring the data to a usable format (Dkt. #492, Ex. H). These managers' e-mails were turned over to Plaintiffs' counsel on September 14, 2007, and the screened Plaintiffs' e-mails on October 3, 2007 (Dkt. #492, Ex. E). On October 5, Plaintiffs received Mr. Lanterman's invoice for the screening and filtering work he performed, which totaled $91,191.35 (Dkt. #492, Ex. F). This invoice was subsequently reduced to $79,965.01 in a modified bill due to an inadvertent double billing for certain work (Dkt. #492, Ex. G.).

Plaintiffs immediately provided Defendants a copy of this invoice and informed them of their intent to depose Mr. Lanterman regarding his bill and the protocol he followed (Dkt. #492, Ex. I). On the day scheduled for Mr. Lanterman's deposition, Defendants filed a motion for protective order, attempting to prevent Plaintiffs from deposing Mr. Lanterman (Dkt. #456). On November 1, 2007, this Court denied Defendants' motion and ordered Mr. Lanterman's telephonic deposition (Dkt. #473). Plaintiffs deposed Mr. Lanterman on November 30, 2007.

6

Mr. Lanterman testified that he began his work on the e-mails on or about July 18, 2007, starting with the managers' e-mails and initially following the procedure described in the letter (Dkt. #497, Ex. B., Lanterman Dep. at 13, 58). Consistent with the protocol, he treated the first and last names of Defendants' legal personnel as compound exclusionary terms; that is, both the first and last names must have appeared in the email for the email to be screened. *Id*. at 13-14. The remaining e-mails were produced to Defendants on August 17, 2007 ("Submittal 1") (Dkt. #492, Ex. G). Submittal 1 cost $26,972.62 (Dkt. #492, Ex. F).

Unsatisfied with Submittal 1, defense counsel instructed Mr. Lanterman to perform another round of screening, this time treating the first and last names of legal personnel as separate search terms ("Submittal 2") (Dkt. #497, Ex. B, Lanterman Dep. at 14; Dkt. #492, Ex. G; Dkt. #492, Ex. J). Before proceeding with the separated first and last names, Mr. Lanterman warned defense counsel that running first names as separate terms would remove a significant amount of e-mails from the population and "literally wipe out some people's [e]-mails" (Dkt. #497, Ex. B., Lanterman Dep. at 14-16). Defense counsel nonetheless instructed Mr. Lanterman to proceed with the modified exclusionary search. *Id.* Apparently all subsequent searches also used this procedure that Mr. Lanterman had warned against. As a result of these modified exclusionary terms, all e-mails containing either the first or the last name of Defendants' legal personnel were screened out. *Id*. at 17. This apparently excluded the e-mails of team leaders David Lee and William Pellow and the e-mail boxes of Plaintiffs Amy Parker, Chris Gogos, Elizabeth Skomra and Richard Ikeh. This resulted in an under-inclusive set of e-mails. Defense counsel took the additional step of instructing Mr. Lanterman to screen all attachments for the modified exclusionary terms. *Id.* Submittal 2 cost $11,751.37 (Dkt. #492, Ex. G). This

7

screening of attachments would have further reduced the set of remaining e-mails.

Defendants' counsel remained unsatisfied with the set of e-mails that resulted from Submittal 2, and instructed Mr. Lanterman to perform a third round of screening ("Submittal 3"). Submittal 3 was identical to the second round, except it also screened nested e-mails for the modified exclusionary terms (Dkt. #497, Ex. B, Lanterman Dep. at 31-32). This apparently reduced the set of e-mails further. Submittal 3 cost $16, 507.94 (Dkt. #492, Ex. G).

After finishing with the team leader manager e-mail screening, counsel for Defendants instructed Mr. Lanterman to screen the Plaintiffs' e-mails using the same protocol as used in Submittal 3. As noted above this eliminated all e-mails of Plaintiffs Amy Parker, Chris Gogos, Elizabeth Skomra and Richard Ikeh ("Submittal 4") (Dkt. #497, Ex. B, Lanterman Dep. at 20). Submittal 4 cost $12,535.22 (Dkt. #492, Ex. G).

Apparently realizing that they had gone too far in excluding e-mails, defense counsel next instructed Mr. Lanterman to perform another round of screening ("Submittal 5"), this time without excluding the four shared first names, so they could repopulate the mailboxes of Plaintiffs Parker, Gogos, Skomra and Ikeh that had been emptied in Submittal 4 (Dkt. #497, Ex. B, Lanterman Dep. at 20). These procedure did screen out any e-mails containing the first names of the other ten attorneys on the list. This fifth round of screening cost $11,171.91 (Dkt. #492, Ex. G). These e-mails of Plaintiffs Parker, Gogos, Skomra and Ikeh were later individually screened by defense counsel for privileged matter at no cost to Plaintiffs. No e-mails were excluded for attorney-client privilege for these four Plaintiffs.

Thus after the first screening run, defense counsel modified the search protocol on the use of attorney first and last names separately in a manner different from the July 10, 2007, letter

8

as that letter was understood by Mr. Lanterman and by Plaintiffs' counsel. Defense counsel had no communication with Plaintiffs' counsel informing them of this change seeking their comment or concurrence during the four remaining e-mail search and filtering processes. As noted above, Mr. Lanterman was prohibited from contacting Plaintiffs' counsel concerning these changes. Thus, Plaintiffs' counsel had no opportunity to object or bring the dispute to the Court's attention for resolution if the parties could not have reached agreement.

In the present motion, Plaintiffs' counsel contends that without their knowledge, Defendants chose to go beyond the scope of the agreed upon protocol with numerous modified searches, resulting in a bill that bears no relation to the parties' agreements and the Court's order. Accordingly, they argue that Plaintiffs should not be required to pay for any costs stemming from the second, third, or fifth submittals noted in Mr. Lanterman's October 3, 2007, amended invoice (Dkt. #492, Ex. G).[4] They request that the Court order Defendants to pay for these costs.

## II. ANALYSIS

While there is no suggestion that defense counsel was acting unethically in serving his client's interest, defense counsel's actions exceeded the scope of the "direction and control"

---

[4] For some reason Plaintiffs' counsel has not protested the Fourth Submittal that was likely under-inclusive for many Plaintiffs and had entirely wiped out the e-mails of four Plaintiffs. Plaintiffs counsel also disputes the 24 hours Mr. Lanterman devoted to preparing for his 8 hour deposition. That preparation time seems excessive given that most billing disputes can be settled over an informal telephone conversation. Moreover, for Mr. Lanterman's deposition he charged a rate of $375/hour while his regular rate is $275/hour. While it is known that certain experts charge more for in court and deposition time because of the added stress and attentiveness required, this deposition was a simple billing explanation, and charging the higher amount seems inappropriate under the circumstances. Again as noted at the hearing it is impossible to resolve such disputes without giving Mr. Lanterman notice and an opportunity to be heard.

powers this Court vested in him in his unilateral and unauthorized modification of the "specific parameters" of the July 10, 2007, letter.

If there was a belief before or after the first screening run that there was some ambiguity in the meaning of screening for the names of identified company legal personnel, where those names were listed as a usual combined first and last name, defense counsel should have aired that with Plaintiffs' counsel. If agreement could not be reached, Plaintiffs' or Defendants' counsel could have raised the matter with the Court. Had the issue of screening separately for first names of the 14 attorneys been brought to the Court's attention, the initial interpretation and recommendation of Mr. Lanterman of using both names together would have been adopted, or if separation was to occur, the screening would be done using the last name only of the attorneys. Instead of this, defense counsel unilaterally and secretly resolved any ambiguity, if such exists, in his client's favor and against the advise of the forensic computer screening expert.[5] It appears

---

[5] At the hearing I noted that there was evidence that suggests the forensic expert might have used his experience to forestall many of the problems and subsequent expenses that arose. It would seem that a competent forensic expert with experience in computer screening of e-mails would, before running an expensive e-mail search and screen, have gotten clear marching orders on what is meant by "non-email data and documents," and whether e-mail histories, e-mail attachments, and nested e-mails in the Outlook e-mail system were to be screened or not. He might also have clarified his understanding of the name search if this was a common issue or problem in e-mail searching and stated his opinion on each of these subject areas. It was noted at the hearing that the Court cannot in fairness determine the portions of the added expenses that might have been avoided had Mr. Lanterman asked questions that he would reasonably be expected to foresee as being potential problems and pitfalls prior to undertaking so many and such expensive screenings. That is why it was noted that without giving Mr. Lanterman an opportunity to be heard, it was impossible to resolve the "billing dispute" portion of this controversy. That was the reason it was stated that all three sides – counsel for Plaintiffs and Defendants and Mr. Lanterman – contributed in part to the excessive expenses in completing this e-mail retrieval effort, and hopefully they can resolve it in some fashion with each bearing some of the cost. The initial court orders on this screening did not retain jurisdiction over billing disputes. Thus, absent agreement, they are not within the province of this Court to resolve. This current opinion and order determines only that defense counsel acted inappropriately in

that as a result of this all e-mails screened subsequent to the initial screening were corrupted as being under-inclusive. Thus, it is determined that it is not a reasonable expense to impose the costs of subsequent screening runs on Plaintiffs where the corruption was caused by the acts and omissions of defense counsel, and could have been avoided.

At his deposition, Mr. Lanterman estimated that 150,000 e-mails were produced to Plaintiffs, but could not estimate how many tens of thousands of e-mails were screened out or "missing" because of the modified exclusionary terms (Dkt. #497, Ex. B, Lanterman Dep. at 81, 88). During the deposition, Plaintiffs requested that Mr. Lanterman provide a letter identifying the number of e-mails that were screened as a result of Defendants' counsels' varying instructions to him. *Id*. at 88. At the February 11, 2008, hearing on this matter, Defendants had yet to provide Plaintiffs with the number of e-mails screened, and Plaintiffs' counsel indicated they would pursue the matter further with Mr. Lanterman. If this information can be obtained at reasonable expense, it may help determine what further searches the Plaintiffs may request Mr. Lanterman to perform.

### III.   ORDER TO SHOW CAUSE

It appears that Mr. Lanterman's Submittal 1 was the only screening conducted pursuant to the parties' agreed upon protocol and consistent with this Court's order. There is currently another motion to compel concerning waiver of attorney-client privilege that is still under advisement (Dkt. #491). Resolution of that motion may moot the following. If it does not, Defendants are **ORDERED** to show cause on or before February 29, 2008, why Defendants should

---

modifying the attorney name screening in a manner that over-excluded untold numbers of e-mail and corrupted the outcome of each screening after Submittal 1.

11

not surrender to Plaintiffs' counsel all e-mails gathered during Submittal 1. Plaintiffs may submit a response within 7 days of Defendants' submission.

**IV.    ORDER**

Until further order of the Court, or written stipulation of counsel, it is believed that any further contact of either attorney with Mr. Lanterman be done with notice to opposing counsel and with the an attorney for the other side available by phone as needed. This modifies the Court's earlier order and applies to counsel for Plaintiffs and Defendants.

It is **FURTHER ORDERED** that Defendants shall pay for the costs stemming from the second, third, and fifth submittals noted in Mr. Lanterman's October 3, 2007, amended invoice, i.e., $39, 431.22 (Dkt. #492, Ex. G).

The parties to this action may object to and seek review of this Order, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Any objections are required to specify the part of the Order to which the party objects and state the basis of the objection.

**SO ORDERED.**

Date: February 15, 2008                                         s/Steven D. Pepe
Ann Arbor, MI                                                   United States Magistrate Judge

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing *Opinion and Order* was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 15, 2008.

                                                s/ Alissa Greer
                                                Case Manager to Magistrate
                                                Judge Steven D. Pepe
                                                (734) 741-2298