UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

RYAN C. HENRY, individually and on behalf
of all other similarly situated employees,

                Plaintiffs,

v.

QUICKEN LOANS INC., a Michigan corporation, and
DANIEL B. GILBERT, personally and individually,

                Defendants.

Civil Action No.: 04-CV-40346

Honorable Paul V. Gadola

Magistrate Judge Steven D. Pepe

_____

Kathleen L. Bogas (P25164)
EISENBERG & BOGAS, P.C.
33 Bloomfield Hills Parkway, Ste. 145
Bloomfield Hills, MI 48304-2945
(248) 258-6080

Mayer Morganroth (P17966)
Jeffrey Morganroth (P41670)
Morganroth & Morganroth, P.C.
3000 Town Center, Ste. 1500
Southfield, Michigan 48075
(248) 355-3084

Donald H. Nichols, MN Bar No. 78918
Paul J. Lukas, MN Bar No. 22084X
Rachhana T. Srey, MN Bar No. 340133
NICHOLS KASTER & ANDERSON, PLLP
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 256-3200

Robert P. Davis
Robert C. Varnell
MAYER BROWN
1909 K Street, NW
Washington, DC 20006-1101
(202) 263-3000

Attorneys for Plaintiffs

Attorneys for Defendants

_____

**PLAINTIFFS' <u>AMENDED</u> RESPONSE TO DEFENDANTS' OBJECTIONS TO
MAGISTRATE PEPE'S FEBRUARY 15, 2008 ORDER**

_____

## ISSUES PRESENTED

Should the Court affirm Magistrate Judge Pepe's decision to shift costs to Defendants for their unilateral and unauthorized modification of the agreed upon email search protocol?

Plaintiffs' Answer:    Yes.

## <u>MOST CONTROLLING AUTHORITIES</u>

<u>Anton v. SBC Global Servs.</u>, 2007 WL 1500171 (E. D. Mich. May 22, 2007) ...........................12

<u>Lewis v. City of Detroit</u>, 2006 WL 1897660 (E. D. Mich. July 11, 2006)....................................14

<u>United States v. Mandycz,</u> 200 F.R.D. 353 (E. D. Mich. 2001) ....................................................12

<u>United States v. U.S. Gypsum Co.</u>, 333 U.S. 364 (1948) ..............................................................12

<u>United States v. Dakota</u>, 188 F.3d 663 (6th Cir. 1999) ................................................................12

<u>In Re Search Warrant Executed at Law Offices of Stephen Garea</u>, 1999 WL 137499 (6th Cir.

Mar. 5, 1999)..............................................................................................................................13

<u>Reed v. Baxter</u> 134 F.3d 351 (6th Cir. 1998)..............................................................................  13

<u>Hagaman v. Comm'r of Internal Rev.</u>, 958 F.2d 684 (6th Cir.1992) ...........................................13

<u>Amway Corp. v. The Proctor & Gamble Co.</u>, 2001 WL 1818698 (W.D. Mich. Apr. 3, 2001) ..132

<u>In Re Rospatch Securities Litig.</u>, 1991 WL 574963 (W. D. Mich. Mar. 14, 1991)................13, 14

## INTRODUCTION

On April 17, 2007, Magistrate Judge Steven D. Pepe devised a solution to protect the attorney-client privilege Defendants claimed existed in emails subject to Plaintiffs' discovery requests. After three years of waiting for these emails, Plaintiffs learned that the email search process they agreed to and ordered by Magistrate Judge Pepe was corrupted by Defendants' unilateral and unauthorized manipulation and expansion of the search protocol, which resulted in underinclusive data. Plaintiffs immediately filed a motion for relief, seeking to hold Defendants responsible for their improper conduct. Magistrate Judge Pepe granted Plaintiffs' motion and shifted the expert's unreasonable expenses to Defendants. In doing so, Magistrate Judge Pepe correctly determined that it would not be reasonable to charge Plaintiffs with expenses associated with email screenings that went beyond the scope of the parties' agreement and his orders.

Defendants' Objections to Magistrate Judge Pepe's February 15, 2008 Order granting Plaintiffs' Motion for Relief raise the same unsupported arguments previously rejected by Magistrate Judge Pepe. Magistrate Judge Pepe's Order is fully supported by the facts in the record and is based on sound reason. Defendants abused their agency relationship with the expert, and without Plaintiffs' knowledge or consent, modified the "specific parameters" of the agreed upon protocol. Under these circumstances, a finding shifting the expert's unreasonable expenses to Defendants is not contrary to law or clearly erroneous. As such, the Court should enter an order overruling Defendants' Objections to Magistrate Judge Pepe's decisions.

## SUMMARY OF RELEVANT FACTS

**A.      Plaintiffs' Email Request and Defendants' Motion for Protective Order.**

On February 8, 2005, Plaintiffs deposed Defendants' corporate representative who testified that Quicken Loans had undertaken an "exhaustive effort" to preserve emails since the

beginning of this case, at the direction of their counsel.  (Ex. A, Lundsford Dep. at 33.)  In addition to preserving its monthly backup tapes infinitely, Quicken Loans has a specific retention policy for emails.  (Id. at 34.)  The company takes month-end full snapshots of the entire email environment.  (Id. at 33.)  On February 10, 2005, Plaintiffs served written discovery requests seeking emails for all Plaintiffs and certain relevant managers' emails.  (See Dkt. #310 at Ex. D.)  In response to Plaintiffs' discovery requests, Defendants refused to produce the emails and claimed that they would need to rebuild mailboxes and conduct a manual privilege review, and that doing so would take more than 9,000 hours and approximately $1.1 million to accomplish.  (See Dkt. #310 at Ex. E.)  Plaintiffs were required to file a motion to compel.  (Dkt. #310).  Defendants opposed Plaintiffs' motion and responded with a motion for protective order seeking to limit their discovery obligations, again claiming undue burden and costs.  (Dkt. #328.)

Plaintiffs responded to Defendants' undue burden and expense arguments by offering their computer forensics expert, Mark Lanterman, who could retrieve emails from backup tapes without having to rebuild and restore mailboxes, significantly reducing Defendants' cost and time estimates.  (Id.)  At a January 17, 2007 hearing, the Court ordered Defendants to produce the 91,000 emails that they had retrieved two years earlier on their own accord, and ordered the parties to meet and confer regarding the costs and degree of difficulty of compiling a more extensive sample of emails and Plaintiffs' larger request.  (Dkt. #378 at 2.)  On January 29th, Defendants produced the 91,000 emails and a privilege log containing only 494 emails purporting to contain privileged communication.  (Dkt. #383 and Ex. B.)

The parties continued to meet and confer, and submitted status reports detailing their divergent positions on February 20, 2007.  (Dkt. ##383, 384.)  Despite the Court's contemplation of a second sample of emails, Defendants now contended that they should only have to produce

the 91,000 emails, again arguing undue burden and expense.  (Dkt. #384.)  Conversely, Plaintiffs proposed having their expert retrieve the emails from the backup tapes, using either a claw back or quick peek protocol for privilege review, and pared their discovery request down to ten time periods.  (Dkt. #383.)

Defense counsel later claimed that ten months worth of backup tapes would require pulling approximately 250 backup tapes because each monthly backup contained approximately 25 tapes.  (Ex. C.)  The parties submitted status reports on their progress on April 10, 2007. (Dkt. ##394, 395.)  Defendants' position remained unchanged and Plaintiffs again challenged Defendants' arguments by offering their expert and his proprietary software.  (Dkt. #394, 395.)

**B.     Magistrate Judge Pepe Crafted a Search Protocol at the April 17, 2007 Hearing.**

At an April 17, 2007 hearing, the Court resolved the electronic discovery issues by devising what seemed to be a workable solution.  (Dkt. ##396, 505-4.)  The next day, the Court issued an order, which was later modified on May 15th.  (Dkt. ##396, 398.)  Magistrate Judge Pepe ordered production of all of Defendants' system backup tapes which contain emails sent or received in one month—May 2004—to be provided to Plaintiffs' expert.  (Dkt. #396.)  Plaintiffs would be responsible for the **reasonable** expenses their expert incurred in retrieving the emails and he would work under defense counsel's direction to protect whatever attorney-client privileged information Defendants claimed existed in these emails.  (Dkt. #396 at 2; #505-4 at 17.)  The search and filtering of the email databases would be limited to the search terms agreed upon by the parties.  (Dkt. #398.)

There was no discussion at the hearing about screening for lawyers by separating their first and last names.  (Dkt. #505-4 at 54-55.)  Instead, Defendants first raised the issue of two "Richards"—one a lawyer and one a manager—to argue against producing one full month of

emails for all Plaintiffs and managers, and advocate instead for producing emails for only seven individuals chosen by Plaintiffs.  (Id. at 36-41.)[1]  Defendants claimed that because each of the 600 mailboxes for Plaintiffs and managers contained approximately 3,000 email messages per person, they would be required to review an "astronomic" number of emails (1.8 million) for privilege if the Court ordered one full month of emails.  (Id. at 38-41.)  Defendants were willing to concede that the seven additional Plaintiffs were representative of the group if the Court ordered production of these seven mailboxes rather than a full month for all Plaintiffs and managers.  (Id. at 39.)

Believing that a manual review was unnecessary, Plaintiffs' counsel responded by stating that both Richards have a last name and noted that it was obvious that Defendants did not want Plaintiffs to see a full month of emails.  (Id. at 37-38, 42.)  The Court rejected Defendants' proposal for seven additional Plaintiffs and determined that the email screening would include attorneys' names, and that doing so would lessen substantially the risk of waiver.  (Id. at 51.)  Defendants then raised the two Richards issue a second time but mentioned nothing about screening lawyers names based on separated first and last names.  Instead, defense counsel quickly turned to a discussion regarding Plaintiffs' inclusionary search terms.  (Id. at 55.)

Finally, during the hearing, Plaintiffs' counsel expressed concern about having to pay for unnecessary screening activity and not wanting to be in a situation where Defendant has *carte blanche* to do unnecessary screening procedures on Plaintiffs' dime.  (Id. at 60.)  Plaintiffs also requested that the Court have an opportunity to review the procedure if necessary.  (Id. at 53-54.)  Magistrate Pepe then summarized the search protocol as follows:

> So we can - we can do some screening by terms. Then we're going to do
> screening by names of lawyers.   And it may be that Mr. Davis will have some

---

[1] As Magistrate Judge Pepe correctly noted, there is no manager involved in this email screening process named "Richard."  (See Dkt. 504 at 4, fn 2; see also Dkt. #505-5 at Ex. 3.)

> other terms that he will agree with that you'll screen for purposes of privilege or I don't know if we're going to be able to screen for work product.  Now, Mr. Davis, I think that when we've done this we will be able to say to some Court in southern Missouri that has a discovery request, that you've waived privilege to some issue dealing with truth in lending that we took every feasible means to screen out attorney/client privileges before anything was turned over to the plaintiffs.  And then we have these other protocols for the call back or whatever.  And that the burden is on the requesting party to show the screening process wasn't adequate.

(Id. at 56-57.)

Magistrate Pepe issued an Order the next day.  The Order did not indicate that screening of lawyers' names was to be based on separated first and last names.  (See Dkt. #396.)  The order required Defendants to produce backup tapes for all emails sent or received in May 2004.  (Id.)  Two days later, Defendants claimed that May 2004 was an incomplete set and offered backup tapes from July 2004.  (Ex. D.)  Plaintiffs questioned the validity of Defendants' contention about May 2004, requested backup tapes from either April or June 2004 as an alternative, and reminded Defendants of their corporate representative's testimony asserting that Defendants maintained monthly backup tapes of their email server infinitely.  (Dkt. #507-22 - Srey Decl. ¶3.)  Because Defendants had previously represented that one month of backup tapes consisted of 25-30 tapes, the Court modified its April 18th Order and required Defendants to produce a copy of its system backup tapes that contain emails sent or received in April, May, and June 2004.  (Dkt. #398.)

**C.   Defendants Memorialized the Parties' Agreements in a July 10, 2007 Letter to the Expert.**

After the hearing, the parties met and conferred on several occasions regarding screening terms.  Defendants never proposed using first and last names of their legal team as separate exclusionary terms during any of these communications.  (Dkt. #492 – Srey Decl. ¶3; Ex. J ¶4.)  Defendants also never proposed screening attachments or nested emails for exclusionary terms.

(Ex. J ¶4.)  On May 11, 2007, Plaintiffs received Defendants' exclusionary terms and a list of lawyers' names.  (Ex. E.)  These lawyers' first and last names were listed side by side, not as separate exclusionary search terms.  (Id.)

Defendants drafted a letter to the expert dated July 10, 2007, providing him the "specific parameters" to follow for the email search and screen process.  (Dkt. #505-5.)  Defendants included Plaintiffs' inclusionary search terms and their exclusionary search terms as exhibits to the letter.  (Dkt. #505-5 at Exs. 4-6.)  Again, the names of Defendants' legal personnel were listed first and last name side by side.  (Dkt. #505-5 at Ex. 6.)  The letter did not state that Mr. Lanterman should screen for privilege using the first and last names as separate search terms.  (Dkt. #505-5.)  Nor, did the letter address whether attachments or nested emails should be screened against Defendants' exclusionary terms, regardless of the author or recipient.  (Id.)

Pursuant to the letter, Mr. Lanterman became Defendants' agent, working under defense counsel's direction and control.  (Id.)  The expert could not have any communications with Plaintiffs' counsel during the email search process.  (Id.)

**D.     Unknown to Plaintiffs, Defense Counsel Directed Mr. Lanterman to Conduct "Modified" Searches.**

On October 5, 2007, the same day Defendants filed their Motion for Summary Judgment on their good faith and lack of willfulness defenses (Dkt. #436), Plaintiffs received an invoice for the work the expert performed to retrieve the managers' and Plaintiffs' emails.  (Ex. F.)  The invoice contained "modified" searches and totaled over $91,000, which was later reduced to $79,965.01 due to inadvertent double billing.  (Dkt. #505-10.)[2]

Plaintiffs immediately provided defense counsel with the invoice and informed them of their intent to depose Mr. Lanterman regarding the invoice and the email search protocol he

_____

[2] Plaintiffs had already paid Mr. Lanterman's earlier invoice totaling $14,937.50 for copying the backup tapes and restoring the data to a usable format.  (Dkt. #505-7.)

followed under defense counsel's direction and control. (Ex. G.) Defendants attempted to prevent the deposition, seeking a protective order. (Dkt. #456.) Magistrate Pepe denied Defendants' motion and permitted Plaintiffs to depose the expert telephonically. (Dkt. #473.)

During his deposition, Mr. Lanterman revealed that defense counsel indeed instructed him to alter the email search process agreed upon by the parties and outlined in the July 10th letter. He testified that he initially followed the procedure described in the July 10 letter when he began working on the managers' emails. (Lanterman Dep. at 13, 58.) Accordingly, he treated the first and last names of legal personnel as compound exclusionary terms; that is, both the first and last names must have appeared in the email for the email to be screened out. (Id. at 13-14.) Mr. Lanterman produced the remaining managers emails to Defendants on August 17, 2007 (Submittal 1). Submittal 1 cost **$26,972.62**. (See Dkt. ##505-10; 497 at 5.)

On this same day, Plaintiffs specifically inquired about the status of the emails. (Ex. I.) Defendants did not respond. (Ex. J ¶3.) On August 21, 2007, apparently unsatisfied with Submittal 1, Defendants instructed Mr. Lanterman to use first and last names of legal personnel as separate exclusionary terms and to screen for attachments (Submittal 2). (Lanterman Dep. at 14; Ex. H.) Mr. Lanterman warned defense counsel that running first names as separate terms would "literally wipe out some people's [e]-mails.") (Id. at 14-16.) Defense counsel nonetheless instructed the expert to proceed with the modified exclusionary search. (Id.; Ex. H.) As a result of these modified exclusionary terms, all emails containing either the first or the last name of Defendants' legal personnel were screened out. (Lanterman Dep. at 17.) Submittal 2 cost **$11,751.37**. (Dkt. #505-10.)

On this same day that the new instruction was given, Defendants responded to Plaintiffs' counsel's email requesting an update on the emails. (Ex. K.) Defendants failed to mention any

issues relating to the search terms or attachments.  (Id.)  On or about August 29, 2007, defense counsel received Submittal 2 from the expert and was apparently unsatisfied with the emails contained in this Submittal 2.  (Dkt. #497.)  Therefore, Defendants' counsel instructed Mr. Lanterman to perform a third round of screening (Submittal 3).  (Dkt. #497 at 5-6.)  Submittal 3 was identical to the second round, except it also screened nested emails for the modified exclusionary terms.  (Lanterman Dep. at 31-32.)  Defendants never contacted Plaintiffs about any issues related to nested emails.  (Ex. J ¶4.)  Submittal 3 removed additional emails from production.  Submittal 3 cost approximately **$15,835.22**.  (Dkt. #505-10.)

When the expert moved on to the Plaintiffs' emails, defense counsel instructed him to screen these emails using the same protocol as Submittal 3; separated first and last names of lawyers, screened against emails, attachments, and nested emails.  (Lanterman Dep. at 20.)  As a result of the modified exclusionary screening, all emails from at least four Plaintiffs' inboxes were completely eliminated because they shared the same first name as four members of Defendants' legal team (Amy, Chris, Elizabeth, and Richard) (Submittal 4).  (Lanterman Dep. at 20.)  Submittal 4 cost **$12,535.22**.  (Dkt. #505-10.)

Realizing they had gone too far, defense counsel next instructed Mr. Lanterman to perform yet another round of screening (Submittal 5), this time without excluding the four shared first names, so they could repopulate these Plaintiffs' mailboxes.  (Lanterman Dep. at 20.)  This fifth round of screening cost **$11,171.91**.  (Dkt. #505-10.)  10,400 emails were repopulated into the mailboxes after just four names were removed from the exclusionary searches for these four Plaintiffs.  Of the 10,400 emails, Defendants' manual privilege review produced zero privileged emails.  (Dkt. #497 at 7.)[3]  Plaintiffs constantly communicated with Defendants about the emails

_____

[3] Even before Defendants conducted their manual review of these 10,400 emails, they correctly doubted any would be privileged.  (Ex. S.)

during this time period.  (Ex. L.)  Defendants never mentioned the modified searches, emptied mailboxes, repopulation, or manual privilege review.  (Id.; Ex. J ¶¶4-6.)

The expert testified that the screening process produced 150,000 emails, but he could not estimate how many emails were screened out because of the modifications to the screening process.  (Lanterman Dep. at 81, 88.)  Plaintiffs requested Mr. Lanterman to provide a letter identifying the number of emails screened when first and last names were separated.  (Id. at 88.)  Defendants had no objection.  (Id.)  Mr. Lanterman testified that it would take him some time but that he could easily obtain this number.  (Id.)

**E.     Plaintiffs Filed Two Motions Heard by Magistrate Judge Pepe on February 11, 2008.**

On December 17, 2007, Plaintiffs filed their Motion for Relief from Computer Forensics Expert's Invoice and Motion to Compel.  (Dkt. ##491, 492.)  The Motion to Compel argued that Defendants waived the attorney-client privilege when they filed their summary judgment motion on good faith defenses.  (See Dkt. #436)  As a result of this waiver, privileged screening was entirely unnecessary.  (See Dkt. #491.)

Plaintiffs' Motion for Relief sought to shift portions of the expert's invoice to Defendants because of their unilateral and unauthorized modification of the agreed upon protocol.  (Dkt. #492.)  Specifically, the motion sought payment for Submittals 2, 3, and 5.  (Id.)  At the time of filing their motion papers, Plaintiffs had not yet received from Mr. Lanterman the letter detailing the number of emails screened.  (Dkt. ##492, 501.)  Plaintiffs sought defense counsel's assistance for this letter on several occasions during the interim.  (Ex. M.)  Initially, defense counsel claimed that Mr. Lanterman had not gotten back to them about the letter and that they would follow-up with him.  (Ex. N.)  Defendants later contended that the work had not yet been

done and that Plaintiffs would need to agree to pay the expert's earlier invoices before he would

do the work.  (Ex. O.)

At the February 11, 2008 hearing, Magistrate Pepe specifically asked defense counsel

whether he knew the percentage of emails screened.  In response, defense counsel stated:

> Your Honor, I know that he went back after the deposition and started looking at
> the manager e-mails because that's what he ran, you know, the two different
> screens, the combined first and last names and the single first and last names, and
> I know we made significant progress on that.  What I also know is that when I
> asked Plaintiffs to just give me specific assurance that they will pay for the work
> that they asked him to do, they haven't done that.  Again, it's just another step in
> the process of them asking him to do additional work but then not saying they'd
> pay for it.

(Ex. P at 121.)   At the conclusion of the hearing, Magistrate Pepe noted Plaintiffs could

communicate directly with Mr. Lanterman about his invoices and number of emails screened.

(Id. at 135-138.)

## F.     Magistrate Pepe Granted Plaintiffs' Motion for Relief, Ordered Defendants to Show Cause, and Took the Motion to Compel Under Advisement.

On February 15, 2008, Magistrate Pepe issued an Order granting Plaintiffs' Motion for

Relief.  (Dkt. #504.)  In this Order, the Court specifically requested Defendants to show cause as

to why the Court should not order Defendants to surrender all emails gathered in Submittal 1 and

noted that the resolution of Plaintiffs' pending motion to compel may render this request moot.

(Dkt. #491.)  Magistrate Pepe concluded that Submittal 1 was the only submittal that followed

the "specific parameters" outlined the July 10, 2007 letter and consistent with this Court's order.

(Dkt. #504 at 11.)   Specifically, Magistrate Pepe concluded that defense counsel's actions

exceeded the scope of the "direction and control" powers vested by the Court, and that their

unilateral and unauthorized modification of the "specific parameters" of the July 10th letter,

resulted in a corrupted screening email screening process.  (Id. at 10.)  The Court determined that

10

it was not reasonable to impose the costs of these subsequent screenings on Plaintiffs, where the corruption was caused by the acts and omissions of defense counsel, and could have been avoided. (Id. at 11.) With respect to any "ambiguity" in the process, Magistrate Pepe stated:

> If there was a belief before or after the first screening run that there was some ambiguity in the meaning of screening for names of identified company personnel, where those names were listed as a usual combined first and last name, defense counsel should have aired that with Plaintiffs' counsel. If agreement could not be reached, Plaintiffs' and Defendants' counsel could have raised the matter with the Court. Had the issue of screening separately for first names of the 14 attorneys been brought to the Court's attention, the initial interpretation and recommendation of Mr. Lanterman of using both names together would have been adopted, or if separation was to occur, the screening would have been done using the last name only of the attorneys.

(Id. at 10.) Defense counsel instead chose to unilaterally and secretly resolve any ambiguity in their clients' favor. (Id.) Magistrate Judge Pepe acknowledged that Defendants had not yet provided to Plaintiffs the number of emails screened and that this number might be helpful to determine what further searches Plaintiffs may request of the expert. (Id. at 11.) Finally, Magistrate Judge Pepe modified his earlier order, and determined that both parties could only jointly communicate with the expert. (Id. at 12.)

Pursuant to Magistrate Pepe's Order, Defendants filed the present Objections and their Show Cause Response on February 29, 2008. (See Dkt. ##505, 506.)

## ARGUMENT

### A.    Standard of Review.

Under 28 U.S.C. § 636(b)(1)(A), nondispositive orders, such as Magistrate Judge Pepe's February 15, 2008 Order granting Plaintiffs' Motion for Relief, are reviewed under a "clearly erroneous or contrary to law" standard. Further, for non-dispositive pretrial matters, the Federal Rules of Civil Procedure 72(a) provide:

> A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

Here, Magistrate Judge Pepe's February 15, 2008 Order is not dispositive of the claim, and thus, this Court reviews the order to determine whether any portion of the order objected to by Defendants is "clearly erroneous" or "contrary to law."  See Anton v. SBC Global Servs., 2007 WL 1500171, at *1 (E. D. Mich. May 22, 2007).  According to the law of this Court, a finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. See id. (citing United States v. Mandycz, 200 F.R.D. 353, 356 (E. D. Mich. 2001) (Gadola, J.) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 398 (1948); Hagaman v. Comm'r of Internal Rev., 958 F.2d 684, 690 (6th Cir.1992)).  Magistrate Judge Pepe committed no error when he decided to shit a portion of the expert's expenses to Defendants.   Defendants' Objections should be overruled.

**B.      The Risk for Disclosure of Privileged Communication is Minimal.**

Defendants continue to claim that there is a high risk for disclosure of privileged communications.  It is now clear that such a claim is merely conjecture.

The burden of proving the attorney-client privilege rests with the party asserting it. United States v. Dakota, 188 F.3d 663, 667 (6th Cir. 1999).  The attorney-client privilege is an exception from the rule requiring full disclosure, and should be strictly confined within the narrowest possible limits consistent with logic and its principle.  See In Re Rospatch Securities Litig., 1991 WL 574963, at *5 (W. D. Mich. Mar. 14, 1991)  The elements of the attorney-client privilege are: 1) legal advice sought; 2) by a client from a professional legal adviser in his

capacity as such; 3) the communications relate to that purpose; and 4) the communications are made in confidence.  Reed v. Baxter, 134 F.3d 351, 355-56 (6th Cir. 1998).

Communications that reflect business advice rather than legal advice are not afforded the privilege protection.  See In Re Search Warrant Executed at Law Offices of Stephen Garea, 1999 WL 137499, at *1 (6th Cir. Mar. 5, 1999) (concluding that the privilege log was devoid of any document that would lead one to conclude that anything other than business advice was sought); Amway Corp. v. The Proctor & Gamble Co., 2001 WL 1818698, at * 5 (W.D. Mich. Apr. 3, 2001) (recognizing that merely including an in-house counsel as one of the many recipients of a business-related memorandum was not privileged communication).  The attorney-client privilege shields only communications made in confidence by the client to the attorney in connection with seeking or rendering legal advice.  See Amway, 2001 WL 1818698, at *5 (citing Reed, 134 F.3d at 355-56)).

The risk for disclosing privileged communications is minimal at best.  Of the 91,000 emails Defendants produced in January 2007, only 494 emails or less than 1% of the emails purportedly contained any privileged information.   (See Ex. B.)   When the four Plaintiffs mailboxes were recently repopulated with 10,400 emails, not a single one was privileged.  (Dkt. #504 at 8.)  The risk is further minimized by the fact that Plaintiffs have already seen many of these emails during their employment with Defendants.

Further, even if loan consultants or managers emailed questions to the legal department about various state and federal lending laws, it is difficult to imagine how these communications were made in confidence.  See Lewis v. City of Detroit, 2006 WL 1897660, at *2 (E. D. Mich. July 11, 2006) (finding attorney-client privilege inapplicable where there was no evidence that communications were made in confidence).  For example, on Defendants' earlier privilege log,

13

the emails related to state and federal lending laws generally reported changes to the state's regulations and processes in that state.  (See Ex. B at pgs. 41-42, 45, 47, 48, 63, 75, 90, 115, and 128.)  Most of these emails have multiple recipients on them and do not appear to be seeking "legal advice."   (Id.)   See In Re Rospatch Securities Litig., 1991 WL 574963, at *8 ("A communication is not privileged simply because it is made by or to a person who happens to be an attorney.")   Finally, Defendants have a distorted view of what is truly privileged as demonstrated by their previously designation of discovery as attorney-client privileged when it clearly is not.  (See Dkt. #482-6.)[4]

**C.    Magistrate Judge Pepe Properly Shifted the Expert's Unreasonable Costs to Defendants.**

But for Defendants' unilateral and unauthorized corruption of the email search process, Mr. Lanterman's expenses would have been reasonable.

**1.    The Expert Initially Followed the Specific Parameters Outlined in Defendants' July 10th Letter.**

Defendants claim that Magistrate Judge Pepe fundamentally and clearly erred in shifting the costs of Submittals 2 and 3 because he failed to recognize that these submittals were flawed because the expert did not screen the attachments and nested emails in Submittal 1.  (Dkt. #505 at 14-16.)  Magistrate Judge Pepe properly determined that Submittal 1 was the only screening conducted pursuant to the agreed upon protocol and consistent with his orders.

Defendants' arguments concerning nested emails and attachments are a transparent attempt to shift blame to the expert and distract the Court's attention from what really happened

---

[4] Dkt. #482-6 is a copy of as CD containing Defendants' "Call Clip Library" marked as attorney-client privileged.  Defendants' Call Clip Library contains recorded telephone calls between the loan consultants and prospective customers, frequently disseminated to loan consultants as "successful" examples of loan consultants following the steps of The Sale Process.  (See Dkt. #450.)  These call clips are clearly not attorney-client privileged.

with the email screening process.   Defendants were unsatisfied with the number of emails contained in Submittal 1 and directed the expert to re-run Submittal 1 twice to exclude more emails.  If the protocol Defendants followed was truly agreed upon, there would be no reason for Defendants to hide from Plaintiffs the fact that Mr. Lanterman had made a mistake and failed to screen the attachments and nested emails, and that he had used the wrong exclusionary search terms because he combined the first and last names of legal personnel.

Defendants never informed Plaintiffs of these subsequent screenings because they were not part of the agreement.   Because Submittal 1 is the product of Mr. Lanterman's strict adherence to actual search protocol agreed to by Plaintiffs as outlined in the July 10th letter, it cannot be fundamentally flawed.  The July 10 letter did not suggest screening emails using first and last names of Defendants' legal personnel as separate screening terms.  (Dkt. #505-5; Lanterman Dep. at 55-56.)   Nor did the letter suggest that attachments to emails and nested emails would be screened.  (Dkt. #505-5.)  Defense counsel was specifically warned by Mr. Lanterman about separating first and last names and chose to proceed in this manner despite his warnings.   During the process, even Defense counsel questioned whether proceeding with separated first and last names would "ultimately be the right call," but—without any discussion with Plaintiffs' counsel—instructed Mr. Lanterman to proceed anyway.  (<u>See</u> Ex. T.)  In an email exchange with the expert, defense counsel stated:

> You said that "Richard" was the first name of one of the plaintiffs, and so you did not exclude "Richard" in some or all cases.  As we discussed, **<u>as that may ultimately be the right call</u>**—you must inform us about any deviation from our agreed upon search and exclusion protocols, and get our sign off.

 (<u>Id.</u>) Defendants deprived Plaintiffs' counsel and this Court of any opportunity to comment or opine on whether separating lawyers' names or screening attachments and nested emails would be appropriate by concealing it from Plaintiffs' counsel.  Indeed, the concealment came on the

heels of repeated requests by Plaintiffs' counsel regarding the email search process. Yet, Defendants never made mention of any of changes to the search process as it was happening.

### 2. Separating First and Last Names Was an Afterthought to Eliminate Emails.

Absent any legitimate excuse, Defendants continue to claim that they were "directed to take every feasible means" to screen out attorney-client privileged communications. (Dkt. #505 at 17.) Defendants incorrectly believe that, at the April 17th hearing, Magistrate Judge Pepe gave them license to do whatever necessary to protect the privilege. Magistrate Pepe discussed and rejected this notion at the February 11th hearing and in his February 15th Order. (Dkt. #504, fn 2; Ex. P at 85-86.)

There was no discussion at the April 17th hearing about using separated first and last names as exclusionary terms. Neither the "terms nor spirit" of the hearing authorized screening for privileged communication on this basis. Instead, Defendants raised the two Richards issue as support for its arguments that Plaintiffs should only be afforded an additional seven Plaintiffs' emails not a full month for all 444 Plaintiffs and 160 managers. (Dkt. #505-4 at 37-41.) Later in the hearing, defense counsel raised the two Richards again and never completed his thought. (Dkt. #505-4 at 55.)

Defendants can simply offer no explanation as to why, if the April 17th hearing truly gave them authority to search by separated first and last names: (1) the parties never discussed separating first and last names during any of their meet and confers; (2) Defendants listed the first and last name of each legal personnel member side by side instead of as separate terms; (3) the July 10th letter did not mention anything about separating first and last names; (4) Defendants undertook a haphazard approach to repopulate the four Plaintiffs' emptied mailboxes once they learned that these mailboxes were completely wiped out by the over-expansive

exclusionary terms;[5] and (5) Defendants questioned whether separate terms would be ultimately the "right call," but continued with the process anyway.

Separating first and last names was not the agreed upon protocol. Simply put, Defendants instructed the expert to re-run Submittal 1 twice to remove more data.[6]

## **CONCLUSION**

Once the expert became Defendants' agent, they secretly defied this Court's direction and the parties' agreement, without consequence for their actions as Plaintiffs had agreed to pay the expert's reasonable expenses. Like Magistrate Judge Pepe, the Court should hold Defendants responsible for their improper conduct and overrule Defendants' attempt to escape responsibility.

Dated: 3/18/08                          NICHOLS KASTER & ANDERSON, PLLP

                                        s/Rachhana T. Srey
                                        Donald H. Nichols, MN Bar No. 79818
                                        Paul J. Lukas, MN Bar No. 22084X
                                        Rachhana T. Srey, MN Bar No. 340133
                                        4600 IDS Center, 80 South 8th Street
                                        Minneapolis, MN 55402
                                        Telephone (612) 338-1919
                                        Fax (612) 338-4878
                                        srey@nka.com

                                        ATTORNEYS FOR PLAINTIFFS

---

[5] Defense counsel was cautioned about the manner in which the four Plaintiffs' mailboxes were being repopulated. The expert specifically suggested that defense counsel consider providing alternative keywords to enable the expert to identify emails relevant to the four emptied Plaintiffs' mailboxes. (Ex. R.) As Plaintiffs noted in their Motion to Relief, a review of Amy Parker's repopulated mailbox, shows only one email with "Amy" on it. (Dkt. #492 at 9.)
[6] Defendants' brief remarkably claims that Submittals 2 and 3 "undeniably expanded the universe." (Dkt. #505 at 10.) This is logically untrue as separating first and last names as exclusionary terms doubled the number of exclusionary terms and removed far more emails than combined first and last names.

17

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2008, I electronically filed the foregoing motion with the Clerk of the Court using the ECF system, which will send notification of such filing to the following: Kathy L. Bogas, Charlotte Croson, Robert P. Davis, Paul J. Lukas, Jeffrey Morganroth, Mayer Morganroth, Donald H. Nichols, and Robert C. Varnell.

s/Rachhana T. Srey
4600 IDS Center
80 South 8th St.
Minneapolis, MN 55402
Phone: (612) 338-1919
Email: srey@nka.com
[Attorney Bar No. 340133]