# EXHIBIT P
# (Part One)

1              UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MICHIGAN
2                 SOUTHERN DIVISION

3   RYAN C. HENRY, KEVIN ANSARI,   .   Case No. 04-40346
    BRIAN BATDORFF, TIFFANIE BICE,.
4   CHRIS GOGOS, JENNIFER HABBO,   .
    DANIEL JENUWINE,               .
5   JENNIFER MAULL,                .
    JULIE MAZOROWICZ, CHRIS McCOY,.
6   MICHAEL McLEAN, KEVIN MIRACLE,.
    TERRY NUOTTILA, SCOTT PELLOW,  .
7   VICKI PELLOW, STEVEN PRATT,    .
    PETER RABBAN, JOSEPH SANTOS,   .
8   VERA SOBOLNITSKY,              .
    ANDREW TOCCO,                  .
9   KIMBERLY WILLIAMS, OWEN GADE,  .
    MARK SIMS, JEFFREY SMITH,      .
10  ROY KRAUTHAMER,                .
    FIRAS MOUKALLED,               .
11  ANTOINETTE WAS, AIMEE WELICKI,.
    ROSLYN DORFMAN, KATIE ENNES,   .
12  MICHAEL YOUNG, LISA MAROIS,    .
    STEVEN GUIDO, KRISTEN COFFEE,  .
13  DANIEL KOSTKA,                 .
                                   .
14          Plaintiffs,            .
                                   .
15             v.                  .   Ann Arbor, Michigan
                                   .   February 11, 2008
16  QUICKEN LOANS, INCORPORATED,   .
    a/k/a Rock Financial           .
17  Corporation,                   .
    DANIEL GILBERT,                .
18                                 .
            Defendants.            .   (Hon. Paul V. Gadola)
19  . . . . . . . . . . . . . . . .
                                   .
20  DENISA CHASTEEN,               .   Case No. 07-10558
    Individually and on Behalf of  .
21  All Other Similarly Situated   .
    Employees,                     .
                                   .
22                                 .
            Plaintiffs,            .
23                                 .
               v.                  .
24

25

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 3 of 71    2
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

```
 1   ROCK FINANCIAL, a Quicken         .
     Loans, Incorporated Company,      .
 2   DANIEL B. GILBERT,                .
     Personally and Individually,      .
 3
                 Defendants.           .
 4   .  .  .  .  .  .  .  .  .  .  .  .  .  .

 5                        MOTION HEARING
               BEFORE THE HONORABLE STEVEN D. PEPE
 6                UNITED STATES MAGISTRATE JUDGE

 7   APPEARANCES:

 8   For the Plaintiffs:          PAUL J. LUKAS
                                  RACHHANA T. SREY
 9                                DONALD H. NICHOLS
                                  NICHOLS KASTER & ANDERSON
10                                4600 IDS Center
                                  80 South 8th Street
11                                Minneapolis, MN   55402
                                  (612) 338-1919
12
     For Defendants Quicken &     ROBERT C. VARNELL
13   Gilbert:                     ROBERT P. DAVIS
                                  MAYER BROWN
14                                1909 K Street, N.W.
                                  Washington, DC   20006-1101
15                                (202) 263-3000

16   Court Recorder:             None present

17   NOT PRESENT:

18   Court Transcriber:          Karin Dains, CSMR/CER 4656
                                  28741 Santa Barbara Drive
19                                Lathrup Village, MI   48076
                                  (248) 569-9703

20

21

22   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
23

24

25
```

## TABLE OF CONTENTS

PROCEEDINGS - Monday, February 11, 2008

|  | PAGE |
|---|---|
| Motion re Chasteen Discovery by Mr. Davis | 5 |
| Response by Mr. Lukas | 19 |
| Continued Arguments by Mr. Davis | 23 |
| Response by Mr. Lukas | 26 |
| Plaintiffs' Motion to Compel by Mr. Lukas | 27 |
| Response by Mr. Varnell | 36 |
| Plaintiffs' Rebuttal by Mr. Lukas | 52 |
| Further Arguments of Parties | 55 |
| Taken Under Advisement | 81 |
| Plaintiffs' Motion for Relief by Mr. Lukas | 83 |
| Defendants' Response by Mr. Varnell | 97 |
| Further Arguments of Parties | 112 |

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 5 of 71          4
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          Ann Arbor, Michigan

2          Monday, February 11, 2008

3          Afternoon Session

4                    -        -        -

5     (Call to order of the court)

6          THE CLERK:  The Court calls Case 04-40346, Henry

7  versus Quicken Loans, and 07-10558, Chasteen versus

8  Rock Financial.

9          THE COURT:  Good afternoon.  I would ask the

10  attorneys for the parties to put their appearances on the

11  record, please.

12          MR. LUKAS:  Good afternoon, your Honor.  Paul Lukas

13  from Nichols, Kaster & Anderson.  Here with me is

14  Rachhana Srey, also from Nichols, Kaster & Anderson, and

15  Don Nichols from Nichols, Kaster & Anderson.  We are here on

16  behalf of the plaintiffs in both cases.

17          THE COURT:  Thank you, Mr. Lukas.

18          MR. VARNELL:  Good afternoon, your Honor.  Robert --

19  Robert Varnell with Mayer Brown on behalf of Defendants

20  Quicken Loans, Inc., and Daniel B. Gilbert.

21          I also have my colleague Robert Davis here.

22          MR. DAVIS:  Hello, your Honor.

23          THE COURT:  Mr. Davis.

24          I think that I would like to start with the Chasteen

25  dispute first with regard to the discovery.

Case 2:04-cv-40346-SJM-MJH  Document 512-19  Filed 03/18/08  Page 6 of 71      5
*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1    THE COURT:  Yes, Mr. Davis.

2    MR. DAVIS:  Your Honor, thank you.  Hopefully, this

3  will be clear enough for the -- for the transcription.

4    THE COURT:  Fine.

5    MR. DAVIS:  Great.  Thank you.

6    THE COURT:  You can remain seated if you are

7  comfortable remaining seated.

8    MR. DAVIS:  Well, your Honor, I'm so used to coming

9  to federal court and standing up --

10    THE COURT:  Okay.

11    MR. DAVIS:  -- I wouldn't know what to do sitting,

12  so that's --

13    THE COURT:  That's fine.

14    MR. DAVIS:  Your -- your Honor, we have moved to

15  compel on certain discovery matters.  Plaintiffs have what is

16  essentially a reciprocal motion for protective order.

17    Your Honor has been fairly thoroughly briefed on a

18  short turn-around.  I -- I've got perhaps maybe six or seven

19  minutes of short comments, if -- if I may make those.

20    Your Honor, as -- as the Court has recognized in

21  other opinions, there's a fundamental difference between a

22  collective action under the Fair Labor Standards Act under

23  29 U.S.C. 216(b) and a class action under Rule 23.

24    In a collective action, each person who joins the

25  case gets listed as a separate party and thus stands on their

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 7 of 71    6

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   own as a party. That is why the overwhelming majority of

2   courts -- and we've cited them in our brief -- have held that

3   individualized discovery lies in a Fair Labor Standards Act

4   collective action. For example, in the American -- for

5   example, in the Coldiron against Pizza Hut case, three hundred

6   and six plaintiffs, they were all required to respond to

7   discovery.

8           We've gone through the Royal and Sun Alliance case,

9   the Pratt & Whitney case. I won't take up the Court's time.

10  We -- we have briefed it, but there is a long line of cases

11  that hold that individualized discovery, both written

12  discovery and deposition, is really the rule in Fair Labor

13  Standards Act cases.

14          THE COURT: All right.

15          MR. DAVIS: Yes, your Honor.

16          THE COURT: Before we get into this, it seems that

17  it would be helpful to get in clear visibility what the

18  primary factual issues it seems that this Court will have to

19  resolve are in this case, and it seems to me that that is to

20  determine, with respect to the plaintiffs -- and I'll use that

21  term just in the plural at this time --

22          MR. DAVIS: Yes, sir.

23          THE COURT: -- what their job duties and tasks are

24  and how they perform them and, to some extent, the relative

25  proportion of time they might be doing things that would be

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 8 of 71    7
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1  called sales on the individual customers or individual sales

2  services.  Is that not basically what --

3           MR. DAVIS:  Absolutely, your Honor.  Matter of fact,

4  I think that there are a number of lines of inquiry that come

5  out of those questions.  For example, where did each plaintiff

6  get his or her leads for people to talk to about loans?  How

7  often did each plaintiff work out of the office in meeting

8  with potential clients or with referral sources, such as

9  builders, realtors, closing companies?

10          THE COURT:  And I take it that's exempt from the --

11          MR. DAVIS:  We clearly believe --

12          THE COURT:  -- or they are going to be exempt from

13  sales.

14          MR. DAVIS:  -- it is exempt, but it's -- it's -- if

15  you will, it's a different type of exempt activity than

16  sitting in the office and dealing with people over the

17  telephone.

18          How did those mixes change for these plaintiffs over

19  the two or three years of issue in -- in the case?

20          These plaintiffs collectively worked out of three

21  different offices.  Were there differences among those offices

22  in terms of what they were told to do and how they in fact did

23  their work?

24          Did each plaintiff use the company's technology the

25  same way?  Apparently some of these people would go off and

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 9 of 71     8

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   meet with clients and just take nothing fancier than a pad,

2   gather information.  Other people would put it directly into

3   the computer system.

4           How much time did each plaintiff claim that he or

5   she worked, and did that amount of time worked change for that

6   person over a two- or three-year period?

7           A couple of other brief examples:  If they had more

8   than one supervisor over the recovery period, what did that

9   supervisor say?  What were the expectations of the duties?

10          And finally, how did the actual nature of their work

11  change over the two- or three-year period, both due to market

12  conditions and changes in market conditions?

13          So, your Honor, very much -- you've absolutely

14  framed what the factual issue is, but we can really see it

15  quickly proceed, in terms of each individual, what their

16  actual claim is, what they say that their work actually was.

17          THE COURT:  What I find confusing is David Henry,

18  for instance, in the lack of willfulness assertions --

19          MR. DAVIS:  Right.

20          THE COURT:  -- seems -- now, this is obviously in

21  the -- in the Henry case in that that involves, I understand,

22  a different setting --

23          MR. DAVIS:  Right.

24          THE COURT:  -- and may therefore make substantially

25  different nature of proofs, but it's -- in that case, he seems

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 10 of 71     9
Henry, et al. v. Quicken Loans, et al
Chasteen, et al. v. Rock Financial, et al.

1    to suggest that in determining whether or not these persons

2    fell under the administrative exemption and fell within the

3    opinion letter that I assume that the trade association for

4    Quicken helped get written --

5              MR. DAVIS:  Hm-hmm.

6              THE COURT:  -- as they would properly be trying to

7    get done, that he characterizes these individuals as basically

8    doing the same job.

9              I also recall that there was an expert -- one -- or

10   -- or one question -- questionnaire that had about twenty-five

11   or thirty parts to it that is presently under a motion to

12   strike with respect to the Henry case, but in that, we got all

13   the persons in the survey indicating they did all of the same

14   functions, so it seems to me that in one case I'm getting a

15   defense perspective on two different issues, that these people

16   all basically do the same job, and this job should be, almost

17   as a matter of law, determined not to be covered by any

18   obligations for paying overtime --

19             MR. DAVIS:  Your Honor, I -- I -- I understand your

20   question.

21             THE COURT:  -- and now in this case --

22             MR. DAVIS:  I'm sorry.

23             THE COURT:  -- you're saying, "Oh, we've got to do

24   individual, Judge."  I -- I just don't understand do these

25   people or do they not basically do much the same work.

1      MR. DAVIS:  Your Honor, we think that they do

2  basically the same thing, that they contact their clients --

3  potential clients, they gather information from them, they

4  analyze that information, they evaluate it, they look at

5  various loan products that are available, they try to match up

6  those loan products of what best meets the needs of -- of each

7  client.  We think, at the end of the day, that this is -- is

8  -- is a very cohesive group.

9      Nevertheless, unlike the Henry case where you pretty

10  much had everybody working together on essentially a common

11  and uniform environment, i.e., a floor with -- with cubicles

12  and telephones, here you have people spending most of their

13  time in the office, some people spending a fair amount of time

14  out of the office.

15      Here's why we want to develop that inquiry, your

16  Honor.  You have an order on -- on the agreement, stipulation

17  of the parties, conditionally certifying this class.  Notice

18  has gone out and has been underway now for -- for over a week

19  -- a week and a half.  We have the opportunity under the cases

20  that this Court has -- has discussed in other contexts to come

21  back at the end of that process when discovery is done and be

22  able to say, "Your Honor, we move to decertify the -- the

23  class."  I'm not sure if we'll do that, your Honor.  What we

24  need to do is hear what these people say and see their

25  responses before we can -- before we can do that, and the case

Henry, et al., v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1  law is very specific in setting forth that process.

2        The end of the day, I'm going to guess that we're

3  going to say we have one group of people here doing

4  substantially the same thing, but until I hear what they have

5  to say, I can't -- I can't conclude that.

6        THE COURT:  The plaintiffs are saying, again in the

7  Henry case, but that at one time you had uncertainty as to

8  whether you were going to rely on advice of counsel and wanted

9  to do a privilege screen, and now they are contending you are

10  relying on advice of counsel, though there's some dispute on

11  that -- we'll get to that when we get --

12        MR. DAVIS:  Right.

13        THE COURT:  -- to that motion --

14        MR. DAVIS:  Right.

15        THE COURT:  -- but that the extraordinary gymnastics

16  we undertook to set up safeties for your client to protect

17  privilege, they are now contended are unnecessary because of a

18  fuller elaboration of -- of your defense strategy, which you

19  are entitled to do, but I am just -- if the plaintiffs are

20  willing to sort of live by what is the mean average, so to

21  speak, of this job as opposed to having to put every bloody

22  plaintiff and try each and every one of their job descriptions

23  to find out which may be the outliners that may do some

24  unusual kinds of things, maybe things they oughtn't even be

25  doing and probably might even be advised not to do and the

1   supervise realized he was squandering time and might be doing

2   something that was an inappropriate solicitation or other

3   things -- I -- you never know what you may find out on this --

4   and -- and I'm also, you know, concerned about whether these

5   cases are going to be manageable as a collective action.

6          I mean, if you do not have sort of this commonality

7   -- and again, I realize that the ability to seek to decertify

8   a conditional collective action later is a way of determining

9   when you have an inappropriate collective action, but

10  obviously the courts are hoping that when we have a collective

11  action, then you will have some of the efficiencies that are

12  not unlike a class action even though I do realize that there

13  are differences.

14         MR. DAVIS:  Well, your Honor, exactly that is where

15  the motion for decertification, if one is ever made in this

16  case, comes into play.

17         The cases that I have just described to you and that

18  we've briefed, most of them come up in the context of notice

19  having gone out, exactly where we are now -- paeople have said

20  -- raised their hand and have said, "I want to join the case"

21  -- and then looking hard at those people not only in the terms

22  of merits of the case but also are they, for purposes of

23  Section 16(b) in the Fair Labor Standards Act, similarly

24  situated.

25         THE COURT:  Okay.

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 14 of 71    13
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          MR. DAVIS:  If they are similarly situated, then all

2     of the efficiencies that -- that you contemplate will come

3     into place for dispositive motions and -- and trial.

4          THE COURT:  Isn't it anticipated -- and to put this

5     maybe roughly -- that the members of the collective class are

6     to be in office, primarily, mortgage brokers that have worked

7     in three offices here in Southeastern Michigan?

8          MR. DAVIS:  Your Honor, actually I think that that

9     is not necessarily the case over the three-year recovery

10    period for -- for each of these people.

11         Again, I'm totally uninformed about what these --

12         THE COURT:  Who -- who would not be included?

13         MR. DAVIS:  -- plaintiffs say.

14         For -- for example, I -- I think going back to late

15    2004, early 2005, I think there are some number of people who,

16    at least in the putative class -- let's see if -- if they sign

17    off -- who actually spent fair amounts of time outside the

18    office.  They would go off and meet with clients.  They would

19    go off and meet with referral services.  Because of changes in

20    market conditions, because of changes in technology, because

21    of the increasing use and products, frankly, of the company's

22    national advertising, you have people affirmatively calling

23    in.  he same person who may have gone out of the office in

24    early 2005 doesn't need to go out of the office anymore.

25    They're getting people who are calling in.  They have a

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 15 of 71    14
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    computer profile where they can start to enter the

2    information, so that's why we have this, if you will, change

3    in circumstances which --

4              THE COURT:  Let me ask this.

5              MR. DAVIS:  -- we did not have in the Henry case.

6              THE COURT:  If -- if one were to want to ultimately

7    determine whether it's worth the effort to try and decertify

8    the collective action, might it not be prudent to at least

9    start with a subset of the whole to determine whether there

10   are some in here that don't belong in here?  And if that's the

11   case, then one might infer from that that there are probably

12   others out there that don't belong, and that -- that would

13   then warrant maybe undertaking some further and additional

14   discovery, particularly even if -- assuming discovery has

15   started now, we've got sixty days before we know who all is

16   going to be in this class.  I mean, we're going to have to

17   sequence this discovery for any number of reasons just because

18   of the numbers of individuals involved, and if you get them

19   out to your definition of what amounts to a representative

20   sample, we're still going to have a healthy bunch of

21   individuals to take discovery from --

22             MR. DAVIS:  Correct.

23             THE COURT:  -- but would it not be prudent to start

24   off with trying to develop what would be a representative

25   class if we determine that will be sufficient and see if there

Case 2:04-cv-40346-SJM-MJH  Document 512-19  Filed 03/18/08  Page 16 of 71    15

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   is this sufficient amount of extraneous or outliners that

2   really don't meet the model of either what would qualify for

3   this exemption because of some unusual things they're doing or

4   maybe shouldn't be doing.

5        MR. DAVIS:  Your Honor, I think what the cases tell

6   us is to look at the context.  We have a number of cases where

7   essentially everybody shows up the same place every day and

8   does the same thing, the assembly line model, the call center

9   model.  I -- those cases essentially recognized that when

10  you've got a group of people together doing the same thing,

11  you don't necessarily need to look at everybody, or you can

12  look at a much smaller number of them.  Frankly, in those

13  situations, you rarely see motions for decertification.

14       However, when you have a highly variegated

15  population, particularly a population that changes over time,

16  the person is doing something different today than what they

17  were doing in early 2005 but, for example, it's very hard,

18  other that using some fairly powerful statistical techniques

19  to be comfortable that, if you will, a small group of people

20  really sheds much light on what the larger group is actually

21  doing.  That is why we have spent a fair amount of time in our

22  papers going through some statistical analysis to say that if

23  a statistical approach is used, one must use it very carefully

24  and really abide by those statistical imitations, particularly

25  when you have a population which is a relatively -- yeah --

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 17 of 71      16
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1  small sample. You're not polling all of the people of

2  Michigan.  You know, you're polling -- if you will, "polling"

3  in the statistical sense; we're pulling from -- I think our

4  notice went to seven hundred and roughly fifty people.  I

5  don't know how many people will come into this case, but we're

6  certainly talking about numbers that are much, much lower

7  than, if you will, the assembly line cases.

8          THE COURT:  Is there not a date now of 2004 or

9  whatever at which time, because the defendant did the

10  advertising to bring the customers -- that is, they were sort

11  of the rainmakers, more so than the individual employees being

12  able to get prospective customers -- and a time when, because

13  of the need to have access to computers to run these various

14  tests to see if they're suitable for this loan or that loan,

15  which are sort of office-based -- did there not come a time

16  when the major predominate traffic was through these offices,

17  not out in the field?

18          MR. DAVIS:  Your Honor, I think I can say that as to

19  the work force as a whole, but we're not looking at the

20  work force as a whole here.  We're looking at a self-selecting

21  group who are going to decide whether to join this case.

22          If we were litigating a 23(a), 23(b)(3) class

23  action, there would be a great debate over who's truly

24  representative of -- of the absent plaintiffs.  Here we have a

25  finite population who raise their hand and say, "I want to get

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 18 of 71    17
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    in the case."

2            THE COURT:  There would be that -- that we want to

3    find out who maybe doesn't belong in this group, and my bet is

4    the plaintiffs probably want to find out who doesn't belong in

5    this group for fear that you might somehow use them to try and

6    defeat those that they claim ought to go on the group list.

7            Again, what would be the harm of starting off with a

8    representative sample, and then possibly finding out who else

9    doesn't belong could then be done at least with written

10   discovery and wouldn't necessitate depositions once one has

11   refined exactly kind of what are the specific differences, and

12   how would one get an answer to whether this person did or

13   didn't do that by a written question format, and again, we're

14   not dealing with unsophisticated farmers that can't read.

15           MR. DAVIS:  Your Honor, two responses to that.

16   First of all, we -- we do not have -- and I understand exactly

17   the Court's inquiry, and I'm not trying to -- to be obdurate

18   about this; I'm trying to look carefully at what is -- is a

19   changing state of factual circumstances over the two or three

20   years at issue.

21           I assume that there's clearly a group, for example,

22   in 2006 that spent most, if not all, of their time in the

23   office, frankly working very much like the -- like the web

24   mortgage bankers that you've heard about in the Henry case.

25   These leads are being developed by other people.  They're

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 19 of 71     18
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   being sent to those -- to those mortgage bankers and

2   essentially dealing with those people over the Internet by

3   e-mail and by telephone, much as they do in -- in -- in Henry.

4   We could probably figure out who those people are.

5           Now comes -- now comes, if you will, the -- the --

6   the twist to it.  Those people may have -- some appreciable

7   number of them may have spent the first part of their working

8   time at the company spending more time out of the office,

9   calling on realtors, calling on developers, if you will,

10  marketing or promoting the Quicken Loans-slack-Rock Financial

11  name.  I have a very hard time, as -- as -- as a result, for

12  it saying -- well, I'm going to pick on Mr. Varnell here --

13  that -- that Mr. Varnell in his 2006 incarnation is

14  representative, but that doesn't bear on his claims back in,

15  you know, early -- early 2005.  That's why we think that if

16  there need to be limits put here, that using hypergeometric

17  distribution is -- and -- and well-established theories of

18  statistical selection is the best way to level through all of

19  those changes over the period.

20          We have a pool of people.  We pool them in a

21  statistically significant level, and we -- we will live and

22  have to live with the -- with the results, because it is a

23  finite set sampled without replacement, and that's who it is.

24          THE COURT:  Let me ask if -- you may not be finished

25  with your presentation, but on this point, why don't we ask

Case 2:04-cv-40346-SJM-MJH  Document 512-19  Filed 03/18/08  Page 20 of 71    19
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    Mr. Lukas to respond?

2           Did you file a reply brief -- if so, I didn't read

3    it -- to the issue of this -- their definition of what would

4    be a statistically significant number?

5           You did not.  Okay.  I thought I missed something,

6    and I was going to apologize if that's the case, but if not,

7    you have time now to answer, one, on this difference between

8    the Henry case that Mr. Davis has outlined and, secondly,

9    whether or not you believe there's a method to determine a

10   representative class short of deposing everybody in discovery

11   -- everybody with written discovery as well as depositions.

12          MR. LUKAS:  Thank you, your Honor.

13          You know, we struggled with this, actually, because

14   it was sort of -- our main concern is that discovery is a two-

15   way street, so to us it's, like, well, if it's everybody,

16   fine; then they can't come back and argue burdensomeness

17   because they have to produce documents and they have to answer

18   discovery that's specific to two hundred or two hundred and

19   fifty individuals.  That's our first concern, is that it's a

20   two-way street.

21          But we are constrained by what makes sense, and --

22   and I think it's that constraint that brought us to this -- to

23   the request for representative discovery.  We were tempted to

24   say, "Fine.  If it's a two-way street, we'll go one-on-one-on-

25   one-on-one-on-one."

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 21 of 71     20
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          In Henry, they could have taken as many depos as

2     they wanted.  There wasn't any kind of constraint on

3     representative of whatever.  In Henry, they took eight

4     depositions out of -- what? -- we have four hundred and

5     something plaintiffs.

6          So in a way, we're tempted to say, "Fine, you pick

7     your poison," in a way, but that's sort of cynical, too,

8     because it's not really looking at what makes sense, and what

9     we think makes sense is pretty obvious, and it seemed that --

10    in our previous conversations, that it seemed that the Court

11    thought that representative makes sense.

12         I think there's a really good quote in that <u>Caribou</u>

13    [ph. spelling] case that we cite.  It's from Minneapolis.

14    It's Judge Schiltz [ph. spelling], who's denying a decert'

15    motion on a FLSA **Caribou** case, and he says, you know, he finds

16    it hard to hear defendants argue about how they need to try

17    these cases one-by-one-by-one-by-one when they felt perfectly

18    comfortable classifying them all as exempt as a group, and

19    that's kind of where we're at here.  They -- they seem

20    perfectly comfortable waving a wand over this group and

21    saying, "You're exempt because you're outside salespeople,"

22    but then they come in here and talk about discovery, and

23    they're going to come in here maybe and talk about decert' and

24    say, "Well, we've got to go person-to-person-to-person-to-

25    person," and that doesn't make any sense.

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 22 of 71    21
*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1    I mean, I don't know a thing about a hypogeometric

2    distribution, but I do know that they're applying the wrong

3    standard to representative testimony in an FLSA case.  It's

4    not scientific certainty of any kind.  It's what makes sense.

5        We cited the cases.  There are plenty of cases that

6    talk about going through each individual plaintiff, having

7    them answer interrogatories, requests for production, and --

8    and on the other hand, Plaintiffs sending requests on an

9    individual basis, making them answer stuff on an individual

10   basis doesn't make sense, and there is no -- the -- the

11   standard isn't scientific certainty in discovery, and you're

12   absolutely right, we take a cross-section of some kind, of

13   somehow.  It's not rocket science.  It's not hypogeometric,

14   whatever.  We do something that makes sense.

15       THE COURT:  He cites a Federal Judicial Center

16   authority for it, so --

17       MR. LUKAS:  Well -- well, your Honor, the point is

18   it's what makes sense, and we can figure it out, and we have

19   eighty people -- eighty-some people signed up right now.

20       You know, I've got -- I've got to tell you, if you

21   sat through any of these depositions and you're a -- and

22   you're a judge, you'd be -- you'd be screaming "similarly

23   situated" after about five of these babies.

24       THE COURT:  One of the few benefits of being a judge

25   is not having to.  It's bad enough to read selected portions

1    of them.

2            MR. LUKAS:  I -- yeah, I hear you.

3            So, I mean, that's --

4            THE COURT:  That and reading SEC security

5    statements.  That was the another thing a lot of my classmates

6    have spent a lot of money earning a lot of money doing.

7            MR. LUKAS:  Yeah.  No, thanks.

8            But -- and, you know, we can -- we can figure out --

9    it -- it's not a scientific certainty and all.  We don't have

10   to be running a statistical analysis to figure out what a

11   representative sample is, and if -- if we run -- if we do the

12   discovery this way and we come to decertification and

13   Defendant actually wants to bring a decertification motion,

14   which in this case you're talking about three locations, you

15   know, we call that decert' motion sort of a, "Be careful what

16   you wish for," motion.  Does Defendant really want to try one

17   after another after another after another?  It's sort of

18   silly.

19            You know, those decert' cases are cases where you

20   have a thousand plaintiffs all across the country.  We've got

21   these people sitting right here, and even under a Rule 42

22   analysis, as far as consolidation or separation, the judge is

23   going to want to try these things together, so we just think

24   it makes sense -- they're talking about representative and

25   Henry over and over and over again.  This case isn't any

Case 2:04-cv-40346-SJM-MJH Document 512-19  Filed 03/18/08  Page 24 of 71    23
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    different.  They could have made the same arguments in Henry

2    they're making here, which is, "Well, if you really drill

3    down," you know, "these people were selling" -- you know,

4    "these people were selling less at different points in time,"

5    or whatever.  I mean, you could drill down as deep as you

6    want.

7              So I guess our number one goal is a two-way street.

8    And we want you to remember this:  If you grant their motion,

9    deny our motion, and we go marching ahead on a one-by-one-by-

10   one basis, within six months to a year from now when Defendant

11   is back here screaming about burdensomeness, I want you to

12   remember why we went down this road, because what's happening

13   to us and what happened to us in Henry is happening in this

14   case, is it's whatever we say, they want the opposite, and

15   it's this flip-flop thing, and I'm telling you what they're

16   asking for right here doesn't make a lot of sense.  We'll do

17   it.  It doesn't make a lot of sense, but we'll do it as long

18   as it's a two-way street, and if they're going to do

19   individual discovery, so are we, but that doesn't make sense,

20   and we can pick a representative sample very easily, and we

21   don't need scientists or doctors or experts to do it.

22              MR. DAVIS:  Your Honor, I --

23              THE COURT:  Mr. Davis.

24              MR. DAVIS:  -- we -- we hear a lot about how to pick

25   a representative sample.  I -- I do note that -- Mr. Lukas'

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1  statement of a moment ago, that they are prepared to proceed

2  under an individualized basis.  That may end this -- may end

3  this debate, at least between the parties.

4         But assuming that that's not exactly what he

5  intended, the point of the papers that we put in is that to

6  say "a representative sample" and to say nothing more doesn't

7  inform the Court.  Well, we have focused specifically on the

8  Smith against Lowes Home Center case, one of the cases that

9  they came forward and told the Court about.

10        THE COURT:  And that had fifteen hundred class --

11        MR. DAVIS:  It -- it -- it -- it did, and we went

12 back, and -- and the documents are very clear on -- on Pacer.

13 We had a very quick turnaround briefing schedule.  We can

14 supply those within twenty-four hours from this hearing if you

15 would like to see them, but Plaintiffs' counsel put in a

16 statistical expert and said, "All right, let's draw a

17 hypergeometric distribution.  Let's draw something at -- at --

18 at a ninety-five percent confidence level, and here's the

19 number."

20        Now, Judge King in that case concluded that that was

21 actually too plaintiff-friendly, that there should be more

22 depositions than -- than that.  The case ultimately was

23 transferred to another district and settled as part of a

24 global settlement with a whole series of cases.

25        Our proposal is -- if we cannot persuade the Court

1   or take Mr. Lukas' point to proceed solely on the basis of

2   individualized discovery, is to do exactly what Judge King did

3   in the Lowes Home Center case, which is have a sample drawn at

4   ninety-five -- have a sample drawn at ninety-five percent.

5   That's the number.  Those people are selected at random, and

6   those will be the people who will be deposed and will respond

7   to discovery.

8           We -- we would like to add to that we get to pick

9   ten extra people; they get to designate ten other people.  If

10  they have Quicken Loans documents and recordings, including

11  unauthenticated recordings, we'd like to know about those

12  before trial, but the core of -- of our proposal is exactly

13  congruent with -- with what Judge King did in the -- in the

14  Lowes Home Center case which Plaintiff argued to you.

15          THE COURT:  Mr. Lukas?

16          MR. LUKAS:  With a sample this small --

17          THE COURT:  I mean, the defendants are saying --

18          MR. LUKAS:  Sure.

19          THE COURT:  -- one, they've got precedent of where

20  this has worked; secondly, they have a secondary authority as

21  to the method of picking a reliable, statistically significant

22  sample that will have some competence level if the Court can

23  -- feels worth the -- is worth the candle, so to speak.

24          MR. LUKAS:  The two people to my right do know what

25  hypogeometric distribution is --

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          THE COURT:  Great.

2          MR. LUKAS:  -- and they tell me that a ninety-five

3    percent scientific certainty means a hundred and fifty-two out

4    of two hundred plaintiffs.  Then they're talking about adding

5    ten on each side.  That's a hundred and seventy-two people out

6    of two hundred plaintiffs.  What's the point?  Let's just do

7    the two hundred plaintiffs.  You know, I -- when you're

8    talking about scientific certainty applied to this small of a

9    group, it's a wash.  You -- you may as well just do the whole

10   group.

11         And they talk about "have to take depos" and all

12   that.  I'd be surprised if they --

13         THE COURT:  I think Mr. Davis says that if you're

14   accepting that as your option, that they will go with that,

15   and I take it they also realize that -- that you're going to

16   attack the minute they say this is burdensome with regard to

17   your discovery.

18         MR. LUKAS:  Well, what -- I mean -- I mean, what's

19   the point:  a hundred and fifty-two out of two hundred?

20   What's the point?  How is that -- how is that representative

21   of anything?  That's representative of a hundred and fifty-two

22   people.  Let's go the extra mile, go the extra forty-eight

23   folks or whatever it's going to be.

24         I mean, I guess, you know -- you know, that's -- you

25   know, we'll go -- we'll go person by person.  That's fine.

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 28 of 71    27
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    We'll go person by person.  They'll -- and we'll see how many

2    depos they actually take.  We'll see what they actually do.

3    We'll see what they actually answer.  We'll go person by

4    person if that's what they want to do.

5         THE COURT:  Mr. Davis?

6         MR. DAVIS:  Thank you, your Honor.  We will.

7         THE COURT:  Okay.  Is that going to resolve all the

8    issues, then, or are there other --

9         MR. LUKAS:  I believe that was it on Chasteen.

10        MR. DAVIS:  Your Honor, I believe that -- that --

11   that takes care of it.

12        THE COURT:  So we may now turn with greater

13   attention to David Carroll.

14        MR. LUKAS:  I'm going to remain seated if that's

15   okay, your Honor.

16        THE COURT:  Surely.

17        MR. LUKAS:  Do you prefer to hear the motion to

18   compel first?

19        THE COURT:  Yes.

20        MR. LUKAS:  Okay, your Honor.

21        As I'm sure your Honor is aware, what we're talking

22   about is willful and liquidated, and I want to talk briefly

23   about the impact that willful and liquidated has on a case.

24        Willful -- if the plaintiffs prevail on willful and

25   the plaintiffs receive the full doubling of liquidated

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 29 of 71    28
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    damages, you're talking about double or tripling the damages

2    in the case, okay?  And as your Honor also notes, the standard

3    for both of those, willful and liquidated, is a good faith and

4    -- basically, it's good faith and reasonableness, both

5    objective and subjective reasonableness.

6            We found in one of your cases in a patent case, the

7    KMU v. Bing Lear case, you've been down this road of privilege

8    waiver a lot further than we have.  In fact, I --

9            THE COURT:  Only in patent law.  I'm finding a lot

10   of my judicial colleagues around the country disagreed with

11   me.  At least they were -- or they were the primary authors, I

12   was happy to see:  Wayne Brazil [ph. spelling] --

13           MR. LUKAS:  But I think that line of cases is

14   instructive, your Honor, in that you can't -- I mean, they all

15   agree you can't manipulate the privilege to release only

16   favorable information.  I think we all -- I think they all

17   agree on that, and there's a -- and we cited the FLSA cases

18   that say the same thing, you can't, and -- and that's what we

19   have here, is the classic -- it's almost passe to say it --

20   the sword and shield, and that's not ground-breaking law or

21   new to anybody in the courtroom or probably anybody in a law

22   school.  You can't do it.

23           And let's talk -- and that's what they've done here,

24   and let's talk about the shield.

25           The shield is their assertion of the privilege

Case 2:04-cv-40346-SJM-MJH Document 512-13 Filed 03/18/08 Page 30 of 71    29

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   starting in September of 2004, three and a half years ago,

2   coming up on four years.  Interrogatory Number Six is a great

3   example.  His -- this is a direct quote, Defendants

4   responding, telling us why they're not going to answer our

5   requests regarding good faith and reasonableness, and they

6   say:

7           "Defendant sought and received attorney advice on

8           the classification of loan consultants, but it is

9           not prepared at this point to waive the attorney-

10          client privilege."

11      And they did the same thing in their document

12  requests.  They said, "We're not waiving privilege; we're not

13  giving you anything," and guess what, Judge?  Guess what they

14  gave us relating to classification decisions:  nothing, not

15  one document, not one Post-It note that has anything to do

16  with the classification decision.  For three and a half years,

17  as we sit here today, we don't have anything, and the reason

18  we don't is because they asserted the privilege and we

19  respected that.

20      Now, I know they come back and say somehow we should

21  have challenged it when they asserted the privilege, but

22  there's no challenge.  We respected their assertion of the

23  privilege, as we are required to do, and they have asserted

24  the privilege, and they gave us no documents.

25      Then we went through this whole process in the

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 31 of 71    30
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   summer of '07 with you, your Honor, with this e-mail

2   screening.  So not only do they not produce documents, they

3   went even further and tried to protect even more because

4   they're asserting the privilege, and they have consistently

5   asserted the privilege throughout.

6          They include Mr. Carroll on their list of legal

7   personnel in their legal department, his entire e-mail box

8   wiped out, any e-mail that has his name on it wiped out, and,

9   something we'll talk about in the next motion, any e-mail that

10  said "David" was wiped out.  We believe that screening process

11  prevented us from receiving more than ninety-five percent of

12  the e-mails.  We think it wasn't a screen; it was a full-blown

13  blockade.  We believe over ninety-five percent of the e-mails

14  were screened.

15         So they not only -- the shield here is not only

16  asserting the privilege and not producing documents, it's

17  making us go around and around, as we did with this e-mail,

18  screening David Carroll and every document that had anything

19  to do with anything, and that's the part that, frankly, has

20  got us a little excited.

21         Now let's talk about the sword.  So that's the

22  shield, and the irony of this -- of -- the irony of the timing

23  -- I don't know if the judge picked up on the timing, but we

24  received the ninety-four-thousand-dollar invoice or

25  ninety-one-thousand-dollar invoice from Mr. Lannerman [ph.

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 32 of 71      31

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    spelling] three days before they filed their summary judgment

2    motion basically waiving the privilege.  They filed their

3    motion for summary judgment on willful and liquidated, taking

4    the position that not -- there's such reasonableness here and

5    such good faith here, there's not even a genuine issue of

6    material fact, and then they say, "Ha-ha, Plaintiffs can't

7    show otherwise."  I think we can, but to the extent we can't,

8    maybe it's because they asserted the privilege, and we haven't

9    seen one document to support the claims they're now making.

10          Mr. Carroll puts in a very detailed declaration.  I

11   would call it more of a brief than a declaration, but it's

12   called a declaration, and he talks -- he describes four years

13   of analysis, consultation, communication regarding cases,

14   regulations, Department of Labor opinion letters, Mortgage

15   Bankers Association requests.  He flat out says four times in

16   the declaration he consulted with the legal department.  He

17   says he consulted with H.R.  He consulted -- the expert

18   report, which we also find ironic because they couldn't give

19   us a draft of the report, apparently he has one or had one at

20   some point -- they -- he talked to contacts in the industry.

21   He did all these things.

22          Supporting documents produced to Plaintiff in

23   discovery regarding this -- I think we were calling it a -- a

24   road map --

25          (Unintelligible dialogue, apparently between Court &

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 33 of 71    32

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1      clerk)

2          THE COURT:  Excuse me.  Go ahead.

3          MR. LUKAS:  But what documents do we have in support

4   of this road map?  None.  And the reason we have none is

5   because they asserted the privilege.

6          And here comes Mr. Carroll.  We don't have

7   documents.  We don't have any testimony challenging any of

8   this stuff either, and the reason we don't is Mr. Carroll and

9   Defendant is -- now it's a sword.  Now, "Ha-ha, Plaintiffs

10  can't prove otherwise; we -- we had good faith," and the

11  reason we can't is because they asserted the privilege.

12         Now, Defendants come back in their brief and they

13  say, "Well" -- it's kind of a "gotcha" argument -- they go,

14  "Oh, Plaintiffs misunderstood.  Mr. Carroll is a client, not a

15  lawyer."  He's a client, not a lawyer, so I guess the thought

16  is Plaintiffs' remedy is to bring a motion to compel, but it's

17  too late for that, so they assert the privilege for a non-

18  lawyer, apparently, and give us nothing.

19         Here's the problem with that argument.  His status

20  as a lawyer or a client makes no difference to the analysis,

21  and I'm sure your Honor is already on this, but I'm going to

22  explain why.  If he's a client -- if he's a client, then they

23  have no grounds for the privilege that they -- they invoked

24  back in 2004.  They have no grounds for withholding all the

25  documents supporting this road map, no grounds for it

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 34 of 71      33

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    whatsoever, and that's what they've done, withhold all that

2    stuff.

3              And with respect to --

4              THE COURT:  You mean putting his name as a screening

5    device.

6              MR. LUKAS:  Exactly.  Well, that's one thing, and --

7    that's one thing.  That's the e-mail.  That's just the e-mail.

8    All the other documents, summaries, communications with the

9    NBA, the DOL, and so on, all that stuff, we didn't get any of

10   that stuff.  So if he's a client, they have no basis for not

11   giving us any of that stuff.  They have no basis for the

12   privilege that they cited.  If he's a lawyer, they've now

13   waived it by that lawyer putting in that dec', so either --

14   you call them what you want.  It's a red herring.  It doesn't

15   matter if he's a client or a lawyer.  They -- they still -- if

16   he's a client, they had no basis to withhold the stuff, and

17   he's a client who in the dec' says he consulted with Legal,

18   which is a waiver; and if he's a lawyer, he's obviously waived

19   it.  There's no argument.  That's why they argue he's a

20   client, because if he's a lawyer, he's obviously waived it by

21   putting in this dec'.

22             And this is -- you know, this is, especially after

23   that e-mail stuff, and I know we went around and around on

24   that, the part that -- that really fried us when we read that

25   summary judgment motion because they wait for discovery to --

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 35 of 71   34
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    they assert a privilege that rides through the entire

2    discovery period; they let it pass.

3         We go even further with the screening of the

4    e-mails, all this hullabaloo, ninety-some thousand bucks to

5    screen, and then they bring a motion for summary judgment

6    waiving the same privilege that they used as a shield, and

7    that's exactly what happened here, and that's why we brought

8    the motion, and that's why we're asking for all documents

9    related to this road map, to this declaration, and if you read

10   his declaration, you can almost go line by line, and they're

11   all communications with all of these people, all of these

12   places, all these things he claims he's done.  We get that,

13   e-mail or non-e-mail both.

14        That would include his e-mail box -- David Carroll's

15   e-mail box, which was completely wiped out by putting him on

16   the list of lawyers in the legal department when we did this

17   whole e-mail system.  That's one thing we're asking for.

18        We're asking that we get -- that they assume the

19   cost of that screening, and this kind of goes over to the

20   other motion, but this is more inclusive than the other

21   motion.  The other motion is only asking for them to pay

22   pieces.  In this motion, we're saying, because they waived

23   the privilege and they used the privilege as a shield and ran

24   us through the paces that they ran us through, they should

25   have to pay for that.

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 36 of 71    35
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1      When Mr. Lannerman billed us for the conversion to

2  put this stuff in a readable format -- it was, like, fifteen

3  thousand bucks or whatever -- we immediately paid that

4  invoice, and we -- and -- and we have no problem paying that

5  invoice, but everything else that happened after that was for

6  screening for privilege when they turned around and waived

7  most of it a couple days later.  That's the really frustrating

8  part.

9      But we should get David Carroll's e-mail box.  We

10 think we should get all the screened e-mails.  We think we

11 should get additional month of e-mail, which the Court and us

12 had talked about previously.  We want August of 2004, we want

13 it at Defendant's expense, and we want no screening.

14      All of these things --

15      THE COURT:  Why has that other month been held off

16 until now, because that -- I thought that was always

17 available.

18      MR. LUKAS:  Well, I don't know if it --

19      THE COURT:  It's on a showing that it was -- you

20 know, that you were getting --

21      MR. LUKAS:  No.  You're right.  That -- that --

22 that's -- we brought it into this motion because we had talked

23 about it before.  When we're talking about the e-mail, we

24 bring it up.  It's not necessarily related to this motion, but

25 we want that.

1   But what -- what is related to this motion is

2   there's no screening on that group, and there's -- and they

3   pay for the production of that -- of that month as -- as a

4   sanction for what they've done here, and I think it's --

5   that's our position, your Honor.

6   David Carroll, lawyer, or David Carroll, client, we

7   were run through paces we shouldn't have been run through, and

8   now we get documents and now we get e-mails that were withheld

9   from us throughout the litigation.

10   THE COURT:  Mr. Varnell?

11   MR. VARNELL:  Thank you, your Honor.

12   Let me make a couple intro' points.  One, I think

13   Plaintiffs' motion to compel is all over the map.  In a lot of

14   ways, it's a rehash of the opposition brief that -- that they

15   filed last fall in response to our summary judgment motion on

16   -- on good faith and -- and lack of willfulness.

17   In other ways, as Mr. Lukas points out, it sort of

18   bleeds over into the -- the other pending motion they have to

19   transfer Mr. Lannerman's costs.  But either way you look at

20   it, their motion is both procedurally and substantively

21   deficient.

22   I'd like to at least point out the -- the procedural

23   problem here, and -- and we do address it in our brief, and

24   that's that this motion that they filed just -- I don't know

25   -- a month ago is in a sense in sum and substance a surreply

1   to the summary judgment motion on -- on good faith and lack of

2   willfulness that we filed all the way back in the -- in the

3   fall.

4          When you look at this brief, they're not even shy

5   about it.  Pages eight through ten cite directly to our reply

6   brief filed back in November in support of our summary

7   judgment brief.  They cite directly to it numerous times.

8   They answer that head on.  In a sense, it's the fourth

9   installment, and as I'm sure the -- the -- the Court knows.

10  Local Rule 7.1 looks disfavorably upon surreplies unless

11  there's -- there's some showing of good cause.  They -- they

12  didn't file a motion asking to do this, and they may say,

13  well, that this -- this motion is -- is bound up in -- in this

14  other issue that they've got floating out there about Mr. --

15  Mr. Lannerman and the e-mails, but the bottom line is several

16  pages of this brief are devoted to answering our reply brief

17  back in the fall, and I think that -- that should mean

18  something, that it should count for something, and I respect

19  the fact that --

20          THE COURT:  Okay.

21          MR. VARNELL:  -- you're in charge --

22          THE COURT:  But we've also got --

23          MR. VARNELL:  -- you're in charge of the procedure.

24          THE COURT:  We've also got Rule 56(f), and they're

25  claiming that they're entitled now to the additional discovery

1   to meet your summary judgment motion because these documents

2   were withheld under an argument that they respected because

3   they thought it was being asserted in good faith that they

4   contend now has been basically eviscerated.

5           MR. VARNELL:  I -- I understand that point, your

6   Honor, and I respect it.  I just -- I point out the -- the

7   procedural problem here because I think it -- it does go

8   directly to what -- what Rule 7.1 is all about, and I'll --

9   I'll leave it at that.

10          THE COURT:  Okay.

11          MR. VARNELL:  But if -- if I could, I'd like to --

12  to turn to the -- to the merits.

13          THE COURT:  Turn -- turn to the more complicated

14  issue of the merits of the use of an attorney to be the

15  ultimate repository of decision-making authority for a

16  corporation to be able to maybe have your cake and eat it,

17  too, with regard to attorney-client privilege, and if this

18  transfers into the patent solution, you may have a solution to

19  the conundrum I was addressing in my -- in my <u>Bing Lear</u> case.

20          MR. VARNELL:  I won't -- I won't have any -- I won't

21  have any claim to -- to solving that case for your Honor, but

22  one thing I can tell you.  The --

23          THE COURT:  At least you know to say so you've

24  waived attorney-client privilege with respect to your

25  communications with your client because the -- a right in

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 40 of 71   39

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   light of advice of counsel is being asserted, but is advice of

2   counsel being asserted?

3        MR. VARNELL:   The -- the -- the consultations that

4   David Carroll had in regards to how to classify mortgage

5   bankers were -- were privileged, and he has not asserted any

6   confidential communications, and he did not, in filing that

7   declaration or in being deposed back in February of 2005, do

8   that within the role of -- of a lawyer for Quicken Loans.

9        The law is clear and we cite authority that a lawyer

10  can be a client, that a lawyer can essentially wear two hats.

11  I draw the Court's attention to a couple of cases, Meade [ph.

12  spelling] Data Central v. U.S. Department of Air Force and In

13  re Grand Jury Proceedings, that make that clear, that a --

14  that a lawyer can also be a client, and it's clear in this

15  regard that David Carroll is -- he was never -- he was never

16  giving the advice of an attorney; he was -- he was receiving

17  the legal advice.   He was -- he was acting as the client.   He

18  was also acting as the decision-maker, and all the sworn

19  testimony in this case makes that clear, and I'd like to -- to

20  bring a couple of cites to the Court's attention.

21        His deposition which Mr. Lukas took of David Carroll

22  three years ago, all the way -- almost three years ago to the

23  day, as a matter of fact, your Honor, back in February of 2005

24  -- on page sixty-three of that deposition Mr. Carroll, in

25  direct response to -- to a question asked by Mr. Lukas, said:

1    "Richard Chyette" [ph. spelling] -- and he's the corporate

2    counsel for Quicken Loans --

3              "would advise me of various happenings in the law."

4              Later on in that deposition at page one-oh-three

5    Mr. Carroll testified:

6              "I would consult with him,"

7    meaning Richard Chyette, his lawyer, the corporate counsel for

8    Quicken Loans.

9              THE COURT:   That's C-h-y-e-t-t-e?

10             MR. VARNELL:   C-h-y-e-t-t-e, your Honor, correct.

11             "I would consult with him,"

12   meaning Mr. -- Mr. Chyette --

13             "and he'd continually provide me updates on the law,

14             but ultimately I made the decision."

15             Again, at deposition sworn testimony, Mr. Lukas

16   asking those questions, Mr. Carroll made clear that he -- he

17   was not the lawyer giving that advice; he was turning to

18   Mr. Chyette, his lawyer, and getting that advice from him so

19   that he could make an informed decision on how to -- how to

20   classify mortgage bankers and -- and, when he would return to

21   that issue about whether or not bankers are -- were classified

22   properly, he would -- he would consult with his attorney in

23   doing so.

24             Also, the -- the sworn declaration that -- that

25   Mr. Carroll submitted in -- back in the fall, that also makes

Case 2:04-cv-40346-SJM-MJH  Document 512-19  Filed 03/18/08  Page 42 of 71    41
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    clear that he was the decision-maker and not the advising

2    lawyer, and again I just -- a few cites for -- for the Court's

3    attention.  Paragraph twelve, Mr. Carroll says:

4           "It was my decision to maintain the classification."

5           At paragraph fifteen, he says:

6           "I led the company's evaluation."

7           And again, at paragraph twenty-four, he says:

8           "I determined in good faith that Quicken Loans'

9           mortgage banker satisfied the exemption."

10          Again, all the sworn testimony in this case, whether

11   it was deposition or -- or declaration, makes clear that --

12   that Mr. Carroll was -- was -- was the client in this

13   relationship, he would turn to Mr. Chyette for -- for legal

14   advice and legal counsel, and he was the decision-maker on how

15   to -- how to -- what -- what decision to come to in terms of

16   how to -- how to classify mortgage bankers.

17          And, your Honor, if I could talk for a minute,

18   leaving -- leaving the issue of whether or not the -- the --

19   the conversations were -- were privileged and what -- what

20   role Mr. Carroll had in that -- that relationship with

21   Mr. Chyette, I think it's clear that there's been no waiver.

22   David Carroll never explicitly waived -- waived the privilege.

23   As the client, again, as I'm sure the Court knows, he holds

24   the privilege and he didn't explicitly waive it.

25          THE COURT:  Well, in the spring when we were talking

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 43 of 71          42

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    about screening, that -- and again, I was somewhat amazed that

2    the plaintiffs were willing to do it, but in order to move

3    forward, they were willing to make a number of concessions,

4    and I understood there . . . [unintelligible; voice fades] . .

5    . make practical concessions in order to get access to the

6    e-mails at that time, but then I felt that the -- one of the

7    things we were going to screen for and they weren't going to

8    squawk is if any attorney got cc'd, we'd assume that was for

9    -- for legal advice from that attorney, and Carroll was put on

10   that list, and that would have implied to me that he was an

11   attorney that gave legal advice and therefore we were going to

12   screen him out entirely, empty his mailbox, basically.  Why is

13   it that he should not have been -- been at least an individual

14   which you were actually reading all his correspondence to

15   determine whether this was his as ultimate repository of

16   decision-making authority on whether these people were

17   properly categorized and -- and therefore exempt from

18   overtime, that -- that it might have been his stuff wasn't

19   being read as to whether this actually was privileged, the

20   communication with Chyette or other legal advice, or whether

21   it was something that was not privileged, such as his getting

22   information from H.R. as to exactly what these job functions

23   were, so that they might have at least gotten all of that, and

24   they might have found some information that suggested that

25   there was more telephone sales activities than was being

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 05/18/08 Page 44 of 71    43
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    otherwise represented or something else of that sort?

2           MR. VARNELL:  I think I can answer that.

3           THE COURT:  I mean, I think that's what the

4    plaintiffs are complaining about, is you -- you got the

5    advantage of tossing all of his e-mails as if he were one of

6    these attorneys that we're going -- "No questions asked; you

7    can just completely block us from them; we're not going to try

8    to screen as to, you know, whether someone was copied that --

9    that wasn't -- didn't -- didn't need to get this for the

10   giving or implementation of legal advice or this was just

11   copying him for information purposes and had nothing to do

12   with any legal inquiry" --

13          MR. VARNELL:  Let me --

14          THE COURT:  -- because that was a very, very

15   generous protection for everyone who got put in that category,

16   and I was assuming that people who were getting put in that

17   category were attorneys giving legal advice.

18          MR. VARNELL:  And, your Honor, I -- I can address

19   that point directly, and again it goes back to a point that I

20   at least touched on, which is that Mr. Carroll at the company

21   wears two hats at times, and that's not something we've been

22   cute about, and that's not something that we've been indirect

23   about.

24          At pages five and six of his deposition taken,

25   again, back in February 2005, up front, pages five and six, he

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 45 of 71    44
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    testified that some of his duties are -- are legal in nature,

2    and some are non-legal.  He noted that he's involved in -- in

3    the drafting and review of loan documents.  He also said that

4    he's involved in mortgage-related documents and issues.  He

5    also pointed out and informed Mr. Lukas that he's the overseer

6    of the company's client relations -- relations team, and with

7    that -- and within that regard, he's -- he's in charge of

8    providing advice and -- and strategy as to how to handle

9    customer complaints.  If -- if customer lawsuits are

10   originated, he's involved in handling those and strategizing

11   how to defend against those.

12         If there are complaints that come in from the Better

13   Business Bureau or from state regulatory agencies -- again,

14   and his role is overseeing the client relations -- relations

15   team -- he gives advice and strategy as to how to handle those

16   kinds of regulatory actions.

17         He was up front about that.  He -- he -- he let

18   Plaintiffs' counsel know that -- that at times he does act

19   like a lawyer, and you're exactly right, Lawyer -- your Honor,

20   the -- the -- the deal that was struck over e-mails was

21   generous, but it was also clear and it was -- it was well

22   defined that we were going to put all lawyers within the

23   company or lawyers that the company relies upon on that list,

24   and for those reasons, David Carroll was put on that list, and

25   there was -- there was direct discussion at -- at the hearing

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 46 of 71    45
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    back on April 17th that it was going to be an automated

2    process, that we weren't then going to do a -- a manual or an

3    in camera review of -- of David Carroll's e-mails.

4              To use Mr. Lukas' memorable phrase, all e-mails

5    containing -- containing an attorney's name would go,

6    quote/unquote, right in the dumper, and so we put

7    David Carroll's name on that list.

8              THE COURT:  But that way they had no idea that this

9    was the individual that was going play this dual role.  I

10   mean, I guess his deposition had been taken, but it was taken

11   as a corporate representative, wasn't it?

12             MR. VARNELL:  No, it was not.

13             THE COURT:  It was not taken --

14             MR. LUKAS:  Yes, it was.  It was a 30(b)(6).

15             THE COURT:  I thought it was a --

16             MR. VARNELL:  Jay -- Jay Farner was put forward as

17   our 30(b)(6) witness.

18             MR. LUKAS:  He was part -- he was part 30(b)(6),

19   too.

20             THE COURT:  Okay.  I got that from a submission of

21   the plaintiffs' attorneys, but --

22             MR. VARNELL:  But it --

23             THE COURT:  -- how is it they should have known he

24   was going to play this -- this dual role, in which case they

25   clearly would have said, "Okay, if -- if he does attorney-

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 47 of 71       46
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   client privilege for certain things, fine, you -- you can

2   screen those, but at least with respect to Carroll's e-mail

3   box, you're going to have to do a visual lawyer screening old-

4   fashioned, flat-world way.  You can't just -- we're -- we're

5   not going to give you the benefit of the doubt like with all

6   the other attorneys to him, because if he is the ultimate

7   decision-maker on this issue and they are claiming he made his

8   decision in good faith and his -- if there was a violation, it

9   wasn't willful, we are at least entitled to all communications

10  that Carroll had with anybody that was not a lawyer, that --

11  that was factored into his decision-making basis," because

12  none of those are privileged.

13        MR. VARNELL:  Your Honor, if I -- if I could, this

14  probably would be the appropriate time to -- if I can approach

15  the bench, I've got a couple of exhibits that I'd like to

16  share with the Court which I think go to this -- this exact

17  issue.

18        THE COURT:  Okay.

19        MR. VARNELL:  Again, your Honor, David --

20  David Carroll was clear at his deposition about what his

21  roles, both non and -- legal and non-legal, were at the

22  company.  We struck the agreement as to e-mails.  We -- couple

23  -- couple points on -- on the protocol, one more obvious than

24  the other.

25        We shared the list of -- of those individuals back

Case 2:04-cv-40346-SJM-MJFF Document 512-19 Filed 03/18/08 Page 48 of 71     47
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   on July 14th with -- or, excuse me, July 10th with Plaintiffs'

2   counsel as to who was going to be included on that list.  They

3   saw David Carroll's name there, and they raised no issue to

4   that whatsoever.

5          One -- one other point, and it sort of goes to the

6   -- the issue of the remedies that Mr. Lukas is seeking.  He

7   says that we need to essentially reconstruct David Carroll's

8   e-mail box and include that and that because he was -- his

9   e-mail box was screened out entirely -- David -- David Carroll

10  wasn't -- wasn't even on the -- the manager's list in terms of

11  those -- those managers that -- that we put e-mail boxes

12  together for working for Mr. Lannerman, so that's just

13  something that I think needs to be cleared up for the record.

14         But in any event, your Honor --

15         THE COURT:  So there was never even an initial

16  screen to try and find his e-mail --

17         MR. VARNELL:  That -- that's correct.

18         THE COURT:  -- what e-mail was in and out of his

19  box.

20         MR. VARNELL:  That -- that's correct.  I'm looking

21  at what is Exhibit Three to July 10th letter, and that lists

22  the -- the QL leaders, and David Carroll is not on that list,

23  your Honor.

24         THE COURT:  It's Exhibit Three to what?

25         MR. VARNELL:  It -- it's the July 10th letter that

1   we sent to Mr. Lannerman to get him started.

2            THE COURT:  Where is that in what I have, if you

3   know?

4            MR. VARNELL:  If you look at our opposition brief to

5   -- to the Lannerman motion, your Honor, that would be

6   Exhibit C is one place where it can be found, your Honor.

7            MR. LUKAS:  It's also Plaintiffs' Three, if that

8   helps you, Judge -- Plaintiffs' Exhibit Three.

9            THE COURT:  Okay.  And it was -- what request number

10  was it -- request for production number?

11           MR. VARNELL:  Yes, your Honor.  The -- the -- the

12  notion that we haven't -- are you referring to B?

13           THE COURT:  No.  You -- yeah -- you were referring

14  to me where Carroll was not listed.

15           MR. LUKAS:  He's talking about a list.

16           THE COURT:  Of managers.

17           MR. LUKAS:  That's Plaintiffs' Exhibit Three.  It's

18  the list of managers whose mailboxes we did search.  That's --

19  that's it.  This is what you're talking about, isn't it, now?

20           THE COURT:  To your motion to compel?

21           MS. SREY:  It's actually Plaintiff's Exhibit Five,

22  but --

23           MR. LUKAS:  Oh, is it?

24           MS. SREY:  -- if you want to bring it --

25           THE COURT:  Plaintiff's Exhibit Number Five.

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 50 of 71          49

Henry, et al. v. Quicken Loans, et al
Chasteen, et al. v. Rock Financial, et al.

1              MS. SREY:  Yes.

2              THE COURT:  Oh, it's only off by two.

3              MR. VARNELL:  Sorry, your Honor.  There's a --

4    there's a lot of paper here.

5              THE COURT:  Okay.  Thank you very much.

6              MR. LUKAS:  Here.  This is it.  This will be Five.

7              THE COURT:  I mean, I -- okay.

8              MR. LUKAS:  Ignore the "Exhibit Three" on the back

9    because I guess that's wrong.

10             THE COURT:  Anyway, I now have it.

11             MR. VARNELL:  Okay.  Well, I just wanted -- that's a

12   point for the record, your Honor.  That's no --

13   David Carroll's e-mail box was not one that we ever -- ever

14   constructed.

15             But, your Honor, I want to -- I -- I guess I want to

16   return to the more fundamental point, which is that we have

17   declared and maintained the -- the privilege of -- of

18   David Carroll's privileged communications all along, and for

19   Mr. Lukas to sit here and say that we haven't produced any

20   responsive or even non-privilege documents, that -- that's

21   just incorrect, and one thing that -- and this goes to the

22   exhibits that I -- that I have just presented to the Court,

23   your Honor -- one month after taking Mr. Carroll's deposition,

24   Plaintiffs served us with new discovery, and they were aware

25   of the fact that they could -- you know, they had the

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 51 of 71    50
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   opportunity to take follow-up discovery related to what came

2   out at Mr. Carroll's deposition, and they in fact did that,

3   your Honor, and if the Court turns to Request Number Thirty-

4   Five, you'll see that they asked for:

5           "all documents relating to Defendant's lobbying

6           efforts for changes to the Fair Labor Standards Act

7           or the corresponding regulations as described in

8           part by David Carroll in his deposition,"

9   and, your Honor, we -- we did in fact submit or produce our --

10  our responsive, non-privileged documents in response to this

11  -- this request. We haven't been playing games.

12          There's -- there's dozens of documents here, and

13  they're the -- the correspondence between David Carroll and --

14  and third parties that don't fall within the privilege.

15  There's -- there's correspondence here between David Carroll

16  and the Mortgage Bankers Association. There's correspondence

17  involving the Chamber of Commerce. There's correspondence

18  that he sent to various government officials, including

19  John Conyers from -- from Detroit and -- and Candace Miller as

20  well.

21          So we have, in fact, your Honor, produced the -- the

22  responsive, non-privileged documents that -- that fall outside

23  the privilege and that essentially answered or complied with

24  -- with Plaintiffs' follow-up discovery requests.

25          Also, your Honor, if you turn to Request Numbers

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 52 of 71    51
*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1  Forty and Forty-One, that's where Plaintiffs asked for various

2  e-mails.  Forty asks for e-mails from Plaintiff; Forty-One

3  asks for e-mails from essentially the defendants that they're

4  asking for.  They ask for e-mails from managers, and they also

5  specifically mention Jay Farner, but they -- they -- they

6  don't specific David Carroll, and that's again why he wasn't

7  included on the -- the list of managers who we were putting

8  e-mail boxes together for.

9           I guess, your Honor, if -- you know, one other

10 point.  I've already, I guess, in a sense touched upon it.  We

11 don't think there was a -- a waiver of privilege.  We -- we --

12 we asserted the privilege at the beginning of this litigation.

13 We've continued to -- to maintain it.  We've produced

14 documents that fall outside the privilege, but, your Honor,

15 even -- and this, again, just assuming for -- for argument

16 purposes -- if there was a waiver, Mr. Lukas is focusing on

17 this -- this declaration that we provided.  Nothing new came

18 out of that declaration.

19          Again, Mr. Carroll was deposed back in February

20 2005, and the information that he provided there was the same

21 information that he provided in his declaration.  He -- he

22 identified himself as the decision-maker when it came to how

23 to classify mortgage bankers.  He acknowledged that he

24 consulted with his counsel, with Richard Chyette, the same way

25 that he did in his declaration, without ever getting into the

1  content of that discussion.  He -- he never did that at his

2  declaration, but he -- he made clear at his deposition that he

3  talked with Richard Chyette.  He also described the steps that

4  he took in his -- his decision-making process.

5          They can't claim surprise about that declaration.

6  They had a chance to sit down for several hours with -- with

7  Mr. Carroll, and they asked him questions about what he did as

8  the -- as the decision-maker, and once that deposition

9  concluded, they followed up with -- with this discovery,

10  asking him about his lobbying efforts.  That's what they were

11  interested in.  They -- they knew they had that right, and

12  they -- they exercised that right, but they can't now come

13  back three years later and basically take another run at this

14  and say, you know, "We have a right to -- to pursue additional

15  discovery there.

16          The issue of -- of waiver is valid, and whether they

17  point to Rule 56(f) or Rule 37, both of those rules make clear

18  that timeliness is -- is a factor and it's something that has

19  to be reserved or -- or recognized.

20          THE COURT:  Mr. Lukas?

21          MR. LUKAS:  Mr. Carroll was produced as a 30(b)(6)

22  witness.  It's on page five of his deposition.  I showed him

23  the 30(b)(6) notice, asked him if he was prepared to answer

24  questions on that topic, informed --

25          THE COURT:  What was the topic?  What was --

Case 2:04-cv-40346-SJM-MJH  Document 512-19  Filed 03/18/08  Page 54 of 71       53

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          MR. LUKAS:  It was -- it was Exhibit One.  I don't

2    think we gave you that, but it's job duties, who made the

3    decision, all those things.  It's like a twelve-point thing.

4          He was a 30(b)(6) witness, and throughout that

5    deposition, whenever asked about who made the decision, it was

6    he and Mr. Chyette, he and Mr. Chyette, he and Mr. Chyette,

7    and this is after they've asserted the privilege in their

8    discovery responses, and I did not invade that privilege.

9          They talk about lobbying efforts and -- and whatnot.

10   They still today -- and -- and I want to make sure this is

11   clear; it sounds like -- I -- I realize our emphasis on the

12   e-mails may be misleading you.  They have produced no

13   documents, no summaries, no letters, no memos, no analysis, no

14   NBA documents, no DOL documents, or e-mails that have anything

15   to do with the classification decision.  They have asserted

16   the privilege as to the classification decision.  That's what

17   they asserted the privilege on, and now they're turning around

18   and saying we know -- we knew we could have asked for it.

19         We did ask for it, and they asserted the privilege,

20   and that's what we cited in our brief.  Where we specifically

21   asked for the decision-making, they asserted a privilege, and

22   we've respected that privilege, and now we're being told we

23   shouldn't have, we should have somehow known they were going

24   to do this.

25         The other thing that's important that I -- that's

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 55 of 71       54

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   the other --

2            THE COURT:  Wait a minute.

3            MR. LUKAS:  -- that's one point I wanted to make.

4   It's everything they withheld.

5            THE COURT:  I thought -- I thought they produced

6   Carroll as the person who made the decision as to the

7   classification.

8            MR. LUKAS:  He said he and Mr. Chyette made the

9   decision.  When you read the depo', he says over and over

10  again that Mr. Chyette made the decision.

11           THE COURT:  Okay.  I want to get to that in a

12  moment.

13           But assuming that -- during that deposition, were

14  there questions as to whether he consulted with counsel --

15  other counsel?

16           MR. LUKAS:  Your Honor, there's a part in this

17  deposition where they instruct him not to answer, because I

18  ask him about a conversation he had with Mr. Chyette.  On page

19  ninety-one, we're talking about their decision to -- to bring

20  an ethics charge against Nichols, Kaster & Anderson.  I'm

21  asking him about that, and Mr. Perry says -- I say:

22           "Prior to bringing ethics charges, what did

23           Mr. Chyette tell you about Mr. Jared had to say"

24           [sic]?"

25           "MR. PERRY:  Objection.  Attorney-client

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 56 of 71   55
*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1          privilege.  We'll stipulate that there were

2          conversations, but the substance of those

3          conversations are subject to the privilege."

4          They asserted the privilege during the depo',

5    instructing him not to answer, with conversations regarding

6    Mr. Chyette.

7          THE COURT:  Okay.  Mr. Varnell, how is it that he at

8    his deposition was not saying, "I made the decision alone,"

9    but, "I made the decision in conjunction with Mr. Chyette,"

10   and it's clear that Mr. Chyette is playing the role of counsel

11   for those places.  Apparently there was an objection to it.

12   Why is it that he is not basically saying that, "I did it

13   based on the advice of Counsel Chyette because we made the

14   decision jointly"?  Why is that not similar to waiver, to --

15   to saying, "I'm basing my decision in part on advice of

16   counsel that this was legal"?

17          Now, my bet is there's nothing that you're going to

18   discover when you get to the bottom of this, if you get to the

19   bottom of this, from Chyette that's going to be any different

20   than -- than in the declaration from Carroll, but that's --

21   that's a -- a question to be answered, not a premise from

22   which we should begin.

23          MR. VARNELL:  Your Honor, at his deposition, David

24   -- David Carroll made clear that he was the decision-maker --

25   again, pages sixty-three and page one-oh-three -- and he -- he

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 57 of 71        56

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   did testify that he talked with his -- his counsel, with his

2   lawyer Mr. Chyette, but, your Honor, talking with -- talking

3   with his counsel, receiving advice from counsel and

4   acknowledging the fact that he received advice from counsel,

5   that doesn't cross the threshold into what the content of that

6   -- that advice was, and he makes clear that it was one

7   component of the overall decision-making process that -- that

8   he went through.

9          He -- he acknowledged the fact that he -- he looked

10   at the statute, that he looked at the regs, that -- that he

11   was aware of the Conseco case of various department opinion

12   letters.  He makes clear that that was -- that he -- that he

13   underwent a -- a comprehensive examination of -- of-- of -- of

14   the issue at hand.

15          But, your Honor, he also went out of his way to say

16   that those were -- were informal conversations that he had

17   with -- with Mr. Chyette.  He -- he talks about the fact that

18   they've got a long working relationship, and they did talk but

19   it was -- it was informal.  He -- he said that there were

20   memos generated, that -- that kind of thing.

21          THE COURT:  Okay.  Okay.  That may justify why

22   there's no documentation of it, but it doesn't change it from

23   whether or not he is saying, "I made the decision based upon

24   the advice of counsel," and could the advice of counsel not

25   been [sic] either whether or not the practice at the

1    defendant's organization was or -- was or was not congruent

2    with the premises set out in Paul DeCamp's [ph. spelling]

3    opinion letter?

4            MR. VARNELL:  He did acknowledge, your Honor, that

5    he -- that he talked with -- with counsel, that they had had

6    discussions about the issue in terms of how to -- how to

7    classify mortgage bankers and whether or not they were -- they

8    were classified properly, but does that entitle Plaintiffs to

9    David Carroll's files, the -- the full extent of them?  I

10   would respectfully submit it doesn't, your Honor.

11           He's produced the -- the responsive, non-privileged

12   documents that he has.  That's what's included in File Number

13   Thirty-Five that I presented to the Court.  The remainder of

14   those documents are between Mr. Carroll and Mr. Chyette as --

15   as the lawyer and the client, and again, because they were

16   informal discussions that he had, there aren't extensive files

17   that he has available to produce, that he's -- he's produced

18   what he has -- has that's -- that's responsive and non-

19   privileged, and again, bottom line is -- and he made this

20   clear in his -- his sworn testimony both at deposition and in

21   his declaration -- he was the decision-maker.  He makes that

22   clear at the -- the very end of his deposition on page one-oh-

23   three.

24           THE COURT:  If -- if an individual who's not an

25   attorney that works at a corporation is facing an issue of

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 59 of 71    58

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   willfulness and wishes to show good faith and lack of

2   willfulness that there's been a violation and he says, "I made

3   the decision based upon a number of factors, but I made the

4   decision in conjunction with discussions with counsel," and

5   then he states all the reasons for why the decision ought to

6   be accepted as valid, basically, brief as the declaration of

7   David Carroll basically is -- I'm not saying it's false; I'm

8   not saying it's not what he -- the calculus that he said, but

9   it -- but it looks like a legal brief, and he says, "I made

10  this decision based in part on the advice of counsel to show

11  that I acted in good faith and did due diligence," why is that

12  not the same as saying, "I acted on advice of counsel," and

13  that long declaration just had the signature of Chyette who --

14  or any outside counsel on it when that is the -- at least the

15  purported justification that he in good faith relied upon?

16          MR. VARNELL:  I guess the --

17          THE COURT:  And then when we take this officer and

18  turn him into an attorney also, it even gets more confusing.

19          MR. VARNELL:  Your Honor, I guess the -- the sort of

20  -- the -- the quick or the -- the straightforward answer is

21  there's -- there's a big difference between disclosing the --

22  the content of those communications and just acknowledging the

23  fact that he -- that he talked to his lawyer as -- as part of

24  the decision that -- that he reached, and both the cases cited

25  by Plaintiffs and Defendants -- the In re Lot [ph. spelling]

Case 2:04-cv-40346-SJM-MJH  Document 512-19  Filed 03/18/08  Page 60 of 71      59
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    case and the Ross [ph. spelling] v. City of Memphis case --

2    those are Sixth Circuit decisions that say for there to be

3    implicit waiver -- leaving aside whether you explicitly make

4    the decision to -- to waive those communications, but for

5    there to be implicit waiver, you've got to place the content

6    of those conversations with your lawyer at issue, or you've

7    got to disclose the -- the communication itself, and the --

8    the cases that -- that we cite and -- and Plaintiffs cite

9    again, In re Lot and Ross v. City of Memphis, make that clear.

10   That's -- that's what David Carroll's declaration did.

11          THE COURT:  I have not and will read those cases,

12   but let me -- let me pose a hypothetical to you.  Assuming,

13   which I think was this case, that you say in a declaration,

14   "These are the reasons why I think that these employees

15   qualify for the exemption, and I made this decision -- I was

16   the decision-maker.  I made this decision talking to people in

17   Human Resources, based upon lots of communications I had with

18   other people about what the mortgage bankers and the telephone

19   banks did, and I also talked to and relied upon advice of

20   counsel."  Is that not an implication that what I have said in

21   my declaration, that I received no information from counsel,

22   is inconsistent with that?  Is that not an inference?

23          This is in the nature of half-truths and fraud law,

24   that when one makes a statement, there is an implicit,

25   unstated statement included in every statement that you know

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 61 of 71    60
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   nothing of a material nature that's inconsistent with the

2   assertion you make and -- and that if that turns out not to be

3   true -- that is, if there's been a mental reservation or a --

4   selective ignorance on -- on certain information that you're

5   disclosing, that that's treated as active fraud, why is that

6   when a person says, "This is my reason why I think these jobs

7   are exempt, and I made this in conjunction with an attorney,

8   among other things," these are not implications that the

9   attorney said nothing inconsistent with what's in my

10  declaration?

11          MR. VARNELL:  Your Honor, I would -- I would --

12          THE COURT:  And therefore, if that is what -- what

13  that ordinarily would imply -- otherwise why mention you also

14  relied on advice of counsel --

15          MR. VARNELL:  The --

16          THE COURT:  -- because you can rely and disregard

17  the advice of counsel is not the implication that that

18  wouldn't help you with making an assertion in good faith, but

19  why is that not the equivalent, as I say, of having the

20  attorney ratify what's in that declaration and that's the

21  advice of counsel, and why isn't that a waiver?

22          MR. VARNELL:  Your Honor, I would say that the --

23  the declaration that -- that David Carroll submitted was to

24  explain the various steps that he took.  He had to apply the

25  law as he understood it, and the point of his declaration was

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 62 of 71    61
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    to show that he arrived as a decision-maker at -- at his

2    decision on how to classify mortgage bankers in a measured

3    way, and --

4              THE COURT:  He wanted to show and he wanted to get

5    the advantage as part of his due diligence that he had relied

6    on advice of counsel.

7              MR. VARNELL:  That -- that's correct, your Honor.

8    He did -- he did show in his declaration that he -- that he

9    talked to his attorneys as part of the decision-making

10   process, and I -- I would respectfully submit that that was

11   the -- the smart, reasonable thing to do.  These are

12   complicated issues, and he turned to his lawyers to get their

13   input, just as he looked at the -- the regulations and -- and

14   the opinion law and talked to other -- or the opinion letters

15   and talked to other people within -- within the industry.

16             But again, the purpose of the declaration was to

17   show what his -- his decision-making process was, and that's

18   really what is at the heart of the -- the recklessly

19   disregarded or -- or lack of willfulness question.  It's not

20   whether or not he arrived at the right legal conclusion.  It's

21   -- it's did he take steps sufficient to inform himself of what

22   the exempt status decision should have been, and he did do

23   that, and his -- his declaration just makes that clear from a

24   factual standpoint, the steps that he took.

25             THE COURT:  And the case law you cite says that they

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 63 of 71   62

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   actually have to refer to the specific content of the

2   communications lawyer before there's an actual waiver and

3   identified as such, because I'm assuming that there's nothing

4   that -- assuming again as an untested premise, because his --

5   his declaration is so thorough -- that I'm assuming that

6   anything he told him was in that declaration -- that was

7   helpful.

8           MR. VARNELL:  He did -- he did go through a -- a --

9   a thorough examination, your Honor.  He -- he -- he makes that

10  clear in his declaration.  He also makes that clear at his

11  deposition.  He says that he had ongoing and continuous

12  communications with his counsel.  He says they were informal.

13  They weren't generating memos back and forth, but they've got

14  a close working relationship, and they talked to each other

15  about those issues all the time.

16          And again, he made that -- that point crystal clear

17  to Mr. Lukas and -- and Plaintiffs' counsel all the way back

18  in February 2005.  The declaration doesn't shed any new light

19  on that.  Mr. Lukas even asked Mr. Carroll if he looked at

20  various cases like the Conseco opinion or even the John --

21  John Alden case.  He had -- he had those discussions with him.

22  There's nothing -- nothing new in terms of what efforts

23  Mr. Carroll came -- that came to light out of his declaration

24  that -- that came -- that hadn't come to light three years

25  ago.

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 64 of 71   63
*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1      THE COURT:  I take it, Counsel, you did not screen

2  any of Carroll's, and I take it you didn't screen Chyette's

3  either as far as the screening process, because Chyette's also

4  would have been just -- he was not also on this list, was he?

5      MR. VARNELL:  He wasn't on the list of --

6      THE COURT:  He wouldn't be because he --

7      MR. VARNELL:  -- of managers, but he --

8      THE COURT:  -- clearly general counsel --

9      MR. VARNELL:  -- he was on the list of fourteen

10  lawyers that were screened.

11      THE COURT:  Lawyers, so --

12      MR. VARNELL:  Correct.

13      THE COURT:  -- so basically they were all screened

14  out, so there's been no -- no review of it.

15      MR. LUKAS:  Had we had this declaration, he

16  certainly would have been one of the people's e-mails we would

17  have been going through.  That's the point, your Honor.  I

18  think you hit it on the head.  You said everything that was

19  helpful to Mr. Carroll you -- from the lawyers you assume is

20  in the declaration.  We get to know that there's something

21  there that wasn't helpful for the declaration.  That's the

22  whole point.

23      And this whole argument that he's not a lawyer when

24  he makes his -- he's a lawyer for some reasons at Quicken but

25  not others, and when he's making the decision as to how to

1    classify these people under the legal standard of the

2    FLSA, after reading this dec' with legal conclusion upon legal

3    conclusion, you're to believe he's not a lawyer at that point?

4    It just strains credibility, everything that's helpful.

5            And if he's not, okay, let's -- again, assume he's

6    not a lawyer.  Four places in that declaration says he

7    consulted with legal counsel.  We get to determine -- they

8    don't get to just say -- they don't just get to take the good

9    stuff and put it in there.  We get to see it all.

10           And it's not just e-mails, Judge.  We haven't gotten

11   one document.  He gave you some lobbying efforts.  This hasn't

12   -- this isn't an interrogatory request or a request for

13   production regarding the decision -- classification decision.

14   It's not.  They didn't give us anything.  We don't have one

15   document related to the classification decision, and we don't

16   because when we asked those questions, they asserted the

17   privilege.

18           THE COURT:  I take it at the deposition you went

19   into the decision-making process for why they were exempt,

20   similar to what's in the letter that they applied to their

21   partial summary judgment motion.

22           MR. LUKAS:  Every time I asked him about something,

23   he said, "Me and Mr. Chyette," and I never went into anything

24   with Mr. Chyette.  I asked him, "What did you look at?" and he

25   told me some of the things he looked at.  He looked at

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 66 of 71   65
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    Conseco; he looked at John Alden.  I didn't get into the

2    analysis or anything with him.

3              And he said -- you read -- you read the deposition.

4    He says -- every time he's talking about the classification,

5    he keeps saying, "Mr. Chyette and I," "Mr. Chyette and I."

6    It's -- well --

7              THE COURT:  But did you not know that this was in

8    the process of making the decision of whether or not they fell

9    within the exemption area?

10             MR. LUKAS:  Certainly, and that's why I didn't ask

11   about what he talked to Mr. Chyette about, because it was

12   privileged.

13             THE COURT:  And -- and they're saying that they have

14   maintained whatever Chyette's advice was was privileged and

15   that Chyette's the lawyer in this and that he's the client.

16             MR. LUKAS:  Well, first of all, he's a lawyer, but

17   they haven't maintained it.  They say over and over in the

18   dec' that they consulted with Legal, and he says over and over

19   in the depo' he consulted with Mr. Chyette, who's Legal.  When

20   we go to screen, they include him as Legal.  They -- they

21   produce a declaration that can be read as nothing but a legal

22   brief from a lawyer who they're saying, "Well, he's wearing a

23   different hat when he writes that dec' and makes that

24   decision."

25             THE COURT:  Where in the deposition you said did he

Case 2:04-cv-40346-SJM-MJH   Document 512-19   Filed 03/18/08   Page 67 of 71   66

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    say that he and Chyette made the decision as opposed to he and

2    Chyette consulted?

3            MR. LUKAS:  Okay.  Here we go.  He and Chyette made

4    the original decision -- it starts on page sixty --

5            THE COURT:  Where is this attached?

6            MR. LUKAS:  It is Exhibit A.  Deposition of

7    David Carroll, Exhibit A to Plaintiffs' brief.

8            THE COURT:  Okay.  What page?

9            MR. LUKAS:  Page sixty, line thirteen.

10       (Brief pause in proceedings)

11           MR. LUKAS:  And I can walk you right through the

12   depo', Judge, in that between page sixty and page sixty-five,

13   he says he and Mr. Chyette went through this five times.  He

14   says he "and Mr. Chyette."

15       (Pause continuing)

16           THE COURT:  So he said the original decision was

17   made by him and Chyette in '95 --

18           MR. LUKAS:  Yep.

19           THE COURT:  -- and '96.

20           MR. LUKAS:  Yep.  And then on page --

21           THE COURT:  And then you --

22           MR. LUKAS:  -- sixty-two he says they revisited it a

23   number of times.

24           THE COURT:  -- you -- you characterize that --

25   pardon me?

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 68 of 71    67

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          MR. LUKAS:  And then on page sixty-two he says he --

2     he revisited the issue a number of times.

3          THE COURT:  Well, yeah, but always --

4          MR. LUKAS:  And on page sixty --

5          THE COURT:  -- specifically in -- in the

6     spring/summer of 2002 --

7          MR. LUKAS:  Right, and then --

8          THE COURT:  -- after the -- after the <u>Conseco</u>

9     case --

10         MR. LUKAS:  Right, and then he says on page sixty-

11    three --

12         THE COURT:  -- and, "That was occasion for

13    Richard Chyette and I to revisit the issue."

14         MR. LUKAS:  Exactly.  Then again on sixty-four:

15         "No formal review, for Richard Chyette and I have

16         had a working relationship."

17         And then on the top of page sixty-five he says:

18         "But we would -- those types of informal

19         conversations would be pretty frequent between Rich

20         and I over the years."

21         MR. VARNELL:  But, your Honor, if I can point out,

22    on page sixty-three he makes clear:

23         "No formal reviews, but Richard Chyette and I have a

24         working relationship, and he would advise me of

25         various happenings in the law."

Case 2:04-cv-40346-SJM-MJH Document 512-19 Filed 03/18/08 Page 69 of 71      68

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1      And then at the very end of his deposition on page

2   one-oh-three he states clearly:

3           "I would consult with him, and he'd continually

4           provide me updates on the law, but ultimately the

5           decision -- I made the decision" --

6           THE COURT:  Where are you, now?

7           MR. VARNELL:  That's on page one-oh-three, your

8   Honor.

9           THE COURT:  One-oh-three?

10          MR. VARNELL:  In the middle:

11          "I would consult with him, and he'd continually

12          provide" --

13          THE COURT:  Let me -- let me get there.  Let me get

14  there before you start reading.

15          MR. VARNELL:  I'm sorry.

16       (Pause in proceedings)

17          THE COURT:  Mr. Lukas, that does seem to clarify

18  that when he said he made the decision with Chyette, that he

19  meant that he sought consultation with him, that he was the

20  ultimate decision-maker, and I don't see anything that was

21  prompting that.  Obviously, his lawyer may be --

22          MR. LUKAS:  That was his lawyer.  Well -- well, the

23  break in the hallway maybe.

24          THE COURT:  Obviously, Carroll being a lawyer is --

25  he may not need prompting.

Case 2:04-cv-40346-SJM-MJH Document 572-19  Filed 03/18/08  Page 70 of 71     69
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          MR. LUKAS:  But, your -- what -- I -- I guess I'm

2   missing the point.  He's saying right there he's consulting

3   with a lawyer.  He's consulting with a lawyer, but I don't get

4   -- I don't ask what he said --

5          THE COURT:  But what the defendants are saying, that

6   -- that --

7          MR. LUKAS:  -- or what he's doing.

8          THE COURT:  What the defendants are saying, that

9   when you say that, "I consulted with a lawyer in my decision-

10  making process," that that does not waive the content of what

11  the lawyer told him, and again I'm going to read these cases

12  because I was telling you why I thought there was an

13  implication --

14         MR. LUKAS:  Yeah.

15         THE COURT:  -- that there was nothing inconsistent

16  said.

17         MR. LUKAS:  It -- it is when you're waving it as a

18  flag as part of your good faith effort, and when I -- and on

19  page ninety-one when I got -- when I tripped into a

20  conversation with Mr. Chyette, they shut it down:  attorney-

21  client privilege.

22         So I -- you'll read those cases.  You'll see.  They

23  don't -- when -- when you in a willful situation cite as part

24  of your good faith basis -- you cite as part of your good

25  faith basis consultations with attorneys, we get to know what

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    that consultation was.

2              And if he's not a lawyer, Judge, where --

3              THE COURT:  What case did you have -- you --

4              MR. LUKAS:  We cited them.  They're all in our

5    brief.

6              THE COURT:  Okay.

7              MR. LUKAS:  And -- and, your Honor, the -- the --

8    the point is, if he's not a lawyer, where are all the other

9    non-privileged documents concerning the classification

10   decision?  They have given us none.

11             He showed you lobbying efforts.  That has nothing to

12   do with the classification decision.  Where are those

13   documents if he's not a lawyer?  They didn't give them to us

14   because --

15             THE COURT:  What -- what was the request for

16   production on that?

17             MR. LUKAS:  Absolutely, your Honor, and that's --

18             THE COURT:  I said what was the request.  I knew

19   there was.

20             MR. LUKAS:  It was Request Number Twenty-Five is the

21   most specific.

22             MR. VARNELL:  Thirty-five, your Honor.

23             THE COURT:  Thirty-five?

24             MR. LUKAS:  No.

25             MS. SREY:  Are you --