# EXHIBIT P
## (Part Two)

Henry, et al. v. Quicken Loans, et al
Chasteen, et al. v. Rock Financial, et al.

1    MR. LUKAS:  Our request for production was Number

2    Twenty-Five, not Thirty-Five.

3         MS. SREY:  There's Nineteen, Twenty, and Twenty-Five

4    that relate to the classification.

5         MR. LUKAS:  We cite them in our brief, Requests

6    Nineteen, Twenty, and Twenty-Five, and they assert the

7    privilege when it comes to good faith efforts and

8    classification efforts, and they don't give us a single

9    document, and they still haven't today.  That was back in

10   2004.

11        It's Exhibit Two -- Two to our brief?

12        MS. SREY:  One.

13        MR. LUKAS:  Exhibit One to our brief.

14        No.  Exhibit One is the interrogatory, isn't it?

15        MS. SREY:  Oh.  Two, yes.

16        MR. LUKAS:  Exhibit One is the interrogatory where

17   they flat out say they --

18        THE COURT:  So on -- on page two of your brief you

19   set them out, right?

20        MR. LUKAS:  Okay.  Exhibit One, pages five and six,

21   it's Interrogatory Number Six.  It's our request and their

22   answer.

23        (Pause in proceedings)

24        MR. LUKAS:  And then in Exhibit Two, Requests Number

25   Twenty and Twenty-Five, they again assert the privilege on --

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 3 of 71      72
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   on the Fair Labor Standards Act compliance issues and willful

2   and liquidated.  Twenty-Five specifically asked willful and

3   liquidated, and they assert the privilege.

4            THE COURT:  Which request was that?

5            MR. LUKAS:  It's Exhibit Number Two --

6            THE COURT:  Yes.

7            MR. LUKAS:  -- Request Twenty-Five, page ten.

8            THE COURT:  Twenty-five?  Thank you.

9        (Pause in proceedings)

10           THE COURT:  Was there a -- a motion to compel with

11  respect to this earlier?

12           MR. LUKAS:  No, your Honor.

13           MR. VARNELL:  No, your Honor, there was not.

14           MR. LUKAS:  We didn't challenge their assertion of

15  the privilege.

16           THE COURT:  Well, but they -- they -- they are

17  asserting more than the -- the attorney-client privilege

18  they're asserting, but they're also asserting that there's a

19  burden on you, that they don't have to produce the documents.

20           MR. LUKAS:  Well, "willful" is a burden on us;

21  "liquidated" is not.  "Liquidated" is their burden.

22           But, no, we didn't bring a motion to compel on that

23  because they asserted the privilege, so --

24           MR. VARNELL:  Your Honor, I would say we -- we

25  asserted the privilege at the -- the -- the beginning of the

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1    litigation, and we -- we continue to assert the privilege.

2              THE COURT:  Was there a search done for any other

3    document other than attorney-client privileged documents that

4    dealt --

5              MR. VARNELL:  Yes, your Honor.  We -- we looked --

6    we looked in David Carroll's files to see what else he had.

7              THE COURT:  And were those turned over?

8              MR. VARNELL:  There -- the -- the documents that he

9    has are the -- the -- the ones that we produced --

10             THE COURT:  In response to Thirty-Five?

11             MR. VARNELL:  -- in response to -- to Thirty-Five.

12             He doesn't have any other documents related to the

13   other document requests that we've been discussing.

14             THE COURT:  So everything else was informal

15   information he gathered and/or discussions he may have had

16   with counsel.

17             MR. VARNELL:  That's correct, your Honor.

18             THE COURT:  And there's never been a search for any

19   of the written correspondence he may or may not have had with

20   Chyette, though from his deposition you indicate that his

21   communications with Chyette were oral.

22             MR. VARNELL:  We -- we did go back to -- to look at

23   his files to see if there was anything else in there that was

24   not privileged or what -- what he had --

25             THE COURT:  Were there any documents in there that

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1   were privileged that would be put on a privilege log?

2         MR. VARNELL:  I'm not aware of any, your Honor, no.

3   We did -- we did that search, and we didn't find any documents

4   between Mr. Carroll and Mr. Chyette on the decision-making

5   process.

6         He said at his deposition that those were informal

7   discussions that he had with -- with Mr. Chyette, that there

8   wasn't paper generated on them.

9         THE COURT:  You've not checked Chyette's hard copy

10  files with respect to any communications he may have had with

11  Carroll.  You checked Carroll's files, right?

12        MR. VARNELL:  We checked David Carroll's files, your

13  Honor.

14        THE COURT:  Did you check Chyette's?

15        MR. VARNELL:  Your Honor, I would have to check and

16  see.  Our discovery production was, you know, a long time ago.

17        THE COURT:  I mean, if there are none that would be

18  on a privilege log --

19        MR. LUKAS:  You read that declaration.  You tell me

20  there's no documents relating to that road map that he laid

21  out, nothing with the NBA or the DOL?  I find -- I'd like that

22  in writing because I think a jury is going to find it

23  impossible to believe that he did all of those things and

24  didn't generate a single piece of paper.  It's -- that will

25  work just fine, too, I suppose.

1      MR. VARNELL:  Your Honor, David Carroll and

2   Richard Chyette go back many years.  They've had a long

3   working relationship, I think, since the -- either the late

4   eighties or the -- the early nineties.  He made clear at his

5   deposition that they were informal conversations that they

6   had.

7      It's a relatively informal company in some ways.

8   David Carroll's title I think officially is "Vice President

9   for Administration," but he also carries another title about

10  vice president for -- for miscellaneous stuff.

11     THE COURT:  And -- and -- and Carroll's fully

12  competent to do the legal analysis on his own, as he

13  apparently did in the declaration.

14     MR. VARNELL:  Your Honor, he -- he looked at various

15  relevant legal materials, but he was not -- he was very open

16  about the fact that he -- he consulted and conferred with his

17  -- with his counsel on that:  Mr. Chyette.  He doesn't hold

18  himself out as a -- as an expert on the law or how to classify

19  people under the FLSA.  It's -- it's very complicated, and so

20  he did turn to his attorneys for advice on that, but he -- but

21  he made -- he made clear that he was arriving at the -- the --

22  the decision in a thoughtful, measured way.

23     THE COURT:  I'm assuming the DOL opinion letter was

24  solicited by the Mortgage Bankers Association in tandem with

25  its members, of which your client is one, I assume.

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1    MR. VARNELL:  Yes.  Your -- your Honor, actually I

2  -- I can speak to that.  I believe that we produced to the

3  Court the request letter from the Mortgage Bankers Association

4  to --

5        THE COURT:  As well as the response to it.

6        MR. VARNELL:  -- to the Department of Labor, which

7  was signed by -- by Mr. Bordenaur [ph. spelling], the senior

8  officer of the Mortgage Bankers Association.

9        THE COURT:  And I understand your defense in this

10  case is that your employees were on the safe side of -- in

11  their job functions, were on the safe side of that opinion

12  letter.

13        MR. VARNELL:  Absolutely.

14        MR. LUKAS:  In fact, your Honor, Mr. Davis

15  represented the Mortgage Bankers Association in connection

16  with that letter.

17        If they say there's no documents, we know there's

18  e-mails, and they haven't given us those.  You didn't ask him

19  if he looked for those.

20        There's -- there's no way there's no communication

21  whatsoever or any documents, no e-mails relating to any of

22  this road map.  There's no way.  There is at least e-mails,

23  tons of e-mails, and we haven't gotten over ninety-five

24  percent of what we were supposed to get.

25        MR. VARNELL:  Your Honor, we've -- we've produced

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1    the -- the e-mail communications between David Carroll and the

2    Mortgage Bankers Association.  That's part of what we produced

3    in response to Request Number Thirty-Five.

4         MR. LUKAS:  We haven't gotten one e-mail relating to

5    his classification decision or the classification decision

6    with Mr. Chyette or anyone else.

7         THE COURT:  But -- but the -- but at the time, he

8    was screened out for making e-mails.  You knew that.  He was

9    -- he was on the attorney list.

10         MR. LUKAS:  Your Honor, we didn't --

11         THE COURT:  He wasn't one --

12         MR. LUKAS:  -- get this declaration until two days

13    after we got the invoice for the e-mail screening.

14         THE COURT:  I have not read his whole deposition,

15    but at his deposition did you not go into the -- the very

16    same --

17         MR. LUKAS:  I did not go --

18         THE COURT:  -- decision?

19         MR. LUKAS:  -- into the privileged conversations.  I

20    absolutely did not.

21         THE COURT:  No, but did you go into what his

22    decision was, because he says he was the decision-maker?  You

23    could ask him what were his decisions, what were the factors

24    that were put into his decisions.

25         MR. LUKAS:  I asked him about a lot of those things,

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   and I didn't touch his conversations with counsel, and he kept

2   saying repeatedly it was he and Mr. Chyette, he and

3   Mr. Chyette.  I got half the story, and I've still got half

4   the story except now they get to tell the whole story but I

5   don't get to look behind the curtain.  That's what they're

6   saying.  "I get to tell the whole story about what good faith

7   I showed and I talked to my lawyers," but I don't get to look

8   behind the curtain.

9          I not only don't get privileged stuff.  They're

10  saying -- now I hear him saying for the first time there isn't

11  any non-privileged stuff.  Now, they left out e-mails.  We

12  didn't get the e-mails, that's for certain, so we should at

13  least get the e-mails.

14         I can accept that there's no non-privileged

15  documents.  I actually kind of like that.  I like talking to

16  the jury about how he claims he did all these things at the

17  time, not recreating it later -- he did at the time and

18  generated not a single document.  That's fine; but the

19  e-mails, we get.

20         MR. VARNELL:  Your Honor, to the -- to the extent

21  that his declaration acknowledges the fact that he -- that he

22  talked to -- to legal counsel, he -- he did the same thing at

23  -- at his deposition.  I mean, there's -- there's no surprise

24  there.  The -- the fact that he submitted his declaration

25  doesn't -- doesn't change the equation.  That's nothing new to

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1    -- to Mr. Lukas and his team.

2              MR. LUKAS:  The Department of Labor letter came out

3    after the deposition.  A lot of things happened after the

4    deposition.

5              THE COURT:  It was issued after the --

6              MR. LUKAS:  He said -- he went on and on that this

7    was an ongoing process.  You read the declaration.

8              THE COURT:  But -- but the declaration seems to -- I

9    read the declaration as he took this position and he never

10   altered it and that it was -- it was, if anything, ratified

11   and -- and -- and his earlier decision-making process was

12   basically agreed upon by the Department of Labor opinion

13   letter because obviously they were working to get a letter

14   that would give them a safe harbor, but I -- I don't see any

15   suggestion that he ever changed his opinion from the 2006,

16   2005 decision he made with Chyette.

17             MR. LUKAS:  And we never got to -- we never got to

18   explore that decision he made with Chyette.  We only got to

19   explore what he was telling us at the deposition, and that's

20   it, and they haven't produced a single document or an e-mail

21   result revolving around that conversation.

22             Now, I think we're just talking about e-mails --

23             THE COURT:  What -- I mean --

24             MR. LUKAS:  -- because Mr. Varnell said there's no

25   documents, so all we're talking about is e-mails.  We should

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   get his e-mails relating to this classification decision.

2            MR. VARNELL:  Again, your Honor, I -- I would just

3   respectfully submit we asserted the privilege at the beginning

4   of this litigation; we asserted it in -- at his deposition; we

5   continued to assert it through the issuance of his

6   declaration; we continue to assert it now.

7            THE COURT:  At the deposition, were there inquiries

8   into -- into Carroll's decision-making process, since he said

9   he was the decision-maker -- the ultimate decision-maker for

10  the --

11           MR. LUKAS:  Yes, I asked him what he reviewed.  I

12  did.

13           THE COURT:  Okay.  And did he give you answers?  I

14  take it that --

15           MR. LUKAS:  He gave me answers about what he did,

16  but I didn't ask him about his -- and he -- and -- and he --

17  he laid out Chyette -- his conversations with Chyette and how

18  he kept talking to Chyette, and I didn't go into that.

19           THE COURT:  Okay.  You -- you carved out Chyette,

20  but with respect to -- he did a lot other than Chyette.  Did

21  you go into what he did with Human Resources -- H.R.?

22           MR. LUKAS:  He didn't identify Human Resources at

23  the time.  He said he and Mr. Chyette.  He looked at -- here's

24  what he told me at the depo'.  He looked -- I think if you

25  compare the depo' to his declaration, his declaration is far

Case 2:04-cv-40346-SJM-MJH Document 572-20 Filed 03/18/08 Page 12 of 71    81
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    more -- more thorough.  He said he looked at <u>Conseco</u> and he

2    looked at the -- what was it? --

3              MS. SREY:  <u>John Alden</u>.

4              MR. LUKAS:  -- and <u>John Alden</u> case and decided it

5    should be not mixed in, and he talked to Chyette.  He left the

6    impression that the -- the majority of the heavy lifting was

7    Chyette, and when you read the depo', I think you come to the

8    same conclusion, and we left it alone because they had

9    asserted the privilege.

10             I hear them saying the issue is whether they waive

11   privilege or not because they're claiming they still have

12   privilege.

13             THE COURT:  They are claiming --

14             MR. LUKAS:  Yeah.

15             THE COURT:  -- that they still privilege.

16             MR. LUKAS:  Well, I think it's clear that they

17   don't, and we should get the e-mails because I understand

18   there's no documents anywhere.  We get the e-mails.

19             THE COURT:  Anyway, I'm going to have to review the

20   cases.  I will read the entire --

21             MR. LUKAS:  Certainly, your Honor.

22             THE COURT:  -- deposition at the same time --

23             MR. LUKAS:  I hear you.

24             THE COURT:  -- I re-read the declaration that he's

25   filed.

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 13 of 71     82
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          I am troubled by the attorneys wearing multiple hats

2     to sort of have their cake and eat it, too, but it may very

3     well be that the law of privilege allows that.

4          MR. LUKAS:  I don't think it does.

5          THE COURT:  Anyway, that's going to have to wait

6     under advisement pending my further review.

7          THE CLERK:  The other motion --

8          THE COURT:  Yeah.  I think we should take a ten-

9     minute break.

10          MR. LUKAS:  Okay, Judge.

11          MR. DAVIS:  Thank you, your Honor.  Your Honor,

12     personally I appreciate that very much.

13          THE COURT:  Well, I'm glad.  You could have left.

14     You were not arguing.  I wouldn't have been offended.  I would

15     have understood.

16          (Recess in proceedings)

17          THE COURT:  Okay.  Recalling the Henry case.

18          And, Mr. Lukas, let me ask you to give me a tutorial

19     on the screening process, and I will need an explanation of

20     the difference between a reply with history when there's a

21     whole string of cases and this nested concept that's part of

22     your explanation of what the agreement was.

23          MR. LUKAS:  You want me to throw in a little of that

24     -- what was that other one?  You want me to throw in a

25     little --

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          MS. SREY:  Hypogeometric.

2          MR. LUKAS:  -- hypo -- what was it? -- hypogeometric

3   something?

4          MR. VARNELL:  Hypergeometric.

5          MR. LUKAS:  Yeah.

6          THE COURT:  No.  We're going go in every e-mail.

7   We're not going to take a random sampling of them.

8          MR. LUKAS:  Yeah.  I guess they just scared me away

9   from it.

10         THE COURT:  I hope your -- I hope your flights were

11  at six or so.

12         MR. VARNELL:  Yes.

13         MR. DAVIS:  We're -- we're fine, your Honor.

14         THE COURT:  Okay.  Okay.

15         MR. LUKAS:  Are you ready for us, Judge?

16         THE COURT:  I'm ready for you.

17         MR. LUKAS:  Okay.  On this motion for release [sic]

18  -- relief, I think it -- we've already talked about the

19  context of that screening, and it was our understanding that

20  they had asserted a privilege.  That was one of the reasons we

21  were willing to give what you, I think, called a generous kind

22  of -- you know, we agreed to stuff we otherwise wouldn't, but

23  without respect to that, and we've been through that, there

24  was a very broad screening procedure that was put in place,

25  and that broad screening procedure included basically five

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    steps.

2          We first listed the plaintiffs -- only the

3    plaintiffs who were in the case with their e-mail -- only the

4    -- first of all, we picked the dates, and for those three

5    months, only the plaintiffs' and their managers' who worked

6    during those months e-mail boxes would be searched.

7          The second thing we limited was we limited to key

8    terms or what we call Plaintiffs' terms, so we were only

9    searching for Plaintiffs' terms.

10          The third thing we did was we included some

11    exclusionary terms from Defendant:  legal, compliance,

12    privilege, confidential, counsel, lawyer, attorney.  Those --

13    those were the exclusionary terms.

14          Then we decided we were also excluding lawyer names,

15    lawyers from the legal department.  We've looked at that and

16    talked about that a little bit already.

17          And then the last thing we did is we --

18          THE COURT:  And originally that was with first and

19    last names.

20          MR. LUKAS:  It was first and last names.  The -- the

21    terms were listed "David Carroll," one line;

22    "Richard Chyette," one line; not "David," "Carroll,"

23    "Richard," "Chyette," like you would see if they were going to

24    be one on one.

25          And the last thing we did is we made Mr. Lanterman

Case 2:04-cv-40346-SJM-MJH   Document 512-20   Filed 03/18/08   Page 16 of 71     85
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    their agent, someone we could not and were prohibited and

2    forbidden from talking to, so those are the things we did.

3            Defendant argues in their brief that you somehow

4    said that they were allowed every -- every feasible means, but

5    if you read what you said in context, you were addressing

6    Mr. Davis' concern about a Southern District of Missouri judge

7    saying you waive something, and you were saying, well, with

8    this process -- and this process being the one I just

9    described for you -- you can say to the court in the Southern

10   District of Missouri that, quote:

11           "We took every feasible means to screen out

12           attorney-client privilege before turning over to the

13           plaintiff."

14           That was the context of "every feasible means," not

15   that they could expand this already ridiculously expansive

16   screening, so I wanted to point that out because that's a

17   pretty --

18           THE COURT:  I was -- I was providing Mr. Davis the

19   more hyperbolic defense statements they could make in another

20   court.

21           MR. LUKAS:  You were -- that -- that was supposed to

22   be quoted -- that was supposed to be quoted in a different

23   courtroom --

24           THE COURT:  Okay.

25           MR. LUKAS:  -- not right back here in the way he did

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   it.

2          THE COURT:  So they took that as a license --

3          MR. LUKAS:  Right, and --

4          THE COURT:  -- to make it a true statement.

5          MR. LUKAS:  Right.

6          The reason I point that out is because they

7   basically make it sound like they had carte blanche to do

8   whatever they wanted.  We already gave them the moon when it

9   came to this screening.

10          So that's where we were.  So we --

11          THE COURT:  Now --

12          MR. LUKAS:  -- couldn't talk to Lanterman, and we

13   were doing all these things.

14          THE COURT:  In that hearing, since I didn't think

15   about it until reading this motion, was there an agreement in

16   working out a protocol with regard at least to when there's a

17   reply with history that when it talked only about the top or

18   if there's a bottom history that has an attorney name, that

19   they all get flushed?

20          MR. LUKAS:  Yeah.  I don't think we talked about it.

21   Like the -- the -- I think they called them nested and

22   embedded e-mails, I don't think we talked about that, and I'm

23   not sure that that's that big of an issue with respect -- for

24   us it's not that big of an issue as to whether they should

25   have or shouldn't have been.

Henry, et al., v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    To us the issue with the nested and the embedded --

2    and I'll get to that -- is that they went back, redid it to do

3    that without talking to anybody about it.  That -- that's

4    really more of our complaint.  Whether it should have been

5    done in the first place or not is -- is -- I wouldn't say

6    irrelevant, but it's not as important to us as why did you

7    just go do it and ring up another twelve grand and not say

8    anything to anybody about it.

9    But that's what happened, so here's what happened.

10   So that's what it was supposed to be; here's what happened,

11   and frankly, the only reason we know what happened is because

12   Mr. Lanterman provided a pretty detailed invoice.  Had

13   Mr. Lanterman sent us a letter saying, "You owe us ninety-one

14   grand," we'd have no clue that any of this stuff happened that

15   I'm about to tell you --

16        THE COURT:  Okay.

17        MR. LUKAS:  -- but here's what happened.

18        THE COURT:  But -- but there was no agreement or

19   understanding with regard to whether the screening would be of

20   the -- I'm now just using "reply with history" because that's

21   what I'm familiar with, though I also know sometimes I get

22   a --

23        MR. LUKAS:  Yeah.

24        THE COURT:  -- pdf attachment that I have to double-

25   click on to open, but -- but there was no --

Case 2:04-cv-40346-SJM-MJH Document 512-26 Filed 03/18/08 Page 19 of 71    88
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          MR. LUKAS:  I don't think it was addressed, Judge,

2     and -- and these guys can say if they remember it, but I don't

3     remember us talking about this nested, embedded, string -- I

4     call them string e-mails.

5          THE COURT:  Strings.  Okay.  Well, anyway.  "Reply

6     with history" is --

7          MR. LUKAS:  I -- I don't remember us talking about

8     that.  I really don't, so --

9          MS. SREY:  I think we talked about a "To," "From,"

10    and then a "cc" situation, but I don't --

11         MR. LUKAS:  Yeah.

12         MR. VARNELL:  Your Honor, I -- I wasn't at the

13    hearing, but I've read the transcript pretty closely, and the

14    -- the nested e-mails and the attachments I -- I don't believe

15    were addressed --

16         THE COURT:  No, but I --

17         MR. VARNELL:  -- addressed specifically.

18         THE COURT:  -- I -- I was assuming there were going

19    to be a meet-and-confer to work out protocols much beyond what

20    I -- limited thought that I had given to it at the hearing.  I

21    mean, I -- I --

22         MR. LUKAS:  Well, there was.

23         THE COURT:  -- I wasn't assuming at that hearing

24    that I had written in granite the entire marching orders to

25    that because I -- one, I'm not competent to do it, and

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    secondly, that was not my intent.

2              MR. LUKAS:  Well, your Honor, I think --

3              THE COURT:  It would be resolved, sort of a meta

4    issue with regard to attorney-client privilege, but okay.

5    Anyway --

6              MR. LUKAS:  So -- so he --

7              THE COURT:  -- there was -- there was no

8    consideration of that.

9              MR. LUKAS:  I don't believe so, Judge.

10             THE COURT:  Okay.

11             MR. LUKAS:  Okay?

12             THE COURT:  That may or may not have caused extra

13   problems, but go ahead.

14             MR. LUKAS:  Right.

15             Here's what did happen, and here's what we -- here's

16   what we've pieced together.

17             They -- Mr. Lanterman did do the retrieval and the

18   conversion.  That was fifteen thousand bucks, and as I told

19   you earlier, we paid that right away.

20             THE COURT:  Yeah.

21             MR. LUKAS:  Then he screened the manager -- the

22   manger e-mail boxes.  That cost twenty-seven thousand dollars.

23   Okay?

24             Then they went back to Defendant, and apparently

25   Defendant went back to Mr. Lanterman and said, "Well, you need

Case 2:04-cv-40346-SJM-MJH   Document 512-26   Filed 03/18/08   Page 21 of 71     90
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   to expand the lawyer list, not just David Carroll; has to be

2   'David,' 'Carroll,' separate inquiries."

3          THE COURT:  And this was for all of the attorneys?

4          MR. LUKAS:  All of the managers' boxes.

5          So Mr. Lanterman ran them again and excluded first

6   names and last names as separate exclusionary terms.  This

7   cost another twelve thousand bucks.

8          Then it went back to Defendant, and then Defendant

9   found this embedded/nested issue, sent that back.

10         THE COURT:  Okay.  Explain that to me now.

11         MR. LUKAS:  The embedded/nested is what we were

12  talking about.  Basically, it's a -- two things, as I

13  understand it, and I can be corrected, but it's an attachment

14  to an e-mail.  Whatever is attached wasn't searched the first

15  time by Mr. Lanterman, and they wanted whatever is attached.

16         I think -- I'm not sure which is which, and I think

17  the other is sort of the string -- is it the string or is

18  it --

19         MR. VARNELL:  A nested e-mail, your Honor, is that

20  function on Outlook where you can forward an e-mail to

21  somebody else, and when it appears on the -- the recipient's

22  computer screen or monitor, it looks actually like a -- an

23  envelope that you then have to click on to open up.  That --

24  that's what a nested e-mail is.

25         MR. LUKAS:  It's like forwarding an e-mail.  It's

Case 2:04-cv-40346-SJM-MJH  Document 512-20  Filed 03/18/08  Page 22 of 71    91
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    forwarding an actual -- it's like dragging and dropping

2    e-mail onto another e-mail and mailing that -- e-mailing that.

3             Right?

4             MR. VARNELL:  That's correct.  It's different from

5    just forwarding an e-mail on, but it's -- it's --

6             THE COURT:  I've never used Outlook.  I only use

7    Lotus, but --

8             MR. VARNELL:  It's the other --

9             THE COURT:  -- but it's -- it's if you were

10   forwarding an e-mail --

11            MR. VARNELL:  It's -- it's essentially forwarding an

12   -- an e-mail in its physical form so that it -- on Outlook, it

13   shows up like that.

14            THE COURT:  It just arrives in their in-box as

15   another item that needs to be opened, much like an attachment

16   would in Lotus.

17            MR. LUKAS:  Exactly.

18            MR. VARNELL:  That's -- that's correct, your Honor.

19            THE COURT:  Okay.

20            MR. LUKAS:  So -- so they -- they -- they -- they --

21   they screened the managers' boxes; then they redid it and

22   expanded the first and last names.  No call to us.  No letter

23   to us.  No indication to us that there was a problem.

24            Then they went back -- sent it back to Mr. Lanterman

25   again, this time removing embedded and nested e-mails.  Again,

1    no phone call to us, no letter to us, no indication to us that

2    they're sending it back.  That cost another fifteen thousand

3    eight hundred bucks, the removing the embedded and the nested.

4              Then they turned their attention to the plaintiffs'

5    e-mail boxes, and using the same first and last name,

6    embedded/nested, and everything else we agreed to, then they

7    screened the plaintiffs' e-mail boxes.  That's twelve thousand

8    five hundred bucks.

9              Then --

10             THE COURT:  But that would be a first run, so if

11   they did it right --

12             MR. LUKAS:  First run, right.

13             THE COURT:  -- that's the first run.  This is not a

14   rerun.

15             MR. LUKAS:  That's a first run.

16             So we've got the fifteen grand we've already paid;

17   we've got the twenty-seven hundred [sic] for the first run of

18   the manager -- or twenty-seven thousand for the first run of

19   the managers' e-mail boxes; and now you've got the twelve

20   thousand five hundred for the first run of the plaintiffs.

21   Those are the three what we would call legitimate expenditures

22   based on the protocol, not -- without respect to the privilege

23   issue, but they expanded the first and last names.  That was

24   another twelve-thousand-dollar run.  The removing embedded and

25   nested was another sixteen-thousand-dollar run.  These are

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1    round numbers.

2            And then here's the last thing they did.  So they

3    screened the plaintiffs' e-mail boxes, and they realized that

4    by separating out these first and last names of the managers

5    -- of the legal department, they basically wiped out some

6    plaintiffs' e-mail boxes entirely, because some of the

7    plaintiffs' was "David" somebody or "Amy" somebody who had a

8    first name the same as --

9            THE COURT:  A lawyer.

10            MR. LUKAS:  -- a lawyer.

11            So then they went back, and I'm still not sure how

12    they did this.  They repopulated four of the plaintiffs'

13    e-mail boxes.  It generated about -- they -- they took out

14    those four -- they took out four first-name exclusionary

15    terms, repopulated the e-mail boxes, and got us -- I think it

16    resulted in another ten thousand or so e-mails, and that cost

17    another twelve thousand bucks.

18            So those are the things that happened, and when you

19    look at the plaintiffs' -- you look at what was actually

20    produced, there's some kind of bizarre things that happened.

21    Like, John -- well, we think through that process, including

22    this first-and-last-name thing, we believe that they excluded

23    over ninety-five percent of the e-mails, and -- and the reason

24    -- you know, and they did -- a lot of this they did without

25    ever talking to us.

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1      Oh, by the way -- and I think we have it in our

2  reply brief -- during some of these times, for example, like

3  the first and last name, the very day they decided to rerun it

4  and -- and separate out these first and last names, Ms. Srey

5  had sent Mr. Varnell an e-mail saying, "How are things going

6  on the e-mail search?"  Not a word.  Not a word about, "Oh,

7  we're about to do a second run because Mr. Lanterman screwed

8  up," or anything like that.  It was an attempt to expand the

9  search beyond the protocol without talking to us.

10      But there's some -- we believe ninety-five percent

11  or more, probably more, of the e-mails were excluded.  We

12  asked Mr. Lanterman in his depo' how many of the e-mails were

13  actually produced and how many were actually screened.  He

14  said, "Oh, I can figure that out for you.  I've got the run

15  upstairs."

16      We said, "Well, just put it in a letter to us,

17  okay?"

18      "Sure."

19      No letter.  No letter.  We go back and forth with

20  Mr. Varnell.  I don't know if Mr. Varnell told Mr. Lanterman

21  not to send us the letter or what.  We never got it.  We still

22  don't have it.

23      We believe it's ninety-five percent or more that are

24  excluded, and the reason we believe that is when you look at

25  some of these e-mail boxes -- John Baldezar [ph. spelling] --

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 26 of 71    95
Henry, et al. v. Quicken Loans, et al
Chasteen, et al. v. Rock Financial, et al.

1    Balkdezar [ph. spelling] -- he's one of our plaintiffs; he

2    doesn't have one of those "David" or "Amy's" or legal law --

3    or one of the legal members' first name problems -- he has two

4    e-mails produced in his e-mail box for a three-month period.

5    -- Two e-mails, and there's a lot of circumstances like that

6    where there -- where there's almost nothing in them.

7         Those ten thousand -- here's another sort of

8    interesting thing that happened with the run.  Those ten

9    thousand kind of repopulated e-mails that we got from

10   Defendant as a result of them repopulating those four

11   mailboxes, Defendant did a hand search for privilege.  Do you

12   know how many privileged documents they found in those ten

13   thousand?  Zero.  They held back none.  After doing a hand

14   search of privileged documents:  none.

15        So we wouldn't have known about any of this but for

16   the detailed invoice, because we get the invoice and it says

17   "Submittal One," "Submittal Two," and it's fifteen thousand

18   dollars here and twenty thousand dollars there, and not one

19   phone call, not one inquiry, no disclosure.  We're

20   communicating with them right at the same time.  They refuse

21   to let us talk to him, you know, and they end up screening out

22   almost all of the e-mails as a result of this process.

23        What we're asking for in this motion -- and this

24   motion isn't related to the privilege -- first of all, we

25   think this whole screening process, as we argued in the first

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 27 of 71    96
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   motion, was unnecessary in the first place, but in this

2   motion, we're asking that they pay for these three reruns:

3   the rerun with the first and last name, we're asking that they

4   pay for the rerun on the removal of the embedded and nested,

5   and we're asking for the repopulation of the four plaintiffs'

6   e-mail boxes.

7           THE COURT:  It wasn't a removal of the embedded and

8   nested but search the embedded and nested for the terms --

9           MR. LUKAS:  Right.

10          THE COURT:  -- and -- and the excluded names for

11  lawyers.

12          MR. LUKAS:  And the exclusion which pretty much

13  wiped them out, we think, all but less than five percent

14  probably, and that's what we're asking for in this motion.

15          It's -- you know, without respect -- we believe they

16  ran the search, they didn't like the result, they wanted it

17  broader, they went back.  Then they -- they went, "Oops, we

18  went too far."  They repopulated, all of this happening

19  without talking to us, without talking to the Court, without

20  doing anything.

21          Interestingly enough, Mr. Lanterman ran the search

22  with the first and last name of the legal people as one

23  exclusionary term like we expected.  He's the expert.  He runs

24  these searches all the time.  They're the ones that go back

25  and go, "Oh, it was always meant to be first and last," and it

Case 2:04-cv-40346-SJM-MJH Document 512-26   Filed 03/18/08   Page 28 of 71     97

Henry, et al. v. Quicken Loans, et al
Chasteen, et al. v. Rock Financial, et al.

1   was never meant to be first and last, and -- and that's what

2   we're saying, is that this -- they should have to pay for

3   those things.

4            It's a situation where even if it's not sinister --

5   let's say, you know, that it's something -- it's --

6   Mr. Lanterman just made these mistakes and they had to correct

7   them.  Well, he made these mistakes under their watch.  He was

8   their agent.  We weren't allowed to talk to Mr. Lanterman, so

9   at the very least, this is their fault, their mistake.  They

10  ran a fifty-thousand-dollar e-mail search up to ninety-one

11  grand.  That's what happened, and that's on the best day when

12  you don't consider privilege and how we went through all of

13  this rigmarole to protect something that was going to be

14  waived two days later.

15           That's our position on this motion, your Honor.

16           THE COURT:  Thank you.

17           Mr. Varnell?

18           MR. VARNELL:  Your Honor, I think I'd like to start

19  out with a couple of intro' comments, and then to the extent

20  you want to ask me about the -- the first and last name issue,

21  the nested e-mails, the attachments, that kind of thing, I'm

22  happy to do that.

23           Just briefly, Plaintiffs' motions, they -- they

24  contain a lot of rhetoric, essentially accusing me and my

25  colleagues of this dark conspiracy.  Mr. Lukas just said "even

Case 2:04-cv-40346-SJM-MJH    Document 512-20    Filed 03/18/08    Page 29 of 71    98
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   if it wasn't sinister," implying that maybe there was some

2   sinister motive to deprive them of e-mails and -- and drive up

3   the cost.  I pulled out of their brief phrases like we took

4   advantage, there was abuse, we were over-zealous, there was a

5   scheme, there -- there was hiding, that we gleefully ran up

6   costs, all of that kind of stuff.  There's no basis for these

7   accusations, and -- and again, just a couple of intro' points.

8          The Court came up with a -- a -- a workable solution

9   that was to balance their demands for e-mails, which they got,

10  as well as protecting Defendant's privileged information,

11  which we made clear was -- was important to us.

12         Last year, starting in the summer and then going way

13  over into the fall, my colleagues and I worked hard to put

14  that -- that solution together, and I should say, your Honor,

15  we spent a lot of hours doing that, not at their expense but

16  at our expense:  things like this July 10th letter that --

17  that we sent to Mr. Lanterman to get him started.  That was at

18  our expense, and as my client would probably let you know more

19  readily than I, we -- we don't come cheap.  We spent a lot of

20  time pulling that kind of stuff together to get him started.

21         We also spent a lot of time fielding questions from

22  -- from him and his team to -- to keep him going, that kind of

23  thing.  The bottom line is we worked hard to -- to put this

24  together and to get those e-mails out the door.

25         We also worked within the bounds of the April 17th

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 30 of 71    99
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    hearing, the orders that -- that you put out following that

2    hearing, this July 10th letter, plus Mr. Lanterman's

3    declaration.  At deposition, Mr. Lanterman testified that he

4    was -- that we never told him to either ignore or to deviate

5    from any of that guidance, and that's because we didn't tell

6    him to ignore it or to deviate from it.

7         Another point, your Honor:  Mr. Lukas has said that

8    -- that Mr. Lanterman was -- was our agent.  He also was put

9    forward as -- as their expert.  He was -- he was their guy.

10   They'd worked with him several times in the past.  They

11   understand his operation.  They've seen his bills before.  I'm

12   amazed that they claim such surprise at his -- at his

13   invoices.

14        The flip side is we've never worked with the guy

15   before.  This was the first time, and I think we did the best

16   we could.  I got to know Mr. Lanterman quite well.  I think

17   he's a competent guy.  I developed a good working relationship

18   with him.  It was my first time.  I didn't know the in's and

19   out's of his operation; I didn't know the in's and out's of

20   his team members.  Neither did my colleagues, but we worked --

21   we worked with him, and -- and we did a good job working with

22   him.

23        There was no hiding or scheming.  We -- we cc'd

24   Plaintiffs' counsel on this July 10th letter.  We also had

25   initial meet-and-confers with them to exchange search terms

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 31 of 71    100
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    and the -- the screening terms, both the -- the terms like

2    "privilege" and "confidential" and -- and the lawyers' names.

3    We weren't trying to -- to hide the ball.

4             When issues arose later, we followed up with

5    Mr. Lanterman.  At deposition he testified that that kind of

6    follow-up was -- is common with his clients.  We didn't do

7    anything wrong.

8             At most, this is a billing dispute with

9    Mr. Lanterman.  There's no grounds for us to -- to pick up

10   these costs because we didn't do anything unreasonable, and we

11   didn't do anything in -- in bad faith.

12            The bottom line, your Honor, is that Plaintiffs

13   received about a hundred and fifty thousand top-level e-mails

14   from eighty-seven different individuals' mailboxes, the

15   thirty-two managers and the fifty-five plaintiffs who were at

16   the company during the three-month time period that they

17   selected, May -- April, May, and June 2004, and they got these

18   hundred and fifty thousand e-mails at a cost of about seventy-

19   nine thousand dollars, which is consistent with the other cost

20   estimates that -- that have come up in this case, including

21   the first batch of ninety-one thousand e-mails that -- that we

22   produced to -- to Plaintiffs.  That was the first installment.

23   That was for forty-three thousand dollars, which to date we've

24   borne the entire cost there.

25            Also, at deposition Mr. Lanterman provided a rule of

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1   thumb in terms of how he prices out these kinds of projects,

2   and he said that for restoring e-mails from a particular

3   individual's mailbox costs between a thousand and eleven

4   hundred dollars.  Again, we produced e-mails for eighty-seven

5   different individuals at a cost of seventy-nine thousand

6   dollars, so it came in under that rule-of-thumb estimate that

7   Mr. Lanterman provided, and frankly, your Honor, this -- this

8   cost of seventy-nine thousand dollars, it's also consistent

9   with a -- just a basic fact in discovery these days that

10  electronic discovery is -- is not cheap.  It's an expensive,

11  high-tech endeavor.  That's, frankly, the reason why we

12  objected to -- to further electronic discovery earlier on.  So

13  it's consistent with all of that, your Honor, in terms of --

14  of the price.

15          Another point I'd like to make, your Honor, is that

16  in a different context, the -- the summary judgment motion,

17  Plaintiffs filed their -- their partial motion for summary

18  judgment back in the fall, and right up front they make clear

19  and in fact I would say they brag about the fact -- about all

20  the various e-mails that they got.  They say that they've got

21  to submit to the Court selected samples of e-mails in order

22  not to inundate the Court with e-mails, and they cut and paste

23  e-mails and put them right into the text of the brief, so

24  they've gotten plenty of e-mails, your Honor.  They've gotten

25  them at the -- at -- at market cost, and they've made use for

1    those e-mails, and in fact they've -- they've bragged about

2    the number of e-mails that they've received.

3         I think the bottom line is, though, now that they --

4    they -- they struck their -- their bargain, they got -- they

5    got those e-mails, they made use of them, they don't want to

6    pay for it, and, your Honor, I think that's a pattern, and I

7    would say that it's even a disserving pattern, and one thing

8    that I wanted to do, your Honor, was provide you with sets of

9    some of the correspondence that we've gotten throughout this

10   process.  If I could approach the bench?

11        THE COURT:  Okay.

12        MR. VARNELL:  Thank you, your Honor.

13        What I've given you, your Honor, is essentially a

14   series of correspondence, primarily from -- from Plaintiffs'

15   counsel Ms. Srey.  That's her documents where I'm talking

16   about in -- in terms of a pattern.

17        At that April 17th hearing, Mr. Lukas said that

18   they'd put their money where their mouth is and fall on the

19   sword in order to get e-mails.  Just as I've said, we -- we

20   worked throughout the summer and fall to get those e-mails.

21   As soon as they get them, we receive this -- this October 5th

22   letter from Ms. Srey saying that they're shocked by this

23   outrageous bill and that when they initially discussed this

24   project with Mr. Lanterman, he estimated that the project

25   would cost approximately ten thousand to twelve thousand

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 34 of 71    103

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    dollars.  I -- I can get into that -- that supposed estimate

2    that was provided in a moment, your Honor.

3              The next stage was Plaintiffs demanded to take

4    Mr. Lanterman's deposition, and they agreed and were ordered

5    to pay -- and I'll -- I'll quote:

6              "all fees and expenses associated with this

7              deposition."

8              That's from your Honor's October 1st, 2007, order,

9    Docket Number four-seventy-three.  Again:

10             "all fees and expenses associated with this

11             deposition."

12             We objected to that.  We said it was unnecessary.

13   We said it was costly.  We offered to put Mr. Lanterman on --

14   on the phone with Plaintiffs in order to discuss what was at

15   most a billing issue.  They insisted on a deposition.  They

16   said that they'd pay for it.  They ultimately got to take that

17   deposition, and then days later I get this letter dated

18   December 13th, 2007 -- and again I've highlighted the -- the

19   relevant portions -- from Plaintiffs' counsel objecting to the

20   cost of that -- that deposition, which we said up front was --

21   was going to be costly and expensive.  It's just another sort

22   of step in this entire pattern, your Honor.  They demanded

23   this deposition.  They said they'd pay for it.  They get to

24   take it, and then they -- they don't want to pay for it.

25             THE COURT:  I didn't hear that as part of the

Case 2:04-cv-40346-SJM-MJH  Document 512-20  Filed 03/18/08  Page 35 of 71    104
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    argument that he was making.  He was talking about the reruns

2    of the computer searches.

3              MR. VARNELL:  It's --

4              MR. LUKAS:  I'll -- I'll address it, Judge, when

5    he's done.

6              THE COURT:  Okay.

7              Go ahead, Mr. Varnell.

8              MR. VARNELL:  And then -- and then, your Honor, also

9    within that deposition Mr. Lukas referenced this additional

10   work that they asked Mr. -- Mr. Lanterman to put together.

11   They wanted him to go back and run some comparisons.  The

12   relevant cite is at page eighty-eight.  He said that he could

13   -- he could do that, and he -- he said that he could easily do

14   it, but he also said that it would take some time to do that.

15   That was the quote:  "some time."

16              Mr. Lanterman then provided a -- a -- a specific

17   time and cost estimate that it would take for him to -- to do

18   that work.  He said it was between twenty and twenty-five

19   hours.  We sent that on to -- to Plaintiffs' counsel, and

20   then, your Honor, I get this -- this January 24th letter

21   taking issue with that and essentially saying that I've

22   somehow moved additional -- additional work unrelated to this

23   project or some other case over to Mr. Lanterman so that he

24   would essentially bundle those costs into -- into this cost

25   estimate.

1    My point is, your Honor, it's a pattern here of --

2 of demanding information, demanding discovery, whether it's

3 e-mails, depositions, additional work, but then not wanting to

4 -- to pay for it and not -- not wanting to hold up their end

5 of the bargain.

6    And again, your Honor, we've -- we've worked hard

7 with Mr. Lanterman.  At most, Plaintiffs have a billing

8 dispute with him, but that's it.  There's no grounds to shift

9 some of these costs over to us.  We've worked hard with the

10 guy to get those e-mails out the door, and that's what we did.

11    THE COURT:  Is Mr. Lukas incorrect when he says that

12 the instructions to Lanterman when he originally had the

13 attorneys' names in the conjunctive, as both of them need to

14 be in the terms, and that he did that run and that after that

15 you decided that you wanted it rerun with one or the other

16 name in the document?

17    MR. VARNELL:  Your Honor, the -- the -- the

18 first/last name issue was -- was discussed at -- at the

19 April 17th hearing, and I would draw the Court's attention to

20 a couple of different cites, one at page thirty-eight.

21 Mr. Davis says to -- to do something less than a run for first

22 names, what he referred to as the -- the "two Richards" issue,

23 which was a reference, again, to Quicken Loans' corporate

24 counsel Richard Chyette, to -- to run -- to run searches on

25 something less than first names would -- would, quote/unquote,

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 37 of 71    106
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    not be failsafe.

2            He also, your Honor, at page fifty-five -- this is a

3    direct quote -- says:

4                "It's going to be a real issue, if you will, the two

5                Richards, that issue.  There are going to be e-mails

6                that are going to refer to Richard.  Presumably

7                Mr. Lanterman can identify them."

8            That was an issue that was -- that was brought up

9    and discussed.  We identified the fact we were going to ask

10   Mr. Lanterman to -- to run those.

11           Mr. Lukas never --

12           THE COURT:  But -- but why, then, wasn't that done

13   on the first twenty-seven-thousand-dollar screening when he

14   did the double names?

15           MR. VARNELL:  You know --

16           THE COURT:  If the -- if -- if the agreement was,

17   "We're going to do disjunctive, either first or last name, and

18   screen that out," that -- that wasn't what was done, it seems

19   to me the instruction is -- either the first or the second

20   were erroneous.

21           MR. VARNELL:  It -- it -- it -- it did happen on the

22   -- the second run, your Honor.

23           The July 10th letter, looking back in hindsight, I

24   wish that I had made it -- made it clearer.  I -- I -- I do

25   wish that, but the -- the bottom line is I had -- I had

1    discussions with -- with Mr. Lanterman.  Maybe this falls into

2    the -- the category of the fact that I had never worked with

3    the guy before.  I told him that the -- the screening needed

4    to be extensive.  I thought he understood that.  He then runs

5    -- runs the searches in the -- the conjunctive, and at

6    deposition he admitted that that was his interpretation.

7            I would respectfully say that under his

8    interpretation, if the reference was just to the name Chyette,

9    just to last names, those would have -- would have stayed in.

10   That -- that wasn't -- that wasn't the -- the -- the proper

11   way to do the screen.  When I saw the invoice, I -- I was --

12   or when I got the first -- excuse me -- the batch of manager

13   e-mails back, I was surprised by that, so I called him up andI

14   said, "What's the deal?" and I told him that he had to -- to

15   go back and redo that, and the ironic thing is when I talked

16   to him about that and he -- he informed me, "Well, I'm going

17   to have to charge additional money for that" -- I mentioned,

18   too, this -- this to you before, your Honor, and it came up at

19   the deposition -- Mr. -- Mr. Lanterman acknowledged that I

20   actually advocated on behalf of Plaintiffs and said, "This is

21   a big project; I don't think you should charge double for --

22   for any of this additional work."  He took fifteen percent

23   off.  I didn't tell him to take fifteen percent off.  I didn't

24   discuss the -- the percentage or anything like that, but I

25   advocated on behalf of -- of Plaintiffs.  I didn't gleefully

Case 2:04-cv-40346-SJM-MJH   Document 512-20   Filed 03/18/08   Page 39 of 71        108
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   run up the cost.

2            Similarly, it was -- it was Defendants that on his

3   invoice saw that Mr. Lanterman had actually double-billed for

4   two items.  Mr. Lukas says that the -- the bill came in at

5   ninety-one thousand dollars or something like that.  We were

6   the ones that informed Mr. Lanterman that, "It looks like

7   you've got a mistake on the invoice here," and that's when he

8   dropped it down to -- to seventy-nine thousand dollars, your

9   Honor.

10           So again, we did the very best we could on this.  No

11  way did we gleefully run up any of the costs.

12           THE COURT:  Well, gleefully or not, I mean, the --

13  this first name, second name issue, if it had been right the

14  first time, it seems to me that -- that the extra twelve

15  thousand has got to be on your shilling.

16           Now, with regard to the embedded or nested, I don't

17  know why he -- he wasn't given clear instructions on that,

18  too, if you wanted him to search the attachments as well as

19  the original document; and then not saying what the protocol

20  was is -- which, the way I was ruling, this wasn't one of the

21  issues that I focused on, but it -- it seems to me that that

22  second run was also done because he wasn't told how to do it

23  right the first time.

24           MR. VARNELL:  Your Honor, our -- our -- our

25  July 10th letter makes clear that he has to screen all

Case 2:04-cv-40346-SJM-MJH  Document 512-20  Filed 03/18/08  Page 40 of 71     109
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   e-mails, and all non e-mail data and documents are not to be

2   produced whatsoever.

3           A nested e-mail is an e-mail.  If I forward an

4   attachment on to somebody in an e-mail and I say, "Please look

5   at the attachment," I mean that attachment, that's -- that's

6   -- that's what gives the e-mail meaning.  That stuff should

7   have been screened.  Mr. Lanterman -- he should have screened

8   it.

9           To -- to the extent that there was any mistake, that

10  mistake is on him.  I mean, he's -- he's the expert.  He made

11  the decision not to screen that.  We took the -- the -- the

12  position that it needed to be screened, and our position

13  actually increased the number of -- of e-mails ultimately

14  produced to Plaintiffs, but a nested e-mail is an e-mail.

15          THE COURT:  It increased it?  Looking at the nesting

16  increased it?  -- Because you --

17          MR. VARNELL:  Because the only other -- the only

18  other alternative argument is that --

19          THE COURT:  Because their search terms showed up

20  more frequently than your exclusionary terms --

21          MR. VARNELL:  Well, the -- the --

22          THE COURT:  -- in -- in -- in the attachments.

23          MR. VARNELL:  The -- the only -- the argument is

24  that a -- a -- a nested e-mail is -- is not an e-mail, and if

25  it's not an e-mail, then it shouldn't have been produced, but

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 41 of 71    110
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    we said if it was picked up by the search terms and it was a

2    top-level e-mail, that it should go along with it, but then at

3    the same time it should be screened for privilege.  Otherwise

4    they would -- the only other position is they were all non

5    e-mails, and therefore the -- the protocol makes clear that

6    stuff shouldn't have been produced.

7         THE COURT:  So you're saying that the letter to --

8    to Lanterman -- the July 10th letter made it clear that he was

9    to search those.

10        MR. VARNELL:  It made -- it made clear that all --

11   all non e-mails or documents were not to be included in -- in

12   the production, and if a nested e-mail is not an e-mail, then

13   it's got to be non e-mail or something else, so it should have

14   been just left aside and -- and not -- not included in the --

15   the production.

16        We included it as part of the -- what was responsive

17   in terms of what would be produced over to Plaintiffs,

18   provided that it didn't contain one of the -- the privileged

19   terms, and that's why we screened for it.

20        THE COURT:  But what are you referring to in the

21   July 10th letter that you just said that he misinterpreted?

22        MR. VARNELL:  It's on -- on page two at -- at the

23   top, Item Number One is where we -- in italics we say:

24        "In fact, non e-mail data and documents" --

25   I want to make sure I'm giving you the right quote; it is

Case 2:04-cv-40346-SJM-MJH Document 512-20  Filed 03/18/08  Page 42 of 71   111
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   right at the beginning of the -- the italics -- italicized

2   information.

3          THE COURT:  In -- in one or two?

4          MR. VARNELL:  Number one on page two.

5          THE COURT:  Paragraph one.  Okay.

6          MR. VARNELL:  "No" -- "No access to non e-mail data

7          and documents is to be provided to Plaintiffs or

8          their counsel."

9          THE COURT:  I take it that the attachments would be

10  e-mails.  If -- if what you're describing, the nested one is

11  basically the forwarding of an e-mail, it -- it just gets a

12  different format in Outlook than it does in Lotus, that that

13  would be an e-mail so that he would have been producing them,

14  and you're saying they weren't being produced.

15         MR. VARNELL:  I'm saying under -- under this reading

16  that the nested is not an e-mail, then it's got to be a -- a

17  non e-mail and it shouldn't be part of the production.  That's

18  correct, your Honor.  And the same way, an attachment is part

19  and parcel to an e-mail.  If I forward an attachment on to

20  somebody and say, "Please review the attachment," I mean,

21  that's the whole purpose of the e-mail, so very reasonably we

22  took the position that -- that a nested e-mail is an e-mail,

23  and an attachment is inherent to an e-mail so it's got to be

24  screened for privilege if it's going to be included in -- in

25  the production.

1    THE COURT:  But why -- I mean, why would a person

2   not think that, again, with these nestings that may be an

3   e-mail because it's forwarding of an e-mail, but if the

4   attachment was a pdf or WordPerfect attachment of a memorandum

5   to the recipient, why would that -- why would he not

6   reasonably assume that's not an -- that's not e-mail data?

7    MR. VARNELL:  I think, your Honor, given the fact

8   that he's an expert and -- and deals with this stuff, he

9   should have absolutely assumed that that was either an e-mail

10   or inherent to an e-mail, and at a minimum, he should have

11   asked us about that.

12    But again, that goes to my point.  This is a billing

13   issue between Plaintiffs' counsel and Mr. Lanterman.

14    THE COURT:  Mr. Lukas, why is it --

15    MR. LUKAS:  I have a couple questions.  Why -- why

16   -- why, before turning a forty-thousand-dollar e-mail search

17   into a seventy-nine-thousand-dollar e-mail search, they didn't

18   call us or reply to one of the e-mails and say, you know,

19   "We're having a problem.  Lanterman screwed up.  He did this;

20   he did that.  We have to go back to him.  It might cost more

21   money."  Nothing like that.  We've got them just running back,

22   and frankly, if we didn't have that -- that detailed invoice,

23   we would have no clue.

24    THE COURT:  But that doesn't get away from the fact

25   that maybe Lanterman bears some of the responsibility for not

1  getting a definition or a clarification of what non e-mail

2  data.  I mean, it seems to me that one of the primary

3  questions that people that are thinking about this when

4  they're searching e-mails is do you want to search the

5  attachments or do you just want to search the body of the

6  e-mail, and --

7       MR. LUKAS:  Well, I find it hard to believe that --

8  I mean, if -- if we were having this conversation before

9  Mr. Lanterman spent the fifteen grand, I would say I find it

10 hard to believe that there's an attachment that is -- there's

11 an e-mail attaching something that's going to escape the

12 screen.  I mean, we're talking -- and I'd like Mr. Varnell to

13 tell you what percentage of e-mails were screened here.  It's

14 over nine -- he knows, but Mr. Lanterman is telling us it's

15 going to cost us six grand to find out.  Nothing is slipping

16 by this search.  That's for darn sure.

17       And whether or not it should have been in the first

18 place, we have no control over it.  Their -- he's their agent.

19 We're paying for it.  We're not allowed to talk to him, and

20 they're not letting us know any of this stuff is happening, so

21 I don't know what we could have done about it at any stage of

22 this process.

23       THE COURT:  I mean, did you focus on that issue of

24 the non e-mail data, whether that would flush all attachments?

25       MR. LUKAS:  We didn't know it was an issue until we

1    got -- until we took Mr. Lanterman's deposition and found out

2    why he ran up another -- why he ran another six-thousand-

3    dollar run of the e-mail.

4              THE COURT:  You didn't have any concern about what

5    non e-mail would be and what -- what Lanterman was going to do

6    with that?

7              MR. LUKAS:  No.  Did I?  No.

8              I -- you know, you call it a mistake.  You call it

9    Lanterman's mistake, and then what?  You call it Lanterman's

10   mistake, and then you call us, maybe you, and say, "What are

11   we going to do about this?"  You don't just say, "Go ahead and

12   run another sixteen-thousand-dollar run after I already had

13   you run another twelve-thousand-dollar run without talking to

14   Plaintiffs," when there's an e-mail sitting in your e-mail box

15   from Ms. Srey.

16             THE COURT:  This -- this -- this -- this was -- this

17   was the instruction that went out that he ran, and that's when

18   he did the screening attachments, and, I mean, obviously the

19   language could have been clearer.  Is there anywhere in here

20   where he's told to -- to screen attachments?

21             MR. LUKAS:  No.  Nowhere in there.

22             THE COURT:  And that didn't cause you concern?  You

23   didn't -- you were -- you were confident with this -- all the

24   attachments were screened?

25             MR. LUKAS:  What I was confident was that they --

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

 1    that -- that all of these people --

 2            THE COURT:  Screened for screening in, not

 3    screening out.

 4            MR. LUKAS:  No, I -- I didn't have a position on it

 5    one way or the other.  I never considered it, Judge.  I can't

 6    tell -- I can't sit here and tell you I considered it.  I

 7    didn't.  I sure would have considered it if they'd called us

 8    and told us it was a problem.

 9            THE COURT:  And Lanterman didn't ask you this when

10    he -- or get a clarification as to whether attachments were to

11    be searched or just the body of the e-mail?

12            MR. VARNELL:  He -- he did not, your Honor.  He did

13    ask about attachments or the nested e-mails, the same --

14    the --

15            THE COURT:  I mean, he talked about parent and --

16    and -- and histories.  I take it those he was understanding

17    that he was -- he was to screen the whole thing, because he

18    probably wouldn't have a methodology just to screen out the

19    top part of it, because I think they're all just part of the

20    text.

21            MR. VARNELL:  My -- my understanding and intent was

22    that he was going to screen the entire e-mail, including any

23    nested e-mails or attachments, so I was more than surprised

24    when he essentially made the call not -- not to do that.

25            And as to Mr. Lukas' point about --

Case 2:04-cv-40346-SJM-MJH  Document 512-20  Filed 03/18/08  Page 47 of 71    116
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1       THE COURT:  He read the "no access to non e-mail" as
2   ruling out attachments.
3       MR. VARNELL:  I'm not exactly sure how -- how he in
4   fact read that -- that specific language, your Honor, but he
5   -- he did not screen for attachments and nested e-mails the
6   first time around.
7       THE COURT:  But, your Honor, I guess to answer
8   Mr. Lukas' part about us not conferring with them every step
9   of the way along here, your Honor, again you came up with a
10  good solution to -- to balance their need or request for
11  e-mails, our need to protect our privilege.  We executed that
12  -- that solution.  Part of it was that Mr. Lanterman would
13  work as our agent.  If we were having to go to -- to Mr. Lukas
14  or his firm and -- and check every step along the way, that
15  would have defeated the -- the purpose of -- of the agency.
16  They were -- they were pressing us to get the e-mails out the
17  door.  We were working diligently to do that, and when these
18  issues -- we -- we quickly QC'd -- quality checked for -- for
19  review each -- each installment that he sent us.
20      And again, your Honor, when -- when he came up and
21  -- and gave us the -- the -- the manager e-mails the first
22  time around, I advocated on behalf of Plaintiffs in terms of
23  the price, and I think this is an important point:  The
24  overall production, the one hundred and fifty thousand
25  e-mails that were produced, came in at market cost, both in --

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   in comparison to the number of e-mails --

2          THE COURT:  Well, I -- I hear that.

3          MR. VARNELL:  -- we produced and --

4          THE COURT:  Let me ask, on -- on this third run, the

5   one where they were doing embedded/nested, that was for the

6   managers first?

7          MR. VARNELL:  That's correct, your Honor.

8          THE COURT:  Okay.  And then it was rerun for the

9   plaintiffs?

10          MR. VARNELL:  That's right.

11          MR. LUKAS:  No.  By the time they got to the

12  plaintiffs, they'd already cleaned up the first and last name

13  and the embedded issue, so when they ran the plaintiffs the

14  first time, it was a one-time run.

15          THE COURT:  That was the --

16          MR. VARNELL:  That's Submittal Number -- that's

17  Submittal Number Four, your Honor.

18          THE COURT:  But then there were four plaintiffs who

19  got excluded.

20          MR. LUKAS:  They repopulated.

21          THE COURT:  And was that because of the names?

22          MR. VARNELL:  Let -- let me answer that, your Honor,

23  if I -- if I may.

24          Again, we did a quality control each time the

25  e-mails were sent back to us.  We noticed that one plaintiff's

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   mailbox had been over-excluded.  It looked like all the

2   e-mails had been taken out, so my colleagues and I, we called

3   Mr. Lanterman and his team and said, "What's the deal with

4   this?"  That's when we realized that there was this overlap

5   issue involving the first names.

6           We asked Mr. Lanterman's team to identify how many

7   mailboxes that happened to.  He came back with the four names.

8   That's when we told him to repopulate those mailboxes and that

9   we would -- we would review those mailboxes for privilege.

10          It wasn't because we were trying to hide the ball.

11  It wasn't because we were trying to deprive him of e-mails.

12  That was just essentially a -- a glitch in the system that we

13  remedied, and we remedied -- remedied it manually at our cost.

14          THE COURT:  The repopulating you didn't do at your

15  cost because you would -- didn't know which e-mails were --

16          MR. LUKAS:  No.

17          MS. SREY:  No.

18          MR. LUKAS:  The -- the manual review, we did.

19          THE COURT:  What do you mean?  Once he -- once he

20  put the -- took the first names out of these four individuals,

21  these names were -- you checked to make sure there weren't any

22  attorney-client privileges --

23          MR. VARNELL:  That -- that's correct.

24          THE COURT:  -- and there weren't any.  Okay.

25          I mean, I'm amazed that Lanterman didn't get a clear

Case 2:04-cv-40346-SJM-MJH  Document 512-20  Filed 03/18/08  Page 50 of 71    119
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    and distinct marching order on whether there was or was not

2    going to be a search of attachments, and I'm also -- of these

3    that when he said we're going to go to first and last names,

4    you didn't say, "Are you sure that none of the persons whose

5    mailboxes we have, have any of these first names?"  I mean, I

6    just think that Lanterman has got to bear some of the costs on

7    this thing because I think that --

8          MR. LUKAS:  Your Honor, the point is are those are

9    things we could have brought up.  He says that to talk to us

10   would have defeated the purpose of the agency.  The purpose of

11   the agency was to prevent us from seeing privileged documents.

12   That was the purpose of the agency.  It wasn't to keep us

13   completely in the dark when you turn a forty-thousand-dollar

14   search into an eighty-thousand-dollar one.  That wasn't the

15   purpose of the agency.

16         And -- and, you know, it goes even further.  He

17   talks about the nine thousand dollars for depo' prep.  Why

18   should we have to pay Lanterman nine thousand dollars because

19   Mr. Varnell wants to prepare him for a depo'?  What could you

20   possibly have to prepare him for?  He was talking about an

21   informal conversation on the phone.  Why do they need twenty-

22   four hours to prepare him for a depo'?  Why --

23         MR. VARNELL:  Your Honor, I --

24         MR. LUKAS:  -- and why should we have to pay for it

25   so they can prepare him for a depo'?

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1    MR. VARNELL:  Your Honor, if I can respond to that

2   point, they asked for the deposition.  We said that it would

3   be costly and expensive.  We also said we'd put him on a

4   conference call.

5        Your order said that he needed to do two things.  It

6   said that he needed to gather up all of his relevant

7   documents, as did his team, and it said that he needed to be

8   in position to explain his invoice to Plaintiffs.  That's the

9   conversation that I had with him.  Those were the two marching

10   orders I gave him, that he -- he and his team needed to gather

11   up all their e-mails and other responsive documents.  They did

12   that, and then he put himself in position to -- to be able to

13   explain the invoice.

14        I had one conversation with him the night before.

15   This twenty-four hours, I'm not responsible for that.  As I

16   pointed out in my response letter to Plaintiffs --

17        THE COURT:  Okay.

18        MR. VARNELL:  -- when you -- when you ask to depose

19   a CEO, they've got to take some time to get up to speed.

20        THE COURT:  Did my original order say anything about

21   who the -- or what the dispute resolution is likely -- is

22   going to be vis-a-vis Lanterman, because he's obviously not

23   here, and he has some due process rights, but I do think

24   that --

25        MR. LUKAS:  I don't believe so, your Honor.

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 52 of 71    121
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          Your Honor, one more thing on this issue, and I

2    think this is important; maybe you don't think it is.  It's

3    very important for us that you know that this screening

4    process eliminated virtually all of the e-mails.  They're

5    saying it will cost us somewhere between fifty-five hundred

6    and sixty-eight-seventy-five to get an answer from Lanterman

7    on what percentage of the e-mails were screened-slash-

8    blockaded here.  Mr. -- if Mr. Varnell is not prepared to give

9    you that answer, we're going to go -- we're going to leave

10   here and pay Lanterman that money to find out, because I think

11   what you're going to learn is that it's ninety-five percent

12   plus was screened.  We got this much of this stuff, and --

13   and --

14          THE COURT:  Do you know what the percentage was?

15   Did he give you the answer to that question?

16          MR. VARNELL:  Your Honor, I know that he went back

17   after the deposition and started looking at the manager

18   e-mails because that's what he ran, you know, the two

19   different screens, the combined first and last names and the

20   single first and last names, and I know we made significant

21   progress on that.

22          What I also know is that when I asked Plaintiffs to

23   just give me specific assurance that they will pay for the

24   work that they asked him to do, they haven't done that.

25   Again, it's just another step in the process of them asking

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    him to do additional work but then not saying they'd pay for

2    it.

3            MR. LUKAS:  We're going to pay for it if he's not

4    prepared to tell you -- we think he knows, but he's not

5    prepared to tell you, and we'll -- we'll get that from him and

6    we'll pay for it, because we think it's important you know

7    that it's an extremely high number, probably in the ninety

8    percent.

9            MR. VARNELL:  I -- I don't know where this ninety or

10   ninety-five percent number is coming from.  I don't.

11           I also know that --

12           MR. LUKAS:  Well, we'll find out.

13           MR. VARNELL:  I also know that Mr. Lanterman can

14   look at the manager e-mails, because those are the two

15   different searches that he did in terms of combined first and

16   last names.

17           MR. LUKAS:  We know we've got plaintiffs who

18   literally have no -- no e-mails in there:  none.  We think

19   this -- and -- and we know -- you've got eighty-seven people

20   and we've got a hundred and fifty thousand e-mails?  You do --

21   I mean, I don't know what your e-mail box looks like, but I'll

22   bet you I've got fifty of them since we've been sitting --

23           THE COURT:  What were your discussions -- what were

24   your discussions with Mr. Varnell in -- in the earlier, you

25   know, meet-and-confer over what Lanterman was going to do,

Case 2:04-cv-40346-SJM-MJH   Document 512-20   Filed 03/18/08   Page 54 of 71    123
Henry, et al., v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    because again --

2              MR. LUKAS:  It's in this letter, Judge.

3              THE COURT:  -- it just -- it just seems to me that

4    the issue of whether you're going to look at attachments or

5    not look at attachments is, like, real early in the discussion

6    somewhere, and in fact, you know, I think you would have

7    wanted to make sure that they're going to be looking at the

8    attachments because otherwise you're going to miss a lot of

9    stuff, and you might also want to make sure that you're

10   looking at all the histories, and if -- if a lawyer's name

11   shows up on the fourth attachment, you get to at least see the

12   parent document on that attachment.

13             MR. LUKAS:  I would -- I would assume the opposite.

14   I would assume that if the e-mail gets through, the

15   attachments get through.  That's what I would assume.

16             THE COURT:  Well, you're talking about the --

17             MR. LUKAS:  If the parent e-mail gets through, the

18   attachment -- that would be my working assumption.

19             THE COURT:  So -- so -- so you're accepting the fact

20   that if a lawyer's name is in the fourth attachment, the

21   entire string of four e-mails is excluded.

22             MR. LUKAS:  No.  You're saying -- you're saying what

23   I would --

24             THE COURT:  Well, that's -- that's -- if you're

25   doing a search for excluded terms and on the fourth e-mail is

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 55 of 71    124
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   one of the lawyer's names, everything above it's going into

2   the --

3         MR. LUKAS:  No.  You're asking what I would have

4   presumed, and you would have presumed I would want that to

5   happen.  On the contrary, I would have presumed -- and maybe

6   it's dumb of me to presume this -- I would have presumed that

7   if the parent e-mail makes it through, the attachments make it

8   through, but that's sort of like what we would have presumed

9   had we put it in this letter to Lanterman.  I can't tell you

10  what we would have presumed.

11        THE COURT:  The e-mails you got were produced to you

12  in electronic form?

13        MR. VARNELL:  Native PST, your Honor.

14        THE COURT:  Okay.

15        MR. LUKAS:  And that's -- that was the whole point

16  of the Native -- that's what he had to convert that we paid

17  the fifteen thousand dollars for, so that it would come in

18  that format.

19        THE COURT:  Okay.

20        MR. LUKAS:  But we'll get you the percentage of

21  e-mails screened because that's very important to us, and

22  we'll -- I guess we're going to pay seven grand to do it,

23  but he still hasn't answered the question what -- what

24  percentage was excluded.  I think they were almost all

25  excluded, Judge.  A hundred and fifty e-mails from eighty-

Case 2:04-cv-40346-SJM-MJH  Document 512-20  Filed 03/18/08  Page 56 of 71     125
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   seven people over a three-month period that covers however

2   long back -- they just sit there in your e-mail box -- sounds

3   incredible to us.

4           THE COURT:  Yeah.  I also -- even though Mr. Davis

5   may have used as an example at that hearing the Richard

6   problem and -- and the difficulty to determine whether it's

7   the marketer Richard or the lawyer Richard, I -- if I was told

8   whether we were going to do first name and/or last names, I

9   would say you can do only last names, but I -- I can't

10  conceive that I would have ever authorized that a first

11  name --

12          MR. LUKAS:  We --

13          THE COURT:  -- was going to exclude --

14          MR. LUKAS:  We did address the Richard problem, your

15  Honor.  We addressed it by having -- limiting to our terms;

16  they had exclusionary terms, and they got the full name on the

17  thing.  So we did.  We -- I mean, this -- if you look at this

18  document and you look at our screening, it was extremely

19  broad.  We did address any problem.

20          Boy, I'll tell you they sure didn't come out on the

21  short end of the stick on this, so --

22          THE COURT:  Wait a minute.  I have not read the

23  whole July -- is that -- is that discussed in -- is the

24  Richard document discussed in here?

25          MR. LUKAS:  No.

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          THE COURT:  Okay.

2          MR. LUKAS:  No.  He's talking about -- when he was

3    talking to you, you talked about what was discussed at the

4    hearing with you.  Afterward, we did this whole rigmarole.

5          THE COURT:  Okay.  But what was the resolution with

6    respect to whether the first name or last name or both names

7    or either name was going to be used?  That was not decided at

8    that hearing.

9          MR. LUKAS:  It was the list.  It was the list, and

10   the list identified them by full name --

11         THE COURT:  Okay.

12         MR. LUKAS:  -- first and last name.  That was the

13   list.

14         MR. VARNELL:  Again, your Honor, I would -- I would

15   just point to page fifty-five of the transcript where my

16   colleague Mr. Davis said:

17         "Presumably Mr. Lanterman can identify them."

18   That's where he's referring to the real issue, if you will,

19   the two Richards, that issue.  His whole point was there are

20   going to be e-mails where somebody may say "Richard," meaning

21   Richard Chyette, the corporate counsel, advises this or that.

22         We talked and we agreed to a fully automated process

23   in order to -- to expedite this.  Mr. Lukas never commented or

24   objected on any of that.  All he said was that if -- if an

25   e-mail has a lawyer's name, it can, quote/unquote, go right in

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1    the dumper.

2              MR. LUKAS:  Here's the list, Judge, and this is what

3    we did after sitting down.  Here's the list.  Here's the

4    exclusionary terms.  It's not --

5              THE COURT:  If you want, we can make copies of that

6    list also.

7              MR. LUKAS:  I'll give you this.

8              THE COURT:  Is that attached?

9              MR. LUKAS:  Yeah.

10             MR. SREY:  Yes.

11             MR. VARNELL:  It's -- it's in the pleadings, your

12   Honor.

13             THE COURT:  Okay.  Okay.  I will be able to get it

14   out, then.

15             MR. LUKAS:  I think this is the second time I've

16   given it to you, actually.

17             THE COURT:  No.  That was the list --

18             MR. LUKAS:  Oh, yeah.  I gave you the list of

19   managers.

20             THE COURT:  You gave me -- the list here is just

21   managers.

22             MR. LUKAS:  But that's what he was given, and that's

23   why he --

24             THE COURT:  Exhibit D.  Okay.  That's all I need to

25   know.  I will -- I will tab it.

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 59 of 71    128
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          MR. LUKAS:  Oh.  Okay.

2          THE COURT:  Give us Exhibit D.

3          It's not that Exhibit D.

4          MR. LUKAS:  Exhibit --

5          MS. SREY:  It -- it is D, but there's probably more

6    than one.

7          THE COURT:  It's in there.

8          MR. LUKAS:  Apparently they gave me the -- the

9    grouping binder.

10         Your binder has got them, right?

11         Yeah.  There's nothing in the letter to Lanterman

12   and in the protocol that talks about separating out this list

13   in any way.  These are the terms given to him.

14         THE COURT:  I want to read this thing Mr. Davis said

15   about the two Richards.

16         "Search term for privilege would also certainly be

17         lawyers' last names."

18         Let me also -- because I know, having looked at this

19   stuff, it's going to be a real issue -- if he wrote "two

20   Richards," that issue --

21     (Pause in proceedings)

22         THE COURT:  That's such an opaque aside, I'm sorry

23   to say, to anything.  I mean, the first thing he realizes is

24   that the search term would certainly be the lawyer's last

25   name, and then he's got the musing about first names, but he

Case 2:04-cv-40346-SJM-MJH   Document 512-20   Filed 03/18/08   Page 60 of 71     129
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    doesn't say that, "We would want to search for first names,"

2    or that that issue really got put in clear focus at the

3    hearing, and I must say that if I were to have had to make a

4    determination, I would say last name because, especially in

5    string cites, usually somewhere in the e-mail address or

6    somewhere a last name will appear as part of the identifier.

7         MR. LUKAS:  Ms. Srey and Mr. Varnell talked about

8    the -- the search terms over and over, and never once did

9    Defendant take the position that it had to be separated out,

10   and this is what was given, and this is the list:  first and

11   last name as -- as the exclusionary term.

12        MR. VARNELL:  That -- that's because, your Honor, I

13   know at the April 17th hearing that the -- the -- the two-name

14   issue was -- was discussed.  Mr. Davis says presumably

15   Mr. Lanterman can identify them.  I mean, that -- that

16   statement says that we were going to ask him to identify first

17   and last names.  The entire point of this privilege screen was

18   to err on the side of -- of being --

19        THE COURT:  Well, that -- that --

20        MR. VARNELL:  -- overly cautious, and --

21        THE COURT:  Anyway, that's assuming that in a -- the

22   fast-paced give and take of -- of -- of language, I am to say

23   that infers that we're going to -- we've agreed to a search

24   for first names.

25        Had we said we'll do a lawyer's -- for a search

*Henry, et al. v. Quicken Loans, et al.*
*Chasteen, et al. v. Rock Financial, et al.*

1    name, if I was asked to decide on it, I would say either the

2    combined name or the last name. I would never have authorized

3    the first name because of the problem of overlapping first

4    names being so common.

5         MR. VARNELL: Again, your Honor, at -- Mr. Lanterman

6    then -- he used his own interpretation, which would have

7    allowed the last names of lawyers to -- to remain. That --

8    that clearly wasn't right. I don't think it was the intent

9    coming out of -- out of the hearing, so, you know, I -- I

10   corrected him on that point in order to make sure that last

11   names were -- were screened out and so that, again, the

12   privilege structure put in place -- the privilege protocol put

13   in place provided maximum protection.

14        And again, in other context, Plaintiffs seemed very

15   happy -- in fact, they -- again, they brag about the number of

16   e-mails they got, and they make use out of them in their --

17   their summary judgment motion. They got plenty of e-mails.

18        THE COURT: I just can't -- I mean, I -- again I --

19   I -- who's responsible for -- for communicating clearly with

20   Mr. Lanterman? I think Lanterman has got some responsibility

21   for describing some of the problem that you've got to focus on

22   and get clear and distinct answers to, and again the first

23   name -- the first and/or last name is one of them. A list had

24   both names. As he says, if the lawyer didn't have a first --

25   his first name, was only referred to by his last name or used

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 62 of 71    131
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    a nickname as a signature like Tom instead of Thomas, that he

2    would have missed that in there.

3          MR. LUKAS:  How do you -- how -- we're running a

4    search for the person's name.  It's either to them, from them,

5    or they're cc'd on the thing.  Where would they -- why do you

6    have to run a search for "David"?  Why do you have to run a

7    search for "Davy"?

8          THE COURT:  I'm -- I'm ruling out David, but I'm

9    saying with -- what he's saying is that had we run it as

10   Lanterman initially ran it and as you say you authorized,

11   first and last name, that you would not have gotten e-mails

12   that had only the last name anywhere in the text.

13         MR. LUKAS:  I don't -- I mean, you can ask

14   Mr. Varnell.  I don't think we did.  The first -- ask him --

15         THE COURT:  And sometimes people use "T" or "SPB"

16   and -- instead of a full first name in the e-mail address.

17   They often assign shortcuts for their -- you know, their

18   common given name.

19         MR. VARNELL:  Your Honor, if I -- when -- when I

20   clarified the -- the first and last name issue with

21   Mr. Lanterman, there's -- there's an e-mail attached as an

22   exhibit where they then asked for clarification on common

23   derivations of first names, I said, "No, 'Thomas' doesn't need

24   to become 'Tom,'" that kind of thing.

25         THE COURT:  But there wasn't this kind of discussion

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1    at the initial round so you could get these, and that's why

2    I'm surprised this thing even got launched in the first place

3    without a lot of these questions getting asked. I mean, they

4    just seem so primary.

5          MR. VARNELL: Again, I -- after sending him this --

6    this letter, I had follow-up conversations with Mr. Lanterman,

7    asked him if he understood it. I thought this issue was --

8    was addressed with him. Apparently it was not because when we

9    QC'd it, he'd gone ahead and -- and run the combined first and

10   last name searches, which I then went back and said that's --

11   that's not correct.

12         THE COURT: Well, I mean, I can't -- I mean, I'm

13   making a lot of negative inferences with regard to Lanterman,

14   and again he's not here to speak for himself, so I don't -- I

15   don't -- I'm obviously not in a position to make any ruling.

16   I'm not sure I have jurisdiction to make any rulings over this

17   bill or whether this is a Minnesota -- Minnesota State Court

18   issue.

19         MR. LUKAS: Well, we can't help you, Judge, because

20   we haven't been allowed to talk to him, and they never talked

21   to us while it was happening. That's the point. All this is

22   going on behind the curtain, and then we just get the ninety-

23   thousand-dollar or -- what is it? -- seventy-nine-thousand-

24   dollar bill.

25         MR. VARNELL: They had deposed him, your Honor.

1    THE COURT:  Anyway, this is something that -- and

2  you can tell him I'm quite willing to give him a hearing, and

3  I'll even do it telephonically and get written statements from

4  him first, but it's an issue on which all three parties are

5  going to have to give some, and part of the sum total, their

6  share, should go that you're picking up twenty-four hours

7  preparing for the deposition because that was way beyond what

8  I was expecting, but that was nothing of their doing.  They --

9  it was not twenty-four hours with them.

10    MR. LUKAS:  Well, I don't know that.  I don't -- we

11  don't know that.

12    THE COURT:  He just said he didn't spend more than

13  fifteen minutes with him --

14    MR. VARNELL:  I --

15    THE COURT:  -- giving him the instructions that I

16  gave from the court -- from the bench, and when I gave those

17  instructions, I was assuming it would take him several hours

18  to round up what he did, maybe reread the letters, make sure

19  he had those, but I wasn't anticipating it would take twenty-

20  four hours to prepare for a deposition.

21    MR. LUKAS:  I'm sorry.  I didn't hear him say that

22  he didn't spend --

23    MR. VARNELL:  I had an initial conversation with him

24  where I told him that he and his team needed to pull together

25  all their documents and that he needed to be in position to

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 65 of 71    134
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   explain his invoice, and then the night before his deposition,

2   I had a conversation with him.

3           Frankly, we weren't always dealing with

4   Mr. Lanterman.  We were at times dealing with members of his

5   team.  You know, he's got an organization underneath him.

6           So I had one substantive conversation with him the

7   night before.  That was it.

8           MR. LUKAS:  For how long?

9           MR. VARNELL:  I'd have to go back and look at my --

10  my time records.  Probably an hour.

11          THE COURT:  Did he explain what at this deposition,

12  or did you know that he was going to be able to make it in

13  twenty-four hours for the --

14          MR. LUKAS:  No.  That -- that came after, of course,

15  and now it's sixty-eight hundred bucks to find out what

16  percentage of the e-mails were screened.

17          THE COURT:  And did you find out what it's going to

18  cost to find out how he spent those twenty-four hours?

19          MR. LUKAS:  No.  We can't talk to him.

20          THE COURT:  Okay.  Without his involvement, I can't

21  resolve this dispute.  I think a part of it goes on his not

22  getting his clients to give him clear and distinct

23  instructions on ambiguities that he would know are commonplace

24  problems that come up in these kinds of searches.

25          MR. LUKAS:  Your Honor, can I ask you when the scope

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1   of this agency relationship ends?  When can we talk to

2   Lanterman?

3           THE COURT:  I think that you have no objections to

4   him talking to him not involving attorney-client privilege.

5           MS. SREY:  No.  There's a --

6           THE COURT:  Pardon?

7           MS. SREY:  There's a letter from them that says that

8   we don't have permission to talk to them.

9           MR. LUKAS:  Yeah.  This letter from them saying we

10  can't talk --

11          MR. VARNELL:  We -- we have taken the position that

12  -- that your order still -- still applies, your Honor, that

13  he's -- he's our agent.  I mean, that -- that order is still

14  in place.

15          THE COURT:  As your agent, so long as he is not

16  talking about the content of any e-mails -- that is, the

17  substantive content that might be involving attorney-client

18  privilege -- I don't see what he can't talk about search

19  protocols, instructions, communications.

20          MR. VARNELL:  Your Honor, I think they should have

21  to pay for those conversations as well as --

22          THE COURT:  No, no.

23          MR. VARNELL:  Oh.

24          THE COURT:  If -- if they're going to --

25          MR. VARNELL:  And what Mr. Lanterman -- or, excuse

1  me -- what Mr. Lukas has -- has offered to pay for in terms of

2  any additional data that they want.

3          THE COURT:  If -- if they want additional data,

4  they're going to have to pay for it, and if they want to talk

5  to him, they're -- what is his hourly rate?

6          MR. LUKAS:  I don't know.  It must be five hundred

7  bucks.

8          MR. VARNELL:  Well, it's here on his invoices, your

9  Honor.

10          MR. LUKAS:  Twenty-four hours is nine grand, so --

11  wasn't it?  Twenty --

12          MS. SREY:  Twenty-four hours is nine grand, so --

13  twenty-four hours of dep' --

14          THE COURT:  Two-seventy-five?

15          MS. SREY:  I think so.

16          THE COURT:  Okay.  Well, that's really not out of

17  line for a forensic computer expert.

18          MR. LUKAS:  Well, I'm not sure that's his --

19          MR. VARNELL:  I think it's actually -- I think it's

20  actually three seventy -- seventy-five, your Honor.

21          MS. SREY:  Oh.

22          MR. LUKAS:  Yeah.  He's --

23          THE COURT:  Three seventy-five?

24          MR. LUKAS:  Yeah.  His -- his associates are

25  cheaper.

Case 2:04-cv-40346-SJM-MJH   Document 512-20   Filed 05/18/08   Page 68 of 71        137
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          THE COURT:  Yeah.  Okay.

2          Anyway, there is a billing dispute.  Who contributed

3    to the problem?  I think that there is some responsibility

4    going all the way around.  I must say that I'm sure

5    Mr. Varnell will have learned from this the next time he deals

6    with a forensic expert, but I must say if Lanterman is dealing

7    with somebody that he thought was giving him -- giving him

8    ambiguous instructions or instructions that they may not

9    really want, that he's had some of the requirement to advise

10   you to what exactly do you mean by this, because it's --

11   because it's inconceivable that he doesn't get a clear and

12   decisive answer on whether you're searching attachments and he

13   doesn't get a clear and decisive answer as to names and what

14   his, maybe, advice would be on searching for names and what he

15   could do as a second round -- if you screen it this way, how

16   much of additional search is going to be -- need to be done

17   manually or can be done by another computer method.

18         But, I mean, I -- I can't resolve the dispute just

19   on your present submissions.  I mean, Mr. Varnell, I'm sure

20   the last clear chance doctrine applies a little bit in this

21   case, too, that if in your communications with him -- but you

22   said you sent the 10th letter to them, and they didn't -- but

23   -- but he ran -- the 10th letter came after his first run.

24   That wasn't his -- that was before his first run.

25         MR. LUKAS:  No.  The 10th letter came before he did

1    a thing.

2              THE COURT:  Okay.

3              MR. VARNELL:  I'm sorry, your Honor.  The 10th

4    letter?

5              THE COURT:  The July 10th letter was before he did

6    anything.

7              MR. VARNELL:  Oh, the July 10th letter.

8              MR. LUKAS:  Yeah.

9              THE COURT:  Okay.  I was just getting that

10   clarified.

11             Okay.  Anyway, I can't resolve this, I'm sorry,

12   based on the present submissions.

13             MR. LUKAS:  So they -- so we can't talk to Lanterman

14   about privileged information, but we can talk to him at his

15   hourly rate about the process.

16             THE COURT:  About the process, yes.

17             MR. LUKAS:  Okay.  Thank you, Judge.

18             Shall we renew the motion or talk -- Mr. Varnell and

19   I talk after we talk with Lanterman or --

20             THE COURT:  I -- I think you should talk to

21   Lanterman and Mr. Varnell about trying to resolve this.

22             MR. LUKAS:  Okay.

23             THE COURT:  Okay?

24             MR. LUKAS:  Okay.

25             THE COURT:  Okay.

Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1          MR. LUKAS:  That's what we'll do.

2          THE COURT:  Thank you.

3          MR. LUKAS:  Thanks, Judge.

4          MR. VARNELL:  Thank you, your Honor.

5          MR. DAVIS:  Thank you, your Honor.

6       (Proceedings concluded)

7                        -      -      -

Case 2:04-cv-40346-SJM-MJH Document 512-20 Filed 03/18/08 Page 71 of 71    140
Henry, et al. v. Quicken Loans, et al.
Chasteen, et al. v. Rock Financial, et al.

1

2

3

4

5

6

7

8

9          I certify that the foregoing is a correct

10   transcript from the electronic sound recording of the

11   proceedings in the above-entitled matter.

12

13

14   _____        March 4, 2008
     Karin Dains, Court Transcriber         Date Certified

15

16

17

18

19

20

21

22

23

24

25