THE UNITED STATES DISTRICT COURT
THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RYAN C. HENRY, individually and on behalf
of all other similarly situated employees,

           Plaintiffs,                       Case No. 04-40346

vs.

                                     DISTRICT JUDGE PAUL V. GADOLA
                                     MAGISTRATE JUDGE STEVEN D. PEPE


QUICKEN LOANS, INC., a Michigan corporation,
and DANIEL B. GILBERT, personally and individually,

           Defendants.
_____/

**OPINION AND ORDER GRANTING PLAINTIFFS'
MOTION TO COMPEL (DKT. #491)**

On December 17, 2007, Plaintiffs filed a Motion to Compel Defendants to (1) produce

emails screened on the basis of the privilege; (2) produce non-e-mail documents withheld on the

basis of the privilege; (3) produce an additional month of e-mails as previously contemplated

and; (4) assume the cost of Defendants' unnecessary screening (Dkt. #491). This motion was

referred for hearing and determination pursuant to 28 U.S.C. § 636 (b)(1)(A) (Dkt. #493). A

hearing was held on February 11, 2008, in which all unresolved issues were heard. For the

reasons indicated below, Plaintiffs' motion is **GRANTED**.

**I.**     **BACKGROUND FACTS**

This is a Fair Labor Standards Act ("FLSA") overtime collective action brought under 29

U.S.C. § 201 *et seq.*, involving approximately 422 Plaintiffs who worked as "loan consultants"

for Defendants Quicken Loans and Daniel B. Gilbert. Plaintiffs allege that during their

employment as loan consultants for Defendant Quicken Loans that Defendants unlawfully

withheld wages from Plaintiffs by denying them overtime pay for hours worked in excess of 40

hours per week in violation of §207(a)(1) of the FLSA. As a result of this alleged practice,

Plaintiffs contend they suffered a loss of wages and ask for judgment against Defendants for an

amount equal to Plaintiffs' unpaid back wages at the applicable overtime rate, and an equal

amount as liquidated damages, a three year limitation period and all costs and attorney fees

incurred prosecuting this claim because they allege Defendants violation of the FLSA was

willful (Dkt. #1, ¶8).

Plaintiffs' counsel in the present Motion to Compel claims that the "Defendants asserted

good faith reliance on the advice of counsel as an affirmative defense in their Answer (Dkt. #11

at 4.)" (Dkt. #491, p. 1). Yet, the June 30, 2004, affirmative defense states "6. To the extent

Defendants failed to comply with any aspect of federal wage and hour laws, said conduct was

not wilful or intentional, but rather occurred in good faith." This affirmative defense does not

specify that its claim of good faith is based on advice of counsel as Plaintiffs' counsel asserts.

Defendants note in response to the current motion that it is Plaintiffs' burden to prove willfulness

both for liquidated damages and to obtain the three year limitations period. In Defendants'

Reply Brief on their Motion for Summary Judgment on Good Faith Defenses and Lack of

Willfulness, they note:

> Defendants have disclosed no content whatsoever from attorney-client conversations.
> Even a cursory review shows that Defendants based their good-faith claims on Mr.
> Carroll's investigation of the legal standards and mortgage bankers' job duties, not
> his reliance on the substance of counsel's advice.

(Dkt. #476, p. 4.)

**A.      Plaintiffs' First Set of Discovery Requests**

On August 12, 2004, Plaintiffs served Defendants with their first set of discovery requests, which sought information related to Defendants' efforts to determine whether their decision not to pay Plaintiffs overtime compensation complied with the FLSA, and to whether that decision was "willful" or made in good faith. The relevant requests and Defendants' responses are as follows:[1]

> **Interrogatory 6**: To the extent Defendant is relying on attorney advice for its good faith defense to liquidated damages and willful conduct, identify and describe all conversations and correspondence with counsel that was relied upon.

> **Answer 6**: Defendants object to this interrogatory because it requests information that is subject to the attorney-client privilege. Defendants further object to this interrogatory to the extent that it seeks information regarding a good faith defense to "willful conduct" because under the FLSA, Plaintiff has the burden of demonstrating that Defendants engaged in willful conduct. Notwithstanding these objections, and without waiving it [sic], Defendant Quicken Loans, Inc. sought and received attorney advice on the classification of loan consultants but it is not prepared at this point to waive the attorney-client privilege with respect to these communication inasmuch as the issue is not ripe for determination.

> **Request 20**: All documents that identify or describe all efforts taken by Defendant to determine whether or not it was in compliance with the Fair Labor Standards Act and other wage laws by not paying Plaintiffs overtime compensation.

> **Answer 20**: Defendant Quicken Loans, Inc. objects to this Request to the extent that it seeks information that is subject to the attorney-client privilege. Defendant is conducting its investigation, and based on its knowledge and review of the records to date, has no documents which are responsive. Notwithstanding this, to the extent that Defendant discovers responsive, non-privileged documents, Defendant will produce them subject to the entry of an appropriate protective order.

> **Request 25**: All documents that identify, describe or relate to any claim that Defendant's method of compensating loan consultants was not a willful violation of the FLSA and was performed with a good faith belief that Defendant was complying with the FLSA.

---

[1] Defendants' responses to Plaintiffs' Interrogatories are attached as exhibit 1 to the present motion. Defendants' responses to Plaintiffs' document requests are attached as exhibit 2 to the present motion.

**Answer 25**: Defendant Quicken Loans, Inc. objects to this Request because it requests information that is subject to the attorney-client privilege. Defendant further objects to this interrogatory to the extent that it seeks information regarding a good faith defense to "willful conduct" because under the FLSA Plaintiff has the burden of demonstrating that Defendant engaged in willful conduct. Notwithstanding these objections, and without waiving it, Defendant Quicken Loans, Inc. is not prepared at this point to waive the attorney client privilege with respect to these communications inasmuch as the issue is not yet ripe for determination.

Thus, Defendant Quicken Loans while acknowledging that it received legal advice, preserved its attorney client privilege on the classification of loan consultants by not indicating the content of that legal advice.

B.      **Standards for Waiving Attorney Client Privilege**

Unlike authoritarian societies, the freedoms of our society are based on a need for voluntary compliance with the law. Lawyers play a central role in explaining the law and its requirements. They are professionally barred from assisting a client in the violation of the law (*See* American Bar Association Model Rules of Prof'l Conduct R. 1.2(a) & (c)-(d) ("AMRPC"); *see also* Michigan Rules of Prof'l Conduct R. 1.2(a) & (c)-(d) ("MRPC")). Thus, it is believed that facilitating clients seeking legal advice generally serves the interest of justice and society through voluntary compliance. To facilitate clients seeking advice, their communications are protected by confidentiality except in rare instances, including the commission of a crime. *See, e.g*, AMRPC R. 1.6(b)(2); MRPC R. 1.6(c)(4). In a civil matter, a client's decision to disregard the advice of counsel is generally protected from voluntary disclosure by the attorney.[2] The laws of privilege protect the client's confidences from compulsory disclosure by a court.

---

[2] In a situation where a client used an attorney to commit an illegal or fraudulent act, the lawyer can disclose confidences but only to the extent necessary to rectify the consequences of the lawyers misuse. AMRPC R. 1.6(b)(3); MRPC R. 1.6(c)(3)

If we intend to serve the interests of justice by encouraging consultation with counsel free from the apprehension of disclosure, then courts must work to delineate the scope of the privilege in ways that are predictable and certain. "An uncertain privilege-or one which purports to be certain, but rests in widely varying applications by the courts-is little better than no privilege." *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.,* 32 F.3d 851, 863 (3d Cir.1994) (quoting *In re von Bulow,* 828 F.2d 94, 100 (2d Cir.1987)); *Swidler & Berlin,* 524 U.S. at 409, 118 S.Ct. 2081 (recognizing the need to avoid "substantial uncertainty into the privilege's application"). When defining the contours of the attorney-client privilege, we are guided by "the principles of the common law ... as interpreted by the courts ... in the light of reason and experience." Fed. R. Evid. 501; *Swidler & Berlin,* 524 U.S. at 403, 118 S.Ct. 2081.

*In re Lott,* 424 F.3d 446, 450 (6th Cir. 2005).

The privilege may be waived expressly or by implication in several ways. Generally, "the 'attorney-client privilege is waived by voluntary disclosure of private communications by an individual or corporation to third parties. In addition, a client may waive the privilege by conduct which implies a waiver of the privilege or a consent to disclosure.' " *In re Columbia/HCA Healthcare Corp. Billing Practices Litigation,* 293 F.3d 289, 294 (6th Cir. 2002) (internal citations omitted). . . .

The privilege is held to be waived when a client attacks the quality of his attorney's advice through, for example, **a civil defendant's pleading of an advice-of-counsel defense** or a criminal defendant's appeal on grounds of inadequate legal representation. The doctrine is also invoked to waive a personal injury plaintiff's physician-patient privilege and to waive the psychiatrist-patient privilege of a criminal defendant pleading an insanity defense. These allegations have one thing in common: **the pleading places at issue the subject matter of a privileged communication in such a way that the party holding the privilege will be forced to draw upon the privileged material at trial in order to prevail.**

Developments in the Law-Privileged Communications, Implied Waiver, 98 Harv. L.Rev. 1629, 1638 (1985); *see also U.S. Fire Insurance Co. v. Asbestospray, Inc.,* 182 F.3d 201, 212 (3d Cir.1999) (party waives the privilege only when he or she "has made the decision and taken the affirmative step in the litigation to place the advice of the attorney in issue."); *Garcia v. Zenith Electronics Corp.,* 58 F.3d 1171, 1175 (7th Cir.1995). ("[T]he attorney-client privilege is generally waived when the client asserts claims or defenses that put his attorney's advice at issue in the litigation.").

*  *  *

Implied waivers are consistently construed narrowly. Courts "must impose a waiver no broader than needed to ensure the fairness of the proceedings before it." *Bittaker,* 331 F.3d at 720 (habeas proceeding). "A broad waiver rule would no doubt inhibit the kind of frank attorney-client communications and vigorous investigation of all possible defenses that the attorney-client and work product privileges are designed to promote." *Id.* at 722.

*  *  *

To be sure, litigants cannot hide behind the privilege if they are relying upon privileged communications to make their case. "[T]he attorney-client privilege cannot at once be used as a shield and a sword." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.1991). But, while the sword stays sheathed, the privilege stands.

*  *  *

The privilege remains the client's, and the client must take some affirmative step to waive it . . . .[An] implied waiver is limited to situations where the [the party] has made the confidential relationship the subject of [the judicial] inquiry. Importantly, the waiver is implied from the nature of the claim, not from the nature of the proceeding.

*Id.* at 452-454 (emphasis added).

As stated another way in *Ross v. City of Memphis*:

A popular image is that "the attorney-client privilege cannot at once be used as a shield and a sword." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991). FN5 This image is meant to convey that "the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications." *Ibid.*

_____
FN5. It seems to us that this phrase, while elegant, is perhaps a mixed metaphor. Litigants rarely use the attorney-client privilege itself as an offensive tool. Rather *the contents of a privileged communication may be injected into litigation either by making the content of communications a factual basis of a claim or defense* or by disclosing the communication itself. *Thus, it is the content of privileged communications that is used as a sword*, while the privilege is used as a shield to prevent either testing of the claim or, if some privileged communications have been revealed, amplification or impeachment

*Ross v. City of Memphis,* 423 F.3d 596, 604 -605 (6th Cir. 2005) (emphasis added).

Thus, the claim of good faith as an affirmative defense does not imply reliance on the advice of counsel, even in a case such as this where the party acknowledges seeking such advice. Rather the party must by some specific act or assertion put the *content* of that advice behind its claim of good faith – making it "a factual basis of a . . . defense." One might wish to imply that when a party acts after seeking the advice of counsel and acknowledges this, that his or her action was in accordance with that advice – thus implying that the legal advice given the party was an affirmative opinion that the party could proceed without facing liability. In other areas of the law such an implied assertion of fact is accepted from certain other statements of fact.[3] Yet, Defendant Quicken Loans' affirmative defense and its interrogatory responses do not trigger any such implied fact, and with these statements Quicken Loans has not waived its attorney client privilege.[4] In the *Lott* case it was held that, although his attorney might have information from petitioner Lott that was inconsistent with his assertion of actual innocence, in his habeas petition, that assertion of actual innocence alone " has put neither the performance of his attorney *nor the content of their confidential communications* before the court." *Id.* at 454 (emphasis added).

As noted above, it is Defendants' contention that they "have disclosed no content whatsoever from attorney-client conversations." They assert in their defense to this motion that Quicken Loans' Vice-President of Miscellaneous Stuff and Government Relations, David

---

[3] In the law on misrepresentation in both torts and contracts, the doctrine of "half-truths" implies that when the speaker makes a partial statement of facts, there is an implied assertion of fact from that partial statement that the speaker is aware of no facts that are inconsistent with or would render the statements made untrue.

[4] In a different context, when a party is accused of intentional violation of the law, certain responses, such as "Nonsense, I only acted after I talked with my attorney," could be found to imply that the *content* of the attorney's advice was that the action was legally proper. This is not such a context with regard to Quicken Loans' affirmative defense and interrogatory responses.

Carroll, while an attorney himself and well versed in the law on classification under the FLSA,

its regulations and other legal authority was the agent of Quicken Loans and made the decision

concerning the Plaintiffs' job classification for Quicken Loans. Thus, he was not acting as legal

counsel to the corporation but rather he was acting as the decision maker for the corporation.

Among the many sources he considered in making his decision, he acknowledges that he had

sought the advise of Quicken Loans general counsel, Richard Chyette. It is Mr. Chyette's advice

as legal counsel for Quicken Loans, that it asserts is privileged. Defendants argue:

> Plaintiffs have had ample opportunity to test Mr. Carroll on the basis of his
> conclusions. On February 8, 2005, Plaintiffs deposed Mr. Carroll and he answered
> every question they asked about the classification decision he made. Thus,
> Plaintiffs' claim that they have been unable to "test[] the veracity of [his] affidavit,"
> Pls' Br. 8, is extraordinary. Moreover, as the decisionmaker, Mr. Carroll determined
> (with the advice of counsel) how to classify web mortgage bankers. He was not part
> of a legal team that was jointly advising somebody else on how to proceed; he was
> the recipient of advice from the legal department, which he applied in making the
> ultimate classification decisions on his own.[1]
>
> _____
> [1] Of course, the fact that Mr. Carroll was not acting in a legal capacity in this
> circumstance does not mean that he would *never* act in such a capacity. In his
> February 8, 2005, deposition, Mr. Carroll discussed how some of his tasks were legal
> and others were not. *See* Carroll Dep., Ex. A, at 6. Such an arrangement is not
> unusual and does not compromise the privilege Mr. Carroll enjoys when acting as
> a client. As the Seventh Circuit has explained, "[a] client does not lose the privilege
> merely because his attorney serves a dual role." *In re Grand Jury Proceedings*, 68
> F.3d 193, 196 (7th Cir. 1995); *see also* Edna Selan Epstein, *The Attorney-Client
> Privilege and the Work-Product Doctrine* (2008), § 1.III.E4.F.1 ("Lawyers often
> wear two hats. And a communication may be relevant to both capacities. Thus, it is
> often necessary to determine in what capacity the particular communication was
> made."). . . .

(Defendants' Memorandum of Law, Dkt. #496, p. 4.)

At the February 8, 2005, deposition of Mr. Carroll, he noted his two roles as attorney

giving legal advice on certain issues, but as decision-maker on the questions of how the

employees were categorized under the FLSA.

13 Q. And who is involved in the decision to categorize them
14 as exempt?
15 A. Myself and in-house counsel.
16 Q. Mr. Chyette?
17 A. Yes.
18 Q. And when was that decision made?
19 A. When the position -- initially when the position was
20 created.
21 Q. And when was that?
22 A. In January, late '95, early '96.
23 Q. And why was the decision made to categorize them as
24 exempt?
25 A. This was a new position at the time. Based on the job

1 duties as described to us, we, in consultation with
2 him, determined that based on the administrative
3 exemption that the loan consultants fit the
4 administrative exemption.

(Dkt. #491, Ex. 11, 60:13-61:4.)

7 Q. Prior to the spring-summer 2002, was there an occasion
8 that you can recall in which a review was conducted
9 regarding the propriety of the exempt categorization
10 of loan consultants?
11 A. No formal reviews, but Richard Chyette and I have a
12 work relationship and he would advise me of various
13 happenings in the law, such as the Department of
14 Labor's 2001 -- I guess it was a letter in 2001, and I
15 remember him telling me about some letter that came
16 out that confirmed that the administration exemption
17 administrative exemption is acceptable for loan
18 officers, and that the Department of Labor had been
19 pretty consistent saying that stock brokers are -- fit
20 under the administrative exemption because of their
21 relationship with clients, and Richard and I would
22 talk about that, compare our loan consultants to stock
23 brokers. We'd have those types of informal
24 conversations. I couldn't tell you specifically when
25 or specifically what legal issues we discussed, but we

1 would -- those types of informal conversations would
2 be pretty frequent between Rich and I over the years.

(*Id.* at 64:7-65:2.)

    1  Q.  What was it about -- what did you and Mr. Chyette
    2  decide was different about your loan consultants as
    3  opposed to the loan originators described in the
    4  Conseco case?
    5  A. Several different things. Based on our reading of the
    6  case, it seemed like the loan, the loan officer's job
    7  in Conseco was not nearly as involved or complex as
    8  ours, as the loan consultants in our case.

(*Id.* at 67:1-8.)

At this point in the deposition it would appear that Mr. Chyette was a joint decision-

maker with Mr. Carroll, but after a recess, defense counsel Perry clarified what they asserted was

the different roles of Mr. Carroll and Mr. Chyette.

    7  BY MR. PERRY:
    8  Q. Mr. Carroll, you're still under oath. I'd like you to
    9  clarify what you meant when you had said that you and
    10  Richard Chyette made certain decisions.
    11  A. Well, Richard Chyette is the in-house counsel, and on
    12  matters such as classification of employees as to
    13  exempt and nonexempt status, I would consult with him,
    14  and he'd continually provide me updates on the law,
    15  but ultimately the decision -- I made the decision.
    16  When I say we made them or whatever I said, I consult
    17  with him but I make the decision.
    18  Q. Thank you.

(*Id.* at 104:7-18.)

Giving this clarification, the undersigned gave Quicken Loans the benefit of the doubt in

deference to the importance of the attorney client privilege and the reluctance of courts to find an

implied waiver too readily.

**C.      Defendants' Motion for Summary Judgment on Good Faith and Willfulness**

On October 5, 2007, Defendants brought a Motion for Summary Judgment for Good

Faith Defenses and Lack of Willfulness (Dkt. #436). In that motion, Defendants identified

David Carroll, an officer in the company and an attorney, as the sole individual who advised

Defendants regarding their classification of loan consultants (*Id*. at 5). Defendants filed a

declaration from Mr. Carroll in support of their motion (Dkt. #436, Ex. E, and also Dkt. #496,

Ex. B). Mr. Carroll stated that he does not regularly act as Quicken Loans' legal representative,

but "part of my responsibility as VP of Administration is to analyze and work through issues that

have a legal component, including, at times, to evaluate and make determinations related to

compensation issues involving the Company's employees." (*Id.* at ¶2.) The declaration

describes in detail the allegedly "good faith" efforts Mr. Carroll undertook to classify

Defendants' loan consultants.

In paragraph12 of that declaration, he notes that at all relevant times it was his decision to

maintain the classification of mortgage bankers as exempt from overtime compensation under

the FLSA based on periodic review of the Quicken Loans compensation policies and practices,

the mortgage bankers' job duties, federal regulations, relevant opinion letters of the U.S.

Department of Labor, and the expert report of Dr. Malcolm Cohen. He concludes ¶ 12 noting:

> Based on a fair and honest reading of these materials, and in ongoing
> consultation with the Company's legal and HR departments, I
> determined that our mortgage bankers met the requirements of the
> FLSA's administrative exemption.

(*Id.* at ¶ 12.)

In paragraph 16, he notes why he determined that Quicken Loans' mortgage bankers

were different than the loan originators in the *Conseco* case and states

> Based on a fair and honest reading of *Conesco*, and in ongoing consultation with the
> Company's legal and HR departments, I determined – and I continue to believe – that
> there are material differences between the primary duties of Conesco loan originators

and those of Quicken Loans mortgage bankers.

(*Id.* at ¶ 16.)

In paragraph 20, he notes his review of  the DOL regulations and states that 29 C.F.R. §

541.203(B) further supported his conclusion that Quicken Loans' mortgage bankers met the

requirements of the FLSA's administrative exemption.  He states

> In examining the new white-collar regulations, and in consultation with the
> Company's legal and HR departments, I determined that our mortgage bankers do
> precisely these types of activities . . . and therefore they fell squarely within this new
> "financial services" provision.

(*Id.* at ¶ 20.)

Finally, in a paragraph 24 summary he notes that "at all times relevant to this case" he

took into consideration longstanding and recent developments in the law related to the exempt

status classification of Quicken Loans' mortgage bankers and concluded:

> With that awareness and consideration, and based on a fair and honest reading and
> interpretation of relevant authorities, and in ongoing consultation with the
> Company's legal and HR departments, I determined in good faith – and continue to
> believe – that Quicken Loans  mortgage bankers satisfy the requirements of the
> FLSA's administrative exemption.

(*Id.* at ¶ 24.)

Plaintiffs responded to this Defendants' Motion for Summary Judgment on October 29,

2007, demanding that Defendants be ordered to produce the documents supporting their good

faith and lack of willfulness arguments based on a waiver of the attorney-client privilege (Dkt.

#470).  Plaintiffs filed an affidavit under Rule 56(f) explaining why further discovery was

necessary into the matters addressed in Mr. Carroll's declaration and detailing the information

Plaintiffs seek (Dkt. #470-6).  Defendants filed their Reply memorandum on November 13,

2007, arguing (1) that they did not waive the privilege, and 2) that Plaintiffs should have

inquired about the privileged advice during David Carroll's deposition on February 8, 2005 (Dkt. #476, pgs. 3, 4).

By submitting the affidavit of attorney David Carroll in support of a motion for summary judgment, Plaintiffs argue that Defendants placed the factual material over which they asserted the attorney-client privilege directly at issue, and in doing so, waived the privilege. As a result, Plaintiffs contend that Defendants must now produce e-mail data and other documents previously withheld on the basis of the privilege.

Having reviewed the law on waiver of privilege, the undersigned was inclined to defer to the Defendants' claim of privilege and treat these repeated references to "ongoing consultation with the Company's legal and HR departments" as approaching an implied waiver but not quite crossing the line by asserting their content. Using an analogy to the example in footnote 4, the question seems to be whether these four references in the Carroll declaration, made in response to Plaintiffs' assertion of a willful violation of FLSA, are equivalent to Quicken Loans saying "Nonsense, we made the decision on classification after ongoing consultation with the Company's legal and HR departments." Without more related to the content of those consultations, it seemed that they were not equivalent to such a statement. Indeed at a hearing on May 29, 2008, in the similar case of *Chasteen v. Rock Financial, Case #*07-10558, this tentative determination was stated on the record. Yet, in writing this opinion, a review of Defendants' October 26, 2007, Memorandum in Support of Defendants' Motion for Summary Judgment on the good faith issue related to the Carroll declaration provided the "plus factor" to push Defendants' position over the line. Defendants noted that Mr. Carroll in classifying mortgage bankers as exempt, relied on a series of relevant regulatory pronouncements, DOL

13

regulations and various cases.

> Mr. Carroll classified mortgage bankers at Quicken Loans as exempt. Carroll Dep.,
> Ex. D, at 104; Carroll Dec., Ex. E, ¶ 12 ("I determined that our mortgage bankers
> met the requirements of the FLSA's administrative exemption."). In making this
> classification decision (and maintaining it after periodic reviews), Mr. Carroll relied
> on a number of sources, including: (1) "federal regulations defining the FLSA white-
> collar exemptions (including the versions in effect both before and after August 23,
> 2004)"; (2) "the relevant opinion letters of the United States Department of Labor.
> . . addressing the scope and application of those regulations"; (3) "relevant federal
> case law"; (4) his "periodic review of the Company's compensation policies and
> practices [and] mortgage bankers' job duties"; and (5) the exempt status of similar
> occupations. Carroll Dec., Ex. E, ¶ 12; Carroll Dep., Ex. D, at 62-69.

(October 5, 2007,  Memorandum in Support of  Defendants' Motion for Summary Judgment:
Good-faith Defenses and Lack of Willfulness, Dkt. #436, pgs. 5-6 (footnotes omitted).)

Had Defendant Quicken Loans stopped at this point it would have not argued the content

of the attorney-client consultations in support of its good faith defense.  Yet, its memorandum

proceeded with the assertion that "Mr. Carroll confirmed his understanding of these sources with

in-house and outside legal counsel.  Carroll Dep., Ex. D, at 104." (Dkt. #436, p. 6.)  This

assertion that the opinions of "in-house and outside legal counsel" confirmed Mr. Carroll's

understanding on the exempt status question reveals by direct implication the *content* of those

communications.

As stated in *Lott* "[t]he privilege may be waived expressly or by implication" and "a

client may waive the privilege by conduct which implies a waiver of the privilege." Here, Mr.

Carroll's February 8, 2005, deposition explored his understanding on the exempt status question.

That legal position and analysis was restated in his October 5, 2007, declaration.  Quicken Loans

in its October 5, 2007, memorandum argued in support of its good faith defense that the opinions

of "in-house and outside legal counsel" confirmed Mr. Carroll's understanding on the exempt

status question.  Such an argument that Mr. Carroll's legal position was in accord with the advice

received from "in-house and outside legal counsel" enhances what was already a very strong argument for good faith. Yet, in choosing to add this "plus factor" on the content of the opinions of "in-house and outside legal counsel," Defendant Quicken Loans "has made the decision and taken the affirmative step in the litigation to place the advice of the attorney in issue." As noted in the *Ross* case "the contents of a privileged communication may be injected into litigation . . . by making the content of communications a factual basis of a . . . defense." This sentence in Defendants' memorandum makes the content of the opinions of "in-house and outside legal counsel" a factual basis in support of Mr. Carroll's good faith in his understanding on the exempt status question. It reveals that these opinions confirm the position and understanding of Mr. Carroll. "Thus, it is the content of privileged communications that is used as a sword " as stated in *Ross*.

While Plaintiffs' counsel did not quote this particular sentence in their Motion to Compel nor in their response to Defendants' Motion for Summary Judgment: Good-faith Defenses and Lack of Willfulness (Dkt. #470), they did, however, argue that the Carroll declaration and the Defendants' Motion for Summary Judgment: Good-faith Defenses and Lack of Willfulness amounted to an " eleventh-hour waiver" of attorney client privilege (Dkt. #470, p. 1). Read together, Plaintiffs' contention is correct, Defendant Quicken Loans has waived attorney client privilege on the advice of "in-house and outside legal counsel" obtained by Mr. Carroll in his decision-making capacity on whether the Quicken Loans' mortgage bankers met the requirements of the FLSA's administrative exemption. Accordingly, Plaintiffs' counsel are entitled to receive any documents involving communications between Mr. Carroll and Mr. Chyette and any outside counsel on the exempt status question.

15

There is presently a hearing scheduled in *Chasteen v. Rock Financial* on July 23, 2008. It is suggested that the attorneys for the parties in this case be available that day for a status conference on the various discovery issues that are implicated by this decision. The parties are directed to meet and confer and prepare an agenda for that status conference, including the e-mail issues and the various disputes involving the computer forensic exert Mark Lanteman. It will also be known by that date whether Defendants will seek to have this opinion set aside as clearly erroneous under 28 U.S.C. § 636(b)(1)(A).

The parties to this action may object to and seek review of this Order, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Any objections are required to specify the part of the Order to which the party objects and state the basis of the objection.


**SO ORDERED.**

Date: June 30, 2008                                    s/Steven D. Pepe
Ann Arbor, MI                                          United States Magistrate Judge

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Order* was served on the attorneys and/or parties of

record by electronic means or U.S. Mail on June 30, 2008.


s/ Alissa Greer
Case Manager to Magistrate
Judge Steven D. Pepe
(734) 741-2298