UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RYAN C. HENRY, individually and on behalf
of all other similarly situated employees,

    Plaintiffs,

vs.

CASE NO. 4:04-CV-40346

DISTRICT JUDGE PAUL V. GADOLA
MAGISTRATE JUDGE STEVEN D. PEPE

QUICKEN LOANS INC., a Michigan corporation,
and DANIEL B. GILBERT, personally and individually,

    Defendants.
_____/

**REPORT AND RECOMMENDATION GRANTING IN PART AND DENYING IN PART
DEFENDANT DANIEL B. GILBERT'S MOTION FOR SUMMARY JUDGMENT BASED ON
HIS LACK OF "EMPLOYER" STATUS UNDER THE FAIR LABOR STANDARDS ACT (DKT. #435)**

This is a Fair Labor Standards Act ("FLSA") overtime collective action brought under 29 U.S.C. § 201 *et seq.*, involving approximately 422 Plaintiffs who worked as "loan consultants" for Defendants Quicken Loans and Daniel B. Gilbert. Plaintiffs allege that during their employment as loan consultants for Defendant Quicken Loans that Defendants unlawfully withheld wages from Plaintiffs by denying them overtime pay for hours worked in excess of 40 hours per week in violation of §207(a)(1) of the FLSA. As a result of this alleged practice, Plaintiffs contend they suffered a loss of wages and ask for judgment against Defendants for an amount equal to Plaintiffs' unpaid back wages at the applicable overtime rate, and an equal amount as liquidated damages, a three year limitation period and all costs and attorney fees incurred prosecuting this claim because they allege Defendants violation of the FLSA was willful (Dkt. #1, ¶8).

On October 5, 2007, Defendant Gilbert filed a motion for summary judgment based on

his lack of "employer" status under FLSA (Dkt. #435) to which Plaintiffs responded (Dkt. #468). For the reasons stated below, it is **RECOMMENDED** that Defendant Gilbert's motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**.

**I.  BACKGROUND**

Quicken Loans was formerly known as Rock Financial Corporation, a publicly traded NASDAQ company co-founded by Daniel Gilbert in 1985 (Dkt. #435, Ex. A, ¶¶ 1-2). In December 1999, it was acquired by and became a wholly owned subsidiary of Intuit and was renamed Quicken Loans (*id.* at ¶¶ 3-4). Gilbert was the CEO of Quicken Loans until he announced in November 2001 that effective February 1, 2002, he would resign as CEO and William Emerson and Patrick McInnis would assume day-to-day operational control of the company as CEO and President, respectively (*id.* at ¶ 6).

In 2002, Quicken Loans was acquired by Rock Acquisition Corporation (now known as Rock Holdings, Inc.), a group of investors led by Gilbert that also owns interests in two other companies (*id.* at ¶¶ 7-8). Since that time, Gilbert has been the Chairman and CEO of Rock Holdings and the Chairman of Quicken Loans, but he has never resumed his former role as CEO (*id.* at ¶¶ 1, 8). Gilbert owns a majority interest in Rock Holdings, Inc. of 58% (*id.* at ¶ 10).

**II.  ANALYSIS**

**A.  THE LEGAL STANDARD FOR SUMMARY JUDGMENT**

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1324 (6th Cir. 1983). But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not merely rely "upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### B. LEGAL STANDARD FOR EMPLOYER STATUS UNDER FLSA

"[T]he determination of whether a particular factual setting gives rise to coverage under the FLSA is a matter of law." *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984). The FLSA defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). The FLSA contemplates there

being several simultaneous employers who may be responsible for compliance with the FLSA. *Falk v. Brennan*, 414 U.S. 190, 195 (1973). "The remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) (per curiam). In deciding whether a party is an employer, "economic reality" controls rather than common law concepts of agency. *Goldberg v. Whitaker House Cooperative*, 366 U.S. 28, 33 (1961).

"The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991) (both quoting *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)). The main focus of the inquiry is whether the employer exercised "substantial control of the terms and conditions of the work." *Falk*, 414 U.S. at 195. To be personally liable, an officer must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee. *See Martin v. W. E. Monks & Co.*, 805 F. Supp. 500 (S.D. Ohio 1991).

In *Agnew*, the court determined that "corporate officers with a significant ownership interest who had operational control of significant aspects of the corporation's day to day functions, including compensation of employees, and who personally made decisions" were employers under the FLSA. *Agnew* 712 F.2d at 1514. "No one factor is dispositive; rather, it is incumbent upon the courts to transcend traditional concepts of the employer-employee relationship and assess the economic realities presented by the facts of each case." *Dole*, 942

4

F.2d at 965 (quoting *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 195 (5th Cir. 1983)).

"The economic reality test includes inquiries into: whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997) (citing *Bonnette v. Cali. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)).

### C. FACTUAL ANALYSIS

The relevant time period in this case is controlled by the statute of limitations for FLSA claims which is two years unless the violations are found to be willful in which case it is extended to three years. 29 U.S.C. § 255. For most of the Plaintiffs in this case that distinction makes no difference with regards to Gilbert's "employer" status since they were employed after Gilbert announced his resignation as CEO and gave up day-to-day operational control. Some of the Plaintiffs, however, were working for Quicken Loans while Gilbert still made day-to-day decisions (Dkt. #435, Ex. A, ¶¶ 6, 17). The three year statute of limitations would allow their claims to include that time period.

In his October 5, 2007 declaration, Gilbert indicates that since November 2001, when he announced his resignation as CEO of Quicken loans, he has no longer "exercised the day-to-day operational, managerial or financial control over payroll, over how employees are classified for purposes of overtime compensation, over hiring and terminations, over disciplinary actions, over the setting of work schedules, over the assignment of daily duties or tasks, or over the rate of employees' pay" (*id.* at ¶ 17). Gilbert's statement implies that prior to November 2001, he possessed control over these responsibilities. Yet, Gilbert's resignation was not effective until

5

February 1, 2002, when Mr. Emerson replaced Mr. Gilbert as the new CEO and Mr. McInnis became President. Later Mr. Gilbert states that "since he started serving as the new CEO of Quicken Loans in February 2002, William Emerson has had the general powers of supervision and management over the business and operational affairs of Quicken Loans" (*id.* at ¶ 15). The implication is that Mr. Gilbert legally had operational control until Mr. Emerson replaced him as CEO on February 1, 2002. Because of the ambiguity in Mr. Gilbert's declaration and given the Court's reading of his statements in total, the Court will set the date upon which Mr. Gilbert turned over operational control of day to day operations at Quicken Loans at February 1, 2002.

Below is a discussion of Mr. Gilbert's actions after he stepped down as CEO of Quicken Loans on February 1, 2002, to the filing of the present motion. As noted above, Mr. Gilbert continues to serve as Chairman and CEO of Rock Holdings and the Chairman of Quicken Loans. Utilizing the economic realities test, Mr Gilbert's actions as Chairman of Quicken Loans and Chairman and CEO of Rock Holdings are examined to determine if he has "employer" status under the FLSA for periods after February 1, 2002.

        **1.**     *Gilbert Did Not Control the Conditions or Terms of Quicken Loans' Consultants' Employment*

Plaintiffs claim that Gilbert was directly involved with Quicken Loans consultants by giving them specific training on how to sell particular loan products, and general instruction on how to increase their sales (Dkt. #468, p. 6). Gilbert acknowledges that he did speak to Quicken Loans' employees, from time to time, about corporate culture or philosophies during orientation and at special company-wide meetings, worked with some of the employees on special projects, and participated in major decisions affecting the future of the company (Dkt. #435, Ex. A, ¶ 18; Ex. B ¶ 21; Ex. C, pp. 15-16, 19-21, 44-45; Ex. D, ¶ 2; Ex. F, ¶ 7; Ex. G, ¶ 5). Gilbert interacted

with loan consultants both directly and through senior management (Dkt. #468, Ex. 44, pp. 125, 133, 138, 144). He shared with the loan consultants selling techniques that were working for other loan consultants (*id.* at 159). He also commented on a sales script used by loan consultants (*id.* at 193). According to an email from the Director of Web Sales, Gilbert made fake application calls and submitted fake leads to evaluate his company's sales skills (*id.* at 240). He involved himself in at least one that a loan consultant was having trouble closing (*id.* at 281).

Much of Gilbert's interaction, however, amounted to little more than cheerleading and efforts to motivate the work force (*id.* at 98, 124-25, 129, 131-33, 148, 171-72). Gilbert emailed the loan consultants company-wide announcements of significant one-time events and training sessions (*id.* at 142-43, 146-47, 160-64). He encouraged them to maintain certain principles to achieve success (*id.* at 126, 135, 137, 139, 150-51, 224). Gilbert sent news articles and tips to the loan consultants that he thought might help them succeed (*id.* at 152-53, 155-56, 159, 166). He was concerned with people's auto reply messages when they were out of the office (*id.* at 127-28, 130). He was upset that some mortgage bankers at Quicken Loans were not giving out there direct dial numbers for people to call them back (*id.* at 202). In one email he encouraged loan consultants to sell loans at Thanksgiving dinner, telling them to "Always Be Closing" (*id.* at 115).

In contrast, the new CEO, William Emerson, is ultimately responsible for the day-to-day operational, managerial and financial activities of Quicken Loans (Dkt. #435, Ex. A, ¶ 6; Dkt. #435, Ex. B, ¶ 11). Each functional area within the company (*e.g.* human resources, accounting, payroll, Web Center, mortgage bankers, etc.) is managed and controlled by a person or team of persons that report to the CEO, the President, Pat McInnis, or the Vice President of

Administration, David Carroll. For instance, any policies or procedures relating to work schedules are established by the VP of the Web Center and his subordinates, subject only to oversight by the CEO (Dkt. #435, Ex. A, ¶ 17(e); Dkt. #435, Ex. B, ¶ 17; Dkt. #435, Ex. H, ¶ 5). None of the heads of these functional areas report to Gilbert, nor is there any evidence that Gilbert has ever interfered with this chain of command.

Plaintiffs have provided no evidence that would satisfy any of the indicators under the economic realities test. *Villarreal*, 113 F.3d at 205. There is no evidence, for example, that Gilbert supervised or controlled employee work schedules or conditions of employment. *Compare*, *e.g.*, *Fegley*, 19 F.3d 1126 (A single person controlled and guided several business entities, and that person was the only one who could authorize compliance with the FLSA.); *U.S. Dep't of Labor v. Cole Enters.*, 62 F.3d 775 (6th Cir. 1995) (Individual was authorized to issue checks on the corporate accounts, and he and his wife had custody and control of the employment records, and were responsible for maintaining those records. The individual determined the employment practices for the enterprise, including hiring, firing, rates of pay and hours of work.); *Dole*, 942 F.2d 962 (Individual determined the amount of employee salaries, was the "top man" at the enterprise, and the corporation functioned for his profit.). Instead the available evidence shows that the supervision and control was handled by the VP Farner of the Web Center and the CEO Emerson (Dkt. #435, Ex. A, ¶ 17(e); Dkt. #435, Ex. B, ¶ 17; Dkt. #435, Ex. H, ¶ 5).

        **2.**    *Gilbert Did Not Control the Investigation and Disciplining of Loan Consultants*

Gilbert sent emails to loan consultants threatening to personally seek out individuals who do not comply with Quicken Loan's policies (Dkt. #468, Ex. 44, pp. 137). Gilbert expressed

8

concern that if the policies were not followed that it would damage the company's reputation (*id.*). In one instance, when it came to his attention that an individual was not following the policy, Gilbert asked the loan consultant for a "good answer" as to what had happened (*id.* at 144). In one email Gilbert suggested that certain behavior would be an insult to the "other 1499 great people" who worked at Quicken Loans, but again he never suggested or took any action as a result (*id.* at 139). There are several other emails indicating that Gilbert took failure to return phone calls very seriously, but nothing suggesting any sort of discipline or action on the part of Gilbert (*id.* at 198, 247, 252, 275, 288, 294, 312).

He did, in one instance, state that if the Loan Officer responsible for not calling a customer back did not admit to Gilbert what had happened that the Loan Officer could "guess the rest" (*id.* at 106). Yet, one isolated incident in which Gilbert threatens action without any evidence that he followed through does not support a finding that he was an "employer" under FLSA. Plaintiffs also point to incidents when Gilbert questioned an individual's claim that he had not returned customer calls because he had been out with a brain aneurysm (*id.* at 244), scolded a individual for not following the correct protocol for voice and email messages when they are out of the office (*id.* at 299), and an instance where Gilbert was concerned by comments made by a terminated employee during his exit interview (*id.* at 302). Gilbert also received an email from a disgruntled Quicken Loans employee stating her disdain for her work at Quicken Loans, which he forwarded to the VP and a Managing Member without taking any further action himself (*id.* at 209).

All of the evidence that Plaintiffs have provided proves that Gilbert was interested in the performance of his company and concerned if employees of Quicken Loans were not following

9

policies and protocol, but none of that satisfies any of the indicators under the economic realities test that Gilbert was their "employer." None of the evidence shows Gilbert exercising or possessing substantial control over the terms and conditions of the work. *See Falk v. Brennan*, 414 U.S. at 195. The Directors of Mortgage Banking, on the other hand, generally take disciplinary actions short of terminations on their own and with the involvement of a more senior manager (Dkt. #435, Ex. A, ¶ 17(d); Dkt. #435, Ex. B, ¶ 16; Dkt. #435, Ex. H, ¶ 5). They also make termination decisions, although in those cases they generally confer with their regional or divisional vice president and human resources. In the most serious cases, the situation may be elevated to the President and/or CEO, and from time to time, Gilbert was apprised of certain terminations that may pose a potential reputational risk to Quicken Loans (Dkt. #435, Ex. A, ¶ 17(d)). During the times relevant to this lawsuit, however, the company has disciplined and terminated hundreds of employees and Gilbert has not participated in, nor exercised operational or managerial control over, the decision making that affected the termination or discipline of these employees (*id.*, Dkt. #435, Ex. H, ¶ 5).

### 3. *Gilbert's Involvement in Setting Workplace Conditions*

Gilbert communicated with the loan consultants concerning the workplace environment. Gilbert sent out office-wide announcements concerning updates to the infrastructure (Dkt. #468, Ex. 44, p. 141). He commented on concerns that Quicken Loans employees were parking in the "employee of the month" and "visitor" parking sports (*id.* at 114, 154). He also responded to a comment suggesting that Quicken Loans offer on-site daycare for its employees' children (*id.* at 322). None of these emails involved anything related to FLSA nor do they demonstrate Gilbert

making a decision or exercising control that would satisfy any of the indicators under the economic realities test. *Villarreal*, 113 F.3d at 205.

Plaintiffs also point out that Gilbert was involved with issues concerning cigarette butts lying on the ground and litter by the doorways to the Quicken Loans office, however, both of the events took place prior to February 1, 2002, while he was still CEO and maintained day-to-day control, and thus cannot be used as evidence of his control after his resignation (Dkt. #468, Ex. 44, pp. 48, 76).

### 4. *Gilbert's Response to the Lawsuit Filed by Plaintiffs*

According to the Plaintiff's, Gilbert adamantly denied that Quicken Loans had violated the law and all of the allegations in the instant case (Dkt. #468, p. 9; Dkt. #96, Ex. M)[1]. Moreover, Gilbert indicated that Quicken Loans would never settle the case, even for "one dime." Plaintiffs contend these statements should support their allegation that Gilbert was an "employer" for purposes of FLSA. Even if it were assumed that Gilbert's comments mean that he exercised control over the handling of specific litigation, that control would not be over a significant aspect of day-to-day operations of Quicken Loans relevant to the FLSA and would not satisfy any of the indicators under the economic reality test. *Villarreal*, 113 F.3d at 205.

### 5. *Gilbert's Financial Control over Quicken Loans*

Mr. Gilbert is the majority owner (58%) and CEO of Rock Holdings which owns Quicken Loans, and Chairman of Quicken Loans (Dkt. #435, p. 7). From the founding of the company until February of 2002 he was the CEO of Quickens Loans and its predecessors (Dkt.

---

[1]Plaintiffs' brief (Dkt. #468) lists Paul Lukas' letter to Richard Cheyette as Dkt. #96-3, Ex. 45. The Affidavit of Paul J. Lukas (Dkt. #96) lists the letter as Ex. N. The letter appears on the docket as Dkt. 96, Ex. M.

#435, Ex. A, ¶¶ 1-6). There is no doubt that Mr. Gilbert has a significant ownership and financial interest in Quicken Loans. A significant ownership interest in the corporation has been a factor in determining "employer" status, but has never been considered dispositive. *Dole*, 942 F.2d at 966; *Fegley*, 19 F.3d at 1131; *Cole*, 62 F.3d at 778. Only in instances that the individual also exercised control over significant aspects of the corporation's day-to-day function did the courts find the individual fulfilled the FLSA requirements for "employer" status. *Dole*, 942 F.2d at 966; *Fegley*, 19 F.3d at 1131; *Cole*, 62 F.3d at 778.

No evidence has been produced that Mr. Gilbert exercised control over significant aspects of Quicken Loans's day-to-day functions after his resignation as CEO of Quicken Loans. Since that date, he has not exercised day-to-day operational control over Quicken Loans employees with respect to payroll, their classification for purposes of FLSA, their work schedules, the rate or structure of their compensation, their daily tasks or duties, disciplinary action or hiring and firing decisions (Dkt. #435, Ex. A, ¶¶ 17(a)-(g); Dkt. #435, Ex. B, ¶ 21; Dkt. #435, Ex. H, ¶¶ 5-6). These functions are the ultimate responsibility of the current CEO and President. Mr. Gilbert's position as a majority owner of Rock Holdings and as Chairman of Quicken Loans alone is insufficient to make him an "employer" under the FLSA and his control over the company prior to February 1, 2002, is not relevant to his status afterwards.

### 6. *Summary*

Therefore, if Plaintiffs are able to prove that the violations were willful and a three-year statute of limitations is applicable,[2] then Mr. Gilbert would be considered an "employer" under

---

[2]There is pending a Defendants' Motion for Summary Judgement on Good-Faith Defenses and Lack of Willfulness (Dkt. #436). If this motion is denied, Mr. Gilbert will remain a Defendant with regards to the Plaintiffs who were employed as web mortgage bankers on or before May 17,

the FLSA for those Plaintiffs who were employed by Quicken Loans prior to February 1, 2002, and who filed a notice of claim prior to February 1, 2005. Without a finding that the violations were willful, Mr. Gilbert was not an "employer" under the FLSA for any Plaintiff in this action.

## III.     RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that Defendant Gilbert's motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections. A

---

2001, through January 31, 2002. If this motion is granted, the analysis of Gilbert's "employer" status will be the same for all Plaintiffs, and he will be dismissed from this case.

party may file a reply brief within 5 days of service of a response. The reply shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.

Dated: August 22, 2008                                                 s/ Steven D. Pepe
Ann Arbor, MI                                                                 United States Magistrate Judge

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Report and Recommendation* was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 22, 2008.

                                                                   s/ Alissa Greer
                                                                   Case Manager to Magistrate
                                                                   Judge Steven D. Pepe
                                                                   (734) 741-2298