UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RYAN C. HENRY, individually and on behalf
of all other similarly situated employees,

      CASE NO. 04-CV-40346

      Plaintiffs,

      DISTRICT JUDGE STEPHEN J. MURPHY, III
vs.      MAGISTRATE JUDGE STEVEN D. PEPE

QUICKEN LOANS INC., a Michigan corporation,
and DANIEL B. GILBERT, personally and individually,

      Defendants.
_____/

**REPORT AND RECOMMENDATION GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT
ON GOOD FAITH DEFENSES AND LACK OF WILLFULNESS (DKT. #436)**

      This is a Fair Labor Standards Act ("FLSA") overtime collective action brought under 29

U.S.C. § 201 *et seq*., involving approximately 446 Plaintiffs who worked as "loan consultants,"

Quicken Loans' former job title for mortgage bankers, for Defendants Quicken Loans and Daniel

B. Gilbert in their "call center" also known as the "sales center" or "web center" (Dkt. #469, Ex.

92, ¶ 3).  Plaintiffs allege that during their employment as "loan consultants" (hereinafter

"mortgage bankers") for Defendant Quicken Loans that Defendants unlawfully withheld wages

from Plaintiffs by denying them overtime pay for hours worked in excess of 40 hours per week

in violation of §207(a)(1) of the FLSA.  As a result of this alleged practice, Plaintiffs contend

they suffered a loss of wages and ask for judgment against Defendants for an amount equal to

Plaintiffs' unpaid back wages at the applicable overtime rate, and an equal amount as liquidated

damages, a three year limitation period and all costs and attorney fees incurred prosecuting this

claim because they allege Defendants violation of the FLSA was willful (Dkt. #1, ¶8).

On October 5, 2007, Defendants filed a motion for summary judgement as to their good faith defenses and "lack of willfulness" defense under the FLSA, 29 U.S.C. §§ 201 *et seq*. (Dkt. #436). Defendants' motion was referred for Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B) (Dkt. #449). Plaintiffs filed a response on October 29, 2007 (Dkt. #470), which included a Rule 56(f) affidavit requesting that Plaintiffs receive additional discovery before the Court decided Defendants' motion. This Court subsequently ordered Defendants to produce documents involving certain communications between Mr. Carroll and Quicken Loans' inside or outside counsel (Dkt. #516). Defendants also agreed in a September 11, 2008, stipulation to produce certain emails from Managers and individual Plaintiffs, plus a privilege log as to that category of emails (Dkt. #528). In the September 11, 2008, stipulation the parties agreed that "[d]iscovery in this matter is hereby closed," and that the parties need only complete the production of the outstanding discovery noted in that stipulated order (Dkt. #528, p. 4). Those documents have since been produced to Plaintiffs.

During a March 23, 2009, status conference, the Court then set a supplemental briefing schedule, so that the parties could respond to the newly produced documents (Dkt. #550). Plaintiffs filed their supplemental brief on April 6, 2009 (Dkt. #551) and Defendants filed their brief on April 20, 2009 (Dkt. #553).

In their motion for partial summary judgment, Defendants are asking for the following three items:

(1) summary judgment on all claims arising after September 8, 2006, based on a good faith defense;

(2) summary judgment that even if a violation is found, it was not willful, thus limiting all claims to a two-year limitations period; and

2

(3) an affirmatively ruling that even if Defendants were to be found liable, they not be required to pay liquidated damages because their actions or omissions were in good faith and based on a reasonable belief that Plaintiffs' jobs were exempt from the FLSA.

Defendants have the burden of proof on issues (1) and (3), whereas the Plaintiffs have the burden of establishing wilfulness on issue (2). These three motions involve analysis of Defendants' intent and categorizing it along a continuum from good faith, negligence, reckless to willful. At the beginning of this Report, it is helpful to briefly outline the differences of these somewhat overlapping issues and state the recommended rulings on each.

Issues (1) and (3) both involve Defendants proving they acted in good faith, but the standard of proof differs. On issue (1), which is a total defense to any damages, the pillars supporting Plaintiffs' good faith claim must be constructed by the Department of Labor ("DOL") and/or the Administrator of the Wage & Hour Division ("Administrator"). Plaintiffs must point to and have reasonably relied on a written administrative regulation or an order, ruling, approval or interpretation by the Administrator of the Wage & Hour Division. In this case the Plaintiffs rely on a September 8, 2006, Opinion Letter of the Administrator. On issue (3), if a violation is found by the jury, then this Court has discretion to award lesser or no liquidated damages on top of the time and a half damages if it finds that on or after May 17, 2001 (or 2002 if the violation was not willful) Plaintiffs' acted on a good faith belief that Plaintiffs' jobs qualified for the administrative exemption from the FLSA.[1] Yet on this issue, Plaintiffs can build their good faith

_____

[1] In an FLSA collective action, each individual claimant's action is not commenced until the date his or her consent is filed in court. 29 C.F.R. § 790.21(b). For example, Plaintiff Henry's action was commenced on May 17, 2004, the date on which this action was filed and his consent form was filed. Liability to Plaintiff Henry for overtime can extend back only to the pay period including May 17, 2002 (two years before Henry's action commenced for a non-willful FLSA violation) or to May 17, 2001 (three years before Henry's action commenced for a willful FLSA

defense a far wider basis than for issue (1) – their good faith can be demonstrated by any reasonable inquiry, review, checking with other reliable sources and reliance.  On issue (2), Plaintiffs have the burden of showing that Defendants either knew or showed reckless disregard for the fact that Plaintiffs' jobs did not qualify for the administrative exception.

For reasons stated below, on issue (1) **IT IS RECOMMENDED** that this Court find that once the Administrator issued his September 8, 2006, DOL Opinion Letter, Plaintiffs relied on it in good faith and thus face no liability on or after that date.  On issue (2) **IT IS RECOMMENDED** that during the limitations period of this suit Plaintiffs cannot prove a willful or reckless violation of the FLSA and thus the two year limitations period applies.  Regarding issue (3), because this is an issue the Court decides only if the jury finds liability, **IT IS RECOMMENDED** that such a discretionary determination would be better made and more fully informed after hearing the entire case, and therefore Defendants' motion be denied as to the issue of liquidated damages at this time.

## I.    BACKGROUND

Plaintiff Ryan C. Henry ("Henry") and the "opt-in" Plaintiffs worked as mortgage bankers for Quicken Loans, selling loans at its call centers in Livonia and Troy, Michigan, and locations in Ohio and Arizona.  As described by Quicken Loans's owner and Chairman of the Board, Defendant Daniel B. Gilbert, these employees are the "salespersons" that make up Quicken Loan's "sales force" (Dkt. #432, Exs. 3 & 4).  Quicken Loans acknowledges that these mortgage bankers routinely worked over forty hours per week without overtime compensation (*See* Dkt. #432, Farner Dep., pp. 66-68; Carroll Dep., pp. 73-74; *see also* Ex. 6).

violation).

On May 17, 2004, Henry filed this collective action under the FLSA, 29 U.S.C. § 216(b), on behalf of himself and other similarly situated web mortgage bankers who worked overtime hours for Defendants without compensation (Dkt. #1). On September 28, 2006, the Court conditionally certified this case as a collective action, finding Henry "similarly situated" to the other web mortgage bankers, and ordered Quicken Loans to produce a list of all putative class members for purposes of judicial notice (Dkt. #298). As a result of court-authorized notice, this case consists of approximately 446 individuals who have joined Henry as opt-in Plaintiffs by filing consent forms with the Court consistent with the requirements of section 216(b) of the FLSA (Dkt. #469, Ex. 92, ¶ 3).

### A.    *Quicken Loans and Daniel B. Gilbert*

Quicken Loans markets itself as "America's # 1 On-line Mortgage Lender," which funded over $19 billion in loans in 2007.[2] It sells loans to customers in all 50 states in the United States (*id.*). At the time the present motions were filed, the company was headquartered in Livonia, Michigan and employed approximately 565 mortgage bankers between five locations, including two call centers in Troy and Livonia, Michigan, and recently opened offices in Cleveland, Ohio and Phoenix, Arizona (Dkt. #432, Ex. 5, Farner Dep., p. 7; Mazey Dep., pp. 16-17). At corporate headquarters, Quicken maintains a "bridge," which is a raised platform in the middle of the sales floor, from which the company monitors each web mortgage banker's daily work activity in "real time." (Dkt. #432, Ex. 5, Lundsford Dep., pp. 15-16).

Quicken Loans's management structure is designed to supervise its employees closely (Dkt. #432, Ex. 5, Carroll Dep., pp. 27-28). The loan consultants are on the lowest rung of

---

[2] https://www.quickenloans.com/about (last visited August 25, 2008).

Quicken's organizational structure, with no supervisory authority (Dkt. #432, Ex. 5, Carroll Dep., p. 36; Dkt. #432, Ex. 42).[3]  Mr. Gilbert, who is named personally and individually as a defendant in this lawsuit serves as the Chairman of Quicken Loans (Dkt. #432, Ex. 5, Gilbert Dep., pp. 15-16; Dkt. #1).  Quicken Loans's Chief Executive Officer is William Emerson and Mr. Jay Farner serves as Vice President of the Web Center (Dkt. #432, Ex. 5, Gilbert Dep., p. 16; Farner Dep., pp. 5-6).

Mr. Farner's sole responsibility is to run the day-to-day operations of the only division of the company in which the web mortgage bankers work — the "call center," also known as the "sales center" or "web center" (Dkt. #432, Ex. 5, Gilbert Dep., pp. 42-43; *see* Dkt. #432, Exs. 7, 8, 10).  Mr. Farner has the most knowledge with respect to the web mortgage bankers' job duties and the manner in which they perform these duties, and he is expected to make sure the web mortgage bankers are performing their job in a manner that is consistent with the company's expectations (Dkt. #432, Ex. 5, Gilbert Dep., pp. 42-45).

### B.    *Mortgage Banker Hiring, Training & Procedures*

#### 1.    **Job Offer Letters**

Before their employment begins, Quicken Loans tells the web mortgage bankers that by accepting employment with Quicken Loans, they are "joining the most highly skilled **sales force** in the United States of America — the Quicken Loans **Sales**/Web Center!" (Dkt. #432, Ex. 8) (emphasis added).  The offer letter states that the applicants' "rugged character and strong

---

[3] Quicken Loans has a separate business unit, the "Frontline," staffed by non-exempt employees, that is responsible for some outbound telemarketing and for screening inbound loan inquiries for basic information.  It is unclear if they are on a "lower rung" or a parallel rung of the organization.

competitive spirit . . . is vital to being a great winning **salesperson**" (*id.*) (emphasis added).

Further, these offer letters outline the main expectations of the web mortgage bankers at Quicken

Loans. The letters specifically state:

> • As a **sales** professional at Quicken Loans, you will carry a company-provided pager and return all pages within 10 minutes. This includes the weekend.

> • As a **sales** professional, you will need to work the phones hard. In order to be successful, we have found that you will need to make a minimum of 80 outbound calls per day and spend a minimum of five hours on the phone **selling** to clients per day.

> • You will need to work **55+ hours per week** to achieve your goals and deliver exceptional client service. Every client, every time, no excuses, and no exceptions is our company philosophy.

(Dkt. #432, Ex. 8.) (emphasis added).[4]

## 2. Sales Training

Defendants require all web mortgage bankers to attend Defendants' mandatory four-week

"Initial Sales Training" course:

> The Initial Sales Training (IST) program is an intensive four-week long journey into Mortgage Banking that new team members embark upon. There are three basic aspects to the program — Mortgage training, sales training, and technology training, broken down and then specifically blended to build confidence and competence.

---

[4] On April 23, 2004, the Department of Labor issued its Final Rules on the "white-collar" exemptions to the Fair Labor Standards Act. *See* Preamble, Department of Labor: Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule, 69 Fed. Reg. 22122 (Apr. 23, 2004). The revised Final Rules became effective on August 23, 2004. During this time-period, Defendants made several changes to the documents they supplied to web mortgage bankers including the job offer letters and compensation plans. The offer letter was revised to eliminate any reference to the word "sales" or "sell" and any references to how many hours a web mortgage banker was expected to work (Compare Dkt. #432, Ex. 8 with Dkt. #432, Ex. 9). The compensation plans were also revised to include language mirroring the duties requirements for administrative employees in the financial services industry as defined in the revised regulations (*Compare* Dkt. #432, Ex. 12 with Dkt. #432, Ex. 13).

> Students leave the program with both tested knowledge and meaningful experience
> selling here at Quicken Loans.

(*See* Dkt. #432, Ex. 14; *see also* Dkt. #432, Ex. 5, Henry Dep., pp. 31-32).  After Initial Sales

Training, Defendants expect web mortgage bankers to "trail" their sales team leader (individuals

chosen because of their "superior selling skills") three to four times per week so they can better

integrate the sales training concepts they learned into realistic sales scenarios (Dkt. #432, Ex. 8).

In addition to "Initial Sales Training," Defendants have other training courses focused

solely on sales such as "Sales Excellence Training" and "Sales Process Training" (Dkt. #432,

Ex. 14).  Further training is provided through Defendants' intranet website, Rock World, where

loan

consultants can access a "Call Clip Library" (Dkt. #432, Ex. 15).  Call clips are recorded sales

calls and are emailed weekly to loan consultants as examples of "successful" sales techniques

(*id.*).

Quicken Loans requires all web mortgage bankers to follow the same mandatory sales

approach, named "The Sales Process" (Dkt. #432, Ex. 2).  Quicken Loans describes The Sales

Process as a "consistent method of selling adopted by Quicken Loans to improve production and

customer service" (*id.*).  The Sales Process is generally executed in two phone calls and includes

nine or ten steps, all of which are followed by a script of what to say, and how to say it.  The

headings for these steps are as follows:

Step 1: FORESHADOW/GAIN CONTROL

Step 2: INITIAL QUESTIONS/CREATE NEED/GOALS

Step 3: 2nd FORESHADOW OF PROCESS/DEPOSIT

Step 4: INCOME/BUILD RAPPORT

Step 5: Get SSN & 3rd FORESHADOW/STC/NEW PROGRAM INTRO/INCOME DOCS

Step 6: REVIEW CREDIT/4th FORESHADOW OF DEPOSIT/REVIEW GOALS, PITCH & BENEFITS

Step 7: CLOSE/ARC 5 TIMES!

Step 8: TAKE APPLICATION

Step 9: TRIAL CLOSE (If you cannot gain commitment, take control to set-up the next call on your terms)

Step 10: FORESHADOW FUTURE BUSINESS

(Dkt. #432, Ex. 2).

Under The Sales Process, web mortgage bankers are directed to try to "close" the sale, in other words obtain the mandatory $500.00 deposit, at least five times during the phone call (*id.*). Before web mortgage bankers actually "pitch" loan products to the customers, The Sales Process mandates that web mortgage bankers "foreshadow" this deposit at least three times (*See* Dkt. #432, Ex. 2, Steps 2, 4, and 5).  If after five attempts the web mortgage banker is still unsuccessful in securing the $500.00 deposit, The Sales Process directs the web mortgage banker to push to a "Trial Close":

[client name], it's obvious that at this point you are not able to commit. I think we are going to work together, but it is clear that you need more time. What I'd like to do is this: why don't I give you a call back on [date]. Is the morning or afternoon better? Great, I'll call you at [time]? At that point if everything looks good and you're ready to move forward, then we'll accept your $500 good faith deposit and get your loan in process, ok? Great. It was nice speaking with you and we'll get things going on [date].

(Dkt. #432, Ex. 2, Step 9).  Defendants require web mortgage bankers to follow this sales script on every phone call:

Here is Article II of OUR SALES CONSTITUTION!

9

> Today's is easy – Block out everything going on around you and concentrate on only one thing – the sales process. Forget when lunch is, forget your buddy wants to take a smoke in 10 minutes, forget the client is giving you bogus objections. One simple message – FOLLOW THE SALES PROCESS. Challenge yourself – between calls coming in and leads you follow up on. – FOLLOW THE SALES PROCESS on every call – NOT 99% – EVERY CALL.

(*See* Dkt. #432, Ex. 16; *see also* Exs. 17, 18).

Plaintiffs contend that the mandatory nature of The Sales Process would seem to leave little room for the web mortgage bankers to exercise discretion and independent judgment in the performance of their jobs. They argue that commitment and strict adherence to The Sales Process is a critical part of the web mortgage bankers' job duties and any departure has grave consequences, as emphasized by Mr. Farner in a voicemail sent to all web mortgage bankers:

> Last thing and very, very important is the Jay Farner's, ah, ah – three-strike policy and I'm ah doing this to certainly help out every single person and make you aware . . . I will not accept any excuse and the three-strike policy is if I – I'm always listening to phone calls. If I happen to listen to a phone call where you don't do the right steps. You don't foreshadow, you don't close. You don't, ah you know – I mean I've got people that I've listened to who aren't even doing step one which is just to simply get out there and tell them to take out a pen and a piece of paper. If you're not doing these things I'm going to issue you a strike. And at three strikes, then we're just going to have to not work together any longer. Ok. I've got to – I've got a three-strike policy here that I'm going to be sticking to because it's so important to you, and to the company that you do this correctly . . . Please don't be a victim of this three-strike policy.

(Dkt. #432, Ex. 17).

### 3.     Handling "Objections" and Other Sales Techniques

Plaintiffs assert that web mortgage bankers are told to take control of the phone call, to be a "master of sales," and to get aggressive when selling loans (Dkt. #432, Ex. 1). Defendants

consistently provide web mortgage bankers with sales tips and techniques, and sales "isms" on how to sell certain loan products or refine their sales skills so that they are always attempting to close the sale and obtain the $500 deposit necessary to start the loan (Dkt. #432, Exs. 19, 20).

A major part of The Sales Process, Plaintiffs maintain is to know how to handle questions — called "objections" by Quicken Loans — from customers. "Objections" are questions a customer may ask during the sales pitch that interrupt The Sales Process or suggest a customer's reservations or concerns about purchasing a loan from Quicken Loans (Dkt. #432, Ex. 21). Defendants teach web mortgage bankers to "Acknowledge, Respond, and Pivot" ("ARP") back to The Sales Process when they are "interrupted" during The Sales Process with questions about the loan product they are trying to sell (Dkt. #432, Ex. 22). According to this ARP sales technique:

> Getting thrown off track is to be expected on a sales call. The key is to get back on track and continue within the conversation YOU dictate. Use the technique of ARP-Acknowledge, Respond, and Pivot back to where you need to be in the structure. This is a major component of controlling the call and not throwing in the towel.

(*id.*). Defendants have "ARP" scripts tailored to sell different loan products (*id.*).

Defendants also teach the loan consultants to handle objections using the "ARC" technique. ARC is a three part process; (1) Acknowledge the Objection; (2) Respond to the Objection; and (3) Close again (Dkt. #432, Ex. 21). "One of the most difficult and most rewarding parts of the job is bringing the conversation full circle and closing again after an objection." (*id.*). Defendants provide loan consultants detailed "Responses to Objections" scripts designed to overcome specific objection scenarios, such as a customer who: 1) is "shopping" around; 2) has questions about the "rate"; 3) suggests he/she needs to speak to their

spouse before giving the $500.00 deposit; 4) is suspicious about the need for the $500 deposit; or

5) is hesitant to give out his/her social security number (*id.*).  Throughout the web mortgage

bankers training and employment, Defendants stress that:

> The most important thing to realize is that if you choose to respond to an objection then it is IMPERATIVE that you bring your response to full circle and CLOSE! Stopping short of that just turns control over to the borrower and is a waste of your time. You would be better off saving your breath and getting off the phone at the point of the objection (Dkt. #432, Ex. 21).

> Your job is to diffuse each and every objection that comes up, pivot and move towards the final close. . . . Clients say that they want to shop, get a lower rate, think about it, and talk to their spouse usually all in one breath.  Instead of interrupting them and getting angry, write it down on a piece of paper.  Let them VENT. Then, very calmly, go back through the list and address each objection and then CLOSE!" (Dkt. #432, Ex. 22).

Defendants specifically direct web mortgage bankers to limit the amount of time they

spend on the phone with the customer (*See* Dkt. #432, Ex. 21; *see also* Ex. 42).  For example,

Step 6 takes place during the second phone call and is the part of The Sales Process where the

web mortgage banker is required to talk about the $500.00 deposit, review the customer's goals,

and "pitch" the loan program that the customer is interested in. (Dkt. #432, Ex. 2).  According to

The Sales Process, this step should take only three minutes (Dkt. #432, Ex. 23).  Defendants

enforce a specific "3-Minute Rule" for this step with closing the sale as the main objective (*id.*).

In addition to the 3-Minute Rule, Defendants try to control the amount of information web

mortgage bankers may give the prospective customer:

> We must use Controlled Release of Information.  This consists of giving only small nuggets of information if the client is PUSHING for answers. . . . The controlled release of information should be used when the client asks specific questions during our line of questioning.

(Dkt. #432, Ex. 24).

Moreover, web mortgage bankers are encouraged to create a sense of "urgency" in their customers and to provide "successful examples of how they were able to limit the amount of information they provided during The Sales Process" (*id.*).  Defendants also instruct web mortgage bankers to take advantage of the "urgency" they created:

> Listening to calls, I have heard a desperation in the client's voices because the rates fell and will go up soon and so will their opportunity to save. **TAKE FULL ADVANTAGE OF THEIR MINDSET AND CLOSE THEM. EASE THEIR CONCERNS AND THEIR POCKETBOOK.**

(*id.*) (emphasis added).

Plaintiffs argue that the overall message communicated by management to web mortgage bankers is to "sell, sell, sell" loans (Dkt. #432, Ex. 1).  They contend that web mortgage bankers are told over and over again by people in management and operations that they are Defendants' "sales force" (Dkt. #432, Ex. 3).  As members of the sales force, web mortgage bankers are in a high-pressured sales environment under the control of Jay Farner and his Divisional Vice Presidents and Sales Directors (Dkt. #432, Exs. 10, 17).  Plaintiffs contend that Jay Farner and his management team email and leave voicemail messages for the web mortgage bankers throughout the workday repeating the "sell, sell, sell" mantra (Dkt. #432, Exs. 1, 17, 27, 29).  A few examples of these communications include:

> About 7:30 I went and kind of looked around and about four or five of us are still in the building and the Pistons are playing tonight and I am sure that had something to do with it. But you know tomorrow, Wednesday, Thursday, I mean a lot of you guys are behind in your goals number one. Number two, ah, you know we're talking about closings. I mean we're talking about pipelines. Some of your pipelines are now very, very thin and its one thing to do your job, write two deals, get two back. Walk out 7:30, that's fine. You get there at 9:30, walk out. But if you don't have a deal, if you don't have a book, leaving early or leaving on time is just not acceptable, period. I mean this is **a commissioned sales environment** and we got to treat it as such (Dkt. #432, Ex. 27.) (emphasis added).

13

Wake up guys . . . . . lets be on the phone. 1 deal is a joke in this environment. (Dkt. #432, Ex. 29).

LEADS ARE OUT OF CONTROL . . . SELL WITH PASSION . . . ENTHUSIASM . . . PRODUCTS ARE THERE . . . . . . . MAKE THE CLIENTS LOVE YOU . . . . SOMEONE SELL!!!!!!!!!!!!!! I HEAR MOJICA SELLING HIS ASS OFF . . . ANYONE ELSE OUT THERE? (*id.*).

Here it goes I am on the phone selling too . . . . . . . . . . . If I bag one before you, you owe me lunch and an extra hour of your time!!!!!!!!!!!!!!! You better damn well believe I will bag 1 or 2 . . . . . . . . . (*id.*).

What do all of you have in common? NOTHING, ZERO, GEESE, GOOSE EGGS, that is right NONE of you have written a loan on the day we committed to writing 35 loans.  Rates are at an all time low. What is the problem? Are you not asking for the deposit? Do we as a team have a commitment from each of you to write at least one if not more loan. Respond to all give us your commitment! (*id.*).

Here is the phone time report for Friday. I have it organized by Total Talk Time. You guys know . . . you have be to be on phone to write deals. We should be on for 4-5 hours. . . . . Our job is to Sell! We can't sell if we are not on the phone . . . . . too many people on the phone less than 4 hours . . . . . lots of people even less than me. . . . . (*id.*).

YOU SHOULD HAVE 2-3 BOOKS BACK MINIMUM. GET ON THE HORN AND GET THOSE BOOKS BACK BEFORE NOON!! 10AM – 12PM BOOKS BACK 1-6 PM SELL YOUR BUTT OFF!! LETS GO! (*id.*).

One of my concerns is the average extension outcalls has dropped over the last week meaning we're making less outbound calls then we were in March. The average total talk time has dropped over the last week to almost well under 4 hours approaching almost 3 hours a day in a 10-hour day. In addition, the CTI information would show us that there are more leads now than ever that have less than 4 phone calls. So we're not calling and talking to enough people. And that's the heart of the problem. . . .My expectations are that people start early in the day.  I don't mean that I want you to get here early. What I mean is when you get here I want you to get started selling. I want to see - if you wait two or three or four hours most successful bankers will tell you that they start selling early in the day. I'm expecting that everyone will make a minimum of 80 outbound calls if you've been here less than six months, - 60 outbound phone calls at a minimum if you've been here more than six months . . .. I will expect that each of you will call your leads more than 4 times (Dkt. #432, Ex. 17).

14

If at any point in time you've got somebody on the phone and you're not selling properly, plain and simple, you're hurting yourself. You're either winning or losing. There's no in between (*id.*).

Web mortgage bankers are also grouped into "teams" and compete directly with one another or members of their own team (Dkt. #432, Ex. 5, Farner Dep., pp. 7-8; Ansari Dep., p. 72; Ex. 30). They are motivated to sell more loans through sales contests, sales trips, money, and tickets to sporting events (Dkt. #432, Ex. 30). Other sales incentives include permitting web mortgage bankers to leave early for the day, take a Saturday or holiday off, or work an eight hour day — known as a "flex day"— rather than a 10+ hour day (Dkt. #432, Ex. 31).

### C.   *Compensation*

Web mortgage bankers' compensation is premised on "sales." Defendants' commission structure is based on closed loans (Dkt. #432, Ex. 12). The more "units" a web mortgage banker sells, the more money in commissions he or she earns (*id.*). Under the compensation plan, web mortgage bankers are categorized into three levels (*id.*). Movement from one level to another — whether promotion or demotion — is based primarily on sales and how much revenue the web mortgage banker earns for Quicken Loans (*id.*). Web mortgage bankers are also paid more if they sell loans at a premium (otherwise known as an "overage"), which involves extra costs and charges added to the customer's loan that exceeds Quicken Loans' actual cost for originating the loan (*See* Dkt. #432, Exs. 12, 42).

On the other hand, if web mortgage bankers sell loans at an underage, they are required to obtain prior approval from management and relinquish 50% of the commission they earn on that sale (Dkt. #432, Ex. 12; Ex. 5, Farner Dep., p. 64). Web mortgage bankers have the ability to view the exact overage or underage on any given loan in Defendants' loan origination

15

computer system, Lakewood (Dkt. #432, Ex. 5, Farner Dep., p. 63). Overages appear in Lakewood as a "green bar" while underages are a "red bar" (Dkt. #432, Ex. 5, Farner Dep., p. 63; Lundsford Dep., pp. 57-58). Web mortgage bankers are specifically taught and encouraged by management to "raise the green bar" (*See* Dkt. #432, Ex. 42).

Web mortgage bankers are evaluated on their ability to sell (Dkt. #432, Exs. 11, 18). Plaintiffs contend that disciplinary action taken against web mortgage bankers for failure to sell a sufficient number of loans is commonplace (Dkt. #432, Ex. 11). For example, almost all of the disciplinary documents produced by Defendants focus on the web mortgage banker's "level of production" and provide a performance plan with specific sales activities and goals (*id.*). Typical comments in these performance counseling documents include:

> • You must focus 100% of your attention on sales.

> • You will focus on selling and producing. There is no need for you to visit other teams, excessively socialize, send inappropriate e-mails or take too many smoke breaks. Concentrate on your job and sell and eliminate other excessive actions.

> • You will focus on selling and producing.

> • . . . stay in [your] cubes for the duration of this warning and avoid all smoke breaks and social interactions with anyone who will not give you a $500.00 deposit.

(*See id.*).

On the other hand, web mortgage bankers who are ahead of pace on sales, revenue, loan applications, and closed loans are publicly praised as role models (Dkt. #432, Ex. 33). They are lauded for their "killer sales instinct" for being "effective sales people," for their ability to "pivot" and close the customer, to sell specific loan products, and to meet their sales goals (*See* Dkt. #432, Ex. 33; *see also* Dkt. #432, Ex. 15).

### D.    *The Administrative Exemption*

16

Despite the sales activities of mortgage bankers, Defendants argue that mortgage bankers are covered by an administrative exemption, which warrants summary judgment in their favor. The administrative exemption provides that overtime is not required for an employee if:

(1) the employee is compensated on a salary basis at a rate of at least $455 per week, or $23,660 per year ($250 per week prior to August 23, 2004);[5]

(2) the employee's "primary duty is the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers"; and

(3) as part of the employee's primary duty, the employee performs "work requiring the exercise of discretion and independent judgment" with respect to "matters of significance."[6]

29 C.F.R. § 541.200(a) (2005); 29 C.F.R. §§ 541.2(a)(1), (e)(2) (2004).

The United States Department of Labor's ("DOL") updates to the regulations in 2004 indicate that "financial services" employees qualify for the administrative exemption if their primary duties include:

(1) collecting and analyzing the customer's income, assets, investments, or debts;

(2) determining which financial products best meet the customer's needs and financial circumstances;

---

[5] During all time periods relevant to this case, mortgage bankers were paid in compliance with the FLSA's salary requirements (Dkt. #439, Ex. W, Zarotney Dec., ¶¶ 3-4; Dkt. #438, Ex. A, Farner Dec.,¶ 7; *see also, e.g.*, Dkt. #439, Ex. H, Bettis Dec., ¶ 3(d) (starting base salary $24,000); Dkt. #438, Ex. C, Ortman Dec.,  ¶ 3 (same); Dkt. #439, Ex. I, Jahn Dec., ¶ 1(b) (base salary was $24,000, then $26,000, then $30,000); Dkt. #439, Ex. X, Thompson Dec., ¶ 3(b) (same).  Plaintiffs do not contend otherwise.

[6] Under the regulations, a job requires the exercise of discretion and independent judgment if it "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a) (2005).  Decisions or recommendations may be "reviewed at a higher level," even though they are sometimes "revised or reversed" by the employee's supervisors.  29 C.F.R. § 541.202(c).

17

(3) advising the customer regarding the advantages and disadvantages of different financial products; and

(4) marketing, servicing, or promoting the employer's financial products.

29 C.F.R. § 541.203(b) (2005).[7] *See also id.* § 541.201(c) (exempt status of "employees acting as advisers or consultants to their employer's clients or customers []as … financial consultants").

In September 2006, the DOL issued an Opinion Letter concluding that certain mortgage loan officers satisfy the FLSA administrative exemption.[8]  Specifically, DOL held that

---

[7] This provision also states that "an employee whose primary duty is selling financial products does **not** qualify for the administrative exemption" (*id.*) (emphasis added).

[8] FLSA2006-31, Wage and Hour Opinion Letter (Sept. 8, 2006), Dkt. #439, Ex. Y, *available at* http://www.dol.gov/esa/whd/opinion/FLSA/2006/2006_09_08_31_FLSA.pdf.

A subordinate employee at the DOL issued two previous letters addressing the exempt status of loan officers, *i.e.*, a May 17, 1999, DOL Opinion Letter and a February 16, 2001, DOL Opinion Letter.  Both the May 17, 1999, DOL Opinion Letter and the February 16, 2001, DOL Opinion Letter opined that the described loan officers were non-exempt.  In the May 17, 1999, DOL Opinion Letter, the DOL opined that loan officers were non-exempt because they were "engaged in carrying out the employer's day-to-day activities rather than in determining the overall course and policies of the business" and because they "appear to require the use of skills and experience in applying techniques, procedures, or specific standards rather than the exercising of discretion and independent judgment" (Dkt. #467, Ex. 58).  The February 16, 2001, DOL Opinion Letter resulted from a request for reconsideration from the employer.  The second time around, the employer revised the "facts," representing that "the primary duty of the loan officer is to advise a borrower in the selection of a loan package" (Dkt. #467, Ex. 59).  Adopting this revision of the assumed "facts," the DOL found that the loan officers were performing general business operations, but still found the loan officers to be non-exempt because they lacked the requisite discretion and independent judgment (*id.*).

Following *Fazekas v. Cleveland Clinic Found. Health Care*, 204 F.3d 673, 678 (6th Cir. 2000), this Court should give more persuasive value to the September 2006 DOL Opinion Letter than to the May 17, 1999, DOL Opinion Letter (Dkt. #467, Ex. 58), and February 16, 2001, DOL Opinion Letter (Dkt. #467, Ex. 59), cited by Plaintiffs, as these earlier letters were not signed by the Wage & Hour Administrator and thus "do not constitute [agency] rulings or interpretations."

18

mortgage loan officers who performed the following duties qualified for the administrative

exemption:

> 1. "work[ing] with the employer's customers to assist them in identifying and securing a loan that is appropriate for their individual financial circumstances and is designed to help them achieve their financial goals, including home ownership";

> 2. "respond[ing] to and follow[ing] up on customer inquiries (sometimes referred to as 'leads') that come from several sources";

> 3. "collect[ing] and analyz[ing] the customer's financial information" — including "the customer's income, assets, investments, debt, credit history, prior bankruptcies, judgments, and liens" — "and assess[ing] the customer's financial circumstances to determine whether the customer and the property qualify for a particular loan";

> 4. "advis[ing] the customer about the risks and benefits of the loan alternatives, including the options and variables involved," which may include "multiple mortgage products, resulting in hundreds of loans to choose from, requiring specific analysis, evaluation, and advice"; and

> 5. "stay[ing] up-to-date on market conditions."

(Dkt. #439, Ex. Y, p. 2).  In addition, the mortgage loan officers described in the DOL

September 2006 Opinion Letter use various software programs and other "technological tools,"

although these products "[did] not substitute for the discretion and judgment" that the job

requires, and the mortgage loan officer remained "responsible for recommending the best

products for the customer" (*id.*).  Finally, the DOL September 2006 Opinion Letter approved

exempt status for mortgage loan officers who spend "less than 50 percent of [their] working time

over a representative period . . . on customer-specific persuasive sales activity" (*id.*).[9]

---

[9] The DOL September 2006 Opinion Letter defines "customer-specific persuasive sales activity" to include such activities as "encouraging an individual potential customer to do business with his or her employer's mortgage banking company rather than a competitor, or to consider the possibility of a mortgage loan if they have not expressed prior interest" (Dkt. #439, Ex. Y, p. 2).

The DOL September 2006 Opinion Letter reached three definitive conclusions.  First, the "duties test" was not materially changed by the 2004 clarification of the administrative exemption, and the outcome of the DOL's opinion as to the exempt status of mortgage loan officers described in the letter would be "essentially identical under either version of the regulations" (*id.*, p. 3) (citations omitted).

Second, the primary duty of the described mortgage loan officers was not "sales" and, therefore, they "satisfy the duties requirement under 29 C.F.R. § 541.203(b)" (*id.*, p. 2, 4-5).  DOL further observed that mortgage loan officers "also satisfy the traditional duties requirements of the administrative exemption by performing office or non-manual work directly related to the

management or general business operations of the employer, and by performing duties that include the exercise of discretion and independent judgment with respect to matters of significance" (*id.*, p. 5) (citations and case analysis omitted).

Third, mortgage loan officers' use of technological tools does not diminish their exercise of "discretion and independent judgment," so long as the tools "do not select the mortgage loan product . . . and the mortgage loan officer is still responsible for assessing the alternatives and making recommendations to the customer" (*id.*,  pp. 6-7).  Based on the foregoing, DOL concluded that these mortgage loan officers "satisfy the duties requirements of the administrative exemption" (*id.*, p. 7).

Here, Defendants contend that the material facts — including the well-documented duties of web mortgage bankers, the standards that web mortgage bankers must meet to qualify for licensure and to comply with lending laws, and the declarations of current and former web

mortgage  mortgage bankers (including the sworn Job Duties Statements of randomly selected

mortgage bankers)[10], and the testimony of Plaintiffs themselves — all clearly establish that

Plaintiffs have the same primary duties as the mortgage loan officers described in the DOL

September 2006 Opinion Letter, and were therefore properly classified as exempt.

Moreover, Defendants contend that Plaintiffs' allegation that a web mortgage banker's

primary duty is "selling loans," (Dkt. #1, ¶ 3), cannot defeat summary judgment because detailed

empirical data about Plaintiffs' activities at work show that there is no factual basis for this

allegation.  In addition, Defendants state that the federal agencies responsible for analyzing and

classifying jobs do not classify mortgage bankers as "sales" employees.[11]  Finally, Defendants'

motion for summary judgment is further supported by the expert analysis of Dr. Malcolm S.

Cohen, Ph.D., a nationally recognized and preeminent labor economist based in Michigan.[12]

Defendants therefore argue that it is indisputable that web mortgage bankers (i) perform

duties that are identical, in all material respects, to those performed by employees the DOL

deems exempt under the "financial services" provision of the administrative exemption, *see* 29

---

[10]A separate Order issued on September 30, 2008, concludes that these sworn Job Duties
Statements should be stricken, and therefore will not be considered in this decision (Dkt. #530).

[11] Defendants argue further that Plaintiffs' case is based entirely on what they try to label their
job rather than the actual job activities performed as QL mortgage bankers.  Job titles referencing
sales and "sales" jargon are, as a matter of well-established FLSA law, irrelevant to exempt
status classification.  29 C.F.R. § 541.2 (2005) (job titles insufficient).  Defendants argue that
like stockbrokers, who traditionally have been classified as exempt by DOL, the primary
responsibility of mortgage bankers is to advise and serve their clients.  They contend that web
mortgage bankers are expected to establish ongoing relationships with their clients.  To reinforce
this point, mortgage bankers are provided with a detailed explanation of their duties and of the
Quicken Loans' expectations, when hired, during training, and as memorialized in written
materials (Dkt. #438, Ex. A, Farner Dec., ¶ 15).

[12]A separate Order issued on September 30, 2008, limits the use of Dr. Cohen's report and
testimony (Dkt. #530).

C.F.R. § 541.203(b) (2005); and (ii) exercise the same or higher levels of discretion and independent judgment as the mortgage loan officers described in the DOL September 2006 Opinion Letter.  According to Defendants, the essence of the web mortgage banker's job is to understand each client's financial needs, goals, and situation, and to help the client obtain the loan program that will meet his or her unique objectives.  As such, Defendants argue that Quicken Loans properly classified web mortgage bankers as exempt under the administrative exemption.

**II.   ANALYSIS**

   *A.   The Legal Standard for Summary Judgment*

   Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact.  The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The moving party has "the burden of showing the absence of a genuine issue as to any material fact."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  *See also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985).  In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party.  *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1324 (6th Cir. 1983).  But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which

> that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not merely rely "upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### B.    *FLSA Exemptions*

The FLSA establishes as a general rule that employees must be compensated one and one-half times their regular rate of pay for each hour worked in excess of 40 hours per week. *See* 29 U.S.C. §§ 207(a)(1).  The provision does not apply, however, to employees who fall within one of the exemptions set forth under the Act.  Defendants assert that they are entitled to exemption in this case under the "administrative employee" exemption.

Owing to the remedial nature of the FLSA, exemptions under the Act are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."  *Arnold v. Ben Kanowksy, Inc.*, 361 U.S. 388, 392 (1960); *Auer v. Robbins*, 519 U.S. 452 (1997); *Martin v. Cooper Electrical Co.*, 940 F.2d 896 (3d Cir. 1991).  The burden is on the employer to establish that it is clearly entitled to the benefit of an exemption and excused from the general overtime payment provision.  *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 291 (1959); *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1070 (1st Cir. 1995); *Martin v. Cooper Electrical Co.*, 940

23

F.2d 896, (3d Cir. 1991) (holding that burden of proving exemptions is on employer and 'if the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden") (citing *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. (1966)).  *See also Casas v. Conseco Finance Corp.*, 2002 WL 507059, *3 (D. Minn. Mar. 31, 2002).[13]

   **C.    Factual Analysis**

   **<u>Issue (1): Section 10 of The Portal-To-Portal Act</u>**

   Under the FLSA, an employer has an affirmative defense if it relied on a written ruling by the Administrator.  According to Section 10 of the Portal-to-Portal Act,

> no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay . . . overtime compensation under the Fair Labor Standards Act . . . **if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation**, of [the Administrator of the Wage & Hour Division].

29 U.S.C. § 259 (emphasis added).[14]  Once established, this defense is "a bar to the action or proceeding," even if the DOL ruling "is modified or rescinded or is determined by judicial

---

[13] In this opinion involving approximately 2900 "loan originators," the Minnesota district court considered many of the arguments raised by the current parties in a similar case involving Conseco Finance Corporation's failure to pay said employees overtime compensation.  In *Conseco*, the loan originators called potential customers from a list provided by the employer and, using guidelines and standard operating procedures, obtained information such as income level, home ownership history, credit history and property value; ran credit reports; forwarded the application to an underwriter; and attempted to match customer needs to employer loan products.  If the underwriter approved the loan, the originator gathered documents, verified the information, and ordered title work and appraisals.  The District Court concluded the employees were non-exempt.

[14]   The 2006 Opinion Letter was issued by the Administrator of the Wage and Hour Division.

24

authority to be invalid or of no legal effect" (*id*).  *See also Marshall v. Baptist Hosp., Inc*., 668

F.2d 234, 239 (6th Cir. 1981) (noting that "where the defense is established it acts to deprive the

court of any further jurisdiction") (alteration and internal quotation marks omitted).

As an initial matter, to avail itself of the defense, an employer must point to a sufficiently

authoritative writing, 29 U.S.C. § 259 ("any written administrative regulation, order, ruling,

approval, or interpretation"), which includes an opinion letter issued by the Administrator of the

Wage & Hour Division ("Administrator").[15]  *Fazekas v. Cleveland Clinic Found. Health Care*,

204 F.3d 673, 679 & n.3 (6th Cir. 2000); *see also In re Wal-Mart Stores, Inc., Fair Labor

Standards Act Litig*., 395 F.3d 1177, 1184 (10th Cir. 2005) ("Given their provenance and legal

effect, [the Administrator's] opinion letters are entitled to great weight. . . .").  The opinion letter

in question must, of course, actually relate to the employer's classification decision.  *Marshall*,

668 F.2d at 238 (requiring that the written interpretation be one that could be "plausibly

interpet[ed] as insulating [the employer] from liability"); *Schneider*, 102 F. Supp. 2d 827, 833

(S.D. Ohio 1999) (limiting the defense "to employers who rely on administrative rulings

addressing their particular circumstances").  A DOL opinion letter from the Administrator about

---

[15]

An opinion letter signed by the Administrator of the Wage and Hour Division is an official ruling or interpretation of the Wage and Hour Division for purposes of the Portal-to-Portal Act, 29 U.S.C. 259. Such rulings provide a potential good faith reliance defense for violations of the FLSA. . . . Opinions signed by other Wage and Hour officials (i.e. Non-Administrator letters), denoted by an NA following the opinion number; do not constitute rulings or interpretations under the Portal-to-Portal Act.

Wage and Hour Division, Opinion Letters, http://www.dol.gov/esa/whd/opinion/opinion.htm
(last visited July 14, 2009).

the classification of certain employees — here, mortgage bankers — therefore is precisely the kind of "written ruling" on which an employer may rely in classifying those employees.

After identifying the particular opinion letter upon which it relied, the employer must make three showings:[16] that it acted (1) "in reliance on" the letter,[17] (2) "in conformity with" the letter,[18] and (3) "in good faith."[19] *E.g.*, *Hultgren v. County of Lancaster*, Neb., 913 F.2d 498, 507

---

[16] No Sixth Circuit case enumerates these requirements, and in the past quarter century, "the Sixth Circuit has had little . . . opportunity to construe the defense to damages provided by § 259(a)." *Schneider*, 102 F. Supp. 2d at 833.  But these requirements are manifestly derived from the statute and are not inconsistent with Sixth Circuit precedent.

[17] To show reliance on an opinion letter, an employer must at a minimum show that it was aware of the letter.  29 C.F.R. § 790.16(b).  The employer need not have requested the letter, *Frank*, 950 F.3d at 599, but it must have "actually relied upon it," 29 C.F.R. § 790.16(a), either in formulating or in "maintaining" its policy, *Quinn v. N.Y. State Elec. & Gas Corp.*, 621 F. Supp. 1086, 1090-91 (N.D.N.Y. 1985) (granting summary judgment to an employer who relied on a regulation in "maintaining" a policy established 11 years before the regulation was promulgated).  For example, an employer relies on a regulation when the employee charged with legal compliance is "well aware" of its promulgation from "a variety of legal periodicals" and ensures compliance "by looking to the regulation itself." *Id.* at 1090.

[18]   To demonstrate conformity to a DOL Opinion Letter, the employer must prove that "its actions actually conformed with the letter[]." *Hultgren*, 913 F.2d at 508; *see also Cole v. Farm Fresh Poultry, Inc*., 824 F.2d 923, 927 (11th Cir. 1987).  In other words, an employer must ensure that the "the circumstances described in the opinion letter[]" match the employer's own "actual circumstances." *Hultgren*, 913 F.2d at 508.

[19] To prove good faith, the employer must show objective reasonableness—that it "acted as a reasonably prudent man would have acted." 29 C.F.R. § 790.15(a).  Good faith also "requires that the employer have honesty of intention and no knowledge of circumstances which ought to put him upon inquiry." *Id.*  In practice, courts presume good faith where an employer relies on and conforms to an opinion letter.  *Frank*, 950 F.3d at 598 ("The Portal Act and its regulations strongly imply that an employer who relies on and conforms to an Opinion Letter which specifically addresses him and his circumstances is acting in good faith.") (cited approvingly in *Schneider*, 102 F. Supp. 2d at 833); *see also Marshall*, 668 F.2d at 238.  Even though the good faith inquiry includes a subjective element, *i.e.*, the absence of subjectively dishonest intention, it is fully appropriate to decide the question of good faith on a motion for summary judgment. *Quinn,* 621 F. Supp. at 1089 (noting that "summary judgment has been found to be an appropriate tool to dispose of cases involving a Portal-to-Portal Act defense"); *see also Frank*, 950 F.3d at 599 (reversing the denial of summary judgment for an employer "protected from any

(8th Cir. 1990); *Frank v. McQuigg*, 950 F.3d 590, 598 (9th Cir. 1991).

### 1.      Quicken Loans' Reliance on the 2006 Opinion Letter

Quicken Loans claims it was fully aware of the 2006 Opinion Letter and relied on it in continuing to classify mortgage bankers as exempt.  This analysis is described in the deposition and declaration of David Carroll.  Mr. Carroll, the Company's Vice President of Administration and a lawyer by training, was responsible for classifying mortgage bankers for purposes of the FLSA (Dkt. #436, Deposition of David Carroll ("Carroll Dep."), Ex. D, at 60, 104; Declaration of David Carroll ("Carroll Dec."), Ex. E, ¶¶ 2, 12).  In making this classification decision (and maintaining it after periodic reviews), Mr. Carroll relied on a number of sources, including: (1) "federal regulations defining the FLSA white-collar exemptions (including the versions in effect both before and after August 23, 2004)"; (2) "the relevant opinion letters of the United States Department of Labor . . . addressing the scope and application of those regulations"; (3) "relevant federal case law";[20] (4) his "periodic review of the Company's compensation policies and practices [and] mortgage bankers' job duties"; and (5) the exempt status of similar occupations.[21]

Mr. Carroll reevaluated and reaffirmed his classification decision on several occasions,

---

back-pay liability" because it relied on an opinion letter).

[20] An example is Mr. Carroll's consideration of *Casas v. Conseco Finance Corp.*, 2002 WL 507059 (D. Minn. 2002) (Dkt. #436, Carroll Dep., Ex. D, at 64-65, 68-71; Carroll Dec., Ex. E, ¶¶ 15-19).  Mr. Carroll distinguished the loan officers in that case because they did more "outbound cold calling" and seemed to have "a pretty perfunctory, straightforward sales job," in contrast to mortgage bankers at Quicken Loans, who performed, in his view, complex duties and exercised more discretion and independent judgment (Dkt. #436, Carroll Dep., Ex. D, at 68-69; *see also* Carroll Dec., Ex. E, ¶¶ 15-19).

[21] *See, e.g.*, Dkt. #436, Carroll Dec., Ex. E, ¶ 12 (noting that he "compared the job duties of mortgage bankers with those of other financial services professionals, including stockbrokers").

(Dkt. #436, Carroll Dep., Ex. D, at 62-69), taking into account the exempt status of similar occupations and relevant legal developments (*id.* at 64-65). He "carefully studied" the 1999 and 2001 staff Opinion Letters, and found, in his "reasoned estimation," that the Company's mortgage bankers were readily distinguishable from the loan officers described in those letters (Dkt. #436, Carroll Dec., Ex. E, ¶ 14). When DOL proposed regulations in March 2003, he considered them "and they confirmed [his] understanding that employees may be exempt if they perform services for the clients of their employer, which mortgage bankers do" (*id.* at ¶ 20). When DOL promulgated its final regulations in April 2004, he also "examin[ed]" them, including the "financial services" provision at § 541.203(b), which "further solidified [his] earlier conclusion that the FLSA administrative exemption was, all along, the correct classification for our mortgage bankers" (*id.* at ¶ 20). In addition, Mr. Carroll "took particular note" of the Preamble to the 2004 regulations and its recognition that "some selling to consumers" would not defeat application of the administrative exemption to "financial services" employees (*id.* at ¶ 21).

Finally, Mr. Carroll "revisit[ed his] classification decision" following the issuance of the 2006 Opinion Letter (*id.* at ¶ 22). Mr. Carroll indicates he knew of the 2006 Opinion Letter "immediately after" its release and specifically relied on it in reviewing and maintaining his previous conclusion: "I closely reviewed the 2006 Opinion Letter" and "concluded that we should maintain the exempt classification for our mortgage bankers" (Dkt. #436, Carroll Dec., Ex. E, ¶ 23).

Indeed, as a member of the Mortgage Bankers Association ("MBA") which solicited the 2006 Opinion Letter to complete the retrenchment from two earlier Opinion Letters of May 17,

1999, and February 16, 2001, and the *Conseco* case, Quicken Loans and Mr. Carroll were

closely tracking and hoping for a new opinion letter to resolve any doubts concerning the

legitimacy of their position.  Once it obtained this eagerly awaited clarification of the law

concerning mortgage loan officers, it is hard to counter their claim of reliance on it to justify

their position.  While Plaintiffs' stronger arguments challenge the *bone fide* or good faith of

Defendants' position that the job of  its call center mortgage loan officers was properly described

in the 2006 Opinion Letter, it offers no credible evidence that Defendants did not rely on "the

best law yet" supporting its position.  Accordingly, the material facts sufficiently demonstrate

that Quicken Loans knew of and relied on the 2006 Opinion Letter when deciding to maintain

the exempt status classification of mortgage bankers after September 8, 2006.


### 2.      Quicken Loans' conformity with the 2006 Opinion Letter.

Quicken Loans also asserts that it acted in conformity with the 2006 Opinion Letter in

maintaining its classification decision.  The 2006 Opinion Letter describes the duties of a

"mortgage loan officer" and concludes that such officers "are exempt administrative employees"

(Dkt #436, 2006 Opinion Letter, Ex. A, p. 1-2).  Mr. Carroll "closely reviewed" the 2006

Opinion Letter and "compared its description of the job duties of the 'mortgage loan officers' . . .

with the job duties of [the Company's] mortgage bankers," concluding that they were

"substantially the same" (Dkt. #436, Carroll Dec., Ex. E, ¶ 23).

Plaintiffs argue that because it should have been clear to Defendants that Quicken Loans

mortgage bankers are predominately sales employees, which engage in duties that are

substantially different from those described in the 2006 Opinion Letter, it was unreasonable for

Quicken Loans to conclude that the 2006 Opinion Letter applied to the Plaintiffs in the present action. [22] In a separate Report and Recommendation on the parties' opposing motions for summary judgment on the merits (Dkt. #432 & #434), the undersigned recommends that both parties be denied summary judgment because there remains a disputed question of material fact whether Plaintiffs predominately engaged in sales activities and are therefore not exempt.  Yet, on the current issue the question is not whether the evidence is such that reasonable minds might differ on whether the job of Defendants' mortgage bankers is primarily sales nor whether Defendants might ultimately lose on this issue.  The relevant question on whether Defendants acted in conformity with the 2006 Opinion Letter is whether that opinion could be "plausibly interpet[ed] as insulating [the employer] from liability."  *Marshall*, 668 F.2d at 238.  In other words, is Defendants' position plausible that the job tasks of its mortgage bankers are sufficiently similar to those described in the 2006 Opinion Letter to warrant reliance on that opinion.

David Carroll in his October 5, 2007, declaration describes his take on the primary job functions of the mortgage bankers at Quicken Loans (Dkt. #436, Carroll Dec., Ex. E).  He parses the job in extreme detail demonstrating the multiple tasks of mortgage bankers that are not directly sales activities.[23]  Plaintiffs do not actually counter that those tasks were not undertaken by Plaintiffs in their work as mortgage bankers, but rather they focus on the multiple counter evidence stressing sales.  Yet, Mr. Carroll's declaration acknowledges that mortgage bankers

---

[22] Defendants' position is articulated in David Carroll's affidavit.

[23] Had Willy Loman's work day been sliced up is such detail, even Arthur Miller might not have recognized him as a salesman.

undertake "persuasive sales" activity, but he asserts it is "a significantly less amount of the mortgage banker's overall client telephone time than the time sent engaged in the client interview, needs analysis, credit analysis" (Dkt. #436, Ex. E, ¶ 8).  Plaintiffs have not presented evidence countering the defense evidence on percentages of time, but rather asserts these other activities are targeted at making a sale.  Ultimately, a jury will determine this issue.

Yet, Mr. Carroll's declaration notes that the Department of Labor in its 2004 white-collar regulations at 29 C.F.R. § 541.2003 (b) specifically addressed employees in the "financial services industry" as generally qualifying for the administrate exemption.[24] (Dkt. #436, Ex. E, ¶ 20)  The qualifying duties in that 2004 regulation parallel those Mr. Carroll describes in his declaration concerning Defendants' web mortgage bankers.  He indicates that the regulations note that "some selling to consumers" will not defeat the administrate exemption so long as "inside sales" is not the employee's primary duty (Dkt. #436, Ex. E, ¶ 21).  Mr. Carroll notes the February 16, 2001, DOL Opinion Letter modified the May 17, 1999, opinion letter and found that the loan officers covered by that letter met the primary duty requirements of the administrative exemption but failed to qualify because of not exercising sufficient discretion and independent judgment (Dkt. #436, Ex. E, ¶ 13).  Yet, he notes why he believes Defendants' mortgage bankers made significantly more decisions on important matters than the loan officers

---

[24] 29 C.F.R. § 541.2003 (b) Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

described in the 2001 opinion letter (Dkt. #436, Ex. E, ¶ ¶ 14, 10).  He also explains his reasons why he believes *Conseco* decision would have been decided differently if applied to Defendants' mortgage bankers who must deal with many more loan programs and exercise more judgment and discretion than involved in *Conesco* (Dkt. #436, Ex. E, ¶¶ 16-19).  Because the 2006 Opinion Letter addressed the same industry and the same classification decision at issue in this litigation, and because the undersigned does not recommend that Plaintiffs receive partial summary judgment on the issues of Plaintiffs' jobs being primarily sales, no reasonable fact finder could conclude that Quicken Loans's position that it acted in conformity with the DOL 2006 Letter was not plausible.

### 3.    Good Faith

Finally, Quicken Loans maintains it acted in good faith.  Plaintiffs argue that Defendants did not act in good faith because they should have known their asserted job description was an unfair characterization of the job function of their mortgage bankers, which they should have known was primarily sales.  While what one sees is commonly affected by one's perspective, and David Carroll's and Defendants' perspectives might have been distorted in part by an adversarial squint, a different focus is not proof of bad faith.  As noted in the next section, there is not a sufficient showing from which a reasonable jury could conclude that Defendants knowingly violated FLSA or were reckless in not being attentive to the law.  Their assertion of the primary job functions of their web mortgage bankers is plausible and they have a right to assert that factual position in determining whether to rely on the 2006 Opinion Letter.  In this case, it is objectively reasonable for an employer to follow an opinion letter from the Administrator, because it is the "most  reliable" interpretation of the regulations.  *Fazekas*, 204

32

F.3d at 679; *see also In re Wal-Mart*, 395 F.3d at 1184.  This is even more true where, as noted above, the employer is relying on a DOL opinion letter addressing the same industry, what it perceived as similar job duties, and a similar classification decision.

Here, the material facts show that Quicken Loans considered the 2006 Opinion Letter and acted reasonably when deciding to rely upon it in maintaining the exempt classification of mortgage bankers (Dkt. #436, Carroll Dep., Ex. D, at 64-65, 68-71; Carroll Dec., Ex. E, ¶¶ 12-22).  On several occasions Mr. Carroll specifically reexamined his exempt classification decision to ensure that it was correct, just as he did following the release of the 2006 Opinion Letter (Dkt. #436, Carroll Dep., Ex. D, at 62-63; *see also* Carroll Dec., Ex. E, ¶ 12 (conducting "periodic review[s]" of relevant information), *id*. ¶ 15 ("[I]n the wake of the *Conseco* decision, I led the Company's evaluation of its mortgage bankers' compensation structure and exempt status classification."), *id*. ¶ 20 (gaining "further assurance" from the 2004 regulations), *id*. ¶ 22 (the 2006 Opinion Letter provided an "occasion to revisit" the classification decision)).  And Mr. Carroll has attested to his own good faith in deciding to maintain the classification (*id.* at ¶ 24).

Finally, while I recommended excluding from trial and summary judgment consideration on the merits the October 7, 2007, affidavit and the September 4, 2007, OCCUPATIONAL ANALYSIS REPORT and exhibits of Dr. Malcolm S. Cohen, Ph. D (Dkt. #440, Ex. AA to the Defendants' Motion for Summary Judgment on the Merits (Dkt. #434)) because they address the central issue for the jury and other reasons, this exclusion does not preclude Defendants using the consistency of Dr. Cohen opinion concerning the 2006 Opinion letter and his other sources of comparison as another basis of support for their claim of a good faith reliance on the 2006 Opinion letter.  Accordingly, because no reasonable jury could conclude that Defendants did not

act in good faith in reliance on the September 8, 2006, DOL Opinion Letter, **IT IS**

**RECOMMENDED** that this Court find that Quicken Loans **BE GRANTED** summary judgment on all

claims arising on or after September 8, 2006.

### Issue (2): A Willful Violation Of The FLSA

Under the FLSA, the statute of limitations is two years, but it is extended to three years in

cases for "a cause of action arising out of a willful violation." 29 U.S.C. § 255(a).[25]  The

plaintiff has the burden of proving "that the employer either knew or showed reckless disregard

for . . . whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe, Co.*,

486 U.S. 128, 133, 135 (1988); *Schneider*, 102 F. Supp. 2d at 835 (*citing id.* at 135).  This

standard requires more than a showing of negligence on the employer's part.  *McLaughlin*, 486

U.S. at 133.  Even if an employer acts unreasonably, but not recklessly, in determining its legal

obligation under the FLSA, its conduct does not satisfy the "willfulness" standard.  *Id.* at n. 13.

When deciding whether an employer has acted willfully, courts will consider *inter alia*

the employer's consultation of legal authorities such as "letter rulings from the Administrator"

and the employer's attestations of good faith.  *See Schneider*, 102 F. Supp. 2d at 835-36 (finding

these sufficient to grant Defendant summary judgment on the statute of limitations where

Plaintiffs produced no evidence of willfulness); *see also Zachary v. Rescare Okla., Inc.*, 471 F.

Supp. 2d 1183, 1191 (N.D. Okla. 2006) (granting summary judgment on the statute of limitations

---

[25] Under the FLSA, the statute of limitations runs from the date each opt-in plaintiff submits his
or her consent to the court.  29 U.S.C. § 255(a).

because, *inter alia*, employer relied on a DOL opinion letter and demonstrated an "internal decision-making process that attempt[ed] compliance with the FLSA").[26]

Here, Plaintiffs are unable to show a willful violation of the law because they cannot sufficiently demonstrate that Quicken Loans knew that it was violating the FLSA.  Before the 2006 Opinion Letter was published, Mr. Carroll examined the legal authorities bearing on the Company's decision to classify mortgage bankers as exempt, and conducted a "periodic review" of new legal developments (Dkt. #436, Carroll Dec., Ex. E, ¶ 12; *see also id.* ¶¶ 13-23; Carroll Dep., Ex. D, at 64-65, 68-71).  While the 1999 and 2001 Opinion Letters and the 2002 *Conseco* case could reasonably be interpreted to imply that Plaintiffs were not exempt employees prior to the time period the September 2006 Opinion Letter was issued, there is insufficient evidence to suggest that Defendants *knew* they were violating the law based on these authorities.[27]

---

[26] Plaintiffs must bring forth specific evidence that the employer had actual knowledge it was violating the statute or that the employer recklessly disregarded its obligations under the statute. *Dole*, 942 F.2d at 967 (granting plaintiff summary judgment on the statute of limitations where defendant offered only a generic attestation of good faith but plaintiff proved that the Wage & Hour Division had investigated the employer, notified it most particularly of how it was violating
the FLSA, and received from it an assurance — on which the employer reneged — that it would comply with the FLSA in the future).

[27] A subordinate employee at the DOL issued the 1999 and 2001 letters addressing the exempt status of loan officers.  These letters were signed by a member of the Fair Labor Standards Enforcement Team, rather than the Administrator.  *See* Wage and Hour Opinion Letter, 2001 WL 1558764 (Feb. 16, 2001), Dkt. #436, Ex. B ("2001 Opinion Letter"); Wage and Hour Opinion Letter, 1999 WL 1002401 (May 17, 1999), Dkt. #436, Ex. C ("1999 Opinion Letter"). Unlike the 2006 Opinion Letter, these two earlier letters were not issued by the Administrator of the Wage and Hour Division.  As noted in footnote 15 "Opinions signed by other Wage and Hour officials (i.e. Non-Administrator letters) . . . do not constitute rulings or interpretations under the Portal-to-Portal Act" as do opinion letters signed by the Administrator.

Mr. Carroll acknowledges that he reviewed the 2002 judicial decision in *Conseco,* and admits "it caused quite a stir in the mortgage banking industry" (Dkt. #436, Carroll Dec., Ex. E, ¶ 14).  Yet, he goes on in his declaration to carefully explain why he believed the facts in that case were distinguishable from the facts in the present case (*id.* at ¶¶ 14-19).  Specifically, he notes that the *Conseco* court pointed out that "only a small subset of these loan originators received leads generated by that company's marketing efforts—a business model much different than ours" (*id.* at ¶ 17).  Quicken Loans' mortgage bankers benefit from Quicken Loans's "robust marketing and advertising effort, which allow them to focus on inquires generated from people already interested in obtaining a mortgage loan" (*id.*).  Thus, Mr. Carroll distinguished the loan officers as doing more sales related activities dealing with "outbound cold calling" whereas in Defendants' operation the mortgage loan officers worked on leads and thus had to do less persuasive sales activities to clients already identified as interested in obtaining a new mortgage or refinancing.  He also believed the *Conseco* loan officers seemed to have "a pretty perfunctory, straightforward sales job" dealing with a "***very*** limited number of loan programs" in contrast to the Quicken Loans mortgage bankers, who performed complex duties and exercised considerably more discretion and independent judgment involving "over 100 different Quicken Loans mortgage loan programs" (Dkt. #436, Carroll Dep., Ex. D, at 68-69; *see also* Carroll Dec., Ex. E, ¶¶ 10 & 15-19).  Mr. Carroll concludes that he was "confident" that if Quicken Loans faced a similar legal challenge, it could "readily differentiate [its] mortgage bankers from the

36

loan originators described in *Conseco* and convincingly show those differences to a judge or jury" (*id.* at ¶ 19).[28]

There was also an important change between the 1999 and 2001 DOL Opinion Letters that adds credence to Defendants' position it did not knowingly violate the law. The 1999 Opinion Letter opined that loan officers were not exempt because they were "engaged in carrying out the employer's day-to-day activities rather than in determining the overall course and policies of the business" and because they "appear to require the use of skills and experience in applying techniques, procedures, or specific standards rather than the exercising of discretion and independent judgment" (Dkt. #467, Ex. 58). In the request for the 2001 Opinion Letter, the employer revised the facts representing that "the primary duty of the loan officer is to advise a borrower in the selection of a loan package" (Dkt. #467, Ex. 59). Adopting this revision of the assumed "facts," the DOL found that the loan officers were performing general business operations, but still found the loan officers to be non-exempt because they lacked the requisite discretion and independent judgment (*id.*).

Although the facts were revised for the 2001 request, the fact remains that the DOL altered its 1999 opinion to find that the primary duty of the described loan officers was not sales. As discussed in greater detail in a separate Report and Recommendation regarding the motions

---

[28] It should also be noted that *Conseco* is a district of Minnesota case, and therefore is a decision that is not binding in the Sixth Circuit. Moreover, because this case originates from a court outside the Sixth Circuit, and is not an appellate decision, it is not unreasonable to conclude that its holdings were not clearly established in a similar manner that they would be required to be under the framework for qualified immunity before a defendant could be held liable. As such, it may be unfair to conclude that Defendants knew they were violating the law based on this one decision. Defendants may have reasonably determined that *Conseco* could be reversed on appeal or that the facts presented in that case would result in a different decision under the case law of the Sixth Circuit.

for summary judgment on the merits, this is the main factual issue in dispute in this case, and may have lead Defendants to believe they were acting reasonably in classifying their employees as exempt. In addition, the 1999 Opinion Letter is outside the statutory period for this case. In an FLSA collective action, each individual claimant's action is not commenced until the date his or her consent is filed in court. 29 C.F.R. § 790.21(b). For example, Plaintiff Henry's action was commenced on May 17, 2004, the date on which this action was filed and his consent form was filed. Liability to Plaintiff Henry for overtime can extend back only to the pay period including May 17, 2002 (two years before Henry's action commenced for a non-willful FLSA violation) or to May 17, 2001 (three years before Henry's action commenced for a willful FLSA violation). During the critical time period, therefore, it was reasonable for the Defendants to rely on the February 2001 Opinion Letter for guidance and not the May 1999 Letter.

Further support in avoiding the implications of the May 1999 opinion letter and the *Conesco* case came April of 2004 when the Department of Labor issued its final white-collar regulations. 29 C.F.R. § 541.2003 (b) specifically addressed employees in the "financial services industry" as generally qualifying for the administrate exemption (*see* footnote 24). Mr. Carroll had been following this proposed regulation since March of 2003 when this regulation was proposed (Dkt. #436, Carroll Dec., Ex. E, ¶ 20). While the May 1999 opinion letter and the *Conesco* case standing alone would suggest Defendants' mortgage bankers were non-exempt, it cannot be said they clearly established that fact, and that Mr. Carroll's efforts to distinguish those references were not plausible. But of greater significance, in the 2001 DOL Opinion Letter and again in the 2004 regulation, mortgage banking employers seeking the administrative exemption for their employees saw an evolution of progress for their position and an erosion of

the contrary position with the change of administration from Democrat to Republican and might well anticipate more progress as possible, which occurred in the 2006 DOL Opinion Letter. Plaintiffs cannot demonstrate that Defendants knowingly violated the law when all indicators suggested Defendants' position might well prevail.

Plaintiffs also cannot demonstrate that Quicken Loans recklessly disregarded the FLSA. Quicken Loans was not reckless in either its decision-making process or in its conclusion.  Mr. Carroll considered all appropriate legal authorities (Dkt. #436, Carroll Dep., Ex. D, at 64-65, 68-71; Carroll Dec., Ex. E, ¶¶ 12-24) and even before the "win" with DOL's 2006 Opinion Letter on which Defendants could rely, there were plausible reasons in the 2001- 2004 period to suggest Plaintiff's jobs would be classified as exempt.  When Mr. Carroll distinguished legal authorities, while other arguments could be made, in fairness his position is a "reasoned estimation" (*see e.g.* Carroll Dec., Ex. E, at ¶ 14 – distinguishing the 2001 and 1999 staff Opinion Letters), and followed "a fair and honest review" (*see id.* ¶ 16).  And Quicken Loans' conclusion can hardly been characterized as reckless in light of the 2004 "financial services industry" regulation and its Preamble (*see, e.g.*, 69 Fed. Reg. 22146 (Apr. 23, 2004)) and with the aid of hindsight –  the 2006 Opinion Letter.

Plaintiffs argue that although Defendants claim that Mr. Carroll "examined the legal authorities" bearing on the classification decision and that he was a "conscientious executive doing his best to follow the law," this was not the case.  They note that upon learning of the *Conseco* decision,[29] Quicken Loans' Senior Legal Counsel warned Mr. Carroll on September 5,

---

[29] *See* Dkt. No. 436, p. 5 & n.3 (citing and quoting Mr. Carroll's testimony on his consideration of the *Conseco* decision and his factual basis for distinguishing the duties of the loan officers at *Conseco* from the mortgage bankers at Quicken Loans).

2002, that "unless the FLSA overtime exemptions are explicitly broadened . . . this decision could have a serious financial impact on our business" (Dkt. #551, Ex. A).[30]  And rather than "following the law," Mr. Carroll tried to change it by "team[ing] up with the MBA . . .  to 'right this wrong' through lobbying and legislation" (Dkt. #551, p. 8).

Plaintiffs' theory appears to be  that if a party believes a case was wrongly decided or even that there should be a change in the law, then, as a matter of law, the party's current conduct must be unlawful.  Yet, the right of petition for the redress of grievances is fundamental in our system and the Supreme Court has made clear that this protection applies to efforts to influence public officials in a representative democracy, regardless of the intent of those efforts. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc*., 365 U.S. 127, 139 (1961) ("The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws **cannot properly be made to depend upon their intent in doing so.**  It is neither unusual or illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves . . . .") (emphasis added).  Nor does having the power, money and access to a possibly sympathetic administration tarnish the enterprise to change or clarify the law to your favor.  The list of possible reasons for seeking a change in the law is endless, but the motivation of a party seeking a change of law is generally not probative – standing alone –  of the legality of that person's current conduct.  Indeed, to hold otherwise could chill the right to petition the government and it would be bad policy if the simple fact of the petition were deemed proof that the petitioner was not in compliance with the law.

---

[30] Mr. Carroll was also informed by Quicken Loans' counsel on November 3, 2003, that "[t]he *Conseco* case and two DOL Opinion Letters say non-exempt" (Dkt. #551, Ex. D at DC023).

Based upon the evidence before the Court, a trier of fact could conclude, at most, that the Defendant acted unreasonably in determining its obligations under the FLSA, and even that is a general supposition for the Plaintiffs. In short, on the evidence before the Court no reasonable fact finder could conclude that the Defendants' failure to pay the Plaintiffs overtime compensation stemmed from willful or reckless non-compliance with the FLSA. Accordingly, **IT IS RECOMMENDED** that Defendants **BE GRANTED** summary judgment on all claims arising outside each opt-in Plaintiff's two-year limitations period.

### Issue (3): Liquidated Damages

In addition to paying past-due overtime compensation, an employer who violates the FLSA ordinarily must pay an equal amount as liquidated damages. 29 U.S.C. § 216(b). If an employer pleads and proves that the act or omission giving rise to FLSA liability was done in good faith, and if it had reasonable grounds for believing that its conduct did not violate the Act, then a court may, in its discretion, decline to award liquidated damages. *E.E.O.C. v. City of Detroit Health Dept.*, 920 F.2d 355, 357 (6th Cir. 1990) (citing 29 U.S.C. § 260); *see also Martin v. Ind.-Mich. Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004); *Dole v. Elliott Travel & Tours, Inc*., 942 F.2d 962, 967 (6th Cir. 1991). To meet these requirements, the employer "must show that it took affirmative steps to ascertain the [FLSA's] requirements," and that its classification decision was objectively reasonable. *Martin*, 381 F.3d at 584 (alteration and internal quotation marks omitted). Even when an employer meets this burden, however, a court nevertheless "may award full liquidated damages equal to, and in addition to, the unpaid back wages." *McClanahan v. Mathews*, 440 F.2d 320, 323 (6th Cir. 1971). Alternatively, even though an employer meets its burden, a court retains the discretion to award liquidated damages in some

amount less than the plaintiff's total unpaid overtime compensation. *Featsent v. City of Youngstown*, 70 F.3d 900, 906 (6th Cir. 1995). But when an employer lacks good faith and reasonable grounds for believing that its conduct did not violate the Act, a district court must award liquidated damages. *Dole v. Elliott Travel & Tours*, *Inc*., 942 F.2d 962, 967 (6th Cir. 1991).

The determination on issue (1) that Defendants are entitled to a good faith defense on and after the September 8, 2006, DOL Opinion Letter does not necessarily imply that they acted in good faith at all dates between May 2001 and September 8, 2006. Nor does a finding on issue (2) that there is not sufficient evidence to find Defendants wilfully or recklessly violated the FLSA necessarily entail a finding that their actions were in good faith. Along the continuum from the area of good faith at one end to the area of reckless and then willful violations at the other end is a middle ground where reasonable minds might differ whether negligence or other failings are or are not in good faith depending on the circumstances. For example, one may have a non-frivolous reason to believe Plaintiffs qualify for the administrative exemption, but if most FLSA lawyers would state a firm belief that such an argument will fail, the losing party might be deemed not to have acted in good faith pursuing a colorable but likely losing position.

If there is a Plaintiffs' verdict, then construing the evidence in this case in a light most favorable to the Defendants, a reasonable trier of fact might conclude that Defendants acted in good faith, and with reasonable, albeit mistaken, grounds for believing that its conduct conformed with the FLSA. But on Defendants' motion for summary judgment on issue (3), this Court must view the evidence in the light most favorable to the non-moving party.

Viewing the evidence in the light most favorable to Plaintiffs, the record contains evidence and inferences from which a rational trier of fact could conclude that Defendants failed to act in good faith and with a reasonable belief that no FLSA violation existed.  Here, Plaintiffs proffer significant evidence that a Quicken Loans' web mortgage banker's primary duty is to generate sales of loans.  A reasonable fact finder could conclude they do not assist in the administrative operation of the business, must follow standard operating procedures and guidelines, and are evaluated and compensated on the basis of their sales performance.  They could determine that these employees under 29 C.F.R. § 541.201(a) are primarily involved in selling Defendants' products or services rather than in "running or servicing the business" itself.  A reasonable jury could conclude that there are significant dissimilarities between the web loan consultants/mortgage bankers specific job parameters and those of the hypothetical financial service industry employees found exempt in the DOL's September 2006 Opinion Letter.  They could find that the Quicken Loans' web loan consultants/mortgage bankers were closely supervised in careful efforts to improve their ability to sell mortgage loans.  And therefore, viewing the evidence in the light most favorable to the non-moving party, a reasonable jury could conclude that "the character of the job as a whole" of the loan consultants/mortgage bankers centers around sales.

Assuming that the Court – which determines what, if any, liquidated damages shall be awarded – also makes the mixed legal/factual determination on good faith and does not submit that question to the jury,[31] this Court would be more fully informed on where along the

---

[31] This issue was not briefed and may warrant further briefing at trial to determine the division of labor on making the predicate factual finding on good faith on issue (3).

continuum of good faith to wilful Defendants actually were at different periods between May 2001 and September 8 after hearing all of the evidence at trial. Defendants' position was clearly weaker in 2001 and 2002 after the *Coseco* case cast its threatening shadow across the financial services industry and the clearly more supportive April 2004 modification of the regulations had not yet been adopted. Thus, the good faith/lack of good faith divide may have been delineated by some date such as April 23, 2004, when the new white collar regulations were adopted. Even though the Administrator says there was no change in substance between the new and old regulations, the new regulations had clearer language supportive of Defendants' position. Because it is recommended in the other Report and Recommendation issued today that both motions for summary judgment be denied on the merits and thus the case must proceed to trial, it is recommended that the Court defer a final determination on issue (3) until the conclusion of trial.

Finally, even assuming *arguendo* that the Defendant did act in good faith and with an objectively reasonable belief in the propriety of its actions, the Court could determine that a total denial of liquidated damages would be inappropriate. Even when an employer meets its burden, a court "may award full liquidated damages equal to, and in addition to, the unpaid back wages." *McClanahan v. Mathews*, 440 F.2d 320, 323 (6th Cir. 1971). A court also retains the discretion to award liquidated damages less than a plaintiff's total unpaid overtime compensation. *Featsent v. City of Youngstown*, 70 F.3d 900, 906 (6th Cir. 1995). Without the opportunity to hear testimony describing, with particularity, the Defendants efforts to comply with the FLSA, the Court cannot exercise its discretion judiciously-assuming, of course, that the Defendant first establishes its good faith reasonableness, thereby allowing the Court to exercise its discretion at

44

all.  *See Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991) (recognizing that when an employer lacks good faith and reasonable grounds for believing that its conduct did not violate the FLSA, a district court must award liquidated damages in the full amount).

Accordingly, **IT IS RECOMMENDED** that Defendants' motion for summary judgment on the liquidated damages issue (3) be **DENIED** at this time. The Court will be in a better position to ascertain whether such damages should be awarded and in what amount, if any, after hearing the testimony and arguments of all the parties at trial.

## III.    RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART** as follows:

On issue (1) **IT IS RECOMMENDED** that this Court find that once the Administrator issued his September 8, 2006, Opinion Letter, Plaintiffs relied on it in good faith and thus face no liability on or after that date.

On issue (2) **IT IS RECOMMENDED** that during the limitations period of this suit Plaintiffs cannot prove a willful or reckless violations of the FLSA and thus the two year limitations period applies.

On issue (3), because this is an issue the Court decides only if the jury finds liability, **IT IS RECOMMENDED** that such a discretionary determination would be better made and more fully informed after hearing the entire case, and Defendants' motion **BE DENIED** as to the issue of liquidated damages.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy

hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file

specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S.

140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*,

638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others

with specificity, will not preserve all the objections a party might have to this report and

recommendation.  *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit*

*Fed'n of Teachers Local 231*, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR

72(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than twenty (20) pages in

length unless by motion and order such page limit is extended by the Court.  The response shall

address specifically, and in the same order raised, each issue contained within the objections.  A

party may file a reply brief within 5 days of service of a response.  The reply shall be not more

than five (5) pages in length unless by motion and order such page limit is extended by the

Court.

Dated: July 16, 2009                                          s/ Steven D. Pepe
Ann Arbor, MI                                                 United States Magistrate Judge

46

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that a copy of the foregoing Report and Recommendation was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 16, 2009.


<u>s/Deadrea Eldridge</u>
Generalist Deputy Clerk