UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RYAN C. HENRY, individually and on behalf
of all other similarly situated employees,

          Plaintiffs,

vs.

QUICKEN LOANS INC., a Michigan corporation,
and DANIEL B. GILBERT, personally and individually,

          Defendants.

_____/

CASE NO. 04-CV-40346

DISTRICT JUDGE STEPHEN J. MURPHY, III
MAGISTRATE JUDGE STEVEN D. PEPE

**REPORT AND RECOMMENDATION DENYING PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGEMENT ON LIABILITY (DKT. #432)
AND
REPORT AND RECOMMENDATION GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE MERITS (DKT. #434)**

       This is a Fair Labor Standards Act ("FLSA") overtime collective action brought under 29

U.S.C. § 201 *et seq*., involving approximately 446 Plaintiffs who worked as "loan consultants,"

Quicken Loans' former job title for mortgage bankers, for Defendants Quicken Loans and Daniel

B. Gilbert in their "call center" also known as the "sales center" or "web center" (Dkt. #469, Ex.

92, ¶ 3).  Plaintiffs allege that during their employment as "loan consultants" (hereinafter

"mortgage bankers") for Defendant Quicken Loans that Defendants unlawfully withheld wages

from Plaintiffs by denying them overtime pay for hours worked in excess of 40 hours per week

in violation of §207(a)(1) of the FLSA.  As a result of this alleged practice, Plaintiffs contend

they suffered a loss of wages and ask for judgment against Defendants for an amount equal to

Plaintiffs' unpaid back wages at the applicable overtime rate, and an equal amount as liquidated

damages, a three year limitation period and all costs and attorney fees incurred prosecuting this

claim because they allege Defendants violation of the FLSA was willful (Dkt. #1, ¶8).

On October 5, 2007, Plaintiffs filed a motion for summary judgement on liability with respect to the FLSA's administrative exemption, 29 U.S.C. § 213(a)(1) (Dkt. #432). Under this exemption, "an employee whose primary duty is selling financial products does not qualify for the administrative exemption." 29 C.F.R. § 541.203(b) (2004). Plaintiffs argue that a mortgage banker's primary job duty at Quicken Loans is sales and that summary judgment in Plaintiff's favor on liability is therefore appropriate. Defendants' also filed an October 5, 2007, motion for summary judgement in which they argue that the primary duty of mortgage bankers is to service their clients, and that while selling is part of what mortgage bankers do, sales activity is only a secondary duty (Dkt. #434). Accordingly, Defendants argue that the mortgage bankers are exempt from the overtime requirements of the FLSA, and Defendants are entitled to judgment as a matter of law. Both motions were referred for Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B) (Dkt. #449). For the reasons stated below, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART,** and that Plaintiffs' motion for partial summary judgment be **DENIED**.

## I. BACKGROUND

Plaintiff Ryan C. Henry ("Henry") and the "opt-in" Plaintiffs worked as mortgage bankers for Quicken Loans, selling loans at its call centers in Livonia and Troy, Michigan, and locations in Ohio and Arizona. As described by Quicken Loans's owner and Chairman of the Board, Defendant Daniel B. Gilbert, these employees are the "salespersons" that make up Quicken Loan's "sales force" (Dkt. #432, Exs. 3 & 4). Quicken Loans acknowledges that these mortgage bankers routinely worked over forty hours per week without overtime compensation

(*See* Dkt. #432, Farner Dep., pp. 66-68; Carroll Dep., pp. 73-74; *see also* Ex. 6).

On May 17, 2004, Henry filed this collective action under the FLSA, 29 U.S.C. § 216(b), on behalf of himself and other similarly situated web mortgage bankers who worked overtime hours for Defendants without compensation (Dkt. #1).  On September 28, 2006, the Court conditionally certified this case as a collective action, finding Henry "similarly situated" to the other web mortgage bankers, and ordered Quicken Loans to produce a list of all putative class members for purposes of judicial notice (Dkt. #298).  As a result of court-authorized notice, this case consists of approximately 446 individuals who have joined Henry as opt-in Plaintiffs by filing consent forms with the Court consistent with the requirements of section 216(b) of the FLSA (Dkt. #469, Ex. 92, ¶ 3).

### A.      *Quicken Loans and Daniel B. Gilbert*

Quicken Loans markets itself as "America's # 1 On-line Mortgage Lender," which funded over $19 billion in loans in 2007.[1]  It sells loans to customers in all 50 states in the United States (*id.*).  At the time the present motions were filed, the company was headquartered in Livonia, Michigan and employed approximately 565 mortgage bankers between five locations, including two call centers in Troy and Livonia, Michigan, and recently opened offices in Cleveland, Ohio and Phoenix, Arizona (Dkt. #432, Ex. 5, Farner Dep., p. 7; Mazey Dep., pp. 16-17).  At corporate headquarters, Quicken maintains a "bridge," which is a raised platform in the middle of the sales floor, from which the company monitors each web mortgage banker's daily work activity in "real time." (Dkt. #432, Ex. 5, Lundsford Dep., pp. 15-16).

Quicken Loans's management structure is designed to supervise its employees closely

---

[1] https://www.quickenloans.com/about (last visited August 25, 2008).

(Dkt. #432, Ex. 5, Carroll Dep., pp. 27-28).  The loan consultants are on the lowest rung of

Quicken's organizational structure, with no supervisory authority (Dkt. #432, Ex. 5, Carroll

Dep., p. 36; Dkt. #432, Ex. 42).[2]  Mr. Gilbert, who is named personally and individually as a

defendant in this lawsuit, serves as the Chairman of Quicken Loans (Dkt. #432, Ex. 5, Gilbert

Dep., pp. 15-16; Dkt. #1).  Quicken Loans's Chief Executive Officer is William Emerson and

Mr. Jay Farner serves as Vice President of the Web Center (Dkt. #432, Ex. 5, Gilbert Dep., p. 16;

Farner Dep., pp. 5-6).  Mr. Farner's sole responsibility is to run the day-to-day operations of the

only division of the company in which the web mortgage bankers work — the "call center," also

known as the "sales center" or "web center" (Dkt. #432, Ex. 5, Gilbert Dep., pp. 42-43; *see* Dkt.

#432, Exs. 7, 8, 10).  Mr. Farner has the most knowledge with respect to the web mortgage

bankers' job duties and the manner in which they perform these duties, and he is expected to

make sure the web mortgage bankers are performing their job in a manner that is consistent with

the company's expectations (Dkt. #432, Ex. 5, Gilbert Dep., pp. 42-45).

### B.    *Mortgage Banker Hiring, Training & Procedures*

### 1.    **Job Offer Letters**

Before their employment begins, Quicken Loans tells the web mortgage bankers that by

accepting employment with Quicken Loans, they are "joining the most highly skilled **sales force**

in the United States of America — the Quicken Loans **Sales**/Web Center!" (Dkt. #432, Ex. 8)

(emphasis added).  The offer letter states that the applicants' "rugged character and strong

---

[2]  Quicken Loans has a separate business unit, the "Frontline," staffed by non-exempt employees, that is responsible for some outbound telemarketing and for screening inbound loan inquiries for basic information.  It is unclear if they are on a "lower rung" or a parallel rung of the organization.

competitive spirit . . . is vital to being a great winning **salesperson**" (*id.*) (emphasis added).

Further, these offer letters outline the main expectations of the web mortgage bankers at Quicken

Loans.  The letters specifically state:

> • As a **sales** professional at Quicken Loans, you will carry a company-provided pager and return all pages within 10 minutes. This includes the weekend.
>
> • As a **sales** professional, you will need to work the phones hard. In order to be successful, we have found that you will need to make a minimum of 80 outbound calls per day and spend a minimum of five hours on the phone **selling** to clients per day.
>
> • You will need to work **55+ hours per week** to achieve your goals and deliver exceptional client service.  Every client, every time, no excuses, and no exceptions is our company philosophy.

(Dkt. #432, Ex. 8.) (emphasis added).[3]

### 2.      Sales Training

Defendants require all web mortgage bankers to attend Defendants' mandatory four-week

"Initial Sales Training" course:

> The Initial Sales Training (IST) program is an intensive four-week long journey into Mortgage Banking that new team members embark upon. There are three basic aspects to the program — Mortgage training, sales training, and technology training, broken down and then specifically blended to build confidence and competence.

---

[3] On April 23, 2004, the Department of Labor issued its Final Rules on the "white-collar" exemptions to the Fair Labor Standards Act.  *See* Preamble, Department of Labor: Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule, 69 Fed. Reg. 22122 (Apr. 23, 2004).  The revised Final Rules became effective on August 23, 2004.  During this time-period, Defendants made several changes to the documents they supplied to web mortgage bankers including the job offer letters and compensation plans.  The offer letter was revised to eliminate any reference to the word "sales" or "sell" and any references to how many hours a web mortgage banker was expected to work (Compare Dkt. #432, Ex. 8 with Dkt. #432, Ex. 9).  The compensation plans were also revised to include language mirroring the duties requirements for administrative employees in the financial services industry as defined in the revised regulations (Compare Dkt. #432, Ex. 12 with Dkt. #432, Ex. 13).

> Students leave the program with both tested knowledge and meaningful experience selling here at Quicken Loans.

(*See* Dkt. #432, Ex. 14; *see also* Dkt. #432, Ex. 5, Henry Dep., pp. 31-32).  After Initial Sales Training, Defendants expect web mortgage bankers to "trail" their sales team leader (individuals chosen because of their "superior selling skills") three to four times per week so they can better integrate the sales training concepts they learned into realistic sales scenarios (Dkt. #432, Ex. 8).

In addition to "Initial Sales Training," Defendants have other training courses focused solely on sales such as "Sales Excellence Training" and "Sales Process Training" (Dkt. #432, Ex. 14).  Further training is provided through Defendants' intranet website, Rock World, where loan consultants can access a "Call Clip Library" (Dkt. #432, Ex. 15).  Call clips are recorded sales calls and are emailed weekly to loan consultants as examples of "successful" sales techniques (*id.*).

Quicken Loans requires all web mortgage bankers to follow the same mandatory sales approach, named "The Sales Process" (Dkt. #432, Ex. 2).  Quicken Loans describes The Sales Process as a "consistent method of selling adopted by Quicken Loans to improve production and customer service" (*id.*).  The Sales Process is generally executed in two phone calls and includes nine or ten steps, all of which are followed by a script of what to say, and how to say it.  The headings for these steps are as follows:

Step 1: FORESHADOW/GAIN CONTROL

Step 2: INITIAL QUESTIONS/CREATE NEED/GOALS

Step 3: 2nd FORESHADOW OF PROCESS/DEPOSIT

Step 4: INCOME/BUILD RAPPORT

6

Step 5: Get SSN & 3rd FORESHADOW/STC/NEW PROGRAM INTRO/INCOME DOCS

Step 6: REVIEW CREDIT/4th FORESHADOW OF DEPOSIT/REVIEW GOALS, PITCH & BENEFITS

Step 7: CLOSE/ARC 5 TIMES!

Step 8: TAKE APPLICATION

Step 9: TRIAL CLOSE (If you cannot gain commitment, take control to set-up the next call on your terms)

Step 10: FORESHADOW FUTURE BUSINESS

(Dkt. #432, Ex. 2).

Under The Sales Process, web mortgage bankers are directed to try to "close" the sale, in other words obtain the mandatory $500.00 deposit, at least five times during the phone call (*id.*). Before web mortgage bankers actually "pitch" loan products to the customers, The Sales Process mandates that web mortgage bankers "foreshadow" this deposit at least three times (*See* Dkt. #432, Ex. 2, Steps 2, 4, and 5). If after five attempts the web mortgage banker is still unsuccessful in securing the $500.00 deposit, The Sales Process directs the web mortgage banker to push to a "Trial Close":

> [client name], it's obvious that at this point you are not able to commit. I think we are going to work together, but it is clear that you need more time. What I'd like to do is this: why don't I give you a call back on [date]. Is the morning or afternoon better? Great, I'll call you at [time]? At that point if everything looks good and you're ready to move forward, then we'll accept your $500 good faith deposit and get your loan in process, ok? Great. It was nice speaking with you and we'll get things going on [date].

(Dkt. #432, Ex. 2, Step 9). Defendants require web mortgage bankers to follow this sales script on every phone call:

Here is Article II of OUR SALES CONSTITUTION!

> Today's is easy – Block out everything going on around you and concentrate on only one thing – the sales process. Forget when lunch is, forget your buddy wants to take a smoke in 10 minutes, forget the client is giving you bogus objections. One simple message – FOLLOW  THE  SALES  PROCESS. Challenge yourself – between calls coming in and leads you follow up on. – FOLLOW THE SALES PROCESS on every call – NOT 99% – EVERY CALL.

(*See* Dkt. #432, Ex. 16; *see also* Exs. 17, 18).

Plaintiffs contend that the mandatory nature of The Sales Process would seem to leave little room for the web mortgage bankers to exercise discretion and independent judgment in the performance of their jobs. They argue that commitment and strict adherence to The Sales Process is a critical part of the web mortgage bankers' job duties and any departure has grave consequences, as emphasized by Mr. Farner in a voicemail sent to all web mortgage bankers:

> Last thing and very, very important is the Jay Farner's, ah, ah – three-strike policy and I'm ah doing this to certainly help out every single person and make you aware . . . I will not accept any excuse and the three-strike policy is if I – I'm always listening to phone calls. If I happen to listen to a phone call where you don't do the right steps. You don't foreshadow, you don't close. You don't, ah you know – I mean I've got people that I've listened to who aren't even doing step one which is just to simply get out there and tell them to take out a pen and a piece of paper. If you're not doing these things I'm going to issue you a strike. And at three strikes, then we're just going to have to not work together any longer. Ok. I've got to – I've got a three-strike policy here that I'm going to be sticking to because it's so important to you, and to the company that you do this correctly . . . Please don't be a victim of this three-strike policy.

(Dkt. #432, Ex. 17).

### 3.    Handling "Objections" and Other Sales Techniques

Plaintiffs assert that web mortgage bankers are told to take control of the phone call, to be a "master of sales," and to get aggressive when selling loans (Dkt. #432, Ex. 1). Defendants consistently provide web mortgage bankers with sales tips and techniques, and sales "isms" on

how to sell certain loan products or refine their sales skills so that they are always attempting to close the sale and obtain the $500 deposit necessary to start the loan (Dkt. #432, Exs. 19, 20).

A major part of The Sales Process, Plaintiffs maintain is to know how to handle questions — called "objections" by Quicken Loans — from customers. "Objections" are questions a customer may ask during the sales pitch that interrupt The Sales Process or suggest a customer's reservations or concerns about purchasing a loan from Quicken Loans (Dkt. #432, Ex. 21). Defendants teach web mortgage bankers to "Acknowledge, Respond, and Pivot" ("ARP") back to The Sales Process when they are "interrupted" during The Sales Process with questions about the loan product they are trying to sell (Dkt. #432, Ex. 22). According to this ARP sales technique:

> Getting thrown off track is to be expected on a sales call. The key is to get back on track and continue within the conversation YOU dictate. Use the technique of ARP-Acknowledge, Respond, and Pivot back to where you need to be in the structure. This is a major component of controlling the call and not throwing in the towel.

(*id.*). Defendants have "ARP" scripts tailored to sell different loan products (*id.*).

Defendants also teach the loan consultants to handle objections using the "ARC" technique. ARC is a three part process; (1) Acknowledge the Objection; (2) Respond to the Objection; and (3) Close again (Dkt. #432, Ex. 21). "One of the most difficult and most rewarding parts of the job is bringing the conversation full circle and closing again after an objection." (*id.*). Defendants provide loan consultants detailed "Responses to Objections" scripts designed to overcome specific objection scenarios, such as a customer who: 1) is "shopping" around; 2) has questions about the "rate"; 3) suggests he/she needs to speak to their spouse before giving the $500.00 deposit; 4) is suspicious about the need for the $500 deposit; or

5) is hesitant to give out his/her social security number (*id.*).  Throughout the web mortgage

bankers training and employment, Defendants stress that:

> The most important thing to realize is that if you choose to respond to an objection then it is IMPERATIVE that you bring your response to full circle and CLOSE! Stopping short of that just turns control over to the borrower and is a waste of your time. You would be better off saving your breath and getting off the phone at the point of the objection (Dkt. #432, Ex. 21).

> Your job is to diffuse each and every objection that comes up, pivot and move towards the final close. . . . Clients say that they want to shop, get a lower rate, think about it, and talk to their spouse usually all in one breath.  Instead of interrupting them and getting angry, write it down on a piece of paper.  Let them VENT. Then, very calmly, go back through the list and address each objection and then CLOSE!" (Dkt. #432, Ex. 22).

Defendants specifically direct web mortgage bankers to limit the amount of time they

spend on the phone with the customer (*See* Dkt. #432, Ex. 21; *see also* Ex. 42).  For example,

Step 6 takes place during the second phone call and is the part of The Sales Process where the

web mortgage banker is required to talk about the $500.00 deposit, review the customer's goals,

and "pitch" the loan program that the customer is interested in. (Dkt. #432, Ex. 2).  According to

The Sales Process, this step should take only three minutes (Dkt. #432, Ex. 23).  Defendants

enforce a specific "3-Minute Rule" for this step with closing the sale as the main objective (*id.*).

In addition to the 3-Minute Rule, Defendants try to control the amount of information web

mortgage bankers may give the prospective customer:

> We must use Controlled Release of Information.  This consists of giving only small nuggets of information if the client is PUSHING for answers. . . . The controlled release of information should be used when the client asks specific questions during our line of questioning.

(Dkt. #432, Ex. 24).

Moreover, web mortgage bankers are encouraged to create a sense of "urgency" in their

customers and to provide "successful examples of how they were able to limit the amount of information they provided during The Sales Process" (*id.*).  Defendants also instruct web mortgage bankers to take advantage of the "urgency" they created:

> Listening to calls, I have heard a desperation in the client's voices because the rates fell and will go up soon and so will their opportunity to save. **TAKE FULL ADVANTAGE OF THEIR MINDSET AND CLOSE THEM. EASE THEIR CONCERNS AND THEIR POCKETBOOK.**

(*id.*) (emphasis added).

Plaintiffs argue that the overall message communicated by management to web mortgage bankers is to "sell, sell, sell" loans (Dkt. #432, Ex. 1).  They contend that web mortgage bankers are told over and over again by people in management and operations that they are Defendants' "sales force" (Dkt. #432, Ex. 3).  As members of the sales force, web mortgage bankers are in a high-pressured sales environment under the control of Jay Farner and his Divisional Vice Presidents and Sales Directors (Dkt. #432, Exs. 10, 17).  Plaintiffs contend that Jay Farner and his management team email and leave voicemail messages for the web mortgage bankers throughout the workday repeating the "sell, sell, sell" mantra (Dkt. #432, Exs. 1, 17, 27, 29).  A few examples of these communications include:

> About 7:30 I went and kind of looked around and about four or five of us are still in the building and the Pistons are playing tonight and I am sure that had something to do with it. But you know tomorrow, Wednesday, Thursday, I mean a lot of you guys are behind in your goals number one. Number two, ah, you know we're talking about closings. I mean we're talking about pipelines. Some of your pipelines are now very, very thin and its one thing to do your job, write two deals, get two back. Walk out 7:30, that's fine. You get there at 9:30, walk out. But if you don't have a deal, if you don't have a book, leaving early or leaving on time is just not acceptable, period. I mean this is **a commissioned sales environment** and we got to treat it as such (Dkt. #432, Ex. 27.) (emphasis added).

> Wake up guys . . . . . lets be on the phone. 1 deal is a joke in this environment. (Dkt. #432, Ex. 29).

11

LEADS ARE OUT OF CONTROL . . . SELL WITH PASSION . . . ENTHUSIASM . . . PRODUCTS ARE THERE . . . . . . . MAKE THE CLIENTS LOVE YOU . . . . SOMEONE SELL!!!!!!!!!!!!!! I HEAR MOJICA SELLING HIS ASS OFF . . . ANYONE ELSE OUT THERE? (*id.*).

Here it goes I am on the phone selling too . . . . . . . . . . . If I bag one before you, you owe me lunch and an extra hour of your time!!!!!!!!!!!!!!! You better damn well believe I will bag 1 or 2 . . . . . . . . . (*id.*).

What do all of you have in common? NOTHING, ZERO, GEESE, GOOSE EGGS, that is right NONE of you have written a loan on the day we committed to writing 35 loans.  Rates are at an all time low. What is the problem? Are you not asking for the deposit? Do we as a team have a commitment from each of you to write at least one if not more loan. Respond to all give us your commitment! (*id.*).

Here is the phone time report for Friday. I have it organized by Total Talk Time. You guys know . . . you have be to be on phone to write deals. We should be on for 4-5 hours. . . . . Our job is to Sell! We can't sell if we are not on the phone . . . . . too many people on the phone less than 4 hours . . . . . lots of people even less than me. . . . . (*id.*).

YOU SHOULD HAVE 2-3 BOOKS BACK MINIMUM. GET ON THE HORN AND GET THOSE BOOKS BACK BEFORE NOON!! 10AM – 12PM BOOKS BACK 1-6 PM SELL YOUR BUTT OFF!! LETS GO! (*id.*).

One of my concerns is the average extension outcalls has dropped over the last week meaning we're making less outbound calls then we were in March. The average total talk time has dropped over the last week to almost well under 4 hours approaching almost 3 hours a day in a 10-hour day. In addition, the CTI information would show us that there are more leads now than ever that have less than 4 phone calls. So we're not calling and talking to enough people. And that's the heart of the problem. . . .My expectations are that people start early in the day.  I don't mean that I want you to get here early. What I mean is when you get here I want you to get started selling. I want to see - if you wait two or three or four hours most successful bankers will tell you that they start selling early in the day. I'm expecting that everyone will make a minimum of 80 outbound calls if you've been here less than six months, - 60 outbound phone calls at a minimum if you've been here more than six months . . .. I will expect that each of you will call your leads more than 4 times (Dkt. #432, Ex. 17).

If at any point in time you've got somebody on the phone and you're not selling properly, plain and simple, you're hurting yourself. You're either winning or losing. There's no in between (*id.*).

Web mortgage bankers are also grouped into "teams" and compete directly with one another or members of their own team (Dkt. #432, Ex. 5, Farner Dep., pp. 7-8; Ansari Dep., p. 72; Ex. 30).  They are motivated to sell more loans through sales contests, sales trips, money, and tickets to sporting events (Dkt. #432, Ex. 30).  Other sales incentives include permitting web mortgage bankers to leave early for the day, take a Saturday or holiday off, or work an eight hour day — known as a "flex day"— rather than a 10+ hour day (Dkt. #432, Ex. 31).

### C.    Compensation

Web mortgage bankers' compensation is premised on "sales."  Defendants' commission structure is based on closed loans (Dkt. #432, Ex. 12).  The more "units" a web mortgage banker sells, the more money in commissions he or she earns (*id.*).  Under the compensation plan, web mortgage bankers are categorized into three levels (*id.*).  Movement from one level to another — whether promotion or demotion — is based primarily on sales and how much revenue the web mortgage banker earns for Quicken Loans (*id.*).  Web mortgage bankers are also paid more if they sell loans at a premium (otherwise known as an "overage"), which involves extra costs and charges added to the customer's loan that exceeds Quicken Loans' actual cost for originating the loan (*See* Dkt. #432, Exs. 12, 42).

On the other hand, if web mortgage bankers sell loans at an underage, they are required to obtain prior approval from management and relinquish 50% of the commission they earn on that sale (Dkt. #432, Ex. 12; Ex. 5, Farner Dep., p. 64).  Web mortgage bankers have the ability to view the exact overage or underage on any given loan in Defendants' loan origination computer system, Lakewood (Dkt. #432, Ex. 5, Farner Dep., p. 63).  Overages appear in Lakewood as a "green bar" while underages are a "red bar" (Dkt. #432, Ex. 5, Farner Dep., p.

13

63; Lundsford Dep., pp. 57-58). Web mortgage bankers are specifically taught and encouraged by management to "raise the green bar" (*See* Dkt. #432, Ex. 42).

Web mortgage bankers are evaluated on their ability to sell (Dkt. #432, Exs. 11, 18). Plaintiffs contend that disciplinary action taken against web mortgage bankers for failure to sell a sufficient number of loans is commonplace (Dkt. #432, Ex. 11). For example, almost all of the disciplinary documents produced by Defendants focus on the web mortgage banker's "level of production" and provide a performance plan with specific sales activities and goals (*id.*). Typical comments in these performance counseling documents include:

• You must focus 100% of your attention on sales.

• You will focus on selling and producing. There is no need for you to visit other teams, excessively socialize, send inappropriate e-mails or take too many smoke breaks. Concentrate on your job and sell and eliminate other excessive actions.

• You will focus on selling and producing.

• . . . stay in [your] cubes for the duration of this warning and avoid all smoke breaks and social interactions with anyone who will not give you a $500.00 deposit.

(*See id.*).

On the other hand, web mortgage bankers who are ahead of pace on sales, revenue, loan applications, and closed loans are publicly praised as role models (Dkt. #432, Ex. 33). They are lauded for their "killer sales instinct" for being "effective sales people," for their ability to "pivot" and close the customer, to sell specific loan products, and to meet their sales goals (*See* Dkt. #432, Ex. 33; *see also* Dkt. #432, Ex. 15).

### D.    *The Administrative Exemption*

14

Despite the sales activities of mortgage bankers, Defendants argue that mortgage bankers are covered by an administrative exemption, which warrants summary judgment in their favor. The administrative exemption provides that overtime is not required for an employee if:

> (1) the employee is compensated on a salary basis at a rate of at least $455 per week, or $23,660 per year ($250 per week prior to August 23, 2004);[4]

> (2) the employee's "primary duty is the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers"; and

> (3) as part of the employee's primary duty, the employee performs "work requiring the exercise of discretion and independent judgment" with respect to "matters of significance." [5]

29 C.F.R. § 541.200(a) (2005); 29 C.F.R. §§ 541.2(a)(1), (e)(2) (2004).

The United States Department of Labor's ("DOL") updates to the regulations in 2004 indicate that "financial services" employees qualify for the administrative exemption if their primary duties include:

> (1) collecting and analyzing the customer's income, assets, investments, or debts;

> (2) determining which financial products best meet the customer's needs and financial circumstances;

---

[4] During all time periods relevant to this case, mortgage bankers were paid in compliance with the FLSA's salary requirements (Dkt. #439, Ex. W, Zarotney Dec., ¶¶ 3-4; Dkt. #438, Ex. A, Farner Dec.,¶ 7; *see also, e.g.*, Dkt. #439, Ex. H, Bettis Dec., ¶ 3(d) (starting base salary $24,000); Dkt. #438, Ex. C, Ortman Dec.,  ¶ 3 (same); Dkt. #439, Ex. I, Jahn Dec., ¶ 1(b) (base salary was $24,000, then $26,000, then $30,000); Dkt. #439, Ex. X, Thompson Dec., ¶ 3(b) (same).  Plaintiffs do not contend otherwise.

[5] Under the regulations, a job requires the exercise of discretion and independent judgment if it "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a) (2005).  Decisions or recommendations may be "reviewed at a higher level," even though they are sometimes "revised or reversed" by the employee's supervisors.  29 C.F.R. § 541.202(c).

15

(3) advising the customer regarding the advantages and disadvantages of different financial products; and

(4) marketing, servicing, or promoting the employer's financial products.

29 C.F.R. § 541.203(b) (2005).[6] *See also id.* § 541.201(c) (exempt status of "employees acting as advisers or consultants to their employer's clients or customers [] as … financial consultants").

In September 2006, the DOL issued an Opinion Letter concluding that certain mortgage loan officers satisfy the FLSA administrative exemption.[7] Specifically, mortgage loan officers who performed the following duties qualified for the administrative exemption:

1. "work[ing] with the employer's customers to assist them in identifying and securing a loan that is appropriate for their individual financial circumstances and is designed to help them achieve their financial goals, including home ownership";

2. "respond[ing] to and follow[ing] up on customer inquiries (sometimes referred to as 'leads') that come from several sources";

3. "collect[ing] and analyz[ing] the customer's financial information" — including "the customer's income, assets, investments, debt, credit history, prior bankruptcies, judgments, and liens" — "and assess[ing] the customer's financial circumstances to determine whether the customer and the property qualify for a particular loan";

4. "advis[ing] the customer about the risks and benefits of the loan alternatives, including the options and variables involved," which may include "multiple mortgage products, resulting in hundreds of loans to choose from, requiring specific analysis, evaluation, and advice"; and

5. "stay[ing] up-to-date on market conditions."

---

[6] This provision also states that "an employee whose primary duty is selling financial products does **not** qualify for the administrative exemption" (*id.*) (emphasis added).

[7] FLSA2006-31, Wage and Hour Opinion Letter (Sept. 8, 2006), Dkt. #439, Ex. Y, *available at* http://www.dol.gov/esa/whd/opinion/FLSA/2006/2006_09_08_31_FLSA.pdf.

(Dkt. #439, Ex. Y, p. 2). In addition, the mortgage loan officers described in the DOL

September 2006 Opinion Letter use various software programs and other "technological tools,"

although these products "[did] not substitute for the discretion and judgment" that the job

requires, and the mortgage loan officer remained "responsible for recommending the best

products for the customer" (*id.*). Finally, the DOL September 2006 Opinion Letter approved

exempt status for mortgage loan officers who spend "less than 50 percent of [their] working time

over a representative period . . . on customer-specific persuasive sales activity" (*id.*).[8]

The DOL September 2006 Opinion Letter reached three definitive conclusions. First, the

"duties test" was not materially changed by the 2004 clarification of the administrative

exemption, and the outcome of the DOL's opinion as to the exempt status of mortgage loan

officers described in the letter would be "essentially identical under either version of the

regulations" (*id.*, p. 3) (citations omitted).

Second, the primary duty of the described mortgage loan officers was not "sales" and,

therefore, they "satisfy the duties requirement under 29 C.F.R. § 541.203(b)" (*id.*, p. 2, 4-5).

DOL further observed that mortgage loan officers "also satisfy the traditional duties

requirements of the administrative exemption by performing office or non-manual work directly

related to the

management or general business operations of the employer, and by performing duties that

include the exercise of discretion and independent judgment with respect to matters of

---

[8] The DOL September 2006 Opinion Letter defines "customer-specific persuasive sales activity"
to include such activities as "encouraging an individual potential customer to do business with
his or her employer's mortgage banking company rather than a competitor, or to consider the
possibility of a mortgage loan if they have not expressed prior interest" (Dkt. #439, Ex. Y, p. 2).

significance" (*id.*, p. 5) (citations and case analysis omitted).

Third, mortgage loan officers' use of technological tools does not diminish their exercise of "discretion and independent judgment," so long as the tools "do not select the mortgage loan product . . . and the mortgage loan officer is still responsible for assessing the alternatives and making recommendations to the customer" (*id.*, pp. 6-7). Based on the foregoing, DOL concluded that these mortgage loan officers "satisfy the duties requirements of the administrative exemption" (*id.*, p. 7).

Here, Defendants contend that the material facts — including the well-documented duties of web mortgage bankers, the standards that web mortgage bankers must meet to qualify for licensure and to comply with lending laws, and the declarations of current and former web mortgage  mortgage bankers (including the sworn Job Duties Statements of randomly selected mortgage bankers)[9], and the testimony of Plaintiffs themselves — all clearly establish that Plaintiffs have the same primary duties as the mortgage loan officers described in the DOL September 2006 Opinion Letter, and were therefore properly classified as exempt.

Moreover, Defendants contend that Plaintiffs' allegation that a web mortgage banker's primary duty is "selling loans," (Dkt. #1, ¶ 3), cannot defeat summary judgment because detailed empirical data about Plaintiffs' activities at work show that there is no factual basis for this allegation.[10] In addition, Defendants state that the federal agencies responsible for analyzing and

---

[9] A separate Order issued on September 30, 2008, concludes that these sworn Job Duties Statements should be stricken, and therefore will not be considered in this decision (Dkt. #530).

[10]  Quicken Loans, like many employers, has a computer system that records the telephone usage of all employees, including mortgage bankers. A compilation of the records generated by this system shows that, on average, the Plaintiffs spent 15.2 hours a week on the telephone (Dkt. #447, Booth Dec., Ex. RR, ¶ 8(a)).  This amounts to 24% of the average weekly hours that

classifying jobs do not classify mortgage bankers as "sales" employees.[11]  Finally, Defendants'

motion for summary judgment is further supported by the expert analysis of Dr. Malcolm S.

Cohen, Ph.D., a nationally recognized and preeminent labor economist based in Michigan.[12]

Defendants therefore argue that it is indisputable that web mortgage bankers (i) perform

duties that are identical, in all material respects, to those performed by employees the DOL

deems exempt under the "financial services" provision of the administrative exemption, *see* 29

C.F.R. § 541.203(b) (2005); and (ii) exercise the same or higher levels of discretion and

independent judgment as the mortgage loan officers described in the DOL September 2006

Opinion Letter.  According to Defendants, the essence of the web mortgage banker's job is to

understand each client's financial needs, goals, and situation, and to help the client obtain the

loan program that will meet his or her unique objectives.  As such, Defendants argue that

Quicken Loans properly classified web mortgage bankers as exempt under the administrative

exemption.

---

Plaintiffs claim that they worked (*id.*).  Defendants argue that even if one were to assume that all of this telephone time was "sales" time, which they do not, it still is substantially less than 50% of the time that Plaintiffs claim they worked on a weekly basis.

[11] Defendants argue further that Plaintiffs' case is based entirely on what they try to label their job rather than the actual job activities performed as QL mortgage bankers.  Job titles referencing sales and "sales" jargon are, as a matter of well-established FLSA law, irrelevant to exempt status classification.  29 C.F.R. § 541.2 (2005) (job titles insufficient).  Defendants argue that like stockbrokers, who traditionally have been classified as exempt by DOL, the primary responsibility of mortgage bankers is to advise and serve their clients.  They contend that  web mortgage bankers are expected to establish ongoing relationships with their clients.  To reinforce this point, mortgage bankers are provided with a detailed explanation of their duties and of the Quicken Loans' expectations, when hired, during training, and as memorialized in written materials (Dkt. #438, Ex. A, Farner Dec., ¶ 15).

[12] A separate Order issued on September 30, 2008, limits the use of Dr. Cohen's report and testimony (Dkt. #530).

## II.   ANALYSIS

### A.   *The Legal Standard for Summary Judgment*

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party

demonstrates there is no genuine issue as to any material fact.  The Supreme Court has

interpreted this to mean that summary judgment should be entered if the evidence is such that a

reasonable jury could find only for the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986).  The moving party has "the burden of showing the absence of a genuine issue

as to any material fact."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  *See also Lenz*

*v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985).  In resolving a summary judgment motion, the

Court must view the evidence in the light most favorable to the non-moving party.  *See Duchon*

*v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d

1319, 1324 (6th Cir. 1983).  But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against
> a party who fails to make a showing sufficient to establish the
> existence of an element essential to that party's case, and on which
> that party will bear the burden of proof at trial.  In such a situation,
> there can be "no genuine issue as to any material fact," since a
> complete failure of proof concerning an essential element of the non-
> moving party's case necessarily renders all other facts immaterial.
> The moving party is "entitled to a judgment as a matter of law"
> because the non-moving party has failed to make a sufficient showing
> on an essential element of her case with respect to which she has the
> burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not merely rely

"upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as

otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### B.    FLSA Exemptions

The FLSA establishes as a general rule that employees must be compensated one and one-half times their regular rate of pay for each hour worked in excess of 40 hours per week. *See* 29 U.S.C. §§ 207(a)(1).  The provision does not apply, however, to employees who fall within one of the exemptions set forth under the Act.  Defendants assert that they are entitled to exemption in this case under the "administrative employee" exemption.

Owing to the remedial nature of the FLSA, exemptions under the Act are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."  *Arnold v. Ben Kanowksy, Inc.*, 361 U.S. 388, 392 (1960); *Auer v. Robbins*, 519 U.S. 452 (1997); *Martin v. Cooper Electrical Co.*, 940 F.2d 896 (3d Cir. 1991).  The burden is on the employer to establish that it is clearly entitled to the benefit of an exemption and excused from the general overtime payment provision.  *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 291 (1959); *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1070 (1st Cir. 1995); *Martin v. Cooper Electrical Co.*, 940 F.2d 896, (3d Cir. 1991) (holding that burden of proving exemptions is on employer and 'if the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden") (citing *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. (1966)).  *See also Casas v. Conseco Finance Corp.*, 2002 WL 507059, *3 (D. Minn. Mar. 31, 2002).[13]

---

[13] In this opinion involving approximately 2900 "loan originators," the Minnesota district court considered many of the arguments raised by the current parties in a similar case involving Conseco Finance Corporation's failure to pay said employees overtime compensation.  In

C.      *Factual Analysis*

Here, Plaintiff attests that he and other web mortgage bankers located in Defendants' call centers are improperly classified as "exempt" employees under the FLSA and therefore not paid overtime.  He further asserts that the position in which he is employed is primarily a sales position, and does not require or permit the significant exercise of individual discretion or authority necessary to excuse Defendants from responsibility for overtime payment.  Defendants maintain that web mortgage banker are properly treated as exempt from overtime either because they are primarily customer-service providers, akin, *e.g*., to an in-house securities broker providing investment advice to the brokerage firm's clients, and thus excluded from the FLSA's overtime requirements by the "administrative employee" exemption.

On the other hand, Plaintiffs argue that they are a class of employees whose position significantly entails telephoning Defendants' potential home mortgage customers, taking information necessary to the loan application, running the Company's computer program to determine what loan package(s) may be offered to that potential customer based on the financial information provided, and compiling customer documents for forwarding to an underwriter.  Web mortgage bankers have no authority to approve, suspend or deny loans and no authority to sell loans not approved by Defendants' underwriters.  More particularly, it is Plaintiffs' position

--------------------

*Conseco*, the loan originators called potential customers from a list provided by the employer and, using guidelines and standard operating procedures, obtained information such as income level, home ownership history, credit history and property value; ran credit reports; forwarded the application to an underwriter; and attempted to match customer needs to employer loan products.  If the underwriter approved the loan, the originator gathered documents, verified the information, and ordered title work and appraisals.  The District Court concluded the employees were non-exempt.

that web mortgage bankers employ Defendant's internal leads, guidelines, and standard operating procedures to try to match a potential customer's needs with one of Defendants' loan products in order to make a sale.  To do so, they necessarily compile the customer's financial information (*e.g.*, income and equity levels, credit history) and discuss with that customer the qualifying and operating conditions/terms of particular loans.  Again, as noted above, web mortgage bankers are hired, trained, earn commissions, and are otherwise successful in their positions on the basis of their sales performance.

In accordance with the provisions of the FLSA, the overtime requirements do not apply to "any employee employed in a *bona fide* . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). An employee qualifies for this exemption if (a) s/he meets the salary basis test and minimum compensation; (b) his/her "primary duty" is the performance of office or non-manual work directly related to management policies or general business operations of the employer or the employer's customers; and (3) such primary duty includes work requiring the exercise of discretion and independent judgment.  *See* 29 C.F.R. § 541.200.

### 1.    Salary Basis Test

An employee is paid "on a salary basis" if she receives a predetermined amount of minimum compensation each pay period that is not subject to being reduced because of the "quality or quantity of the work performed." 29 C.F.R. § 541.118(a).  On November 27, 2006, the DOL issued, under the signature of the Administrator, an Opinion Letter providing an "interpretation" of the applicable regulation and clarifying that (i) the "salary basis" test for an administrative overtime exemption is met where the employees receive a guaranteed pre-determined payment of at least the applicable minimum and said amount is not subject to

reduction; and (ii) this arrangement still qualifies for exemption even if compensation in excess of the minimum (*e.g.*, additional commissions) may be offset by carry-forward of an earnings/sales quota deficit in a prior pay period (Dkt. #447, Ex. KK).

For at least the three-year period prior to May 17, 2004 (the date on which this litigation was filed), and continuing to August 23, 2004 (when the salary basis minimum was increased under the FLSA regulations, Quicken Loans' policy was to pay its mortgage bankers a salary of not less than $250 a week (Dkt. #437, Ex. A, ¶¶ 3-4).  That salary was paid bi-weekly, and mortgage bankers also could earn additional compensation.  For the period from August 23, 2004, to at least October 2, 2007 (the date of the declaration of Todd Zarotney, Director of Compensation & Benefits at Quicken Loans), Quicken Loans' policy was to pay its mortgage bankers a salary of not less than $455 a week (*id.*).  That salary was paid bi-weekly, and mortgage bankers also could earn additional compensation.

Because the DOL has interpreted the applicable regulation in a manner which clearly encompasses the compensation arrangements in the present case, and because such interpretation is a well-reasoned and accurate interpretation entitled to deference, **IT IS RECOMMENDED** that Defendants be **GRANTED** summary judgment on this factor of the administrative employee exemption.

### 2.    Primary Duty Test

In general, the regulations define an employee's "primary duty" as the principal main, major, or most important duty based on all the facts in a particular case, with a major emphasis

24

on the "character of the employee's job as a whole." 29 C.F.R. § 541.700(a) (2005).[14]  The

requirement that the employee's "primary duty" be "directly related to management policies or

general business operations" has generally been understood to refer to the administrative

operations of a business as distinguished from "production" or "sales" work.  This has been

referred to as the "administrative/production dichotomy," and the regulations, at least until their

revision in April 2004,  further delineate these types of exempt and non-exempt work by

differentiating between (i) employees engaged in "servicing" a business (*e.g.*, "advising the

management, planning, negotiating, representing the company, purchasing, promoting sales, and

business research and control") and (ii) those engaged in producing or generating "the very

product or service that the employer's business offers to the public." 29 C.F.R. § 541.205(b)[15];

*Casas v. Conseco Finance Corp.*, 2002 WL 507059 at *6 (D. Minn. Mar. 31, 2002).  *See also*

*Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3d Cir.1991)[16]; *Reich v. Chicago Title Insur.*

---

[14] This mode of assessment explicitly adopted the approach used by the Fourth Circuit in *Counts v. South Carolina Elec. & Gas Co.*, 317 F.3d 453 (4th Cir. 2003).

[15] This particular language appears to have been omitted in the 2004 revisions although it is still referred to in case law.  *See, e.g., Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688 (4th Cir. 2009).  It is also captured in part in the current 29 C.F.R. § 541.201(a) that distinguishes between "running or servicing the business," which is exempt, from "manufacturing production line or selling a product in a retail or service establishment," which is not.

[16] In this leading case, the Third Circuit considered whether employees who worked for an electrical product wholesaler qualified for exemption where they made telephone sales with some authority to deviate from computer-generated price quotes based on a customer's purchase history and/or item availability/cost.  The Third Circuit concluded the plaintiffs were employed to produce sales of electrical products (the defendant's primary business) and held they were non-exempt. *Martin*, 940 F.2d at 902-04.  It should be noted that the DOL's 2004 regulations do not change this "primary duty" definition linking administrative work "with the running or servicing of the business versus selling a product." Tilson & Glenn, *The FLSA: Emerging Trends in Wage and Hour Litigation*, 746 PLI 571, October 2006.

*Co.*, 853 F. Supp. 1325 (D. Kan. 1994); *Haywood v. N. Am. Van Lines, Inc*., 121 F.3d 1066, 1072

(7th Cir. 1997), *Reich v. John Alden Life Ins. Co.,* 126 F.3d 1, 9 (1st Cir.1997).

 In addition, the regulations further provide that employees in the "financial services

industry" generally meet the administrative duties test if said employees (i) collect/analyze

financial information, (ii) determine the best products for the client/advise the client, and (iii)

market and service the employer's financial products.  *See* 29 C.F.R. § 541.203.  They expressly

require, however, that if an employee's "primary duty is *selling* financial products" that

employee "does not qualify for the administration exemption" (*id.*) (emphasis added).

 The 2004 Preamble to § 541 cites with approval three leading cases in which employees

in the financial services industry were held to be "administrative employees" exempt from

overtime compensation.  Each involved insurance agents or insurance marketing representatives.

In *Hogan v. Allstate Ins. Co.*, 361 F.3d 621 (11th Cir. 2004), the Eleventh Circuit concluded that

insurance agents who "spent the majority of their time" servicing and advising existing policy

holders, and who also adapted client policies as appropriate, decided on advertising

budgets/techniques, hired and trained and set compensation levels for staff, and delegated routine

matters and sales to staff, were within the exemption.  Similarly, in *Wilshin v. Allstate Insur*. Co.,

212 F. Supp. 2d 1360 (M.D. Ga. 2002), the district court dismissed a religious discrimination,

---

It should also be noted that the administrative/production dichotomy is not an exclusive method for assessing the "primary duty" factor of an administrative employee exemption. *See, e.g., Bothell v. Phase Metrics, Inc*., 299 F.3d 1120, 1126 (9th Cir. 2002) (concluding that the dichotomy is a useful piece of the larger inquiry, and that the courts should construe the statutes and applicable regulations as a whole); *Takacs v. A.G. Edwards and Sons, Inc*., 444 F. Supp. 2d 11 (S.D. Cal. 2006) (citing *Bothell's* direction that the administrative/production dichotomy be applied in conjunction with an assessment of the employees' "advising . . . planning, negotiating, and representing" activities).

retaliation and FLSA action concluding, in part, that a neighborhood insurance agent who provided claims help to existing policy holders, represented the company and handled public relations, and directed the day-to-day affairs of the branch office (such as selection/lease of office location, collecting and accounting for premium payments), in addition to selling insurance products, was exempt.  Finally, in *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1 (1st Cir. 1997), the First Circuit held that insurance marketing representatives who primarily cultivated/facilitated relationships with licensed independent third party agents (who in turn recommended multiple companies' products to end-purchasers) were administrative employees engaged in representing and promoting the company "generally", in comparison to employees "focused simply on particular sales transactions" (*id.* at 10).

Here, Plaintiffs assert, and well support, that a web mortgage banker's primary duty is to generate loan sales, that they do not assist in the administrative operation of the business, must follow standard operating procedures and guidelines, and are evaluated and compensated on the basis of their sales performance.  Their position is, without question, distinguishable from those of the insurance industry employees in the cited cases which involved clear administrative tasks such as renting space, advertising, hiring , training and/or having a sales force beneath them. *Compare also Jastremski v. Safeco Insur. Co.*, 243 F. Supp. 2d 743 (N.D. Ohio 2003) (discussing claims adjuster who investigated, made covered loss determinations, negotiated settlements, and had independent settlement authority); *Palacio v. Progressive Insur. Co.*, 244 F. Supp. 2d 1040 (C.D. Cal. 2002).

As noted earlier, Defendants attach to their brief a September 8, 2006, DOL Opinion Letter issued in response to a request made by the MBA in September, 2005.  In its request, the

MBA described the mortgage loan officers as to which it sought assessment of entitlement to an administrative employee exemption as follows: such employees (a) work with the employer's customers to identify and secure loans appropriate to their individual circumstances by analyzing and assessing financial information, (b) advise customers of risks and benefits, (c) respond to and follow-up on customer inquiries, (d) spend less than 50% of their time "selling" mortgage loan products,[17] (e) use technology to help evaluate loan qualification, but (f) remain responsible for recommending the best products to meet customer needs.  The DOL concluded that such loan officers would fall within the administrative employee exemption.  It also observed, of course, that its "application" of the regulations to MBA's hypothetical was based on the facts/circumstances described in the request letter.

A court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute.  *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, (3d Cir. 1991) (recognizing that DOL regulations interpreting the FLSA "constitute the agency's 'body of experience and informed judgment' about the statute, and so, they should be given 'considerable and in some cases decisive weight' ") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  Yet, in *Christianson v. Harris County*, 529 U.S. 576, 587 (2000), the Supreme Court held that agency interpretations of statutes which are not arrived at after a formal adjudication or notice-and-comment rule-making do not warrant *Chevron* deference, but are instead entitled to

---

[17] The MBA elects to define "selling" financial products as "customer-specific persuasive sales activity," which it further delineates as either (a) persuading a prospective customer to borrow from Defendant rather than a competitor, or (b) soliciting a mortgage loan from a prospective customer absent any prior expression of interest, *e.g.*, cold call prospecting.

28

"some respect" to "the extent that those interpretations have the 'power to persuade.' " *See also Barnett v. Washington Mutual Bank*, 2004 WL 1753400 (N.D. Cal. Aug.5, 2004) (discussing *Chevron* and *Christianson*). *Compare, e.g., Hogan v. Allstate Insur. Co.*, 361 F.3d 621, 628 n. 8 (11th Cir. 2004) ("DOL Opinion Letters should be considered and given due deference, but they are persuasive authority only-not binding.") (citing *Arriaga v. Florida Pac. Farms*, 305 F.3d 1228, 1238-39 (11th Cir. 2002)); *Kilgore v. Outback Steakhouses of Fla.,* Inc., 160 F.3d 294 (6th Cir. 1998) (stating that opinions of the Administrator of the DOL have persuasive value if they are thoroughly considered and well-reasoned); *Jastremski v. Safeco Ins. Co.*, 243 F. Supp. 2d 743, 753 (N.D. Ohio 2003) (giving deference to Administrator's Opinion Letter because it was a "thorough, well reasoned, and accurate interpretation of the regulations").[18]  A review of the case law and commentary regarding the degree of deference due a particular agency interpretation indicates that the jurisprudence is extensive, complicated and fraught with inconsistencies and disagreements.

Defendants now assert in their brief that, because the web mortgage bankers' duties are substantially similar to those of the typical mortgage loan officer hypothesized to the DOL the Court should defer to the DOL's September 2006 Opinion Letter and recommend summary judgment in their favor.  Furthermore, Defendants argue that the September 2006 DOL Opinion

---

[18] In its discussion of the question and related precedent, however, the Supreme Court has reiterated that, under *Auer*, "[a]n administrative rule may receive substantial deference if it interprets the issuing agency's own ambiguous regulation." *Gonzales v. Oregon*, 546 U.S. 243 (2006) (noting that, in *Auer*, the DOL's amicus brief was accorded weight as to its interpretation of the "salary basis" test, a "creature of the [DOL]'s own regulations"); *id*. (noting that the interpretation was "controlling unless plainly erroneous or inconsistent with the regulation"). *See also Camphill Soltane v. Dept. of Justice*, 381 F.3d 143, 148 n. 4 (3d Cir. 2004) (noting, in INS case, that, under *Auer*, an agency interpretation of a regulation in a format lacking the force of law warrants *Chevron*-style deference).

Letter, as an interpretation and application of DOL's own regulations, is "controlling unless . . . plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1996) (internal quotation and citation omitted); *accord Long Island Care at Home v. Coke*, 551 U.S. --, 127 S. Ct. 2339, 2349 (2007) (reaffirming *Auer* holding that DOL's interpretation is controlling unless plainly erroneous or inconsistent with the regulation); *In re Farmers Ins. Exchange*, 481 F.3d 1119, 1129 (9th Cir. 2007) ("We must give deference to the DOL's interpretation of its own regulations through, for example, Opinion Letters."). *Cf. Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991) (observing that whether salespersons fell within the administrative employee exemption was "a mixed question of law and fact").

Throughout their briefs and their now excluded expert's report, Defendants rely heavily on their definition of "sales" as "customer-specific persuasive sales activity" (*see, e.g.*, Dkt. #434, p. 96, Defs.' Ex. AA Cohen Occupational Analysis Report) ("QLI Mortgage Bankers spend less than 50% of their total work time engaged in 'client-specific persuasive sales activity'"), and conclude that Plaintiffs fail to meet this definition.[19]  29 C.F.R. § 541.203(b) notes that "an employee whose primary duty is selling financial products does not qualify for the administrative exemption." While 29 C.F.R. § 541.700(b) suggests that an employee spending more than 50% of employment time on exempt work "will generally satisfy the primary duty requirement," it does not make the 50% figure either a necessary or a sufficient condition for evaluating an employee's primary duty.  No DOL regulation nor the FLSA define or equate "primary duty" as "50% of total work time engaged in customer-specific persuasive sales

---

[19] Dr. Malcolm Cohen uses both the phrase "client-specific persuasive sales activity" and "customer-specific persuasive sales activity" in his report.  It is assumed that these two phrases are synonymous.

activity."  A hypothetical employee who spends less than 50% of employment time on "customer-specific persuasive sales activity" might still be found to have selling financial products his primary duty if the bulk of his other time is spent getting ready to make a sale or completing the sale once the persuasion was successful or even being idle.  Surely Defendants are not asserting that any time not spent on "customer-specific persuasive sales activity" is necessarily time spent on exempt activities or activities that detract from sales being the employee's primary duty.

The only place it is suggested that the "primary duty" test for sales requires 50% of total work time engaged in customer-specific persuasive sales activity is in the MBA's request for an opinion letter to the DOL on September 23, 2005, apparently drafted by Quicken Loan's current attorney in his capacity as counsel for the MBA.  In response, the DOL repeats this phrase in the September 2006 DOL Opinion Letter, stating:

> **You describe** the sales component of the mortgage loan officer's duties, *i.e.* when he or she spends time selling mortgage loan products to customers, as 'customer specific persuasive sales activity, such as encouraging an individual potential customer to do business with his or her employer's mortgage banking company rather than a competitor, or to consider the possibility of a mortgage loan if they have not expressed prior interest.

(Dkt. #467, Ex. 61, p. 2) (emphasis added).  The DOL *does not approve* that phrase as the proper definition of "sales" for purposes of the DOL administrative exemption regulation, *it simply repeats it* as the MBA's representation concerning the "sales" activity engaged in by its hypothetical loan officers.  The DOL repeats the exclusionary provision of the regulations: "Of course if, based on all the facts in a particular case, a mortgage loan officer's primary duty is selling mortgage loans, the mortgage loan officer will not qualify for the administrative exemption.  29 C.F.R. § 541.203(b)" (*see id.* at n. 3).

Importantly, quoting the primary duty regulation, the DOL also notes that the "'amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee,' but time alone 'is not the sole test.' 29 C.F.R. § 541.700(b)" (*id*. at 3). Rather, the DOL states that an employee's primary duty is "defined in 29 C.F.R. § 700 as 'the principal, main, major or most important duty the employee performs' based on all the facts in a particular case, with the major emphasis on 'the character of the job as a whole'" (*id*. at n. 3). As an illustration, the regulations state:

> Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

Here there clearly is a disputed issue of fact concerning the primary duties of Quicken Loan's web loan consultants/mortgage bankers. A reasonable jury could conclude that there are significant dissimilarities between the web loan consultants/mortgage bankers specific job parameters and those of the hypothetical financial service industry employees found exempt in the DOL's September 2006 Opinion Letter. In light of Plaintiff's submissions, a jury could find that the web loan consultants/mortgage bankers were closely supervised in careful efforts to improve their ability to sell mortgage loans. Despite the efforts of Defendants to analogize the web mortgage bankers duties to those of individuals who principally provide services to employer customers (*e.g*., securities/investment services or insurance services), a reasonable juror could find that the positions are quite distinguishable.

32

As noted in the *Pontius v. Delta Financial Corp.,* No. 04-1737, 2007 WL 1496692, at * 9 n. 20 (W.D. Pa. March 20, 2007), while the web mortgage bankers compile and analyze potential loan customer information, doing so is necessary to evaluate the customers' qualifications for a loan, *i.e.*, to make a sale.  That decision explains that a stock brokerage firm's client may take the portfolio analysis and/or investment advice proffered by his account representative/stock broker and employ it, with little or no further ado, to his benefit at that brokerage firm or quite readily elsewhere — *i.e.*, he can realize the benefit of the financial compilation/analysis services provided by the securities broker and use it elsewhere without further financial disclosures and analysis.  Yet, the same may not be said of the prospective mortgage loan customer.  Should he decline the loan vehicles for which he qualifies with one financial institution and which were recommended, he cannot go to another bank and obtain the identical loan (*e.g.*, 6% – 30 year fixed rate) without undergoing substantially the same financial compilation procedure.  Lending institutions need to know that financial information to determine if the customer is worth the risk of lending to him.  In essence, a jury could find that the web mortgage bankers are screening as much, if not more, for the benefit of their employer than servicing for the benefit of the customer.  Nor is it sufficiently evident from the record that mortgage bankers have an independent duty or incentive to develop a long term relationship with a prospective customer as does a stock analyst, because additional stock purchases have a far greater frequency than additional refinancing.  *Cf.* 69 Fed. Reg. 22, 146 (April 23, 2004) (DOL comments to the 2004 revised FLSA regulations stating that approach to financial services employees is "consistent with existing § 541.207(d)(2), which provides that 'a customer's man in a brokerage house'"

exercises discretion and independent judgment 'in deciding what recommendations to make to customers for the purchase of securities'").

In addition, the *Pontius* court draws a distinction that the September 2006 Opinion Letter is an "application" not an interpretation. *See Pontius v. Delta Financial Corp.,* No. 04-1737, 2007 WL 1496692, at * 9 (W.D. Pa. March 20, 2007). While that case cites no legal authority for this distinction, and clearly many "applications" of the law to a given set of facts entail either an express or implied interpretation of the law, the distinction does make some conceptual sense.[20] Yet, where the application takes various sections from the regulations and applies them to a given set of facts, this straightforward decision process involves lesser expertise of an administrative agency than when the agency provides a new interpretation or clarification of an ambiguous regulation as occurred in *Auer.*[21]

_____

[20] The *Pontius* finds an important distinction between (i) an agency's reasonable "interpretation" of an ambiguous regulation, *i.e.*, its proclamation of what the regulation means, and (ii) that agency's "application" of a regulation to a particular hypothetical, *i.e.,* the inherent gap filing that always occurs when a general rule is applied to a particular circumstance. The DOL seems to make this distinction. *Compare* November 2006 Opinion Letter at n. 5 at 1 (referring to itself as providing an "interpretation" of the "salary basis" test) with September 2006 Opinion Letter (referring to itself as providing an "application" of the administrative exemption to "certain . . . mortgage loan officers"). Here, the issue is not about a failure to distinguish between the MBA's narrowly-defined "sale" and other activities; it is about the primary nature of those other activities.

[21] In *Auer, 519 U.S. at 462,* Justice Scalia for a unanimous Court notes that an administrative interpretation can come in the form of an amicus brief to the Supreme Court. Yet, in that case the Secretary of Labor's brief was clearly interpreting an ambiguity in a regulation concerning the exempt status for an employee being paid on a salary basis, which exemption in turn required that the compensation not be subject to reduction because of variations in the "quality or quantity of the work performed." 29 C.F.R. § 541.118(a) (1996). Various higher level salaried police officers were nominally covered by a police manual that subjected all department employees to a range of disciplinary sanctions including disciplinary deductions in pay. But this provision only once was applied to a single sergeant among these higher leveled salaried police and that sanction was by consent of the sergeant to avoid discharge. The Secretary of Labor in the

A careful review of the September 2006 Opinion Letter shows that it is an application of various provisions of 29 C.F.R. Part 541 to a given set of facts, which facts were likely drafted with that regulation in hand.  There is no ambiguous section singled out for clarification or interpretation.  Indeed the nearest thing that the opinion states that comes as a clarification or interpretation is that "the criteria in the duties test for the administrative exception in the 2004 revised final regulations are substantially the same as under the prior rule," and thus the opinion would be the same under either version of 29 C.F.R. Part 541 (Dkt. #439, Ex. Y, p. 3).  As a straight forward application of the regulation to a given set of facts, this September 2006 Opinion Letter  may carry less weight and deference than is to be accorded an agency's own interpretation of an ambiguous regulation such as involved in *Auer*.  The ambiguity in the present case is more related to whether the primary job duties of the Plaintiffs are sales or as the job description given in the September 2006 Opinion Letter.  Clearly, if a jury finds the latter,

_____

amicus brief interpreted the regulation as requiring more than a theoretical possibility of such deductions, rather there must be something more to suggest that the employee is *actually* vulnerable to having his pay reduced.  The Court of Appeals had rejected petitioner's approach, saying that "[t]he mere possibility of an improper deduction in pay does not defeat an employee's salaried status" if no practice of making deductions exists.  Justice Scalia noted:

> The Secretary of Labor, in an amicus brief filed at the request of the Court, interprets the salary-basis test to deny exempt status when employees are covered by a policy that permits disciplinary or other deductions in pay "as a practical matter." That standard is met, the Secretary says, if there is either an actual practice of making such deductions or an employment policy that creates a "significant likelihood" of such deductions. The Secretary's approach rejects a wooden requirement of actual deductions, but in their absence it requires a clear and particularized policy – one which "effectively communicates" that deductions will be made in specified circumstances.

Thus, in that brief the Secretary of Labor was clearly interpreting the ambiguous language of the exception for salaried employees to the "executive, administrative, or professional" exemption to the Fair Labor Standards Act.

then  September 2006 Opinion Letter is persuasive authority for them to find these jobs qualify

for the administrative exception.

Citing *Fazekas v. Cleveland Clinic Found. Health Care*, 204 F.3d 673, 678 (6th Cir.

2000), Defendants argue in their Reply Brief that the application/interpretation distinction is at

odds with what they consider to be the Sixth Circuit's recognition that all DOL opinion letters

are "interpretations" entitled to controlling weight (Dkt. #478, p. 1).  In *Fazekas*, a panel of this

circuit held that home health care nurses at the Cleveland Clinic, who were paid solely on a fee

basis for each patient visit, were exempt professionals who were paid in accordance with §

541.313(b) of the FLSA regulations.  In so doing, the *Fazekas* panel primarily addressed the

issue of whether the nurses' patient visits were unique "rather than . . . a series of jobs which are

repeated an indefinite number of times and for which payment on an identical basis is made over

and over again." 29 C.F.R. § 541.313(b); *see also Fazekas*, 204 F.3d at 676-79.

Heeding the Supreme Court's ruling in *Auer* that the Secretary's interpretation of DOL

regulations is controlling unless "plainly erroneous or inconsistent with the regulation" both

parties presented to the court DOL documents that purportedly articulated the Department's

official position regarding the *uniqueness* of each home health visit.  Defendant offered as

evidence the June 1992 response of the Acting Administrator of the Wage and Hour Division of

the Department to a request for advice from counsel for an employer operating a home health

care service.  In its request for advice, the employer described a scenario in which it paid

registered nurses on a per-visit basis to provide health care services to clients in their homes.

According to the employer, "no employee will perform what is essentially a single repetitive

task. . . over and over.  Each patient's needs and situation [would be] different, and would be

individually assessed and treated by the employee as the employee deems necessary during each

visit.  The employees must use independent, professional and largely unsupervised judgment on

a case-by-case basis."  In a written opinion letter, the Acting Administrator agreed that these

positions would meet the exemption requirements of 29 C.F.R. § 541.3 and, in particular, that the

per-visit pay plan would qualify as compensation on a fee basis within the meaning of 29 C.F.R.

§ 541.313.

In response, the plaintiffs offered an internal memorandum dated October 1, 1994, from

counsel for the Wage and Hour Division in response to a request from the National Association

for Home Care for a formal opinion as to whether per-visit compensation of a registered nurse

making home visits constitutes a fee basis of payment under the Department of Labor

regulations.  In its letter, the Association argued that each visit made by a registered nurse to a

patient's home is necessarily unique.  In the response, counsel for the Department's Wage and

Hour Division disagreed, concluding:

> [W]e think that payment on a "per visit" basis is probably not the type of fee
> payment arrangement contemplated by the regulations. Section 541.313(d) refers to
> payment methods made to singers, artists, and illustrator/writers to demonstrate the
> adequacy of a fee payment, i.e., whether the amount of payment meets the
> regulation's requirement that the rate of pay is "not less than $170 per week to a
> professional employee". The use of these professional occupations to demonstrate
> this point suggests to us that the character or nature of the job itself must be unique,
> and not simply that the performance of the job vary from day to day. While we
> recognize that the nurse will necessarily make professional judgments and
> assessments based on his or her skills in providing patient care on each visit, such
> work is not unique in character because unlike work performed by a singer, artist, or
> illustrator, the work performed by the nurse is generally repetitive and not original
> in character.

*Fazekas*, 204 F.3d at 677.

During the pendency of the appeal, plaintiffs submitted two additional opinion letters, dated April 27, 1998, and November 9, 1998, and signed by a member of the Division's Office of Enforcement Policy Fair Labor Standards Team.  Both of those letters drew the same conclusion as the 1994 internal memorandum.  Yet, as of the date of oral argument on appeal, the Administrator of the Wage and Hour Division had not issued an opinion contrary to the position taken by the Administrator in 1992, to the effect that supervising nurses in a situation such as the one now before us are exempt employees.

In deciding which of these opinions, issued by the Division during different administrations, may help decide the case, the Sixth Circuit noted that not all opinion letters of an administrative agency are worthy of deference by the courts.  It noted that the Supreme Court has indicated that an opinion of the Administrator of the Wage and Hour Division of the Department of Labor has persuasive value if the position of the Administrator is well-considered and well-reasoned.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  Accordingly, the Sixth Circuit held in *Fazekas* that the Acting Administrator's 1992 opinion letter met the *Auer* and *Skidmore* standard as being "persuasive legal authority" in the case given that it was also not inconsistent with the language of the regulation nor plainly erroneous.  *See Fazekas*, 204 F.3d at 678.  They held the higher ranking Acting Administrator's 1992 opinion was the "controlling interpretation" notwithstanding later lower level inconsistent opinions from the Wage and Hour Division of the Department of Labor.

Yet, while the September 2006 DOL Opinion Letter is persuasive authority and its interpretations of the regulations, if any, are controlling, that opinion letter is controlling of the outcome in this case, as Defendants contend, only if the jury determines that the Plaintiffs' job

38

duties are sufficiently similar to those of the mortgage loan officers described in that opinion letter.  The Supreme Court in *Skidmore* noted interpretations and opinions of the Administrator under the Fair Labor Standards Act were not controlling upon the courts but rather "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."[22]  Thus, while such administrative opinions may be persuasive legal authority, *Skidmore* stressed that often no legal formula can resolve cases so varied in their facts and in many situations "[w]hether in a concrete case [the specific job] falls within or without [the overtime provisions of the FLSA] is a question of fact to be resolved by appropriate findings of the trial court." *Skidmore,* 323 U.S. at 136-37.

Accordingly, under *Fazekas* and *Skidmore,* the September 2006 DOL Opinion Letter is the controlling opinion and this Court should give it more persuasive value than the May 17, 1999, DOL Opinion Letter (Dkt. #467, Ex. 58), and February 16, 2001, DOL Opinion Letter (Dkt. #467, Ex. 59), cited by Plaintiffs, as these earlier letters were not signed by the Wage & Hour Administrator and thus "do not constitute [agency] rulings or interpretations."[23]  Reading

---

[22] In *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), the Supreme Court noted:

> We consider the rulings, interpretations and opinions of the Administrator under the Fair Labor Standards Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier pronouncements, and all those factors which give it power to persuade, if lacking power to control.

[23] DOL, Opinion Letters, http://www.dol.gov/esa/whd/opinion/opinion.htm (last visited June 22, 2009); *see also Fazekas*, 204 F.3d at 678.  It should be noted, however, that both the May 17, 1999, DOL Opinion Letter and the February 16, 2001, DOL Opinion Letter opined that the described loan officers were non-exempt.  In the May 17, 1999, DOL Opinion Letter, the DOL

these three letters together, however, does demonstrate the seemingly inconsistent results that occur when the job duty defenses are applied on a case-by-case basis, and when the "facts" surrounding hypothetical employees' "primary duty" are revised.

Yet, nothing in *Fazekas* requires that this Court reject the underlying reasoning behind the application/interpretation distinction discussed above that reduces the strength of straight forward applications of the regulations and involves no interpretation of ambiguities. Yet, even if the September 2006 DOL Opinion Letter is considered to be an "interpretation" of the regulations rather than an "application" of the regulations to a particular fact pattern, the facts in the DOL Opinion Letter and in the present case must be found to be substantially similar for that letter to have persuasive authority in this matter. As *Sizemore* suggests, where that is in dispute, as is the case here, it is for a jury to determine if Plaintiffs' primary duties are similar to the financial service industry employees found exempt in the DOL's September 2006 Opinion Letter or whether Plaintiffs' primary duties are sales as asserted by Plaintiffs.

Viewing the evidence in the light most favorable to the non-moving party, as this Court must in ruling on a motions for summary judgment, a reasonable jury could conclude that "the character of the job as a whole" of the loan consultants/mortgage bankers centers around sales.

---

opined that loan officers were non-exempt because they were "engaged in carrying out the employer's day-to-day activities rather than in determining the overall course and policies of the business" and because they "appear to require the use of skills and experience in applying techniques, procedures, or specific standards rather than the exercising of discretion and independent judgment" (Dkt. #467, Ex. 58). The February 16, 2001, DOL Opinion Letter resulted from a request for reconsideration from the employer. The second time around, the employer revised the "facts," representing that "the primary duty of the loan officer is to advise a borrower in the selection of a loan package" (Dkt. #467, Ex. 59). Adopting this revision of the assumed "facts," the DOL found that the loan officers were performing general business operations, but still found the loan officers to be non-exempt because they lacked the requisite discretion and independent judgment (*id.*).

Plaintiffs received a consistent barrage of emails, voice mails and other communications repeating the "sell, sell, sell" mantra, and cultivating the "high pressured sales environment." Defendants identified and described Plaintiffs as their "sales force" and "sales team." Defendants required Plaintiffs to strictly adhere to a proprietary sales method called "The Sales Process." Plaintiffs were required to attend Initial Sales Training, Sales Excellence training, and Sales Process training, and participated in one-on-one coaching sessions with Sales Process Coaches. Plaintiffs were taught scripted responses to "objections," and other sales techniques such as "pressing the bruise," "ARPing," and "ARCing." Defendants conducted sales contests and rallies designed to inspire Plaintiffs to sell. Plaintiffs had specific sales goal and performance standards requiring them to make at least eighty outbound sales calls per day, and spend at least five hours of "Total Talk Time" on the phone. Plaintiffs were required to work late nights and weekends, and were allowed to leave early or work a regular 8-hour day as a reward for superior sales numbers. Plaintiffs were evaluated, praised, and promoted based on their sales numbers and sales skills. Plaintiffs were disciplined and terminated based on their sales numbers and Plaintiffs were paid commissions based on sales.

In considering the "character of the employee's job as a whole" the "primary duty" test seeks to distinguish between tasks "directly related to management policies or general business operations" (or "the administrative operations of a business") as distinguished from "production" or "sales" work. On these facts a reasonable jury could conclude the company product or service was brokering mortgage loans and not giving financial advice. For periods up to April 23, 2004, such a jury could conclude that the primary duties of the web mortgage bankers was closer to producing or generating "the very product or service that the employer's

41

business offers to the public" than in "servicing" the business (*e.g.*, "advising the management,

planning, negotiating, representing the company, purchasing, promoting sales, and business

research and control").  29 C.F.R. § 541.205(b). [24]  Under the revised white collar regulation

issued April 23, 2004, which the DOL's September 2006 Opinion Letter said made no

significant changes to the "duties test" for the administrative exemption, a reasonable fact finder

could conclude the loan consultants/mortgage bankers do not assist in the administrative

operation of the business because they are primarily involved in selling Defendants' products or

services rather than in "running or servicing the business" itself. 29 C.F.R. § 541.201(a).   A

reasonable jury could ask if the loan consultants/mortgage bankers were not the lower level

employees whose primary tasks was generating the sales of the company product at Quicken

Loans, who was ? [25]

  In sum, because genuine issues of material fact remain as to the nature and extent of the

particular duties and responsibilities of Defendants' web loan consultants/mortgage bankers and

Defendants' establishment of its entitlement to exemption, and because the undersigned does not

— within the appropriate summary judgment parameters — conclude it impossible that a

---

[24] See footnote 15 noting 29 C.F.R. § 541.205(b) was modified in the new white color regulation
issued April 13, 2004.

[25]  Footnote 2 notes that Quicken Loans has a separate business unit, the "Frontline," staffed by
non-exempt employees, that is responsible for some outbound telemarketing and for screening
inbound loan inquiries for basic information. Defendants may contend that the "Frontline" group
consists of the lowest level of employees at Quicken Loans.  Yet, there is no evidence to suggest
that Quicken Loans' web mortgage bankers had managerial control over the "Frontline"
employees, or any other employees at Quicken Loans.  As noted above, it is unclear whether the
web mortgage bankers or the "Frontline" employees are on a "lower rung" or a parallel rung of
the organization.  Indeed, these two groups may both occupy the lowest hierarchal rung at
Quicken Loans, and engage in activities that serve complimentary purposes.

reasonable jury could find in Plaintiffs' favor on this question, **IT IS RECOMMENDED** that

summary judgment on the "primary duty" element of the administrative employee exemption be

**DENIED** to both parties.[26]

### 3.    Discretion and Independent Judgment Test

The third factor of the administrative employee exemption requires that the employee's

primary duty include the exercise of "discretion and independent judgment."  It "also implies

that the person has the authority or power to make an independent choice, free from immediate

direction or supervision and with respect to matters of significance." *See* 29 C.F.R. § 541.200(a);

541.207(a).  In comparison, "an employee who merely applies his knowledge in following

prescribed procedures or determining which procedure to follow, or who determines whether

specific standards are met or whether [something] falls into one or another of a number of . . .

categories is not exercising discretion and independent judgment within the meaning of . . . the

regulations." *Id.*[27]

---

[26] *Cf. Casas*, 2002 WL 507059 at *9 (concluding that loan originators making direct contact with customers to sell lending products and identify, modify, structure and process loans, were production employees engaged with "the day to day carrying out of the business") (citing *Bratt v. County of Los Angeles*, 912 F.2d at 1070); *id.* (noting that plaintiffs focused on particular sales transactions).  *See also generally Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3d Cir.1991) (concluding that telephone sales employees did not "negotiate," "servic[e] the business" or "represent" the company within the meaning of the administrative employee exemption).

[27] *Cf.* 29 C.F. R. § 541.202(f)(noting that an employee "does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial loss if the employee fails to perform the job properly"); Mark Tabakman, *The Department of Labor Takes Aim at the Banking Industry*, 118 Banking L.J. 798, 800-801 (Oct. 2001) (discussing "crucial difference" between employee who utilizes skill and experience, *e.g.*, in applying established standards, guidelines, techniques and/or procedures, and employee who exercises discretion and independent judgment); *id.* at 801 (distinguishing an employee "applying certain designated and fixed criteria to given situations, which is only skill, not discretion").

The November 27, 2006, Opinion Letter supports, as Defendants assert, the proposition that neither (i) the use of computer software and/or technology, nor (ii) a duty to comply with applicable laws and employer guidelines, of itself disqualifies from administrative exemption an employee who is nonetheless responsible for assessing alternatives and making independent recommendations (*see* Dkt. #447, Ex. KK, p. 6, n. 4)(stating that, *e.g.*, use of computer software that does not select the mortgage loan product "does not necessarily disqualify" an administrative employee from exemption).  Similarly, the September 8, 2006, Opinion Letter obtained by the MBA concludes that the use of underwriting software programs to assess risk and to narrow the scope of products available does not disqualify mortgage loan officers from the exemption where "these tools do not substitute for the discretion and judgment required of the loan officer" (Dkt. #439, Ex. Y, p. 2).

The facts of record again are in conflict, and a reasonable juror could conclude that web loan consultants/mortgage bankers lacked the discretion and independent judgment necessary to qualify for the exemption.  Plaintiffs' evidence indicates that the web mortgage bankers were significantly restricted/limited by Defendants' pre-existing and established operating procedures and guidelines in, *e.g.*, determining which lending products to offer and on what terms.  *See Casas*, 2002 WL 507059 at *10.  *Compare* November 27, 2006, Opinion Letter (discussing the brokers' use of knowledge and expertise in securities to perform multi-factor analyses regarding facilitation of the clients' given investment objects, *e.g.*, financial status, risk tolerance, age, tax considerations, and fluctuations in market conditions); *In re Farmer's Insurance Exchange*, 466 F.3d 853, 2006 WL 3026037 (9th Cir. Oct. 26, 2006) (finding factor met by insurance adjusters

who exercised discretion as to, *e.g.*, losses covered, set-aside reserves, determinations of blame/fault, and negotiations with an insured and his/her counsel).

Accordingly, for reasons akin to those set forth above in summation of the "primary duty" element, **IT IS RECOMMENDED** that summary judgment be **DENIED** on this third factor of the administrative employee exemption.

## III.   **RECOMMENDATION**

For the reasons stated above, **IT IS RECOMMENDED** that:

i.)  Defendants' motion for summary judgment be **GRANTED IN PART** as to the sufficiency of the employees' compensation under the "salary basis" test for the administrative exemption;

ii.)  Defendants' motion for summary judgment be **DENIED** as to the "primary duties" and the "discretion and independent judgment" elements of the administrative exemption; and

iii.) Plaintiffs' motion for summary judgment be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit*

*Fed'n of Teachers Local 231*, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections. A party may file a reply brief within 5 days of service of a response. The reply shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.

Dated: July 16, 2009                                s/ Steven D. Pepe
Ann Arbor, MI                                       United States Magistrate Judge

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Report and Recommendation was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 16, 2009.


s/Deadrea Eldridge
Generalist Deputy Clerk