```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                    SOUTHERN DIVISION
      RYAN C. HENRY, et al.,
 3
                      Plaintiffs,        Case No. 04-cv-40346
 4      -v-

 5    QUICKEN LOANS, INCORPORATED,
      et al.,
 6
                      Defendants.
 7    _____/

 8                    JURY TRIAL(excerpt)
                         Volume I
 9         BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                 United States District Judge
10         Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
11                    Detroit, Michigan
                 Tuesday, February 8, 2011
12
      APPEARANCES:
13
      FOR THE PLAINTIFF:
14                          Ms. Rachhana T. Srey
                            Mr. Donald H. Nichols
15                          Mr. Paul J. Lukas
                            Mr. Robert L. Schug
16                          Nichols, Kaster, PLLP
                            4600 IDS Center
17                          80 South 8th Street
                            Minneapolis, MN  55402
18    FOR THE DEFENDANT:  Mr. Jeffery B. Morganroth
                            Mr. Mayer Morganroth
19                          Mr. Jason R. Hirsch
                            Morganroth & Morganroth
20                          344 North Old Woodward Avenue, #200
                            Birmingham, MI  48009
21                          Mr. Robert Davis
                            Mayer, Brown
22

23        Also Present:  Mr. Michael Gerardi, Law Clerk

24        To Obtain a Certified Transcript Contact:
            Karen Klerekoper, CSR, RPR - (313)962-1119
25    Proceedings taken by mechanical stenography, transcript
             produced by computer-aided transcription
```

1                          TABLE OF CONTENTS

2
      Opening statement by Mr. Lukas.......................    3
3      Opening statement by Mr. Mayer Morganroth...........   41

4                   WITNESSES FOR THE PLAINTIFFS:

5      Witness                                          Page
       LINDSEY TITTENSOR
6      Direct Examination by Mr. Nichols..................   56
       Cross-Examination by Mr. Mayer Morganroth..........   96

7


8


9      EXHIBITS RECEIVED:                               Page
       Exhibit P21           Quicken sales process....   63
10     Exhibit D2            Compensation plan........  101

11


12


13


14


15


16


17


18


19


20


21


22


23


24


25     CERTIFICATE OF COURT REPORTER..........................121


                   *Henry, et al. v Quicken Loans, Inc., et al. 04-40346*

```
 1 ‖ Detroit, Michigan
 2 ‖ February 8, 2011
 3 ‖ At 9:00 a.m.           -   -   -
 4 ‖         (Beginning of excerpt at 2:15 p.m.)
 5 ‖                 OPENING STATEMENT
 6 ‖         MR. LUKAS:  Thank you, Your Honor.  Counsel, good
 7 ‖ afternoon.  Ladies and gentlemen, good afternoon.  I have
 8 ‖ some technology here, which can be dangerous.  So,
 9 ‖ hopefully I will fuddle through without pressing the wrong
10 ‖ buttons, or something like that.
11 ‖         My name is Paul Lukas.  I'm one of the lawyers
12 ‖ that represents the loan consultants in this case, or the
13 ‖ former loan consultants at Quicken, or the plaintiffs you
14 ‖ will hear them referred to.  My partners are Don Nichols,
15 ‖ Robert Schug and Rachhana Srey.  Those are the four lawyers
16 ‖ that will be taking the podium up at different times.  Some
17 ‖ of our clients are back there.  I may introduce some of
18 ‖ them in a little bit.
19 ‖         Ladies and gentlemen, this is a case about sales.
20 ‖ It's about a company trying to avoid the federal overtime
21 ‖ law by claiming that their sales force's primary duty is
22 ‖ not selling loans.  The company is Quicken Loans, one of
23 ‖ the largest sellers of loans in the country.  And under
24 ‖ federal law, employers in the finance industry have to pay
25 ‖ overtime to their salespeople who work more than 40 hours.
```

```
 1   The 300-plus plaintiffs in this case work for Quicken in
 2   this type of sales job.  They were called loan consultants,
 3   sometimes they were called loan officers, sometimes they
 4   were called web bankers.  They worked during different time
 5   periods in the time frame that matters in this case, May
 6   2002 to September 2006.  And they were not paid overtime,
 7   despite working a lot of it.
 8        Now, Quicken will try to win this case by
 9   claiming that these employees' job duty was not sales.  But
10   the evidence will show that their job was sales.  In fact,
11   the company-stated goal for these employees was to be
12   called, quote, the best sales force in the country,
13   unquote.  But even though loan consultants were
14   salespeople, Quicken did not pay them overtime and they
15   violated federal law.
16        Now, the overtime law says employers must pay
17   overtime to employees who work over 40 hours a week.  There
18   are exceptions to that general rule.  They are called
19   exemptions.  And in this case Quicken claims they didn't
20   have to pay these loan consultants overtime because of
21   something called the administrative exemption.  You will
22   hear the law from the Judge.  And I'm going to do my best
23   to summarize it, but what the Judge tells you is right.
24   But the administrative exemption only applies when the
25   employee's primary duty is office work directly related to
```

1    management or general business operations and the exercise,

2    discretion and independent judgment with respect to matters

3    of significance or generally when the employees provide

4    financial advice, consulting or financial analyst services

5    for the benefit of the customer.  That's a mouthful but

6    more simply, and most simply, the administrative exemption

7    does not apply -- flat out does not apply in the financial

8    industry when the employee's primary duty is sales.  And

9    that's why this case is all about sales.  This is true even

10   if they were paid salary, or commission or hourly under,

11   what you'll hear of the law, financial services employee

12   whose primary duty is sales get overtime.

13          In other words, if the loan consultants' primary

14   duty in this case was sales, Quicken has to pay overtime,

15   and that's it.

16          Now, when an employer claims an exemption under

17   the overtime laws, they have the duty to prove it.

18   Plaintiffs do not have to have some kind of burden or know

19   that the law was being violated while they were working

20   there.  Quicken has to show that the loan consultants'

21   primary job in this case was not sales

22          Now, for the reasons I will share with you now,

23   defendant will be unable to prove this.  Instead, the

24   evidence will show that the loan consultants' primary duty

25   was very obviously sales.  And that was a very demanding

1    sales job that took between 60 and 70 hours a week on

2    average to perform.

3              But first, let me tell you a little bit about

4    Quicken Loans.  Quicken is run by some really smart

5    salespeople.  Dan Gilbert is the principal owner and an

6    excellent businessman.  He is a lawyer and a very smart

7    salesperson.  You may know him as a high-profile Detroit

8    resident or the owner of the Cleveland Cavaliers.  I

9    believe he is sitting back in the corner over here.

10             Now, Mr. Gilbert and his group took advantage of

11   advances in the internet, smartly coupled them with

12   extremely effective sales technique that I'll explain to

13   you, and a very sophisticated technology system.  And as

14   they describe it, became the number one online lender in

15   America.

16             Now, they became the number one online lender in

17   the country by abandoning the traditional face-to-face

18   lending procedure and replacing it with selling loans from

19   massive call centers, and with loan consultants sitting in

20   endless rows of cubicles wearing headsets, pounding the

21   phones, calling sales leads over and over, and using very

22   successful high-pressured sales techniques to convince

23   customers to buy a Quicken loan.

24             Quicken used its sophisticated and automated

25   computer systems in pricing, that quickly figured out for

1   the customer whether they qualified for a Quicken loan and

2   what the terms and price for that loan would be, even

3   within minutes.  It was pretty impressive.  It is pretty

4   impressive.  They put together a marketing promotion and

5   public relations team that established the company name,

6   got the phone to ring and gathered hundreds of thousands of

7   leads for the sales force to call.  So you will learn that

8   not only was the primary duty of Quicken's loan consultants

9   sales, but that Quicken grew to be the number one online

10  lender in America precisely because these loan consultants

11  were the sales force behind the successful loan-selling

12  machine.

13          The loan consultant job was a high-pressure,

14  high-stress, high-turnover sales job.  The fact that it was

15  a sales job was never in question.  Loan consultants were

16  hired and trained, motivated and monitored and judged and

17  paid as salespeople.  The best evidence of the fact that it

18  was a sales job comes right from Quicken's mouth.  Everyone

19  there called the loan consultant Quicken's sales force.  It

20  was Mr. Gilbert who stated that the company goal was to be

21  the best sales force in the country and said, quote, how do

22  we get there?  By the success of one loan officer at a

23  time.  In other words, they were going to become the best

24  sales force in the country because of the work of a group

25  of people that they are now saying primary duty wasn't

```
 1  | sales.
 2  |           Jay Farner, that's a name you will hear, if you
 3  | haven't heard it on radio.  Mr. Farner is the manager in
 4  | charge of these loan consultants.  He's in charge of the
 5  | call centers.  His title was vice president of sales.  He
 6  | was in charge of the web sales center.  His direct reports
 7  | were sales directors.  He very clearly told the loan
 8  | consultants what their job was.
 9  |           Here I go with the technology.  Here we go.
10  |      "We are not order takers.  We are sales
11  | professionals.  Let's sell hard today.  Everybody writes
12  | two.  Jay."
13  |           He also tells them what their job is all about.
14  | It's all about selling.  Here's another one.  We sell,
15  | let's get excited about it, exclamation point.  You will
16  | see a lot of exclamation points, you'll see a lot of all
17  | caps in e-mails at Quicken.
18  |           Mr. Farner's sales directors parroted this
19  | message daily.  Here is one from Jeff Perry.
20  |      "Do not just crumble when you get an objection.
21  | Rates are moving up.  Close at least three times.  If you
22  | burn it, big deal.  You can always call back."
23  |           "Burn it" means making the person angry and they
24  | hang up on you.
25  |           "The bankers that get aggressive will win.  As a
```

```
 1    salesperson our job is to sell.  Today we have to sell
 2    hard."
 3             There is all kinds of e-mails everywhere when no
 4    one was looking.  Up until 2004, when we sued out this
 5    case, everything at Quicken called these people
 6    salespeople.  But after our lawsuit, Quicken mysteriously
 7    removed the word "sell" and "sale" from many of their
 8    corporate documents.  The job didn't change, only the
 9    language in Quicken's corporate documents.
10             Here's an example.  The sales center loan
11    consultant compensation plan, that's our folks, the
12    plaintiffs here, that became web center loan consultant
13    compensation plan.  New hires, who had previously received
14    initial sales training when they were hired, got the exact
15    same training, but it was suddenly called mortgage banking
16    training program.  Loan consultants hired before the
17    lawsuit received a letter that said, congratulations --
18    oops, there I go.
19             Congratulations, you are joining one of the
20    mostly highly trained and skilled sales forces in the
21    United States of America, the Quicken Loans sales web
22    center.
23             After the lawsuit, new hires were told,
24    congratulations, you are joining one of the most highly
25    trained and skilled web loan banking teams in the United
```

2:04-cv-40346-SJM-MJH   Doc # 713   Filed 04/06/11   Pg 10 of 121   Pg ID 20423

```
 1    States of America, Quicken Loans web center.

 2             Also, after the lawsuit, Quicken drafted an

 3    8-page single-spaced tiny-font job description.

 4    Conspicuously, absent as you'll see from this 8-pager,

 5    maybe it's 7 pages, is the word "sell" or "sale" anywhere

 6    in it, describing the loan consultant's job duties.

 7             So, before this lawsuit, loan consultants were

 8    identified for what they were, salespeople.  And the

 9    evidence will show that their job did not change after this

10    lawsuit in 2004.  Their job was sales before and after this

11    lawsuit was filed.  From May of 2002, which is the start

12    date that you are going to care about, all the way through

13    when our lawsuit was filed in '04 to September of '06,

14    their job was the same, sales.  Their job was the same

15    because they were still hired and trained, motivated and

16    monitored and judged and paid as salespeople.

17             I'm going to tell you what the evidence will show

18    on each of the those categories, starting with hiring.

19             Hiring:  Sales experience was the main criteria for

20    hiring loan consultants.  No finance, mortgage or loan

21    experience was required.  Employees were recruited and

22    hired based on sales experience.  The job interviews were

23    all about sales.  Quicken told loan consultant candidates

24    that it was a sales job and all they needed was a desire to

25    sell.  They were told Quicken would teach them a successful
```

```
 1   method for selling these loans and that they would develop
 2   the skills and experience necessary to do it more and more
 3   efficiently, which is really true.  They taught them to how
 4   sell, and they did a great job of teaching them how to
 5   sell.  They told them, don't worry about your lack of
 6   finance and mortgage finance experience.  We will teach you
 7   how to sell this stuff.
 8          Again, the hiring letter before the lawsuit said
 9   it all.  In addition to welcoming them to the most highly
10   trained and skilled sales force in the United States of
11   America, the hire letter said, as sales professionals, you
12   will need to work the phones hard.  In order to be
13   successful, we have found you will need to make a minimum
14   of 80 outbound calls per day and spend a minimum of 5 hours
15   on the phone selling to clients per day.  Hiring, because
16   of sales.  Again, in the hiring documents, showing it's
17   sales.
18          After hire, Quicken trained the loan consultants
19   to sell.  All new loan consultants were required to attend
20   a four-week training program that used to be called initial
21   sales training.  The first couple weeks they taught them
22   the basics about mortgages and Quicken Loans, in
23   particular, so they'd know what were selling and the weeks
24   after that was all about how to sell them.  The loan
25   consultants were taught they need to A, B, C, Always Be
```

1    Closing.

2              You will hear the term "closing" in this case in

3    connection with the loan consultants.  I don't want you to

4    be confused because you figure, well, it's a case about a

5    loan company, closing must mean when the customer closes on

6    the loan, gets their property or money.  No, that's not

7    what closing usually means when they are talking to loan

8    consultants.  When they're talking to loan consultants,

9    closing means to ask the customer for a $500 deposit.

10   That's what closing means.  When you hear, did you close on

11   the customer, that means did you ask him for the 500 bucks.

12   You will learn that this $500 is very important.  Quicken

13   Loans teaches the loan consultants that once the customer

14   plops down that $500, the sale is very likely to actually

15   happen.

16             In fact, the loan consultant could not even put

17   in a loan application for the customer until or unless they

18   got the $500 in the system by credit card number or check

19   routing number.

20             Also, in training, more sales stuff, in training

21   they are played clips from modern classic sales movies,

22   like Boiler Room, Glengarry Glen Ross.  They are given the

23   book The Sales Bible to read, and they are taught that

24   pounding the phones and selling is what will make them

25   successful.  They spend a lot of time role-playing sales

1    calls and near the end of their training, they may take

2    live calls, or make live calls from the sales floor as part

3    of their training.

4            You will learn that loan consultants were not

5    trained to provide financial advice.  They were not trained

6    to provide financial counseling and they were not trained

7    to do a financial analysis.  Rather, they were trained to

8    call individual customers directly and obtain information

9    necessary to determine if that person qualified for a

10   Quicken loan.  If they did, no option.  Sell.

11           They taught them how to do that, get that $500

12   and sell that loan.  Now, if the customer qualifies a loan

13   under Quicken's guideline, that's the end of the analysis.

14   If it made sense for Quicken, the loan consultants were

15   taught to sell.  That makes sense.  That's sales.

16           So within a few short weeks of training, they

17   knew exactly what they needed to know about Quicken's loans

18   to sell them.  They had their headsets strapped on sitting

19   in their cube in the call center trying to sell loans.

20           Now, the centerpiece of this training is

21   something called the sales process.  This is Exhibit 21,

22   you will be seeing this.  This is the heart and soul of the

23   Quicken training program.  This is the heart and soul of

24   the loan consultant job.  It's literally called the refi

25   sales process.

 1          Learning and effectively using this sales process
 2   is the key to becoming a successful loan consultant.  It's
 3   a ten-step sales script that the loan consultants are
 4   required to follow.  It's a creation of the Quicken sales
 5   training team, their managers, executives.  It represents
 6   the collective knowledge of these very talented
 7   salespeople.  It is incredibly successful, or was
 8   incredibly successful.  And you will get an insider view of
 9   how this thing works and you will likely understand why it
10   was successful.
11          It's designed to be executed over two calls.  The
12   yellow side is the first call and the green side is the
13   second call.  Now, the first call, the loan consultant is
14   taught step one is foreshadowing, gain control.  They teach
15   a lot about gaining control of the phone call.  Like a good
16   salesperson, don't lose control of the call.  That's where
17   we start with step one.
18          Then they have step two.  And step four, they
19   have to get certain information necessary to see if the
20   person qualifies for a Quicken loan, and they fill those
21   out.  While they are doing that, they are trained to
22   perform some very specific and effective sales techniques.
23          Examples of those will be explained to you
24   through the witnesses as we go.  I don't want to spend too
25   much time on all of them.  I'll give you a couple examples.

1    One is called foreshadowing, the $500.  That means -- I

2    think it's up to four times, or three times, before they

3    actually ask for the 500 bucks in call two, they

4    foreshadow.  They basically say -- they have ways of

5    bringing up and then backing off, not really asking for it.

6    So that the customer gets comfortable with it, so that when

7    they go for the close and get that $500, it's been

8    foreshadowed.  That's just a good sales technique.

9    Foreshadowing is one.

10          Building rapport, which is right, actually,

11   literally, on the process.  Creating the need.  Here's a

12   section called create need.  And find the emotional hook,

13   that's a big one.  Find out what the person needs the money

14   for because that's how you sell these loans.  Because later

15   on, in call two, they tell you to tie in emotionally, find

16   out what you found out about why they needed the money.

17   They want to send their kid to college and when they're

18   coming for the close, well, don't you want your kid to go

19   to college, that kind of thing.  That's call one.

20          The second call includes five more steps.

21   Actually the first call, I should tell you, ends with them

22   getting the Social Security number.  If they're successful

23   in the first call, it ends with getting the Social Security

24   number.

25          The second call has five more steps, and if

```
 1    that's successful, they get the $500.  They close and get
 2    the $500.  That's the green side.  Getting the money is the
 3    green side of the sales process.
 4         Now, between the first call and the second call,
 5    the loan consultant prepares a sales pitch by pulling the
 6    customer's credit, figuring out what loan the customer
 7    qualifies for and figuring out which loan is the easiest to
 8    sell.  Newer loan consultants often need their manager's
 9    help with this but through experience, most loan
10    consultants can do it under ten minutes.
11         In fact, when things are going really well, some
12    of the most skilled and experienced loan consultants could
13    do it in one call.  They could run credit, piece together a
14    loan, do what they are supposed to do on call two or on the
15    second side, and just keep going.  It can go all the way
16    through the two-call process in one step.  Now, that is
17    considered exceptional selling at Quicken.  But in most
18    cases, it happened between the first and second call where
19    they get the Social Security number, they run credit and
20    then the start of the second call -- this one is an example
21    of the refi sales process.
22         They have another one for mortgages.  And here's
23    what it says.  Prep before the call.  Look at credit,
24    calculate and fill in all blanks in step six.  This is step
25    six.  Determine how you will start the call and rehearse
```

1    call before calling client.  So they get the Social

2    Security number.  They get what they need.  They have all

3    the income and property information.  They fill out this

4    form here and then they rehearse their second call and then

5    they make their second call.

6          Now, the most important -- there is a number of

7    sales techniques on this side, too, but the most important

8    one by far is called ARCing to overcome objections.  ARCing

9    is A-R-C, and you will see it on here.  ARC, it means,

10   Acknowledge, Respond and Close.  Acknowledge means, yes, I

11   understand what you are -- an objection, by the way, I

12   should probably tell you for loan consultants in their

13   world -- Quicken calls an objection any time a customer

14   hesitates or raises a concern about giving up that $500.

15   That's called an objection.

16         When an objection happens, they are supposed to

17   ARC.  ARC means acknowledge it, respond and close.  I

18   understand, I understand your concern.  A lot of my

19   customers have that concern.  That's A.

20         R is to respond to the concern.  And they are

21   trained.  There is a training manual, pages and pages of

22   canned responses to give to the most difficult objections.

23         And then close.  And that's how it works.

24   Acknowledge, respond and close.

25         For example -- I will give you an example of one.

1    If the loan consultant is trying to sell a loan without a

2    fixed-rate interest rate, like an interest-only loan.  Or

3    an adjustable-rate mortgage.  And the customer says, I want

4    a fixed-rate mortgage, the loan consultant is trained to

5    say, for example, I could do a fixed-rate mortgage but I'm

6    not comfortable putting my -- most of my clients in that

7    program.  I will do it if you insist but I don't feel like

8    I'm doing my job to the best of my ability if I don't

9    explain the fantastic advantage program we have.  In fact,

10   it is the same program I put my parents and sisters in.

11   That's a response.  This comes from a training manual that

12   you will see that has pages and pages.  This is response

13   number 36.

14          So, once they have acknowledged, once they have

15   responded, then they close.  These use one of these five.

16   These are five examples that are in the training.

17          As you will see, for example, the top one, bottom

18   line is that we both know this makes sense.  So let's get

19   the ball rolling and get this loan in process.  What credit

20   card do you want to put your deposit on, Visa or

21   MasterCard?  And you will see the other ones are just sort

22   of variations on that theme, usually ending in Visa or

23   MasterCard.  That is ARCing.

24          This sales process says that a loan consultant is

25   supposed to ARC five times before giving up.  Actually,

1    they are told not to give up.  They are told to do
2    something called a trial close, which is, okay, try again
3    later.  Try five times and if you still can't close, you
4    still can't get the $500, then you set up another
5    appointment or phone call, a very specific date and time to
6    call back, rearm and try again.
7            So if successful on the green side, the customer
8    gives the $500 deposit.  The loan consultant takes an
9    application, enters it into their computer system and it
10   becomes a part of the loan consultant's pipeline.  But
11   that's not the end of the sale.  The loan consultant has to
12   send the documents, the sale documents, for the customer to
13   sign and return.  This is called the book.  You will hear
14   it be recalled to as the folder, and it's all the documents
15   you need to sign in order to get a loan.
16           And that book or folder is sent off to the
17   customer by the loan consultants.  And then the loan
18   consultants have to manage their pipeline, which
19   means -- you'll hear that, manage your pipeline.  That
20   means, find where your loans are in the process.  And if
21   you need to do anything to make sure that that thing is
22   moving along and the sale is going to happen, so that you
23   get paid your commission.
24           Now, when all of documents are returned, the loan
25   consultant sends it off and it goes to their processing,

1    underwriting and closing departments.  So that's pretty

2    much it.  Unless a problem arises, it comes back and the

3    loan consultant may have to get more information, or

4    something, from the customer, or maybe even have to resell

5    a different loan if underwriting didn't like the first one.

6          So, the sales process -- this is the sales

7    process.  It's not a mere suggestion, by the way.  It is

8    mandatory.  It must be used every time at the risk of being

9    fired if these loan consultants didn't use it.

10         They say, use your own personality, inject your

11   own personality, and all that, but follow this process.  It

12   works.  No sense reinventing the wheel.

13         Here is what Jay Farner tells the loan

14   consultants about this sales process.  Block out everything

15   going on around you and concentrate on only one thing.  The

16   sales process.  Forget when lunch is, forget that your

17   buddy wants to take a smoke in ten minutes, forget that the

18   client is giving you bogus objections, one simple message,

19   follow the sales process.  Challenge yourself between the

20   calls coming in and leads you follow up on, follow the

21   sales process on every call.  Not 99 percent, every call.

22   So, it is not surprising that the bread and butter of this

23   sales job is entitled the Sales Process.  You will hear

24   more about it.

25         So that's hired and trained, as salespeople.  How

```
 1    about motivated and monitored?  Let's talk about those two
 2    things.  Once the trainee hits the sales floor and they are
 3    an actual loan consultant, the loan consultants find
 4    themselves in a very high-pressure sales environment.
 5    Their cubicles are in this call center.  Some of the
 6    witnesses will describe it as a frat house atmosphere.  The
 7    loan consultants are divided into teams with catchy names,
 8    like The Vault, Brass Nuckolls, The Bottom Line, The
 9    Rockefellers and The Money Train.  The mega-caffeinated
10    beverage Red Bull is distributed for free.  Balls are being
11    thrown around, gongs, sirens, sounds to celebrate or
12    signify a sale made by one of the other teams.  And there's
13    all kinds of rowdy, motivational sales behavior going on in
14    addition to that
15         Give you an example.  Here's one sales director
16    telling his team, at the beginning of the second call
17    block -- I will explain to you what call blocks are -- I
18    want everyone to get off the phones, stand up, clap
19    repeatedly 20 times and say, yes, when Mark Mazey pulls his
20    hand down.  This will be our daily signal to get to work.
21    This is the kind of environment it was.  It was so loud on
22    some occasions, and there is so much horsing around, that
23    loan consultants were trained to make up an excuse when
24    they are on the phone and one of these things happened.
25    They were told to say things like, oh, everyone is really
```

1    excited here because the rates just went down.

2             So loan consultants were expected to make 80

3    dials a day to sales leads.  Although these people were

4    supposed to be what they called warm leads, many of the

5    people the loan consultants called never heard of Quicken

6    or they weren't interested in a loan or they were sick of

7    getting called just because they put their information in a

8    website like LowerMyBills.com or lendingtree.com.  So it

9    was often difficult to get these people on the phone, and

10   when they got them on the phone, it was really hard to keep

11   them there.  It was a tough sales job, it really was.

12            All leads were to be called at least four times.

13   Quicken, like I said, their marketing and promotions

14   departments did a great job of generating leads.  So they

15   had a lot of leads and they would say, pound the phones.

16   All leads were to be called at least four times, although

17   Quicken encouraged the loan consultants to far exceed that

18   minimum.

19            For example, Mr. Gilbert, and that senior vice

20   president of sales, Jay Farner, called one loan consultant

21   a true champion and a great example of persistence and

22   success when he called one potential customer 24 times in 7

23   days.  Over and over again, we see this from Dakota, this

24   guy is a true champion.  That's what made a good loan

25   consultant.  And again, I'm not saying it's bad.  It's just

```
 1    sales.  It's nothing else.
 2           Those who were not this persistent were asked,
 3    why not?  The loan consultants will testify and the
 4    evidence will show that all of their duties was sales.  In
 5    addition to being on the phone between 15 and 20 hours a
 6    week, loan consultants were expected to communicate with
 7    current and potential customers by e-mail, keep track of
 8    and organize their list of leads and make notes of any
 9    contacts or attempted contacts they had, like Mr. Dakota
10    did.  I don't know his last name.  Behind that is a list of
11    all the 24 times he tried to call.
12           They're reading and answering e-mails and
13    returning voice mails from the managers and potential and
14    current customers.  They enter sold loans into -- by the
15    way, returning voice mails and e-mails from customers was a
16    really big deal because Quicken made a very big deal about
17    customer service.  They had, like, a rule.  I don't know,
18    if it was a 24-hour rule, something like that, where
19    everyone gets called back.  And loan consultants were very
20    jumpy because if you didn't call somebody back and they
21    called and complained that you didn't call somebody back,
22    you would get an e-mail from Dan Gilbert himself during
23    this time period, in this 2002 to 2006 time period.
24           They would have to follow up and gather documents
25    from customers they'd already sold loans to.  They would
```

1    have to track the pipelines of sold loans and obtain any

2    additional information, if necessary.  They had to attend

3    daily team sales meetings, sometimes multiple team sales

4    meetings.  These teams would get together and rah, rah,

5    multiple times during the day to keep these guys motivated,

6    because it was a -- really could be a mind-numbing job at

7    times with the dialing and dialing and dialing and managing

8    the pipeline and navigating through the systems.

9         So these people were either preparing to sell,

10   selling, following up on a sale or training or meeting on

11   sales.  Not only was their primary duty sales, it was their

12   only duty.  But truthfully, the most stressful part of this

13   job was the e-mails and the voice mails and the other

14   conduct by the managers pushing for more sales and

15   constantly monitoring their sales progress.  You will see

16   and hear many examples of the pressure to sell, and these

17   are just a handful of e-mails but you will see it all over

18   the place.

19        Here is one from Jay Farner, the big boss:

20   Congrats to the 122 bankers who have contributed today.

21   It's 3:30 in the afternoon and that means 122 loan

22   consultants had sold something at that point.  Everybody

23   else ask yourself a question.  When was the last time you

24   sold a deal?  15 minutes ago?  An hour ago?  3 hours ago?

25   There are 1,000 reasons why you might be doing something

1    else right now besides selling.  Are they really that

2    important?  No one can do a loan with us unless we call.

3    When the rates are 6 percent or they have decided to go

4    with someone else, it's too late.  This is a sales job.

5         Here's one from a sales director:  We need to crank

6    up the intensity -- the sales intensity tomorrow.  We have

7    an additional 60 bankers on the floor and production is

8    flat.  We also have a program with a start rate of 1.99

9    percent.

10        Another loan sales director, telling his team:

11   Leads are out of control, sell with passion and enthusiasm,

12   the products are there, make the clients love you.  Someone

13   sell.  I hear Mojica selling is off.  Anyone else out

14   there?

15          Like I said, we don't really need to blow up many

16   of these e-mails.  There is a lot of all caps and a lot of

17   exclamation points.  And they're making their point.  Their

18   point is, this job is to sell.

19          We are still in panic mode.  Just stay calm.

20   Don't leave your chair or phone unless you have to go to

21   the bathroom.  Dial and sell and we will finish strong.

22   It's still early.  It's like 4:30 in the afternoon.  It's

23   still early.

24        Quicken used the team concept to apply peer

25   pressure on their loan consultants.  Sales contests within

```
 1   the teams, sales contests between the teams, and this is
 2   the kind of thing this generated.
 3           Look at the board above McLean and you will see
 4   The Firm -- that's one of the sales teams -- is getting
 5   their... kicked by the Goodfellows, another sales team.
 6   Anyone going to step up or are we just going to give in?
 7           Here is another one from the same manager, his name
 8   is Jeff Perry.  Eighth place is pretty hard for me to
 9   swallow, guys, considering we have been number one for the
10   last two years.  Make a choice to step it up today.  Team
11   Noja has a hundred books back for the month and we have
12   116.  Something doesn't seem right with that.  Let's go,
13   let's go, let's go, let's go, let's go.
14           And it worked.  The loan consultants will testify
15   that their team members actually would get mad at them if
16   they went to lunch or if they left before anybody else.  So
17   it was highly effective.  Individuals and their teams were
18   constantly told where they were in meeting their sales
19   quotas, and where they ranked both on their team and call
20   center-wide.  Each loan consultant's sales numbers were
21   written on a board.  I think you saw that in one of the
22   e-mails.  Every team had a big board right outside where
23   everyone on the team could see it and everyone in the call
24   center could see it, where they kind of put a -- when they
25   sold a deal, they got 500 bucks.  They'd go out and slap a
```

1    mark by their name.

2            If they were behind their sales quotas, they were

3    constantly reminded about it and hounded.  If they were

4    ahead, they were told to keep selling and to help the team.

5    If they didn't sell enough loans, they were given a written

6    warning with specific sales quotas to meet.  If they didn't

7    meet the sales quotas that were in the written warnings,

8    they were fired.

9            Daily call blocks, which you saw referenced in one

10   of the e-mails, were randomly scheduled during the loan

11   consultants' day.  Suddenly, one of the managers would

12   announce call block from X time to X time, usually, like, a

13   two-hour time period.  All loan consultants were required

14   to drop whatever they were working on, whatever they were

15   doing, and just get on the phone and make new calls, new

16   calls, new calls, and pound the phones using this sales

17   process.  No other sales duties allowed, the phone only.

18   That's what a call block was.

19           The sales contest prizes, free pizza, sales

20   meetings and other motivational events were also never

21   ending.  It was always sell, sell, sell.  And loan

22   consultants worked crazy hours to meet these expectations.

23           To make it more stressful, Quicken monitored the

24   loan consultants' every move.  Managers responsible for

25   each team paced up and down the aisles and listened to them

 1     talk on the phone.  They walked right up and had the

 2     ability to plug into their phone and listen right on the

 3     spot, and gave advice on how to bag the deal while it was

 4     happening.  In other words, while the loan consultant was

 5     talking to the customer, they'd plug in where only the loan

 6     consultant could hear, and say, you know, ARC, ARC, or

 7     pivot, or find the emotional hook, whatever else they

 8     thought would make the sale on the spot.

 9             Loan consultants' calls were also recorded and

10     they would be called into something called the listening

11     room, and then the sales manager in charge of them and

12     sometimes training managers would sit with them and

13     critique them on their use of the sales process and say,

14     well, you know, you weren't very assumptive, or you didn't

15     pivot, or you didn't ARC, or, you know, those things.

16     They'd be kind of critiqued by that.

17          Quicken also monitored the loan consultants from a

18     control center in the middle of the sales floor called the

19     bridge.  In the bridge, the bridge team monitored every

20     lead given to these people, I mean, when they were called,

21     how long the calls took.  It wasn't uncommon for a manager

22     to come up to a loan consultant and ask why they hadn't

23     been on the phone for X period of time or why one call took

24     so long or why a lead hadn't been called X number of times.

25     They had all that information running real-time.  The

```
 1    technology was fantastic there at Quicken and they could
 2    definitely tell what loan consultants were doing.
 3          Quicken not only monitored the loan consultant's
 4    phone calls, they monitored their e-mails and internet
 5    usage.  Quicken's managers knew exactly what every loan
 6    consultant was doing almost every day.  Not even activities
 7    outside of work were necessarily off-limits.  One of the
 8    loan consultants will tell you about how she changed her
 9    profile on monster.com from home, came back into work the
10    next day, or shortly thereafter, and was called into her
11    manager's office and asked why she was looking for a new
12    job.
13          So because of this high-pressure, constant
14    monitoring, stress and long hours, most loan consultants
15    did not make it at Quicken very long.  Many of them just
16    burned out.  They worked such long hours, they tried so
17    hard, the pressure was so great, they really just couldn't
18    take it.  They either burned out and quit or they couldn't
19    meet their sales quota and they were fired.
20          The plaintiffs in this case made it approximately,
21    on average, the 300-plus plaintiffs, on average
22    approximately 8 months, which is longer than most of the
23    people -- many of the people they started with.  So that's
24    hired and trained, that's motivated and monitored as
25    salespeople.
```

1          Let's talk about judge.  I already kind of

2     mentioned, like you would expect with a sales job, a loan

3     consultant's performance was judged almost solely in terms

4     of sales production.  A loan consultant's daily performance

5     was judged by how many loans they'd sold, how many $500

6     deposits they'd collected, how many dial-outs they'd made,

7     how much money the loans they'd sold generated for Quicken.

8     You will see that by far the most common reason loan

9     consultants were disciplined and terminated was for poor

10    production, which means poor sales.

11         On the other hand, the great salespeople were

12    promoted.  Here is an announcement from a sales manager

13    announcing this guy, they called him Charles The

14    All-American Nance, promoted to senior mortgage banker.  In

15    other words, he was a loan consultant.  Then he got

16    promoted to senior loan consultant.  And here is the reason

17    given -- or the number one reason given for his promotion:

18    Number one, he is a salesman.  Chuck loves to sell.  The

19    difference between Chuck and most other salespeople is his

20    enthusiasm and ability to build rapport with any type of

21    person.  He loves to create.  Chuck's strength is in

22    creating great responses to objections and pivoting back to

23    the sale.  That is a natural ability.  I call him a

24    salesman's salesman.  If you really enjoy selling, you

25    should come by and listen to the All-American create some

1    sales music.

2           These are the guys that got promoted.  These are

3    the guys that make it up the chain.  The really good

4    salesmen.  And again, nothing wrong with that, but that's

5    what you would expect because it's a sales job.  The people

6    who sell succeed.  The people who do not sell enough fail.

7           Now, finally, pay.  Are they paid like

8    salespeople?  You bet they are.  They are paid a salary and

9    commission.  A sales commission.  They got a base salary

10   and then a commission based on how many loans they sold and

11   not on how people they advised or consulted or how much

12   they analyzed the information they obtained through the

13   sales process.

14          Indeed, loan consultants are taught to increase

15   the cost of the loan by increasing the interest rate or

16   adding points or extra fees from what the customer

17   qualified for on Quicken's computerized price sheets.  In

18   other words, they would up-sell them.  They were taught how

19   to do it, how to increase the rates, add points or add

20   extra fees.  So here would be the line they'd have to sell

21   the loan at, that's the minimum.  They'd raise it above

22   that.  If they do they'd actually earned an extra

23   commission for doing that.  They called that creating

24   overage.  They also called it raising the green bar.  If

25   the loan came back at this price through Quicken's

1     computerized system and they sold it for this much, they

2     just raised the green bar and they got an extra commission.

3          Now, on the other hand, if the loan consultant sold

4     the loan for less than the mandatory cost generated by

5     Quicken's computerized system, that's called an underage or

6     a red bar loan.  Loan consultants had to get preapproval

7     from a manager to sell a red bar loan and their commission

8     is reduced for doing so.  So loan consultants were actually

9     paid more for running up the price of a loan on the

10    customer, as you would expect in a sales job.

11         Loan consultants' supervisors were paid by

12    commission also.  For example, one of the managers, Mark

13    Mazey, made $300,000 in 2003, and 80 percent of that came

14    from commissions based on his team of loan consultants'

15    sales performance.  This explains why, as you will learn

16    from the plaintiffs' testimony and from a lot of these

17    e-mails and voice mails that you will hear and see, that

18    Quicken managers were so aggressive about pushing these

19    guys to sell, sell, sell, and work such outrageously long

20    hours to do so.

21         Now, the loan consultants got a salary of $24,000 a

22    year, plus commission, despite Quicken's constant dangling

23    the prospect of huge commissions in front of the loan

24    consultants as they worked these 60-plus hours a week.  The

25    average total pay for the loan consultants in this case is

1    40 grand a year.  And the most typical loan consultant in

2    this group earned $35,200.  This was good money then, and

3    certainly it's good enough money now in the current

4    economic environment, but not when you are working 60 to 70

5    hours a week to earn it.  Very few of the plaintiffs

6    actually made the six figures that Quicken was constantly

7    telling the sales force it could make.

8            So that's what we know.  Hired and trained,

9    motivated and monitored, judged and paid as salespeople,

10   because their primary duty was sales.  But despite all this

11   evidence of sales, Quicken's executives and managers will

12   also try to sell you on the claim that sales was not the

13   loan consultants' primary duty.  They will say that the

14   primary duty was to dig deep, gather financial information

15   and provide a financial analysis, provide financial advice,

16   provide financial consulting on the customer's behalf.

17   They will claim that sales was only a small part of the

18   process, far secondary to this analysis, advice,

19   consulting, all on the benefit of the customer.  But the

20   evidence will show that they gathered only what they needed

21   to make a sale, and they dug only as deep as necessary to

22   build rapport and define that emotional hook to help them

23   sell the most expensive loan they could get the customer to

24   buy.

25            For loan consultants, it was about getting that

 1   $500 and making a sale, not about sharing extensive

 2   financial knowledge and advice with the customer.  Instead,

 3   loan consultants were given warnings like this one.  This

 4   is from a sales trainer:  Just listening to your calls this

 5   week, it is evidence that you have vast knowledge of the

 6   mortgage industry, as well as our products here at Quicken.

 7   The key is not to let this knowledge deter you from the

 8   task at hand.

 9         Now, Quicken will say loan consultants helped

10   customers, that they saved them money, that the customer

11   benefitted from their world-class mortgage service.  These

12   things may or may not be true.  But it doesn't really

13   matter because this is about sales, not about whether those

14   sales helped or benefitted or saved money.  All salespeople

15   can argue that their activities helped people, benefitted

16   them, saved them money.  Likewise, Quicken will likely say

17   that these mortgages are extremely complicated.

18         The evidence will show that Quicken's sales

19   process, right here, training and superior technology, made

20   it simple enough that those with mortgage experience

21   actually had to be careful not to let that get in the way

22   of their primary duty, which is sales.

23         But, regardless, salespeople sell complicated

24   things all the time.  It doesn't make it anything other

25   than sales.  The loan consultants' job was to sell to the

1    customer and regardless of whether or not it's a

2    complicated transaction or whether it helped, benefitted or

3    saves the customer money, their primary job is sales.

4        Now, I want to shift gears a little bit and talk to

5    you about hours worked.  This sales job required the loan

6    consultant to commit a tremendous amount of time and hours

7    every week.  The offer letter Quicken sent to the loan

8    consultants before the lawsuit said 55-plus hours per week

9    is what they were probably going to have to work.  It turns

10   out it was a little bit worse than that, a little bit worse

11   than 55-plus.  It was between 60 and 70 hours a week.

12       The loan consultants will tell you about their

13   families dropping them off at Quicken after church on

14   Sunday, about how their kids were often sleeping when they

15   left, back in bed when they got home.  Things like that.

16   It was too much for these folks to sustain for over too

17   long a period of time.  That's why this was such a

18   high-turnover job.  All you'll need to confirm this is to

19   see a few examples of the constant daily e-mails from

20   management pushing the loan consultants to come early, stay

21   late, work Saturdays and Sundays to, quote, do what it

22   takes to be a successful salesperson.  Loan consultants who

23   would work late nights and into the morning hours were

24   publicly praised.  This loan consultant was there until

25   1:30 in the morning, wow, that's dedication.  Pressure was

1   high not to go home and those who did were not team

2   players.

3          Managers were fond of telling the loan consultants

4   exactly what it took.  Here's one from a sales director to

5   his team:  For those of you staying late tonight, thanks.

6   I had an offer to go the Pistons game, hang with my son and

7   watch cartoons, or come in and be here with you.  The

8   choice was easy.

9           Here's another one:  If I can cancel plans with

10  my son, you guys can make arrangements to stay late,

11  too.

12         This is kind of how it was.  A regular daily shift

13  was over 11 hours, just a regular old daily shift.  The

14  loan consultants will testify they regularly worked beyond

15  their shift and came in before their shift.  Saturdays were

16  scheduled depending on the time period.  They had one

17  Saturday a month and one Sunday every six weeks but you

18  will hear testimony that loan consultants were there, when

19  you were behind, you were there on Saturdays and Sundays if

20  you were weren't meeting your quota, and it started over

21  every month.  If you were a loan consultant who happened to

22  be meeting their quota, you were still pressured to stay

23  because you had to help the team.  It was that whole sales

24  concept.

25          So the pressure to work long hours was constant,

 1    they either worked hours it took to meet those quotas and
 2    if they didn't meet their quotas, they were fired.  And
 3    that's why they had the hours.
 4         Frankly, really -- the people struggling worked the
 5    most hours because they were the ones that were getting
 6    really pounded about not meeting their quota, not helping
 7    their teams, et cetera.
 8              Now, under the overtimes law, it's not good
 9    enough for an employer to say that they warned the employee
10    they would be working 55-plus hours a week.  The employees
11    are not required to know that their employer is violating
12    the law by paying them the way they are paying them.  You
13    will also learn that -- and you will learn that these
14    people did it because, they were told -- pressure -- if you
15    want to make more money than the base salary of $24,000,
16    you better sell, sell.  So they did.  They worked to try to
17    sell, sell, sell.  And meet their -- all these sales quotas
18    and all these team goals.  You will also learn that the
19    employers are responsible to track actual hours worked by
20    their employees.  In other words, the employer is not
21    allowed to stand up and go, sure, we didn't pay you but
22    what were your hours, when they didn't keep track.  They
23    have to keep track.  When they don't, employees are allowed
24    to come and tell the jury, or make a good-faith estimate of
25    what their hours worked were, knowing that they don't have

```
1    time records, they weren't keeping track of it at the time,
2    they have to do their best.  And that's what the plaintiffs
3    in this case are going to have to do because Quicken did
4    not record the actual hours they worked.  Plaintiffs will
5    have to do their best and give you an estimate of the hours
6    they worked at Quicken.
7              That estimate will be between 60 and 70 hours on
8    average.  But you can decide what number of hours is fair
9    and reasonable, and that would be your job.
10             Now, there are 300-plus loan consultants in this
11   case, as the Judge said.  They worked at Quicken's first
12   and largest call center in Livonia.  Others worked in call
13   centers in Troy and Laurel Park, and then near the end of
14   our time period here in Cleveland, Ohio.  Don't worry, as
15   the Judge said, all 300 are not going to testify.  In fact,
16   the Judge is very sensitive in this case to keeping us
17   moving.  We are going do what we can to keep things moving.
18   We are going to call a representative number of plaintiffs
19   so that you can hear from them.  We have also been
20   encouraged not to bury you in paper and we have limited our
21   exhibits, both sides have, so that you will be seeing
22   examples, not full e-mail boxes, or boxes and boxes and
23   boxes of stuff that each respectively have back in our
24   offices.
25             In addition to our loan consultants, we may be
```

1    calling some of Quicken's own people in cross-examining

2    them in our case instead of waiting to see if Quicken calls

3    them.  But the Judge will be watching the clock and both

4    sides will do everything to keep things moving.  We may

5    spend more time with the first few plaintiffs that we call

6    to give you a big, full picture.  And then we will probably

7    spend less and less time with the plaintiffs as we go, just

8    enough to give you comfort that their experience was a

9    shared one or a similar one across the board.

10          Now, Quicken Loans was a major player in the

11   mortgage industry, or they are a major player in the

12   mortgage industry, precisely because of sales.  Selling is

13   how they got where they got.  In every contest they

14   emphasize sell, sell, sell.  Now, in an attempt to avoid

15   paying overtime, suddenly what was always sales, and never

16   any doubt was sales, is something else.

17          But when not defending a lawsuit, when not knowing

18   the lawsuit was going to happen, when they didn't know it

19   mattered to do anything but just tell it exactly like it

20   was, Jay Farner said it best.  This is the guy in charge of

21   all the loan consultants.

22              April 2004, we sued them very shortly after that.

23   Now, Quicken's managers are great salespeople.  And I feel

24   like -- my opening statement feels like I'm disparaging

25   salespeople because -- all I'm doing is pointing out that

```
 1    it was sales and, again, there's nothing wrong with sales.
 2    What is wrong is saying it's not sales to avoid overtime
 3    pay.
 4           And they are going to come in here, these managers,
 5    and probably try to use the same techniques they teach
 6    their loan consultants, to sell you on the claim that these
 7    loan consultants weren't salespeople.  They were hired and
 8    trained, motivated and monitored, judged and paid as
 9    salespeople because their primary duty was sales.  The
10    evidence will show that Quicken is legally responsible to
11    pay them for overtime their worked over 40 hours a week,
12    and that typical week would be between 60 and 70 hours.
13           For all these reasons, at the end of the trial,
14    I'm going to stand back up and I'm going to ask that you
15    find that the primary duty was sales and that you give them
16    a just and reasonable number of hours of overtime for doing
17    it.
18           Thanks a lot your time.
19           THE COURT:  Thanks, Mr. Lukas.
20           Would the defense like to offer an opening
21    statement to the jury at this time.
22           MR. MAYER MORGANROTH:  We would, Your Honor.
23    Would the Court want to take a break?
24           THE COURT:  Come right on up, Mr. Morganroth, if
25    you're ready to go.  Thank you, sir, the podium is yours.
```

```
 1            MR. MAYER MORGANROTH:  Your Honor, thank you.
 2            THE COURT:  Thank you.
 3                         OPENING STATEMENT
 4            MR. MAYER MORGANROTH:  Members of the Jury, thank
 5  you for your sacrifice and for the hard work I know you are
 6  going to have to do.  We say that every time and we mean
 7  it.  We are used to saying it but never used to watching
 8  people go through that.
 9            My name is Mayer Morganroth.  You've have already
10  been introduced to the members of the defense lawyer, et
11  cetera, et cetera, and I don't think it's necessary to go
12  beyond that again.
13            Now, there are two times, as the Court has told
14  you, that the lawyers can address the jury.  The opening
15  statement, which you've already heard plaintiffs', wherein
16  we tell you what we intend to prove and give you a road
17  map, as the Court has told you.  The purpose, of course, is
18  to get you with the road maps so you get an understanding
19  of what we intend to prove so when it comes on, you will
20  have some understanding of what we are doing.
21            The second time is the closing argument.  The
22  closing argument is when we are permitted to argue based on
23  upon what we understand we did prove to the jury.  Neither
24  one is evidence, as the Court has told you.  It's our
25  opportunity to be able to address the jury directly.
```

```
 1          You have also been told about how we don't greet
 2    jurors, we don't say hello, we don't smile.  We even go
 3    beyond that.  We try to avoid getting on the same elevator,
 4    because it's only appropriate to have noncontact with
 5    jurors.
 6          Now, each side is highlighting what they feel
 7    they are going to prove.  And the jury has a role as the
 8    judge of the facts.  That's why, once you were sworn in, we
 9    stand up.  Because even though you don't have robes on, you
10    are really robed as the judges of the facts and you have an
11    important role, just as important as the Judge, who
12    actually, of course, is the decider of the law and, of
13    course, does the other things that the Court has identified
14    for you.  He is also the referee for the rules of
15    procedure, and as the Court has instructed you, to see that
16    each side has a fair trial.
17          Now, the evidence will show that this case is
18    about 300 some-odd former employees at Quicken Loans.  Each
19    of the particular plaintiffs held a job position as a
20    mortgage banker, which was also referred to as a loan
21    consultant or loan officer at Quicken Loans.  The position
22    of a mortgage banker is heavily regulated by the
23    government.  There are licensing requirements in virtually
24    all the states that Quicken Loans does business in.
25          They do business in 50 states.  That's why, as
```

1    you saw, I probably chuckled a little when they said 4:00

2    is early in the day.  They are doing business in Hawaii,

3    which is 10:00 in morning.  There is different shifts.  So

4    certainly it may be early in the day because it could be

5    10:00 where the business is being done.

6          The job of a mortgage banker at Quicken Loans is

7    a salaried professional position providing financial

8    mortgage services to Quicken Loans' clients.

9          Each of the plaintiffs, you will find out, turned

10   out to be a short-term employee who worked at Quicken Loans

11   for a brief period of time during the portion of time frame

12   of May 17th, 2002 until September 8th, 2006.  And the

13   plaintiffs' claims relate only to that time frame, May 17,

14   2002 to September 8th, 2006.

15         You will see evidence, you will see documents,

16   agreements that each plaintiff accepted specifically, and

17   understood from the beginning of their employment, and

18   agreed to the compensation as follows:  A guaranteed base

19   salary in the amount between $24,000 and $28,000 a year for

20   all hours worked.

21         By the way, you will also see that they

22   understood they were exempt.  It's right in their contract.

23   They were exempt from overtime.  They were paid the base

24   guaranteed salary, whether they worked for more or less

25   than 40 hours a particular week.  They also got

```
 1   commissions, which were paid to the plaintiffs, providing
 2   them with upside of earnings between $100 and $200,000 a
 3   year.
 4            As you heard in the opening statement of
 5   plaintiff, one of them was making $300,000.  Gee, it would
 6   have been nice to just give them overtime and take all that
 7   money back.  Right?  I don't think you would have been so
 8   happy with that.
 9            Which mortgage bankers at Quicken Loans
10   earned -- all of them earned that base salary and
11   commission.  Plus, they had a comprehensive benefits
12   package which was provided to the plaintiffs.  We didn't
13   hear anything about that but we will show you that package.
14   They got company-paid medical benefits, dental benefits,
15   and vision benefits.  They got short and long-term
16   disability, life insurance, accidental death and
17   dismemberment insurance.  They got a flexible spending
18   account, tuition reimbursement, paid time off for
19   vacations, sick time, holidays and for parenting.  They got
20   company-matched 401(k) contributions, discounted home
21   loans, home internet connection assistance, gym membership
22   reimbursement, assistance with purchasing a home computer.
23   You will hear in the evidence, they got all these things.
24   Not just the pay and commissions, they also got all these
25   benefits.
```

1          You will hear witness testimony, and see

2     documents and agreements, establishing that the

3     compensation package over the mortgage bankers was

4     structured so that it would be better for the mortgage

5     bankers than if they were paid hourly with overtime.  You

6     will see they actually made more money than if they got

7     overtime.

8          High-level management witnesses from Quicken

9     Loans will explain that because the position was a salaried

10    professional position, Quicken Loans designed a

11    compensation package in order to be better for the mortgage

12    bankers than if the mortgage bankers were paid on an hourly

13    basis with overtime.  All these people made more than if

14    they were just paid overtime, considerably more, and the

15    evidence will show that.

16         But after agreeing to this and accepting the

17    generous compensation package, during the entire time they

18    worked at Quicken Loans, each plaintiff is now seeking

19    overtime on top of, and in addition to, their guaranteed

20    salary they were paid for all hours they worked, and

21    overtime even on top of and in addition to the commissions

22    they were paid; and on top of the benefits.

23         You will hear testimony that not a single

24    plaintiff ever contended that they should've received

25    overtime on top of their guaranteed salary and on top of

 1    their commissions.  Or that they were entitled to anything,

 2    or paid anything, beyond that which they were paid any time

 3    that they were at Quicken Loans.  Never complained or said

 4    they were entitle to more.  You will hear testimony that

 5    didn't come about until they were solicited for a lawsuit.

 6           Now, you heard statements as to what will be

 7    shown as the hours that particular plaintiffs worked.  We

 8    will show those are fabrications.  You will hear certain

 9    plaintiffs claim that they worked 70 hours per week for

10    each and every week that they worked at Quicken Loans.  You

11    will hear other testimony that will show that 70 hours a

12    week was certainly impossible.  The testimony will show

13    that, if true, they would have worked 14 hours a day during

14    a five-day workweek.  For example, they worked from 9:00 in

15    the morning until 11:00 p.m., according to what you heard

16    in the opening statement.  The evidence will show they did

17    not.  The testimony will show that even if Saturday was

18    used as a workday, on occasion, that would mean the

19    plaintiffs would have had to work over 11.5 hours each and

20    every day for that six-day workweek without any breaks for

21    lunch or any other reasons.

22           Approximately 25 plaintiffs will testify

23    they -- and will make a preposterous attempt to claim the

24    hours worked by each of the 300 some-odd plaintiffs who are

25    not testifying, but their testimony will reveal they don't

1    have the slightest clue on how much the other nontestifying

2    plaintiffs worked.  In fact, they didn't even work in the

3    same period of time as a lot of them, never even saw them.

4    They weren't even employed at the same time.

5             The testimony will reveal that there were over

6    6,000 employees at Quicken Loans during the time period at

7    issue in this case.  Now, you've seen a couple of slides,

8    just to show you how things may be taken out of context or

9    not appropriate or correct.  One was ...

10            (Brief pause)

11            MR. MAYER MORGANROTH:  Jeff Sherman was there at

12   4:00 in the morning.  Well, you weren't told but the

13   evidence will show that Jeff Sherman was not a mortgage

14   banker.  Had no role as a mortgage banker.  He was a

15   computer technology employee.  So, he being there at 4:00

16   in the morning trying to correct a computer has nothing to

17   do with being a mortgage banker or overtime in that

18   position.

19            Another one that you saw is David Lee, regarding

20   the Pistons game.  The evidence will show he was not a

21   mortgage banker either.  He was a regional vice president

22   having nothing to do with mortgage banking, as a mortgage

23   banker.

24            So, when you see these things, you will see what

25   the real evidence is.  You will also see that there is some

```
 1    20, 30 -- there are e-mails or communications that talk
 2    about sales.  Evidence will show there were hundreds of
 3    thousands of communications that don't mention sales and
 4    all the plaintiffs are doing is cashing in on one word
 5    that's in maybe 20 or 30 documents or 20 or 30
 6    communications out of hundreds of thousands.  You wanted to
 7    do that, the evidence will show, that would be like one
 8    statement or -- in effect, it was once said if you put
 9    3,000 monkeys in a room for 4,000 years with typewriters,
10    by accident one of them will come out with Shakespeare's
11    Hamlet.
12            So if you take -- and you'll see there is such a
13    limited few amount that say "sales" in them and they are
14    cashing in on using that word because it was used.
15            Now, the testimony will further show that the
16    mortgage bankers were assigned to teams and those teams
17    didn't even work the same time, as I've related to you
18    before, when they talk about coverage being early in the
19    day at 4:00.  They staggered their time frames.  So it
20    could have been a group that just came on on top of it
21    because they had to cover different time zones.
22            The testimony will confirm even the mortgage
23    bankers working the same teams worked different hours,
24    different amount of time.  They got paid time off, aside
25    from the benefits we talked about before, accommodations
```

1    for personal business.  They came in early very often

2    but -- and worked late sometimes, but they left early as

3    well.  Some took breaks throughout the day.  Some even

4    participated in the playtime which was given at Quicken

5    Loans.  Quicken Loans also was a fun place to work.  It had

6    arcade games, ping-pong contests they engaged in while they

7    were there.  They also had karaoke, nerf football, and many

8    other things that occupied people to enjoy their workday.

9            The evidence will also be undisputed that none of

10   the plaintiffs kept track of their hours that they worked,

11   let alone the hours that other mortgage bankers worked.

12   The evidence will show there was no reason to do that

13   because each plaintiff knew and understood and agreed from

14   the start they were salary, not hourly.  Their agreements

15   say it as well.  And you will see their agreements, where

16   they say, we understand that's our total compensation.

17   Each plaintiff knew and understood and agreed there was no

18   overtime right from the beginning.

19           Now, it will be up to you, the jury, to determine

20   whether each plaintiff has satisfied their burden of proof

21   as to the amount of hours worked for each and every week

22   each plaintiff claims that they should receive overtime.

23   Of course, you will be using your common sense and judgment

24   and your own experience to make the determination.

25           Secondly, not only will the testimony and

```
1    evidence reveal that the hours that plaintiffs claim to
2    have worked was absurd, but the plaintiffs were not
3    entitled to receive any overtime at all because there is a
4    exemption from overtime payment called the administrative
5    exemption for financial services in the Fair Labor
6    Standards Act.  The exemption applies to the position of
7    mortgage banker at Quicken Loans during the time frame at
8    issue in this case.
9              There is a two-part test to the administrative
10   exemption.  One is called the duties test, whether the
11   duties, the job, are office work, not manual labor, and
12   directly relate to the general business operations of
13   Quicken Loans or its clients.  You will hear evidence that
14   that's what it related to, the clients and to Quicken
15   Loans.  You will see not 20 times but hundreds and
16   thousands of times that it says, client is number one, do
17   for the client.
18             The second test is the discretion and independent
19   judgment test, whether the mortgage bankers at Quicken
20   Loans have the ability to make judgment calls regarding
21   matters of significance, even if those judgment calls were
22   in the form of recommendations to upper management.
23             You will hear evidence and see agreements and
24   documents that gave them discretion and said they could
25   charge premiums, they could do this, and they could go back
```

```
 1    and they are able to enumerate, whatever, they are able to
 2    call the appraiser and see if comparables were correct.
 3    And we will go through it.  There are a hundred different
 4    variations of loans.
 5              You will hear from the testimony the nature of
 6    the job of a mortgage banker.  We'll call several witnesses
 7    that served as mortgage bankers during the time fame of May
 8    2002 until September 8, 2006.  And those witnesses will
 9    explain, in depth, the nature of what they and the mortgage
10    bankers did.  You know, you can tack the word sales on it
11    all you want just because the word is used, and used on
12    occasion, was selling, but that's not the nature of the
13    job.  You can tack anything you want on it, and the
14    evidence will show, sure, started to take the word out,
15    sell.  Because the plaintiffs, through their attorneys, all
16    of a sudden decided that's the way to cash in on the word
17    sell.  That's all they have, the word sell.  And that they
18    think defines the person, just like saying he has a blue
19    suit on or she as a brown dress on, that that defines the
20    person.
21              The witnesses will explain the nature of Quicken
22    Loans' business operations and the role of the mortgage
23    banker during this applicable time frame.  The interesting
24    thing is, somehow getting that $500 application fee becomes
25    the sale.  That's the beginning of all the work.  That's
```

1    like the retainer for a lawyer, who now four years later is

2    trying the case.  By the way, that $500 is refunded the

3    client when they close.  That's not a closing because of

4    that occasion.  The closing is after all the work is done

5    and all the advice and all of the mental anguish and work

6    that is done to make a mortgage a mortgage for a particular

7    person in a loan.

8            The number of plaintiffs that are called as

9    witness will testify the topic as well.  Their

10   characterization of their job duties will conflict with

11   other witnesses who will be testifying about this topic.

12   It will be for you to judge which witnesses are accurately

13   characterizing the nature of the job duties.  You will have

14   help, as I said before, in making that determination by

15   looking at the agreements, the job duties that are

16   described in the mortgage bankers' documents and agreements

17   at Quicken Loans.  Those agreements were signed and

18   acknowledged by each one of the plaintiffs.

19           Now, you will also hear evidence that -- and it

20   seemed to be not to expose this particular point -- that

21   there was a marketing team entirely separate and distinct

22   from mortgage bankers.  They are the ones that called and

23   got leads.  There was another division called front line,

24   and front line also got the leads, not the mortgage

25   bankers.  When they got it, they were already secured by

```
 1   those particular parts of Quicken Loans, and paid as
 2   employees to do so, not as mortgage bankers.
 3            Also, you will hear evidence and you can use your
 4   common sense to the fact that when a particular
 5   professional is getting a client, you can always say that's
 6   selling.  Isn't the plaintiff's lawyer trying to sell you
 7   when he's selling the jury?  Isn't a doctor when they see a
 8   patient trying to sell them to become their doctor?  Isn't
 9   a lawyer doing the same when they get a retainer?  Once
10   they get the retainer, as I said before, then the work goes
11   on.  They are all professionals.  They are not paid
12   overtime.  When we are in trial, I don't know who could
13   afford to pay us overtime for the amount of time that goes
14   into a trial.
15            Now, what you are hearing is using the word
16   selling as a generic term.  You will hear evidence that
17   Quicken Loans was ranked number one by J.D. Power in
18   customer service and they were top 20 in Forbes as a place
19   to work for.  And you'll hear evidence that the employees
20   were the ones who confidentially were contacted to vote by
21   those particular entities, and you will see that they were
22   voted by the employee voting to make them in those
23   categories.
24            You will see a multitude of materials saying that
25   they should focus on the right thing, they should do
```

```
 1    ethics, they should do the right thing for the client, the
 2    client is number one.  You will see documents and papers
 3    galore to the fact that they have fiduciary duty to their
 4    clients, that they are to obey the laws and regulations of
 5    the United States and every state that they are operating
 6    in.  You will hear duty after duty they had to perform and
 7    knowledge they had to have, not just as mortgage banking as
 8    such but the laws, rules, regulations.  You will hear
 9    evidence that, let alone did they go to school for four and
10    a half weeks before they could even sell anything --
11    supposedly as they call it -- before they can do a mortgage
12    even; after that, they had to have continuing education,
13    and they would have continuing education 20 hours here, 40
14    hours here or 18 hours here, all during the time that they
15    were working.  And they had to have that continuing
16    education also to be licensed in other states.  And they
17    had to take tests in those states.  And they had to conform
18    to their laws and rules and regulations.
19            Now, one of the reasons why you will see in the
20    evidence that Quicken Loans survived these times, when
21    mortgage companies went under like crazy, is because
22    Quicken Loans did their jobs and performed their duties for
23    their clients, and made them number one.
24            Now, when you talk about securing or selling, the
25    plaintiffs were contacted to become plaintiffs.  There were
```

1    seminars for them to get them to become plaintiffs.  I

2    guess that makes everybody salespeople who were the lawyers

3    who got them.

4          Now, you will hear evidence that there are

5    training books, and huge books, you will see these books

6    that those mortgage bankers had to learn and exercise.  You

7    will see that they had the type of performance required

8    that made them professionals, and because they use the word

9    selling 20 or 30 times out of hundreds of thousands of

10   documents, but even if you used it a multitude of times, it

11   doesn't make the person a salesperson.  And you will see

12   that these people who never complained, these people who

13   were in constant training are generally the people that had

14   job after job before, job after job afterwards, didn't stay

15   at any place very long at all and didn't stay at Quicken

16   very long.  And you will see that even though they stayed a

17   short period of time, they generally made more than on

18   their application they said they would like to make, and

19   you will see also that they made substantially more, a

20   great deal more, on the commission and bonus than they

21   would have made in overtime and benefits, I should say,

22   along with the bonus.  And now what you will see what they

23   are doing, is not giving back the commissions, not giving

24   back the benefits but asking now for overtime.  It's up to

25   you to determine whether that's appropriate and whether or

```
 1   not, in reality, these people who have continuing education
 2   have continued training, have hundreds -- hundred different
 3   options and loans, all kinds of discretion and work to do
 4   are salespeople.  Thank you very much.
 5              THE COURT:  Thank you very much, Mr. Morganroth.
 6              Ladies and gentlemen, the lawyers have now
 7   concluded their opening statements, which were, as
 8   advertised, their version of an overview of what the
 9   evidence in the case was to have or will be shown.  And now
10   the actual evidence will begin.  Remember, what you just
11   heard is not evidence.  What comes from here on in from
12   mouths of witnesses and the documents that they introduce
13   will, in fact, be evidence.
14              Mr. Lukas, your first witness, please?
15              MR. NICHOLS:  Lindsey Tittensor.
16                        LINDSEY TITTENSOR
17              (The Witness was Sworn)
18              THE COURT:  Have a seat in the witness chair.
19   Sit back and relax.  You don't have to speak directly into
20   the microphone will pick you up quite nicely.
21              Mr. Nichols, the floor is yours.
22              MR. NICHOLS:  Thank you, Your Honor.
23                       DIRECT EXAMINATION
24   BY MR. NICHOLS:
25   Q.  Let's start off by telling the jury where you live.
```

```
 1    A.   I live in Garden City.

 2    Q.   Let's try this a little better here.

 3    A.   I live in Garden City, Michigan.

 4         MR. NICHOLS:  Can you folks hear that?

 5         JUROR:  (Indicating).

 6         THE COURT:  You might have to speak a little

 7    louder than your normal tone of voice.  Don't speak right

 8    into it or you won't like that.

 9         Go ahead, Mr. Nichols.

10         MR. NICHOLS:  Thank you, Your Honor.

11    BY MR. NICHOLS:

12    Q.   Tell us your educational background.

13    A.   I have a high school diploma and a degree from the

14    University of North Florida.

15    Q.   What's your degree in there?

16    A.   Finance.

17    Q.   And in the degree of finance, did you study anything

18    about mortgages?

19    A.   I studied real estate but there -- it was more

20    commercial than any sort of lending.

21    Q.   When is the first time you ever saw a mortgage

22    document?

23    A.   At Quicken.

24    Q.   Tell us how you got the job at Quicken.

25    A.   I applied online and then I was -- you know, talked to
```

```
 1    a couple friends that knew people that worked there.  And
 2    I'd gotten in touch with a recruiter out in the Troy
 3    location, and I went and interviewed there.
 4    Q.   What was the position you were interviewing for?
 5    A.   Mortgage banker.
 6    Q.   All right.  And who did you interview with?
 7    A.   I interviewed with, not only the recruiter, but I also
 8    interviewed with Jay Farner.
 9    Q.   How did they describe the job to you?
10    A.   They told me it was a sales position.
11    Q.   They told you it was a sales position?
12    A.   Uh-huh.
13    Q.   Did you discuss how much money you would be making?
14    A.   Yes.
15    Q.   What did they tell you?
16    A.   You would make $24,000 a year, plus commission.
17    Q.   And did they tell you how much money you would expect
18    to make in a year?
19    A.   They said upwards of, you know, $75,000 people would
20    make their first year.
21    Q.   And what turned out to be your job duties?
22    A.   Selling mortgages.
23    Q.   You heard Mr. Morganroth say it was just a word, we
24    just pulled "sales" out of the air.
25    A.   Uh-huh.
```

```
 1    Q.   Was that a word you heard at Quicken before you talked
 2    to us, or what?
 3    A.   Yes.
 4              MR. MAYER MORGANROTH:   Objection, Your Honor.
 5    The opening statement shouldn't be used to a witness.
 6              THE COURT:   That's sustained.   Go ahead and focus
 7    on the facts, Mr. Nichols.
 8              MR. NICHOLS:   Sure.
 9    BY MR. NICHOLS:
10    Q.   You heard the word "sales" at Quicken, I take it; is
11    that right?
12    A.   Yes.
13    Q.   That was in your very first interview, you heard that;
14    is that correct?
15    A.   Uh-huh.
16              MR. MAYER MORGANROTH:   Objection, Your Honor.
17    That's leading.
18              THE COURT:   Let's ask open-ended questions and
19    not testify for the witnesses, Mr. Nichols.   Go ahead.
20              MR. NICHOLS:   Sure.
21    BY MR. NICHOLS:
22    Q.   Just describe generally what you did in your job at
23    Quicken.
24    A.   My job was to make outbound calls and get people on
25    the phone and ultimately pull credit with them, see if they
```

```
 1    could qualify for a mortgage, and call them back and sell
 2    them the mortgage.
 3    Q.   Okay.  Did you receive any training to get this job?
 4    A.   To get the job?  After I got the job I did receive
 5    training.
 6    Q.   Tell us about the training.
 7    A.   Training was four weeks of intense training, Monday
 8    through Friday.  It was learning about the different
 9    programs and the different products that they offered, and
10    learning about how to overcome objections to clients and
11    doing your best on the phones, and learning the phone
12    system, the LOLA system and the Lakewood system.
13    Q.   Let's take those one at a time.  What is an objection?
14    A.   An objection is when someone -- maybe you're pitching
15    them a program and they have a concern.  The rate is too
16    high or I want to talk to my spouse, you know, they are not
17    going with the flow.
18    Q.   The rate is too high, I want to talk to my spouse.
19    Can you recall any others?
20    A.   You know, they were hesitant of Quicken because maybe
21    it wasn't their person down the street, the normal banker
22    that they were with, the closing costs were too high.
23    That's what I recall.
24    Q.   You remember your training on those issues?
25    A.   Yes.
```

1    Q.   Let's try a couple of them.

2    A.   Okay.

3    Q.   Spousal might be, my wife and I own the property

4    together, I want to talk to my wife first.

5    A.   Okay.  Well, I understand that, you know, you and your

6    wife want to make this decision together, however, rates

7    are on the rise.  What a great thing to do is, you can go

8    ahead and get the loan started.  You can lock into the

9    rates.  When you are able to see your wife tonight, you can

10   say, honey, great news, we have this great mortgage we've

11   already been pre-approved for.

12         So why don't we go ahead and get the documents

13   started.  Did you want to put that $400 security deposit on

14   a Visa or MasterCard?

15   Q.   Suppose I said I want to use the bank down the street.

16   I talked to Wells Fargo.  I have a friend that works there.

17   I have a good rate.  What would you say?

18   A.   I understand, you know, you might want to walk down

19   the street and use the bank down the street.  But I also

20   understand the convenience of Quicken Loans.  You are

21   calling me, you know, it is 8:00 on a Tuesday night, while

22   your bank down the street isn't there.  I am.  We are able

23   to get these documents signed online for you.  And once you

24   fax everything over to me, we can do everything via phone

25   and you don't ever have to go anywhere.

```
 1   Q.   Okay.  I'm hesitant about Quicken.  I don't really
 2   know much about that company.
 3   A.   We are actually one of the, you know, number one
 4   mortgage banker -- mortgage lenders in the U.S., and then I
 5   would go into more detail.
 6   Q.   And is this all training you learned or did you come
 7   up with this on your own?
 8   A.   We learned these in training.
 9   Q.   How long between the day you started and the very
10   first loan you ever sold?
11   A.   I believe it was a couple months.  Maybe from the day
12   I started to the day I sold the loan, maybe two months.
13   Q.   Were you on the sales floor -- how long before you
14   were on the sales floor trying to sell loans?
15   A.   I was on the sales floor after a month of training.
16   And then I was trying to sell loans from day one on the
17   sales floor.
18   Q.   Do you recall if you made calls to various states?
19   A.   Yes.
20   Q.   Like, how many states?
21   A.   I don't remember the exact number.  It was, you know,
22   I would say most states that I was licensed in.
23   Q.   What team were you an assigned to?
24   A.   I was on The Vault.
25   Q.   As in, like, V-A-U-L-T?
```

```
 1    A.   The bank vault.

 2    Q.   And who was in charge of that team?

 3    A.   Matt Zontini.

 4         THE COURT:  Mr. Nichols, forgive me for

 5    interrupting, do you think we could get for the jury the

 6    time frame for this particular witness's employment at the

 7    company, please?

 8         MR. NICHOLS:  We certainly can.

 9         THE COURT:  Thank you.

10    BY MR. NICHOLS:

11    Q.   When did you work there?

12    A.   I worked there from the beginning of July of '05 until

13    August 3rd of '06.

14    Q.   So a little over a year?

15    A.   Yes.

16    Q.   I want to show you something, and I believe it's

17    Exhibit 21, ask if you can identify this.

18    A.   This was our sales process.

19         THE COURT:  Is there objection to Plaintiff's 21,

20    Mr. Morganroth?

21         MR. MAYER MORGANROTH:  No objection, Your Honor.

22         THE COURT:  Thank you.  We will receive

23    Plaintiff's Exhibit 21.

24         Mr. Nichols, please proceed.

25         (Exhibit P21 was received)
```

1    BY MR. NICHOLS:

2    Q.   I want to go through this with you and ask you about

3    it.  Do you see it there?

4    A.   Yes.

5    Q.   Step one -- first of all, did you follow this process?

6    A.   Yes.

7    Q.   Every time, or most of the time, or what?

8    A.   Every time.

9    Q.   Why did you follow it every time?

10   A.   Because we were told that this was the sales process,

11   no need to reinvent the wheel, and this was just what you

12   did.  This is how you handled your calls.  This has got all

13   the information you needed and this is how you could...

14   Q.   Maybe before we get to that, step one, tell me what

15   you had to do to get to step one.

16   A.   In order to get to step one, I did have to dial

17   outbound within LOLA to actually get somebody on the phone.

18   Q.   Maybe we better start back at LOLA.  What is LOLA?

19   A.   LOLA is lead or loan -- excuse me, lead origination --

20   I'm going to mess this up.  I'm sorry, Loan Origination

21   Lead Allocation system.

22   Q.   What does that system do?

23   A.   It was a system on my PC that was, kind of, tied into

24   my phone system.  So when somebody entered their

25   information on a website, like LowerMyBills.com, if they

 1    entered their first and last name, and maybe their address,

 2    and how much though owed on their house, or something

 3    basic, it would pop up through my LOLA screen.  So from

 4    there I could just click up my mouse and it would ring on

 5    my headset.

 6    Q.  Like, how many leads would you have to go through

 7    before you got to step one with one person?

 8    A.  It depended on, I guess, you know, what kind of day

 9    you were having on the phones.  Usually, you called, you

10    know, maybe a dozen, or so, numbers before you actually got

11    somebody live on the line.

12    Q.  And of the people you got live on the line, how many

13    of them had expected your call?

14    A.  I mean, some people knew that they had filled out some

15    information; some people didn't want to talk, that sort of

16    thing.  So it was, you know, you were kind of seen feeling

17    them out, whether, okay, they knew they filled this out,

18    they want to talk; or no, they don't want to talk, or

19    anything like that.

20    Q.  Okay.  You get somebody live on the phone.  What do

21    you say?

22    A.  I would start with just step one.  I would just kind

23    of introduce them, tell them where I'm from.  And then, you

24    know, ask them, you know, is now a good time?  Okay.

25    That's great.

```
 1              And then I would go through exactly step one,
 2     foreshadow and gain control of the call.
 3     Q.   What's foreshadow and gain control mean?
 4     A.   Foreshadow, I would basically foreshadow, kind of, you
 5     know, what's going to happen.  And then gaining control, I
 6     was gaining control of the sales call saying that, you
 7     know, it was kind of like the, I'm in charge, I'm going to
 8     say, you know, like I'm saying on here, have you got a pen
 9     and paper handy.  Here's my name and number and I give you
10     my full name and number.
11              All right.  That's great.  And then I go into my
12     questions, so kind of take control over where I want the
13     call to head.
14     Q.   Then step two says, initial questions, create need,
15     goals.
16              What is going on in that step?
17     A.   Right here, I'm, you know, initial questions so I'm
18     kind of verifying, you know, where are you calling from.
19     I'm getting some detailed information.  Have you ever
20     worked with Quicken Loans before?
21              And then if they said no, you know, we went into
22     this -- you kind of make them feel more comfortable working
23     with an online lender.
24              Then getting the basic information, you know,
25     what type of home is this, your primary, secondary, making
```

1    sure it was a type of mortgage that we can do; you know,

2    single-family residence, condo, town home, that sort of

3    thing.  And getting the basic informations out here.

4          And then you are creating need to see, you know,

5    what, does this client actually need from me and, you know,

6    what is your goal, you know, from this mortgage.  Are you

7    looking to get cash out?  Are you looking to refinance to

8    save money?  What are you looking to do?

9    Q.   How long did step two take?

10   A.   Step two could take a couple minutes, especially when

11   you are getting, you know, creating need and you're kind

12   of, you know, at that point, you're also -- and I know it

13   says goals listing down there, but you are building rapport

14   with the client.  So, how long have you been with this

15   home, that sort of thing, and you're finding more about

16   them.

17         Then, you know, looking to what they're doing.

18   So you're looking to get cash out.  Oh, what are you

19   looking to get cash out for?  You're looking to, you know,

20   pay for your daughter's wedding, that sort of thing.  So

21   that could go on, I guess, as long as the client was, you

22   know, talking with you.  But that could go on for a few

23   minutes, at least.

24   Q.   Okay.  And then what is step three?

25   A.   Step three is the second foreshadow of process and

1    deposit.  So that's, you know, I'm telling them, I'm sure

2    they have a lot of questions.  Let me just, kind of, tell

3    you how the process works with Quicken Loans.

4          And it says, you know, I'm going to ask -- I

5    pretty much read this verbatim with clients.  You know, I'm

6    going to ask you more questions so I can find out exactly

7    what your situation is.

8          Then if it looks as if we can help you, I will

9    get your Social Security number and I'll pull a credit

10   report.  I should be able to call you back within, about,

11   you know, 10, 15 minutes.

12         At that point we will review your situation and

13   determine if you qualify.  If you do so, then I'll accept a

14   $400 good-faith deposit that is applied at closing.  Then

15   we'll get you into process.

16         So, now, let's get back to my questions.  Tell me

17   about your job.  What do you do and how are you paid?

18   Q.   I noticed you said $400 deposit, not $500 deposit.

19   Why did you say $400 deposit?

20   A.   Because we could basically get away with selling $400

21   good-faith deposit to cover the initial appraisal in a lot

22   of states, so it just sounded better than $500.

23   Q.   Who let you ask for 400 instead of --

24   A.   Our team leader said that was fine.

25   Q.   Step four says, income, build rapport.

```
1              Why was it necessary to build rapport?
2    A.   Because you want the person to trust you, and
3    obviously like you, because they are calling from anywhere,
4    you know, in the U.S. and, you know, they are not down the
5    street.  They can't sit in front of you.  So you are
6    wanting to build that relationship with them.
7    Q.   Step three -- or step five, it says, get SSM and third
8    foreshadow, STC, new program intro, income box.
9              What is going on in that step?
10   A.   This is the part where I'm kind of saying, you know,
11   it looks like I might be able to help you.  What I'm going
12   to do now is pull your credit and give you a call on what's
13   your options.
14             What I do is I get the credit information and
15   then, you know, it says, like I said, great, I'll call you
16   back within X amount of minutes.  Then if you qualify, we
17   can let your loan process shortly.
18             And then STC was Super Trial Close.  It was
19   feeling the client out on how comfortable they were with.
20   You know, are they going to be moving forward?  Do you
21   think they're going to be giving a lot of objections?
22   Q.   You are talking really fast.  I'm sure she's
23   struggling.
24   A.   Sorry.  Sorry.  They were saying, you know, it's kind
25   of feeling out the client, if you think they are going to
```

```
 1    move forward, if they are going to really give you

 2    objections up front when you're going to present the

 3    program or pitch the program.

 4              So you can ask, you know, from my notes, assuming

 5    that you qualify, what would you (sic) using for your

 6    deposit, to let them know, you know -- to kind of remind

 7    them, I am going to ask for that deposit.  Are you going to

 8    use your Visa or MasterCard, to kind of, you know,

 9    foreshadow it.  It is still coming.

10    Q.   I see.  STC stands for Super Trial Close?

11    A.   Uh-huh.

12    Q.   And trial close -- what did you understand "close" to

13    mean at Quicken?

14    A.   Closing was actually closing the deal.  They said,

15    yes, you know, here is my deposit.  I want to move forward

16    with the loan.

17    Q.   This STC right here is special type of close, a Super

18    Trial Close?

19    A.   Uh-huh.

20    Q.   Correct?

21    A.   Yes, because you are, kind of, testing the waters

22    right here.

23    Q.   Is that a word they used around there, a super trial

24    close?

25              MR. MAYER MORGANROTH:  Your Honor, objection.
```

1    The previous question is to -- identify who tells her

2    anything, just is, that what "they" said.  It could be

3    anybody.

4              THE COURT:  That's a good point.  I will sustain

5    the objection and ask you to focus on who it is so that we

6    can properly determine the admissibility of statements.

7              Mr. Nichols, go right ahead.

8    BY MR. NICHOLS:

9    Q.   Who told you STC means Super Trial Close?

10   A.   Well, it was stated right here on the sales process

11   and it was talked about, you know, with our team leader.

12   Q.   Your team leader?

13   A.   Any leaders, basically, it was stated on there.  Then

14   they would talk to --

15   Q.   Is this common --

16             MR. MAYER MORGANROTH:  Objection, again, Your

17   Honor.  What team leader?  Any team leader?  There is 6,000

18   people there.

19             THE COURT:  You will have an opportunity to

20   cross-examine on some of those issues, Mr. Morganroth.

21             In the meantime, be as specific as possible while

22   still telling -- having the witness tell the story,

23   Mr. Nichols.  Go right ahead.

24             MR. NICHOLS:  Sure.

25   BY MR. NICHOLS:

```
 1   Q.   Who was your team leader --
 2   A.   Matt Zontini.
 3   Q.   And he would use this phrase?
 4   A.   Yes.  And it was printed right there.
 5   Q.   What is the New Program Intro, or MPI?  What is that
 6   about?
 7   A.   That's just saying, you know, I'm going to talk to you
 8   about a program that -- clients are choosing and that could
 9   be something on, we have a great interest-only mortgage out
10   there.  And you would just, kind of, give brief
11   explanation, you know, to kind of get them interested.
12   And, say, okay, I'm going to, you know, go ahead and look
13   at the credit and I'll call you back in about 15, 20
14   minutes.
15   Q.   Where would you get those new programs from?
16   A.   We would get e-mails telling us, you know, if a new
17   program came out.
18   Q.   Were there, like, programs that were encouraged at
19   times?
20   A.   Yes.
21   Q.   How were they encouraged?
22   A.   You would get e-mails out stating, you know, the
23   benefits of these, you know, new program, why -- why this
24   is a great program for clients, why you should sell this.
25   You know, creative ways to sell this sort of thing.
```

1    Q.   Okay.  So how does the yellow side of this document

2    end?

3    A.   The yellow side is basically, I have their Social

4    Security number, name, date of birth and I'm going to pull

5    credit.  I let them go.  And then I'm pulling credit.

6    Q.   Then tell the jury what happens next.

7    A.   After I get off the phone, I go ahead and I pull

8    credit.  And then once it goes into the LOLA screen, that I

9    already looked up their original information with -- LOLA,

10   you know, can give you some ideas of some loans that, you

11   know, they primarily can qualify for based on the

12   information you have given it.  And you also have matrix

13   that you go to, and you, kind of, just, you know, say,

14   okay, this is what I want, this is what I'm looking for.

15   They have these things to qualify.  This is what I'm going

16   to go on.

17   Q.   I'm not sure everybody is familiar with the term

18   "matrix" but would you tell the jury what you mean by the

19   word "matrix?"

20   A.   Matrix was a huge document that each of us had at our

21   desk.  And it basically gave all the loan programs that

22   Quicken had to offer and the qualifications for each

23   program, so if they needed income documentations, W-2s,

24   that sort of thing, it was all spelled out for you right on

25   this matrix.

1    Q.   How hard was it to go down the matrix and determine

2    the loan that you could sell?

3    A.   After you learn it, just took a couple minutes.

4    Q.   How much time was -- say, toward the end of your job,

5    did it take to go from step one to step two?

6    A.   10, 15 minutes.

7    Q.   How about at the beginning of your job?

8    A.   At the beginning of the job, it did take awhile.  It

9    took you awhile to, you know, pull the credit.  And you are

10   looking at the matrix.  You are also looking in LOLA.  You

11   are talking to, you know, maybe, your team leader, Matt

12   Zontini in my case, or maybe another fellow teammate.  We

13   are role playing and, kind of, going through objections

14   and, you know, different wants and needs and, kind of, you

15   know, trying to pitch to each other on how I'm going to

16   make the sale happen.

17   Q.   Let's go back to step five.  Just so I'm clear, tell

18   me everything you have done between step five and step six.

19   You have pulled credit, you said?

20   A.   Uh-huh.

21   Q.   You've --

22   A.   I found a loan I'm going to pitch them.  I've kind of

23   written out the loan specifications.  You know, this is the

24   amount you are going to borrow, this is the rate.  If they

25   were saving money, I would say, you know, you are going to

```
 1    be saving $200 a month.  You know, I would write down the
 2    specifications before I called them back.
 3    Q.   I want to explore that term, saving them money.  When
 4    you use the term "saving them money," what do you mean?
 5    A.   I mean lowering their monthly payments.
 6    Q.   Do you know if that was a common use of the words
 7    "saving them money" around Quicken?
 8    A.   Yes.
 9    Q.   Do you know if you were actually saving them money if
10    you measure in terms of total payments?
11    A.   No.
12    Q.   Did anyone ever look at or train you to look at are
13    you really saving them money or not?
14    A.   No.
15    Q.   So saving them money meant lowering their --
16    A.   Yes.
17    Q.   So you would calculate that number --
18    A.   Uh-huh.
19    Q.   -- is that right?
20         Then what did you do?
21    A.   Then I would, you know, get everything together and I
22    would call them back.  And again, you know, foreshadow the
23    deposit and let them, you know, walk through some options,
24    and, again, I'd pretty much read it verbatim, walk you
25    through some of the options I have for you.  Get your
```

1   feedback --

2   Q.   Slow down.  She can only type so fast.

3   A.   I apologize.  Let's walk you through some of the

4   options I have for you, get your feedback and if everything

5   looks good, we will accept the $400 good-faith deposit and

6   get your loan into process.

7            And then I would do, you know, a review of goals

8   and it's to get people starting to say yes.  And it was to

9   say, you know, let's make sure we are clear on some of your

10  goals.  Do you have that paper and pen handy?  Great.  You

11  owe X amount, right?

12           And your current payment is X.

13           So they are saying, yes, yes.

14           And their main goal is to blank; is that right?

15           And they said, yes.

16           Mostly, you know, by accomplishing this goal,

17  we'll be able to enable to -- I don't know, save for your

18  son's college, or, you know, whatever they had told me.

19           And then they say, right?

20           And then they'd say, yes.

21           And that's where, you know, like it says, tie in

22  emotionally, refer to vision goals from first call.

23  Q.   Tie in emotionally --

24  A.   Uh-huh.

25  Q.   -- refers back to the other side of the sheet?

```
 1    A.   To the first call, when you would talk to someone and
 2    you would get, you know, an emotional reason why they want
 3    to refinance.  They want to save money.  They want to be
 4    able to, you know -- one client told me, I want to be able
 5    to take my wife out to dinner.  Clients want to save money
 6    so they, you know, can save for their children's school, or
 7    things like that.
 8    Q.   Let's take the client that told you, on the other
 9    side, I take it --
10    A.   Uh-huh.
11    Q.   -- I just want to take my wife out to dinner.
12    A.   Uh-huh.
13    Q.   That's what this person told you?
14    A.   Uh-huh.
15    Q.   Tell the jury how you tied that in emotionally.
16    A.   So, you know, your main goal is to lower -- lower your
17    payments so you can save money each month and by doing
18    this, you are going to be able to take your wife out to
19    dinner; is that right?
20          And they say yes.
21    Q.   I see.  Then it says, pitch the program, pitch
22    program.  What does that mean?
23    A.   That's when I go ahead and tell them about the program
24    that I have chosen for them.
25    Q.   What do you say about it?
```

1   A.   You know, I basically say, I have a great program

2   here.   Your new loan amount is going to be X amount of

3   dollars based off -- you know, depends on what we were

4   doing.   Paying off your first mortgage and maybe paying

5   off those credit cards.

6          The program is, and I would tell them, you know,

7   five-year ARM.   Your new payment is going to be X amount of

8   dollars per month and, you know, right off the bat, you

9   know, you are going to be saving $200 per month.   The fees

10  for this mortgage are X amount of dollars, and then your

11  rate is whatever percentage rate it was.

12  Q.   Would you present two programs or one program?

13  A.   It kind of just depended on the client.   I usually

14  would have two ready just in case they were, like, oh, I

15  didn't really want an ARM.

16          So you're like, that's no problem.   We also have

17  this 30-year fixed, you know, and then I would go through

18  that.   But if they were really set just on one program, I

19  would just usually put one down.

20  Q.   When you were telling them all of the reasons they

21  should do it, did you ever tell them, no, these are some

22  reasons you maybe shouldn't be taking this loan?   Did you

23  ever do anything like that?

24  A.   No.

25  Q.   Why not?

1    A.   Because it was sales, and we wanted them to initially

2    say yes to the mortgage and sell them the mortgage.

3    Q.   Were you even trained to learn all of the

4    disadvantages of a particular sales or particular mortgage

5    type?

6    A.   No.

7    Q.   It says -- goes on to say, benefits, pivot with

8    enthusiasm and emotion.  What's that mean?

9    A.   That means getting excited about the program with the

10   client.  So, like, if you are going to be able to save them

11   $200 a month, you are saying, saving you $200 a month over

12   the next 10 years is going to save you X amount of dollars.

13   You know, get exited about it with them so they are

14   getting, wow, this is great.

15   Q.   And what does pivot mean?

16   A.   Because you're pivoting away from the program and you

17   are kind of pivoting into -- now you are pivoting into, you

18   know, what you are going to save, what you are going to do.

19   And then the service benefit, you will have these

20   advantages of working with Quicken Loans.  You are kind of

21   pivoting to the close.

22   Q.   Pivot just means, like, change course?

23   A.   Kind of.  You are kind of turning directions.

24   Q.   It says, step seven, close, ARC five times.

25            What is pivot to sacrifice close mean?

```
 1   A.   Right now I'm pivoting to close.  So, again, it's a
 2   lot of reading on my part.  You know, I didn't
 3   vary -- deviate from this too far.
 4              Obviously, this loan makes a lot of sense --
 5   Q.   Read slowly.
 6   A.   Obviously, this loan makes a lot of sense and I'm
 7   excited to get it off your to-do list.  At this point what
 8   we need to do is to get your loan into the system.  First,
 9   what credit card do you want to put your deposit on, a
10   Visa, MasterCard or check by phone?
11   Q.   And what is the sacrifice close?  Why is it a
12   sacrifice close?  Do you understand that?
13   A.   The sacrifice close, I'm trying to close right here.
14   And if I'm not closing, I'm going to keep -- basically, I'm
15   going to, you know, acknowledge, respond, close.  It says
16   five times.  I really never did it five times.
17   Q.   Why didn't you do it five times?  It says four times
18   there, doesn't it?  No, it does say five --
19   A.   I didn't want to feel that pushy.  I mean, I would do
20   it a few times, but I didn't want to be, you know, that
21   pushy with somebody.
22   Q.   Give me an example of an ARC.
23   A.   An ARC is, you know, that sounds great.  I just want
24   to think it over.
25              And then I would just say, you know, while you're
```

1    thinking, I understand you might want to take some time to

2    think this over but while you are thinking it over, rates

3    are changing.  So the best thing to do here is get this

4    rate locked in tonight so you can go to bed knowing that

5    the rate we talked about today is the rate you are going to

6    close with.

7              So did you want to put that on your Visa or

8    MasterCard?

9    Q.   You'd come right back to Visa or MasterCard?

10   A.   Uh-huh.

11   Q.   Were there other ARC techniques that you remember?

12   A.   As far as different people with different objections?

13   Q.   Yes.

14   A.   Yeah.  I mean, you would get spousal objections.  You

15   could get rate objections.  You could get closing cost

16   objections, wanting to think about it objections.

17   Q.   Were there any objections you weren't trained on?

18   A.   No.  I mean, it was pretty much the standard every

19   time.

20   Q.   Okay.  This handling objections, was that something

21   you came up with or was it through training?

22   A.   No.  That was through training and through Quicken

23   Loans.

24   Q.   What is trial close at the end there?  What is that

25   about?

1   A.   The trial close is, if they really are not, you know,

2   they keep objecting, keep objecting, keep objecting, so at

3   that point, you know, you say, well, I understand it's

4   obvious you can't commit tonight, so what we are going to

5   do is just give you a little bit of time to think about it.

6          And then I would just, kind of, set a time for

7   them to follow up with them and say, you know, I will call

8   you tomorrow and then we can go forward from there.

9   Q.   Okay.  Would you set up a specific time?

10  A.   Yes.

11  Q.   Then step ten is foreshadow future business.  What is

12  that about?

13  A.   Kind of telling them, you know, you are excited to be

14  working with them, and then this is kind of where you are

15  asking for referrals.  And you are asking, you know, who do

16  you know that I could help with a mortgage?  Your friend,

17  family, that sort of thing.

18  Q.   Now, after you take -- let's just say on this example

19  you did take the application.

20  A.   Okay.

21  Q.   Tell the jury what you do next.

22  A.   From the application that I would gather, it's all

23  handwritten that you are writing everything out.  So then

24  you enter it into a software called Lakewood.  And Lakewood

25  is where the loan pretty much sits within Quicken to say,

1    yes, this has been approved, yes, their, you know, jobs

2    check out, this is their history, yes, they make this much,

3    that sort of thing.  It's, you know, basically the system

4    where the loan is after you get into LOLA.

5    Q.   In Lakewood, how long would it take you to enter the

6    information from LOLA into Lakewood?

7    A.   At first it took a while, when you first start.  It

8    could take, you know, up to an hour to get everything.  And

9    then after a while, you could get it done in, probably, you

10   know, maybe 15 minutes, 20 minutes.

11   Q.   In Lakewood do you know what the term "green bar" is?

12   A.   Yes.

13   Q.   Would you tell the jury what the green bar is in

14   Lakewood?

15   A.   Green bar in Lakewood is an actual figure and it's

16   highlighted green to represent the green bar.  And that's

17   when there is an overage in the loan.  So if that means

18   there is more money somewhere than necessary, that's where

19   the overage comes from.

20   Q.   Have you ever heard the term "raise the green bar?"

21   A.   Yes.

22   Q.   Tell the jury what raise the green bar means.

23   A.   Raise the green bar means when -- there was ways in

24   the Lakewood system where you are moving fees around and

25   the green bar is growing.

1    Q.   Do you know if you, or anyone else, was trained to

2    raise the green bar?

3    A.   I wasn't very good at it.

4    Q.   Do you know if other people were?

5    A.   Yeah.

6    Q.   How can you raise the green bar?

7    A.   By bogus fees and by increasing, you know, just

8    different costs associated with the loan, putting them in

9    there so if they were only supposed to be, you know, maybe

10   there were $500, you make it $600, that's obviously an

11   overage, that sort of thing.

12   Q.   What's an overage, are there other ways beside putting

13   in fees?

14   A.   Yeah.  If the rates change and maybe you have said,

15   you know, well your rate is going to be the 6 percent but

16   then the market fluctuates, maybe the market went down and

17   now the rate's at, you know, 5.875.  If you stay at 6

18   percent, then there would be a green bar in the loan.

19   Q.   So would you call that yield spread?  What do you call

20   that, the rate is different from what the rate in the

21   computer is?

22   A.   There is just different points associated with it.  I

23   don't remember the exact term.

24   Q.   What is the highest green bar you ever had on any of

25   your files?

1    A.   That I ever had?  That I can remember, I mean,

2    probably only a couple hundred dollars.  Like I said, I

3    wasn't really good at it.  I don't really remember.

4    Q.   What's the highest one you saw?

5    A.   Probably a couple thousand, at least.

6    Q.   Have you heard the term "pushing the bruise?"

7    A.   Yes.

8    Q.   What does pushing the bruise mean to you?

9    A.   Pushing the bruise means to me, when there would be a

10   client that, you know, maybe has a bad situation but we can

11   still help them and it's constantly, like, reminding them

12   of this bad situation to kind of, you know, you are pushing

13   on that bruise, like, I know you -- you have a bad credit

14   score, but, you know, we are actually able to get you into

15   this loan even though you have this bad credit score.  Keep

16   bringing up that you are able to help them even though they

17   have the bad problem.

18   Q.   What's the point of pushing the bruise?

19   A.   It's, you know, it's kind of letting them know, like,

20   they are not going to be able to go anywhere else and we

21   are helping them, even though they have this, you know, so

22   to speak, problem.

23   Q.   Have you heard of the loan tracker program at Quicken?

24   A.   I have heard the phrase, yes.

25   Q.   How is the phrase used?

1   A.   The phrase is used, you know, we have a loan tracker

2   program that we will be tracking your loan over the life of

3   it, to clients.

4   Q.   Is this something you told clients?

5   A.   Yes.

6   Q.   Do you know if there was such a program?

7   A.   No.

8   Q.   You're saying you don't know or --

9   A.   I don't know.

10  Q.   Have you ever seen it?

11  A.   No.

12  Q.   What was the point of telling the client that there

13  was a loan tracker program?

14  A.   So they were comfortable, you know, making a move with

15  your company, just, you know, while they might say, you

16  know, well, that rate seems a little high.

17        Well, I understand that the rate seems high.

18  This is what you qualify for.  So we do have a loan tracker

19  program.  So if rates are going to shift and we can get you

20  into something better, I'm going to be the first one to

21  call you.

22  Q.   But no one ever sent you something to call somebody --

23  A.   No.

24  Q.   -- in your year and a month, or so, there?

25  A.   Uh-uh.

1   Q.   I want to shift gears on you a little bit and talk

2   about whether or not you know you were being monitored at

3   Quicken.

4   A.   Okay.  I definitely think that I was monitored.

5   Q.   How do you know you were monitored?

6   A.   Because the number of dials that you made were

7   monitored by the bridge.  You could actually see them right

8   there on your computer screen.  They were all tracked and

9   calls you made were recorded.

10  Q.   Were any of your calls recorded?

11  A.   Yes.

12  Q.   How were they used when they were recorded?

13  A.   They can be used in a number of ways.  But one of the

14  ways was in, like, a call, I guess a team call clip, where

15  you team goes down to a room and they can play any call

16  they want, like, over a speaker and everyone, kind of, sits

17  there and critiques it.

18  Q.   Were some of yours critiqued?

19  A.   A couple of times, yes.

20  Q.   Give me the example of what was wrong with your call?

21  A.   Just instances of, you know, different areas to close,

22  and that sort of thing.

23  Q.   Different areas where you could close?

24  A.   Where I could have closed or what I could have done.

25  That sort of thing.  It was just critiquing the entire call

```
 1   itself.
 2   Q.  When you say close, you mean --
 3   A.  Close the clients.
 4   Q.  Get the --
 5   A.  Get the deposit.
 6   Q.  Get the $400?
 7   A.  Yeah, get their commitment to do business.
 8   Q.  Can you tell the jury what the layout of the floor
 9   looked like?
10   A.  The layout of the floor was a mass sea of cubicles.
11   And they were cubicles that were only, you know, yea high.
12   So you saw your neighbor.  It was, you know, a lot of
13   people, you know, around their desk.  Some people stood up
14   to sell, some people were, you know, sitting down and a lot
15   of people, you know, were throwing footballs around.  It
16   was just, you know, you had your headphones on and dials
17   and, you know, people had their music going, but it was
18   just a mass sea of people.
19   Q.  Do you know what the bridge is?
20   A.  Yes.
21   Q.  Tell the jury what the bridge is.
22   A.  The bridge was in the center of the sales floor and
23   the bridge is where they kept track of all of our numbers,
24   how many dials you had, how much talk time you had, you
25   know, what teams were doing different things.
```

1    Q.   Do you know if Quicken kept track of your hours

2    worked?

3    A.   No.

4    Q.   Did they ever provide you with a record of the hours

5    you worked?

6    A.   No.

7    Q.   Was there pressure for you to work more than 40 hours?

8    A.   Yes.

9    Q.   Tell the jury the pressure you felt.

10   A.   If you didn't work, you know, at least more than 40

11   hours, you would get, you know, called a part timer, or

12   your chair was spinning, is what they would say if they

13   thought you were leaving too early.  But it was mostly

14   pressure from your team to stay late.

15          Our team's phrase was "the vault is open late."

16   And it was, you know, you are not a team player if you are

17   not staying late with everybody, and, you know, pitching in

18   and doing your part to hit the team sales goal.

19   Q.   What if you had met your goal?

20   A.   It didn't matter.  You still needed to be a team

21   player.

22   Q.   How much overtime do you estimate you worked while you

23   were there?

24   A.   I estimate that I worked roughly 60 hours a week.

25   Q.   Were there weeks when you worked more than that or

1    less than that?

2    A.   Yes.

3    Q.   Both?

4    A.   Yes.

5    Q.   Can you tell us what a typical workweek looked like?

6    A.   Sure.  A typical workweek, I would get there, roughly,

7    9:00 and I would be working until 8:00, and that would be,

8    you know, typically Monday through Friday.  Then I would

9    work on the weekend, either a Saturday or a Sunday,

10   sometimes for a five-hour shift.

11   Q.   Did you work from home?

12   A.   I did.  I was set up to work from home, and I would

13   take calls on my personal cell phone.

14   Q.   Were you ever paged from work or called from work?

15   A.   It was set up that our team leader wanted any

16   voicemail that went to your voice mailbox at work that you

17   didn't respond to X amount of time, it was automatically

18   set up to be sent to your cell phone.  So if I got a

19   voicemail on the weekend, it would automatically ring my

20   cell phone to tell me I had a voicemail at work.

21   Q.   Do you remember getting any of those calls at home?

22   A.   Yes.

23   Q.   Tell time the jury about those.

24   A.   I would get calls at 5:00 in the morning from my sales

25   team leader trying to do a, you know, motivational phone

```
 1    call to pump us up for the day.  It would be, you know,
 2    5:00 a.m. and ringing my cell phone while I'm sleeping.
 3    Q.   Do you remember other calls like that?
 4    A.   There were a few of those.
 5    Q.   The people around you, did they work similar hours to
 6    you?
 7    A.   The people on my team worked similar hours to me.  It
 8    just depended what time zone you were covering to when you
 9    would actually start your shift, to when you would end your
10    shift.
11    Q.   When you left at night, were there still people there?
12    A.   Yes.
13    Q.   When you got in in the morning, were there people
14    there?
15    A.   Yes.
16    Q.   Did Quicken ever tell you you were entitled to get
17    overtime?
18    A.   No.
19    Q.   Do you know if your manager ever instructed you on how
20    to deal with the call live?
21    A.   I need clarification on that.
22    Q.   Did you manager ever come over and plug into your
23    system?
24    A.   Yes.
25    Q.   While you were on the phone?
```

1    A.   Yes.

2    Q.   What would happen?

3    A.   I mean, personally, just made me nervous.  But he

4    would listen in and tell me, you know, close, or ARC, or,

5    you know, they would try to be motivational sales coach

6    right there on the spot, you know, what is happening in

7    your call.

8    Q.   Do you know if that person knew one single thing about

9    the financial circumstances of the person on the phone?

10   A.   No.

11   Q.   No, they did not?

12   A.   I don't know.  They were just walking around plugging

13   into whoever was on a call and pitching somebody or talking

14   to a client.

15   Q.   Okay.  How were you motivated to the job there at

16   Quicken?

17   A.   Motivated?  I mean, by money.  I mean, the more you

18   sell the more money you make.

19   Q.   Were there sales contests, things like that?

20   A.   Uh-huh.

21   Q.   Tell us about those.

22   A.   There were sales blitzes where they would say, you

23   know, today is going to be a sales blitz and we are going

24   to work extra long today and we are going to have call

25   blocks and contests and, you know, games and prizes, and

1    that sort of thing.  And it was just an all-intensive to

2    generate more sales.  They would, you know, have different

3    things going on a different day, and ringing bells, and

4    everything, but it's just basically a day of sales.

5    Q.   Did you win any trips?

6    A.   I did win a trip to the Atlantis.

7    Q.   What is that?

8    A.   A hotel in the Bahamas.

9    Q.   Why did you win that trip?

10   A.   The contest was based on getting deals, which meant

11   actually getting a client, you know, committing to the

12   loan, giving you the deposit and getting information to

13   Lakewood and getting folders back.  So that means, not only

14   did I get the deals into Lakewood during a certain amount

15   of time, X amount of deals you had to sell, I also got the

16   documents needed back.  Maybe they needed their W-2s, or

17   their bank statements, or things like that.  But I got

18   everything I needed to add to a certain number of points, I

19   got to go -- I mean, there was other people, that I did get

20   participate in that.

21   Q.   Was your job performance heavily criticized?

22   A.   Yes.

23   Q.   What was wrong with your job performance?

24   A.   Just the lack of sales at some point if I wasn't at

25   the number they wanted me to be at.

```
1    Q.   Tell us what the criticism was of your job.

2    A.   Basically selling more loans, get more deals.

3    Q.   Who?

4    A.   This was done by my team leader, Matt Zontini.

5    Q.   Was the job stressful?

6    A.   Yes.

7    Q.   Why was it stressful?

8    A.   Because you're, you know, under pressure all day,

9    every day to, you know, make these sales, to get people on

10   the phone, to get their Social Security number, to pull

11   their credit, to get them qualified for a loan, to pitch

12   them the program, to get them to say yes.  And you need

13   them to say yes because, you know, you are being counted on

14   by your team to hit a certain number and your team, you

15   know, your team leader is trying to motivate everybody.

16   Everybody wants, you know, to get to a certain number of

17   deals.  So it's pretty high volume.  It's high stress.

18   Q.   Was there a point where you became kind of

19   discouraged?

20   A.   Yes.

21   Q.   Can you tell the jury what happened?

22   A.   There -- there was a point I was going to go in on a

23   weekend.  I had to go in on a Saturday or a Sunday.  I

24   chose, you know, to go in on a Sunday afternoon.  And the

25   Sunday afternoon rolled around, and I'd gotten a call from
```

1    my family, I think it was from my aunt.  It said, your

2    grandmother is in the hospital and the do-not-resuscitate

3    papers have been signed.  So we want everyone to come up

4    here and be with her.

5              So I said, that's fine.

6              I called my team leader at the time and I left

7    him a voicemail on his work voicemail.  And I said, you

8    know, I'm really sorry.  I can't come in this afternoon.  I

9    have to go to the hospital.  I explained the situation.  I

10   said, I'm going up to the hospital with my family.  That's

11   where I'll be all night.  I won't have time to come into

12   work tonight before I'm going to be there tomorrow.

13             So, you know, I go to the hospital.  I left the

14   hospital that night.  Went home, went to work in the

15   morning.

16             My team leader at the time sat right across the

17   wall from me.  Instead of just saying something to me

18   personally, he left me a -- I believe it was a voicemail,

19   or an e-mail, and I can't really remember which it was, but

20   it wasn't a personal message.  It just basically said, you

21   need to work your extra hours.  I'm sorry, I don't really

22   care, you have to work your extra hours.  You need to be a

23   team player.

24             And I said, no, I'm not.  I'm going to see my

25   Grandma, tonight, sorry.

```
 1    Q.   Did your team leader understand the do-not-resuscitate
 2    papers had been signed?
 3    A.   Yeah.  It didn't matter.  There was sales goals.
 4              MR. NICHOLS:  No further questions, Your Honor.
 5              THE COURT:  Thank you very much, Mr, Nichols.
 6              Mr. Morganroth, it's your turn to examine the
 7    witness now.
 8              MR. MAYER MORGANROTH:  Thank you, Your Honor.
 9                        CROSS-EXAMINATION
10    BY MR. MAYER MORGANROTH:
11    Q.   Good afternoon.
12    A.   Good afternoon.
13    Q.   You testified as to when you first began to work at
14    Quicken.  When was that?
15    A.   I started in July of 2005.
16    Q.   And what were you, 23 years old, then?
17    A.   Yes.
18    Q.   And you left in August of '06?
19    A.   Yes.
20    Q.   You spent about 11 months actually working?
21    A.   Well, I would say 13, from July to August.
22    Q.   I see.  I was excluding, as you testified, you did
23    about 11 months worth of work, after you started, you
24    trained for?
25    A.   Okay.
```

```
1    Q.   Is that correct?
2    A.   I believe training was only a four-week program.  So,
3    I would say, I was on the sales floor for, roughly, a year.
4    Q.   And you actually resigned, did you not?
5    A.   I did.
6    Q.   When you resigned, you specifically left; is that
7    correct?  In other words, you left fully working there?
8    A.   Yes.
9    Q.   You never came back?
10   A.   No, I did not.
11   Q.   Prior to working at Quicken, where did you work?
12   A.   I was an intern, also known as a client associate, at
13   Merrill Lynch.
14   Q.   How long did you work there?
15   A.   I worked there a little over -- maybe a year.  I don't
16   really remember exact dates on that.  I remember I was in
17   college and it was the last couple years of college.
18   Q.   Where did you work after that?
19   A.   I also worked at an Irish pub during the meantime, if
20   that's what you are referring to.
21   Q.   I'm not referring, I'm asking.
22   A.   I worked at an Irish pub, and I interned before that,
23   and then I worked at Quicken.
24   Q.   How long did you work at the Irish pub?
25   A.   Maybe about a year and a half, two years as well.
```

1   Q.  And did you work at a grill and bar other than that,

2   too?

3   A.  I worked at Chili's Grill and Bar, yes.

4   Q.  How long did you work there?

5   A.  I worked there for a while.  I worked there from --

6   off and on from 2000.  I transferred stores when I moved a

7   couple times.

8   Q.  And since you left Quicken, have you worked?

9   A.  Yes.

10  Q.  Where did you work after Quicken?

11  A.  I worked at Paychecks.

12  Q.  When did you start working there?

13  A.  Immediately following my exit at Quicken.

14  Q.  What is your job function there?

15  A.  I am a sales representative.

16  Q.  At Paychecks?

17  A.  Yes.

18  Q.  Now, when you were first interviewed at Quicken Loans,

19  you testified before you were interviewed, was the

20  compensation package explained to you?

21  A.  Yes, it was.

22  Q.  Who explained it to you?

23  A.  I don't remember who explained the compensation

24  package to me.  I believe it was the recruiter.

25  Q.  And you recall that you were informed that your

```
 1    position was a salary position without overtime pay; is
 2    that correct?
 3    A.   Yes.
 4    Q.   You recall signing a compensation claim?
 5    A.   Yes.
 6    Q.   You recall that particular plan stated that you were
 7    paid a biweekly salary?
 8    A.   Yes.
 9    Q.   Do you also recall that in that compensation plan, it
10    stated that you had certain discretion and independent
11    judgment?
12    A.   I don't remember the exact details of that.
13    Q.   Do you recall whether or not you were allowed to set
14    premiums?
15    A.   And by premiums, you mean?
16    Q.   Do you know what premiums are, according to the
17    agreement?
18    A.   No.
19    Q.   Were you allowed to make additional adjustments in
20    monthly commission amounts; do you recall is that?
21    A.   The only adjustments were made by the green bar.
22    Q.   Did you make the recommendations for adjustments?
23    A.   Did I make -- did I get -- did I receive them?
24    Q.   Did you make recommendations for adjustments?
25    A.   I apologize, I don't understand your question.
```

```
 1    Q.   Do you recall that the agreement specifically
 2    stated --
 3    A.   Did I ask to adjust the agreement?  No, I didn't ask
 4    to adjust the agreement.
 5    Q.   No.
 6    A.   At that point I didn't know what the specifications of
 7    the green bar were.
 8    Q.   I'm showing you Exhibit D2.  Do you recall this is the
 9    compensation plan --
10    A.   Uh-huh.
11    Q.   -- that you entered into when you joined Quicken?
12    A.   Yes.
13              THE COURT:  Any objection to that, Mr. Nichols?
14              MR. NICHOLS:  Just a second, Your Honor.
15              THE COURT:  D2 is the compensation plan.
16              MR. NICHOLS:  Yes, I do, Your Honor.  I object.
17              THE COURT:  What is your objection?
18              MR. NICHOLS:  It's not signed by her.  It's not
19    hers.
20              THE COURT:  Give me a little more foundation.
21    It's certainly relevant.  I'm not familiar exactly with D2.
22              Go ahead, Mr. Morganroth.
23              MR. MAYER MORGANROTH:  Yes, Your Honor, if I may
24    address it to the Court.
25              MR. NICHOLS:  Your Honor, I'll withdraw the
```

```
 1    objection.
 2            THE COURT:  D2 is received.  And you may proceed,
 3    Mr. Morganroth?
 4            (Exhibit D2 was received)
 5            MR. MAYER MORGANROTH:  Thank you, Your Honor.
 6    BY MR. MAYER MORGANROTH:
 7    Q.  On page 2 do you see particular paragraph A, which is
 8    mortgage bankers, senior mortgage banker, executive
 9    mortgage banker, job responsibilities and destinations?
10    A.  Yes.
11    Q.  Now, you see there where this agreement you signed
12    states that your primary job responsibilities included the
13    following.  Do you see that?
14    A.  I do.  These were to ultimately make the sale of the
15    loan.
16    Q.  Where does it say that?
17    A.  It doesn't say this but --
18    Q.  Let's stick with what I ask you.
19            By the way, did you prepare for your testimony
20    today?
21    A.  By how, I mean --
22    Q.  In any way.
23    A.  Did I prepare myself?
24    Q.  Did you look at any agreements, any documents, any
25    papers?
```

1   A.   I have in the past, yes.

2   Q.   Did you look at your agreement?

3   A.   No.

4   Q.   So you haven't examined your compensation plan

5   agreement preparing for trial?

6   A.   No.

7   Q.   When was the last time you looked at it?

8   A.   I would say the last time that I have seen this,

9   probably, when I worked there.

10  Q.   As you see the particular duties, do you see that you

11  interview potential loan applicants to determine their

12  goals and needs and collect pertinent financial

13  information?

14  A.   Yes, I see that was to ultimately gain the business.

15  Q.   You keep saying, to gain the business.  Did I ask you

16  that?

17  A.   No.

18  Q.   You keep adding something to my question.  Did I ask

19  you whether it was to gain business?

20  A.   No.

21  Q.   Did somebody tell you to keep saying that?

22  A.   No.  I'm just saying that.

23  Q.   Again, you did interview the potential loan applicant

24  to determine the goals and needs and collect pertinent

25  financial information; is that correct?

1    A.   That is correct.

2    Q.   The next one is, analyzing potential loan applicant's

3    financial situations, analyzing and advising the client on

4    advantages and disadvantages of various loan programs,

5    determining which loan programs meet their needs,

6    determining what they need to do to qualify for certain

7    loan programs and counseling them accordingly.

8             Did you do that?

9    A.   I did not do the disadvantages.  I advised of the

10   advantages of the loan programs based on what they wanted.

11   Q.   Do you know what PMI is?

12   A.   Yes.

13   Q.   What is that?

14   A.   Private mortgage insurance.

15   Q.   A client sometimes needs that private mortgage

16   insurance?

17   A.   Yes.

18   Q.   Was it costly?

19   A.   Just depended on the loan size.

20   Q.   Were there ways of avoiding that that you could

21   suggest to the client?

22   A.   If they qualified.

23   Q.   What were the ways you could avoid it?

24   A.   Splitting the loan.

25   Q.   How would you split the loan?

1    A.   80 percent on one loan and the remainder on the other

2    loan.

3    Q.   What's the other loan?

4    A.   The second loan.

5    Q.   Was that the HELOC?

6    A.   It just depended on what they qualified for.

7    Q.   Could it be a piggyback?

8    A.   That was a term that was used, yes.

9    Q.   What is piggyback?

10   A.   A loan that was a second mortgage.  I don't remember

11   exactly.  I just remember hearing the phrase.

12   Q.   What does the phrase HELOC mean?

13   A.   Home Equity Line of Credit.

14   Q.   You could do that and you would recommend that in

15   order to avoid private mortgage insurance; is that correct?

16   A.   Only if they qualified for it.

17   Q.   Well, if they didn't qualify for it, they wouldn't get

18   it, would they?

19   A.   No.

20   Q.   But you would recommend it, would you not?

21   A.   Yes.

22   Q.   Now, the next one says, marketing and promoting the

23   company's loan products and services.  You did that; is

24   that correct?

25   A.   I personally didn't do any marketing, no.

1    Q.   There was a separate marketing ARM, wasn't there?  Did

2    you know there was a marketing ARM at Quicken?

3    A.   I knew there was a staff that came up with the new

4    marketing ideas, the web page, et cetera.

5    Q.   You knew that the mortgage bankers didn't do the

6    marketing, it was a separate marketing group; is that

7    correct?

8    A.   Yes.

9    Q.   And actually when you got the particular leads you are

10   talking about, they came from another division called front

11   line; is that correct?

12   A.   No.

13   Q.   Where did they come from, marketing?

14   A.   No.  They came from the websites LowerMyBills or

15   Bankrate.

16          Front line was the team that caught the inbound

17   leads, meaning something called directly to Quicken.

18   Q.   And you would get the lead --

19   A.   I rarely got front line leads.  I would get a lot of

20   leads from the LowerMyBills or Bankrate.

21   Q.   But people on the team and mortgage bankers got front

22   line leads, did they not?

23   A.   People could get leads from front line.

24   Q.   Now, the next thing is, have a thorough understanding

25   of the company's mortgage loan programs and those of its

```
 1    competitors.  Is that correct?
 2    A.   I don't believe that is correct.  We would have the
 3    matrix with the company's mortgage loan programs, but I
 4    didn't have any information on competitors, just what, you
 5    know, we had in front of me.  We didn't have a thorough
 6    understanding on what our competition was doing.
 7    Q.   So you had a thorough understanding, though, of your
 8    own loan programs; is that correct?
 9    A.   We would have a matrix of what would give us the
10    information needed, so the information was available to us
11    for the loan.
12    Q.   Were there a hundred of variations of different types
13    of loans?
14    A.   I don't remember exactly how many loans or at specific
15    times.
16    Q.   The next one is.  Working with loan applicants to
17    complete the loan application process and correct the
18    necessary documentation -- on the home buying and mortgage
19    loan processes.  Advising the client on various loan
20    pricing options with respect to loan programs that meet
21    their needs and unfolding/locking their interest rate,
22    communicating the approval status of the loan to the client
23    and advising the client with respect to conditions.
24              Did you do that?
25    A.   I did this to, ultimately, you know, gain their
```

```
 1   business.
 2   Q.   So, I guess the answer is yes, you did that; is that
 3   the answer to my question?
 4   A.   Yes, I did that to gain their business.
 5   Q.   Next one is working with loan applicants, company
 6   staff and others to resolve various issues that arise
 7   between loan application and closing and on various post
 8   closing matters.
 9           Did you do that?
10   A.   Yes.
11   Q.   Next one is, understanding the relevant financial
12   market interest rate environments and managing the
13   monitoring rate locks.
14           Did you do that?
15   A.   No.  We didn't have to, you know, watch the financial
16   market ourselves.  We would get updates sent up.  We didn't
17   have to go and do any research on my own time or in my own
18   speculation or learning about the market on my own.  It was
19   just, kind of, giving it to us in a summarization.  It
20   wasn't so much understanding as just knowing the
21   information that you needed to know for, you know,
22   ultimately, you know, doing your job and selling the
23   mortgage.
24   Q.   Weren't there several different publications that you
25   were to keep abreast of in order to know what the current
```

1    condition was?

2    A.   No.

3    Q.   The next one is, understanding and applying the legal

4    compliance rules associated with mortgage lending and

5    utilizing the various technologies associated with the

6    position.

7              Did you do that?

8    A.   Yes.

9    Q.   In fact, many states, you are required to take tests,

10   weren't you?

11   A.   Yes, you were required to carry licenses.

12   Q.   On the first typed page, page 2 of 18, do you see

13   where it says, second paragraph, under introduction?

14   A.   Uh-huh.

15   Q.   It says, mortgage bankers are paid biweekly salary.

16   In addition, they are eligible for monthly commissions,

17   where applicable.  The monthly commission amount (as

18   described below) commission rate, commission structure,

19   eligibility for commissions and classifications are

20   computed in the manner set forth in this plan and are

21   subject to adjustments and reductions based upon the rules

22   set forth in this plan and are based upon mortgage bankers

23   strict adherence to the rules set forth in this plan.

24             Now, when you saw that particular paragraph and

25   you also discussed the particular agreements, you

```
 1   understood that you had a biweekly salary and commissions;
 2   is that correct?
 3   A.   That is correct.
 4             (Brief pause)
 5             THE COURT:  Are you going to offer another
 6   exhibit, Mr. Morganroth?
 7             MR. MAYER MORGANROTH:  Not yet, Your Honor.
 8             THE COURT:  While we are on a slight pause,
 9   Witness, I would have a very simple question.  D2, as we
10   have established, is a compensation plan.  It obviously
11   doesn't appear to be specific to you or have your signature
12   on it, but is this standard and consistent with what you
13   would have signed and acknowledged when you started in July
14   of 2005?
15             THE WITNESS:  Yes, Your Honor.
16             THE COURT:  Very good.  Go ahead, Mr. Morganroth.
17   BY MR. MAYER MORGANROTH:
18   Q.   Page 14, I see the Quicken Loans fair lending policy,
19   is a chart of mortgage bankers commission structure.
20             Do you see that?
21   A.   Yes.
22   Q.   Did you have any training on the fair lending policy?
23   A.   I don't remember, that I recall.
24   Q.   Do you recall that you had to have training and pass
25   certain tests on it in order to get licensed in other
```

```
 1   states?
 2   A.   I do recall passing certain tests to get licenses in
 3   other states.
 4   Q.   You see the next paragraph is equal opportunity
 5   lender?
 6   A.   Yes.
 7   Q.   Did you understand that --
 8   A.   Yes.
 9   Q.   -- paragraph when you executed your agreement?
10   A.   Yes.
11   Q.   Do you see the paragraph, equal treatment of clients,
12   nondiscrimination?
13   A.   I do see that.
14   Q.   You were talking about the fact that you were
15   monitored; do you recall that?
16   A.   Yes.
17   Q.   Do you see paragraph five, that you agreed to be
18   monitored and also as to ensure fair lending objectives to
19   be achieved.
20         Do you see that?
21   A.   I do see that, however, the factual issues with the
22   sales team, it was to help sales objections and --
23   Q.   I take it your answer was, yes, you see it?
24   A.   Yes, I do, however --
25   Q.   Has anybody instructed you always at the end of every
```

1    answer to add sales to do it?

2    A.   No.

3    Q.   Why do you do that?

4    A.   Because that's how I see that.

5    Q.   That's not the question.  Was that the question I

6    asked you?

7    A.   No, that was not the question.

8    Q.   Now, look further, you will see fiduciary care,

9    fiduciary duty, extraordinary care.

10            Do you see that?

11   A.   I do see that.

12   Q.   Did you understand that you were in a special position

13   of trust and confidence and fidelity with Quicken Loans and

14   also with their clients?

15   A.   I see that, yes.

16   Q.   Next paragraph --

17            THE COURT:  Mr. Morganroth, I do regret and

18   apologize for interrupting you but we are getting near the

19   end of the day, so let me give you the high sign and get

20   another broad area out of the way and when you are

21   finished, we will call it a day.

22            MR. MAYER MORGANROTH:  Thank you, Your Honor.

23            THE COURT:  You're welcome.

24   BY MR. MAYER MORGANROTH:

25   Q.   The next paragraph, page 15, when you read this

```
 1    agreement, you understood you had a duty to exercise
 2    extraordinary care?  Did you understand that?
 3    A.   I'm just reading through it.  Yes.
 4    Q.   And did you see in the next paragraph, special duties
 5    and fiduciary responsibilities as a Quicken Loans mortgage
 6    banker regarding access to client financial information?
 7    A.   Do I see that?  Yes --
 8    Q.   Yes.
 9    A.   -- I do see that.
10    Q.   The next paragraph, do you see the paragraph about
11    fraud?
12    A.   Yes, I see the paragraph.
13    Q.   And did you also see, aside from not engaging in
14    fraud, that you were to see to it that it wasn't engaged in
15    in any particular way; is that correct?
16    A.   I'm sorry, where are you at?
17    Q.   The first line of defense against fraud.  Do you see
18    where you were the first line of defense?
19    A.   Yes.
20    Q.   Would you go to the technology page, please?
21              THE COURT:  Why don't we break for the day there,
22    sir.
23              MR. MAYER MORGANROTH:  That's fine, Your Honor.
24    This is just the last --
25              THE COURT:  Last thing, I'm sorry, go ahead.
```

```
 1              MR. MAYER MORGANROTH:   Thank you, Your Honor.
 2   BY MR. MAYER MORGANROTH:
 3   Q.   You see on page 18.  Do you see the particular
 4   paragraph, in the third sentence, second and third line, I
 5   understand and agree that this plan sets forth the terms of
 6   my job responsibilities as an exempt employee.
 7              Do you see that?
 8   A.   I do see that.
 9   Q.   You understood you were exempt from overtime, did you
10   not?
11   A.   I didn't understand what exempt meant at that point.
12   Q.   You didn't know what it meant?
13   A.   No.
14   Q.   You signed the agreement without knowing what it
15   meant?
16   A.   I did.
17   Q.   In your training and studies about the law in
18   respective states, did you see where it said that anybody
19   that signs an agreement is understood under the law to
20   understand they are signing and have read it?
21   A.   Yes.
22   Q.   When did you find out what "exempt" meant?
23   A.   While I was working there.
24   Q.   How long after you were working there did you
25   understand?
```

1  A.   Probably, I don't know, six months or so, I learned

2  what exempt many versus nonexempt.

3  Q.   Up until then, you were not receiving overtime, were

4  you?

5  A.   No.

6  Q.   You never complained about not receiving overtime, did

7  you?

8  A.   No.

9  Q.   After you say you understood what exempt meant, you

10 didn't write any complaint about not receiving overtime,

11 did you?

12 A.   I didn't know who to complain to.  It was just a given

13 that we were working overtime.

14 Q.   You had a team leader?

15 A.   I did.

16 Q.   And above the team leader there were other officers in

17 the company?

18 A.   Correct.

19 Q.   And you didn't know who to complain to about anything?

20 A.   It was pretty much a given that you were working late

21 and you were working overtime.

22 Q.   And you knew that you had signed an agreement at that

23 point that said you were exempt from overtime, didn't you?

24 A.   Correct.

25          MR. MAYER MORGANROTH:  I have nothing further at

1    this time, Your Honor.

2              THE COURT:  Thank you very much.  Ms. Tittensor,

3    you may step down.

4              Ladies and gentlemen, we are at the end of our

5    first day at trial.  I must say it has been a highly

6    productive and very good day, and I want to thank you for

7    your attention and thank you, as always, for your service.

8    Drive home safely tonight.  Okay.  Tomorrow morning, be

9    here at 8:30, go up to the fifth floor.  Check in.  Come

10   down here and my staff will let you in.

11             In the meantime, don't talk about the case.  Talk

12   about your experience in Federal Court, do whatever you

13   want to but don't discuss the merits, the testimony, or any

14   of that with your loved ones, among yourselves or anybody

15   else.  Have a pleasant evening.

16             All rise for the jury.

17             Michael, if you'll lead them out, we'll conclude

18   day one.  Thank you very much.

19             (Jury out at 5:02 p.m.)

20             THE COURT:  Everybody else may be seated.  Great

21   job, lawyers.  Great day.

22             Mr. Morganroth, what can I do for you?  Go ahead.

23             MR. MAYER MORGANROTH:  The problem is that these

24   people all signed agreements but in the page limits that we

25   have, we don't have an exhibit for every single one.  So

1    what we are using is the --

2            THE COURT:  That's all right.

3            MR. MAYER MORGANROTH:  -- have to somehow bring

4    that forth to the jury --

5            THE COURT:  I think I issued an order yesterday,

6    or today, that said if you can agree on additional

7    exhibits, I'm not going to hamstring you on that.  If you

8    need to go over the exhibit page limit by getting in

9    relevant documents, such as this one for this witness,

10   that's no problem at all.  I think it's highly appropriate

11   and I don't think the defense will have a problem.

12           MR. LUKAS:  Your Honor, I would like to make a

13   record and ask for a curative instruction based on their

14   opening statement.  When would you like me to do that?

15           THE COURT:  Go ahead.  First of all, anything

16   else you want to say about the exhibits?  I think they were

17   handled quite nicely today.

18           MR. LUKAS:  That's fine.  There is a

19   miscommunication between us and Mr. Nichols when he

20   objected.  That's pretty much what we agreed on, as long as

21   they are looking at the right time frame.  I don't want

22   them looking at an agreement that was back in 2003 when

23   they only worked there in '06.  I think we can handle that.

24           THE COURT:  Good.  We got the testimony from the

25   witness that this was not hers but it reflected her

1    obligations and understandings, and Mr. Morganroth

2    effectively committed her to those paragraphs in the

3    agreement.  So I think we are set on that.

4          What's the issue with the opening statement?

5          MR. LUKAS:  Your Honor, we believe that -- or I

6    believe the opening statement was improper in a number of

7    ways, including the exhibits.  Mr. Morganroth made comment,

8    these are just a couple random exhibits, or random e-mails,

9    they pulled out of nowhere, knowing we are hamstrung with

10   the 200.  I can pull out 75, 100, 150 e-mails that say

11   sales on every manager in the darn case.  And he was able

12   to tell -- I'm worried that they are -- I think his opening

13   statement highlighted some very improper things that are

14   going to go on in this trial.  That's one of them.

15         A second is to suggest that we solicited -- the

16   lawyers solicited people to a lawsuit.  As you remember,

17   the Court sent judicial notice on this lawsuit.  And to the

18   extent we spoke to any people prior to that, it's

19   attorney-client privilege, work product and protected

20   advertisement to the extent he did it.

21         THE COURT:  I thought he said there were meetings

22   between counsel and prospective plaintiffs.  I don't know

23   anything about that.

24         MR. LUKAS:  He is going to get into that, your

25   Honor, and that's improper, and it was improper to say to

1   the jury.  He's also implied to the jury that employees

2   can --

3               THE COURT:  Why is it improper to say that you

4   interviewed folks prior to filing suit?

5               MR. LUKAS:  He said we solicited people for this

6   lawsuit.  Your Honor sent judicial notice to people in this

7   lawsuit.  He said we had seminars.  We had no seminars.

8               THE COURT:  Did you?

9               MR. LUKAS:  We did not have seminars.

10              THE COURT:  I don't know.

11              MR. LUKAS:  How are we going to defend ourselves?

12              THE COURT:  It's an opening statement.  It's his

13  view on what the evidence was.  So if you want a curative

14  instruction on something you think is not proven, I will be

15  glad to do that at the end of the case, but I think we have

16  to see how things go.

17              What is your second point?

18              MR. LUKAS:  My second point, Your Honor, is that

19  he made comments regarding that employees can waive FLSA

20  rights by agreement.  He has put these agreements in front

21  of these people, you knew you were exempt.  You knew you

22  weren't getting paid overtime.  It's irrelevant.  It has

23  nothing to do with nothing.  The issue is whether or not

24  the people had work duties so that they could be paid

25  overtime under the law.  He is going to cross-examine every

1  person with a document that says, you knew you didn't get

2  overtime.  Of course, they knew they didn't get overtime.

3  It's irrelevant for purposes of this lawsuit and they are

4  going to run with that over and over again.  It's improper.

5        THE COURT:  I don't know if that's irrelevant.

6  The fact of the matter is that they signed agreements that

7  asserted that they were not going to accept overtime pay.

8        Now, if that agreement was made in violation of

9  federal law, then we will instruct the jury as to what the

10  federal law is at the end of the suit, and you can argue

11  that this is a red herring, or irrelevant.  But I certainly

12  think that in terms of bias, in terms of credibility, and

13  in terms of understanding at the time these individuals

14  took the employment, it is quite relevant to get them to

15  say what they signed up for, and the documents, I think,

16  speak for themselves on that.  Okay.

17        What is your third point, if any?

18        MR. LUKAS:  Well, Your Honor, also, he is making

19  the same type of arguments with respect to salary means no

20  overtime.  He made that argument to the jury that if you

21  get paid salary, you don't get overtime.  That's an

22  improper statement of the law.  He stated that --

23        THE COURT:  It seems to me that Ms. Tittensor

24  said she got a salary and no overtime, so I don't see the

25  harm there.  But anyway, go ahead.  What else?

```
 1              MR. LUKAS:  That's what I have, Your Honor.
 2              THE COURT:  All right.  Those will be preserved
 3    for the record and if you want to submit curative
 4    instructions at the end of the case, I will consider them.
 5              Again, opening statement is opening statement.
 6    We will have to see what the evidence in the case says and
 7    if called for.  We will address the facts when we instruct
 8    the jury.  But I want to say that I really admire all the
 9    work you have done.  We have had a good first day and I
10    think both sets of lawyers have really distinguished
11    themselves.  So I bid you good night and we'll see you
12    tomorrow morning at about 8:45.  Thank you very much.
13              (Proceedings adjourned at 5:10 p.m.)
14                          *      * *
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3                        **CERTIFICATE OF REPORTER**

4              As an official court reporter for the United

5      States District Court, appointed pursuant to provisions

6      of Title 28, United States Code, Section 753, I do hereby

7      certify that the foregoing is a correct transcript of

8      the proceedings in the above-entitled cause on the date

9      hereinbefore set forth.

10

11

12                     s/ Karen Klerekoper

13                KAREN KLEREKOPER, CSR, RPR

14                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25