## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RYAN C. HENRY, et al.

                Plaintiffs,

v.

QUICKEN LOANS INC., et al.

                Defendant.

Civil Action No.: 2:04-CV-40346

Honorable Stephen J. Murphy, III

## PLAINTIFFS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

Plaintiffs, through their undersigned counsel, and pursuant to Fed. R. Civ. P. 50(b) and Fed. R. Civ. P. 59, move this Court for an order granting judgment as a matter of law in favor of Plaintiffs, or, in the alternative, an order granting a new trial in the above-captioned matter.

Dated: April 12, 2011

NICHOLS KASTER, PLLP

s/Paul J. Lukas
Donald H. Nichols, MN Bar No. 78918
Paul J. Lukas, MN Bar No. 22084X
Rachhana T. Srey, MN Bar No. 340133
Robert L. Schug, MN Bar No. 387013
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone (612) 256-3200
Fax (612) 215-6870
Email: lukas@nka.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---

RYAN C. HENRY, et al.

      Plaintiffs,

v.

QUICKEN LOANS INC., et al.

      Defendant.

Civil Action No.: 2:04-CV-40346

Honorable Stephen J. Murphy, III

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

---

1

## ISSUES PRESENTED

Are Plaintiffs entitled to judgment as a matter of law on Defendant's administrative exemption defense?

      Plaintiffs' Answer:    Yes.

Are Plaintiffs entitled to a new trial because of Defendant's improper and prejudicial opening and closing arguments, the Court's confusing and misleading jury instructions, and the weight of the evidence preponderating against the verdict?

      Plaintiffs' Answer:    Yes.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. v

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 2

    A. Quicken Loans is in the Business of Selling Mortgage Loans, and Loan Officers are Quicken's Sales Force ................................................................. 2

    B. The Job Duties of a Quicken Loan Officer .................................................... 3

        1. Training ......................................................................................................... 3

        2. The Quicken Loans Sales Process .......................................................... 4

        3. Day-to-Day Job Duties ............................................................................. 5

            a. The First Call ..................................................................................... 5

            b. Between the First Call and the Second Call ................................ 7

            c. The Second Call ................................................................................ 10

        4. Other Duties ................................................................................................ 11

    C. Quicken Loan Officers are Referred to as Sales/Production Employees, and Hired Without Financial Experience, and are Paid, Evaluated, Disciplined, Motivated, and Fired Based on Sales Production .................... 11

        1. Quicken Refers to Loan Officers as Sales/Production Employees ....... 12

        2. Loan Officers Do Not Need Financial Experience .............................. 13

        3. Loan Officers are Trained on Sales Techniques .................................. 13

        4. Loan Officers are Paid Based on Sales Production .............................. 14

        5. Loan Officers are Encouraged to Increase Sales Production .............. 15

        6. Loan Officers are Promoted, Evaluated, Disciplined, and Terminated Based on Sales Production ............................................... 16

LEGAL ARGUMENT ..................................................................................................... 16

I. THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW FOR PLAINTIFFS ON QUICKEN'S ADMINISTRATIVE EXEMPTION DEFENSE .......... 16

    A. Legal Standard for Judgment as a Matter of Law ....................................... 16

    B. The Question of Whether an Employee's Duties Fall Within an FLSA Exemption is a Question of Law ................................................................... 17

    C. The Administrative Exemption ...................................................................... 18

    D. Plaintiffs' Primary Duty is Selling Financial Products .............................. 19

    E. Plaintiffs' Primary Job Duty is Not the Performance of Office or Non-Manual Work Directly Related to the General Business Operations of Quicken or Its Customers ............................................................................. 20

F.  Plaintiffs' Primary Job Duty Does Not Include the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance ................................ 25

II.  IN THE ALTERNATIVE, PLAINTIFFS ARE ENTITLED TO A NEW TRIAL ............. 28

A.  Plaintiffs Are Entitled to a New Trial Because of Quicken's Improper and Prejudicial Opening and Closing Arguments ............................................................. 28

1.  Legal Standard for a New Trial Based on Improper and Prejudicial Closing Arguments ................................................................. 30

2.  Quicken Foreshadows its Improper Arguments During Opening Statements and Plaintiffs Object ................................................................. 31

3.  Quicken Spends the Bulk of its Closing Argument Making Extralegal Arguments that Plaintiffs Do Not Deserve Overtime ............................................. 33

4.  Quicken's Improper Arguments Were Prejudicial .................................................. 40

B.  The Court's Jury Instructions and Special Verdict Form Were Misleading and Inadequate ................................................................. 41

C.  The Verdict Was Against the Weight of the Evidence ............................................... 44

CONCLUSION ................................................................. 45

## TABLE OF AUTHORITIES

**Federal Cases**

Ale v. Tenn. Valley Auth., 269 F.3d 680 (6th Cir. 2001)................................................17

Allied Chem. Corn. V. Daiflon, Inc., 449 U.S. 33 (1980) ............................................28

Arban v. West Publ'g Corp., 345 F.3d 390 (6th Cir. 2003)..........................................41

Arnold v. Ben Kanowsky, Inc., 361 U.S. 388 (1960)....................................................17

Barrentine v. Arkansas-Best Freight Sys., Inc., 450 US 728 (1981) ............................34

Belton v. Premium Mortg., Inc., 2006 WL 561489 (W.D. Mo. 2006)..........................42

Bothell v. Phase Metrics, Inc., 299 F.3d 1120 (9th Cir. 2002)................................21, 22

Boutte v. Winn-Dixie Louisiana, Inc., 674 So.2d 299 (La. Ct. App. 3d Cir. 1996).....................39

Bratt v. County of Los Angeles, 912 F.2d 1066 (9th Cir. 1990) ......................17, 21, 23

Brickers v. Cleveland Bd. Of Educ., 145 F.3d 846 (6th Cir. 1998)................................16

Casas v. Conseco Fin. Corp., 2002 WL 507059 (D. Minn. Mar. 31, 2002)...............19, 21, 22, 25

City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749 (6th Cir. 1980) ...............30, 38, 39, 40

Dalheim v. KDFW-TV, 918 F.2d 1220 (5th Cir. 1990) ...........................................21, 23

Davis v. J.P. Morgan Chase & Co., 587 F.3d 529 (2d Cir. 2009) ...............21, 22, 23, 24

Denhof v. City of Grand Rapids, 494 F.3d 534 (6th Cir. 2007) ....................................16

Douglas v. Argo-Tech Corp., 113 F.3d 67 (6th Cir. 1997)............................................17

Draper v. Airco, Inc., 580 F.2d 91 (3d Cir. 1978) ........................................................38

Dunlap v. King, 2009 WL 2151311 (M.D. Tenn. July 15, 2009)...........................30, 34

Engle v. Liggett Group, Inc., 945 So.2d 1246 (Fla. 2006) ............................................31

Gallegos v. Equity Title Co. of Am., 484 F. Supp. 2d 589 (W.D. Tex. 2007) ..............25

Hall v. Freese, 735 F.2d 956 (5th Cir. 1984) ................................................................39

Holmes v. City of Massillon, 78 F.3d 1041 (6th Cir. 1996)....................................................29

Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709 (1986).................................................18

Jastremski v. Safeco Ins. Co., 243 F. Supp. 2d 743 (N.D. Ohio 2003) ...........................17

Johnson v. Ford Motor Co., 988 F.2d 573 (5th Cir. 1993)..................................................37

Johnson v. Target Corp., 2006 WL 572014 (E.D. Tenn. Mar. 8, 2006)...........................17

Jones v. Federated Fin. Reserve Corp., 144 F.3d 961 (6th Cir. 2005).............................41

Lioce v. Cohen, 174 P.3d 970 (Nev. 2008) ..............................................................31, 38

Martin v. Cooper Elec. Supply Co., 940 F.2d 896 (3d Cir. 1991)...................................25

Martin v. Ind. Mich. Power Co., 381 F.3d 574 (6th Cir. 2004)......................................22

Neary v. Metro. Property & Cas. Ins. Co., 517 F. Supp. 2d 606 (D. Conn. 2007).......23

Nielsen v. DeVry, Inc., 302 F. Supp. 2d 747 (W.D. Mich. 2003) ...................................17

Olivo v. GMAC Mortg. Corp., 374 F. Supp. 2d 545 (E.D. Mich. 2004)........................42

Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534 (2d Cir. 1992)............................39

Pontius v. Delta Fin. Corp., 2007 WL 1496692 (W.D. Pa. Mar. 20, 2007) .................42

Reich v. Chicago Title Ins. Co., 853 F. Supp. 1325 (D. Kan. 1994) .............................25

Reich v. State of N.Y., 3 F.3d 581 (2d Cir. 1993) .........................................................25

Reich v. Wyoming, 993 F.2d 739 (10th Cir. 1993) ......................................................17

Renfro v. Ind. Mich. Power Co., 2005 WL 4882704 (W.D. Mich. Jan. 25, 2005) .......28

Rutledge v. St. Anne's Hosp., 595 N.E.2d 1165 (Ill. App. 1 Dist. 1992)........................37

Saltsgaver-Roscoe v. Daniels, 1998 WL 516796 (W.D. Mo. 1998) .............................36

Sanders-El v. Wencewicz, 987 F.2d 483 (8th Cir. 1993) ...............................................40

Schaefer v. Ind. Mich. Power Co., 197 F. Supp. 2d 935 (W.D. Mich. 2002),
    rev'd on other grounds, 358 F.3d 394 (6th Cir. 2004)..................................17, 21, 27

Smith v. Travelers Ins. Co., 438 F.2d 373 (6th Cir. 1971) ..........................................39

State v. Chiaromonte, 661 S.E.2d 55 (N.C. App. 2008).................................................31

Strickland v. Owens Corning, 142 F.3d 353 (6th Cir. 1998)...................................28, 44

Talbott v. Lakeview Ctr., Inc., 2008 WL 4525012 (N.D. Fla. 2008) ......................21, 43

Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496 (6th Cir. 2007) ....................18

United States v. Trujillo, 714 F.2d 102 (11th Cir. 1983).................................................31

U.S. v. Watson, 171 F.3d 695 (D.C. Cir. 1999)..............................................................33

Waggoner v. Mosti, 792 F.2d 595 (6th Cir. 1986) .........................................................41

Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419.................................35

White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789 (6th Cir. 2004) ..................17

Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co., 936 F.2d 1474 (6th Cir. 1991) ....................44

**Rules and Regulations**

29 C.F.R. § 541.200(a)......................................................................................18, 20, 25

29 C.F.R. § 541.201(a)...................................................................................................21

29 C.F.R. § 541.201(b) ..................................................................................................21

29 C.F.R. § 541.201(c)...................................................................................................21

29 C.F.R. § 541.202(a)...................................................................................................26

29 C.F.R. § 541.202(b)..............................................................................................26, 27

29 C.F.R. § 541.202(e)...................................................................................................26

29 C.F.R. § 541.202(h)...................................................................................................26

29 C.F.R. § 541.203(b) ................................................................................19, 22, 41, 42

29 C.F.R. § 541.500(b) ..............................................................................................20, 42, 43

29 C.F.R. § 541.504(b) ..................................................................................................42

29 C.F.R. § 541.601 .......................................................................................................38

29 C.F.R. § 541.700(a)......................................................................................18

29 C.F.R. § 541.700(b) .....................................................................................18

29 C.F.R. § 778.108 ..........................................................................................35

29 C.F.R. § 778.109 ..........................................................................................35

29 U.S.C. § 213(a)(1).........................................................................................17

69 Fed. Feg. 22122-01 ..................................................................................19, 21

Fed. R. Civ. P. 50(a). .......................................................................................16

Fed. R. Civ. P. 59(a)(1)(A) ...............................................................................28

**Other Authorities**

<u>Black's Law Dictionary</u> 875 (8th ed. 2004)......................................................30

Administrator's Interpretation No. 2010-1 ....................................................41, 42

FLSA2006-31 ...................................................................................................41

Wage and Hour Opinion Letter, 2007 WL 541650 (Feb. 8, 2007)....................43

http://www.mansfieldtanick.com/CM/Articles/Top-5-Misunderstandings.asp............................43

## <u>INTRODUCTION</u>

In the weeks leading up to trial, the Court denied Plaintiffs' motion for reconsideration of summary judgment on the administrative exemption because of the Court's anticipated "wildly different accounts of what Plaintiffs' work at Quicken was like on a day-to-day basis." (Dkt. 666 at 26.)  Putting issues of semantics aside, however, the actual proofs at trial showed relatively little disagreement as to how Quicken's loan officers actually spend their time on a day-to-day basis.  Because the ultimate question of whether an employee is exempt is a question of law, the Court must now, viewing the historical facts in the trial record in the light most favorable to Quicken, independently determine whether Quicken met its burden of proving the administrative exemption.  Because there is no question that Quicken did not, and as a matter of law could not, meet its heavy burden at trial to show that Plaintiffs plainly and unmistakably qualify for the administrative exemption, this Court must grant Plaintiffs' renewed motion for judgment as a matter of law.

Quicken's undisputed business purpose is to design and sell mortgage products, and then quickly resell them on the secondary market.  Quicken's loan officers are the company's self-described "sales force."  Their primary duty is sales.  They are the production arm of the business whose duties are directly and exclusively related to the goods and services that make up Quicken's marketplace offerings.  They do not perform work directly related to the management or general business operations of Quicken Loans, and do not exercise discretion and independent judgment on significant matters.  Quicken's loan officers are quintessential "production" employees who, as a matter of law, do not qualify for the administrative exemption.

Even if the Court does not grant Plaintiffs' motion for judgment as matter of law, the Court should alternatively grant a new trial because of Quicken's improper and prejudicial

1

opening and closing arguments, which were a blatant (and apparently successful) attempt to convince the jury to disregard the law and instead decide the case based on improper motives of "justice, morality, and fairness."   In addition, the Court should grant a new trial because the Court erred in rejecting Plaintiffs' proposed jury instructions and special verdict form, and because the verdict was against the weight of the evidence.

## FACTUAL BACKGROUND[1]

### A.  Quicken Loans is in the Business of Selling Mortgage Loans, and Loan Officers are Quicken's Sales Force

Quicken is in the business of providing mortgage loans to its customers, i.e., selling loans.   (Tr. 3/3 pp. 223:23-224:7.)   Quicken makes its money by providing financing to individuals for their homes, and then reselling those loans on the secondary market.   (Id.)  Most of Quicken's loans are resold with sixty days of closing.  (Tr. 2/23 p. 38:23-39:3.)

Quicken is organized into various divisions, each with its own role in the lending process. (Ex. P-2 p. 2; Tr. 3/4 p. 66:3-5.)  Quicken's loan officers are its "sales force."  (Ex. P-2 p. 2; Tr. 3/4 pp. 62:24-63:3; Tr. 2/23 p. 24:13-18.)   They are primarily responsible for talking to Quicken's customers and bringing in business for the company.  (Ex. P-2 p. 2; Tr. 3/4 pp. 62:24-63:3, 66:11-67:17.)

The "operations" group at Quicken includes underwriting, processing, closing, and other similar areas.  (Ex. P-2 p. 2; Tr. 3/4 p. 63:4-7.)   Employees in these areas, such as underwriters, may uncover issues with loans (e.g., low appraisals or unverified income), and alert the loan

---

[1] For purposes of Plaintiffs' motion for judgment as a matter of law only, the facts in this brief are set forth in the light most favorable to Quicken Loans, the non-moving party.  Citations to the official trial transcript are designated "Tr." followed by the date of the testimony and the page/line.  Citations to trial exhibits are designated "Ex. P-__" or "Ex. D-__."  Because of the length of the trial transcript and large volume of exhibits introduced at trial, Plaintiffs have not attached the transcript or exhibits to this brief.  Plaintiffs are prepared to provide a courtesy copy of the trial transcript and all trial exhibits to the Court upon request.

officer of the problem and the need to fix it.  (Tr. 3/1 pp. 110:4-111:2.)  Quicken also employs suspense analysts who take over underwriting for broken or suspended loans.  (Tr. 3/1 pp. 109:22-110:3; see also Tr. 3/3 pp. 53:4-54:2.)

Like any large business organization, Quicken has various other functional areas such as accounting, marketing, advertising, facilities, IS, legal/compliance, servicing, client relations, and other areas.  (See Ex. P-2 p. 2; Tr. 3/4 pp. 64:13-65:7.)  For example, Quicken's secondary marketing division, also known as "capital markets," is responsible for pricing and delivering the various loan products that loan officers sell.  (Ex. P-2 p. 2; Tr. 3/4 p. 64:4-7.)  Specifically, this division develops the loan products that Quicken offers, and makes sure the loan officers have all of the right product offerings to sell to customers.  (Tr. 3/2 p. 194:15-20.)  Capital markets sets daily interest rates and pricing for Quicken's products, (Tr. 3/2 p. 194:21-23), and creates the product matrices that are used by the loan officers in the performance of their job duties, (Tr. 3/2 p. 196:11-19; Ex. D-186).  It also handles product rollouts or "specials," educates the loan officers about changes in the marketplace, and fields questions about products and pricing.  (E.g., Tr. 3/2 pp. 194:23-195:2; Ex. P-119; Ex. P-120.)

**B.**     **The Job Duties of a Quicken Loan Officer**

**1.**     **Training**

Depending on when they start with the company,[2] Quicken's loan officers may receive a document entitled "Mortgage Bankers Duties and Responsibilities and Company Expectations and Values."  (Ex. D-4.)  Various job duties are also set forth in employment agreements and compensation plans that loan officers are required to sign at the start of their employment, and from time-to-time the documents are revised and updated.  (See, e.g., Ex. D-1; Ex. D-2; Ex. D-

---

[2] The document was first drafted in May of 2005, after this lawsuit was filed.  (Ex. D-4.)

3.) Quicken's loan officers also receive approximately four weeks of training. Training covers the basics of the mortgage business including terminology, qualifying elements, products, secondary marketing, program guidelines, application documents, various legal responsibilities, and Quicken's sales process. (See Ex. D-16.)

## 2.     The Quicken Loans Sales Process

Loan officers are trained to use Quicken's sales process. The sales process consists of ten steps, and takes place in two separate phone calls.[3]  (Ex. P-21.) The process outlines the information that needs to be gathered in order to sell a mortgage to the customer,[4] and also contains various sales techniques for selling Quicken's products. (See id.) For example, the sales process instructs loan officers to "gain control" of the call, "create need" for Quicken's products, "foreshadow" the process and the good faith deposit, and "build rapport" with the customer. (Id.) The process also instructs loan officers to "pivot" in response to customer "objections" and to "ARC [Acknowledge, Respond, Close]" in order to close the deal.[5]  (Id.) Although they may not always use the sales process as a "script," loan officers are required to

---

[3] Although the sales process is designed to be completed in two calls, it can sometimes be completed in one. (See Ex. P-21; Tr. 3/1 p. 93:8-10.)

[4] As in any sales organization, prior to the first phone call with the loan officer, Quicken's customers are referred to as "leads." Quicken's loan officers get leads from several sources. (E.g., Ex. P-138 (NKA372039).) Some call Quicken directly and are transferred to loan officers from the Frontline, some are referrals from family and friends, and some leads come through the Internet, purchased from websites such as lowermybills.com or lendingtree.com. (Tr. 3/1 pp. 29:19-30:9; Tr. 3/3 pp. 170:6-25.) The "Frontline" is a group at Quicken that makes initial outbound calls to certain leads and also takes incoming calls from leads. (Tr. 2/16 p. 38:12-21.) Frontline agents ask basic questions to see if the customer needs a mortgage, and then pass the customer to a loan officer. (Tr. 2/16 pp. 41:20-42:7.) The loan officers also follow the sales process for leads that are transferred from the Frontline. (Ex. P-106.)

[5] Plaintiffs also testified to being trained on and using techniques such as this as part of the sale process at Quicken. (E.g., Tr. 2/8 pp. 65:20-73:5, 74:17-82:17, 85:6-22; Tr. 2/9 pp. 115:12-116:2, 133:22-134:10, 220:6-25; Tr. 2/11 pp. 93:20-98:9, 175:6-177:11; Tr. 2/14   pp. 88:25-89:22; Tr. 2/16 pp. 182:17-189:8, 271:6-272:2; Tr. 2/22 pp. 181:2-183:2.)

use the process to ensure that they are covering the most important topics with the customer during their sales calls.  (E.g., Ex. P-3 p. 16; Ex. P-5 p. 10; Ex. P-10 p. 7; Ex. P-39; Tr. 3/1 pp. 91:5-19, 92:16-23; Tr. 3/3 pp. 221:19-222:19; Tr. 3/4 pp. 97:20-22, 103:13-17; see also Tr. 2/16 p. 130:4-18.)  As CEO Bill Emerson testified, "Yeah, it's recommended that they follow it, sure, absolutely, because it works."  (Tr. 3/4 p. 103:16-17.)

### 3.     Day-to-Day Job Duties

As the company's sales force, Quicken's loan officers spend time each day on the phone with customers selling Quicken's loan products.[6]  When not on the phone, they also spend time preparing to call leads, figuring out which products they can pitch to the customer, and working on loans that have already been sold or, in other words, are in their "pipeline."  For purposes of this motion only, Plaintiffs use the testimony of Quicken's first witness, Colleen Booza,[7] to set forth the job duties of a loan officer in the light most favorable to Quicken.  Not surprisingly, Booza's testimony regarding the process of selling a loan closely tracks Quicken's sales process.[8]  (See generally Ex. P-21.)

### a.     The First Call

The first sales call with the customer can take from twenty minutes to an hour. (Tr. 3/1 p. 35:11-16.)  During the first call, the sales process directs the loan officer to "gain control" of the call, "create need" for Quicken's products, "foreshadow" the $500 good faith deposit several times, and "build rapport" with the customer."  (Ex. P-21 (first call).)  The call starts with

---

[6] Loan officers can typically spend between three and three and-a-half hours per day on the telephone.  (Tr. 3/1 p. 62:14-18; see also Ex. D-201.)

[7] The duties described by the other current and former loan officers that Quicken called during its case-in-chief are, for the most part, not appreciably different from those described by Booza. (See Tr. 3/1 pp. 157:18-228:10 (Matthew Thompson); Tr. 3/2 pp. 17:16-72:24 (Brian Baumann); Tr. 3/2 pp. 73:17-131:5 (Thomas Ortman); Tr. 3/2 pp. 131:14-188:2 (Victor You); Tr. 3/3 pp. 12:12-60:9 (John Bettis).)

[8] The same is true for the call clips of Booza introduced at trial.  (E.g., Ex. P-103.)

gathering basic contact information, and moves to a discussion of the customer's goals, why they are looking for a mortgage, and what they are hoping to accomplish with a loan.  (Tr. 3/1 p. 30:10-16; Ex. P-21 (steps 1, 2).)  The reason for discussing the customer's goals is so the loan officer can put together a loan program that will meet the customer's expectations.  (Tr. 3/1 pp. 30:17-31:2.)  For example, one customer might be looking to lower their monthly payment or shorten their mortgage term, while another might be looking to take out cash, pay off bills, or make home improvements.  (Tr. 3/1 p. 31:3-14.)  After obtaining this information, the loan officer talks to the customer about the type of property they want to finance, as well as the details of their current mortgage or mortgages.  (Tr. 3/1 pp. 31:15-32:2.)

The loan officer also collects information regarding the customer's income and assets. (Ex. P-21 (step 4).)  Income information includes how much money the customer earns, how they earn their money, and whether they have multiple sources such as rental income, child support, and pensions or annuities.  (Tr. 3/1 p. 32:3-13.)  Asset information includes the types of accounts the customer has, their balances, and how they typically manage their accounts.  (Tr. 3/1 pp. 32:20-33:6.)  This includes investment and retirement accounts such as stocks, bonds, mutual funds, and IRAs, and how much the customer typically contributes.  (Id.)  The loan officer asks these questions for two reasons:

> One being, for example, if they wanted to shorten their mortgage term to a 10-year term from a 30-year term yet they were overdrafting their checking account every single month, it might not be a good idea for that client to increase their monthly payment significantly so we would talk about other options.  The other reason would be if a client was, for example, purchasing a home, I would need to know how much they were willing and able to bring into the transaction and where the funds would be coming from.

(Tr. 3/1 p. 33:7-17.)

Next, the loan officer collects information regarding the customer's credit while looking at their credit report.  (Tr. 3/1 pp. 33:18-34:6; Ex. 21 (step 5).)  This involves going over each line item on the report with the customer, "educating" them on their outstanding debts, and making sure the loan officer has accurate information.  (Id.)  The loan officer gathers this information to put together the loan program that the customer needs and qualifies for under Quicken's guidelines.  (Tr. 3/1 p. 34:7-12.)

The loan officer also asks the customer questions about the property the customer wants to finance.  (Tr. 3/1 p. 34:13-21; Ex. P-21 (step 2).)  This would include, for example, where the property is located, the property's physical, and how long the customer plans on staying there. (Id.)  Collecting this information allows the loan officer to work up the loan product that the customer needs, and that the customer will qualify for within Quicken's guidelines.  (Tr. 3/1 pp. 34:22-35:1.)

At the end of the first call, the loan officer sets up a follow-up call for a later time, which can range from one hour to several days later, depending on what works for the customer.  (Tr. 3/1 p. 35:17-25.)  Sometimes the loan officer can call the customer back within as few as ten to twenty minutes.  (Tr. 3/1 p. 93:15-19.)

### b.    Between the First Call and the Second Call

After the loan officer hangs up with the client, the loan officer, using a pen and a piece of paper, begins looking at the situation to see what would be a good loan program for the customer.  (Tr. 3/1 p. 36:1-8; Ex P-21 (between calls).)  The loan officer performs three simple calculations: (1) the qualifying credit score; (2) the loan-to-value ratio; and (3) the debt-to-income ratio.  (Tr. 3/1 pp. 37:14-38:6.)  The purpose of calculating the debt-to-income ratio is to "make sure that the client can afford the type of loan program that they are looking for and that it

fits within Quicken Loans' guidelines." (Tr. 3/1 p. 38:7-16.)  In other words, by figuring out this ratio, the loan officer knows which programs they cannot offer, and which programs they should be focusing on instead.  (Id.)  The loan-to-value ratio also tells the loan officer which products the customer will qualify for, and which products make sense.  (Tr. 3/1 pp. 38:17-25, 96:2-10.)

Next, the loan officer uses Quicken's product matrix to see what programs may be available for the customer.  (Tr. 3/1 p. 39:1-10; Ex. D-186.)  In some instances, the loan officer may have memorized the information from Quicken's guidelines and matrices, but will still use the matrix to double check.  (Tr. 3/1 pp. 39:1-10, 98:5-23.)  If the loan officer does not have the information memorized, the matrix and guidelines are used to determine the products for every one of their clients.  (Tr. 3/1 pp. 43:23-44:4.)

All of Quicken's products are listed on the matrix, each with its different qualifying factors and guidelines.  (Tr. 3/1 pp. 39:19-40:2; Ex. D-186.)  The loan officer is required to match the information that they gather from the customer to see if a particular program will meet the customer's needs and is something for which they can qualify.  (Tr. 3/1 pp. 40:23-41:6.)  As Ms. Booza testified:

> If this was a program that I was thinking of putting together for the client, I would go through each of these, each of these lines and make sure that that client met these guidelines, and a lot of them I internalized over time, but I would refer back to this document frequently just to make sure.

(Id.)  The loan officer knows which products to consider by reviewing and studying the matrices, and also by using their judgment to know if something is going to work for the customer.  (Tr. 3/1 p. 41:10-17.)

Although loan officers can make recommendations to their director, regional vice president, or the underwriting team, loan officers do not have the authority to sell loan products outside of Quicken's qualifying guidelines without prior approval.  (Tr. 3/1 pp. 96:15-97:5.)  As

loan officers gain skill and experience, they learn what types of recommendations are allowed, and what will be acceptable.  (Tr. 3/1 pp. 97:21-98:23.)

Once the loan officer is done consulting the matrix, the loan officer refers to Quicken's Loan Origination Lead Allocation ("LOLA") computer system to determine the cost for the customer.   (Tr. 3/1 p. 44:5-12.)   Loan officers use LOLA to manage customers' contact information, and to cross-reference Quicken's product matrices to make sure something hasn't been missed. (Tr. 3/1 p. 44:13-18.)  As with the product guidelines, loan officers are required to make a recommendation to their manager prior to deviating from the base cost provided by LOLA. (Tr. 3/1 p. 99:18-22.)

After calculating the base cost with LOLA, the loan officer refers to Quicken's rate sheet, which lists the ranges of interest rates available for Quicken's products each day, as well as the pricing adjustments for each product.  (Tr. 3/1 p. 45:8-14; Ex. D-187.)  The rate sheet, also referred to as the "Rock Street Journal," is put together by Quicken's capital markets division. (Tr. 3/1 p. 45:16-22.)  The loan officer refers to the rate sheet for every customer.  (Tr. 3/1  p. 46:9-14.)  Once the interest rate is selected, the loan officer looks down the rate sheet at the pricing adjustments to see which adjustments apply to that customer.  (Tr. 3/1 pp. 46:17-47:6.) Loan officers cannot deviate from the rate sheet without first making a recommendation to a manager and having it approved.  (Tr. 3/1 p. 99:18-22.)

Next, the loan officer performs simple manual calculations to confirm that the product will meet the client's needs. (Tr. 3/1 p. 47:7-19.)  For example, if the customer is looking to save money on a monthly basis, the loan officer will calculate how much they are going to save each month.  (Id.)  Depending on the client, this is done for one, two, or three different loan programs.

9

(Tr. 3/1 p. 48:2-8.)  If the customer only qualifies for one loan product, the loan officer discusses only one option.  (Tr. 3/1 p. 48:2-8.)

### c.      The Second Call

Once the loan is selected, the loan officer calls the customer back at the scheduled time. (Tr. 3/1 p. 48:9-14.)  Here, the sales process directs the loan officer to continue to "foreshadow" the good faith deposit, to "pitch" the program, and to "close" the sale.  (Ex. P-21 (second call).) The loan officer first reviews the customer's goals from the first call.  (Tr. 3/1 pp. 48:15-48:3.) Next, the loan officer goes through each loan product with the customer, and answers any questions.  (Id.)  The sales process tells the loan officer to "PIVOT WITH ENTHUSIASM AND EMOTION!!!!!"  (Ex. P-21 (step 6).)

At this point, the loan officer asks the customer for their business.  (Tr. 3/1 p. 49:4-9.) Here, the sales process instructs the loan officer to "ARC" (Acknowledge, Respond, Close) five times in response to the customer's "objections" and to pivot to the next close within three minutes of the last close.  (Ex. P-21 (step 7); P-20.)  If the customer responses positively, the loan officer proceeds with the formal loan application.  (Tr. 3/1 pp. 50:20-51:2; Ex. P-21 (step 8).)  The loan officer then accepts Quicken's mandatory good faith deposit, and ends the call. (Tr. 3/1 p. 51:3-12; Ex. P-21 (steps 9, 10).)

The loan officer next enters the customer's information into Quicken's Lakewood system, which generates the loan documentation.  (Tr. 3/1 p. 51:16-23.)  The documents are sent to the customer electronically to sign.  (Id.)  The loan officer answers any questions the customer has, collects the information that's sent back, and reviews it for accuracy against the information in Lakewood.  (Tr. 3/1 pp. 52:24-53:11.)

The loan documents are then sent to Quicken's underwriting department.  (Tr. 3/1 pp. 53:23-54:3.)  Some products are suited for "automated" underwriting.  (Tr. 3/1 pp. 41:18-42:3.)  For these loans, Quicken's automated underwriting system, called "Rocket," tells the loan officer "yes" or "no."   (Tr. 3/1 pp. 41:18-23, 43:7-15.)   Other products have to be manually underwritten, a task the loan officer cannot perform.  (Tr. 3/1 p. 43:11-15.)

Once the loan is sent to underwriting, it becomes part of the loan officer's "pipeline." (Tr. 5 3/1 p. 54:12-19.)  The pipeline is the loan officer's loans that are between application and closing.  (Id.)  Loan officers review their pipeline each day to make sure that the loans in their pipeline are on track to close.  (Tr. 3/1 p. 54:20-25.)  If issues are identified by the underwriters during the underwriting process, the loan officer contacts the customer to confirm that the information they received was accurate.  (Tr. 5 3/1 pp. 55:1-56:3.)

### 4.    __Other Duties__

In addition to the duties described above, a Quicken loan officer may also spend time performing other tasks.  For example, loan officers may spend time studying for licensing exams for certain states that require individual loan officers to become licensed.  (Tr. 3/1 p. 57:5-18.)  Loan officers may review the Internet, as well as publications from the capital markets group regarding what is happening in the financial world.  (Tr. 3/1 pp. 57:22-58:10.)  Loan officers may also attend meetings or training sessions, or attend other work-related functions in the course of a typical work day.  (E.g., Tr. 2/16 pp. 45:15-47:7, 55:8-56:3.)

### C.    __Quicken Loan Officers are Referred to as Sales/Production Employees, are Hired Without Financial Experience, and are Paid, Evaluated, Disciplined, Motivated, and Fired Based on Sales Production__

Aside from the fact that they spend each day selling mortgages to Quicken's customers, the other evidence at trial also overwhelmingly confirmed that the primary job duty of Quicken's

loan officers is selling financial products.   Quicken's loan officers are referred to as sales/production employees, and are paid, evaluated, disciplined, motivated, and terminated based on their production.

**1.        Quicken Refers to Loan Officers as Sales/Production Employees**

At least prior to this lawsuit being filed, Quicken referred to its loan officers as sales employees.  For example, prior to the lawsuit, Quicken's compensation plan was called the "Sale Center Loan Consultant Compensation Plan."  (Ex. D-168.)  Job offer letters given to loan officers told them that they would be joining "one of the most highly trained sales forces" in the country, that their "rugged character and strong competitive spirit" would be vital to "becoming a winning salesperson," and that as a "sales professional" they would need to work the phones hard.  (Ex. P-17 pp.1-4.)   These documents were revised shortly after this the lawsuit was filed. (See Ex. P-17 pp. 5-9; Ex. D-169.)

Quicken also refers to loan officers as sales employees in the course of its day-to-day business operations.   High-level Quicken executives and management employees such as Chairman Dan Gilbert and CEO Bill Emerson refer to loan officers as Quicken's sales force whose primary job duty is to sell loans.  (See, e.g., Ex. P-1 pp. 4, 5-7, 8-10, 11, 13; Ex. P-2 pp. 1, 2; Ex. P-68.)  For example, in January 2004 Gilbert told the loan officers, "By the end of this year, I want the world to call our sales force THE BEST SALES FORCE in the country.  How do we get there?  By the success of one Loan Officer at a time."  (Ex. P-1 p. 6.)   Other employees, including members of management who would later become executives of the company, also commonly referred to loan officers as sales employees whose most important job duty is to sell loans.  (See, e.g., Ex. P-3 pp. 8, 11, 16, 17, 18-20, 21-22; Ex. P-4 p. 1; Ex. P-5 pp.

6, 10; Ex. P-6 p. 1; Ex. P-10 pp. 10, 11; Ex. P-11 pp. 4, 9, 10, 15, 19; Ex. P-76.)  As Jeff Perry

told his loan officers, "Our job is to SELL!"  (Ex. P-11 p. 9.)

### 2.    Loan Officers Do Not Need Financial Experience

Quicken does not require loan officers to have a college degree, or any financial industry

or business background to be hired.  It is undisputed that Plaintiffs who testified at trial had little

or no financial industry experience prior to working for Quicken, and some did not attend or

complete college.  (E.g., Tr. 2/11 pp. 79:18-80:15, 157:20-25, 160:14-16, 218:2-5, 219:7-10; Tr.

2/16 p. 265:12-24.)

### 3.    Loan Officers are Trained on Sales Techniques

Quicken's loan officers receive initial sales training when they start with the company,

and are also continuously trained and coached on sales techniques and best practices throughout

their employment.  (See, e.g., Tr. 2/16 p. 60:5-8; Ex. P-1 p. 11; Ex. P-4 p. 2; Ex. P-6 p. 4; Ex. P-

10 p. 6; Ex. P-11 pp. 1, 3, 7; Ex. P-14; Ex. P-15 pp. 1-2; Ex. P-16 pp. 1-4; Ex. P-18; Ex. P-19;

Ex. P-20; Ex. P-21; Ex. P-22; Ex. P-68; Ex. P-69; Ex. P-83; Ex. P-85; Ex. P-88; Ex. P-89; Ex. P-

131; Ex. P-135.)  For instance, loan officers are taught how to "gain control" of the conversation,

how to overcome client "objections," how to "ARC" (Acknowledge, Respond, and Close), and

how to "push the bruise."[9]  (Ex. P-18; Ex. P-83.)  Quicken teaches loan officers certain words to

use in order to sell more effectively and elicit an "emotional response" from their customers.

(Ex. P-135; Ex.1.)   Quicken's trainers reaffirm this training by forwarding "call clips"

---

[9]  (See also Tr. 2/8 pp. 65:20-73:5, 74:17-82:17, 85:6-22; Tr. 2/9 pp. 115:12-116:2, 133:22-
134:10, 220:6-25; Tr. 2/11 pp. 93:20-98:9, 175:6-177:11; Tr. 2/14 pp. 88:25-89:22; Tr. 2/16 pp.
182:17-189:8, 271:6-272:2; Tr. 2/22 pp. 181:2-183:2.)

demonstrating good sales techniques such as, "A confident banker breezes through the Sales Process, assumes the sale, closes the client and takes the application <u>in under 30 minutes</u>!"[10] (Ex. P-15 p. 1 (emphasis in original).)  Loan officers are also shown clips from "sales" movies like "Boiler Room" and "Glengarry Glen Ross" during training.  (<u>E.g.</u>, Tr. 2/9 pp. 112:15-113:12; Tr. 2/11 pp. 98:21-100:19, 174:9-21; Tr. 2/14 pp. 220:8-222:9.)

### 4.    <u>Loan Officers are Paid Based on Sales Production</u>

Quicken's loan officers are paid on sales production.  As Dan Gilbert readily admits, Quicken uses the potential for high commissions as a means of motivating its loan officers to increase sales and produce a high volume of loans for the company.  (<u>E.g.</u>, Tr. 2/23 p. 53:11-20; Ex. P-5 p. 6; Ex. P-6 p. 4; Ex. P-127.)

Loan officers receive a starting base salary of around $24,000.  Loan officers also receive commissions based on the number of loans they close per month.  (Ex. D-2 pp. 5-14.)  However, loan officers do not automatically receive a commission on every loan closed.  (<u>Id.</u> pp. 5-6.) Loans are assigned various "unit" values, and commissions are only earned if the loan officer closes a designated number of units for the month.  (<u>Id.</u>)  For example, if the compensation plan in place required nine units, a loan officer who sold six units would receive no commissions, whereas a loan officer who sold nine units would receive commissions on all nine units.  (<u>Id.</u>)

Once the loan officer has sold enough loans to earn a commission, commissions can adjust based on client survey responses, the number of loans in suspended status, and various other factors.  (<u>Id.</u> pp. 5-14.)  For example, loan officers may charge a "premium" or "overage" (capped at two points) on a loan by raising the rate/point/fee structure.  (<u>Id.</u> p. 10.)  Loan officers receive a portion of the revenue generated from overages, which appear in Quicken's Lakewood

---

[10] (<u>See also</u> Tr. 2/9 pp. 218:24-220:5; Tr. 2/11 pp. 104:11-105:2; Tr. 2/17 p. 197:12-20.)

computer system as a "green bar."  (Id. pp. 5-6, 10; Tr. 2/8 p. 83:11-19.)  This practice is referred

to within the company as "raising the green bar," and is encouraged.  (E.g., Tr. 2/8 p. 83:20-25;

Ex. P-11 p. 25; Ex. P-90; Ex. P-91; Ex. P-92; Ex. P-93; Ex. P-94; Ex. P-95; Ex. P-96; Ex. P-97.)

On the other hand, Quicken's compensation plan provides that a loan officer must obtain written

approval from a sales manager before lowering the rate/point/fee structure of the loan.  (Ex. D-4

p. 10.)  This is referred to as a "concession" or "underage," and is also known as "red bar."  (See

Ex. D-4 p. 10; Mazey Tr. 57:7-11.)

### 5. Loan Officers are Encouraged to Increase Sales Production

Quicken management employees motivate their loan officers to increase production and

sell more loans, and also use sales contests between "teams" to increase production.  The trial

record is replete with this sort of evidence.[11]  (Ex. P-1 pp. 8-10, 11, 13; Ex. P-3 pp. 8, 9-10, 11,

12, 13, 14, 15, 16, 17, 18-20, 21-22, 23, 24; Ex. P-4 pp. 1, 3; Ex. P-5 pp. 3-4, 5, 6, 7, 8, 10, 17,

23; Ex. P-6 pp. 1, 2, 3, 4; Ex. P-9 pp. 1, 2; Ex. P-10 pp. 3-4, 5, 7, 8, 10, 11, 12; Ex. P-11 pp. 2, 4,

5, 6, 8, 9, 10, 11, 13, 14, 15, 16, 18, 19, 20-21, 22, 24; Ex. P-56; Ex. P-58; Ex. P-60; P-62; Ex. P-

65; Ex. P-67; Ex. P-75; Ex. P-76; Ex. P-77; Ex. P-78; Ex. P-80; Ex. P-81; Ex. P-87.)   For

example, Chief Marketing Officer Jay Farner put it most simply, telling loan officers to "SELL

SELL SELL."  (Ex. P-3 p. 8.)  Likewise, Jeff Perry told loan officers, "THE BANKERS THAT

CAN GET AGGRESSIVE WILL WIN.  As a salesperson, our job is to sell.  Today we have to

sell hard."  (Ex. P-11 p. 19 (emphasis in original).)  Perry motivated his loan officers to "scare"

customers into purchasing loans by referencing potential interest rate spikes.  (Ex. P-76; see also

Ex. P-118 ("Lets[sic] sell the uncertainty—put the improvement in your pocket.").)

---

[11]  In addition to Quicken's own documents, the twenty-five testifying Plaintiffs also provided
voluminous testimony confirming the high-pressure sales environment at Quicken, and the
constant pressure to produce.  (See generally Tr. (plaintiff testimony).)

6. <u>**Loan Officers are Promoted, Evaluated, Disciplined, and Terminated Based on Sales Production**</u>

Quicken loan officers are also promoted, evaluated, and disciplined based on their production. Emails announcing the promotion of loan officers focus on the ability to sell and produce, and to motivate others to do the same. (<u>E.g.</u>, Ex. P-5 pp. 9-10; Ex. P-8 p. 1; Ex. P-74; Ex. P-113; Ex. P-114.) Loan officers are also evaluated and critiqued based on their ability to sell. (<u>E.g.</u>, Ex. P-5 p. 2; Ex. P-9, p. 3; Ex. P-11 pp. 1, 3, 7; Ex. P-86; Ex. P-111; Ex. P-112; Ex. P-136; Ex. P-137; Ex. P-138.) Quicken keeps track of each loan officer's "conversion rate," representing the percentage of leads the loan officer is able to convert into loan applications. (<u>E.g.</u>, P-136.) Quicken also uses "sales boards" in the office for each team to keep track of their numbers. (Tr. 2/11 pp. 89:10-90:6; Tr. 2/16 pp. 189:12-21; Tr. 2/17 pp. 85:7-86:23; Tr. 2/18 pp. 58:18-59:12; Tr. 2/22 pp. 130:19-131:3.) Finally, when loan officers at Quicken are disciplined or terminated, the most common reason, by far, is failure to meet the company's sales goals and production standards. (<u>See</u> Ex. P-100; Ex. P-101.)

## <u>LEGAL ARGUMENT</u>

I.  **THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW FOR PLAINTIFFS ON QUICKEN'S ADMINISTRATIVE EXEMPTION DEFENSE**

A.  <u>**Legal Standard for Judgment as a Matter of Law**</u>

Judgment as a matter of law is appropriate when a party has been fully heard on an issue, and "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed. R. Civ. P. 50(a). "In conducting such an analysis, the evidence must be construed in the light most favorable to the non-moving party." <u>Denhof v. City of Grand Rapids</u>, 494 F.3d 534, 543 (6th Cir. 2007); <u>accord</u> <u>Brickers v. Cleveland Bd. of Educ.</u>, 145 F.3d 846, 849 (6th Cir. 1998). "The inquiry for resolving a motion for judgment as a matter of law pursuant to

Rule 50 is the same as the inquiry for resolving a motion for summary judgment pursuant to Rule 56." White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 794 (6th Cir. 2004).

### B.   The Question of Whether an Employee's Duties Fall Within an FLSA Exemption is a Question of Law

The Fair Labor Standards Act exempts certain employees from its overtime requirements if they are employed in a bona fide executive, administrative, or professional capacity.   29 U.S.C. § 213(a)(1).   The employer bears the burden of proving that an exemption applies. Douglas v. Argo-Tech Corp., 113 F.3d 67, 70 (6th Cir. 1997).   Exemptions from the FLSA are "to be are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."   Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960); accord Ale v. Tenn. Valley Auth., 269 F.3d 680, 691 n.4 (6th Cir. 2001); Douglas, 113 F.3d at 70.

In FLSA cases, "[t]he question of how an employee spends his time is a question of fact, while the question of whether his activities fall within an exemption is a question of law." Jastremski v. Safeco Ins. Co., 243 F. Supp. 2d 743, 747 (N.D. Ohio 2003); see also Reich v. Wyoming, 993 F.2d 739, 741 (10th Cir. 1993); Bratt v. County of Los Angeles, 912 F.2d 1066, 1068 (9th Cir. 1990); Johnson v. Target Corp., 2006 WL 572014, at *5 (E.D. Tenn. Mar. 8, 2006); Schaefer v. Ind. Mich. Power Co., 197 F. Supp. 2d 935, 939 (W.D. Mich. 2002), rev'd on other grounds, 358 F.3d 394 (6th Cir. 2004); Nielsen v. DeVry, Inc., 302 F. Supp. 2d 747, 752 (W.D. Mich. 2003).

For example, in Ale v. Tenn. Valley Auth., the district court conducted a bench trial and found that the defendant violated the FLSA.   269 F.3d at 683.   Specifically, the district court held

that the plaintiffs did not qualify for the executive and administrative exemptions.  Id. at 686.

The Sixth Circuit affirmed.  The Sixth Circuit reviewed the district court's factual findings for

clear error.  Id. at 688-91.  However, on the ultimate question of whether the plaintiffs were

exempt, the Sixth Circuit reviewed the district court's determination de novo, noting that "[t]he

ultimate question of whether the magistrate judge correctly determined that an employee is

exempt is a question of law[.]"  Id. at 691 (citing Icicle Seafoods, Inc. v. Worthington, 475 U.S.

709, 714 (1986)).  The Sixth Circuit concluded that"[i]n the instant case . . . the facts indicate

that shift supervisors did not have management as their primary duty."  Id. at 692.

Accordingly, on Plaintiffs' motion for judgment as a matter of law, this Court must defer

to the jury's determination of how Plaintiffs' spent their time on a day-to-day basis, i.e., view the

facts in the trial record in the light most favorable to Quicken.  However, the Court owes no

deference to the jury's application of those facts to the law on the ultimate question of whether

Plaintiffs were exempt.

### C.    The Administrative Exemption

The administrative exemption applies to any employee: (1) paid on a salary or fee basis at

a rate of not less than $455 per week; (2) whose primary duty[12] is the performance of office or

non-manual work directly related to the management or general business operations of the

employer or the employer's customers; and (3) whose primary duty includes the exercise of

discretion and independent judgment with respect to matters of significance.  29 C.F.R. §

---

[12] "Primary duty" does not mean the most time consuming duty.  Thomas v. Speedway
SuperAmerica, LLC, 506 F.3d 496, 504 (6th Cir. 2007); see also 29 C.F.R. § 541.700(b) ("Time
alone, however, is not the sole test[.]").  Rather, the term "primary duty" means "the principal,
main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a);
accord Thomas, 506 F.3d at 504.  "Determination of an employee's primary duty must be based
on all the facts in a particular case, with the major emphasis on the character of the employee's
job as a whole."  29 C.F.R. § 541.700(a).

541.200(a).  The Department of Labor regulations address the exemption's application to certain employees in the financial services industry.  The regulations state:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products.  **However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.**

29 C.F.R. § 541.203(b) (emphasis added).  In promulgating this regulation, the DOL specifically relied upon and cited Casas v. Conseco Fin. Corp., 2002 WL 507059, at *9 (D. Minn. Mar. 31, 2002).  See 69 Fed. Reg. 22122-01 at 22,146 (citing Casas with approval and noting that "[t]he Department agrees that employees whose primary duty is inside sales cannot qualify as exempt administrative employees").

### D.    **Plaintiffs' Primary Duty is Selling Financial Products**

Quicken's administrative exemption defense fails because Plaintiffs' primary duty is selling financial products.  29 C.F.R. § 541.203(b).  Quicken's loan officers are its self-described "sales force."  Their primary job duty is to sell.

Indeed, all of Plaintiffs' job duties are directly related to selling mortgages.  Even using the testimony of Quicken's own witnesses (e.g., Colleen Booza), Plaintiffs' day-to-day job duties are to: (1) call (or take calls from) Quicken's customer leads to try to sell a loan; (2) gather the information necessary to sell a loan; (3) determine which loan or loans the customer can qualify for using Quicken's matrices and qualifying guidelines; (4) pitch the loan to the customer; (5) gather the necessary documents for closing; (6) answer any questions the customer might have; (7) communicate with the customers about any issues identified by underwriting; and (8) keep

19

track of the sold loan as it moves through the "pipeline" to final closing.  This is "sales," regardless of Quicken's hyper-narrow and legally improper definition of the word.[13]

Not surprisingly, Quicken's own documents are saturated with evidence confirming their loan officers' primary duty of selling loans.  Loan officers are referred to by Quicken as sales employees, and are overwhelmingly paid, evaluated, motivated, disciplined, and terminated based on their sales production.  As Vice President Jeff Perry admitted, "[a]s a salesperson, **our job is to sell**."  (Ex. P-11 p. 19 (emphasis added).)

As a matter of law, the primary job duty of Quicken's loan officers is selling financial products.  Accordingly, the Court should grant judgment in Plaintiffs' favor on the administrative exemption.

### E.     Plaintiffs' Primary Job Duty is Not the Performance of Office or Non-Manual Work Directly Related to the General Business Operations of Quicken or Its Customers

Quicken's administrative exemption defense also fails because Plaintiffs do not perform office or non-manual work directly related to the general business operations of Quicken or its customers.  29 C.F.R. § 541.200(a).

---

[13] Quicken repeatedly made the improper argument at trial—based on its now withdrawn 2006 Opinion Letter—that its loan officers' only "sales" activity was "asking for the business" or "customer-specific persuasive sales activity."  As this Court has previously held, "To reduce the analysis of 'sales' to the time spent doing 'customer-specific persuasive sales activity' would be contradictory to the plain meaning of the regulation, which prohibits the sort of missing-the-forest-for-the-trees approach to defining 'primary duty' Quicken advocates in this case."  (Dkt. 666 at 20.)  Indeed, the Court noted that the definitions in the "outside sales" regulations are instructive in that they explicitly include "work performed incidental to and in conjunction with the employee's own outside sales or solicitations" and "work that furthers the employee's sales efforts" when determining an employee's "primary duty."  (Id. at 20 n.5 (citing 29 C.F.R. § 541.500(b)).  As set forth more fully below, instructing the jury with these regulations would have prevented Quicken from repeatedly making this improper argument, which was both contrary to law and the Court's Order.

The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. Id. § 541.201(a).  "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  Id.  Administrative work includes work in "functional" areas of the business such as tax, accounting, budgeting, auditing, insurance, quality control, advertising, marketing, and other similar areas.[14]  Id. § 541.201(b).

One useful tool in deciding whether an employee qualifies for the administrative exemption is the "administrative/production dichotomy."  Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009); Schaefer v. Ind. Mich. Power Co., 358 F.3d 394, 402 (6th Cir. 2004); Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1126-27 (9th Cir. 2002); Bratt v. County of Los Angeles, 912 F.2d 1066, 1070 (9th Cir. 1990); Dalheim v. KDFW-TV, 918 F.2d 1220, 1230 (5th Cir. 1990); Casas v. Conseco Fin. Corp., 2002 WL 507059, at *9 (D. Minn. 2002); 69 Fed. Reg. 22122-01 at 22,141.  Under the test, an employee is non-exempt if the employee performs "production work," which is work related to the goods or services that constitute the employer's

---

[14] An employee may also qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers.  29 C.F.R. § 541.201(c).  This would include, for example, employees who serve as outside tax experts or financial advisors for their employer's clients.  Id.  However, an employee does not qualify for the administrative exemption where the employers customers are individuals seeking advice for their personal needs.  Of course, individual consumers do not have "general business operations."  See, e.g., Talbott v. Lakeview Ctr., Inc., 2008 WL 4525012, at *5 n.5 (N.D. Fla. 2008) ("The court does not find this provision relevant because even if Lakeview's foster clients are 'customers,' they do not have 'general business operations.'"); Wage and Hour Opinion Letter FLSA2007-7 (Feb. 8, 2007).  Here, it is undisputed that Quicken's customers are individuals seeking mortgages who do not have "general business operations."

marketplace offerings, rather than the running of the business itself.[15]  Davis, 587 F.3d at 535-36;

Bothell, 299 F.3d at 1127.  As this Court recognized, this distinction "continues to influence

employee classification under the FLSA."  (Dkt. 666 at 4.)

In Casas v. Conseco Fin. Corp., one of the four cases that served as the basis for Section

541.203(b), the District of Minnesota held that loan officers do not satisfy the second prong of

the administrative exemption.  2002 WL 507059, at *6-10.  The court described the loan

officers' job duties as follows:

> Loan originators [i.e., loan officers] use internal leads provided to them by
> Conseco to make telephone contact with potential customers.  Using Conseco's
> guidelines and standard operating procedures, loan originators try to match the
> customer's needs with one of Conseco's loan products and obtain information to
> complete a loan application, such as, income level, home ownership, credit
> history and property value. Loan originators also run a series of credit reports
> using credit bureaus integrated into Conseco's computer system.  Once this is
> complete, the loan originator forwards the application information to a loan
> underwriter for an approval decision.  Loan originators have no authority to
> approve a loan.  If the loan is approved, the originator prepares for the closing by
> gathering documents from the customer, verifying information supplied by the
> borrower, answering questions, and ordering title work and appraisals.  If the loan
> is denied, the originator communicates the rejection to the customer and enters it
> into Conseco's system. According to affidavit testimony submitted by defendants,
> loan originators could negotiate the number of points paid by a customer which
> affects the overall price of the loan and, until June 2000, could adjust interest rates
> within a floor and ceiling range.

Id. at *1.  The court held that Conseco's loan officers were production employees not covered by

the administrative exemption.  Specifically, the court reasoned that:

> Conseco's primary business purpose is to design, create and sell home lending
> products.  As loan originators making direct contact with customers, it is
> plaintiffs' primary duty to sell these lending products on a day-to-day basis.  As is
> evident from a description of plaintiff's job duties, plaintiffs are responsible for
> soliciting, selling and processing loans as well as identifying, modifying and
> structuring the loan to fit a customer's financial needs.  In the Court's view, these

---

[15]  On the other hand, an employee does not automatically qualify for the administrative
exemption just because the employee's work does not fall squarely into the category of
"production."  Martin v. Ind. Mich. Power Co., 381 F.3d 574, 582 (6th Cir. 2004).

> duties establish that plaintiffs are primarily involved with "the day-to-day carrying out of the business" rather than "the running of [the] business [itself]" or determining its overall course or policies." Bratt v. County of Los Angeles, 912 F.2d at 1070.

Id. at *9.  The court noted that the loan officers were the company's "sales force" who sold loans to the employer's customers, one at a time.  Id. The court also noted that the loan officers' separation notices revealed that the loan officers' performance "was measured largely according to their sale production."  Id.

Here, Quicken failed to meet its heavy burden at trial of proving the second prong of the administrative exemption.  Quicken's loan officers' primary job duty is undisputedly not the performance of work directly related to Quicken's management or general business operations, the "running or servicing" of the business itself.  They do not perform work in functional areas of the company such as tax, finance, accounting, insurance, advertising, marketing, or other similar areas.[16]  See, e.g., Davis, 587 F.3d at 535 (administrative exemption not met for underwriters with no involvement in determining the future strategy or direction of the business, the overall efficiency or mode of operation of the business, or the establishment of company policies); Dalheim v. KDFW-TV, 918 F.2d 1220, 1231 (5th Cir. 1990) (administrative exemption not met because news producers not responsible for setting business policy, planning the long or short-term objectives of the news department, promoting the newscast, negotiating salary or benefits, or any other types of "administrative" tasks); Neary v. Metro. Property & Cas. Ins. Co., 517 F. Supp. 2d 606, 614 (D. Conn. 2007) (noting that administrative activities "are not activities that

---

[16] As Quicken readily admitted at trial, job duties relating to the development of Quicken's loan products, pricing, guidelines, and various matrices are performed by the capital markets division, not by loan officers.

involve what the day-to-day business specifically sells or provides, rather these are tasks that every business must undertake in order to function").

On the contrary, Plaintiffs' primary job duties are directly related to mortgage products, the "goods and services" that constitute Quicken's marketplace offerings. Quicken's singular business purpose is to design, create, and sell mortgage products to its customers, and then quickly resell them on the secondary market to generate revenue. And Quicken's loan officers are the company's "sales force" that has direct contact with customers on a day-to-day basis in order to sell the company's product. Plaintiffs' job duties are directly related to the production, i.e., "sales," of Quicken mortgage products. As already set forth in detail above, even viewing the day-to-day job duties of a loan officer through the testimony of Colleen Booza and Quicken's other witnesses, there is no question that the loan officer's primary duty is production work. Again, the conclusion of "production" is also compelled by the fact that loan officers are referred to by Quicken as sales/production employees, and are paid, evaluated, motivated, disciplined, and terminated based on their sales production.[17]

The primary job duty of Quicken's loan officers is directly related to Quicken's marketplace offerings, and they are quintessential production employees. See, e.g., Davis, 587 F.3d at 535 (underwriters non-exempt production employees because "their work is not related either to setting 'management policies' nor to 'general business operations' such as human relations or advertising . . . but rather concerns the 'production' of loans—the fundamental

---

[17] As the Second Circuit recently explained in Davis v. J.P. Morgan Chase & Co., the way a company refers to, pays, and incentivizes its workers is relevant to the determination of whether those workers are properly categorized as "administrative" or "production." See 587 F.3d at 535. The Second Circuit, finding mortgage underwriters non-exempt, noted that Chase employees referred to the work performed by underwriters as "production work," that underwriters' productivity was measured in terms of "average of total actions per day," and that underwriters were occasionally paid incentives to increase production. Id.; see also Conseco, 2002 WL 507059, at *9.

service provided by the bank."); <u>Reich v. State of N.Y.</u>, 3 F.3d 581, 586-90 (2d Cir. 1993) (criminal investigators non-exempt because they "produce" investigators for the bureau's business of "law enforcement"); <u>Martin v. Cooper Elec. Supply Co.</u>, 940 F.2d 896, 903-04 (3d Cir. 1991) (inside salesmen of electrical products performed non-exempt production work); <u>Gallegos v. Equity Title Co. of Am.</u>, 484 F. Supp. 2d 589, 595 (W.D. Tex. 2007) (escrow officers non-exempt because, in the escrow closing business, the duties of reviewing documents, checking for errors, contacting the borrower or lender to correct discrepancies, and assuring that closing instructions are followed are "production"); <u>Casas</u>, 2002 WL 507059, at *6-9 (discussed in detail above); <u>Reich v. Chicago Title Ins. Co.</u>, 853 F. Supp. 1325, 1330 (D. Kan. 1994) ("Based on the duties which the escrow closers undisputedly perform, it is clear that the primary duty of the escrow closers is to carry out Chicago Title's day-to-day closing operations.").

Quicken failed to carry its burden at trial of proving that its loan officers' primary job duty is to perform work directly related to the company's or its customers' management or general business operations. Even viewing trial record in the light most favorable to Quicken, there is no question that, as a matter of law, the second prong of the administrative exemption is not met. Accordingly, the court should grant judgment as a matter of law in Plaintiffs' favor.

### F.  **Plaintiffs' Primary Job Duty Does Not Include the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance**

Quicken also failed to carry its burden on the third prong of the administrative exemption, which required Quicken to prove the loan officers' primary duty include the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a).

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the

25

various possibilities have been considered." Id. § 541.202(a). The term "matters of significance" refers to the level of importance or consequence of the work performed. Id. Under the regulations, factors considered in determining whether an employee exercises discretion and independent judgment include, for example:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id. § 541.202(b). "[D]iscretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." Id. § 541.202(e). Moreover, "[t]he substitution of the employee's memory for a manual of standards does not convert the character of the work performed to exempt work requiring the exercise of discretion and independent judgment." Id. § 541.202(h).

Quicken failed to prove that its loan officers exercise discretion and independent judgment with respect to matters of significance as contemplated by the regulations. Even viewing the trial record in the light most favorable to Quicken, loan officers:

- Have no authority to formulate, affect, or interpret management policies or operation practices. As Quicken admits, the policies, guidelines, and matrices loan officers follow are developed by the capital markets group, not loan officers. Loan officers must follow these policies with respect to every customer (either visually or by memory), and must get prior approval from management before deviating from them.

26

- <u>Do not carry out major assignments in conducting the operations of the business.</u>  As explained thoroughly above, the primary duty of loan officers is to sell loans.  They do not carry out assignments relating to the general operations of the business.

- <u>Do not perform work that affects business operations to a substantial degree.</u>  Again, loan officers perform work related to selling loans, which make up Quicken's exclusive offering to the marketplace.  They do not perform work that affects Quicken's general business operations to a substantial degree.

- <u>Do not have the authority to commit Quicken to matters that have a significant financial impact on the company.</u>  As Colleen Booza testified, Quicken's loan officers may only sell loans that fall within Quicken's qualifying guidelines and product matrices.  Loan officers follow these guidelines for each and every loan that they sell.  These guidelines and matrices, including the costs and rates for Quicken's products, are formulated and modified by the capital markets group, not loan officers.  In addition, loan officers do not have authority on whether a loan they sold is approved.  This is handled by underwriting, including "suspense analysts" who hand underwriting for suspended or "broken" loans.  Loan officer undisputedly have no role in how loans are resold on the secondary market.

- <u>Do not have the authority to waive or deviate from policy without pre-approval.</u>  Quicken's loan officers may only sell loans that fall within Quicken's qualifying guidelines and product matrices.  Loan officers follow these guidelines for each and every loan that they sell.  As Colleen Booza readily admitted, loan officers must request prior approval before selling a loan outside of the qualifying guidelines.

- <u>Do not have the authority to negotiate or bind the company on significant matters.</u>  It is undisputed that loan officers may arrive at the company without any financial training at all.  Their primary job duty is to sell loans within Quicken matrices and qualifying guidelines, and the other parameters set by the capital markets group.  They do not negotiate or bind the company on matters of significance.

- <u>Do not provide expert consultation or advice to management.</u>  Again, Quicken can make no claim that loan officers, who sell loans to Quicken's customers, have any role in advising management on significant aspects of the business.

<u>See</u> 29 C.F.R. § 541.202(b).

As the district court properly reasoned in the <u>Conseco</u> case, a loan officer does not exercise the requisite discretion and independent judgment by merely making decisions "concerning whether to proceed with an application, which lending product to suggest, negotiating pricing by adding closing points and taking other customer circumstances into account when selling the loan were all governed by [the employer's] pre-existing established

27

standing operating procedures and guidelines."  2002 WL 507059, at *10.  This is simply "using skills in applying techniques, procedures or specific standards . . . rather than exercising the kind of independent judgment and discretion within the meaning of the regulations to qualify under the administrative exemption."  Id.; see also Schaefer, 358 F.3d at 405 (using knowledge to follow procedures or to decide which procedures to follow, or deciding whether certain standards are met, is not "discretion and independent judgment"); Renfro v. Ind. Mich. Power Co., 2005 WL 4882704, at *14 (W.D. Mich. Jan. 25, 2005) (technical writers do not exercise discretion and judgment where "much of the job involves knowing where to find the correct information to use in a procedure, as from source documents.").

As a matter of law, Quicken failed to prove at trial that its loan officers exercise the type of discretion and independent judgment with respect to matters of significance that qualifies an employee for the administrative exemption.  The Court should grant Plaintiffs' motion for judgment as a matter of law.

## II.	IN THE ALTERNATIVE, PLAINTIFFS ARE ENTITLED TO A NEW TRIAL

Rule 59 of the Federal Rules of Civil Procedure provides that a new trial may be granted after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  The granting of a new trial is within the trial court's sound discretion, Allied Chem. Corn. v. Daiflon, Inc., 449 U.S. 33, 36 (1980), and "is confided almost entirely to the exercise of discretion on the part of the trial court."  Id.  Under Fed. R. Civ. P. 59(a)(1)(A), "a new trial is warranted when a jury has reached a seriously erroneous result . . .."  Strickland v. Owens Corning, 142 F.3d 353, 357 (6th Cir. 1998) (citation omitted).  A "seriously erroneous result" is evidenced by: "(1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the

moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." Holmes v. City of Massillon, 78 F.3d 1041, 1046 (6th Cir. 1996).

A.   **Plaintiffs Are Entitled to a New Trial Because of Quicken's Improper and Prejudicial Opening and Closing Arguments**

The factual issues to be resolved at trial were clear and straightforward: (1) Plaintiffs' prima facie case under the FLSA; (2) Quicken's administrative exemption defense; and (3) the average overtime hours worked by Plaintiffs.  Quicken could have, and should have, confined its argument to the jury to these three issues.  Instead, Quicken deliberately chose to construct its case and closing argument around an extralegal appeal to Quicken's idea of what fairness requires.  In a nutshell, according to Quicken, Plaintiffs simply don't deserve it. Plaintiffs don't deserve it because they were told and agreed they were exempt.  They don't deserve it because they were told and agreed they would be compensated without overtime.  They don't deserve it because, in some cases, they never complained.  They don't deserve it because they were, according to Quicken, well compensated, and seeking an "unfair windfall."  They don't deserve it because they were commissioned employees.  They don't deserve it because they are seeking overtime on both guaranteed salary and commissions.  They don't deserve it because they could have earned less had the job compensated Plaintiffs with overtime but no commissions.  They don't deserve it because Quicken Loans is a local company committed to the city of Detroit. They don't deserve it because, according to Quicken, Plaintiffs were solicited by a law firm to join the case.  And they don't deserve it because that law firm is based out of state.

None of these arguments are novel or unusual. In the great majority of FLSA cases, defendants often express similar sentiments—sentiments that resonate to varying degrees with widely-accepted ideas in society of what is fair and just.  What makes Quicken unique, however, is the fact that it chose to make these extralegal arguments the centerpiece of its presentation to

the jury. For the reasons discussed below, none of the arguments used by Quicken find any support in the law or bear any relation to the issues for the jury to consider at trial.  Together they are, at bottom, a classic jury nullification argument—a plea to the jury to subrogate the law to the jury's own sense of justice, morality, or fairness.  Because the jury nullification arguments made by Quicken were improper and extremely prejudicial, this Court must grant a new trial.

### 1.    Legal Standard for a New Trial Based on Improper and Prejudicial Closing Arguments

Counsel acts inappropriately in attempting to "introduce extraneous matters before a jury or, by questions or remarks, endeavor[ing] to bring before it unrelated subjects" during closing arguments at trial. City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749, 756 (6th Cir. 1980).  Where it finds "a reasonable probability that the verdict of a jury has been influenced by such conduct," a district court properly sets the verdict aside, and should declare a mistrial.  Id. To determine whether improper statements or conduct surreptitiously influence a jury verdict, "a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g., whether it is a close case), and the verdict itself." Id.   In addition, "after repeated exposure of a jury to prejudicial information, cautionary instructions will have little, if any, effect in eliminating the prejudicial harm." Id. at 759.

Jury nullification[18] arguments are improper and prejudicial.  In Dunlap v. King, 2009 WL 2151311 (M.D. Tenn. July 15, 2009), for example, the court relied heavily on counsel's single

---

[18] Jury nullification has been defined as: "A jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness."  Black's Law Dictionary 875 (8th ed. 2004).

improper argument to the jury during closing that his client, a police officer, may not be able to pay any judgment.  Id. at *1.  The court reasoned that "this argument raises the issue of the Defendant's ability to pay a judgment against him. This argument was, in effect, a jury nullification argument that asks the jury to forget the facts and decide the case on the fact that a police officer must personally pay any judgment.  Such an argument . . . is improper."  Id.  The court granted the plaintiff's motion for a new trial.  Id.

Similarly, in Lioce v. Cohen, 174 P.3d 970 (Nev. 2008), the Nevada Supreme Court gave a thorough examination of jury nullification principles as applied to a defense counsel's closing argument.  There, counsel made arguments that the plaintiff's case wasted taxpayers' money and jurors' time.  Id. at 983.  He also argued that the cases were examples of people "looking for an excuse to sue someone at the drop of a hat" and that society now believed that "Americans have become a society of blamers."  Id.  The Court concluded the defense counsel's statements were improper and prejudicial and ordered a new trial.  Id.  According to the court,

> [Defense counsel]'s arguments suggested to the jurors that, regardless of the evidence, if the jury found in the defendants' favors, the jury could remedy the social ills of frivolous lawsuits.  Essentially, [defense counsel] asked the jury to "send a message" about frivolous lawsuits.  His arguments were directed at causing the jurors to harbor disdain for the civil jury process—a defining, foundational characteristic of our legal system—and at perpetuating a misconception that most personal injury cases are unfounded and brought in bad faith by unscrupulous lawyers.  These arguments were irrelevant to the cases at hand and improper in a court of law and constitute a clear attempt at jury nullification.

Id.; see also State v. Chiaromonte, 661 S.E.2d 55 (N.C. App. 2008) (jury nullification arguments are improper); Engle v. Liggett Group, Inc., 945 So.2d 1246, 1271 (Fla. 2006) (same); United States v. Trujillo, 714 F.2d 102 (11th Cir. 1983).

### 2.    Quicken Foreshadows its Improper Arguments During Opening Statements and Plaintiffs Object

The improper nature of Quicken's closing argument was not the result of a few ill-considered or impassioned remarks by counsel.  On the contrary, Quicken's opening statement specifically foreshadowed its intent to bring irrelevant and extraneous matters before the jury.  Counsel for Quicken spent the bulk of its opening statement making extralegal arguments, telling the jury: (1) that "each Plaintiff accepted specifically, and understood from the beginning of their employment" that they would not receive overtime, (Tr. 2/8 pp. 43:15-17, 49:13-18); (2) that the jury "will also see that [Plaintiffs] understood they were exempt.  It's right in their contract.  They were exempt from overtime." (Tr. 2/8 p. 43:21-23); (3) that Plaintiffs were well compensated, (Tr. 2/8 p. 44:9-25); (4) that Plaintiffs are seeking an unfair windfall because they were compensated "better . . . than if they were paid hourly with overtime," (Tr. 2/8 p. 45:2-15); (5) that Plaintiffs are seeking an unfair windfall by seeking overtime on top of their salary and commissions, (Tr. 2/8 p. 45:18-22); (6) that Plaintiffs "never complained or said they were entitled to" overtime, (Tr. 2/8 pp. 45:23-46:5); and (7) that Plaintiffs were "solicited for a lawsuit," (Tr. 2/8 pp. 46:3-5, 54:24-55:3).  These arguments occupied ten pages of the trial transcript, or roughly 63 percent of Quicken's total opening statement.  By way of contrast, Quicken spent a paltry six pages of the trial transcript, or approximately 37 percent of its opening statement, arguing that the evidence would show Plaintiffs qualified for the administrative exemption.  (Tr. 2/8 pp. 50-54.)

Plaintiffs objected to Quicken's opening, arguing that it was "improper in a number of ways," (Tr. 2/8 p. 117:6-7), and sought to bring before the jury the irrelevant and extraneous arguments that Plaintiff were solicited to join the suit, (Tr. 2/8 p. 117:15-16), that Plaintiffs waived their rights under the FLSA because they knew or agreed they were exempt or would not receive overtime, (Tr. 2/8 p. 118:18-22), and that if Plaintiffs receive a salary they are ineligible

for overtime, (Tr. 2/8 p. 119:20-21).  Plaintiffs asked for an immediate curative instruction.  The

Court overruled Plaintiffs' objections, and declined to issue a curative instruction.

### 3. Quicken Spends the Bulk of its Closing Argument Making Extralegal Arguments that Plaintiffs Do Not Deserve Overtime

Following through on what it foreshadowed in its opening, Quicken's closing argument

was overwhelmingly directed at the jury's sense of fairness, at the expense of the law governing

the case.  One category of improper argumentation attempted to convince the jury that Plaintiffs

were not entitled to overtime because they waived their right to overtime, in other words,

because "a deal's a deal."  Counsel's closing pervasively argued that Plaintiffs were not entitled

to overtime—that it would be "wrong," "unfair," and a "windfall"—because they were aware

they would not receive overtime, (Tr. 3/14 pp. 146:19-25, 150:23-24, 155:1-2, 155:3-6), agreed

they would not be paid overtime, (Tr. 3/14 pp. 155:3-6, 155:15-18, 155:20-22, 157:9-13), knew

or agreed they were classified by Quicken as exempt, (Tr. 3/14 pp. 157:14-15, 157:22-24, 158:1-

3,158:10-12, 239:18-22), and, according to Quicken, no Plaintiff ever complained,[19] (Tr. 3/14 pp.

158:12-14, 159: 23-25, 160:7-8, 160:15-18, 239:18-25).

None of these arguments is even remotely relevant to the administrative exemption or

hours worked.  In contrast, each argument contains a great deal of emotional appeal, playing to

---

[19]  Quicken's argument that no Plaintiff ever complained about not receiving overtime is improper for the independent reason that it mischaracterizes the evidence.  See, e.g., Testimony of Plaintiff Katie Ennes (Tr. 2/22 p. 231:18-24 (Q. You ever complain about not getting paid overtime? A. Yes, I did. Q. And when did you complain? A. Late 2004, early 2005. Q. Who did you complain to? A. A couple of the members on my team as well as my DVP, David Lee.)) Defense counsel's misstating the evidence during closing argument is independent and adequate misconduct warranting a new trial.  See U.S. v. Watson, 171 F.3d 695, 705 (D.C. Cir. 1999) (misstating the evidence during closing argument warrants new trial).

the jury's sense of fairness.  In Quicken's view—a view widely shared throughout society—a deal's a deal.  But the settled law does not support Quicken's view.  E.g, Barrentine v. Arkansas-Best Freight Sys., Inc., 450 US 728, 740 (1981) ("This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act.").  As Quicken and their counsel know full well, whether an employee was aware of or agreed to a certain compensation plan, knew how they were classified, or complained about these issues is entirely irrelevant.  By actively encouraging the jury to part ways with the law and substitute in its place Quicken's contorted idea of "fairness," counsel for Quicken acted improperly.  See Dunlap, 2009 WL 2151311, at *1 (jury nullification arguments improper).

A second category of improper argumentation by Quicken attempted to convince the jury that allowing Plaintiffs to recover would be an unjust, unfair windfall, regardless of whether the law entitled them to recovery or not.  Falling within this category was Quicken's most pervasive argument made during closing: that it would be unfair for Plaintiffs to receive overtime on top of both guaranteed salary and commissions. Counsel for Quicken summarized the company's core argument as follows:

> So is what Plaintiffs are seeking in this case fair? Is it just? Is it warranted in any respect?  Plaintiffs want overtime to be paid on top of their guaranteed salary and commission.  They want overtime to be paid on top of the commissions.  They want overtime to be paid on top of their salary, everything.  This would result in this unfair, this unfair windfall.

(Tr. 3/14 p. 149:11-17.)  Counsel for Quicken repeated this argument to the jury a staggering *sixteen times* throughout its closing. ( Tr. 3/14 pp. 148:23-25, 149:11-17, 150:4-6, 150:12-17, 151:5-7, 161:23-25, 162:1-2, 178:23-24,185:24-25, 190:1-2, 194:23-24, 199:15-19, 199:18-20, 200:18-19, 201:19-21, 240:11-12.) In a similar vein, Quicken argued to the jury that Plaintiffs

should not receive overtime because they were well compensated, (Tr. 3/14 pp. 133:11-13, 133:22, 133:14-16, 158:19-24, 163:16-19), because they were commissioned employees, (Tr. 3/14 p. 150:20-21), because they were allegedly solicited to join this lawsuit, (Tr. 3/14 pp. 160:18-20, 161:11-13, 163:9-12), and because the hypothetically would have earned more had they been compensated with a near-minimum wage salary plus overtime but without commissions, (Tr. 3/14 p. 140:2-3, 141:18-19, 144:4-8,145:8-25, 147:16-25, 148:2-21, 154:25, 158:15-17, 161:19-20, 163:17-19, 164:1-7, 164:19-165:4, 202:1-3, 239:18-21).   For example, counsel for Quicken improperly offered his opinion that Plaintiffs would have made "three, four, five, or six times more" had Plaintiffs received overtime.  (Tr. 3/14 p. 161:19-20.)

Like each of Quicken's other improper arguments, each component of Quicken's pervasive "unfair windfall" argument bears no relation whatsoever to the legitimate issues for the jury to decide, but was specifically calculated to arouse the jury's prejudices and inclinations to subvert the law to Quicken's idea of fairness and justice.  With respect to Quicken's argument that it would be an unfair, unjust windfall for Plaintiffs to earn overtime on top of their base salaries and commissions, the law is clear: the "regular rate" of pay includes "all remuneration for employment paid to, or on behalf of, the employee.,"   29 C.F.R. § 778.108, including commissions, 29 C.F.R. § 778.109. See also Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 425 (describing the regular rate as the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed—an "actual fact").  In conformity with this settled law, both parties and this Court agreed the Court, and not the jury, would calculate the regular rate post-trial based on amounts actually earned by Plaintiffs—including salary and commissions.  But the law, apparently, did not stop Quicken from arguing to the jury that it would be "unfair," "unjust," and "a windfall" for Plaintiffs to recover overtime based on

both salaries and commissions.  The reason is obvious.  Quicken wanted to stoke the common misconception that non-hourly, commissioned employees are not entitled to overtime, and that what Plaintiffs were seeking in this case was unusual, outlandish, and unheard of, rather than precisely what the law entitles them to receive.

In addition, the argument is improper for the independent reason that it flaunts this Court's prior evidentiary rulings.  At one point, counsel for Quicken stated:

> It wouldn't make sense and they never would have constructed a compensation package that way to include, as Mr. Lukas is suggesting, commissions and a guaranteed salary and then overtime on top of both of those. I have never heard of a job like that, and certainly Quicken Loans would not have paid that.

(Tr. 3/14 p. 150:12-17.)  This argument was particularly improper and duplicitous because, as this Court (and Quicken) knows from this case and the Biggs v. Quicken litigation, Quicken changed its compensation plan in May 2010 following the DOL's 2010 Administrator's Interpretation, which concluded that loan officers are non-exempt.  At the very moment counsel for Quicken stood before the jury and opined that he has "never heard of" a job paying both commissions and overtime, and that "certainly Quicken Loans would not have paid that," Quicken was paying its current loan officers both overtime and commissions.  Making matters worse, Quicken brought a motion in limine to exclude evidence of its changed compensation policy, no doubt because it did not want the jury to learn it was currently paying both commissions and overtime.  Plaintiffs agreed the compensation plan change fell within the scope of Federal Rule of Evidence 407 as a subsequent remedial measure, but this Court specifically preserved for Plaintiffs the right to raise the issue as necessary for impeachment purposes, as contemplated by Rule 407.  Had, for example, Mr. Gilbert testified that he had "never heard of" a job paying both commissions and overtime, and that "certainly Quicken Loans would not have paid that," Plaintiffs would have impeached him with evidence of the current compensation plan.

36

However, because counsel for Quicken—rather than a witness—made the argument after the close of evidence, Plaintiffs had no opportunity to counter counsel's statement.

Defense counsel's flaunting of Quicken's own motion in limine is misconduct and is independent and adequate grounds for granting a new trial.  In <u>Saltsgaver-Roscoe v. Daniels</u>, 1998 WL 516796 (W.D. Mo. 1998), a police misconduct case, counsel for defendant successfully brought a motion in limine excluding other reported incidents of similar misconduct.  <u>Id.</u> at *3.  During closing argument, defense counsel argued to the jury "that there were no other instances of injury in police vans."  <u>Id.</u> at *2.  The court began by analyzing three cases involving the more common scenario where an attorney refers to evidence that was excluded by a prior court order.  <u>Id.</u> at *6-7. The court then analyzed the misconduct as follows:

> In all of those cases, the attorney at fault attempted to put before the jury evidence which had been ruled inadmissible. **This case is worse.** Here, defense counsel successfully moved to withhold evidence of prior injuries from the jury. . . . Yet defense counsel repeated over and over again during his closing argument that no prior injuries had ever occurred—a fact he knew was not only inadmissible but was outright false.

<u>Id.</u> at *7 (emphasis added).  The court concluded that "[t]his area of questioning and argument alone would be sufficient for a new trial," and granted a new trial "in order to prevent a miscarriage of justice."  <u>Id.</u> at 8; <u>see also</u> <u>Johnson v. Ford Motor Co.</u>, 988 F.2d 573 (5th Cir. 1993) (defense counsel in personal injury case acted improperly by telling the jury that plaintiffs could point to "no other accidents" caused by the allegedly defective automobile, where Defendant had successfully brought a motion in limine to exclude all such evidence); <u>Rutledge v. St. Anne's Hosp.</u>, 595 N.E.2d 1165 (Ill. App. 1 Dist. 1992) (reversing a district court's denial of a new trial where defense counsel improperly questioned plaintiff about the absence of hospital records defendant had previously successfully moved to exclude).

Quicken's argument that it would be unfair for Plaintiffs to recover because they were allegedly well compensated similarly runs counter to the law. Quicken could have, but chose not to, defended itself at trial, without resort to improper argument, on the grounds that Plaintiffs were exempt employees under the so-called "highly compensated employees" exemption. See 29 CFR § 541.601.[20] Absent that, the amount of compensation Plaintiffs received was totally irrelevant to the applicability of the administrative exemption, or the number of hours worked. Although legally irrelevant, the argument was a powerful appeal to prejudice, playing into the widely held belief that well compensated individuals are not or should not be entitled to overtime compensation, and that Plaintiffs are greedy for seeking what the law entitles them to receive.

The same analysis holds true for Quicken's remaining improper windfall arguments. The fact that Plaintiffs "hypothetically" would have made less money had they been paid $24,000 per year plus overtime but no commissions bears no relation to the issues for the jury to decide, but it does strongly, and improperly, suggest to the jury that Plaintiffs are entitled to no damages, and that an award of overtime would amount to a unfair windfall. Similarly, as this Court acknowledged during trial, Defendant's persistent attempts (some successful) to convince the jury that Plaintiffs' counsel aggressively solicited Plaintiffs to join the suit "is completely a sideshow," and "assuredly does not" "go to the issues in this case." (Tr. 3/2 p. 101:16-20). Although completely extraneous to the real issues to be considered by the jury, Quicken's solicitation arguments were calculated to convince the jury that Plaintiffs' case was a frivolous, lawyer-driven enterprise, meant to "extort[]" money from Quicken. (Tr. 3/14 p. 161:11-13).

---

[20] It is not surprising that Quicken chose not to defend itself by arguing for the applicability of the highly compensated employee exemption because none of the plaintiffs would have met the exemption's requirements.

Such arguments are extraneous to the real issues to be decided, City of Cleveland, 624 F.2d at 756, and inherently improper because they are "directed at causing the jurors to harbor disdain for the civil jury process," Lioce, 174 P.3d at 983, and contain counsel's personal opinion of justness Plaintiffs' cause.  Draper v. Airco, Inc., 580 F.2d 91, 95 (3d Cir. 1978); Lioce, 174 P.3d at 984.

The third category of misconduct perpetuated by counsel for Quicken involved an appeal to local bias.  Counsel referred to Quicken as "a special, one-of-a-kind company" that is "committed to the city of Detroit to create jobs."  (Tr. 3/14 pp. 132:7-17, 137:22-25.)  In contrast, counsel repeatedly, deliberately, and pervasively referred to Plaintiffs' counsel as an "out-of-state law firm" that solicited clients to "extort" money from the local defendant. (Tr. 3/14 pp. 160:18-20, 161:1-2, 161:11-13, 161:23).  Such appeal to local bias obviously has no relation to the issues to be decided by the jury in this case—or any case.  Such parochial arguments do encourage the jury, however, to improperly punish the out-of-state entity and favor the hometown team. Appeals to local bias are per se improper.  Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 538 (2d Cir. 1992); Hall v. Freese, 735 F.2d 956 (5th Cir. 1984) (defense counsel emphasized that plaintiff came from New Orleans to Oxford, Mississippi for trial); City of Cleveland, 624 F.2d 749 (new trial ordered because counsel for city argued that plaintiff was large international corporation from New Jersey seeking damages against city where jurors were taxpayers); Smith v. Travelers Ins. Co., 438 F.2d 373 (6th Cir. 1971); Boutte v. Winn-Dixie Louisiana, Inc., 674 So. 2d 299 (La. Ct. App. 3d Cir. 1996) (argument regarding distant residences of opposing counsel and witness designed to appeal to local prejudice).

In contrast to Quicken's thorough, pervasive string of extraneous and improper arguments, counsel for Quicken reserved only a minority of his closing argument to address the

primary issue in the case: the applicability of the administrative exemption.  Out of 113 pages of

transcript, counsel did not even take up the topic until 73 pages into his closing argument.  (Tr.

3/14 p. 201:22-23 ("I want to move on and directly address the administrative exemption.").

After a mere 38 pages of argument, counsel returned to his primary theme once again, signing

off with a flurry of irrelevant, inaccurate, improper, and prejudicial points:

> You decide what's right, what's wrong.  Quicken Loans has been fighting this
> because it's about right versus wrong, and they designed intentionally a
> compensation package that was better for mortgage bankers when they had the
> understanding that they were exempt, and they were up front about this and they
> fully disclosed it and not one plaintiff ever came through and complained or
> objected and said that they didn't want to be paid this way.

(Tr. 3/14 p. 239:18-25).  Because Quicken pervasively implored the jury to decide the case by

reference to irrelevant, unrelated, and extraneous matters, Plaintiffs must be granted a new trial.

### 4.    Quicken's Improper Arguments Were Prejudicial.

There can no doubt that under totality of the circumstances of this case, Quicken's

numerous improper arguments created "a reasonable probability that the verdict of a jury has

been influenced by such conduct," City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d at 756.

As previously discussed, the nature of the comments was highly improper, their frequency was

high, and their possible relevancy to the real issues before the jury—the administrative

exemption and hours worked—was nonexistent.  See id.  The Sixth Circuit has also directed

lower courts to evaluate misconduct in light of "the strength of the case (e.g., whether it is a

close case), and the verdict itself."  Id.  As discussed in greater detail above and below, the

verdict was incorrect as a matter of law and manifestly against the weight of the evidence.  In

addition, as this Court knows, the jury spent two and-a-half days deliberating on the single issue

of the administrative exemption.  Due to the closeness of the ultimate outcome with respect to

the empanelled jury, even slight misconduct would be enough to create a reasonable probability

40

that the scales were tipped toward Quicken by its misconduct.  See Sanders-El v. Wencewicz, 987 F.2d 483, 485 (8th Cir. 1993) ("Whether errors had a significant prejudicial influence in a particular case admittedly is a fine question of judgment in which precedents give little guidance, for what may be harmless in a case where the evidence strongly favors one party may be fatally prejudicial in a close case.").  Given the pervasive misconduct at issue here and the closeness of the case in the eyes of the jury, there can be no doubt that a reasonable probability of influence on the verdict exists. The Court must grant Plaintiffs a new trial.

**B.      The Court's Jury Instructions and Special Verdict Form Were Misleading      and Inadequate**

Jury instructions are to be reviewed "as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." Arban v. West Publ'g Corp., 345 F.3d 390, 404 (6th Cir. 2003) (citing Jones v. Federated Fin. Reserve Corp., 144 F.3d 961, 966 (6th Cir. 1998)). "A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." Id. The correctness of jury instructions is a question of law; therefore a district court's jury instructions are reviewed de novo. Williams ex. rel Hart v. Paint Valley Local School Dist., 400 F.3d 360, 366 (6th Cir. 2005). The special verdict questions "must be read in conjunction with the judge's charge to the jury." Waggoner v. Mosti, 792 F.2d 595, 597 (6th Cir. 1986).

First, the Court erred in declining to ask the jury on the special verdict form whether Plaintiffs' primary duty was sales or selling financial products.  The plain language of 29 C.F.R. § 541.203(b) is clear: if an employee's primary duty is selling financial products, he is non-exempt.  This Court has recognized the plain an unambiguous nature of Section 203(b) part two on numerous occasions.  See, e.g., Henry v. Quicken Loans Inc., 2009 WL 596180, at *11 (E.D.

Mich. Mar. 9, 2009); Henry v. Quicken Loans Inc., 2009 WL 3270768, at *10 n.7 (E.D. Mich. July 16, 2009). The Preamble to the regulation could also not be clearer on the point. See Preamble, 69 Fed. Reg. 22,144 ("An employee whose primary duty is inside sales is not exempt."). In a rare point of harmony, the 2006 Opinion Letter and 2010 Administrator's Interpretation agree that an employee whose primary duty is selling financial products is not exempt. See FLSA2006-31, at 5 n.3; AI 2010-1, at 8. In short, § 541.203(b) operates as a one-way ratchet: while part one does not give employers an alternative, or substitute, grounds for proving employees exempt status, part two does give employees, like Plaintiffs, an alternative or substitute means of defeating a claim of exempt status. When an employee's primary duty is selling financial products, there are simply no countervailing factors, no amount of non-manual work, and no volume of discretion and independent judgment that could result in a finding of exempt status under the law. By failing to ask the jury whether Plaintiffs' primary duty was sales or selling financial products, the Court deprived Plaintiffs over a crucial avenue, fully available to them under the law, to rebut Quicken's proof on the administrative exemption.

Second, the Court erred in declining to instruct the jury on the definition of sales. The jury was entitled to the definition of sales adopted by the DOL and other courts. See 29 C.F.R. § 541.504(b); 29 C.F.R. § 541.500(b); AI 2010-1, at 8; Olivo v. GMAC Mortg. Corp., 374 F. Supp. 2d 545, 550 (E.D. Mich. 2004); Belton v. Premium Mortg., Inc., 2006 WL 561489, at *2 (W.D. Mo. 2006); Pontius v. Delta Fin. Corp., 2007 WL 1496692, at *9 & n.20 (W.D. Pa. Mar. 20, 2007). By parting ways with the DOL and rejecting its definition of the term, this Court failed to give appropriate Skidmore deference to the DOL's interpretation. See Monroe Retail, Inc. v. RBS Citizens, N.A., 589 F.3d 274, 282 (6th Cir. 2009) (administrative interpretations entitled to deference). By failing to give any definition of the term sales to the jury, the Court

allowed Quicken to make its argument—contrary to law—that sales includes only the activity of "asking for the business."  As this Court has previously held, "To reduce the analysis of 'sales' to the time spent doing 'customer-specific persuasive sales activity' would be contradictory to the plain meaning of the regulation, which prohibits the sort of missing-the-forest-for-the-trees approach to defining 'primary duty' Quicken advocates in this case." (Dkt. 666 at 20.)  Indeed, the Court noted that the definitions in the "outside sales" regulations are instructive in that they explicitly include "work performed incidental to and in conjunction with the employee's own outside sales or solicitations" and "work that furthers the employee's sales efforts" when determining an employee's "primary duty." (Id. at 20 n.5 (citing 29 C.F.R. § 541.500(b)).

Third, the Court erred in declining to instruct the jury, as requested by Plaintiffs, that individuals seeking advice for personal needs do not have business operations.  An employee does not qualify for the administrative exemption where the employers customers are individuals seeking advice for their personal needs because individual consumers do not have "general business operations." See, e.g., Talbott v. Lakeview Ctr., Inc., 2008 WL 4525012, at *5 n.5 (N.D. Fla. 2008) ("The court does not find this provision relevant because even if Lakeview's foster clients are 'customers,' they do not have 'general business operations.'"); Opinion Letter FLSA2007-7 (Feb. 8, 2007).  By failing to give the instruction, the jury could have erroneously concluded servicing Quicken's customers made Plaintiffs exempt.

Fourth, the Court erred in declining to instruct the jury on the administrative/production dichotomy.  The voluminous case law, regulatory authority, and DOL guidance on this issue is fully discussed above.  By declining to give this instruction, the Court again unfairly deprived Plaintiffs of a crucial avenue of proof in demonstrating Plaintiffs' clear nonexempt status.

Fifth, the Court erred in declining to instruct the jury that job title and method of compensation are irrelevant to establishing the exemption.  The number one misconception about the FLSA is that commissioned employees are ineligible for overtime.  See http://www.mansfieldtanick.com/CM/Articles/Top-5-Misunderstandings.asp (explaining that the number one misconception seen by FLSA defense lawyers is that only hourly employees are entitled to overtime) (last visited Apr. 7, 2011).  Failing to duly instruct the jury created an unacceptable risk of misunderstanding and prejudice.

Because the special verdict form and jury instructions as a whole provide both a misleading and inadequate picture of the law, Plaintiffs must be granted a new trial.

### C.    The Verdict Was Against the Weight of the Evidence

In ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, "the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence." Strickland v. Owens Corning, 142 F.3d 353, 357 (6th Cir. 1998) (quoting J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co., 936 F.2d 1474, 1487 (6th Cir. 1991)).  The trial court should deny the motion "if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." Id.   As detailed above, Plaintiffs are entitled to judgment as a matter of law on the issue of the administrative exemption.  However, even if this Court concludes the evidence in the record is technically sufficient to support the verdict, the great weight of the evidence, as discussed thoroughly above (and not repeated here), demonstrates that Plaintiffs were engaged in production work, and the selling of financial products, and did not exercise any meaningful

independent discretion and judgment.  Because the verdict is against the weight of the evidence,

Plaintiffs must be granted a new trial.

## <u>CONCLUSION</u>

For all of the reasons stated above, this Court should grant Plaintiffs judgment as a matter

of law on Defendant's administrative exemption, or alternatively, grant Plaintiffs a new trial.

Dated: April 12, 2011                           NICHOLS KASTER, PLLP

<u>s/Paul J. Lukas</u>
Donald H. Nichols, MN Bar No. 78918
Paul J. Lukas, MN Bar No. 22084X
Rachhana T. Srey, MN Bar No. 340133
Robert L. Schug, MN Bar No. 387013
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone (612) 256-3200
Fax (612) 215-6870
Email: lukas@nka.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 12, 2011, I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system which will send notification of such filing to all counsel

of record.

s/Paul J. Lukas
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Phone: (612) 256-3200
Email: lukas@nka.com
[Attorney Bar No. 22084X]

46