UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**RYAN C. HENRY, et al.,**

          Plaintiffs,

     v.

**QUICKEN LOANS, INCORPORATED,
also known as Rock Financial
Corporation, et al.,**

          Defendants.
_____/

**Steven J. Murphy, III**

**No. 04-40346**


**JURY TRIAL - VOLUME XVII**

**Monday, March 14, 2011**


Appearances:

| | |
|---|---|
| Donald H. Nichols | Jeffrey B. Morganroth |
| Paul J. Lukas | Mayer Morganroth |
| Rachhana T. Srey | Jason R. Hirsch |
| Robert L. Schug | Robert Davis |
| Nichols Kaster, PLLP | Morganroth & Morganroth |
| 4600 IDS Center | 344 N. Old Woodward Ave., #200 |
| Minneapolis, MN  55402 | Birmingham, Michigan  48009 |
| (612) 338-1919 | (248) 864-4000 |
|   On behalf of Plaintiffs |    On behalf of Defendants |


-   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313)965-4401 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Jury Trial*
*Monday, March 14, 2011, Volume 17*

**I  N  D  E  X**

|                                              | Page | Vol. |
|----------------------------------------------|------|------|
| Plaintiffs' Closing Argument                 | 29   | 17   |
| Defendants' Closing Argument                 | 128  | 17   |
| Plaintiffs' Rebuttal Closing Argument        | 243  | 17   |
| Final Jury Instructions                      | 253  | 17   |
| Certification of Reporter                    | 282  |      |

-   -   -

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Jury Trial*
*Monday, March 14, 2011, Volume 17*

3

```
 1                             Detroit, Michigan

 2                             Monday, March 14, 2011

 3                             9:24 a.m.

 4                             -   -   -

 5          THE COURT:  Okay.  Everybody may sit down and

 6     relax.  Welcome back.

 7        How are our friends from Minnesota?

 8          MR. LUKAS:  Good, Judge.

 9          THE COURT:  Everybody is okay?  You enjoyed your

10     week of relaxation, Mr. Lukas?

11          MR. LUKAS:  Yeah.  I went home and got the flu

12     from two of my kids.  It was awesome.  I should have stayed

13     hermetically sealed at the Westin, like I have been for the

14     last six weeks.

15          THE COURT:  Exactly.  Well, you might have gotten

16     something worse there.  Who knows?

17        Welcome to our defendants.  How are the Morganroths and

18     everybody doing?

19          MR. JEFFREY MORGANROTH:  Fine, thank you.

20          MR. MAYER MORGANROTH:  Fine, thank you.

21          THE COURT:  Okay.  Well, welcome back.

22        Let's start off with the jury instructions, and I'll go

23     through and give you my update and my point of view, and

24     then we can have a brief discussion and talk about a couple

25     of other things quickly.
```

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Jury Trial*
*Monday, March 14, 2011, Volume 17*

4

1     The record should reflect that the parties each filed

2     competing sets of instructions and verdict forms.  As

3     everybody knows, we worked very hard last week on resolving

4     a joint packet of instructions.  I was very grateful to the

5     lawyers for a two and-a-half hour session last Monday where

6     we thrashed through both parties' suggested instructions and

7     the law.  The Court resolved a joint packet of instructions

8     and issued those electronically with a supporting memorandum

9     on Wednesday.

10         Pursuant to our discussion last Monday, both parties

11    filed objections and corrections electronically on Friday

12    not exceeding three pages.  The Court was very grateful for

13    that guidance as well.

14         And I have now completed, based on all of that work, a

15    final set of instructions that I put in the hands of counsel

16    at 9:00 this morning, which is Monday, March 14th.  I might

17    add that we made all of the corrections that we could

18    possibly make to accommodate the positions of the parties

19    while staying true to what we think is the proper charge in

20    this case.

21         Let me say the following, which is that in many cases,

22    not all, but in many, the parties come together and agree on

23    a lot of the instructions.  In this case there was not a

24    tremendous amount of agreement, and while that makes it much

25    easier for the Court to come up with its own charge, it

1   makes it very, very difficult to put together a joint charge

2   that's acceptable to both sides.  So, given the lack of

3   agreement, it's not surprising to the Court that there is

4   going to be some disagreement with the final charge given to

5   the jury, and I understand that.  I will let you place your

6   final objections on the record, which I would ask you not to

7   go beyond what you have already said last week and what you

8   have said in writing, but anything you have in response to

9   the joint packet I gave out this morning at 9:00 would be

10  welcome.

11       Let me say on the first instance, so you know where I'm

12  coming from, we did not include a sales definition in the

13  instructions, and there is not a sales question on the form.

14  With regard to the verdict form, I am convinced that the law

15  is clear in cases such as this under the FLSA that the

16  proper test is whether or not the exemption is met, and

17  that's what we ask in the jury instruction -- or in the jury

18  verdict form.

19       In terms of sales, we have adopted the plaintiffs'

20  requested instruction as to the regulation.  We didn't mess

21  around with it at all, and we quoted verbatim the

22  instruction regarding financial adviser work.  If sales is a

23  primary duty, then you don't get the administrative

24  exemption, and there's plenty of room, in my view, in the

25  instructions to argue that to the jury based on the

*Jury Trial*
*Monday, March 14, 2011, Volume 17*

6

1    plaintiffs' theory at trial, but I don't think the law

2    supports a special question on the verdict form asking

3    whether or not their primary duty was sales.  The

4    instructions specifically say that, if it is, the

5    administrative exemption doesn't apply, and I would just

6    note that I made that point starting about ten days ago and,

7    notwithstanding the excellent letter and work of the

8    plaintiffs, I am convinced that the verdict form as it

9    stands is proper.

10        With regard to the definition of sales, I looked very

11   hard at that, and I don't want any trouble either way here,

12   but I was convinced by Mr. Davis' position and the research

13   that we performed to indicate that the suggested definition

14   of sales would have come from a regulation that didn't deal

15   with the administrative exemption and the regulations we

16   have at issue in this case.  So, again, I deleted and

17   decided not to instruct specifically on the definition of

18   sales in the instructions with the understanding that sales

19   has a commonly understood meaning.  There is plenty of

20   evidence of what the mortgage bankers here did and did not

21   do, and so you can argue accordingly to the jury.

22        Now, the final thing I will say before I turn it over

23   to Mr. Lukas is that I just cannot, I can't resolve what you

24   folks want to do in terms of the weeks.  I would note last

25   Monday the parties had stipulated as to the number of weeks

*Jury Trial*
*Monday, March 14, 2011, Volume 17*

7

1    worked, and we were going to take that off of the jury

2    verdict form.  At the end of Monday's two and-a-half hour,

3    and professionally done but still contentious, discussion

4    about jury instructions the parties did not stipulate as to

5    the number of weeks worked.

6          We received a follow up a day later from Mr. Lukas'

7    office, which was appropriate, which we took action on and

8    made some decisions on, and heard that now the plaintiffs

9    had at that point agreed upon Exhibit 202 as the number of

10   weeks worked and were going to stipulate to that.  So our

11   verdict form last Wednesday electronically issued eliminated

12   a column for weeks worked, but then Friday's letter seemed

13   to object that we had taken that out.

14         So I'm not sure exactly where you folks are on the

15   weeks.  The plaintiffs' letter indicates that they think I'm

16   wrong that the jury should decide the number of weeks

17   worked, but I don't think I am wrong on that.  I think

18   that's a matter of fact that you folks have not agreed upon,

19   and I don't think there's case law saying that the number of

20   weeks worked per testifying plaintiff or overall as

21   represented by those testifying plaintiffs to the remainder

22   of the plaintiffs who have filed is not a factual question,

23   and whereas I would be glad to take it up as a matter to be

24   resolved by the Court after trial should the parties be able

25   to agree on an exhibit or a general standard for what the

*Jury Trial*
*Monday, March 14, 2011, Volume 17*                                        8

1    weeks are, absent that sort of stipulation, I think the jury

2    should come to a conclusion on the number of weeks worked

3    both by the testifying plaintiffs and those as

4    representative of the ones who didn't testify.

5         My understanding as of last Wednesday is that you had

6    stipulated to Defense Exhibit 202.  Therefore, we removed

7    column three from the verdict form, and I guess what I'm

8    trying to say is I don't understand what the plaintiffs'

9    last letter on Friday said about putting an additional table

10   in as to the weeks for the plaintiffs because I thought you

11   had agreed on that.

12        With that in mind, I have a number of other things I

13   would like to take up before closing argument, but those are

14   the things I would like to note for the record prior to

15   hearing from you on instructions.  I have four other areas

16   where you haven't come to agreement.  We have done the best

17   that we could, but I'll respond after you make your

18   statements if you want to.

19        All right.  Mr. Lukas, go ahead.

20             **MR. LUKAS:**  Thank you, Judge.  I think, you are

21   right, Your Honor, we have worked -- we do appreciate the

22   hard work you have put into this.  The parties have worked

23   hard on it.  We have looked at it real heard.  We have got

24   plenty in the record, I think, that preserves objections.

25        There are two things I would note.  One is the new

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Jury Trial*
*Monday, March 14, 2011, Volume 17*

1    special verdict form has added some language in Paragraph 3
2    about if you decide you cannot draw any conclusions, that
3    paragraph, that's new and we would just log an objection
4    that that's already in the jury instructions and is
5    duplicative and doesn't need to be in the special verdict
6    form.
7              **THE COURT:**  All right.  Thank you.
8              **MR. LUKAS:**  That's new, and that's why I logged
9    that.
10         With respect to weeks worked, I think we were ships
11   passing in the night.  I think we were on the same page, and
12   I think we have been on the same page all along.  I am
13   actually going to turn this over to Adam Hansen over here,
14   Judge, because Adam is the one who wrote that letter to you
15   last week.  That's why there weren't any swear words in it
16   or anything.
17             **THE COURT:**  I was going to make a hilarious joke
18   and say that your signature appeared down below, but that
19   would seem to have come from someone who clerked for like a
20   circuit judge.
21             **MR. LUKAS:**  Exactly.  It was way too smart to
22   have come from my pen.  So I am going to turn it over to
23   Mr. Hansen because I do think, I do think at least the Court
24   and the plaintiffs are in agreement on this.
25             **THE COURT:**  All right.  Go ahead, Mr. Hansen.

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Jury Trial*
*Monday, March 14, 2011, Volume 17*
                                                                    10

1          **MR. HANSEN:**  I can't take credit for something

2     that doesn't have my name on it so Mr. Lukas gets all of the

3     blame for that letter.

4          I think what's been happening with weeks worked is

5     there has been somewhat of a semantic misunderstanding

6     between the parties as to what the Court was after, and we

7     didn't really have a good idea of where the defendants were

8     at on this issue until last week, and it was clear from the

9     JIG conference and from the brief filed on Wednesday that

10    for weeks worked they want to argue weeks worked in excess

11    of 40 hours, which is obviously going to be a different

12    number from total weeks employed.

13         We asked for clarification from the Court on the

14    special verdict form, and we note this morning that the

15    Court has provided that clarification in plaintiffs' favor

16    and that what the Court has really been after all along is

17    the same thing that we thought the Court has been after all

18    along, which is we want to determine the total number of

19    weeks within the relevant statutory period that the

20    plaintiffs were employed as loan officers at Quicken Loans,

21    and quite frankly, that's the only way we can make the math

22    work if you are going to take into account all weeks

23    employed on Question 2, as the special verdict form does,

24    when you calculate the average weekly hours.

25         So I think that's the source of the disagreement,

1    Your Honor.  It's more of a semantic misunderstanding of

2    weeks worked, and what we would ask for this morning is, now

3    that the Court has clarified the special verdict form and

4    made it clear that what you meant, what the Court meant by

5    weeks worked is total weeks employed, that there is no more

6    factual disagreement.  It is a question of fact for the

7    jury.

8          So our position is we have stipulated to their numbers

9    on D202.  D202 has three subcolumns that talk about

10   different categories of weeks worked.  You've got training

11   weeks, full weeks and partial weeks.  Our position is to get

12   total weeks of employment you just tally up those

13   three numbers from those three columns.

14         And, you know, to the extent the jury needs to do that

15   math, that's simple addition, well, it's a question of fact

16   and, sure, they can do it.  So I guess our position this

17   morning is, now that the special verdict form has been

18   clarified to support our position, we would, once again, ask

19   defendants to stipulate to total weeks being the sum of the

20   three columns in their exhibit, and to the extent they won't

21   stipulate, we think that Your Honor should decide the

22   question as a matter of law because there's really not a

23   whole lot else to argue for total weeks of employment and no

24   reasonable jury could conclude otherwise.

25              **THE COURT:**  All right.  I am inclined to agree

*Jury Trial*
*Monday, March 14, 2011, Volume 17*                     12

1    with your point and will certainly hear from Mr. Morganroth,

2    but just so we are on board with each other, if I agree with

3    what you just said and we can't pin down a stipulation to

4    make what you just said agreeable to everybody, then I leave

5    the verdict form as is.  If we do agree that the total

6    number of weeks worked as a mortgage banker is reflected in

7    the three columns of Defendants' 202, I take that column out

8    and now I'm going to compute R and W post verdict.

9              **MR. HANSEN:**  That's correct, if we have a

10   stipulation on the number of weeks, and under the formula

11   that the Court laid out in its order on Wednesday for hours

12   of overtime per week, that factor is where all of the

13   fighting is going to take place.  For hours of overtime

14   worked per week, we'll fight about vacation and chicken

15   nugget eating contests and the rest of it.

16         Weeks worked should be very uncontroversial, weeks

17   employed.  That's just going to be the sum of those

18   three columns.

19         And I guess my additional point, Your Honor, is that

20   even if they won't stipulate to that we don't think there's

21   any factual basis to argue anything different.  They want to

22   argue total weeks worked in excess of 40 hours.  That ship

23   has sailed.  The Court has made it clear it's total weeks of

24   employment within the relevant statutory period, and so we

25   don't really see a basis to look at it any different than

*Jury Trial*
*Monday, March 14, 2011, Volume 17*                    13

1    the way we are looking at it.

2            **THE COURT:**  All right.  Well, that's what I

3    thought as well.

4        All right.  What else from Mr. Hansen and Mr. Lukas?

5    Anything?

6            **MR. LUKAS:**  No, that's -- what he said.

7            **THE COURT:**  All right, good.  All right.  That's

8    what I thought I read in the letter that you signed,

9    Mr. Lukas.

10       It's interesting.  We were down in Cincinnati last

11   week, and as usual, whenever we are down there we learn

12   firsthand how much we rely on the brilliance of these young

13   people who work so hard, and that's true of my law clerks

14   and I know it's true of our associates as well.  So

15   thank you both very much for that.

16       Let's move to Mr. Morganroth, and good morning, sir.

17           **MR. JEFFREY MORGANROTH:**  Good morning, Your Honor.

18           **THE COURT:**  Any response and anything that you

19   would like to guide the Court on at this time is

20   appreciated.

21           **MR. JEFFREY MORGANROTH:**  Thank you, Your Honor.

22       I think we have put in the record both during the

23   hearing on March 8th as well as -- or March 7th, plus the

24   letters that have been circulated March 8th and March 11th,

25   in terms of any objections that we have.

1    I would like to take up this last issue on the verdict

2    form.  What is it that the jury is supposed to be

3    determining?  They are supposed to be determining, if there

4    is liability, how many hours in excess of 40 each plaintiff

5    worked and for how many weeks.  It's not -- the question is

6    not how many weeks they worked.  The question is how many

7    weeks they worked in excess of 40 hours.

8        If someone works 40 weeks, but they only had overtime

9    for two weeks, they can only recover for those two weeks.

10   They don't get to recover for 40 weeks.  So the question on

11   the verdict form is, in our view, misleading and prejudicial

12   because it suggests that if the jury finds liability --

13            **THE COURT:**  Wait a minute.  Specify the question.

14            **MR. JEFFREY MORGANROTH:**  Oh, I'm sorry, the

15   question that Mr. Hansen and Mr. Lukas were talking about,

16   the average hours of overtime worked per week that they

17   worked.

18            **THE COURT:**  Yeah.

19            **MR. JEFFREY MORGANROTH:**  So if the question to the

20   jury is find out how many hours or determine how many hours

21   they worked in excess of 40 and then just plug in how many

22   weeks they were employed, that's prejudicial because they

23   have to decide how many of those weeks that the plaintiffs

24   were employed that they actually worked in excess of

25   40 hours.

1          So if you look at Exhibit 202, D202, it has full weeks

2     in there.  That's a column where each plaintiff worked those

3     number of weeks for a full week.

4          Then there are two other columns, weeks in training,

5     and the testimony by virtually every plaintiff was that they

6     didn't work overtime during their weeks in training.  So if

7     that's included in the weeks worked, then the jury is not

8     getting -- able to make their decision as to whether

9     overtime was worked during those four weeks, which most of

10    the plaintiffs admitted they didn't work overtime.  They

11    can't recover anything for those four weeks.

12         Then the last column is partial weeks.  Partial weeks

13    is defined as working less than three days.  So if someone

14    worked less than three days, they can't have overtime,

15    there's not enough hours, unless they worked 24 hours, and

16    no one testified they worked 24 hours.

17         So Mr. Hansen's comment that you add up three columns

18    and that is what should be plugged into the jury verdict

19    form and the verdict if in fact there is liability, that is

20    completely wrong.  What the jury has to determine is how

21    many weeks were worked in excess of 40, not how many weeks

22    they were employed, and that's why this exhibit was broken

23    down that way, because there are certain weeks that it's

24    impossible for the plaintiffs to have worked overtime even

25    if they were employed.

*Jury Trial*
*Monday, March 14, 2011, Volume 17*                    16

1      And for that reason we sent the letter, Your Honor,

2    requesting that the verdict form be adjusted so that the

3    jury can determine, not only how many weeks they were

4    employed, but of those weeks how many weeks they actually

5    worked in excess of 40 hours.  And that's what we were

6    talking about last week I believe it was March 7th.

7      We can stipulate apparently when they stipulate to

8    Exhibit D202 how many total weeks of employment, but that

9    doesn't get to the real question that the jury has to

10   decide, and that is of those weeks how many did each

11   plaintiff work overtime, work in exercise of 40 hours.

12      Just because they were employed, and even if there is a

13   determination that they didn't satisfy the administrative

14   exemption, doesn't mean that every single week each

15   plaintiff worked in excess of 40 hours.  We have put in

16   a lot of evidence to that effect, including weeks where they

17   worked partial time where they couldn't have worked

18   40 hours, including training where they testified that they

19   did not work in excess of 40 hours.  So that's where we have

20   this issue.

21      And, in terms of stipulation of Exhibit D202, I'm not

22   sure, when is that going to be shared with the jury?  Is

23   that part of the instructions?

24           **THE COURT:**  What's your question, when they get

25   the verdict form?

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Jury Trial*
*Monday, March 14, 2011, Volume 17*

17

1       **MR. JEFFREY MORGANROTH:**  No, Exhibit D202, if we

2   have a stipulation on that, is that being shared with the

3   jury?

4       **THE COURT:**  The stipulation itself?

5       **MR. JEFFREY MORGANROTH:**  Yes.

6       **THE COURT:**  No.  I am at sea on that because I

7   didn't know whether you guys were going to agree or not

8   agree so I didn't put anything in the instructions.

9       I assume if we go past this point and you tell me that

10  you're fine and agree to Mr. Hansen's construction of what

11  D202 says that Mr. Lukas can tell the jury his belief in

12  that regard and you won't make it a factual issue.  That's

13  how I would --

14      **MR. JEFFREY MORGANROTH:**  Well, it's a factual

15  issue, first of all, just on D202.  We can stipulate that

16  those are the right numbers, but they are going to argue

17  that you have to add all of these things up and that equals

18  the total amount of weeks in which each plaintiff worked

19  overtime.

20      But that's not what D202 means.  D202 is simply the

21  full weeks that they were employed, the partial weeks where

22  they couldn't possibly have worked overtime in which they

23  were employed, and the weeks they were in training, which

24  many of the plaintiffs admitted they didn't work overtime.

25      **THE COURT:**  All right.  Let me ask you this.  Do

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1    you agree with me and Mr. Hansen -- or I should say

2    Mr. Hansen that the three columns totaled up reflect the

3    total number of weeks worked by the plaintiffs at

4    Quicken Loans?

5         **MR. JEFFREY MORGANROTH:**  The total number of weeks

6    worked?

7         **THE COURT:**  Yeah.  D202, if you take those

8    three columns that you just mentioned, that would give all

9    of us the universe of how long, how many weeks these folks

10   were employed there, right?

11        **MR. JEFFREY MORGANROTH:**  I agree with that.

12        **THE COURT:**  All right.

13        **MR. JEFFREY MORGANROTH:**  The problem though is

14   that doesn't tell anyone how many of those weeks the

15   plaintiffs actually worked in excess of 40 hours, and that's

16   the jury question that we want the jury to determine, okay,

17   from these number of weeks how many weeks do you find, if

18   you get to that issue, that the plaintiffs worked in excess

19   of 40.  And the only way to, to determine that is to look at

20   the evidence.

21        So you've got a column on partial weeks.  I suggest

22   that it's impossible for any of the plaintiffs to have

23   worked more than 40 hours during these partial weeks.

24        The weeks in training, we have specific admissions from

25   many of the plaintiffs that they did not work in excess of

1    40 hours.  They can't receive overtime for that when they

2    have already admitted, but if you put it in the way the

3    verdict form goes, they would get overtime even though they

4    have admitted that they didn't work in excess of 40 hours.

5         And then they are other issues that we would want to be

6    adjusting in terms of time off, in terms of breaks, in terms

7    of play time, fun time and activities at Quicken Loans that

8    they participated in.

9         So we would say you take the total amount of those

10   weeks and then the jury has to determine how many of those

11   weeks they would subtract out in which each plaintiff could

12   not have or did not work in excess of 40 hours, and that's

13   the question that we need to have answered.

14              **THE COURT:**  All right.  Anything else?

15              **MR. JEFFREY MORGANROTH:**  No, Your Honor.

16              **THE COURT:**  Okay.  I might take a recess here, but

17   let me just say this so I can give you some guidance since

18   we are going to start with the jury pretty soon.  My sense

19   is that, with all due respect, Mr. Morganroth, I think you

20   are asking me to ask the jury too much.  It seems to me that

21   the specific number of weeks for them to find that overtime

22   was worked or not worked is not the relevant test and it's

23   not important for them to decide.

24        What they need to do, I think, is to average out hours

25   of overtime over both weeks that they worked overtime and

1    workweeks that they didn't, and I think that they will have

2    ample opportunity to do that both from the agreement that

3    you have reached with the plaintiffs as well as from the

4    evidence that you have adduced in the defense case as well

5    as from what I know or sense you are going to argue as a

6    factual matter in closing arguments -- or I should say your

7    interpretation of the facts in closing arguments.  So I'm

8    inclined to leave the verdict form alone.

9         How many weeks the plaintiffs actually worked I don't

10   think we can hold the plaintiffs' proofs to absent accurate

11   records from Quicken, which don't exist.  So I think it

12   would be too much to ask the jury to be as specific as

13   Quicken wants them to be.  They can average out partial

14   weeks with overtime weeks, mark down the award accordingly,

15   and Quicken will have ample opportunity to argue its theory,

16   which I think is entirely correct, that the plaintiffs

17   clearly did not work overtime every week that they were

18   employed there because some were training, some were

19   vacations, some were whatever, but I think absent records

20   Mr. Lukas' opportunity and the Court's question of the

21   jurors to ascertain from them what they think is an average

22   is appropriate and the best we can do, all right?

23        So that's where I am on that.

24             **MR. JEFFREY MORGANROTH:**  And just to address that

25   last point, the problem is that under the statute it's week

*Jury Trial*
*Monday, March 14, 2011, Volume 17*

1   by week per week and each workweek is a separate claim.  So,

2   for instance, if the jury is averaging, and let's just make

3   this simple, for two weeks, and week one there is 40 hours

4   that the plaintiffs worked and week two is 60 hours, and if

5   they average that, say 50 hours, and just plug in two weeks,

6   now they are receiving overtime for two weeks when in fact

7   they should only receive overtime for the second week.  You

8   can't average the two in terms of the number of weeks.

9        You may be able to come up with an average in terms of

10  the number of hours that someone worked overtime over a span

11  of time, but not the number of weeks, because what happens

12  in that hypothetical is you have just doubled the damages by

13  averaging two weeks when only one week would be applicable.

14            **THE COURT:**  Okay.

15       All right.  I understand your position.  I guess I

16  don't see them as separate claims.  I see this as more a

17  global claim under the statute.

18            **MR. JEFFREY MORGANROTH:**  Well, what happens is the

19  statute of limitations runs on each workweek based on the

20  payment.  So that's one of the reasons why it's a separate

21  claim.  They can't pursue a claim when the statute runs on

22  one week of pay.

23            **THE COURT:**  Okay.

24            **MR. JEFFREY MORGANROTH:**  After two years passes.

25  But then you have the next week, and the next week they

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1   would be able to recover damages if in fact they could prove

2   their case.

3                **THE COURT:** Okay.  The objection is noted.

4        I'm going to go with what I just said, which is to say

5   that my inclination of the agreement between parties is that

6   D202, the three columns, adds up to, and the parties are

7   agreed that, those numbers reflect the total number of weeks

8   worked by each plaintiff at Quicken Loans during the time

9   period at trial.

10       You can proceed on the presumption that the Court has

11  accepted your agreement and stipulation to that, but I'm not

12  going to instruct the jury that you have stipulated to that,

13  nor am I going to introduce any other evidence as to that

14  stipulation, but it seems to me you have agreed on the

15  columns in D202 as reflecting the total numbers of weeks

16  worked.

17       Notwithstanding that, Mr. Morganroth, as a factual

18  position that he just stated, Mr. Lukas, you should be aware

19  that he's going to argue that, but my overall finding is

20  that, as reflected on this verdict form -- and I think

21  correctly based on all of the work that we have done and

22  having heard from both parties now -- that the specific

23  number of weeks worked overtime is not going to be required

24  to be proven and I'm going to allow the jury to average out

25  the hours of overtime over both overtime and non-overtime

*Jury Trial*
*Monday, March 14, 2011, Volume 17*                    23

1    weeks.

2        And I know Mr. Morganroth disagrees with that and he

3    just told me why, but I have got to decide one way or the

4    other and that's what I have decided.  We are not here to

5    make everybody happy unfortunately.  Okay?

6        All right.  I looked closely at the issue of how we are

7    going to argue here, and we are going to have Mr. Lukas go

8    first, Mr. Morganroth is going to go second, and in my

9    discretion I will allow a brief rebuttal by Mr. Lukas to

10   speak only to the things that Mr. Morganroth has said, no

11   sandbagging, as you well know.

12       I think most of the time, Mr. Lukas, I don't want to

13   guess at this, but I think most of the time you and your

14   colleagues that you have tried cases with in the past have

15   probably agreed upon certain issues that you and Quicken

16   have not agreed on here.  So I think the burden is yours.

17   You should go first.  Mr. Morganroth then has the burden of

18   establishing the administrative exemption by a preponderance

19   of the evidence, as the instructions say, but then, given

20   the overall burden in establishing the case, which Quicken

21   has not agreed to, the plaintiff should get a brief rebuttal

22   not to exceed 10 or 15 minutes, okay?

23       So are we agreed on two hours per side roughly,

24   Lawyers?  Is that what you are thinking?

25           **MR. LUKAS:**  Yeah, we will be under two.

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Jury Trial*
*Monday, March 14, 2011, Volume 17*

24

1        **MR. JEFFREY MORGANROTH:**  We had prepared for the

2   two and-a-half.  I'm not sure how long we will be going.

3        **THE COURT:**  Okay.  That's fine, that's fine.

4        **MR. JEFFREY MORGANROTH:**  So do we get a

5   surrebuttal on the administrative exemption?

6        **THE COURT:**  No, no surrebuttal, okay?  Mr. Lukas

7   gets two to two and-a-half hours, Mr. Morganroth gets

8   two and-a-half hours, and then Mr. Lukas gets a 10- to

9   15-minute rebuttal.  That's how we are going to go, and then

10  I'm going to instruct the jury after that.  All right?

11       **MR. LUKAS:**  Okay.

12       **THE COURT:**  Which leads to my next point, which I

13  will say to the courtroom at large.  I have been in a lot of

14  trials and I understand there is a lot as stake, and we have

15  plaintiffs who are here to support their view of the case,

16  we have executives and others here from Quicken Loans, and

17  we have observers who want to watch the lawyers.  If we go

18  directly from Mr. Lukas' rebuttal into instructions, which

19  is quite likely, I don't want any mass exodus here, okay?

20  It's very distracting and I think disrespectful to the

21  jurors because it says we come to watch our lawyers and then

22  we're bailing out.

23       If people have to leave, I understand that you have to

24  leave, I understand that it's a public courtroom and I'm not

25  going to put up any bars on the doors, but I don't want, you

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Jury Trial*
*Monday, March 14, 2011, Volume 17*                    25

1    know, 50 people leaving the courtroom after Mr. Lukas sits

2    down and the jury wondering what the heck is going on here.

3    And I will, I will enforce that as necessary.

4         We have spoken, not me, but Carol, has spoken with the

5    jury.  They are in a very good mood.  I think they are eager

6    to get the case.  We have explained to them that,

7    notwithstanding their timely arrivals at 8:30, we had some

8    work to do on jury instructions and I think they are fine

9    with the delay, but they are expecting to hear from us soon.

10        So, with that in mind, anything from either lawyer

11   before we get down to business?

12             **MR. LUKAS:**  I just have a Court set of the slides

13   that we are going to be showing, but that's all.

14             **THE COURT:**  Just give those to Mr. Gerardi, and

15   we'll be ready to go.  All right?

16             **MR. LUKAS:**  Sounds good, Judge.

17             **THE COURT:**  All righty.  Good luck to you both,

18   and thanks for all of the hard work.  I think we are ready

19   to go.

20        Carol, why don't you bring in the jury, and we'll go to

21   our closing arguments.

22             **MR. LUKAS:**  Judge, can we get a new version -- I

23   wanted to go through the special verdict form with the jury

24   so could we have the form that . . .

25             **THE COURT:**  Tell them to hang on, tell them to

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Jury Trial*
*Monday, March 14, 2011, Volume 17*                    26

1    hang on.

2         Yeah, we'll take a brief recess and get a final verdict

3    form for your use, okay?

4              **MR. LUKAS:**  Thanks, Judge.

5              **THE COURT:**  All right.  Three-minute recess.

6    We'll be right back.  You may all be seated.  We are in

7    recess.

8         (Recess from 10:00 a.m. to 10:15 a.m.)

9              **THE COURT:**  It's been six and-a-half years.

10   What's another five minutes, right?

11        All right.  Very good.  Is everybody finally ready to

12   go now?

13             **MR. LUKAS:**  Yes, sir.

14             **THE COURT:**  All right.  Let's go, Carol.

15        Okay.  Let's all rise for our jurors.

16        (Jury in at 10:16 a.m.)

17             **THE COURT:**  Good morning.  How is everybody?

18   Good.  Good to see you.  Excellent.  Welcome back.

19        All right.  All of our jurors are here and they are in

20   their spaces, and you may all be seated.

21        It's been so long I can remember all of your names

22   except this woman's in the front.  Ms. Wells-Flanigan, how

23   are you?  Welcome back.  Good to see you.  How was your

24   little vacation?  You would rather do this work than your

25   regular work.

1       Carol tells me you are in a good mood though, so that's

2   good.  We are closer to spring and moving along.  Well,

3   listen, it's great to see you and welcome back and, you

4   know, we had a lot of work and a lot of time together up

5   until this point, but we still have got a lot of work to do

6   and that's what we are going to tell you about right now.

7       In all sincerity, we thought as a group, which is to

8   say myself and the lawyers, about maybe bringing you in for

9   a day or two last week, but then you know we were going to

10  be off Wednesday, Thursday and Friday and the thought was

11  with all of the evidence and testimony that you have heard,

12  to have you in and break up closing arguments and

13  instructions and deliberations would not be efficient and it

14  would be better to resolve legal issues last week, which we

15  did, and then give you the whole week off and have everybody

16  come back today.

17      So, as usual, I want to give great thanks and deference

18  to the lawyers, they worked really hard in your absence, and

19  of course my staff, and we have now put together everything

20  that we have needed to put together and we are going to

21  hopefully get the case to you today.  In fact, I am very

22  confident we will get the case to you today.

23      We are going to have Mr. Lukas open up and give a

24  closing argument.  He's got about two or two and-a-half

25  hours.  So I think we will hear from him, take a very brief

*Jury Trial*
*Monday, March 14, 2011, Volume 17*                28

1    lunch where you can refresh yourselves, get a little food, a

2    little drink, whatever.  Afterwards, Mr. Morganroth will

3    have a similar amount of time, and then Mr. Lukas will have

4    a short rebuttal since they have the burden of proof.  Just

5    like in the witness and opening statement phase, he goes

6    first, he'll go second, and then get a very short rebuttal

7    to conclude the case.

8         I will read instructions to you, which hopefully will

9    take about 30 minutes or so, and then you'll have the facts,

10   you will have the law, you will have the instructions, and

11   you will go deliberate.  And you will do that all day today,

12   tomorrow, however long it takes you to get a verdict, and

13   that's where we are going from here, okay?

14        So I apologize for being about an hour and 15 minutes

15   late today.  With the time off that we had, we had a couple

16   of final things to do, but as usual, you were all here right

17   on time.

18        And I know you have been paying great attention.

19   Please continue to pay great attention with the proviso that

20   anything here on in is not evidence.  You have heard all of

21   the evidence in the case, and now you get to hear closing

22   arguments from the lawyers, which are their opportunities to

23   persuade you on how they think the evidence has come out,

24   all right?

25        Again, thank you for being a great jury, for all of

*Jury Trial*
*Monday, March 14, 2011, Volume 17*                                    29

1    your attention and all of your service, and I expect by the

2    end of the day the case will be in your hands, okay?

3    All right.  Thank you all very much.

4         Mr. Lukas, everybody has heard enough from me this

5    morning.  You may take over.

6         **MR. LUKAS:**  I was just going to say they probably

7    feel like they have heard enough from me, too.

8         Good morning, everybody.

9         **THE JURORS:**  Good morning.

10        **MR. LUKAS:**  I get to talk to you directly finally

11   after being able to do that and then just kind of going good

12   morning in the hallway and what not.

13        It's been a week, it's been ten days since we had

14   testimony, and I think you guys got it.  I think you got it

15   in the first three or four days, but we had to put up our

16   representative plaintiffs and we did that.

17        No matter how many cases I try and we try, it's

18   amazing, the jurors putting their lives on hold and doing

19   this, and this was a long trial as trials go, and we

20   appreciate it and we feel like we have taken over a month to

21   prove what we think has been painfully obvious for a very

22   long time, forever.  And I'll get to that, but we do

23   appreciate that you folks put your lives on hold and do

24   that.

25        This isn't a huge financial case individually for the

1    plaintiffs.  Each one of them worked there for -- not for a

2    very long period of time and they didn't make a lot of

3    money, so they are seeking overtime for relatively short

4    periods of time based on very small amounts of income.  But

5    as you can tell by their perseverance in almost seven years

6    of litigation and being here, that it is very important to

7    them, and we want to thank you for being here and

8    participating in it.

9         And I don't know if I am going to be two and-a-half

10   hours.  I saw you all grimace.  I'll do what I can.  A lot

11   of the stuff that I'm going show you you have seen before so

12   that, you know, if I get an itchy trigger finger and start

13   slamming through them, it's because I think you have seen

14   them and you will have those back with you, the exhibits.

15   So I'm going to do the best I can to get you through this.

16   I feel like you have seen them, you get it, and that's what

17   we are going to do.

18        As I told you in the beginning when I first stood up

19   here, a little nervous, not really feeling like I know

20   you -- that's the other weird thing about jury trials is you

21   never get to talk to the jurors but you feel like you get to

22   know them.  It's kind of a strange dynamic.

23        But I stood up here the first time and I told you this

24   case is about sales and whether or not the primary duty of

25   the loan consultants was sales, and if their primary duty

1    was sales, Quicken has to pay them overtime.  And that's

2    what the judge will tell you the law is.  People selling

3    financial products in an inside environment like this get

4    overtime if sales is their primary duty, and that's what we

5    believe we have proven.

6        Now, the judge is going to give you the law, and it's

7    this.  This is where we start, at least.  This is what

8    Quicken must prove to prove that these guy didn't deserve

9    overtime because, as you remember, the presumption is

10   everybody gets overtime and Quicken has to prove they don't.

11       So Quicken has to prove these two factors:

12               Plaintiffs' primary duty was the performance

13               of office or non-manual work directly related

14               to the management or general business

15               operations of Quicken Loans or its customers.

16   And that:

17               Plaintiffs' primary duty included the

18               exercise of discretion and independent

19               judgment with respect to matters of

20               significance.

21       And you go, oh, my God, what do those two things mean?

22   And he'll tell you what those two things mean, but after he

23   tells you what those two things mean, he goes around and he

24   explains all of those things, he's going to get to the

25   punchline, and this is what you are going to hear.  This is

1   the punchline.  When you hear the word "however," you will

2   know what we have been talking about since the first day I

3   stood up.

4           An employee whose primary duty is selling

5           financial products does not qualify for the

6           administrative exemption.

7   In other words, if their primary duty is sales, they get

8   overtime.

9        There are other ways plaintiffs can win, and we can go

10  back through the general instruction that he gives you and

11  march through all of these ins and outs, and I'll do that

12  briefly with you and we can win that way, but this is the

13  quickest way, this is the most obvious way, and this is the

14  way that plaintiffs prevail in this case.

15       So let's get right to sales, and let's get right to

16  what primary duty is because that's probably the first

17  question.  What is primary day?  The judge is going to tell

18  you it means:

19           The principal, main, major, most important

20           duty that the employee performs.

21  It's just exactly what you think it was, primary duty.  It

22  does not mean most time-consuming duty, the judge will tell

23  you.

24           [It] means the "principal" or "chief" --

25           meaning the most important -- duty performed

1              by the employee.

2     Again, it's just what you think it is, primary duty.

3              The law does not require you to shut off your brain,

4     fortunately.  It does not require you to enter some bizarre

5     universe where sales is only asking for the business.  The

6     law actually allows you to use your reason and common sense.

7     In fact, the judge will use words just like that.  He'll

8     tell you to use your reason and common sense.

9              So let's get right to it.  Why do we know that the

10    primary duty of loan consultants was sales?  Why do we know

11    that?

12             Well, when Quicken didn't know it mattered, when they

13    didn't know whether or not they had to pay overtime hinged

14    on whether it was sales, when they didn't know it mattered,

15    that's what they called it.  When they didn't know it

16    mattered, they were very accurate in how they described it.

17             Mr. Gilbert went on and on about the loan consultants.

18    The best sales force in the country, that's what he wanted.

19                  You, we want to call you the best sales force

20                  in the country.

21    That's the loan consultants.  That's Mr. Gilbert describing

22    these people quite accurately.

23             Here is Mr. Emerson, as we go down the chain.

24    Mr. Gilbert, chairman; Mr. Emerson, CEO.

25                  You know, I'm moving closer to you guys.  I'm

1              moving closer to the sales floor.

2     He wants to make sure his salespeople are selling 90 percent

3     of the time.  You heard Mr. Emerson testify.  He was talking

4     about our people, the plaintiffs, the loan consultants

5     selling 90 percent of the time.

6          Here is Jay Farner, as we move down the chain.

7     Gilbert, Emerson, who I apparently had a hard time keeping

8     straight, Mr. Farner.  Here is Mr. Farner:

9              Sell, sell, sell.

10    I don't even know what font that is, but it sure gets to the

11    point, doesn't it?

12         Here is Mr. Farner:

13             It's all about selling.

14    Here is Mr. Farner again:

15             We sell.  Let's get excited about it.

16         Here is Mr. Apple, who is one of Mr. Birkmeier's

17    disciples.  He worked under Mr. Birkmeier all the way up

18    through the chain.  He's now in Arizona running the Arizona

19    shop.

20         Let's look at this one.  I don't think we looked at

21    this one that carefully so I'll spend a little bit of time

22    with it.  He's trying to, he's trying to fire up his troops.

23    He learned from Mr. Birkmeier how to fire people up.  He

24    knows what the job is.

25             I have been in the business for nine years,

```
 1                and all I can think about is business.  Sales
 2                is a career for me.  It's 9:45 p.m., and I am
 3                sitting on the couch trying to figure out
 4                ways to help all of you become more
 5                successful.  Answer these questions:  Are you
 6                exited to be a salesperson?
 7           That's the loan consultant.  Of course they are
 8      salespeople.
 9                Are you willing to call your past clients and
10                ask them for referrals?
11      He goes on and on.
12                Are you willing to call every LOLA lead
13                five times?
14                 Will you work up and write a deal before
15                lunch?
16                 Are you logged in from home to go through
17                your emails at night instead of during prime
18                time selling hours?
19                 Do you check your voice mail before you go
20                to bed?
21      And he goes on and on.
22           And it's sales.  It's a sales job.  Look at him
23      describe it.
24                Are you angry when the bridge send out emails
25                and your name is at the bottom of the list in
```

*Plaintiffs' Closing*
*Monday/March 14, 2011/Volume 17*                    36

```
 1              brown instead of green?

 2                  Do you hate to see your name at the bottom

 3              of the board?

 4                  Is it hard -- you are fighting to move to

 5              the top.

 6                  Does it make you mad when Dakota gets an

 7              $18,000 commission check and yours is 3,000?

 8       That's a sales job.  That's all it is.  It is a sales

 9  job.

10       Mr. Apple is describing -- here is David Lee.  He came

11  into the business.  I believe he was -- worked with

12  Mr. Perry.  They were kind of -- they were peers at the

13  time.  You saw some banter between them on emails.

14       Here is what he's telling his -- this is when he is a

15  regional.  This is what he's telling his sales directors.

16              Now, when you guys were loan consultants, you

17              were the greatest salespeople in the company.

18              Now that you are their managers, you've got

19              to make them the greatest salespeople in the

20              company.

21       They know how to describe the job.  Here is

22  Bill Pellow:

23              Key stuff from Jay Farner.  The best

24              salespeople make sales calls in the morning.

25  We know that from Mr. Farner's voice mail, that that was his
```

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1    advice to these salespeople.  They know how to describe the

2    job.

3          Here is Mr. Farner:

4                We are not order takers.  We are sales

5                professionals.  Let's sell hard today.

6          It's because it's a sales job.  They knew how to

7    describe it.

8          But then they did find out, they did find out that it

9    mattered and that sales, if it's sales, they have to pay

10   overtime, and what happened then?  What happened when they

11   found out sales matters?

12         I am not sure that coloring didn't turn out so great

13   because it's kind of hard to read, and this is what they

14   call a summary exhibit because it's got a bunch of exhibits.

15         I stood up the first time and told you that they

16   changed the language in the documents, and then it got

17   mucked up and we were worried that you were confused about

18   dates as to when the language changed on what.  So we put it

19   on a time line, it got "Rachhana-rized", and we've got job

20   offer letter.  In May of '02 it didn't say anything about

21   duties or expectations.  September 5, 2003, the job offer

22   letter still doesn't say anything duties or hour

23   expectations.  Ten days later on September 15th suddenly

24   that's when we have the language:

25                Joining one of the most highly trained and

1          skilled sales forces in the United States

2          of America.  Rugged character and strong

3          competitive spirit is vital to be a great,

4          winning salesperson.  As a sales

5          professional, you will need to make a minimum

6          of 80 outbounds a day, 55-plus hours per

7          week.

8     That's where we get that, and the reason we know this

9     is when it happened is because Katie Ennes, one of our

10    plaintiffs who testified, got both letters.  She got one on

11    the 5th and on the 15th.  So we know exactly when they

12    changed.  They decided they wanted to be more specific in

13    September of '03 about what this job was really about, and

14    that's when they said sales, sales, sales.

15        Then the lawsuit happens in May of 2004, and in that

16    September/October '04 time frame, that's when the word sales

17    gets wiped out.  That's sort of the story of the job offer

18    letter.

19        Employment agreement, down there below in green.  It

20    does generally describe the duties, but it doesn't say

21    anything about collecting or analyzing or advising or

22    anything like that.  Instead, it talks about

23    production/sales in the employment agreement.

24        And then come around September '03 you look at the comp

25    plan.  Nothing in the comp plan in '03 about job duties or

 1    primary responsibilities or anything like that.  Then the

 2    lawsuit is filed May 2004.  Then the comp plan -- the word

 3    sales disappears from the comp plan completely, almost

 4    completely.  Instead, it's revised to include primary job

 5    responsibilities that basically conceal the true sales

 6    nature of the job.

 7        And then in May 2004 we get this overarching mortgage

 8    banker's duties and responsibilities statement that they

 9    marched through with every single plaintiff who was there

10    before the -- who started after the lawsuit got one those,

11    from May 2005 on, got one of those stuck in front of them on

12    their first day of employment.

13        And you will have to take a look at that, and when the

14    judge reads you the law, you take a look at that thing.

15    They are trying to match up the law and say, ta-da, see, we

16    were complying all along.

17        But that's the time line.  It was sales and it was

18    perfectly fine sales until they found out it mattered, until

19    they found out that, well, it better not be sales or we have

20    to pay overtime, and then suddenly we get some very creative

21    language by some very good lawyers at a company that's full

22    of very smart people.

23        How else do we know it was sales, why we know their

24    primary duty was sales?  Because that's how they paid them.

25    Very simply, they paid them as salespeople.  Again, is there

1    something wrong were being a salesperson?  No.  Commission

2    sales jobs.  Everyone knows what a commission sales job is.

3         You pay to motivate the primary duty.  That's what you

4    do when you are an employer.  You want to motivate the

5    people that do the thing that you want them to do.  And how

6    do they motivate these people?  They motivate these people

7    by paying them a commission on how many loans they sell.

8         I want to play Mark Mazey's voice mail, and listen to

9    Mark Mazey.  This is a sales director.  I believe at the

10   time he's still in Livonia.  He's the one that moved to Troy

11   and then he went to Cleveland, and he testified.  He

12   testified by video.  Him and Mr. Perry are in Cleveland

13   together.

14        I'm going to play Mr. Mazey's voice mail, and I want to

15   you listen to how he describes it.  He calls it a commission

16   sales environment, and you should treat it as such.

17        (Voice mail played.)

18        **MR. LUKAS:**  I played it for the commission sales

19   environment, but there's some other stuff in there, and what

20   I like about this voice mail is this is just -- and you

21   heard Mr. Mazey testify he left these every day.  I like

22   this one because you can tell this is the kind of thing he

23   tells them every today.

24        This isn't a Jay Farner blast over all loan consultants

25   saying, you know, -- well, we'll play one of Mr. Farner's

1    later.  This is Mark Mazey, sales director of a team of

2    20-some, 20 to 24 loan consultants.  I think he said

3    sometimes it went from 12 to 20 to 24.  This is a guy

4    running those people every day.

5        It's a commission sales environment.  You can hear it

6    in his voice.  He pounds on these people every day:  Do you

7    got deals, do you got deals, do you got deals, do you got

8    books?  This is everyday life, and that's the job and that's

9    what it was.

10       And they paid it that way.  They paid it as a

11   commission sales environment, and it was directly tied to

12   the individual sales production.  It wasn't some vague team

13   goal or an extra little bonus at the end of the month or,

14   you know, some profit thing, you know, based on performance

15   of the whole place.  This was individualized commission

16   sales.

17       They paid a $24,000-a-year salary, just enough so you

18   don't starve.  You can eat, you can put gas in your car, and

19   go to Quicken to work.  After that, boy, you better sell,

20   you better be able to sell or you are not going to last very

21   long.

22       And they do that on purpose.  $24,000 a year at

23   60 hours a week, that's about eight bucks an hour; at

24   65 hours a week, it's $7.38 an hour; and at 70 hours a week,

25   it's about 6.53 an hour.

1          So where is the incentive?  The incentive is to sell,

2     where you would want to put the incentive if you have a

3     sales force.  The rest is commission.  If you make Quicken

4     money, you get a little more.  You have to make Quicken

5     enough money because, as we know, you have to have a certain

6     units per month.  If you only sell five loans a month,

7     Quicken makes the profit for those loans, but you are still

8     stuck with your one-month share of 24 grand, 2,000 bucks.

9     You've got to -- it's not just sell, sell a loan and you

10    make more money.  It's sell enough loans and you make more

11    money.

12         That's why they keep saying, well, there is other

13    factors besides commission.  There is customer service

14    surveys.  There is a small bump you can get if you have good

15    customer service surveys, but that only kicks in if you sold

16    enough to qualify for a commission in the first place.  In

17    other words, you could sell five or six loans and not meet

18    the units, and you could have perfect customer service

19    scores.  So what?  You don't get any extra anything because

20    you didn't meet the units because it's a commission sales

21    job.

22         The same with green bar.  You can jack up the price on

23    all five of those people and make extra money for Quicken,

24    but if you don't sell that sixth loan or seventh loan and

25    get you to the unit piece you need to get to, Quicken takes

1   it all and keeps it all and you don't get paid anything.

2   It's two grand a month.

3         And commission is critical to their system.  You heard

4   Mr. Gilbert testify very emphatically that commission is

5   critical.  Why is it so critical to their system?  For a

6   couple of reasons.

7         Number one, you want to incentivize the people to do

8   what you want them to do:  Sell.

9         Number two, it's a perfect system for Quicken.  They

10  can bring people in, just bring them in and bring them in

11  and bring them in.  If they make it, great, that means

12  Quicken is making a bunch of money on them.  They have to

13  pay them a commission, but it's only a piece of the profit,

14  right?  And if they don't make it, so what, all they have to

15  do is sell enough loans to cover the two grand a month,

16  which can't be too hard, and then they wash out and they are

17  gone.  Bring in more, bring in more.

18        The goal of 1,000.  The more people selling, the more

19  loans sold, the more money made.  Evil?  No.  Is it a

20  nonprofit company?  No.

21        Good for them, they have made a great living, they have

22  done a fantastic job of making money, but they made it with

23  a sales force.  They didn't make it with advisers,

24  consultants and analysts.  That's the point.

25        You know, the customer doesn't pay a consulting,

*Plaintiffs' Closing*
*Monday/March 14, 2011/Volume 17*

44

1   advising or analyst fee.  The employee doesn't get paid to

2   analyze -- if the employee meets with a person on the phone

3   and talks with them for a half hour and only gives them

4   advice and hangs up, there's no pay, no commission pay.

5       And if they don't -- and, frankly, if they did, they

6   would get yelled at.  Find out -- and we'll hear in the

7   voice mail that we play from Mr. Farner.  Find out if they

8   qualify.  If they don't, get off the phone.  That's the

9   instruction to these people.  That's the advise, consult and

10  analyze.  Find out if they qualify under Quicken's

11  guidelines, get that loan, get what you need to figure out

12  loan to value, get what you need to figure out debt to

13  income, get the Social Security number for the credit score,

14  find out if they qualify.  If they don't, good bye.  Okay?

15  So that's how we know.

16      And how do -- and they motivate these people with that

17  carrot of commission, as all salespeople are motivated by

18  commission.  Here are some examples.

19      This is Dan Gilbert.  You remember this one.  Frankly,

20  a pretty harsh one.

21              If I'm 23, 28, 33 or even 40 and I had one

22              chance, one opportunity to insure the

23              financial future of my family and myself,

24              what lengths would I go to?  If I had one

25              chance, one opportunity to rise out of

```
 1                 mediocrity and become great at something,

 2                 would I do it?  If I had one chance,

 3                 one opportunity to work countless hours

 4                 and/or figure out a way to become the most

 5                 efficient production machine ever seen to

 6                 mankind, would I do it?

 7      A production machine, that's what these people are.

 8                 If I had one chance, one opportunity to make

 9                 more money than my mom or dad ever did and be

10                 in a position to help them through their

11                 twilight years, would I do it?  If I had one

12                 chance, one opportunity to make enough money

13                 to insure my kids' college education, would I

14                 do it?

15                   1 to 2 apps in this market is weak.  2 to

16                 3 is mediocre.  4 to 10 is great.

17           Sell loans, make money, and that's how you incentivize

18      and that's how you motivate a salesperson.

19           Tim Birkmeier, same thing:

20                 Do you think about improving as a salesman

21                 when outside of work?  Do you think about

22                 better ways to sell?  Mindset, skill, effort,

23                 and $$$$$.

24           And he told you that that $$$ means $$$ for the loan

25      consultant, not for the customer.  $$$, because that's what
```

1    they were trying to incentivize them to do.

2        This one has even more dollar signs.  This one is from

3    Matt Stauffer, a disciple of David Lee.

4            You guys can read this as just another email

5            or you can take to heart what David is saying

6            here.  There is nothing more important than

7            energetic, enthusiastic sales.  That is how

8            you get somebody emotionally involved in what

9            they are saying.

10       This emotion keeps coming up, too.  Why do you want a

11   person full of emotion when they are trying to figure out

12   their mortgage?

13       Is that what a financial adviser, consultant and

14   analyst does?  On the contrary.  I know financial advisers,

15   consultants and analysts.  They are not emotional people.

16       Why do you want to get them emotional?  You want to get

17   them all fired up, and you want them just to go, okay, okay,

18   okay, okay, yes, yes, yes, the five yeses.

19            Selling with energy, enthusiasm and emotion

20            will lead to more $$$$$$$ for each and every

21            one you.

22   You, being the loan consultant.

23            If you have any questions on how to embrace

24            the concept of selling with energy, come see

25            me.  I have made a great career in sales here

1           by focusing on this each and every day.

2       He didn't have a great career as a financial

3   consultant, analyst or adviser.  He had a great career in

4   sales, and he still has a great career in sales, as do the

5   managers that we have been showing you that properly

6   incentivize people.

7       How else do we know their primary duty is sales?  They

8   are praised, disciplined, promoted and fired based on their

9   sales production.  Sales production, production, production,

10  sales, sales, production.  That's how it goes.

11      Chuck Nance.  Now, I know I have shown this to you

12  before, but I am showing it to you again because it's to me

13  in one email how you succeed as a loan consultant in the

14  2002 to 2006 time period in one email.  It sort of sums it

15  up.

16      Here is Chuck Nance being congratulated for getting

17  promoted.  He was a mortgage banker.  He's going to be a

18  senior mortgage banker.  Why?  Number one, he's a salesman.

19  I think later in that piece right there he's called a

20  salesman's salesman.

21      Number two -- so, number one, he's a salesman.  That's

22  how he got promoted.  Number two -- oh, I like that one.

23          The difference between Chuck and most other

24          salespeople is his enthusiasm and ability to

25          build rapport with any type of person, and he

```
 1              loves to create.  Chuck's strength is in
 2              creating great responses to objections and
 3              pivoting back to the sale.  That is a natural
 4              ability.  That is a salesman's salesman.  If
 5              you want to hear him selling -- if you enjoy
 6              selling, you can come hear him create some
 7              sales music.
 8     I mean, there is no doubt these people are salespeople.
 9          The number two reason why:
10              Chuck not only cares about his own numbers
11              that he's selling but those his teammates are
12              selling, too.
13          Number three, long hours:
14              He's in early and out late most days.
15          There, in one email, one announcement of a promotion
16     you have got the three things you need to succeed.  Number
17     one, you sell; number two, you care about your team's
18     numbers, too, not just yours; and number three, you work
19     long hours.
20          Then you've got this guy, Jeff Perry, and, you know, we
21     didn't pick on Jeff Perry.  I think we have been accused,
22     oh, you have picked on Jeff Perry or you keep choosing
23     Jeff Perry.
24          Quicken kept choosing Jeff Perry.  Jeff Perry was
25     promoted four times from 2002 to 2004.  The Firm, the team
```

1   that he was the sales director for, was number one in sales

2   production from 2001 to 2002.  The Empire Division, when he

3   became a regional vice president, was number one in

4   production in 2003 and 2004.

5        Then he was given Troy.  They opened Troy, and they

6   sent Jeff Perry because this guy knows how to get loan

7   consultants to do their job the right way, okay?  They sent

8   him to Troy.  They opened Troy with the guy.

9        He got Troy up and running, and then they sent him to

10  open Cleveland.  That's what a star this guy is.  Why?

11  Because he's an unbelievable salesman, and he knows how to

12  manage salespeople.  Not because he's just this really

13  genius financial adviser and consultant.  That's not why

14  this guy got promoted four times.

15       And we didn't pick him.  You will see from our

16  emails -- we have very few emails past '04.  We were given a

17  piece like this.  We were told, oh, we had hundreds and

18  millions, whatever.  We were lucky to get Jeff Perry emails

19  because, boy, does it tell a story.

20       Here is his promotion.  Why is he promoted?

21            Because he's one of the premiere salespeople

22            and sales managers.  His team, The Firm,

23            consistently helped set the bar for

24            applications, closings and revenues.

25  That's why.  And he's creating more leaders just like him,

1    Jeff Perry is.

2         How did he become so successful?  He became so

3    successful by clearly communicating what the loan

4    consultant's primary job duty was.  Sell, sell, sell.  This

5    is a Jeff Perry special right here.

6         Here is another one from Jeff Perry to his team.

7              Our job is to sell.

8                   As a salesperson, our job is to SELL.

9              Today we have to sell hard.

10                  Tell this poor guy, remind him that his

11             job in life is to sell tomorrow.

12        He knows how to communicate.  This guy better

13   exemplifies how you advance at Quicken, by being a great

14   salesperson and a person that can motivate people to sell,

15   and that's how he did it.

16        Number two reason, by motivating his loan consultants.

17             Anyone else out there selling their ass off?

18             Make the clients love you.  Someone sell.

19             Sell with passion, enthusiasm.  The products

20             are there.

21                  We are in panic mode.  Stay calm.  Don't

22             leave your chair or phone unless you have to

23             go to the bathroom.  Dial and sell and we

24             will finish strong.  It's still early.  It's

25             only 4:30 in the afternoon.  Every day you

1              must write a loan.  Make it your mission in

2              life right now.

3        He knows how to motivate these folks.

4              Hate to be a prison warden for the night, but

5              we can't leave here with the production we

6              have today.  Too many leads, rates too low.

7        How else did he do it?  How else did he become

8    successful?  By teaching sales techniques.  Let's see some

9    Jeff Perry sales technique specials.

10             Sell these fools.  Scare them.

11             I told a guy yesterday that the rates went

12             up "because of battles in the West Bank."

13   Oh, isn't that clever, Jeff?

14       That's sales.  He's not advising and consulting.  He

15   doesn't know what's going to happen to the rates because of

16   battles in the West Bank.

17       And you heard Mr. Banfield.  Poor Mr. Banfield.  They

18   wanted to try to make it so complicated so they take a

19   person who is not a loan consultant to march through the

20   matrix.  He's a secondary market guy that basically writes

21   the matrix.

22       He was actually excited by this one.  He didn't like

23   the words -- sell these fools, scare them -- but he was

24   actually kind of excited because someone actually took

25   something he said out and used it.  Now, they used it to

1    sell, but so what?  Of course they used it to sell because

2    that's what they do.

3         Here is another Jeff Perry.

4              I don't buy it.  Rates could move higher

5              Monday.  Let's sell the uncertainty.  Put the

6              improvement in your pocket.

7    That's a loan consultant's pocket, by the way, in case you

8    don't understand that one.

9         This is Exhibit P118, and if you look at P118, below it

10   is a Mr. Banfield email saying that he thinks rates are

11   going to drop.  Well, you can't scare somebody with dropping

12   rates so Perry is telling his people I don't buy it, rates

13   could go higher, so keep scaring these fools.  That's how

14   Mr. Perry succeeds.

15        And he teaches his people.  Here is Eric.  Eric works

16   for Mr. Perry.  About a week or two later here is what Eric

17   says.

18              It's time to sell a little bit of fear.

19              Rates are too wild for them to care about

20              quotes.  Sell that fear.  It works.

21        That's exactly what Jeff Perry taught him, it works,

22   and it does work.  It's good sales.

23        How else did he do it?  He did it by developing leaders

24   through his example.  Here is Mr. Perry developing a couple

25   of leaders, Mr. McLean and Mr. Pellow.

1              Production is an F'ing joke today.  Nobody

2              seems to care.  I am going crazy between 5

3              and 7.

4         It seems like Mr. Pellow took the lesson.  A couple of

5    weeks later:

6              Where the F is our pride?  This other team is

7              beating us up.

8         That's how we know.  That's how we know how you

9    succeed.  Mr. Perry, that's the guy.  That guy is a rocket

10   ship during this four years at Quicken.  Every year he is

11   getting a better job, every year he's getting a raise

12   because he's doing those things.  And that's how he did it

13   and that's how he got there, and that's sales.

14        In fact, Mr. Perry -- you don't have to be a Mr. Perry.

15   You can be a Colleen Booza.  You don't have to be a

16   Mr. Perry, you can be a Colleen Booza, but it doesn't make

17   your job any less sales.  It just makes you a nicer person

18   and a less sharp salesperson.  That's all.  It's the same

19   job.

20        Mr. Perry, and the reason we highlight those emails, is

21   because that's so obviously sales.  We don't have to prove

22   dirty, nasty, rotten sales.  In fact, we don't have to show

23   that that's the norm.  We just have to show sales.

24        But, boy, what else do you do with sell these fools,

25   scare them, except it's sales.  That's why we showed you

1    these things.  Not because we are trying to prove it's some

2    kind of vicious, nasty sales all the time.  You heard

3    Colleen Booza.  I doubt very much she's saying scare these

4    fools, but she's still selling.

5         And then there's a couple of big fat exhibits that you

6    will see.  They will be in your pile of stuff.  It's P100

7    and P101, and what these are, P100 is termination letters or

8    termination documents, and you'll see, flip through them,

9    sales production, lack of sales production, good bye.

10   Disciplinary documents.

11        You have seen some of these up on the big screen.  Lack

12   of sales production.  You sell this much, this much and this

13   much or you are gone, and they are.

14        But flip through these and take a look.  Look for you

15   are a really bad adviser and consultant and analyst.  So

16   that's how we know.  You are praised, disciplined, promoted

17   and fired for it.

18        How else do we know that their primary duty was sales?

19   Because that's who they hired.  They hired people with sales

20   experience.  They hired car salesmen, pharmaceutical

21   salespeople, people who were selling Yellow Page

22   advertising.  Mr. Pikora, who was selling high-end exercise

23   equipment, computer sales.  Those are the people they were

24   hiring for the job.

25        No mortgage experience, no financial background?  No

1    worries.  You heard the testimony over and over again, don't

2    worry about it.  You will learn what you need to learn

3    enough to sell stuff, which is what you do with a

4    salesperson.

5         We have telephone debt collectors, hospital orderlies,

6    restaurant workers, college grads right out of college,

7    high school grads, people with community college, people

8    with even less community college than their resume says, and

9    they are getting this job.  And that's fine because it's a

10   sales job, and they can teach you.  We will teach you what

11   you need to know to sell this product, and that's what they

12   tell them over and over again.  If you can sell, you will be

13   fine.

14        Sell me this pen.  Jay Farner's line, Tony Nuckolls'

15   line.  Ms. Farner admitted he said that in the interviews

16   all the time.  He was very candid.  He admitted, yeah, I say

17   sell me this pen.

18        Why do you tell a candidate to sell me this pen?

19   Because that's what matters.  If you can sell a pen to me

20   and I see that you can respond to objections and you can

21   pivot and you can move and dance, then you are good.

22        And that's what he's doing.  That's why he's saying

23   sell me this pen.

24        Look at the hiring packet.  The perfect candidate for

25   hire, prepared on July 2, 2000 for Jennifer Meyers at

1    Quicken Loans.  They put together this profile.  They tried

2    to distance themselves from it.  They are like that's a

3    third-party vender, we hardly used it, I never looked at it.

4        Look how they described the web sales consultant.  This

5    is who they are looking for to hire.

6                 This position sells products or services

7                 directly to customers.  This position's role

8                 is to reach as many potential customers as

9                 possible and in an effective way communicate

10                the value of what he/she is selling.  One

11                must be able to make a positive impression in

12                the first few minutes of interaction with the

13                prospect.  Often the person in this position

14                will encounter a significant amount of

15                rejection and must stay positive and upbeat

16                throughout the day.

17       That's a pretty accurate description of a loan

18   consultant, and that's who they are looking to hire.  Why?

19   Because the position does sell directly to the customer, and

20   they can't divorce themselves from it.

21       How else do we know that their primary duty is sales?

22   How they train them.  I think Mr. Gilbert in an email told

23   us the perfect formula, Quicken's perfect formula for

24   training these people.  Mr. -- I think down below -- this is

25   Exhibit P68.  You will see down below Mr. Banfield laying

 1    out, hey, new products, new types of loans you can sell.

 2    And Mr. Gilbert's response is, duh:

 3              Number one, they all take the course.  In the

 4              course they learn about the products.  They

 5              learn how to SELL them.  They pass the test

 6              and write lots of business.

 7         It's kind of like, duh, that's the formula, and that's

 8    the formula they followed for everybody.  That's the way you

 9    teach a salesperson how to sell.  A salesperson can't sell

10    something they don't understand.  They can't sell something

11    they don't know.  You have to convince a person to buy

12    something.  You can't convince them to buy something if you

13    don't know what it is you are selling.  And that's how they

14    train them.

15         What do they train them on?  That helps us, too.

16    ARCing, acknowledge, respond and close, we have been all

17    over that.

18         ARPing, the same as ARCing, except acknowledge, respond

19    and pivot.  The only difference between pivoting and closing

20    in the ARC and the ARP is where you are in the sales

21    process.  If you are in Step 7 and you are trying to close,

22    it's an ARC.  If you are somewhere else and you need to get

23    back to the sales process because someone is taking you

24    somewhere with a question, God forbid, that's an ARP.

25         We went through these.  This is the ARC, Visa or

 1   MasterCard.  They have training documents, and you will see

 2   them in your jury room, full of responses.

 3        Matthew Thompson.  I'm not going to play this call clip

 4   for you, but Mr. Thompson, he's another outstanding

 5   salesperson, and you heard his call clip that we played for

 6   you.  And it will be -- and you will have those clips and

 7   all of that stuff back with you, the voice mails.

 8        He ARCs, he does an awesome job of ARCing on a deposit

 9   objection, I think you might remember, and the guy is like,

10   oh, I don't have my credit card, it's at home.  You know, he

11   really does a good job, and the guy was shocked.  And so

12   when you go back and hear Mr. Thompson's call, listen for

13   his ARPing on deposits and shopping.  That was great.

14        He also did those soft closes that we heard about,

15   which is you don't ask Visa or MasterCard, but you try to

16   regain control by asking stuff like, well, you know, be

17   assumptive and say when we do this do you want fax or email

18   or would you want the appraisal on the week or the weekend

19   and do you want to lock or float?  You know, those are all

20   of the things that help you pivot and those are soft closes,

21   but Mr. Thompson does a great job of that and you heard

22   that.

23        The other one we hear all the time, ABC, from

24   Dan Gilbert, from Jay Farner.  Always be closing, always be

25   closing.  That's what salespeople do; they are always

1    closing.

2         Here is another one, foreshadowing the sales process.

3    That's up to four times they are foreshadowing.  It's a

4    fantastic sales technique, and they teach it very well and

5    these people do it well.

6         And when you listen to Ms. Booza's call clip -- it's a

7    little long, and I'm not going to play that one for you

8    here.  That's called, "A Great Overall Second Call."  She

9    does a great job of foreshadowing.

10        Actually, she does a great job of all of these things.

11   If you take Ms. Booza's call clip and you follow the sales

12   process, if you start at the second call, the green side,

13   the money side, and you follow Ms. Booza's call, that great

14   overall call, you can just track it.  She puts in her

15   personality and it's not exactly that because the guy made

16   an objection too soon and she had to ARP, but it just

17   follows perfectly.  She's fantastic at it.  She's a

18   wonderful salesperson, and she foreshadows like crazy.

19        Here is one, pushing the bruise.  I still can't be

20   convinced pushing the bruise is a good thing.  I have heard

21   of holistic medicine and new kinds of ways, but I have never

22   heard about healing someone through pushing a bruise.

23   That's not a very good way to heal someone.

24        Here they are talking about bushing the bruise.

25             What's a client's pain?  Find out the pain of

1          the client.  You are then able to use those

2          pains in order to present programs and use

3          during rebuttals or objections.  You can

4          overcome rebuttals and objections if you just

5          know their pain, and you can poke at it.

6          Once the client objects, knowing their pains

7          can be used to your advantage.

8      That's pushing the bruise.  That's why they are digging

9  deep in two minutes.  They are digging deep so that they

10 know why you want this stuff emotionally so that they can

11 get you to buy it.  That's sales.

12     Here is Mr. Perry.  He had a call clip called pushing

13 the bruise.  We couldn't find that one.  I bet that was

14 great.  It's a closing technique for Mr. Perry.

15     The emotional hook, we talked about that, and that's

16 right on the sales process.  I just talked to you about

17 that.

18     Find out why they want in.  The top one there, goals,

19 listening and rapport, that's on the first call.  And then

20 the second call is that bottom box, and in emotionally,

21 refer to vision and goals from the first call because that's

22 sales.

23     The three-minute rule.  This one would kill an adviser,

24 a financial adviser or consultant.  Man, you've got

25 three minutes.  Go, advise, consult, analyze, pivot, close,

 1    start over.  That's what this one is.  Start your closer

 2    clock, foreshadow the deposit, review their goals, pitch the

 3    program, review the benefits, pivot to the sacrifice close.

 4    If they ask another question, restart your clock.  You've

 5    got three more minutes to get that Visa or MasterCard.

 6    That's the three-minute rule.

 7         Control the release of information.  Have you ever

 8    heard of somebody advising someone by controlling the

 9    release of information or not giving them information?

10         Oh, I want to show you something, by the way, about

11    digging deep.  I missed that part of this email.  In the

12    middle of this one, this is a trainer telling a loan

13    consultant:

14              By digging deep, I mean you should ask the

15              client very briefly what they will be able to

16              accomplish once they lower their rates and

17              their payments.  Are they trying to set up

18              retirement?  Is he planning vacation?  That's

19              finding their pain, finding what they really

20              want.

21         Digging deep.  Digging deep very briefly?  That sounds

22    like something Quicken would say.  Selling only means asking

23    for the business?  Digging deep very briefly.

24         Okay.  Controlled release we talked about.

25         The benefit sandwich we talked about, presenting the

 1    benefit sandwich.  The benefit sandwich is, oh, people don't

 2    like to pay fees and rates kind of scare them, so you tell

 3    them a bunch of great stuff about the loan and then you tell

 4    them fees and rates and then you get that emotional piece

 5    back in there and tell them other great benefits and feed

 6    them the sandwich.  That's sales.  That's all it is.  It's a

 7    heck of a good technique, and Ms. Booza on her call clip,

 8    boy, that benefit sandwich was perfect.

 9         Training, green bar.  Here is Mark Mazey, the guy that

10    went from -- he came to Laurel Park actually.  He went

11    Livonia, Laurel Park to Cleveland.  He got promoted,

12    promoted, promoted.  Here is what he says about green bar.

13    He says to one of his loan consultants, you know, are you

14    working today, what's going on?  The guy responds:

15              I came in at 8 a.m. and stayed until

16              7:00 p.m., 11 hours of production.  Two deals

17              with 6K green bar and two books back.  I'm

18              here today at 7:30 a.m., logged in and ready

19              to go.

20    Mr. Mazey says, all right, now that's good.  That's the

21    kind of intensity he wants on XXX.

22         And he's got that green bar going.  That's good.  Green

23    bar, oh, yeah, that's what Mr. Mazey says about green bar.

24    Green bar is sweet.  Green bar is extra money.  Green bar is

25    commission.  Green bar is what salespeople do.  Green bar is

 1    nothing but up-selling, that's all it is, or selling

 2    something --

 3         Do you think a car salesman will sell you a car for

 4    cheaper just because they can?  No, commission salespeople

 5    want the price as high as they can, and that's what Quicken

 6    has set up.  Commission salespeople want the price as high

 7    as they can get away with.  They still have to sell it so

 8    they can't be so outrageous that they lose the deal, but

 9    they can tweak it up a little bit.  They can sell a rate

10    that's a little higher than Quicken's guidelines say they

11    can.  They can raise that bar because they are salespeople,

12    and that's what salespeople do.

13         Again, evil?  No.  In fact, there is caps on how much

14    they can do that.  The loan consultant can't -- I think it's

15    like 2 percent.  It's right in the comp plan.  There's laws

16    in connection with loans on how far you can raise the green

17    bar.  So there is caps.  It's not necessarily evil, but they

18    do it.

19         That guy was selling 6K green bar.  You heard

20    Ms. Farner say, gee, the biggest one I can think of was a

21    couple thousand dollars.  We heard testimony of $10,000

22    green bar, 6,000, 7,000.  Mr. Farner sure has heard of

23    bigger green bars than that, but it doesn't sound good.

24    That sounds like sales so I'm not going to say that I have

25    heard of big green bars.

1          How about huge green bars?  Mr. Mazey says:

2              This is huge.  Halt, green bar monsters.

3          Now, here is another -- sense of urgency is another

4      thing they train these people.  And I want to play you

5      two call clips, and these call clips again, remember, are

6      from defendants' library of best practices for loan

7      consultants, okay?  And both of these call clips are

8      entitled sense of urgency, and I'm going to -- it's

9      two different styles I want you to hear.

10         Let's hear Colleen -- or actually let's listen to

11     Ms. Khoury's first.

12         (Call clip played.)

13         **MR. LUKAS:**  She seemed to understand how to raise

14     a sense of urgency.

15         Let's hear Ms. Booza's style.

16         (Call clip played.)

17         **MR. LUKAS:**  Both of those people, both of those

18     loan consultants are using the same technique, and that's

19     creating a sense of urgency.  Ms. Khoury is doing it by

20     saying, man, your thing is going to expire and you are going

21     to be at 8, 9 percent, you are going to be in big trouble,

22     you better buy from me today, right now.

23         And Ms. Booza is saying, oh, you know, the credit card

24     companies, some credit card companies -- she doesn't know if

25     this one is or what's going to happen -- are going to be

1    raising their minimum payments and you are going to be stuck

2    with an extra 100, 200 bucks so it's a good thing you are

3    doing this.

4          Two different styles, but it's the same technique, and

5    they are both sales.  I would rather talk to Ms. Booza,

6    frankly, but that doesn't mean she's any less sales than

7    Ms. Khoury. It's the same thing, and it's how they are

8    training these people.

9          How else are they training these people?  Language.

10   Boy, words are big, words are big at Quicken.

11         Banker's thesaurus.  This, of course, comes out after

12   the lawsuit.

13              Bag the deal, sell a mortgage, sell a loan,

14              get a loan.

15   Ah, don't use those phrases.  Say:

16              Acquire the client, bring the client on

17              board, gain a commitment.

18   Reason?

19              These phrases speak to a higher level and

20              long-term relationship.  If necessary, we can

21              use these replacement phrases when speaking

22              to anyone, not just one another.

23         It's the same relationship, it's a sales relationship,

24   but, boy, you don't want to say sell.

25              Pitch the program, pitch the deal.

1    No, say:

2              Present the program, present the options.

3                   "Pitch" is commonly used in sales.  It

4              does not assume the sale, and it does not

5              sound professional to clients.  Let's take it

6              to a new level.

7        They are not saying it's not sales.  They are saying --

8    and that's what really I find interesting.  When you look at

9    this banker's thesaurus, they didn't do the banker's

10   thesaurus just for this lawsuit.  They don't want the

11   clients to know it's sales either.

12       I mean, a client at Quicken Loans, would they want to

13   know all of these techniques are being done on them?  Would

14   a client want to know that they are being pivoted, that they

15   are being controlled, that they are getting emotionally

16   hooked, that they are getting their bruise pushed?  No.

17             Be more careful or they are going to figure

18             out we are sales.

19   Just like they are doing with you.

20       Here is another one.

21             Enthusiastic words.  Conveying enthusiasm and

22             energy on the phone is critical to successful

23             selling.

24       Darn right it's critical to successful selling.  Is it

25   critical to advising, consulting and analyzing?  No, but

1    it's critical to successful selling.

2         Power words.  Here is another one, and when you get to

3    this one, the print is pretty small, but they are saying,

4    you know, write down as many of the client's own words as

5    you can and parrot them back, it makes them all comfortable.

6         These are sales techniques.

7              Use humor.

8              Relate to the client.  If he's a car guy, say

9              things like we have got to run a diagnostic

10             check and look under the hood.

11        These are sales techniques, that's all they are, and

12   it's all part of their training, sales training.  In fact,

13   it's even called sales training.

14        How do they train them?  They show them movies,

15   Glengarry Glen Ross.  You heard all about those early on.

16   We quit talking about it because we were bored with it.  The

17   Boiler Room, the same thing.  If you have seen Boiler Room,

18   I think we described the scenes that they play.  They play

19   the hardcore selling scenes for these people, the nasty

20   scenes.  Those movies are about bad sales, but they waive

21   them around like they are wonderful things.  They play them

22   the worst clips from those and say this is it.

23        The sales bible, role playing, taking live calls.

24        Adam Persails was number one in the class.  Why?

25   Because he knew a thing about loans?  No, because he could

1    sell.  That's how he got to be number one in the class and

2    he got to talk to Mr. Gilbert.

3         Ongoing training.  They are plugging into the phones.

4    They are dragging people into the listening room.  They are

5    sending emails all about the sales process.  Saying, oop,

6    you didn't pivot here, you should have closed here, you

7    didn't push the bruise there, you failed to find the

8    emotional hook and use it to your advantage.  They are not

9    pulling them into the room and going, you know, I know you

10   sold this loan to this person and they bought it and it went

11   through and it closed, but it really wasn't the best one for

12   the client.  Now, you sold this kind of loan.  This kind of

13   loan would have been better.  Now, I know you earned the

14   commission on it and we got paid our profit on it, but --

15   where is that training?

16        You picked an okay one for the client, but you raised

17   the green bar a lot and they didn't get the best price on it

18   and really under their circumstance this one would have been

19   better.  Where is that training?  That's nowhere to be found

20   because that's not what these people are supposed to do.

21        Emails from trainers.  This is ongoing.  They had a

22   training team during this time period that was ramming the

23   sales process down their throat.  Here is a good one, and

24   this goods right to it.

25             Just listening to your calls this week it is

1              evident that you have vast knowledge of the

2              mortgage industry as well as our products

3              here at Quicken.  The key is not to let the

4              knowledge deter you from the task at hand.

5         Hey, man, you know too much about mortgage.  You heard

6    Mr. Thompson testify that he was critiqued for too much

7    knowledge.  You heard some others testify that they were

8    actually reprimanded for agreeing with customers that, yeah,

9    you are probably okay where you are.  That's not it.  That's

10   not their job.  Their job is to sell.

11        Here is the other one.  Here is another one.  This is

12   an emotional hook one.  A little gopher with a jackhammer.

13             Get down there, find their emotional

14             benefit -- into the client's emotions before

15             you move for your close.

16   Man, you can't close effectively unless you are tied into

17   their emotions.

18        Here is a great one.

19             Listen to this call clip, everybody.  This is

20             a person that sails through the sales

21             process, got a full application, did

22             everything in 30 minutes.

23   There is some deep digging going on there, and that's

24   awesome.  I mean, that's awesome.  The faster you can do it,

25   the better.  That's clear because that's sales.

1          Here is another one.  Oh, we already talked about this

2     digging deep, finding the pain.  Digging deep means briefly.

3        Here:

4                He goes into the close with a hard forced

5                close choice -- in other words, Visa or

6                MasterCard -- yet fails to really ARC the

7                client's spousal objection and really push

8                the bruise.

9          He didn't make fun of the person for saying they wanted

10    to talk to their spouse.  The didn't push the bruise or

11    whatever.  Maybe they had a bad credit score or something on

12    their credit score that they could have pushed at.  They

13    didn't do it.

14                Please work with Nigel on his controlled

15                release of information.

16    Nigel is giving too much information.

17                And ARCing skills.

18    He's not acknowledging, responding and closing like he

19    should.

20                Provide us feedback regarding how you will

21                address this with him no later than the end

22                of the day Wednesday.

23          This is to a manager, telling a manager how to get this

24    loan consultant in line with how you do this job.

25          Here is the sales process.  Now, I want to talk to you

 1    about the sales process.  At our table we were calling it

 2    the toxic exhibit because, I don't know if you have noticed,

 3    Quicken representatives or lawyers did not touch this thing

 4    throughout the entire trial.  I mean physically touch it.

 5    We had bets as to when one of them would actually touch this

 6    thing.

 7         And they even fought over whether it was mandatory or

 8    not.  This is the sales process.  This is training

 9    encapsulated on two sheets of paper.

10         This is awesome, it really is.  If you're a

11    salesperson -- you heard Mr. Farner.  They have got people

12    breaking into Quicken to learn the sales process.  They have

13    to be careful not to hire people who are just coming in to

14    learn the sales techniques and go out and sell something

15    else, nothing to do with mortgages or finances.  This

16    process is awesome.  You could sell anything with this.  You

17    really could.  It's amazing, and it's good.

18         They won't touch it.  They didn't touch it.  In fact,

19    they have tried to disown it, which is impossible.  They

20    can't disown it, but they have tried.

21         Here is Mr. Farner, April 2003.  Remember, this is a

22    company that in this trial told you this isn't mandatory,

23    and we went from it's not mandatory to you don't have to

24    follow it word for word.  We never said you had to follow it

25    word for word.  We said you had to follow the script, and

 1   that's what they say, follow it.  You may get spun out

 2   somewhere and have to come back, but you follow it.  You

 3   don't have to read it word for word.  We never said that.

 4       Then they talk about, well, it wasn't mandatory.

 5   Mr. Baumann didn't use it.  Well, Mr. Baumann has been

 6   around for ten years at this point.  He's been there before

 7   this even existed.  He had his own version of this, his own

 8   sales technique, a foundation by then.  He had his own

 9   foundation.  But, other than Mr. Baumann, the people that

10   started in 2002 to 2006, this is the ticket to success, and

11   you have to use it.

12       Here is Mr. Farner in April of '03.

13           Lock out everything going on around you and

14           concentrate on only one thing, the sales

15           process.  Forget when lunch is.  Forget that

16           your buddy wants to take a smoke in

17           ten minutes.  Forget the client is giving you

18           bogus objections.

19   Oh, those bothersome clients with bogus objections.

20           One simple message [all caps]:  Follow the

21           sales process.  Challenge yourself.  Between

22           the calls coming in and leads you follow up

23           on, follow the sales process [all caps] on

24           every call.  Not 99 percent, every call.

25       Here is Tim Birkmeier.  He grew up with Jay Farner.  I

 1    call him the new Jay Farner.  He is now in Jay Farner's spot

 2    in that VP role.

 3                    Continue to sell and use the All-American to

 4                    your advantage --

 5        Again, that is the loan consultant's advantage, not the

 6    client's advantage.

 7                    -- just as you have, and make sure to ask all

 8                    the right questions/follow the sales process

 9                    prior to even considering mentioning rates or

10                    investment dollars.  Great job selling

11                    yesterday, everyone, and keep the momentum

12                    rolling today.  The world is yours.

13        It's not the client's, it's yours.  It's yours because

14    if you keep selling and following the sales process you are

15    going to earn commission, and that's a good thing.  That's a

16    good thing for a salesperson.

17        Here is Bill Pellow warning his team.

18                    It was just brought to my attention that all

19                    of the higher-ups, Dan Gilbert and his

20                    entourage, will be listening to phone calls

21                    (ours in particular) for the next week.  So

22                    please do yourself a favor, make sure you

23                    close and close often.  This is not a threat,

24                    it is the facts.  So, please, follow the

25                    schedule, call blocks, sales process,

1            et cetera.  You know I will keep you in the

2            loop.

3        That's the Dan Gilbert, by the way, who claims he

4    didn't know any of the these phrases.  Remember when I went

5    through with him about foreshadowing?  I don't know what

6    foreshadowing means.  He didn't know any of these things.

7    He's listening in to see if they are following it.

8        And let's listen to Jay Farner's voice mail on this

9    issue about whether they had to follow it.  This is

10   January 2004.

11       (Voice mail played.)

12       **MR. LUKAS:**  I guess the theory is because no

13   one testified that they actually got a strike that it wasn't

14   mandatory, you didn't have to follow the sales process.  Did

15   that sound voluntary to you?  This is the boss over all loan

16   consultants.  Does that sound voluntary to you?

17       The fact that no one got a strike tells me a lot.  They

18   got the message.  They got the message.  The boss says

19   follow the sales process.  All right, I am in.  And that's

20   what they did.

21       Other interesting things from that voice mail?  Sell,

22   sale, everything you need to sell, follow the sales process.

23       Knowledge Connection.  They have a website.  Remember

24   Exhibit 19?  You probably don't.  That probably seems like

25   100 years ago.  Last week they were trying to say that's not

1    ours.  That was printed off of a web page of -- I can't

2    remember the name -- SureSpeak's web page.  That was their

3    document.  Look for the QL and the bottom right-hand number,

4    the QL and a number.  It's their document.  It's part of the

5    Knowledge Connection.

6              You can go on the website and pull off all of

7              the stuff you need to pull off.

8                  Find out if they qualify.  If not, get off

9              the phone.

10   That sure wraps it up.

11        And, finally, I don't know if you picked up on this, if

12   you listen to it again you will hear it.

13             If you practice, you don't even have to

14             think.  It just happens.

15        Well, I would hope my adviser and consultant is

16   thinking.  I understand salespeople not necessarily, their

17   job is to close.

18        How else do we know?

19        So that's the sales process.  Apparently they don't

20   have to use it really, it's just voluntary.  That's

21   nonsense.

22        How else do you know their primary duty is sales?

23   Motivated monitor.  We have been through this.

24        Sales goals.  Daily sales goals, monthly sales goals.

25             Jabuaries.  I mean, how would you like to be that poor

1   guy at the third week in January who actually was meeting

2   their goal?  Now they have got a new Jabuary goal.  My

3   goodness.

4       That's what it was like there.  That voice mail is what

5   it was like there.  Mazey's voice mail is what it was like

6   there.  The Mazey's of the world were under a lot of

7   pressure under these sales parameters, and so were their

8   loan consultants because of it.

9       Boards, performance boards, writing your boards.

10  Everyone in the whole place could see how you are doing on a

11  daily basis.

12      Stand and Deliver, how about that team?  You stand.

13  They take your chair away until you sell a deal, and then

14  you get to sit down.  How humiliating.

15      I have got a bunch of emails, but you have seen them

16  all, on motivational efforts, and they are from everybody,

17  Dan Gilbert, Jeff Perry, Jay Farner, Tim Birkmeier, selling

18  with energy.

19      Here is another Tim Birkmeier.  This is one of my

20  favorites just because we know the context.  This is the one

21  where the day he tells -- after Jay Farner's voice mail,

22  Tim Birkmeier tells his team I'm your heat shield.  I don't

23  know if you remember that email.  I'm your heat shield.  The

24  next day he sent this one out saying here is all of the

25  things you better do today.  Oh, I'll CC Jay Farner.

1    Showing off for Jay Farner.  Tim Birkmeier heard the voice

2    mail.

3         Sean Glensmith:

4              I'm in the trenches with you.  Who is selling

5              with me?

6         Call blocks.  This was from Tony Nuckolls.  We heard

7    a lot about call blocks early on.  We didn't hear as much

8    later.  Call blocks, daily call blocks, sometimes multiple

9    call blocks in a day.  They have no choice.  Get on the

10   phone, call blocks.

11        This one is one of those goofy ones.

12             At the beginning of the second call I want

13             everyone to get off the phone, stand up, clap

14             repeatedly 20 times and say yes, yes, when

15             Mark Mazey pulls his hand down.  That means

16             get to work.

17        That brings me to my next point.  Why do we know this

18   place is sales?  Why do we know their primary duty is sales?

19   Here is a board.  Firm versus firm.  You have seen all of

20   those emails over and over.

21        Why do we know it's sales?  The work environment

22   itself.  It's a call center.

23        They say, oh, it's not a call center.  Well, what do

24   you call something when you put 1,000 people in it in cubes

25   in an open area with headsets on?  It's a call center.

 1           They are making calls.  They have headsets.  They are

 2      in cubes.  Their managers roam up and down the aisles.  They

 3      get free Red Bull.  They bang gongs, they ring bells and

 4      toot whistles when they bag a deal.  They have chicken

 5      nugget eating contests.  They throw Nerf footballs all

 6      around.  Juvenile, I heard it called.  Frat house-ish I

 7      heard it called.

 8           Are they trying to convince you this is an environment

 9      of financial advisers and consultants?  Ridiculous.  It's

10      silly.  It's a sales environment.

11           How else do we know it's sales?  I guess the last piece

12      I would say is what wasn't sales?  What did they do that

13      wasn't sales or closely related to sales?  What was it?

14           Calling?  They would say, oh, this wasn't sales because

15      we had hot leads for these people.  Hot leads?  You saw the

16      emails of conversion.  This is Mr. Farner's expectation of

17      growth.  We went through that.  I'm not going to show that

18      to you because I'm running out of time.

19           But, you know, Mr. Farner, Mr. Gilbert, the money keeps

20      getting bigger and bigger and bigger.  I went through that

21      with I think it was Mr. Gilbert's cross-examination.  The

22      money gets bigger and bigger and bigger, and the

23      expectations on these people of how many they should sell a

24      day gets bigger and bigger and bigger as we go.

25           Let's go back.  What wasn't sales?  Calling.  They say,

1    well, this isn't sales because these are hot leads.  The old

2    job was sales because you had to pound the pavement for your

3    leads, but this, we give them hot leads so it's not sales.

4         Why are dials per day critical?  Why is Jay Farner

5    telling people in the April voice mail that I didn't play

6    for you 60 calls a day if you're old, 80 if you're brand

7    new?

8         Why is that so important?  We know why it's important,

9    because we saw their conversion rates.  Their conversion

10   rates, 1.72 more than halfway through August of '04.  And

11   this one, I believe, was calls to applications taken.  I'm

12   sorry, leads to applications.

13        This one, May, it was 2.75.  June, it was 2.54.  July,

14   it was 3.16.  This is to folders back, I believe.

15        So this means that you get 100 leads, these super hot

16   leads from Quicken that they characterize them as, you get

17   100 of them, okay, if you are an average loan consultant at

18   Quicken in May of 2004, you got 2.75 applications out of it

19   or folders back out of it.  That's not loans closed that

20   they actually got paid on.  That's when they got the folders

21   back.

22        Then it went to underwriting, who did their thing;

23   processing, who did their thing; compliance.  All of people

24   who say whether it really gets to be closed or not, okay,

25   that's before all of that happens.  2.75 in May.

*Plaintiffs' Closing*
*Monday/March 14, 2011/Volume 17*                    80

1        And they say that's not cold calling.  That is pretty
2    chilly because we also know phone calls.  How many phone
3    calls?  It's not that you get a lead and then you call them
4    once and then you are done.  You saw the emails.
5    Four times, five times you are supposed to call these leads.
6    Which means you could be making three, four, five hundred
7    phones calls to get 2.75 folders back.
8        You saw Dakota Denison, 24 times, one person, and he is
9    awesome.  He was and he is an awesome salesperson, but that
10   conversion rate, to say that it's not cold, this is freezing
11   cold.  That is inside sales cold.  That's harder than
12   hitting the streets, and hitting the streets is sales, too.
13       Follow the sales process.  So they are on the phone,
14   they call, they finally get somebody, what do they have to
15   do?  Follow the sales process.  I challenge you to find
16   anything on these two pages that isn't sales.
17       Ms. Booza said and Mr. Emerson and all of the Quicken,
18   oh, it's just this Step 7 where I'm actually ARCing and
19   closing and asking for Visa or MasterCard.  You read this.
20   You tell me what isn't sales in here.  It's all sales.
21       Okay.  They follow the sales process.  They close.
22   They get an app.  They enter it into the system.  Entering
23   it into the system, is that closely related to exempt duties
24   of advising, consulting and analyzing?  No.  It's closely
25   related to sales.  They just made a sale.  They are putting

1    their sale into the system.

2         They send the docs for signing, the docs that the

3    system kicks out for them they send out.  They get them

4    back.  We also heard from the testimony that takes some

5    selling, too, because in between the phone calls and sending

6    out the documents the customer maybe gets cold feet, maybe

7    talks to another loan consultant or something happens.  They

8    may have to resell the thing or have to convince them, sign

9    it, sign it, send it back.  That's sales.

10        And they get it back, they pass it on, and the other

11   people do their thing, and sometimes it gets kicked back.

12   Underwriting goes no, no, no, they didn't give us enough

13   income docs, I need W-2's from 1998.  The loan consultant

14   has to hunt that down.  Is that anything but production or

15   closely related to sales?  No.

16        Otherwise, other people are doing their primary duty,

17   and that's Mr. Emerson's email.

18        Oh, this is all the lead sources.  You will see in

19   Exhibit P138 they have a list at the end.  It's kind of

20   interesting.  I should have mentioned this to you.

21        They have all of the lead sources and the conversion

22   rates of those lead sources.  It's kind of interesting.

23   Like, QuickenLoans.com, 33,000 leads, 4.74.  That one is a

24   rocket ship practically compared to some of these.  18,000

25   LowerMyBills.com leads, 1.74 conversion rate on those, but I

1    digress.

2         There is a primary duty for everybody on Mr. Emerson's

3    team.  Do you remember Mr. Emerson talking about team?  Here

4    is his email, and I think this is a good email because it

5    incapsulates how the place runs and who has what primary

6    duty as we march through this list.

7         The sales force who brings it in.  He confirmed for us,

8    yes, indeed, that's the loan consultants.  The operations

9    staff who gets it out.  That's processing, the processing

10   department, underwriting department, there's a suspension

11   team, there's customer care representatives, there's

12   customer relations specialists, there's compliance.

13        He goes on.  The source who closes most of it.  There's

14   a closing group, and if you go through this email, he ticks

15   them all off.  They all have their primary duty.

16        There's the bridge.  There's IT.  There's legal.  We

17   have seen legal, we have seen legal in action with all of

18   the documents they are sticking in front of these people on

19   their first day at work.

20        They all have a primary duty, and it all starts with

21   the loan consultants with the headsets on pounding the

22   phones bringing it in, the sales force.

23        Now, what does the defendant do with all of this?  As

24   you will remember, ironically, it's their burden to prove

25   its not sales, okay?  So it's their burden.  We show you all

 1    of that.  How do they respond?

 2         And I want you, when you think about how they respond

 3    and how they are going to respond in closing, think about

 4    what they have at their disposal versus the 25 loan

 5    consultants or plaintiffs that came in here and the other

 6    300 that we represent.  What does Quicken have at their

 7    disposal versus what they showed in this courtroom?

 8         Emails.  Remember, oh, there's hundreds of thousands of

 9    emails and they just cherry-picked 20 or 30 that have the

10    word sales in them.  You look at my binder, and my binder is

11    right there, that black one, that is full of the word sales,

12    not 20 or 30 times.  I didn't even count.

13         But what do they show you?  Where are the hundreds of

14    thousands of advising, consulting and analyzing emails?  I

15    counted them.  23 emails they put into evidence in this

16    case.  23 emails.  Is it because we, the outsiders, had all

17    of these emails and they didn't have any?  No.  They put in

18    three, and the reason is because those emails aren't out

19    there.  Calling it sales and saying sell, sell, sell isn't

20    some lucky little nugget we found.  That's what they do.

21    That's what they say.  That's the job.

22         23 emails.  11 of them come from Mr. Banfield, who is

23    not even a loan consultant, he's in secondary marketing, and

24    those are those pricing ones.  Holiday special, remember

25    those emails?  11 of them.

1           We had three from Ms. Maull, who is a plaintiff in the

2       case, and they thought those were going to be advising and

3       consulting ones, remember?  She told -- Ms. Srey asked her,

4       well, what did you do?  How did you know how to respond to

5       that?  LOLA kicked it out.  Lakewood kicked it out.  Told

6       her exactly what she needed, what documents to give,

7       et cetera.

8           There are three resignation emails in the group of 23.

9       So that's 11, 3 and 3.  That's 17 of them.

10          There's an April Fool's joke from Mr. Gilbert about the

11      parking lot.  That's 18.

12          We got one from Mr. Emerson talking about clients first

13      and the motto and how important it is.  That's 19.

14          We have one post-lawsuit inquiry from a loan originator

15      asking Mr. Farner about hours and whether he has to work

16      a lot of hours or not.  That's 20.

17          We have the one from Mr. Farner talking about ARM's and

18      fixed.  We have one from Mr. Farner telling Ms. Williams,

19      who is a loan consultant -- Ms. William wanted to know can

20      someone take out two HELOC's, home equity loans, on

21      two different properties?  No, you can't.

22          Okay.  And one to Mr. Ortman on the consumer price

23      index, and not even he, I believe, understood what it meant.

24          And those are not advising and consulting emails.

25      Those are trying to help these people sell.  23 emails.

1    Look at their emails.

2         Call clips.  That's their call clip library.  How many

3    call clips did you hear from them?  None.  Did you hear any

4    advising, consulting and analyzing call clips?  No.

5         Voice mails.  We were fortunate to get a few and have a

6    few, and we played them for you.  Did they play any voice

7    mails advising, consulting or analyzing?  No.

8         Training documents.  We heard, oh, the training

9    documents are like this and only this much is selling, just

10   a little nugget.  Where are the training documents?  We gave

11   you apparently the little nugget.  I didn't see the rest of

12   it.

13        Trainers themselves, the witnesses, where are they?

14   Where are they saying, you know what, we didn't play Boiler

15   Room.  We didn't play Glengarry Glen Ross.  We didn't give

16   them the sales bible.  They didn't come in here and say that

17   because it wouldn't be true.  They did.  They did all of

18   those things.

19        Where are the trainers who are training these people on

20   advising, consulting and analyzing?  They don't exist.

21   That's why they didn't call them.

22        All they bring us is talk time.  Aha, they were only on

23   the phone for two, two and-a-half hours a day.  Well,

24   Mr. Farner and Mr. Gilbert testified that's normal.  They

25   did an analysis of our clients' talk time, but not

1   everybody's.  Mr. Farner's and Mr. Gilbert's testimony is it

2   would have been the same for all of them, two to

3   two and-a-half hours a day, and the judge will tell you

4   primary duty isn't measured based on how many hours.

5        But, frankly, that's their rule.  The reason they put

6   in talk time is because they are claiming that the only

7   sales is when they are on the phone, and not just on the

8   phone, on the phone in Step 7 going Visa or MasterCard, Visa

9   or MasterCard.  That's why they put in talk time.

10       So we got talk time from them, right?  So where is the

11  rest of their information their superior technology can

12  bring?

13       We got some explanation for the exhibits and emails we

14  had.  Oh, it was a poor choice of words.  Instead of sell

15  these fools, I should have said advise, consult and analyze.

16  I didn't really mean what it said.

17       When it says push the bruise, it really means, you

18  know, find out, you know, their problems and solve them.

19  That's what push the bruise means.

20       Oh, it was just a joke.

21       They know me.  I didn't really mean it.

22       The last one we heard last week, that's not our

23  document.  Exhibit 19.  Look at Exhibit 19.  It is produced

24  by defendant.  It has their Bates stamp number or their

25  number on it, QL with a number.  It says Quicken all over

1    it, and it tracks the sales process verbatim.  And last week

2    it was, oh, that's not our document, that's SureSpeak's

3    document.  That was a new one.  That's what we got from

4    them.

5         What else did we get from them?  We got a bizarre

6    definition of sales, a couple of them.  It's sort of a

7    moving target.  We started with it's a spillover from the

8    '90's.  That's why this word just kind of trickled -- it

9    doesn't mean anything.  You know, it doesn't mean anything.

10   It's not really true.

11        And I guess the theory is it was more of a sales job

12   back in, back in the '90's than 2002 to 2006.  Think of how

13   ridiculous that is.  Back when there was no sales process,

14   no sales training program, no sales trainers, no call

15   center, no dial requirements, no teams, no production boards

16   outside your cubes, no LOLA or -- highly sophisticated LOLA

17   or Lakewood, no bridge, no fully automated process.  But

18   that was more sales than this?

19        And you knew I had to show you this just because I love

20   Mr. Mortgage, but it's not just because I love Mr. Mortgage

21   that I kept coming back here.  I want kept coming back here

22   because this is their document from 1999, and I know it's

23   talking about '99, but encapsulates their theory going into

24   2000 and this is how they executed.

25             Mortgage in a Box is a lifesaver for the

1              sales managers at Rock.  As their sales

2              force -- loan consultants -- no longer have

3              to take hours out of their day to sit through

4              applications with their clients, they can

5              focus more of their time on selling -- which

6              translates into incremental loan applications

7              and profit for the company.

8        That's what they did.  All of their efforts and what

9    really made them genius was taking away everything but

10   selling from loan consultants.  And they got LOLA up and

11   running so they could just plug it in and spit it out.  They

12   got Lakewood up and running so they could just plug it in

13   and spit it out.

14       That's what they did, and it was brilliant.  No debate.

15   It was a wonderful, amazing system, but if anything, we went

16   from sales here in the '90's to sales [indicating], not the

17   other way around.  It's completely ridiculous.  They carried

18   this theory forward, and they really improved and did great

19   and turned it into sales.

20       The second one we got was -- so the first one was,

21   well, it spilled from the '90's.  That's why we had the word

22   sell and sale all over.

23       The second one was, well, it was a shortcut.  It's a

24   shortcut reference for advise, consult and analyze.  When we

25   say sell, we really mean advise, consult and analyze.

1      We had this bizarre -- Mr. Farner and I had this

2      bizarre conversation, well, when you sell here -- and they

3      admit because they have to admit there is a sales component

4      to it, but it's just that little Step 7 nugget.  Just the

5      ARC, that's it, okay?

6          And so then I kept on asking Mr. Farner:  Now, is this

7      sell meaning advise, consult and analyze or is this sell

8      meaning that little nugget?  Remember, in every document we

9      talked about it.  It just got ridiculous.

10         Remember this one?

11              So after this two-day marathon selling spree

12              where all of you put everything you had on

13              the line, how do we handle Friday?

14         And I said selling.  He said, well, that's the advise,

15     consult and analyze.

16         I see.  So after a two-day marathon, advise, consult

17     and analyze free.

18         Remember how ridiculous that got?  It got ridiculous

19     because it's a ridiculous excuse for trying to say something

20     isn't what it is.

21         The last one we got that was sort of developed at the

22     trial was asking for the business.  It's just asking for the

23     business.  That's the only sales component to it is just

24     asking for the business.  Never mind that this entire thing

25     is designed to position the person to ask for the business,

1   but it doesn't matter.  Asking for the business, only Step

2   7.  Ms. Booza actually grimaced saying it.

3        And you will notice all of their witnesses started out

4   saying it, and they got less and less convinced, even by --

5   and they couldn't take it.  You could tell.

6        Mr. Emerson even, near the end of my cross-examination

7   I tried to get him to say it again.  He couldn't even get

8   himself to say it again.  He said, well, you know how we

9   define sales, I think we have handled how we define sales,

10  because it's ridiculous, asking for the business.

11       What sales job would be sales if that's all sales was?

12  I asked Mr. Emerson about a car salesperson.  He doesn't

13  know what a salesperson does.  Maybe that's the problem.

14  Maybe Quicken doesn't know what salespeople do, and that's

15  why they think it's just this little tiny nugget.  No.

16       A car salesperson?  That would mean you would walk on

17  the lot and the car salesperson would say buy this car.

18       Hi, how are you?  Buy this car, buy this car.

19       Actually, hi, how are you wouldn't count because that's

20  building rapport, and Ms. Booza said that's not sales.

21  That's not Step 7.

22       It's just silly.  Under their definition of sales the

23  only one I could come up with is a beer vender at a ballgame

24  because a beer vender walks around and goes beer, beer,

25  beer, beer.  Under their definition of sales, that person is

1    a salesperson.  But, you know, actually he's probably more a

2    marketer because he's not walking up to an individual

3    consumer and going beer, beer, beer.  He's generally

4    marketing to the marketplace, beer, beer, beer.

5        Cigarettes?  Buying cigarettes was the analogy we got?

6    The last I checked you could buy cigarettes by walking up to

7    the counter going give me that pack and the person goes

8    (indicating).  The person who is the clerk, the person who

9    is running the register.

10       I'm not sure how that one fits.  It's ridiculous.  In

11   fact, it's a little insulting, and it was a waste of time.

12       So let's get to it.  Let's get to the example.  Let's

13   get to the law.  This is what the judge is going to tell

14   you.

15       The judge is going to tell you -- and there is our

16   punchline, by the way, at the bottom.  Here is what the

17   judge is going to tell you.

18               Employees in the financial services industry

19               generally meet the duties requirements for

20               the administrative exemption if their duties

21               include work such as collecting and analyzing

22               information regarding the customer's income,

23               assets, investments or debts; determining

24               which financial products best meet the

25               customer's needs and financial circumstances;

1              advising the customer regarding the

2              advantages and disadvantages of different

3              financial products; and marketing, service or

4              promoting the employer's financial products.

5              However --

6    Even if they do all of those things, which I'll talk to you

7    about in a moment, they don't do them all.

8              However, an employee whose primary duty is

9              selling financial products does not qualify

10             for the administrative exemption.

11        They could do those four things up in white, they could

12   do those four things perfectly every time and it doesn't

13   matter because, if their primary duty is sales, that

14   overrides it.

15        But let's talk about these four things.

16             Collecting and analyzing information

17             regarding the customer's income, assets,

18             investments or debts.

19   Collecting for sure.  Yeah, they collect stuff for sure

20   because they need to know those things so that they know

21   whether or not they qualify for a Quicken Loans matrix.

22        Analyzing it?  Not so much.  They get the score, they

23   look at the matrix, they go, sweet, the person qualifies, I

24   can sell them what they want.

25             Number two:

1                    Determining which financial products best

2                    meet customer's needs and financial

3                    circumstances.

4        Not so much.  The financial product is always a

5        Quicken loan, and sometimes that one is true because if the

6        customer's best interest lines up with Quicken's sometimes,

7        but then there is always that green bar, there is always

8        that bruising, there is always creating emotion, creating

9        need, pivoting, all of those things that really aren't in

10       the best interest of the customer's needs, all of those

11       sales things that get in the way.  So that one not so much,

12       but sometimes, sometimes.

13           Advising on advantages and disadvantages.  Advising on

14       advantages, for sure.  Man, they are all about advantages.

15           And you even heard Ms. Booza in her call clip.  All

16       advantages, no disadvantages.  When I asked her about that,

17       she said, well, that would be speculating.  Well, the

18       advantages they are giving these people are speculative,

19       too.

20           They don't talk about disadvantages.  They talk about

21       advantages.  So that one is a flatout no.  It's a yes on the

22       advantages, for sure.

23           And then:

24                    Marketing, servicing or promoting the

25                    employer's financial products.

1    That one, we know they have a marketing and promotions

2    department that work there.  We know they don't service the

3    loans, they sell them, so they just flatout don't meet

4    number four.

5         But it doesn't matter.  Let's say they did meet all

6    four of those perfectly, every time.  It says:

7              However, an employee whose primary duty is

8              selling financial products does not qualify

9              for the administrative exemption.

10   That's why these people get overtime.

11        There is the more general law that the judge will start

12   out with about the general business operations and about the

13   discretion and independent judgment, and he will read

14   through all of those things and there's a lot of law that

15   define those things before you get to this and then you will

16   hear the magic language:

17             However, an employee whose primary duty is

18             selling financial products does not qualify

19             for the administrative exemption.

20   Then you go, well, boy, maybe there is an escape hatch for

21   them in this one or something, huh?  No, there isn't because

22   if their primary duty is sales they meet both, they lose on

23   both elements, and that's why it's worded the way it's

24   worded:  However, primary duty is selling does not qualify

25   for the administrative exemption.

1      But I'll tell you briefly why they fail on this part.

2   General business operations.  What is general business

3   operations?  The judge is going to tell you it's performing:

4              work directly related to the management or

5              general business operations . . .

6                             -  -  -

7              To meet this requirement, an employee must

8              perform work directly related to assisting

9              with the running or servicing of the

10             business, as distinguished, for example, from

11             working on a manufacturing production line or

12             selling a product in a retail or service

13             environment.

14     And this is the general rule, and they apply this

15  general rule to here, and if you are selling financial

16  products, that's production work and you don't meet this

17  test, okay?

18     And here's the distinction, and this will probably make

19  it easy for you to understand.  Servicing the business, in

20  other words, are you doing the work that keeps the business

21  running while the people who are making and selling what the

22  company exists to make and sell are doing?  In other words,

23  are you an internal person that isn't necessarily making the

24  company money, but you are servicing the business to keep it

25  running?

1          Here is a list of the examples that the judge will give

2     you.  These are the kinds of examples that service the

3     business as opposed to sell or produce:

4                    Tax, finance, accounting, budgeting and

5                    auditing; insurance; quality control;

6                    purchasing and procurement; advertising and

7                    marketing; research; safety and health;

8                    personnel management and human resources;

9                    employee benefits and labor; public and

10                   government relations; computer network,

11                   internet and database; legal and regulatory

12                   compliance.

13         They clearly don't do any of these things, and that's

14    why they fail on that general test even without the rule

15    about, however, if their primary duty is sales they fail.

16    Because these people are not doing internal work to keep the

17    company running.  They are producing.

18         Even if you say, okay, it's all sales, but they put

19    that, they enter that into the system and I'm not going to

20    say that's directly related to sales.  Okay.  What is it?

21    It's production.  It's production work.  So even then, no

22    matter where they turn -- and they are not doing these

23    things.  They are just not doing these things.  These are

24    the things the judge is going to tell you fit the

25    administrative exemption.

*Plaintiffs' Closing*
*Monday/March 14, 2011/Volume 17*                    97

1          So the specific selling financial products doesn't work

2     for them.  The general doesn't work for them.

3          You say directly related to the management or general

4     business operations.  Here we go, how about customers?  You

5     know, it says at the end the internal workings of

6     Quicken Loans or its customers.  Maybe that's it.  What's

7     that for?

8          Individual consumers don't have general business

9     operations, so that doesn't save them either.

10          Plaintiffs were not assisting with the running or

11     servicing of an individual's business.  They are selling

12     loans to a consumer.

13          Julie Booth is a classic example of what customer means

14     on the end of that phrase.  Ms. Booth testified she worked

15     at Ernst & Young, one of those accounting firms, and Ernst &

16     Young sent her to Quicken to do accounting.  That is a

17     person who is servicing a customer's business.  That's not

18     what we have.  That's right here:  Tax, finance, accounting,

19     budgeting and auditing.  One company is sending their person

20     to another company's to service it.  So that's that.

21          Discretion and judgment.

22          So we've got the first test.  They lose on the first

23     test because their primary duty is sales, number one.

24          Number two, they lose because they are not doing one of

25     these types of jobs.  They are not servicing the business.

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1       Number three, they lose because they are production

2   workers, if nothing else.

3       Okay.  Then we go to the second one.

4           Plaintiffs' primary duty included the

5           exercise of discretion and independent

6           judgment with respect to matters of

7           significance.

8   And, by the way, they have to win both of these.

9       All right.  This one they lose for four reasons.  This

10  one has a long -- the judge is going to read a lot about

11  what this means, a couple of pages before we get to however.

12  But, discretion and judgment, what does it mean?

13      Here are the four reasons they lose on discretion and

14  judgment.  Number one is if it's matters of significance.

15  It's not just discretion and independent judgment.

16      Think about that.  Every employee in America has

17  discretion and independent judgment:  When they go to the

18  bathroom, when they take a smoke break, who they call first

19  maybe, whether they look at their pipeline first or whether

20  they make calls first.  Everyone has it.

21      It has to be matters of significance.  What are matters

22  of significance in the loan world?  Qualifying for the loan,

23  pricing of the loan, underwriting requirements for the loan.

24      Ms. Booza and all of the other witnesses confirmed for

25  us they had no authority in that regard.  If this person

1    does not qualify for a Quicken Loan under Quicken's

2    guidelines, end of story.  They couldn't sell at a price

3    outside the range of Quicken's price sheet.  They couldn't

4    ignore underwriting requirements.  They had to follow them

5    to a T.

6            Number two, you must have:

7                    Authority to make an independent choice, free

8                    from immediate direction or supervision.

9            That goes back to the not having authority.

10    If they wanted to sell something -- I think Ms. Booza

11    calls it recommendations -- if they wanted to sell something

12    outside of the price sheet or something outside of the

13    underwriting guidelines or try to sell it to a person who

14    didn't testify, they had to get independent approval before

15    they went forward.  Not that they had independent choice.

16            I think the judge will tell you, just because it's

17    reviewed later on doesn't mean they lose discretion and

18    independent judgment.  That's not what's going on here.

19    It's not that they are making the call and then it just gets

20    reviewed later.  They can't move forward without immediate

21    supervision on those issues.

22            Third reason:

23                    Must be more than the use of skill in

24                    applying well-established techniques,

25                    procedures or specific standards described in

1             manuals or other sources.

2        In other words -- and Ms. Booza is another classic

3    example of this.  She told you, well, after a while I kind

4    of internalized it.  She said, yeah, I had to follow a

5    matrix, I had to follow LOLA, I had to follow Lakewood, I

6    had to follow the pricing.  I had to follow those things,

7    but after a while I kind of internalized them.

8        And what this is saying is just because you internalize

9    them doesn't turn you into someone who is exercising

10   discretion and independent judgment, and they are not here.

11       And the last one is you can use manuals and that

12   doesn't defeat discretion and the independent judgment but

13   only if it's the type of manual that you have to interpret

14   by someone with advanced or specialized knowledge or skill.

15       And we know that's not the case here.  These are people

16   they are hiring with all kinds of experience, giving them a

17   couple of weeks of training and putting them on the phone.

18       So everywhere they turn, everywhere they turn they

19   lose.  They lose at the specific regulation.  They lose on

20   the general regulation.  Both prongs of it.

21       And the Court will read those to you, and like I said,

22   listen for the punchline:  However, if their primary duty is

23   selling, it does not qualify.

24       So that's the law.  It's pretty boring.

25       So why are we here?  It is obviously sales.  There is

1   no escape hatch.  Make no mistake why we are here.  We are

2   here because in 2004 Dan Gilbert told his people you will

3   not settle, we will not settle.  His exact words were:

4              We will not settle-period.

5              We will not settle-period.

6       That's why we are here.  This is Dan Gilbert's show,

7   and the reason we spent six weeks in trial trying to

8   determine whether the greatest sales force in America's

9   primary duty is sales is because six and-a-half years ago

10  Dan Gilbert said it will be so.  You heard him.  You saw his

11  live testimony.  You saw him on the stand.  This is his

12  show.  He tells a lame joke, and that entire side of the

13  room laughs.  That's the way it works, and that's the way it

14  should be.  He's the boss and he says how it goes, and

15  that's what he said.  He said fight this lawsuit, fight this

16  lawsuit, and that's why we are here.

17      Here is a really interesting thing from the email.  He

18  gave this directive before knowing what the law was, before

19  knowing that the issue and the fight was over whether their

20  primary duty was sales or not, and he stubbornly sat here

21  through six weeks of trial, over seven years of litigation,

22  over whether the sales force's primary duty was sales.

23      How do we know that he didn't know the law when he

24  passed down this edict?  Look at the subject line.  I

25  pointed this out at the time.  I want to point it out to you

1    again.  Here is the subject line of the email:

2              Law firm works with ex-sales people in order

3              to extract settlement from your company.

4    He didn't know the law at the time.  He didn't care.  He is

5    not going to be pushed around.

6         Well, Dan Gilbert has to follow federal law, Quicken

7    has to follow federal law, and these people came in and they

8    fought and they fought for seven years over measly overtime

9    pay for short periods of time and not very much money

10   because he has to follow the law.

11        Let's move on.  Let's talk about hours.

12        Okay.  That's sales.  Remember I stood up in the

13   beginning and said sales and hours.  I don't know how many

14   times we stood up and we said sales and hours, sales and

15   hours, while they went off and attacked our plaintiffs on

16   everything but sales and hours.

17        Hours.  The law protects misclassified employees.  I

18   told you that from the beginning.  The judge is going to

19   tell you that today.

20        An employer is not allowed to misclassify you and say

21   you are not, you do not qualify for overtime and then not

22   track the hours and then come back and go, aha, you can't

23   prove hours.  They are not allowed to do that by law.  What

24   the law says is when that happens and an employee was

25   misclassified by the employer and the employer did not track

1    the time, a jury or a judge can determine the hours worked

2    by a just and a reasonable inference.

3         And that's what we presented to you, the best evidence

4    we have, because they didn't track it.  And the judge is

5    going to tell you what that means.

6         The evidence you consider for a just and reasonable

7    inference, the judge will tell you, is -- it's, it's all of

8    the things you heard knowing that Quicken did not produce

9    the time records and did not keep track of time.

10        What should you consider when you are doing your just

11   and reasonable estimate of hours?  First of all, you should

12   consider the clients' testimony, the 25 plaintiffs'

13   testimony, okay?

14        And Ms. Booth, actually the defendants' witness, she

15   will be glad to see I'm using one of her slides, I am sure.

16   It's D201.  I recommend to you, ladies and gentlemen, you

17   take out a pen and a piece of paper and you write down D201.

18   D201, she has a column where what the person -- what each of

19   our plaintiffs testified to.  D201.  And D201 has all of the

20   testifying plaintiffs' hour estimates that they made.  She

21   missed Zane Kadro and Kelly Lytle.  Zane said 70, and Kelly

22   said 60.

23        So if you take D201 and you take Zane at 70 and Kelly

24   at 60, you will have all you need to know if you didn't

25   write it down in your notes as to what each of these people

 1    said their hours were.  D201, Zane 70 and Kelly 60.

 2         And when you do that and you average them all out, this

 3    is where we end up with our 25 plaintiffs.  I told you

 4    between 60 and 70.  I didn't know exactly where we would be.

 5    It's between 62 and 64.5.  That's the range.

 6         So like, for example, the way we figured this out is if

 7    a person said between 60 and 65, we took their high range --

 8    or their low range, 60, everyone's low range and everyone's

 9    high range.  And everyone's low range averages around 62.

10    Everyone's high range averages around 64.5.  That's right in

11    the wheelhouse where we landed.

12         Think about some of the plaintiffs' testimony.  One of

13    the earlier ones, you may have forgotten her.  I don't know

14    if you can forget this though.  Nicole Lilly, her

15    11-month-old on a pallet.  She made a bed.  She would bring

16    her 11-month-old in after daycare, after hours so she could

17    work.

18         Now, they go, oh, come on, come on, lady, you didn't

19    bring your baby into Quicken every night.  No way.

20         Weren't you waiting for the manager to come in and go

21    that is ridiculous, we didn't have a pallet bed for Nicole's

22    baby?  You didn't hear that testimony because they did and

23    she did it because she wanted to earn commission.  She got

24    the message, she understood her job, and she was there with

25    her kid working the hours.

1     Lindsay Tittensor, our first witness, testified that

2   they joked your chair is spinning if you left at your

3   scheduled time.  Your chair is spinning.  The Vault is open

4   late.  Her team was The Vault.  Voice mail, cell phones at

5   home.  So she can go see her dying grandma.

6     Mona Vats wanted to go to church on Good Friday and got

7   her keys snatched from out of her hand in Cleveland.

8     Chanda Whitted.  Remember Chanda?  I always say Chanda.

9   It's Chanda, sorry.  Dropped off on Sundays after church.

10  Did someone come in and go, no, that's nonsense, she never

11  worked Sunday?  No, you didn't hear any rebuttal evidence on

12  that stuff because it's true.

13    She's pregnant and about to get fired because she's

14  just not into it.  I imagine it's pretty hard to be into

15  60 hours a week in that environment, pregnant eight

16  and-a-half months.

17    Brian Stanczak, hit the 8's, hit 9's, he said.

18    Emanuel Lewis, Emanuel Lewis.  I don't know if you

19  remember Emanuel.  He's a nice young man.  He's the loafer

20  of the bunch.  He said 50 hours.  Then we found out he was

21  going to college at the time.  So the loafer of the bunch is

22  50 hours going to school.

23    We had specific documents from defendants.  Their own

24  hiring letter said 55-plus.  The schedule is 50 hours a

25  week, the schedule, and you heard all of our clients testify

1     they worked before and after their schedule because it was

2     goals, goals, sales goals, production, goals, goals.

3          Here is Mr. Mazey's day.  That's almost 11, that's

4     10:50 scheduled.

5          Again, in connection with hours, let's talk about the

6     evidence we did not see, and we'll see that -- the judge

7     will tell you you can make a just and reasonable inference

8     and it can be just approximate.  The defendant has to come

9     back with precise evidence of time worked, and they can't do

10    that.  They have already admitted they can't do that.  They

11    have said it over and over again, they can't.  So they have

12    to negative the inference is what it's called, and that's

13    what they have been doing, negativing the inference.

14         In their opening statement you heard defendant Quicken

15    say these hour estimates were absurd and impossible.  That

16    must have been before they realized their own witnesses had

17    put in affidavits in this case saying the same thing our

18    clients were saying.

19         Ms. Booza, 50 to 65 hours.  Mr. Thompson, 60 to 70.

20    John Bettis, 50 to 60, closer to 60.  Bari Beckett, who you

21    heard on a call clip talk about 60 to 80.  Those are their

22    people.

23         Thomas Ortman, he didn't last very long and he was

24    gone.

25         Brian Baumann, he's been there for 16 years.

1    Mr. Baumann testified 50 hours.  He was there a decade at

2    that point, and that guy was pulling 50 hours a week.

3    Victor You said 50.

4         So, absurd?  Impossible?  On the contrary.

5         And I asked them all, is Colleen Booza exaggerating?

6    No, Colleen wouldn't exaggerate.  The only difference

7    between Colleen Booza and Matt Thompson, they are not

8    exaggerators why?  Because they didn't join this lawsuit.

9    That's what converts people into exaggerators and liars and

10   thieves.  That's the only difference, because you joined the

11   lawsuit and you are on the other team.

12        How about other things?  Did we see any attempt at

13   reconstructing time?  Does Quicken strike you as a company

14   that's sort of technologically challenged and they just

15   can't get their act together?

16        They were asking questions of our clients:  Who is at

17   212-659-7847?  You called them 72 times in three months for

18   a call time average of whatever.

19        Are they challenged technologically?  No, they are all

20   over it.  They are all over it.  They have security swipes,

21   phone logs, LOLA log in/log out, Lakewood log in/log out,

22   email with dates and times.

23        Was there any attempt to reconstruct?  I'm not saying

24   perfectly.  I'm saying take a person or a few people, try to

25   reconstruct some time and give everyone a feel for what it

 1   was.  No.

 2        Ms. Booth testified, yes, there was, but we didn't see

 3   it.  So they either didn't do it because they knew the

 4   answer or they did it and they didn't like the answer or

 5   they started it and they saw where the answer was going, but

 6   you didn't get it.

 7        And they have all of the technology they need to give

 8   us that time.  They not only didn't keep time records, they

 9   didn't bring the stuff that they could have brought.

10        And why?  Because Ms. Booza wasn't exaggerating,

11   Mr. Thompson wasn't exaggerating, and the 25 plaintiffs

12   weren't exaggerating either.  That's the way it was.

13        How about breaks times?  Oh, man, we have heard a ton

14   about personal phone calls, surfing the web, shopping on

15   line, all of it.  The judge is going to tell you:

16              Rest periods of short duration, running from

17              five minutes to about 20 minutes, should be

18              included in hours worked.

19   Even halfway through the examination I believe

20   Mr. Morganroth started saying, well, there's nothing wrong

21   with personal calls, but isn't it true?  Well, if there is

22   nothing wrong with them, why are we talking about them?

23        Everyone makes personal calls at work.  Everyone surfs

24   the web.  Well, you sure as heck would be surfing the web if

25   you are working 12- to 14-hour days.  I would imagine you

1    would have to make a few personal phone calls:  Look, I'm

2    not going to be home or how was your day today, honey?

3         Less than 20 minutes, so what?

4         Fun time?  That's Quicken time.  Do you think

5    Chanda Whitted would rather be home with her four kids or

6    participating in a chicken nugget eating contest?  Those fun

7    things, those fun and exciting things, that's for Quicken's

8    benefit so that they can keep the people there and keep them

9    energized and enthused and selling.  That's where that time

10   goes and it's compensable under law, and the judge will tell

11   you that.

12        Meal breaks, same thing.  If they take a meal break

13   more than 20 minutes, it's not work time, but it has to be a

14   true meal break, not eating at your desk, not working, not

15   sifting through things, not talking to managers, not

16   anything.  It has to be a true meal break.  These people are

17   not even getting true meal breaks.

18        Are they getting breaks?  Yeah, they are not chained to

19   their chair.  And if you are there for 12-, 14-hour days,

20   you can get up and move around, but it doesn't affect their

21   hour estimates.

22        And you heard the plaintiffs testify that when they did

23   their estimates they considered all the time they worked,

24   their entire period of employment, and they considered all

25   of the things that happened during those times, vacations,

1    holidays, what not, and then they averaged.  Some weeks

2    maybe they went on a two-day vacation and they worked harder

3    the rest of the week.  Maybe they only worked 60 that week,

4    and their estimate is 65.  Well, the next week they worked

5    70 or whatever.  They said that it was over the entire

6    period of time.

7        Exhibit D202, another one of Ms. Booth's exhibits.  I'm

8    sure she's very happy we are going to use two of them.  D202

9    has -- I think I have a slide of it, actually.  Yeah, here

10   it is.

11       This is Ms. Booth, and what she did was she gathered

12   the information we didn't have, and thankfully she did.  And

13   she gave us weeks in training, full weeks, partial weeks,

14   and we know that's their time.

15       And so what our clients did was our clients said taking

16   all of this time, understanding that in some of my training

17   I didn't work overtime, some of it I did, I had a vacation

18   once or twice maybe, I had a long weekend that I had to

19   fight tooth and nail for, and they took it all into account

20   and that's how they came up with their averages.

21       Ms. Booza, Mr. Thompson, the rest of the defendants'

22   witnesses did the same, and that's what they came up with.

23       They came up with, the plaintiffs came up -- oops,

24   wrong way -- with that range, 62 to 64.5, but it's going to

25   be your call what to do with respect to that.

1          Now, what about the non-testifying plaintiffs?  The

2     judge is also going to tell you what I told you the first

3     day, which is the federal overtime law does not require

4     every single person to come in, they have what are called

5     collective actions, okay, and it allows employees to pursue

6     their overtime claim as a group in one case.  It's called a

7     collective action.

8          Jurors do not have to hear from 350 people.  Thank God.

9     The result is you can make a just and reasonable inference

10    for the other non-testifying plaintiffs based on the

11    evidence you heard, the representative evidence from the

12    plaintiffs and the other evidence you heard, and that's what

13    we'll be doing here.

14         And the judge will tell you that you will determine

15    whether or not you heard enough evidence to make what you

16    heard fairly representative of everybody, and the key factor

17    there is they are fairly representative, and the judge will

18    tell you, when the testifying and non-testifying plaintiffs

19    perform substantially similar work.

20         Well, the testifying and non-testifying plaintiffs

21    didn't do substantially similar work, they did identical

22    work, and you heard even defendants' witnesses admit it was

23    the same job, the same job duties.  It was the same employer

24    expectations.

25         Again, Mr. Perry, Mr. Farner, they all admitted these

 1    things.  They had the same players, the same management.

 2    Gilbert, Emerson, Farner, all the way down.  The RVP's, the

 3    sales directors.  The same motivation, the same suggested

 4    work hours, the same pressures, the same compensation plan,

 5    the same firsthand knowledge of the position.

 6         And those are the factors the judge is going to tell

 7    you about.  Substantially similar work, same job duties,

 8    same employer expectations, same motivation, same suggested

 9    work hours, same comp plan, same firsthand knowledge of the

10    job.  You got all of that.

11         And the judge will also tell you there's no specific

12    number.  There's no magic to 25.  We could have called 15,

13    10, 5.  There's no magic.  We called 25, but it's not just

14    those 25 that you have in front of you.  You have all of the

15    defendants' witnesses, their loan consultants that they

16    called, the Ms. Booza's and those people.  Mr. Thompson, all

17    of those people.

18         We have all of the documents you have seen, all of the

19    emails you have seen, all of the voice mails, the call

20    clips.  They all count when you talk about whether you have

21    enough to make a just and reasonable inference that the

22    non-testifying plaintiffs would have come in here and said

23    pretty much the same thing the 25 did and Ms. Booza did and

24    the rest of those people did, all subject to the same stuff.

25         And you also may remember when you talk about

1   representative, I asked Mr. Emerson, just so we are clear,

2   Mr. Emerson, you are making the same claim, you are saying

3   all loan consultants, their primary duty was not sales,

4   right?  Right.  So your legal arguments are the same with

5   respect to everybody, testifying and non-testifying, right?

6   Yes.

7        Okay, good.  So he's not saying all of the

8   non-testifying people who weren't here, we had different

9   defenses for them.  No, it was the same asking for the

10  business.

11       The same with hours.  We had 25 plaintiffs.  We had

12  defendants' witnesses, including the call clips.  Here is

13  what else we had.  Look at the 25 people we did call.  Here

14  they are.  I'll go back to that quickly.

15       Where is my magic slide?  Here is the slide.  The

16  Rachhana Srey special, right here.

17       The Employment Dates and Locations of Representative

18  Plaintiffs' and Defendants' Witnesses.  This is a

19  color-coded job, and what it means is blue -- here is the 25

20  plaintiffs.  Blue means they worked in Livonia.  Purple

21  means they worked in Troy.  Orange means they worked in

22  Laurel Park.  Red means they worked in Cleveland.  Green

23  means their activity covered every one of those places, and

24  the green is the Emerson, Gilbert, Farner.

25       Here is some of these manager types, Pellow, Perry,

 1   Mazey.  Look at Mr. Perry.  Right across the board:

 2   Livonia, Troy, Cleveland.

 3        We have the dates covered.  We have the locations

 4   covered.  In fact, you can even see when these locations

 5   opened by when we have them covered.

 6        I guess, on representativity, I guess the question you

 7   need to ask is did you need to hear from 25 more plaintiffs

 8   to get this?  Did you need to hear from the 25 you heard

 9   from?  Did you need to hear from more than 10 of them?

10        Of course not.  They are representative and their hours

11   are representative, and you should give the non-testifying

12   plaintiffs the same consideration that you give the

13   testifying witnesses with respect to where you come up with

14   the just and reasonable inference.

15        I want to talk to you quickly about some sideshows that

16   we had going on here.  There's an old saying in the legal

17   profession:  If you have the facts on your side, pound the

18   facts.  If you don't have the facts on your side, pound the

19   law.  If you don't have the law on your side, pound the

20   facts.  If you don't have the facts or the law, pound the

21   table.

22        And that's what Quicken did in this case.  They didn't

23   have the facts, they didn't have the law, so they pounded

24   the plaintiffs.  We brought 25 of them in here, and those

25   brave people came in here and took their lumps.  They dug

1    through everything they could find on these people, and they

2    pounded on them.  What did any of that have to do with hours

3    worked or sales?

4         Adam Persails put on his job app that he went to a

5    community college in Florida.  He put two community colleges

6    down, one in Florida.  It turns out he partied at the

7    second one and didn't really go to school.  He put it on his

8    resume or on a job application.  Does that make asking for

9    the business their only sales activity?  No.

10        This Adam Persails, by the way, who didn't even have

11   an Associate's degree from any community college, he was a

12   hospital orderly.  I guess they are saying they wouldn't

13   have hired him if they had known he didn't take any classes

14   in Florida.

15        Zane Kadro.  We brought him back with his plaque on his

16   Series 63.  Why?  Did it matter?  No.  But it mattered to

17   Zane Kadro.  They accused him -- by questions only, no

18   evidence, questions only -- they accused him of not really

19   having his Series 63, not really having his Series 6.  He

20   was so upset when he left, he went home and he went down in

21   his basement and he rummaged through his stuff and he found

22   his plaque.  He is like that is outrageous.  He calls FINRA

23   and says why aren't I on the website.  They said, well, it

24   says right on the website if you got your Series 63 more

25   than 10 years ago it's not on here.  So he got a transcript

*Plaintiffs' Closing*
*Monday/March 14, 2011/Volume 17*

116

1    from FINRA saying he got his Series 63, brought his plaque,

2    and we put him back up there.  Because it mattered?  No,

3    because he wanted to.  And they were asking questions and

4    going after these people.

5        John Semilia, the only person who joined the case

6    before leaving the company.  What happened to him?

7        He joins the case in Cleveland.  Mr. Gilbert comes in

8    within weeks, within days, I think he said, and gives a

9    speech about thank you for your loyalty, this is an

10   outrageous lawsuit, and there sits John and then John gets

11   fired within days.  He gets fired.  And they come in here

12   and say it's because he lied.  He's a lying perjurer because

13   on his license form he said he had never been suspended of a

14   license, and he lost his insurance license back in '02.

15       It kind of begs the question:  When did they find out?

16   They said you were fired for it.  He said, no, that's not

17   what happened.  They didn't say that at the time.

18       By the way, it was Jeff Perry who fired Mr. Semilia.

19   We went to Cleveland and took Mr. Perry's testimony.  They

20   didn't ask Mr. Perry a single question about John Semilia or

21   why he was fired, leaving only Mr. Morganroth's questioning

22   John Semilia as the only evidence, and the judge will tell

23   you what lawyers say is not evidence.

24       Kelly Lacey, one customer complaint in three years.

25   Successful loan consultant.  Loved the place, hated to

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1    leave.  What did they do?  Pull out that one customer

2    complaint and go through it line by line.  And you got a

3    zero score here, didn't you?  Afterward -- and this is a

4    year and-a-half before she left.  The one thing they pull

5    out, they pounded her with it.  Why?  Does it have something

6    to do with sales or hours?  No, because they have no facts,

7    they have no law.

8         My favorite was Hassan Bazzi.  I don't know if you

9    remember Mr. Bazzi.  Let's see if I can get him up here.

10        He's down here in the corner, kind of a mellow dude,

11   quiet, soft spoken, clearly not a fit at Quicken.  No way.

12        Mr. Bazzi is my favorite because they had a stack of

13   stuff this thick.  You maybe didn't pick up on it.  They had

14   a stack of stuff this thick, and boy, they were going to

15   take it to Hassan Bazzi.  And then they figured out they had

16   the wrong Hassan Bazzi, it was his cousin, and man, were

17   they bummed.  Then after that all they could do is make fun

18   of him because he filed bankruptcy a year or two after

19   leaving Quicken.  But, boy, they were going to go after him,

20   but they had his cousin, and that Hassan Bazzi apparently

21   had enough stuff, enough dirt, his cousin had, they had some

22   good stuff on his cousin, they couldn't wait, but not

23   Hassan.

24        These people, these 25 people had the nerve to stand up

25   to Dan Gilbert.  They are low level.  They don't get it.

 1    And they have the nerve to say these people are dishonest,

 2    lying, stealing, money-hungry, greedy people.  They have the

 3    nerve to say that when executive after executive takes the

 4    stand and says sales doesn't mean sales, and I don't know

 5    what salespeople do and I have never bought a car or

 6    whatever.

 7        The nerve of calling these 25 people liars when they

 8    take the stand and they make people take the stand --

 9    Colleen Booza takes the stand.  How comfortable was she

10    saying that her job wasn't sales?  Not very comfortable.

11        More sideshows, other sideshows.  Signed agreements.

12    They didn't complain.  They knew the deal at the time of

13    hire.  The judge is going to tell you:

14              Under the FLSA -- that's the federal overtime

15              law -- the plaintiffs cannot waive, or give

16              up, their right to overtime.

17                              -  -  -

18              The fact that a plaintiff has signed a

19              contract or agreement stating that they will

20              not receive overtime or told at the time they

21              will not receive overtime is not

22              determinative.

23        Think about that.  So because Quicken's lawyers after

24    the lawsuit starts draft a mortgage banker's duties

25    statement, put it in front of the person on their first day

1    of work, they sign it, and they go, aha, these people admit

2    that's their job duty.

3            Wrong.  You can't waive your overtime rights.  Even if,

4    and this didn't happen, even if Quicken told these people on

5    day one you are entitled to overtime but we're not giving it

6    to you and you have to sign this paper saying I don't want

7    it, I fully understand it and I don't want it and I won't

8    complain, okay, even if they did that, which they didn't do,

9    that's not enforceable under law.  You cannot waive your

10   overtime rights.

11           That's not what happened, by the way.  They told these

12   people you don't qualify for overtime.  Mr. Gilbert came in

13   and said this is an outrageous lawsuit, it's ridiculous,

14   your job duties don't fit.

15           But it doesn't matter because you cannot waive your

16   overtime rights.  When you think about it, it makes sense.

17   Would there even be an overtime law if you could?  What

18   employer with half a brain, with the army of lawyers that

19   Mr. Gilbert has, what employer wouldn't have every single

20   employee sign a waiver of overtime rights on the first day

21   of the job, when the person wants the job and is desperate

22   for the job?  A lot of people would waive their overtime

23   rights.  No one would have to pay overtime.

24           So that's a good thing, that law, and the judge is

25   going to tell you that's the law.  And that was a bunch of

1    wasted time putting that stuff in front of these people and

2    going you signed this and you understood you weren't getting

3    overtime.  So what?

4        Another one that was a waste of time, a sideshow:  What

5    you would have been paid.  You would have made more money

6    had you -- you made more money this way than you would have

7    if you had been paid overtime.  Doesn't that kind of beg the

8    question?  The question being:  Well, how would I have been

9    paid?

10       You can be paid overtime and still earn commission.

11   You can be paid overtime and still get a salary.  So what

12   are you talking about?

13       Yeah, if you want to say would they have made more

14   money, most of them made more money under this system than

15   if you only got 24K plus overtime, but who takes that job?

16   Would these people take that job?  That's not what they are

17   told.  They are told six figures, six figures.

18       So this whole thing about what you would have been

19   paid, that begs the question.  What if Quicken had followed

20   the law?  Pretty speculative, but I'm sure they hang on to

21   that commission because that's critical to their business

22   plan and they would figure that out.

23       I asked Mr. Gilbert, oh, are you saying it's impossible

24   to get paid overtime and get paid by commission?  He said,

25   no, I'm not saying that.  What he's saying is, man, I have

1    got to hang on to that commission because that's how this

2    thing hums, because these people are hungry and I want them

3    hungry because I want them selling.

4        Another waste of time, another sideshow:  Whether

5    plaintiffs liked their job there or not.  So what?  Whether

6    they are good at it or not.  Who cares?  It has nothing to

7    do with whether their primary duty was sales whether they

8    were good at their primary duties or not.  It doesn't

9    matter.

10       What we are here talking about is whether they should

11   have been paid overtime based on their hours and their

12   primary duty.  Whether they liked it, who cares?  Whether

13   they were good at it, who cares?  How they left, if they

14   left on good terms or bad terms, who cares?  All of those

15   things, none of that stuff matters, but, boy, we spent a lot

16   of time on it.

17       I'm sure we will hear a bunch about it today.  He will

18   attack these 25 people today, and listen carefully for job

19   duties and hours worked.

20           **THE COURT:**  You are at about two hours and ten

21   minutes, Mr. Lukas, for your information.

22           **MR. LUKAS:**  I was going to go over the special

23   verdict form and end.

24           **THE COURT:**  Okay.  You do whatever you want.  I

25   wanted to let you know how long --

1          **MR. LUKAS:**  Yeah, I want to show these people

2     where to check the boxes.

3          I'm going to show you something called the verdict

4     form.  It's a three-page document that you are going to get

5     that goes back with you.  This is your verdict.  This is

6     what you fill out to tell the Court and us what you want to

7     do.  Okay?

8          The first question -- as soon as Don gets this up and

9     running, I'll put it up here for you.

10          I'll foreshadow it a little bit for you.  The first

11     question is the administrative exemption, did they satisfy

12     it or not.  There's two questions there, the two I showed

13     you up on the screen.  The answer is no and no.

14          There we go.  Verdict Form, administrative exemption.

15          This is the law I showed you on the screen.  This is

16     that general law.  In order for Quicken to win, yes has to

17     be checked in both of these questions, and then you're done,

18     sign it, because we lose, the plaintiffs lose.

19          But that's not what we are asking you to do.  We are

20     asking you to say:

21               Was plaintiffs' primary job duty the

22               performance of office or non-manual work

23               directly related to the management or general

24               business operations of Quicken Loans or its

25               customers?

1    No.  Why?  Because their primary duties is sales.

2         Number two:

3              Did the plaintiffs' primary job duty include

4              the exercise of discretion and independent

5              judgment with respect to matters of

6              significance?

7    No.  Why?  Because their primary duty was sales, and as I

8    showed you when I danced through the law, we could put a

9    couple more checks in the no boxes if you wanted.

10        We could say they weren't servicing the business, they

11   were in production work.  They weren't servicing the

12   business.  They weren't doing any of those list of jobs the

13   Court is going to tell you about, so let's put another no.

14        Discretion and judgment.  They weren't exercising the

15   kind of discretion and judgment the law calls for, not being

16   subject to immediate review, not being subject to the

17   guidelines and manuals.  So we could put two checks there,

18   too.

19        And when you check no -- obviously you only have to put

20   one check, okay?

21        You hit no, then you hit no, and then you go to

22   question two, which is hours worked and weeks employed --

23   hours worked.  I'm sorry, hours worked by plaintiffs.  Then

24   you do that.

25        And I want to make sure I have the right exhibit.

 1   D202, right?  Or 201.  Thank you, Robert.

 2       D201.  And what you do is you look at D201 in that

 3   column, and that will tell you what our clients testified

 4   to.  I'm not going to tell you write that number because

 5   this is your job.  You guys decide what a just and

 6   reasonable inference is.  Because there's no time records,

 7   you have to say what you think is fair, and you put in what

 8   you think is fair.

 9       I give you D201, that column, only because in case your

10   notes aren't complete as to -- remember, Zane Kadro is 70

11   and Kelly Lacey is 60.  Other than that, D201 should give

12   you that in case your notes or your brain doesn't have that

13   in there.  Okay?  And there's a box for each of the 25

14   testifying plaintiffs.

15       And then you go to Question 3:

16           Please determine the average number of

17           overtime hours worked, per week, by the

18           non-testifying plaintiffs while they were

19           employed at Quicken Loans.

20            If you decide that you cannot draw any

21           conclusions about the hours the

22           non-testifying plaintiffs worked based on the

23           testimony of plaintiffs who appeared in court

24           and the other proofs -- that's all of the

25           other evidence you saw -- you may mark "0" in

```
 1              the space below.
 2    But what we are suggesting is that you put in a number here
 3    because we believe you have seen more than enough to fairly
 4    represent what the non-testifying plaintiffs should get.
 5    You should give them a number that represents something
 6    close to what the testifying plaintiffs did.  You saw that
 7    when we did the high/low range it was between 62 and 64.5.
 8    We suggest you do something, whatever you do with the
 9    testifying plaintiffs, we suggest you do something very
10    close to that with the non-testifying plaintiffs, but again,
11    your job, your decision.
12         And then whoever who is chosen as the foreperson should
13    sign and date it.  So, to review, no, no, fair hours, just
14    and reasonable hours based on what you guys think is fair,
15    same thing for non-testifying.
16         And I'm sorry I went so long, but, again, thank you so
17    much.  I know it's been a long case, it's been a long trial,
18    and you guys have been really fantastic.
19              THE COURT:  Okay.  Thank you very much, Mr. Lukas.
20         Ladies and gentlemen, we will take a brief recess.
21    Let's try to make it 25 minutes, which should give you
22    enough time to get a bite to eat and come back, bearing in
23    mind that you need to keep an open mind.  We are going to
24    keep the case going, and Mr. Morganroth will have his
25    opportunity to address you this afternoon.
```

1   And keep in mind, as well, that the evidence is in.

2 These are arguments, which are not evidence, and intended to

3 give you the litigants' views of what the evidence is.

4 All right?

5   Enjoy your break.  We'll take 25 minutes, and refresh

6 yourself.  We'll try to get back in here at 1:00 to hear

7 Mr. Morganroth, all right?  Let's all rise for our jury.

8   (Jury out at 12:37 p.m.)

9   **THE COURT:**  Okay.  You may all be seated.

10   The only issue that I didn't take up with the lawyers

11 that I want to make sure we are clear about is -- Carol, I

12 hope, sent you an email last week.  My senior clerk and I

13 went through all of the documentary evidence.  We have

14 compared and contrasted what we have, what I took notes on

15 with your proposed exhibit lists.  We found everything

16 largely accurate.  There were a couple of issues of items

17 that were missing.  My hope is that you supply what's

18 missing.  I left what had been offered and not used on your

19 tables so my further hope is that you took those with you

20 and that you conferred and that everything we have in front

21 of us is accurate and ready for the jury's review should

22 they ask for it.  All right?

23   Mr. Morganroth, are you okay on that?

24   **MR. JEFFREY MORGANROTH:**  Yes, I am.

25   **THE COURT:**  All right.  Mr. Lukas?

*Plaintiffs' Closing*
*Monday/March 14, 2011/Volume 17*                    127

1          **MR. LUKAS:**  Yep, I think we are set, Judge.

2          **THE COURT:**  Okay, excellent.  Then the exhibits

3     are all taken care of.

4          We'll take a luncheon recess for about 25 minutes, and

5     we'll be back at 1:00.  Thank you all very much.  We are in

6     recess now.

7          (Lunch recess from 12:38 p.m. to 1:16 p.m.)

8          **THE COURT:**  Okay.  You may all be seated.

9          I apologize for the brief delay.  The jurors insisted

10    on five or ten more minutes so they could finish their

11    lunch, and who am I to say no?

12         All right.  Mr. Morganroth, we are ready for you, and I

13    see our friend Mr. Hirsch is here, so welcome back,

14    Mr. Hirsch.

15         So let's get going, Carol.

16         (Jury in at 1:17 p.m.)

17         **THE COURT:**  Okay.  Let's all rise for our jury.

18    Come on back, folks.

19         Okay.  All of our jurors are back and they are in their

20    places so you may all be seated now.

21         Carol said if you didn't get an additional ten minutes

22    to eat your lunch you were going to go on strike, right?

23    Okay.  Well, your tactics worked this time.  All right.

24         Okay.  Ladies and gentlemen, as I mentioned before we

25    broke, Mr. Morganroth is going to present his closing

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1    argument, and as I admonished you when Mr. Lukas finished

2    his, the arguments are just that, they are not evidence, but

3    nonetheless I ask that you give rapt attention.

4         Mr. Morganroth will go for about two, two and-a-half

5    hours.  We will take another short break, just a bathroom

6    break and a drink of water, then we'll come back for a very

7    brief rebuttal from Mr. Lukas, then we will launch right

8    into the instructions and then the case will be yours.

9    Okay?

10        All right.  Give attention, and Mr. Morganroth, it is

11   your turn now.

12            **MR. JEFFREY MORGANROTH:**  Thank you, Your Honor.

13        Good afternoon, everyone.

14            **THE JURORS:**  Good afternoon.

15            **MR. JEFFREY MORGANROTH:**  We started this trial

16   five weeks ago, about four weeks of testimony.  At the

17   beginning of the trial the lawyers had an opportunity to

18   directly address the jury, and that was called the opening

19   statement, to give you a road map to indicate where we

20   thought we would be going, what the evidence would prove,

21   and a good word for the opening statement is foreshadowing

22   or to foreshadow.  We learned a lot about that term, much

23   more about it, during this trial.

24        This is now the closing argument and the closing

25   argument is when the lawyers directly discuss the evidence,

1   the testimony, and what we believe we proved during the

2   case.  And the Court will instruct you, as Judge Murphy has

3   just done, that what the lawyers say during the closing

4   argument is not proof, that's not evidence, and that goes

5   for Mr. Lukas' closing argument as well.  It's simply to

6   deliver our position as to what we think the testimony and

7   the exhibits show and in order to try to convince you of

8   what we think we have proved in the case.

9       Now, both sides get to ask you, the jury, to rule for

10  their side at this stage of the case, and it's much like

11  asking for the business or asking for a commitment to go

12  forward with the loan.  Lawyers on both sides have the job

13  duty of trying to prove their case and trying to convince

14  you to rule for their client.

15      Now, if I do a good job in this case and we win it, my

16  law firm might get more business from Quicken Loans or we

17  may get referrals from Quicken Loans or at least I hope so,

18  but does that mean that my job is a sales job?

19      Now, I have no problem if someone calls me a salesman

20  or if they refer to lawyers as salespeople.  There are

21  courses and books written on how lawyers can attract

22  business.  Lawyers can advertise.  We get referrals.  We get

23  repeat clients.  When we accept a case, we typically get a

24  retainer, much like the deposit that the loan officers would

25  get or mortgage bankers.

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                     130

1          The lawyers who are good at getting business are called

2     rainmakers.  They are actually compensated more because they

3     have the ability to attract business, and most lawyers'

4     compensation is also based upon the business that they bring

5     in.

6          There are courses and books written on how to

7     communicate and sell your client's position in settlement

8     negotiation.  There are courses and books that are written

9     on how to communicate and sell your client's position in

10     motion hearings.  There are courses and books written on how

11     to present and communicate at a trial and to help convince

12     and sell the jury.

13          Sometimes lawyers are referred as to selling legal

14     services.  Do I care if someone calls me a salesperson or if

15     the legal profession uses these types of sales terminology

16     or lingo?  Absolutely not.  But to turn around and try to

17     take advantage of this type of generic lingo in an effort to

18     get overtime, that would be inappropriate and unfair, and

19     that's what's happening in this case.  That's precisely what

20     the plaintiffs are trying to do here.

21          Every single job has a sales component.  I can't think

22     of a single one that doesn't.

23          Members of the clergy, like a priest or a rabbi or a

24     minister, they attempt to get members to join their

25     congregation.  They attempt to convince or sell religious

1    philosophies during sermons.

2        Politicians are constantly selling or trying to

3    persuade others about his or her political views, first in

4    order to get elected and then later in order to try to get

5    measures passed or bills passed.

6        But does this mean that members of the clergy,

7    politicians, lawyers are salespeople in the truest sense, in

8    the literal sense of the word?

9        Now, here is a little bit of foreshadowing for this

10   closing argument.  I'll be focusing on key testimony and

11   exhibits from the trial which you can specifically consider

12   in making your decision in this case, and before I get into

13   the specific testimony and exhibits I first want to

14   thank you, the jury, again for your time and attention in

15   this case.

16       The jury system is extremely important.  It's what sets

17   our judicial system apart from those of many other

18   countries.  So I thank you for your service, your attention,

19   and certainly for your time.  We don't take lightly the

20   sacrifices and commitment that you have made for this trial,

21   and it's been a time-consuming trial.  It has been a lot of

22   work for everyone, including the lawyers.

23       For me, all of the hard work, the long hours, not

24   seeing my family, disruption to my regular routine, lack of

25   sleep, it was all worth it for two reasons.

1       First, well, I got another chance to work with my

2   father, and we have been working together for a lot of years

3   on many different trials over the years, but we both know

4   that we will not be able to work on trials forever so each

5   time we get a chance to work together on a trial it's

6   special for us.  So that's the first reason.

7       The second reason, and the most important reason, is

8   who we represent in this case.  Out of all of our years as

9   lawyers, both my father and I -- and that's a lot of

10  collective years when you take into consideration how long

11  he has been practicing -- we have never ever come across a

12  company like Quicken Loans.  Quicken Loans is a special,

13  one-of-a-kind company, as the evidence in this case has

14  shown.  It is exceptional.  It's made up of fine people that

15  are hard working, dedicated, and they strive to do the right

16  thing.  Do the right thing for their clients, do the right

17  thing for the company, do the right thing for the employees.

18      Now, how many companies have you heard of that put

19  together a compensation package that would pay more money,

20  to the tune of three, four, five, six times more?

21      How many companies have you heard of that send

22  thank you emails company wide and recognize the

23  contributions to the success of the company sent by the

24  chairman and majority owner like Dan Gilbert or sent by the

25  CEO like Bill Emerson?

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    133

1          How many companies have you heard of that provide a

2      tremendous amount of paid days off right from the beginning

3      of the employment?  And this is for new employees.

4          Now, Sarah Little, she is one of the plaintiffs in this

5      case.  We'll put up some pictures here to try to refresh and

6      remind who these plaintiffs were.  So the first one I have

7      up here is Sarah Little, and these pictures are back from

8      the time period that they were actually employed by

9      Quicken Loans.  So she still looks pretty much like that,

10     but it's been a number of years.

11         So, Ms. Little, she was paid for 17 workdays that she

12     missed plus legal holidays that she missed during a

13     five-month span of employment.  Right from the beginning.

14         Tamara Cooke.  You probably remember Ms. Cooke.  She

15     testified, another plaintiff.  Let's put her up here.

16         And, Ms. Cooke, she was paid for 24 work days plus

17     legal holidays that she missed, she didn't work.  She was

18     paid for all of that time in a one-year time span that she

19     was employed.

20         Lindsay Tittensor, the very first witness in this case.

21     I will put up a picture of Ms. Tittensor.

22         Ms. Tittensor was paid for 18 workdays that she missed,

23     plus legal holidays that she missed during an 11-month span

24     of employment.  She worked a mere 11 months as a mortgage

25     banker at Quicken Loans, and she missed 18 days and got paid

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*

134

1    for it plus legal holidays.

2         Now, how many companies have you heard of that have

3    ping pong tables, foosball tables, arcade games, karaoke,

4    Nerf football games, dress-up contests, chicken nugget

5    eating contests, birthday celebrations, decorations in the

6    office, all of these things in the middle of the offices

7    where they know that the employees will take advantage of

8    that, participate during work hours and not work?

9         How many companies do you know or have you heard of

10   that allow the employees to have personal calls during work

11   hours when the company knows the extent, length and nature

12   of the personal calls like Quicken Loans?  They had a

13   telecommunications system that tracked all of the personal

14   calls, measured the time and numbers and who they were

15   calling.

16        We heard from Kelly -- Lytle was her maiden name.  That

17   was her name when she was employed.  Now she married

18   Mr. Lacey, who was in the courtroom.  He was also a Quicken

19   Loans' employee, a mortgage banker.  He worked there for

20   seven years.

21        Here is Ms. Lacey.  Ms. Lacey, she testified and

22   admitted that she had 943 calls to her then boyfriend

23   Alan Lacey that she made externally when he wasn't on the

24   premises and another 378 internal calls to Mr. Lacey while

25   he was also serving as a mortgage banker and he was on the

1    premises.  That's a total of 1,321 calls just to her

2    boyfriend alone.  And there were other personal calls as

3    well.

4         Now, was she disciplined for this?  No.  Quicken Loans

5    knew that she was making these calls and it was okay, but is

6    it okay for her to receive overtime when she's talking 1,321

7    times with her boyfriend or all of these other personal

8    calls?

9         So just to remind us of Ms. Lacy and all of her

10   personal calls, I am going to put up here personal calls,

11   just to refresh us.

12        Now, Nicole Lilly, that's another plaintiff.  Ms. Lilly

13   was I believe the third witness who testified.  We'll put

14   her up.

15        Ms. Lilly acknowledged that she had 722 calls to her

16   fiance at the time, 100 calls to her sister, another 308

17   calls to another number, 103 calls to her son's nursery.

18   Ms. Lilly was the individual who testified that she leashed

19   her son to the desk.  She had other personal calls as well,

20   and she didn't even work one full year at Quicken Loans.  Is

21   it fair for her to get overtime when she has all of these

22   personal calls on the time that she spent?

23        Let's put up here personal calls for Ms. Lilly as well.

24        Now, how many companies have you heard of that allow

25   their employees to surf the internet for personal purposes

1    on a regular basis during work hours and know about it

2    because of their systems?

3         Now, Mona Vats, if you recall, she testified as a

4    plaintiff.  She drove in from Cleveland, Ohio.  Let's put up

5    a picture of Ms. Vats.

6         Ms. Vats testified that she regularly during the

7    four months of employment surfed the internet, she said

8    everyone did, for personal purposes.  So let's put up what

9    she was regularly doing while she was employed at

10   Quicken Loans, surfed the net.  And is it fair to award her

11   overtime on time when she was surfing the net for her own

12   personal purposes?

13        Jennifer Maull.  Jennifer Maull was the individual who

14   came in here and testified that she had been fired because

15   she called a client a swear word.  She called a client a

16   bitch, and then what did she do?  She lied about it and she

17   got fired, and during her testimony she admitted that that

18   was the right call to fire me, it was appropriate to fire me

19   and I should have been fired.

20        Well, she readily admitted during her testimony that

21   she was shopping on line during work hours.  So let's put up

22   a picture of Ms. Maull, who was shopping on line while she

23   was working, and certainly -- surf net.  Certainly that

24   wouldn't be working, while you are shopping on line.

25        Lola Herman.  Lola Herman testified, and she didn't

 1    deny that she shopped on line during work hours.  She

 2    readily admitted that she was doing her personal banking on

 3    line during work hours from Quicken Loans.

 4        So we'll put her up, and this picture is not quite as

 5    clear, but it does look like Ms. Herman.  Surf net.  The net

 6    surfing she was doing was not shopping, but she was doing

 7    her personal banking while at work.

 8        Now, how many companies do you know or have you heard

 9    of that promote from within to the highest levels on a

10    consistent and a regular basis for all employees?

11        Now, we heard about Jeff Perry.  Jeff Perry was a copy

12    guy.  He rose up and was promoted during a four-month period

13    to become a site leader and a regional vice president of the

14    Cleveland web center.

15        We heard about Jay Farner as another example.  He

16    started off as a mortgage banker, and Mr. Farner then became

17    the head of the entire web center.  Now he's the chief

18    marketing officer.

19        And one last example is Mr. Emerson.  Mr. Emerson, he

20    testified that he started as a mortgage banker, and nine

21    year to the day he became the CEO of the company.

22        Now, Quicken Loans is a young, fun and energetic place

23    to work, with its headquarters right here in the City of

24    Detroit, and you heard Mr. Gilbert testify that he was

25    committed to the City of Detroit to create jobs.

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    138

1    Quicken Loans would do so on its own and in conjunction with

2    community efforts, such as Bisdom U.

3        Quicken Loans has consistently been recognized as one

4    of the best places to work in the entire country.  During

5    the time frame that we have at issue in this case

6    Quicken Loans was ranked within the top 15 companies to work

7    in the entire United States, and its employees, including

8    the mortgage bankers, they filled out anonymous surveys as

9    part of the ranking process.

10       And Quicken Loans also consistently has been recognized

11   as one of the top companies in terms of customer service.

12   It's been ranked number one by J.D. Powers.

13       Quicken Loans has created a unique and revolutionary

14   way to consult and advise clients regarding mortgages and to

15   find them solutions.  We heard about Mortgage in a Box, the

16   online web center, and that Quicken Loans has become the

17   number one online residential mortgage company in this

18   country.

19       Its chairman, Mr. Gilbert, sends out emails that

20   motivate, inspire, provoke thought, and have a sense of

21   humor.  We saw the April Fool's stunt email.

22       And there are references to movies in his emails.  He

23   drew upon, "Any Given Sunday", "A Few Good Men", "2001 Space

24   Odyssey."

25       There were references to songs.  One of the emails that

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1    Mr. Lukas took out of context this morning was Eminem's, the

2    song, "The Moment," which Mr. Gilbert was playing off of.

3         Quicken has even developed "ism's".  We have heard

4    about the ism's.  These are the corporate mottos.

5         "Every client, every time, no exceptions."

6         "Eat our own dog food."

7         "What you focus on you find."  That's Mr. Emerson's,

8    one of his favorites.

9         "Do the right thing."

10        Dan Gilbert summed up all of this in his 2002 email, if

11   we can put that up on the screen there.  I would like to go

12   to the third-to-the-last paragraph.  It starts with, "I

13   almost had to pinch myself this morning."  Do you see that?

14        Right in here it starts, right over here, "My mission

15   is clear."  This is what Mr. Gilbert summed up.

16             My mission is clear:  Keep this place the

17             absolute best in the world to work, create an

18             environment where you can express your talent

19             and potential.

20   And that's what Quicken Loans is about, and it's been an

21   honor and a privilege to represent that kind of company in

22   this case.

23        So what is this case really about?  The plaintiffs are

24   trying to suggest that they were somehow cheated out of

25   overtime.  Now, that's far from the truth.  It's actually

1    quite the opposite.

2         We have heard testimony that Quicken Loans put together

3    a compensation package that was actually better for the

4    mortgage bankers, not worse.  Jay Farner first testified

5    about that, then Dan Gilbert testified about it,

6    Bill Emerson testified about it, and they explained this

7    during their testimony.  They testified that they did not

8    pay overtime to mortgage bankers because they didn't qualify

9    for it, but they would put together a package, a

10   compensation package that was actually better for them.

11        And Quicken Loans does pay overtime to employees that

12   qualify, and one example that was given in this case was the

13   frontline agent.  Now, remember, the frontline agent is a

14   separate job position.  The front line would prospect, and

15   they would prescreen prospects to determine if they were

16   interested in pursuing a mortgage with Quicken Loans, and if

17   they did, what the frontline agent would do is transfer that

18   caller to a mortgage banker to consult, advise, recommend,

19   educate, and provide the financial services in connection

20   with mortgages.

21        Now, frontline agents, it was testified to, received

22   overtime, and we heard from at least two, two mortgage

23   bankers that are plaintiffs that also had served as

24   frontline agents at some point in their employment.  That's

25   Nicole Abate and Neil Childs, and both of them admitted that

1  they were paid overtime during that time period.  But that's

2  a different job than what a mortgage banker does.

3       There were a number of witnesses who testified in terms

4  of the compensation package.  You heard about Colleen Booza.

5  She is sitting here today in the courtroom.

6       And Matthew Thompson, who testified.  He's here, too.

7       Brian Baumann, he testified.  He's here.

8       Thomas Ortman, who is not an employee of Quicken Loans

9  any longer and has not been for a number of years, he is not

10 here today.  He appeared to testify pursuant to a subpoena.

11 You heard from him.

12      Victor You, he's here today.

13      John Bettis, you heard from him.  Again, another former

14 employee that is not employed by Quicken Loans at this time

15 and who appeared at the trial to testify pursuant to a

16 subpoena.  He's not here today.

17      Now, what each one of these individuals testified to is

18 that they prefer the compensation package that they

19 received.  It was better.

20      Now, we could have called many more mortgage bankers to

21 testify at the trial, and we could have called many more

22 former mortgage bankers to confirm the testimony of these

23 six witnesses.  We didn't do so because we felt that you had

24 heard enough, and we felt that you had enough information

25 and evidence to see what was really going on.

1        The mortgage bankers at Quicken Loans had an

2    opportunity to earn between 100 to 200 thousand dollars as a

3    young person right out of school.

4        Now, let's talk about Victor You for a minute.  Mr. You

5    testified that he worked about 50 hours a week as a mortgage

6    banker, and he earned $143,000 in 2003.

7        Now, Mr. Nichols asked Ms. Booth when she was on the

8    stand -- Julie Booth, and I believe she is here, too -- he

9    asked her to compare the compensation without overtime that

10    was received, guaranteed salary plus commissions, versus a

11    compensation package with overtime and salary.  And he used

12    the wrong rate, a higher rate.  He used 60 hours a week for

13    work, and he assumed in that that there were no breaks.

14    They worked 52 weeks, no breaks at all, no time off, and

15    spent every minute on the job working for those 60 hours.

16        And Ms. Booth answered his questions, and then I asked

17    Ms. Booth about that.  And I used Mr. Victor You to

18    highlight what would happen to compare the two packages.

19    And we used 60 hours a week even though Mr. You only worked

20    50 hours a week, and we used the wrong, the higher rate.

21    And we assumed that he worked every minute of the day, no

22    time off, 52 weeks a year, and we knew that wasn't right

23    because Mr. You testified he took breaks for lunches, at

24    least an hour and-a-half to two hours a day.

25        And how did that come out?  Well, it came out,

1    Ms. Booth did her calculations while she was on the stand,

2    and it was $49,000 he would have received if he would have

3    gotten paid a salary plus overtime versus $143,000 that he

4    was really paid based on the guaranteed salary and

5    commissions.  That's almost three times more based on the

6    compensation package that Quicken Loans paid him.

7        Now, I would like to put up on the board and look at a

8    few other of the plaintiffs and witnesses who testified.

9    Colleen Booza is not a plaintiff.  I'm going to slide over

10   here, and we'll go through this.

11       Ms. Booza testified that she earned $106,000 in 2006.

12   She was a mortgage banker, and her guaranteed salary was

13   $29,000 a year that year and her commissions were 77,000.

14   That's what she testified to, a total of $106,000.

15       Now, if she was paid overtime instead of a commission

16   and she received hourly or guaranteed salary plus overtime

17   and using 60 hours a week -- now, she testified during this

18   time period she only worked 50 or 55 hours a week, but if

19   you used 60 hours a week -- this is what she would have

20   received in overtime, $4,833.  So $4,833 plus 29,000.

21       We'll say she got a guaranteed salary, and we'll say

22   she worked every minute of every day, took no time off.

23   Again, we know that's not right because Ms. Booza testified

24   that she did take time off.  She worked zero hours some

25   weeks.  She went of vacation.  She took breaks.  She

1    participated in fun, playtime activities at Quicken Loans.

2    She had personal calls, surfed the net.  She came in late

3    sometimes, she admitted, and left early.

4         But, assuming that she didn't do any of that, she

5    worked around the clock, she would have earned $33,833.

6    That's what she would have made in 2006.  But what was she

7    paid?  $106,000.  $106,000 in a guaranteed salary and

8    commissions.

9         Now, Ms. Booza is not a plaintiff here, and she said

10   she didn't feel it was right.  She didn't feel that she

11   would deserve any more compensation.  She testified that she

12   didn't feel that she was entitled to any more compensation.

13   She wanted the compensation that she was given.

14        But if she was a plaintiff in this case, well, the

15   plaintiffs are asking for overtime on top of their salary

16   and their commission.  So if you calculate that using the

17   right rate, this is what she would be seeking in this case,

18   $17,667.

19        And if you add that to what she was paid, which is

20   exactly what the plaintiffs want to do, they want to add

21   that to what they were paid, she would be seeking to be paid

22   $123,667 in this lawsuit when in fact this is the number

23   that she would have been paid if she was paid overtime to

24   begin with, 33,833.  That's the difference.

25        And the plaintiffs aren't coming in here saying, you

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    145

1    know what, let me give you back my commission, let me give
2    you back my guaranteed salary, and recalculate it for us on
3    overtime and a salary.  They are not doing that because this
4    is what they would get if they did that.  But, no, they are
5    asking for this: overtime on top of their guaranteed salary
6    and commission, which was something that -- instead of
7    overtime.

8         Now, let's go through another example.  Brian Baumann.
9    We heard from Mr. Baumann.  Mr. Baumann testified that he
10   worked 50 hours a week, and when he said 50 hours a week, he
11   was talking about the hours that he was at the offices of
12   Quicken Loans.

13        Now, we heard from Mr. Baumann who testified that he
14   didn't work every minute he was at the office.  He
15   participated in the fun activities.  He had personal calls.
16   He surfed the net.  He indicated that he would go on breaks
17   and take walks.  He also indicated he would leave the
18   offices during work hours for two different reasons he gave
19   you as examples.  One was he had a special needs brother
20   that he would leave and take care of, and the second one was
21   to play racketball.

22        But let's say Mr. Baumann worked 50 hours every week,
23   never took a vacation, never took a break.  In 2006
24   Mr. Baumann, he was paid $190,000, and his guaranteed salary
25   30,000 that year so he made $160,000 in commissions, he

1    testified.  And if he was paid, instead of the commissions,

2    he was paid overtime and either a guaranteed salary or

3    hourly salary, he would have made $3,000 in overtime.

4    That's based on 50 hours a week for 52 weeks with no breaks,

5    no time off.

6          Here is what he would have earned, $33,000.  Here is

7    what he was paid, $190,000.  About six times more for his

8    compensation package in terms of what he was actually paid

9    and what he would have been paid if he was paid overtime.

10         And, again, it doesn't stop here.  Based on plaintiffs'

11   demand for overtime in this case, if Mr. Baumann was a

12   plaintiff, which he is not, if he was, this is what he would

13   be asking for, $19,000 more on top of his guaranteed salary

14   and commission.  That means he would have been asking for

15   $209,000 to be paid for 2006 when this is what he would have

16   been paid if he was paid overtime to begin with, $33,000.

17         Look at this difference.  That's what this case is

18   about.

19         Let's go on to John Bettis.  Mr. Bettis is a former

20   employee.  He testified he didn't want to join this lawsuit.

21   He didn't feel he was entitled to any more compensation.  He

22   didn't feel that he deserved any more compensation.

23   Quicken Loans was up front with the way he was to be paid.

24   He wanted to be paid that way, he testified.

25         And Mr. Bettis came in.  He testified pursuant to a

1    subpoena.  You will recall Mr. Bettis, his brother is

2    Jerome Bettis, the former football player for the Pittsburgh

3    Steelers.

4        Mr. Bettis, in 2005 he testified he earned $80,000.

5    His guaranteed salary was $28,000, his commissions were

6    52,000, but if he was paid overtime based on his testimony

7    of working around 55 to 60 hours a week and if he worked

8    every week that amount for 52 weeks with no breaks, this is

9    what he would have received in overtime, $3,818 using the

10   correct rate.

11       Now, we know that Mr. Bettis took time off, he

12   testified to it, and we also know that Mr. Bettis had

13   personal calls and he testified that he participated in the

14   fun, play activities.  He won the stare-down contest, and he

15   said he liked to talk, he would go long on phone calls.

16       But Mr. Bettis would have earned $31,818 if he had been

17   paid overtime.  Instead, he got paid $80,000.  And if he was

18   a plaintiff here, which he says he wouldn't be, this is what

19   he would be asking for in this case.  Another $10,909.  And

20   Mr. Bettis said he didn't feel he deserved any more

21   compensation, but this is what he would be seeking in this

22   case, $90,909 for the year 2005, when this is what he would

23   have been paid if he was paid overtime and a salary to begin

24   with, $31,818.  That's what this case is about.

25       Let's look at one last example, and that's a plaintiff

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*

148

1    in the case.  The very last plaintiff to testify was

2    Kelly -- Lytle is her maiden name -- Lacey.  And what she

3    testified is that she was paid $87,500 in the year 2002.

4    Her guaranteed salary was around $26,500, and her

5    commissions were 61,000, she testified.  And here is what

6    she would earn using 60 hours a week, no breaks, no time

7    off, 52 weeks a year, every minute of every day working at

8    Quicken Loans on premises.

9         Now, we know that assumption is not right.  Kelly Lytle

10   Lacey had all of those phone calls, 1,321 to her boyfriend

11   at the time.  She also went on three trips which

12   Quicken Loans paid for.  She went on a cruise to the

13   Bahamas, they sent her to South Beach, Florida, and sent her

14   to Las Vegas.

15        But she testified she wanted overtime on her personal

16   calls.  She wanted overtime when she was sent away, and it

17   was paid for, on these vacations.

18        Let's assume that's what she would get overtime on.

19   That's $4,417.  So here is what she would have earned if she

20   was paid overtime and salary, $30,917.  And here is what she

21   was paid, 87,500.

22        And what is she asking for in this case on top of her

23   salary and commissions?  She is asking for 14,583 more

24   dollars, which means for Kelly Lytle Lacey in 2002 she wants

25   to be paid $102,083, and this is what she would have been

1    paid had she been paid overtime with a salary, $30,917.

2    That's what this case is about.

3         She also testified to similar numbers for the year

4    2003.  It was 87,000 -- let's see what the number was for

5    2003.  For 2003 it was 87,431, so a very similar breakdown

6    as this 2002 time period and very similar in terms of -- you

7    can just flash it up real quickly -- in terms of all of the

8    differences.  $102,183 is what she would be asking to be

9    paid in 2003 versus 32,667 she would have been paid had she

10   been paid overtime with a salary.

11        So is what the plaintiffs are seeking in this case

12   fair?  Is it just?  Is it warranted in any respect?

13        Plaintiffs want overtime to be paid on top of their

14   guaranteed salary and commission.  They want overtime to be

15   paid to them on top of the commissions.  They want overtime

16   to be paid on top of their salary, everything.  This would

17   result in this unfair, this unfair windfall, the difference

18   between -- here is the line right here, and we have seen it

19   for Ms. Lacey.

20        Now, let's take for a moment into consideration what

21   Ms. Lilly testified to.  Ms. Lilly was up here and she

22   recognized this unfair result, and I asked her are you

23   seeking overtime on your commissions?  And she indicated

24   under oath on cross-examination no.  She acknowledged that

25   she should not be entitled to overtime on top of

1   commissions, but even though she acknowledged that under

2   oath, if you find in favor of Ms. Lilly and the other

3   plaintiffs, they will receive overtime on top of their

4   guaranteed salary and their commissions.  Are you going to

5   give Ms. Lilly overtime on top of her commission even though

6   she admitted under oath she shouldn't receive it?

7        The testimony is clear that the compensation package

8   was structured as salary and overtime, guaranteed salary and

9   overtime, and the plaintiffs would not have received those

10  commissions had they been paid overtime.  Mr. Gilbert made

11  that crystal clear.

12       It wouldn't make any sense and they never would have

13  constructed a compensation package that way to include, as

14  Mr. Lukas is suggesting, commissions and a guaranteed salary

15  and then overtime on top of both of those.  I have never

16  heard of a job like that, and certainly Quicken Loans would

17  not have paid that.  They are already paying two, three,

18  four, five, six times more than what a compensation package

19  would entitle a mortgage banker to in terms of hourly salary

20  plus overtime, and now you are going to put overtime on top

21  of commissions?  No.

22       And Mr. Farner testified to this structure as well and

23  Mr. Emerson testified to that, and the bankers knew it.  The

24  mortgage bankers knew it.  That's why Victor You came in

25  here and testified, Brian Baumann, Colleen Booza and others,

1    that they wanted to be paid guaranteed salary and

2    commissions.  In fact, Mr. You testified that that's one of

3    the reason why he accepted the job:  He wanted those

4    commissions.

5         Are you going to give the plaintiffs overtime on top of

6    their guaranteed salary and commissions when they never

7    would have received the commissions in the first place?

8         Plaintiffs now want overtime to be paid to them for the

9    time periods they took time off, for their vacation time.

10   Are you going to give them overtime for that?

11        Plaintiffs want overtime to be paid for the time

12   periods when they weren't even working, when they were

13   taking breaks, when they were participating in the playtime,

14   fun time activities, their personal calls, surfing the

15   internet, when they were socializing at Quicken Loans

16   offices.  Quicken Loans understood they were doing that.  It

17   was fine.

18        They could go take smoke breaks and leave the building

19   and go outside and socialize and come back up.  They could

20   have personal calls.  They could enjoy themselves, playing

21   Nerf football in the middle of the office or singing

22   karaoke.  They could partake in chicken nugget eating

23   contests.  They could surf the internet or shop on line.

24   They could do personal banking.  Are you going to entitle

25   them to overtime for that though?

1      Now, Chanda Whitted, let me put her picture up.  She

2   was the second witness that testified on behalf of the

3   plaintiffs.  Ms. Whitted, she ultimately admitted on

4   cross-examination that she had a side business going,

5   embroidery/silkscreen business, and she admitted that she

6   was partners with her husband and that she may have worked

7   on the side business while she was at Quicken Loans during

8   work hours.  Is Chanda Whitted entitled to overtime when she

9   was working on a side business?  Are you going to give her

10  overtime for that?

11     Plaintiffs entered into evidence P102.  Maybe you can

12  flash this on the board here.  They put it into evidence as

13  the supposed weeks that the plaintiffs worked, and they

14  brought in from Minnesota someone from their firm who called

15  himself a litigation data specialist, something like that,

16  to testify about this summary exhibit.

17     And we questioned him about this exhibit because this

18  exhibit included weeks where some of the plaintiffs were not

19  even working as mortgage bankers at Quicken Loans.  That's

20  Nicole Abate and Neil Childs.  They were frontline agents

21  during the time period they were put up here, at least some

22  of the time period.

23     The exhibit included weeks where some of the plaintiffs

24  were on leave.

25     And I'll put up Nicole Abate and Mr. Childs so you can

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    153

1    refresh what they looked like here.

2        Chanda Whitted was on leave for an extended period of

3    time and Ms. Lilly was on leave, but they didn't take that

4    out of here, they included that, and the exhibit was riddled

5    with flaws and inaccuracies.  It didn't even take into

6    consideration the testimony of the plaintiffs, and they

7    didn't even bother to talk to the plaintiffs about what

8    period of time they actually were working and suggesting or

9    claiming that they had been working overtime.

10       So we then put in Exhibit D202, and Exhibit D202 was

11   for the purpose of putting in the actual weeks they were

12   employed.  And it was broken down into various columns.

13   One of them is full weeks, and that's the weeks that they

14   were employed where they were there full time, you know, a

15   full week.  And then there was weeks in training, and those

16   were weeks that most of the plaintiffs admitted they

17   couldn't possibly have been working overtime.  And then the

18   last column is partial weeks, and that's where they worked

19   less than three days during the week and they couldn't

20   possibly receive overtime either.

21       And Mr. Nichols gave Ms. Booth a hard time about this

22   exhibit, that it's flawed and that she made mistakes or that

23   it wasn't based on what documents had been introduced.  But,

24   lo and behold, Mr. Lukas comes in here today and he admits

25   that this exhibit is accurate and they are stipulating to

1    this exhibit.  This is the exhibit that they gave us such a

2    hard time about and challenged and attacked Ms. Booth on.

3         What's important in this exhibit is the full weeks

4    column.  That's the maximum amount of weeks that any

5    plaintiff could have worked overtime, the full weeks, but

6    they didn't work overtime every week that they were

7    employed.  They took time off, they took breaks.

8         You heard testimony there was fluctuating hours week to

9    week.  Some weeks they may have worked 40 hours.  Some weeks

10   they may have worked less.

11        Mr. Lukas referenced the Bari Beckett call clip today,

12   and I noticed that he only talked about a portion where she

13   said 60 to 80 hours, but there's another portion she said

14   she works 40 hours and no more than 40 hours and she works

15   from home.  Somehow Mr. Lukas forgot to mention that.

16        Now, for some weeks, based on the start date and the

17   end date of their employment, they couldn't possibly have

18   worked overtime because they didn't work enough hours or

19   enough days.

20        Now, simply put, plaintiffs want overtime for

21   everything.  They want overtime for the weeks where they did

22   not work more than 40 hours.  They want overtime for the

23   time periods where they were not working.  Are you going to

24   give it to them?

25        And the method of compensation was not only better for

1    the plaintiffs but was plainly and clearly disclosed right

2    from the beginning before they were even hired.  We have

3    heard that from witness after witness.  Every single

4    plaintiff admitted to that, that it was discussed with them

5    when they were hired and it was contained in employment

6    agreements.

7         Now, let's look at one of these just as an example.

8    Paragraph C8, and Paragraph C8 -- if you can put up this

9    board -- it's a compensation paragraph right from the

10   employment agreement, and it's a combination of their base

11   salary and incentive pay, which is the commission, pursuant

12   to the compensation plan.

13        And then we went through the compensation plan.  Every

14   plaintiff got a compensation plan.

15        They signed their employment agreement.  They signed

16   the compensation plan.  That's the full measure of their

17   compensation, commissions plus guaranteed salary.  They

18   understood that.  Plus, they were to also get a full,

19   comprehensive benefits package that we heard about.

20        And each plaintiff testified that, and acknowledged,

21   that they knew how they were going to be compensated.  They

22   knew right from the beginning.  They understood it.  In

23   fact, some of the mortgage bankers who testified indicated

24   that their HR representatives went through these documents

25   with them line by line.

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                           156

1          Now, the commissions were based on five factors, and
2     it's not based on selling.  And let's put up that board,
3     Number 6.
4          There's no commission that's paid when you get a
5     deposit. There's no commission that's paid when a loan is
6     originated.  The commissions that come in is when the
7     mortgage banker performs the full balance of services, where
8     they manage the loan process from the very beginning all the
9     way through closing.  They have to perform more than just
10    getting deposit or loan documentation back.
11         And what are the five factors?  Well, one is their
12    designation in terms of what type of a consultant or loan
13    officer they were.  Two, the number and type of loans closed
14    during the month because some loans took more effort, they
15    were more complicated, so they would receive a higher
16    commission rate for that.  Premiums and concessions would
17    also be factored in.  Client survey ratings, how they were
18    doing their job, that was factored in.  Percentage of loans
19    in suspended, and we heard about that.
20         The suspended status is based upon a variety of things,
21    but one thing is, if you don't do the financial service, if
22    you don't do the advising, recommending, educating, if you
23    don't match up loan programs that meet the client's needs,
24    that they are qualified for, that's going to end up as a
25    suspended loan.  So that's taken into account as well.

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*          157

1          And Mr. Lukas indicated you have to originate six,

2     seven loans.  Well, that's not the case.  Each loan had

3     points that would be -- or units that would be allocated to

4     that particular loan for purposes of commissions, and I

5     think that from the testimony it sounded like maybe two or

6     three or four, depending on what type of loan is being

7     originated, that's what the threshold was.  It's not six,

8     seven or eight, as Mr. Lukas was suggesting.

9          The plaintiffs who testified, they all acknowledged

10    that they knew, they understood they were salary, not

11    hourly.  They knew and understood there would be no overtime

12    payment.  They knew and understood that they might work

13    hours more than 40 hours per week.

14         The agreement clearly expressed that they were exempt

15    employees.  That's in many different places.  We'll go

16    through one example, which is the acknowledgment in Exhibit

17    D41, which is in evidence, if you can put that up.  It says:

18              I (the undersigned web center loan

19              consultant) acknowledge receipt of the

20              Quicken Loans, Inc. web center loan

21              consultant compensation plan (November 2004

22              version).  I understand and agree that this

23              plan sets forth the terms of my

24              responsibilities as an exempt employee.

25    Then it talks about compensation, commission, and this is

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1    right above the signature block.  It was specifically

2    discussed with them.  It was completely up front.  It was

3    agreed to.  It was signed off.

4        No one is contending that the plaintiffs waived their

5    rights under the Fair Labor Standards Act.  That's not the

6    purpose of showing this.  The purpose was to merely point

7    out that the nature of the compensation matched up with the

8    nature of the job duties that are set forth in all of these

9    documents.  It's set forth in the employment agreement, in

10   the compensation plan and the duties document.  It was

11   plainly and clearly discussed, and not a single plaintiff

12   disagreed, not a single Plaintiff objected, not a single

13   plaintiff ever made a claim that they had some problem with

14   this.

15       And that the plaintiffs not only thought that their

16   compensation package was fair, but they knew it was better

17   than hourly with overtime, and this is the reason why many

18   of the mortgage bankers came to Quicken Loans, those

19   commissions.  They wanted this compensation plan:  A

20   guaranteed salary, which they knew they would get regardless

21   of any closed loans and they knew they would get it for

22   whatever financial services and advice and consultation,

23   plus commissions, and that they could earn between 100 and

24   200 thousand dollars.  And we see that many did.

25       Mr. Ortman, Mr. Bettis, Mr. You, they all testified

1    they accepted the job in part because of the compensation

2    package and the commissions.

3         Now I would like to look at the duties document,

4    Paragraph S, if you can put that -- I think there's a board

5    on that.

6         And we heard a lot of testimony that during the time

7    period at issue there was an open door policy, and in fact

8    it was put into a document that mortgage bankers were

9    required to actually read and sign and Paragraph S is a

10   mandatory obligation of the mortgage bankers to bring to the

11   attention of their manager or their manager's manager if

12   there is some problem.

13        And there is an acknowledgment that says the same

14   thing -- I think it's Board 19, if you can put that up, or

15   18 -- which reiterated this open door policy and the

16   mandatory procedure.

17        Now, the interesting thing is and the telling thing is

18   not one single plaintiff joined this lawsuit during -- until

19   long after it had been filed.  The lawsuit was filed in May

20   of 2004.  Well, Mr. Henry joined early, I guess, but most

21   all of the other plaintiffs it was two to three years after

22   the lawsuit was filed.

23        During the time period they were employed by

24   Quicken Loans, not one time, despite this open door policy,

25   despite the mandatory requirement, did they ever raise an

1      issue with anyone at Quicken Loans.  Their manager, their

2      manager's manager, Dan Gilbert.

3           We saw Ms. Lilly emailed Dan Gilbert within the first

4      two weeks of her employment asking about a child care issue.

5           We heard about Mr. Persails approaching Mr. Gilbert out

6      of the blue at a ceremony, at an awards banquet.

7           Not one plaintiff ever, ever suggested that they should

8      be paid in a different way.

9           And, for instance, Mr. Semilia.  I'll put his picture

10     up.  Mr. Semilia had much shorter hair when he testified

11     here, and I think he lost some weight.

12          And how about Mr. Bazzi?  Mr. Bazzi looked very similar

13     to this.

14          They joined the lawsuit, they acknowledged, after they

15     had filed bankruptcy and they were in need of money.  If the

16     plaintiffs really felt they were being cheated or they

17     wanted to be paid hourly with overtime, they would have come

18     forward.  They would have said so.  It's only after they

19     were solicited by an out-of-town law firm, out-of-state law

20     firm that these plaintiffs joined this lawsuit.

21          And we have heard about that.  Let's put up Exhibit

22     P73.  Mr. Lukas went through this email that Mr. Gilbert

23     sent company wide to disclose the nature of this lawsuit.

24     Mr. Lukas went through it again today, in part, where

25     Mr. Gilbert disclosed the nature of the lawsuit, and he

1    notes in there that Mr. Henry and his out-of-state law firm

2    even sued Mr. Gilbert and Mr. Emerson personally.  And

3    Mr. Gilbert made clear it was up to the mortgage bankers to

4    decide whether they wanted to join the lawsuit or not and

5    that there would be no penalty, no negative consequences for

6    joining the lawsuit.

7        Mr. Gilbert notified everyone that Quicken Loans would

8    vigorously defend the lawsuit, and Mr. Lukas was suggesting

9    during his closing that it was Mr. Gilbert's show and he

10   would never settle, period.  Well, what Mr. Gilbert says in

11   here is that it was about right versus wrong.  He was not

12   going to be extorted into some sort of settlement by

13   Mr. Henry and an out-of-state law firm, even though that it

14   may have been less costly and even though he may not have

15   been fighting for all of these years, but it was right

16   versus wrong.

17       Why are we here?  That's why we are here.  It's right

18   versus wrong.

19       The mortgage bankers were paid two, three, four, five,

20   six times more in compensation.  They were paid a

21   compensation package that did not include overtime but

22   included commissions to compensate them more, and now, after

23   being contacted by the out-of-state law firm, what's

24   happening is the plaintiffs are seeking overtime on their

25   guaranteed salary plus their commissions.  They are not

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*

1    offering to pay those back, and it creates that unfair

2    result that we were just looking at on those boards.

3    Ms. Lacey, Mr. Baumann, every single one of those boards

4    shows the unfair result.

5         And Quicken Loans pays overtime.  They pay overtime to

6    those that they understood qualify.  An example of that is a

7    frontline agent.

8         But it's going to be up to you, and Mr. Gilbert put

9    that in his email.  It will be up to the jury, but we are

10   not going to roll over into some sort of quick settlement

11   like these cases go because it's right versus wrong and we

12   are going to defend.

13        And there were a series of meetings after that with

14   Mr. Emerson, Mr. Gilbert, Mr. Farner and the mortgage

15   bankers indicating that they could join the lawsuit if they

16   wanted, but they would be defending the lawsuit, Quicken

17   Loans, but there would be no consequences at all, none, for

18   any plaintiff that joined.  And there were solicitation

19   letters that were sent by plaintiffs' counsel, even phone

20   calls.  So the plaintiffs all knew about this, and they,

21   most of them, joined two, three years later.

22        So who are these plaintiffs that are seeking this

23   result, seeking more money on top of their guaranteed salary

24   and commissions?  Who are they?

25        Well, they are a small group of former mortgage

1    bankers.  None of them work at Quicken Loans any longer.

2    Most of them worked for a very short period of time,

3    six months or less, about six months or so.  Many went from

4    job to job before for short periods of time, and many have

5    gone from job to job after for a short period of time.

6        There are 359 plaintiffs but from over 3100 mortgage

7    bankers who worked during the time period at issue and could

8    have joined the lawsuit.

9        As testified by Mr. Ortman, he not only received

10   solicitation letters from plaintiffs' counsel, he also

11   received telephone calls from the plaintiffs' counsel, as

12   did his wife to try to convince her to convince him.  Now,

13   Mr. Nichols didn't like that, and he pointed his finger and

14   raised his voice, but Mr. Ortman didn't back down.

15       And Mr. Ortman testified to the reason why he didn't

16   join the lawsuit despite the contacts.  He didn't think it

17   was fair.  He didn't think he was entitled to anything more.

18   He didn't think he deserved anything more.  The compensation

19   package was better.  He preferred it.  He wanted that.

20       And let's put up Mr. Ortman and see if he was right

21   about that.  Mr. Ortman, again, is not an employee of

22   Quicken Loans any longer.  He worked there for -- I think

23   Mr. Lukas said a short period of time.  He really worked

24   there for three years, and Mr. Ortman, he came in here

25   pursuant to a subpoena.  He was compelled to appear.

1     So what did he testify?  His whole earnings in 2003, he

2    testified, was $90,000.  His guarantied salary was 24,000

3    that year, 66,000 in commissions.  $1,333 he would have been

4    paid if he was paid overtime instead of the commission,

5    which means he would have earned this, 25,333.  Instead, he

6    was paid this, almost four times as much.  Mr. Ortman was

7    right, he wanted this.  He did not want this.

8     But the plaintiffs in this case, what they want is they

9    want this plus overtime on top of both of these components,

10   which, if it was Mr. Ortman, if he had joined the lawsuit,

11   it would be another 5,000.  So what he would be asking for

12   would be to be paid 95,000, when this is what he would have

13   received to begin with, 25,333.

14    Mr. Thompson also testified.  He was the second witness

15   we called, and Mr. Thompson, let's see what Mr. Thompson --

16   he also testified he didn't join the lawsuit and he

17   explained why, it was the same reason, and he was right,

18   too.

19    Mr. Thompson, he earned 89,000 in 2005, 28,000 in

20   guaranteed salary.  His commissions were 61,000.  This is

21   what he would have been paid if he had worked every hour

22   every day 52 weeks, and we know that's not correct because

23   Mr. Thompson indicated he took breaks and time off and

24   participated in fun-time activities and personal calls, but

25   even assuming that, that's what he would have made.  Here is

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                        165

1   what his salary would have been with the overtime, 33,385.

2   This is what he received, $89,000.

3       And he didn't feel right coming into court and joining

4   the lawsuit because this is what he would have asked for

5   additional, $15,000 more, which means that he would have

6   been asking to be paid $106,115.  But this is what he would

7   have been paid if he was paid on an overtime structure,

8   33,385.  That's what this case is about.

9       Now, there were 25 plaintiffs who showed up to testify

10  at trial.  That was their choice.

11      How did they select the 25 plaintiffs?  Well, I'm sure

12  they picked the 25 best plaintiffs out of 359 plaintiffs.

13  They could choose any ones they want, it was their choice,

14  and no one said that they couldn't all testify.

15      And no one said they had to join in one lawsuit as a

16  collective action.  This is not a class action, where

17  one person files and everyone else in the class joins in and

18  it's just represented that way.  This is a collective

19  action.  Each plaintiff has their own claims.

20      So they brought 25 people in to testify.  They picked

21  them.  These are, these are their best witnesses.

22      And we saw and heard who these plaintiffs really are.

23  Now, Mr. Lukas indicated we pounded on them.  Well, wait a

24  minute.  When a witness comes in here to testify in support

25  of their claim, they have an obligation, a duty to tell the

1   truth.  And you are the judges of the facts.  You assess

2   their credibility.  When Mr. Semilia comes in here and if he

3   didn't tell the truth, well, he may not be able to support

4   his claim.  And you also will be instructed by Judge Murphy

5   that if in fact you find that a particular witness was not

6   truthful you can disregard his or her testimony entirely

7   because what is it that you can believe from someone if they

8   are not truthful under oath?

9        So let's -- we have got Mr. Semilia up here, so let's

10  start with him.  He contended on his direct examination he

11  was fired because he joined the lawsuit.  That's what he

12  said, but the reality of the situation is after going

13  through some exhibits with him he admitted that, well, maybe

14  he was fired for a different reason.

15       And what was that other reason?  Well, Mr. Semilia, he

16  lied on his employment application.  He also lied on

17  two licensing applications as a mortgage banker submitted to

18  other states while he was working at Quicken Loans.

19       He checked the boxes on each of these -- the employment

20  application and these two licensing documents when he was --

21  as no when he was asked if he had ever had any type of

22  license suspended or revoked in any state, something very

23  important to a mortgage banker at Quicken Loans because they

24  are going to seek to be licensed.  This is a regulated job

25  in a lot of different states.

1      So let's put up Exhibit D66.  This was his employment

2   application.  And when I first showed this to him, it's very

3   hard to read right now, but there are two questions,

4   Question 4 on Page 8 and Question 5, I asked him if he's

5   ever had any license revoked or suspended in any state, and

6   he checked the box no.  And when I first asked him about

7   this, he was under oath, and he said those were truthful

8   answers.

9      Then there were two license applications I asked him

10  about.  Those were Exhibits D68 and D69, and it's the same

11  question, Question 2 on each of these.  One is for

12  Connecticut, one is for New Jersey, asking:

13          Have you ever been refused any license --

14  I'm sorry.

15          Have you ever been the subject of actions

16          (cease and desist orders, contempt orders,

17          injunctions, license suspensions or

18          revocations) before any regulatory agency,

19          state or federal?

20      Now let's show the next one.  He checked no.  At

21  first when I asked him about that he said it was truthful,

22  that answer, under oath.  These are documents he signed, he

23  prepared.  This is for the state of New Jersey.  I believe

24  it's Question 2:

25          Have you ever had a license or right to

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*

168

```
 1                 engage in this or any other business or
 2                 profession, revoked, denied, suspended or
 3                 restrained by any agency of this state, any
 4                 other state or by any federal jurisdiction?
 5     He said that was a truthful answer.
 6          Well, the problem is that there was another document
 7     that I showed to him and he had to admit that not only did
 8     he lie on all three of these documents, the employment
 9     application and the two licensing applications in New Jersey
10     and Connecticut, but he had also lied under oath to you in
11     this courtroom when he denied that those were untruthful
12     answers.
13          And let's put that exhibit up.  It's Exhibit D67, the
14     Order of Ohio, Department of Insurance.  Here it is.  He was
15     confronted with this.
16          Move it up to see the punchline on this.
17                 It is, therefore, ordered that Semilia's
18                 licenses as an insurance agent in the State
19                 of Ohio be and hereby are revoked pursuant to
20                 the authority granted.
21     And their revocation was immediate.
22          Why was it being revoked?  Because he had solicited and
23     sold Robert B. Kaufman an automobile insurance policy, but
24     he failed to disclose that he was not appointed by the
25     underwriter, and then he accepted a premium payment of
```

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1   $224.52 but failed to either obtain insurance or return the

2   payment.  He pocketed it.

3       And when confronted with this on the stand, Mr. Semilia

4   admitted his answers in the employment application were

5   false, his answers in the license applications were false,

6   and by admitting that, his answers under oath were also

7   false.

8       So Mr., Mr. Semilia, we'll put up here what we remember

9   Mr. Semilia for.  There we go.  He lied.  Not only is this

10  lying, but this is also fraud.  This is misleading

11  Quicken Loans into believing that he had never had a license

12  revoked and also misleading the states of New Jersey and

13  Connecticut when he's applying for application as a

14  regulated mortgage banker, licensing applications that he

15  signed and attested to being accurate.

16      So Mr. Semilia, this is some sideshow?  What kind of

17  sideshow is that?

18      Is this someone that you would believe?  Can you

19  believe a word this guy says?  It's up to you.  You assess

20  his credibility.

21      Are you going to give Mr. Semilia overtime?  He was

22  fired because he lied and Quicken Loans found out about it

23  on something that was very important, applications to become

24  licensed as a mortgage banker on behalf of Quicken Loans in

25  other states.

1     Now, let's move on to Mr. Gurney.  Mr. Gurney testified

2     as a plaintiff in this case.  This is Mr. Gurney.  I think

3     he's here in the courtroom today.  Yes, he is.

4     And Mr. Gurney acknowledged on cross-examination when

5     my father was cross-examining him, he acknowledged that his

6     resume that he prepared, that he circulated, that he wrote

7     in his own words, stated what his job duties were as a

8     mortgage banker at Quicken Loans.  And what did his resume

9     say?  It didn't say anything about sales, and that's a

10    problem because Mr. Gurney on direct examination came in

11    here and said sales, sales, sales, sales, sales, sales

12    because that's what Mr. Lukas said is their case.  That's

13    how they can win this case, sales, sales, sales.  So

14    Mr. Gurney came in here, sales, sales, sales.

15    Well, but what he put on his resume was consulting with

16    clients and conducting an effective interview and needs

17    analysis.  Nothing about sales.  Consulting and needs

18    analysis.  That's what he did as a mortgage banker at

19    Quicken Loans.  His own words.  Quicken Loans didn't prepare

20    this.  Mr. Gurney did.

21    Now, he didn't want to admit to this because that

22    undercuts his sales, sales, sales testimony.  So what did he

23    do?  Mr. Gurney claimed that he lied.  He claimed he lied on

24    his resume.  He claimed he lied on his resume that he

25    prepared and circulated.

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    171

1          Now, Mr. Gurney definitely was lying, so we'll put this

2    up.  Mr. Gurney definitely was lying at some point.  He was

3    either lying on the witness stand because he didn't want to

4    undercut his sales, sales, sales testimony and his attempt

5    to cash in on a claim for overtime or he was lying on his

6    resume that he prepared after he worked at Quicken Loans

7    that he put in his own words and circulated.  There

8    certainly was no reason to lie on that resume, but there

9    certainly was a reason to lie in this courtroom.  It's up to

10   you to decide.  Are you going to give him overtime,

11   Mr. Gurney?

12         Nicole Abate.  She testified, and she painted a very

13   ugly picture of the Quicken Loans work environment.  Is this

14   a sideshow?  We didn't put her on.  This is one of the

15   hand-picked plaintiffs, Ms. Abate.

16         She came in here.  She painted this very ugly picture.

17   Well, how would that relate to job duties?  How would that

18   relate to hours?  Well, she was trying to make it suggest

19   that she had to work all of these hours, it was a harsh

20   condition, she had no choice, and they wouldn't let her

21   leave and all of this very ugly picture.

22         But, but we had her resignation letter.  If you can

23   make that a little larger.  And what did she write in her

24   own resignation letter?  This is what she wrote.

25              It is with both regret and anticipation that

1          I submit this letter of resignation effective

2          March 21, 2005.  This decision has nothing to

3          do with the exceptional opportunity you have

4          provided me here.  I have accepted a position

5          with another company, an opportunity to

6          further my current career goals and achieve

7          growth within the new company through a

8          supervisory role.

9            It has been my genuine pleasure to work

10         for Quicken Loans during this last year.  I

11         have enjoyed working with Quicken Loans' fine

12         staff of professionals and colleagues and

13         will miss my associations here.  I wish you

14         and Quicken Loans continued success in all

15         your endeavors.

16           Thank you for allowing me to serve

17         Quicken Loans.

18      Well, there is a problem here.  This undercut her

19   entire direct examination about all of these harsh, harsh

20   tactics and this harsh work environment.  So what did

21   Ms. Abate do on cross-examination?  She claims she lied in

22   her resignation letter.  She claimed that she lied because

23   her new employer might contact Quicken Loans for the purpose

24   of getting a reference.  But her resignation letter

25   indicates that she already had a new employer.  It says it

1   right in there.  They didn't need to contact Quicken Loans.

2   She already had the job.  And the things she said she was

3   lying about, if you took them out, that wouldn't burn any

4   bridges, it wouldn't cause any problem.  You wouldn't need

5   to put in such nice words in a resignation letter not to

6   burn bridges.

7        So Ms. Abate, another plaintiff, came in here and she

8   definitely lied.  She lied one time.  She was either lying

9   on the witness stand in order to not have her direct

10  examination undercut or she lied on her resignation letter.

11  Certainly there was a big reason for her to lie on the

12  witness stand under oath.  There was no reason to lie on her

13  resignation letter.  She had already gotten another job, and

14  she certainly didn't need to put that kind of language in

15  there not to burn bridges.

16       So it's up to you to decide, it's up to you to decide

17  whether or not Ms. Abate should be given overtime.

18       Let's put Ms. Abate, she lied.  Through her own

19  testimony she said she lied.

20       Sarah Little.  Sarah Little, she testified that the

21  work environment was so stressful to her, to her health that

22  she missed a lot of work and had to quit.  Now, her

23  employment application made clear that she had a history of

24  working at jobs for a short period of time and she had

25  difficulty handling any stress.  And during the initial

1    training before she even started the job as a mortgage

2    banker, her favorite part, she said, if you could put this

3    up, was winning prizes because I needed that stress ball.

4    And I asked Ms. Little about that.  She said she really

5    needed that stress ball.  It's something that you can

6    squeeze and alleviate stress.  Well, I don't know how she

7    needs the stress ball before she even started the job if the

8    job was what gave her so much stress.  This was during

9    training.  She hadn't even started as a mortgage banker yet.

10       Then Ms. Little claimed on direct examination again,

11   along the line of Mr. Lukas, sale, sale, sale, that's how we

12   win this case.  Well, there's a problem because we had

13   Ms. Little's own words in her resume.  And let's put that

14   up.  It's Exhibit D125.  Let's see what she said.

15       You will have to make that larger because it's small

16   print.

17       But she prepared this.  No one told her what to write.

18   There was no reason to be lying.

19       But she wrote that she was a mortgage banker.  That's

20   the first thing that she did.  And then she said she took

21   loan applications, she pulled credit reports, qualified

22   clients for home loans, handled personal financial documents

23   and employment records.  I don't see anything about sales in

24   there at all.

25       And Ms. Little also was confronted with the tests that

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                          175

 1     she took.  Remember, we showed her the tests that she took

 2     in training and asked her what portion of those tests

 3     related to sales?  Which those tests, very little, one

 4     question out of the entire test, related to sales.

 5     Remember, there were all kinds of ratios and computations

 6     and analysis and comparisons that needed to be done.

 7          Ms. Little, she also talked about the number of hours

 8     that she worked.  She testified that she worked 65 hours a

 9     week except for in training.  She testified she didn't work

10     those hours during training.

11          But she missed 17 workdays, she acknowledged, during

12     her less than five months as a mortgage banker, plus legal

13     holidays.  Apparently she wants overtime on those 17 days,

14     too.

15          So, Ms. Little, we will put up a few words for her, if

16     I can find them.  Ms. Little, she exaggerated, exaggerating

17     her hours, not factoring in 17 days she missed work.  Her

18     sales, sales, sales.  And let's put up her own resume,

19     exempt duties, because those are the duties that she

20     admitted in her own words, not the sales, sales, sales that

21     Mr. Lukas was suggesting in court today.

22          Zane Kadro.  Mr. Lukas indicated and referenced

23     Mr. Kadro today, that he came in to try to clear up

24     questions about his Series 6 and 63.  It's interesting

25     because when he came in to clear that up what he ended up

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    176

1    acknowledging is that he lied on two license applications.

2    These license applications were to be a mortgage banker on

3    behalf of Quicken Loans in two different states.

4        This is the state of New Jersey, and Question 1 asks if

5    he's ever been indicted, arrested or convicted of any

6    offense or crime in that state or any other state or federal

7    jurisdiction.  Mr. Kadro first tried to -- he seemed to be

8    waffling, but ultimately when shown another document

9    acknowledged that that was a false answer, that was

10   untruthful.  He had been arrested, he had been convicted,

11   and he acknowledged at least two separate offenses and that

12   that answer should have been yes.  Once again, submitted

13   while he was a Quicken Loans mortgage banker to another

14   state to become licensed.

15       And it happened in another.  The Connecticut license

16   application as well asked the same question.  Number 1:

17              Have you ever been convicted in any state or

18              federal court of any crime?

19   Mr. Kadro admitted that he should have checked yes, but he

20   didn't.  Incorrect, untruthful answer to state licensing.

21       Now, Mr. Kadro also was back and forth on the hours

22   that he suggested he worked.  At one point he said 75,

23   another time he said between 70 and 80, but this is a guy

24   who also admitted to being written up for being perpetually

25   late to work and he admitted to taking lots of smoke breaks

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1   during working hours as well.

2        So you are the judges of the facts.  You get to assess

3   credibility.  Do you believe Mr. Kadro about anything?  He

4   lied to two different states in his licensing applications

5   that were very important as a mortgage banker for

6   Quicken Loans business.  And that's what you call fraud.  He

7   was misleading them.  He was trying to get a license, which

8   he did, for two different states by giving them false

9   information.

10       And I also submit that he exaggerated to exaggerate his

11  hours, 70, 75, 80.  Well, he's not taking into account that

12  he came in late every day or perpetually late, and he also

13  is not taking into account that he took several smoke breaks

14  every day, let alone for personal calls and other things.

15       Now, let's put up Adam Persails, another individual

16  that Mr. Lukas referenced today.  Mr. Persails testified.

17  If you recall, Mr. Persails came in and said he was old

18  school.  He said he was old school, but Mr. Persails before

19  the case started claimed that he had 63 hours a week of work

20  and then during the case at trial that increased somehow to

21  65 to 70.

22       But he had to admit that he missed several days as a

23  mortgage banker during his short stint.  He missed nine

24  workdays plus legal holidays in a four-month span on the

25  job, and he was paid for it.

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*

1    He also admitted that he arrived late to work from time

2    to time because he car-pooled with his relative, with his

3    uncle.

4    And he admitted to having lied on his employment

5    application.  Now, this isn't something that we actually

6    knew.  This is something when I was asking him questions he

7    admitted.  Apparently he didn't want to lie about it any

8    longer.  But he did lie on his employment application,

9    that's Exhibit D143, where he said he went to two different

10    community colleges, and he admitted that he never attended

11    one and the other he might have taken some classes for a

12    very short period of time.  But here he said he took a year

13    and-a-half at each, and he gave grade point averages.  Grade

14    point averages at a school that he never attended.  That's

15    old school, I guess.

16    Mr. Persails was also very evasive and combative during

17    his testimony.  It was very difficult to get a straight

18    answer.

19    So we'll put up a few words on him.  Mr. Persails, he

20    was evasive, certainly old school, if that's what old school

21    means, that's what he said, and he lied on his employment

22    application and he exaggerated his hours.

23    Are you going to give Mr. Persails overtime on top of

24    his guaranteed salary and commission?  It's up to you.

25    Chanda Whitted.  Her picture is already up here.  And

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    179

1    she contended that she did not take licensing courses, nor

2    did she seek to be licensed in other states while employed

3    at Quicken Loans.  She said that on direct examination and

4    suggested the certificates, they must be made up.

5         And she said it as part of her cross-examination, too,

6    and Ms. Whitted was the second witness who testified.  But

7    when she was shown the licensing applications that she

8    filled out in her own handwriting and signed them, we showed

9    her some examples, one for New Jersey and one for

10   Connecticut, well, lo and behold, she suddenly remembered

11   that, yes, and she admitted that, yes, she did take

12   certification courses, yes, she did seek licensing in other

13   states.  100 percent about-face from her direct testimony

14   and before she was shown those documents.

15        In addition, Ms. Whitted additionally denied that she

16   was operating a side embroidery and silkscreen business with

17   her husband.  She acted like she didn't know what I was

18   talking about but ultimately admitted to that, and she also

19   ultimately admitted that she may have spent time working on

20   that while she was at Quicken Loans.

21        She also admitted that she possibly could have been

22   perpetually late to work.  I don't know what that means,

23   possibly I might have been perpetually late to work.  She

24   was perpetually late to work.

25        And she admitted on cross that she didn't work more

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    180

1   than 40 hours during her initial training.  The reason why

2   that was important is because she at first suggested that

3   she had on direct examination, but on cross she admitted

4   that that wasn't correct and that she actually did not work

5   more than 40 hours during her initial training.

6        And then she also contended on direct examination

7   sales, sales, sales, but during her cross-examination when

8   she was confronted with her employment agreement and

9   employment documentation she admitted that her job duties

10  fell within the financial services.  It wasn't all sales,

11  sales, sales.  She had gathered information, analyzed,

12  evaluated, educated.

13       So Ms. Whitted, we have a few words for her.  One --

14  let's see if I can find her.  There we go.

15       Ms. Whitted lied about whether she was seeking

16  applications and took certification courses.  She

17  acknowledged her exempt duties, and she exaggerated her

18  hours.  One example of that is when she said that she was

19  working all the time, but in fact she had a side embroidery

20  business she was working on with her husband.

21       Nicole Lilly.  We remember Nicole Lilly.  She painted a

22  very harsh work environment at Quicken Loans.  She claimed

23  that her team leader, Charlie Warah, Mr. Warah was a tyrant

24  both in terms of hours and leadership.

25       She claimed that she brought her 11-month-old son to

1   work four days a week and leashed him to her desk.  There

2   was nothing about setting up a bed, like Mr. Lukas

3   indicated.  She said she leashed him to her desk.  Now, I

4   don't know whether a parent would actually leash their child

5   to a desk.  I certainly wouldn't do that.

6        Now, Mr. Nichols tried to test that so he asked

7   Mr. Ortman.  Mr. Ortman was on the same team, the same

8   mortgage banking team as Ms. Lilly, worked side by side with

9   her.  Mr. Ortman is a former employee.  He is not employed

10  by Quicken Loans now.  He was here by a subpoena to testify.

11       So Mr. Nichols asked Mr. Ortman about Nicole Lilly and

12  her bringing her son to work.  And what did Mr. Ortman say?

13  He doesn't remember a single time that Ms. Lilly brought her

14  son to work, 11-month-old son, and certainly he would

15  remember that if the child was leashed to a desk.

16       And I've got to tell you, if she really did do that,

17  first off, he must be a lot different than the

18  11-month-old's that I know, including my own kids, because I

19  was not able to do any work if I was watching my

20  11-month-old daughters that I have got.  There is no chance.

21  I mean you've got diapers, feeding.  You have to watch an

22  11-month-old very closely because they can get into a lot of

23  trouble.

24       Ms. Lilly tried to cover up that and say, well, my son

25  was playing basketball.  At 11 months old?  Playing

1  basketball?  How long is the attention span of an

2  11-month-old baby?  He is not playing basketball for all of

3  that time she claims to have been there.

4       So what happened next?  We showed Ms. Lilly her

5  resignation letter, and Ms. Lilly's resignation letter

6  undercuts her entire testimony about this harsh work

7  environment, having to bring her son and leashing him.  What

8  did she say?  She wanted to thank the company for the time

9  that she spent.  She is walking away sad, but the position

10  taught her an invaluable amount of knowledge.

11           I especially thank Charlie Warah -- this

12           tyrant -- for his leadership.  Your support

13           throughout the past 16 months has been

14           phenomenal.

15       Remember, Ms. Lilly, when she saw the word phenomenal

16  said, well, I'm a creative writer.

17           I pray that our team has continued success

18           and that the company sees the value you add

19           to its sales team.

20  This is Ms. Lilly, who says it was such a harsh environment

21  and a tyrant in Charlie Warah.  Is this someone that we can

22  believe?

23       Now, she also claimed that her job duties were pure

24  sales.  Sales, sales, sales, that's the Mr. Lukas mantra.

25  Let's see what she put in her own resume that she prepared.

1      Is this a sideshow to see what words they used when

2    they describe their own job?  Is it a sideshow to bring out

3    a document to show that they are not telling the truth in

4    terms of their work environment and what their director is

5    like, not a tyrant but someone she actually praises as being

6    phenomenal?

7      So what did she say?  She educated and consulted

8    clients on the mortgage industry.  That's exempt duties.

9    Now, she has a second line, too.  It says:

10             Utilize assumptive selling techniques to

11             obtain client commitment.

12   Do you see that?  That's accurate.  That's asking for the

13   business.  That's the sales component.

14      These are two different things.  She educated and

15   consulted clients on the mortgage industry.  That's

16   one thing she did, and then the sales component, which you

17   heard about from all of these other mortgage bankers that

18   Quicken Loans called to testify is what she says she did.

19   She utilized assumptive selling techniques to obtain client

20   commitment.  That's the portion of asking for the business,

21   asking to move forward with the loan, a specific loan

22   commitment.

23      Ms. Lilly also exaggerated her hours.  She changed her

24   estimate slightly from 58 before the case into 60 during the

25   trial, and she admitted to all of these personal calls, but

1   I don't know how she would have been working 60 hours when

2   she had 722 calls to her fiance, 100 calls to her sister,

3   308 personal calls to another number, 103 calls to her son's

4   nursery school and others, and she included in her estimated

5   hours, if she really was bringing her son and leashing him

6   to her desk, the drive time to leave and come back.

7        So, Ms. Lilly, are you going to award her overtime?

8   Are you going to give it to her?  It's up to you, but she

9   definitely, she definitely lied.

10       Let me find her here.  There she is.

11       And her resume has exempt duties in her own, in her own

12   words, and then she also exaggerated her hours as well as

13   the nature of the work environment.  But it's up to you to

14   decide.

15       Michael Lofton, I'll put him up.  He testified.  There

16   he is, Mr. Lofton.

17       Mr. Lofton testified -- he initially claimed his hours

18   were 69 hours before the trial.  During the trial it changed

19   down to 55 to 60 hours.  I guess that's a benefit to us.

20       He denied he had poor work attendance.  Well, he was

21   then confronted with Exhibit D101 where he was specifically

22   written up for his work attendance.

23            Your absenteeism and tardiness is becoming

24            excessive.  He would call in the day and

25            request the time off, and he consistently

1              would arrive 15 minutes to an hour late.

2              Over the past couple of weeks he failed to

3              come in to work over three different times,

4              and he failed to come on July 11th at all.

5              We were having repeated discussions with him.

6         So I don't know how he could have so many hours he's

7    working.  He's not even showing up on a regular basis during

8    his short stint.

9         He also was sent on a trip, he testified.  He was sent

10   on a cruise to the Bahamas by Quicken Loans where they paid

11   for it.  He admitted to personal calls and admitted to

12   surfing on the internet for personal business, not work

13   related.  He acknowledged one of his favorite sites was

14   ESPN, of his, and that there were several others.

15        When he was confronted with his exaggerations about

16   hours and duties, he would repeatedly answer "maybe" on

17   cross-examination.  That was his way of not -- of trying to

18   waffle so that he wouldn't be caught in another lie.

19        So for Mr. Lofton we'll put up "maybe" because that's

20   what almost every answer was.  He surfed the net.  He had

21   personal calls.  He exaggerated.  I would say "maybe" is

22   really evaded -- evasive, evade the answer.  Instead of

23   acknowledging the truth, he just said maybe, maybe.

24        It's up to you to decide.  Are you going to give

25   Mr. Lofton overtime on top of his guaranteed salary and

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    186

1    commission?

2         Hassan Bazzi.  Hassan Bazzi, Mr. Lukas takes exception

3    that it was brought out that he had filed bankruptcy, and

4    somehow he suggested we had a stack of paper on his cousin.

5    We didn't have any stack of paper on his cousin.  We had

6    one document.  It was a resume, and I said when I handed it

7    to him I'm not sure if this is you or someone else, can you

8    identify that.  When I was asked if I was going to use it in

9    evidence, I said I didn't know if it's his.  One document.

10   He said it was his cousin's.  We put it away.

11        I assume he was being truthful there, but he was not

12   being truthful on his employment application, and this is

13   not something we dug up.  This is going through routine

14   questioning to establish that he had actually graduated from

15   school before he was a mortgage banker to address some of

16   these positions that Mr. Lukas was taking that, well, they

17   had no background, they had nothing but sales.

18        So I said you've got a degree, right?  So you've got a

19   degree from Eastern Michigan in arts management, a B.A.?

20   Well, he testified he didn't have a degree.

21        And what did he do when he was confronted with that and

22   now he admitted that he lied on his employment application?

23   Well, on the witness stand he then made up, well, I had

24   credit, I just didn't walk through graduation.

25        Well, I don't know anyone who can get a degree and

1   doesn't say they have the degree if they didn't walk -- you

2   don't have to walk through graduation to get your degree.

3   He admitted he never even earned the degree, period, but

4   somehow he felt the need to lie to Quicken Loans on the

5   employment application.

6        Now, Mr. Bazzi also testified that he had 72 hours a

7   week he worked, and I would like to put up Exhibit D201.

8   Now, what's interesting about this is Exhibit D201 is the

9   talk time.  Mr. Lukas seemed to make light of this, but this

10  is an important document.  The talk time document tracked

11  based on the raw data of the telecommunication system, CMS,

12  all of the time, all of the telephone time, every single

13  minute starting from dialing out on outbound calls and

14  ringing for inbound calls.  It measured all calls.  This

15  doesn't except out personal calls.  This doesn't except out

16  calls to internal, a director.  This doesn't except out

17  calls to outside realtors or attorneys.  It's everything.

18       And Mr. Bazzi had 8 hours and 49 minutes per week on

19  average.  That's what he had.  That's not even, that's not

20  even two hours a day on the phone.  That's approximately an

21  hour and-a-half, even less if he worked a six-day workweek,

22  like he said.

23       So he said he worked 12 hours a day.  So 12 hours a

24  day, but he spent less than an hour and-a-half a day on

25  the phone.  So what does that mean?  That means that for

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    188

1   10 1/2-plus hours he's doing something other than on the

2   phone, and Mr. Lukas is suggesting that this is a call

3   center, telemarketer.  They are just dialing, dialing,

4   dialing.  Well, this system measures when you are dialing.

5   It starts when you dial.  So it records the time for all of

6   the dialing, too.

7        So if he was on the phone for less than an hour

8   and-a-half a day, but he says he worked 12 hours a day, what

9   was he doing for the other 10 1/2 hours?  Now, either he

10  really wasn't working another 10 1/2 hours and he's

11  exaggerating his hours or he's doing something other than

12  sales because he's not communicating with the clients here.

13       So, you know, it's up to you, but that means there

14  would be another 63 hours a week that Mr. Bazzi filled in

15  doing something other than making calls, receiving calls or

16  being on the phone.  And of course there is a great deal

17  more that mortgage bankers were doing when they weren't on

18  the phone.  We have heard testimony they were doing analysis

19  and evaluation.  They would manage the loan process.  They

20  would manage their pipeline.  They would study for licensing

21  certification and exams, ongoing training, problem-solving,

22  troubleshooting.  They were keeping aware of market

23  conditions.  But not for 63 hours.

24       Now, how do we know this is right?  Well, Mr. Nichols

25  gave Ms. Booth a whole hard time about this exhibit.  He

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    189

1    said I have got some report on Ryan Henry.

2        I don't know what that report was.  It was some

3    compilation report not generated by the telecommunications

4    system.  Ms. Booth relied upon the telecommunications system

5    raw data, and at lunch she went back and checked and it

6    worked out.

7        But we know that Mr. Bazzi didn't work 72 hours a week.

8    How do we know that?  Well, his director came in here and

9    testified, Mr. Victor You.  And Mr. Victor You testified

10   that he was a new director and Mr. Bazzi was under him as a

11   mortgage banker, and Mr. Victor You testified he was the

12   first to get here in the morning, Mr. Victor You himself,

13   and the last to leave and he made sure that was the case

14   because he was a new director, brand new, and he confirmed

15   he didn't work those kind of hours, there's no way that

16   Mr. Bazzi did because Mr. You was there in the beginning and

17   the end.

18       So let's put up a few works for Mr. Bazzi.  He lied on

19   his employment application.  There he is.  His phone time,

20   8 hours and 49 minutes per week on average, less than an

21   hour and-a-half a day, and he's exaggerating his hours.

22   There's not a chance -- not exaggerating but he's lying

23   about his hours according to Mr. Victor You and Exhibit 201.

24       It's up to you to decide.  Is this a sideshow or can

25   you believe this guy about anything he says?  It's up to you

1   to decide whether to give Mr. Bazzi overtime on top of his

2   guaranteed salary and commissions.

3         Mr. Ryan Henry.  Mr. Henry testified that he built in a

4   $1,000 processing fee on all of his loans.  Well, my father

5   cross-examined him.  He was confronted with actual loan

6   documents, and Mr. Henry had to admit that he had not done

7   so.  He did not build in a $1,000 processing fee.  In fact,

8   none of those loans had any processing fee like that.

9         Now, Mr. Henry also testified that he took part in

10  sexual harassment training as part of Quicken Loans normal

11  program, and he was written up for some language he used.

12  But on cross-examination he admitted he actually had to take

13  sexual harassment training on more than one occasion because

14  of sexual harassment claims made against him and that the

15  sexual harassment claims didn't only involve language, it

16  also involved inappropriate touching, and he also admitted

17  he posted provocative and dirty photos on his computer

18  screen saver and circulated demeaning and offensive jokes

19  and references to co-workers.

20        He admitted on cross-examination that he hacked into

21  Quicken Loans systems after he was no longer employed there.

22  And how did he do this?  Well, he had worked in the IT

23  Department, and he had the administrative password.  So he

24  hacked in using the administrative password because his

25  password had already been deleted, and he bragged about

1    doing so on his blog.

2        He threatened to retaliate against Quicken Loans if

3    they came after him for violating his non-compete.

4        This is how he looked back when he was employed by

5    Quicken Loans.  He has got a different hairstyle now, and

6    he's more clean-shaven.  I think he's in the courtroom.  Oh,

7    there he is.

8        Mr. Henry, if you recall, his talk time showed

9    32 minutes, and Mr. Nichols made a big deal of that.  Well,

10   this was for the last four weeks of his employment, if you

11   look on there.  It says the number of weeks with data, four.

12   This is the last four weeks that he was employed.  He had

13   obtained another job at a competitor, Countrywide.

14   32 minutes for the four weeks was confirmed by the raw data.

15       Mr. Nichols was also trying to ask him questions from

16   some compilation report as to partial days that they didn't

17   have complete data, and that wasn't part of the four weeks.

18   The 32 minutes per week, that was accurate, it was

19   double-checked.  Mr. Henry must have been doing something

20   different during those four weeks other than being on the

21   phone, and I suggest that he was already plotting his

22   departure and he was goofing around.

23       So what are the catch -- what are the phrases that --

24   what are the phrases as far as Mr. -- that we can remember

25   Mr. Henry about?  Well, he lied, lied about the processing

1    fee, lied about his sexual harassment training and his

2    departure.  He was very evasive, and he had phone time of

3    32 minutes for his last four weeks when he was moving on to

4    another job.

5         The very last witness that plaintiffs called that was a

6    plaintiff was Kelly Lytle Lacey, and she claimed to have

7    done nothing other than take deposits.  That's what she said

8    on direct:  I only did sales.  I just took deposits.

9    Nothing else.  By cross-examination she admitted that she

10   consulted with clients and recommended loan programs that

11   matched up with their needs that they could qualify for for

12   the past 10 years, including when she had worked at

13   Quicken Loans.

14        On direct examination she claimed that she only had

15   one loan product to offer at Quicken Loans, but on

16   cross-examination she admitted that there were numerous loan

17   programs and variations when she was pressed.  She claimed

18   that Quicken Loans didn't have DU, a software program to

19   conduct preliminary underwriting by the mortgage banker, but

20   when pressed, she admitted that Quicken Loans did in fact

21   have DU, which is called Rocket.

22        She claimed not to have talked to her boyfriend as to

23   the reasons why he referred her to work at Quicken Loans in

24   the first place while he was working there, and she claimed

25   that she never talked to her boyfriend or her husband after

1    she had married him about how much he had earned at

2    Quicken Loans even though he was a plaintiff, too, and he

3    was sitting in the courtroom listening to her testimony.

4         I would like to put up her farewell letter, which is

5    Exhibit D207.  She wrote it herself.  She was talking about

6    what a great experience it was and it was unfortunate she

7    couldn't work any longer.  She was moving on to get married

8    and taking some time off and that the last three years had

9    been wonderful and she had had the good fortune to work for

10   a company like that and for people like that.

11        And, you know, that was the case.  There were so many

12   of the plaintiffs that acknowledged or admitted that they

13   had friend or relatives that referred them to Quicken Loans,

14   that were very happy at Quicken Loans, happy with the work

15   environment, happy with the corporate culture, happy with

16   the nature of their job, and especially with their

17   compensation packages.  And Ms. Lacey was referred to

18   Quicken Loans by her then boyfriend, who worked at

19   Quicken Loans for seven years total.

20        So let's put up a few things to remember Ms. Lacey

21   about.  There she is.  We remember her about her personal

22   calls.  We can also remember her about lying.  She lied,

23   sales, sales, sales, one product, pretended that there was

24   nothing like DU.  She was very evasive on cross-examination.

25   It was very difficult to get her to answer a question

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    194

1    straight.

2         And there was another thing that she lied about.

3    Every -- there was not a single witness that ever heard of a

4    three-strike policy.  Not one witness ever testified to ever

5    hearing that voice mail that Mr. Lukas played.  Not

6    one plaintiff admitted that they knew what the three-strike

7    policy was.  All of the individuals that Quicken Loans

8    called never heard of a three-strike policy, no one ever got

9    a strike, but Mr. Lukas and the plaintiffs made a big deal

10   of this voice mail.

11        Ms. Lacey, she tried to say that she had heard of the

12   three-strike policy, the very last witness, apparently to

13   try to shore up this problem.  She said, oh, yeah, I've

14   heard of that.  I've heard of that from Tony Nuckolls and

15   maybe Darren.  I've heard of that.

16        Well, when did you hear of that, Ms. Lacey?  She

17   testified that she heard of that in 2002 from Tony Nuckolls.

18   Well, the voice mail that was played was in 2004.  She

19   certainly didn't hear of the three-strike policy from

20   Mr. Nuckolls in 2002 because there wasn't anything like

21   that.  There was not even a voice mail to that effect until

22   more than two years later.

23        So it's up to you.  Are you going to award Ms. Lacey

24   overtime on top of her guaranteed salary and commissions?

25        The last example I will go through is Bill Pellow.

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1    Mr. Pellow, here is a picture of him from during that time

2    period.  He came in and testified.  We'll make a new board

3    with Mr. Pellow here.  Mr. Pellow had shorter hair when he

4    came in, and it looks like he may have lost a little bit of

5    weight as well.

6         And we saw and heard exactly who the plaintiffs are

7    relying upon to make their case.  Mr. Pellow on

8    cross-examination, he admitted to committing fraud.

9         Now, why did they call Mr. Pellow?  Well, they called

10   Mr. Pellow because they wanted to get into all of these

11   emails.  I don't know how many there were.  I didn't count

12   them.  50, 100, whatever it may have been.  The emails that

13   make up their whole case, they wanted to get into those so

14   they needed someone to identify those.

15        And why did they need someone?  There was not a single

16   plaintiff who received any of those emails.  You didn't hear

17   from any of those plaintiffs that, yes, I saw that email, I

18   got that email, this was sent to me, sell, sell, sell.  Not

19   one.  So they called Mr. Pellow to come in and to identify

20   that these kinds of emails were sent even though none of the

21   plaintiffs ever got them.

22        Now, the problem with that is we didn't have to do any

23   digging with Mr. Pellow.  Mr. Pellow admitted on

24   cross-examination why he was fired.  Now, he had been a

25   successful mortgage banker at Quicken Loans.  He testified

 1    that he had earned $150,000 in the year of 2003.  28,000

 2    guaranteed salary, 122,000 in commissions.

 3         Now, Quicken Loans did not hesitate to fire him for

 4    doing the wrong thing.  There were three things that he did

 5    wrong.  One is he caused Quicken Loans to loan him $176,000

 6    more on his own house than it was valued at, and he did that

 7    by creating a phony AVM appraisal report that he cut and

 8    pasted from another house.  And he admitted to that on the

 9    stand.  He admitted he committed fraud.  He admitted that he

10    cut and pasted and used this -- and created a phony AVM

11    report.

12         And I think over there we went through some of the

13    numbers, and it's still on the board there in writing.  He

14    admitted to all of this.  This guy committed fraud.

15         Now, in addition to that, he's not a plaintiff.  He

16    could have been a plaintiff.  He worked as a mortgage banker

17    during the time period.  He was not a plaintiff, but his

18    mother and brother are plaintiffs in the case.

19         And when Mr. Pellow had been terminated, he sent an

20    email to Mr. Gilbert, a series of emails, and Mr. Gilbert

21    called him out for committing criminal fraud against Quicken

22    Loans.

23         And what did Mr. Pellow admit to doing?  He sent him an

24    email back saying your words motivated me, Mr. Gilbert.  And

25    that's why he was here.  He came here to show up and try to

1    make a case for the plaintiffs. Mr. Gilbert's words

2    motivated him when Mr. Gilbert called him out for his

3    criminal fraud, and he's got a mother and a brother who are

4    plaintiffs.

5         Now, there are some other interesting things, important

6    things that Mr. Pellow admitted.  One thing he admitted,

7    since he's not a plaintiff here, was that he never used the

8    sales process at all.  At all, zero, never.  And this is the

9    centerpiece of their argument:  Every one has to use the

10   sales process.  He never used the sales process.

11        He also admitted on cross-examination the nature of his

12   duties in terms of gathering information, advising,

13   consulting, recommending, educating, problem solving.  All

14   of the exempt duties, he admitted to them.  He admitted to

15   discretion as a mortgage banker, that they had discretion to

16   make independent judgments as to matters of significance and

17   went through a whole host of those.

18        Mr. Pellow, one other thing that was interesting.  On

19   direct examination he acknowledged and admitted and

20   identified Exhibit P21, which was the sales process, this

21   laminated document that Mr. Lukas was flashing around.

22   Well, on cross-examination he admitted that that document

23   wasn't even in existence when he was working at

24   Quicken Loans.  It was sometime later.  I don't know why

25   during direct examination he identified it and made it sound

1    like it was something he worked with.  Apparently it was

2    because he wanted to try to make the case.

3         Well, let's put up a few words to remember Mr. Pellow

4    by.  Mr. Pellow, he committed fraud and he admitted to it

5    against Quicken Loans.  Mr. Pellow admitted that the job

6    duties were exempt.  He admitted to discretion and

7    independent judgment, and that's good enough to remember

8    Mr. Pellow.

9         This is who the plaintiffs are relying upon.  Sideshow?

10   No.  They brought him in here to try to make their case.

11   This is who they are using to make their case.  And while

12   they are using him to make their case, he is making

13   admissions that actually support our case, exempts duties

14   and discretion.

15        I could go through the rest of the plaintiffs, but

16   there is just not enough time to do that.  But there are a

17   couple of things.  Every single plaintiff who testified on

18   direct went through this sales, sales, sales story, but then

19   on cross they admitted that their job was much broader than

20   that.  They admitted that they gathered financial

21   information from the client and dug deep.  They admitted to

22   analyzing and evaluating financial information to select

23   loan programs that matched up to the client's needs and that

24   they could qualify for.  They admitted to making

25   recommendations to clients, to problem solving,

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    199

1    troubleshooting, managing their pipeline.  They admitted to

2    setting pricing and managing the entire loan process, from

3    origination through closing.

4        Virtually every plaintiff who testified exaggerated

5    their hours.  They didn't take into account their time off,

6    their vacation, their sick time, their personal days, their

7    missed days, tardiness, leaves of absences, breaks, their

8    non-work activities, personal calls, surfing the internet,

9    socializing, their playtime, their fun time.  No, they are

10   asking for overtime on all of that, and they were making

11   their hours as if they were working when they were doing all

12   of that.

13       If the testifying plaintiffs are representative of

14   anything, they are representative of people who commit

15   fraud, lie, exaggerate, evade the truth, simply try to cash

16   in on something that they are not even entitled to in order

17   to obtain an unfair result.

18       And it's up to you to decide that.  Are you going to

19   give them overtime compensation on top of their guaranteed

20   salary and commissions?

21       Now, there are another 334 plaintiffs who did not

22   testify at all.  We didn't hear from them.  We didn't see

23   them.  That was their choice, they weren't barred from

24   testifying, and the plaintiffs could pick anyone they wanted

25   to testify.  So they didn't come in here at all, and there

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    200

1     was no evidence presented at all as to how many hours they

2     worked, estimated or otherwise.  I'm not talking about their

3     job duties.  I'm talking about their hours.  There is not

4     one piece of evidence that was presented.

5          There was no evidence that was presented as to the

6     amount of hours they worked during any particular week.

7     They didn't have to answer any questions as to their

8     attendance, their paid time off, their personal calls, their

9     non-work-related activities during work hours, their leaves

10    of absences.  We never got a chance to question them under

11    oath at all.  They didn't have to answer any question about

12    lies and fabrications and frauds and exaggerations, evasion

13    of the truth.  There is nothing about them.

14         So let's put up -- this is these unknown plaintiffs,

15    unknown bankers.  That's what we have for the 334.  And what

16    do we know about them?  Just a bunch of question marks.

17    That's it.  Nothing else.

18         Are you going to give them overtime on top of their

19    guaranteed salary and commissions?  You don't know how many

20    hours they worked.

21         Now, in terms of the plaintiffs, the testifying

22    plaintiffs, we asked every one of them do you know how many

23    hours the non-testifying plaintiffs worked?  Nope.

24         Do you know who they are?  Nope.

25         Do you have a clue?  Nope.

1          Did you work even the same time frames?  Were you

2     employed during the same time periods?  Some said no.  Most

3     of them, they were not even employed during the same time

4     period.

5          Other times some of the plaintiffs said, well, I don't

6     know, I never saw a list.  They never saw a list?  That had

7     to have been intentional.  There must be some reason they

8     weren't shown that list.  Plaintiffs all had the same

9     counsel.  They came in here and said they never even saw the

10    list.  There's a reason they didn't see the list.  They

11    didn't know these other plaintiffs.  They didn't know how

12    many hours they worked.  They couldn't present any evidence

13    at all.

14         We showed the list to our mortgage bankers and former

15    mortgage bankers that we called in.  They knew 10, 5, 20,

16    that's it, and they had no idea how many hours these people

17    worked.  Not a clue.

18         There is simply no evidence at all, but it's up to you

19    to decide.  Does the unknown mortgage banker -- are you

20    going to give them overtime on top of their guaranteed

21    salary and commission?

22         Now I want to move on and directly address the

23    administrative exemption.  So there were two reasons that

24    Quicken Loans did not pay overtime to the plaintiffs that

25    the evidence has shown.

1      One reason is from a business standpoint they were

2   trying to make the compensation package better for the

3   mortgage banker.  We heard from Mr. Farner, Mr. Gilbert,

4   Mr. Emerson, and we heard from various mortgage bankers or

5   former mortgage bankers that this compensation package was

6   better.  We heard that from Ms. Booza, Mr. Thompson,

7   Mr. Baumann, Mr. Ortman, Mr. You, Mr. Bettis.  We even saw

8   that from Ms. Lytle Lacey.

9      And, incidentally, we didn't hear any testimony from

10  Ms. Booza or Mr. Thompson, Mr. Baumann, Mr. Ortman, Mr. You,

11  Mr. Bettis or any of the witnesses that Quicken Loans called

12  in terms of lies or fabrications or frauds.  They weren't

13  impeached in terms of their credibility or their

14  truthfulness.  They didn't lie on the stand.  No one brought

15  out any evidence that they lied on the stand or in any type

16  of employment documents or licensing applications.  They

17  didn't claim that they lied in their resignation letter or

18  termination letter.  They didn't claim that they lied in

19  their resume.  There is none of that.  It's only the

20  plaintiffs who came in here to testify that we had that

21  problem with.

22      Well, anyway, the second reason that Quicken Loans

23  didn't pay overtime was because their good intentions of

24  creating a compensation package that was better was

25  consistent with the law.  And you will be instructed on the

1    administrative exemption, and if we can put up that board.

2        So Mr. Lukas showed you that there is an administrative

3    exemption.  This is the, this is the administrative

4    exemption, and it's designed to protect individuals,

5    employees who are working in the financial services

6    industry.  This is, this is like a mortgage banker or loan

7    consultant.  This is not geared to the line worker or

8    factory worker.  This is something different.  This is the

9    financial services industry and specifically geared to

10   someone who works like a mortgage banker or a loan

11   consultant.

12       And so there's two parts, and one is whether their

13   primary duty is:

14           The performance of office or non-manual work

15           directly related to management or general

16           business operations of the company or its

17           customers.

18   And the second is:

19           Did the primary duty include the exercise of

20           discretion and independent judgment with

21           respect to matters of significance?

22       Mr. Lukas suggests the answer is no.  We say the

23   evidence says yes.

24       So let's look at the first part, which is the primary

25   duty part.

1        So what does it mean by office or non-manual work?

2   Well, that's just simply non-manual labor.  We are not

3   talking about working in a factory or working on a line.

4   This is for individuals working in an office like a mortgage

5   banker, and that's what the plaintiffs were doing.

6        And what does it mean by directly related to management

7   or general business operations of the company or its

8   customers?  This language is broad and general, and it's

9   certainly broad enough and general enough to cover the

10  precise job duties of the mortgage bankers at Quicken Loans.

11       And the Department of Labor created a regulation that

12  explains examples of what is covered by this, and the Court

13  will provide you with instructions on the examples.  So if

14  you find that plaintiffs' job duties fell within any of the

15  categories of the examples, then those categories would

16  be -- the job duties would be exempt.  They would be part of

17  the administrative exemption.

18       So can you put up the examples.  And this is --

19  Mr. Lukas showed you this, but we broke it down into numbers

20  so it would be easier to see.

21           Employees in the financial services industry

22           generally meet the duties requirements for

23           the administrative exemption if their duties

24           include work such as --

25  They don't have to include all four of these, just one of

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    205

1    them, that's it, and these are not sales.  This is not

2    considered to be sales.  Each one of these is not sales.

3    Any one of them would satisfy the exemption.

4         So the first one is:

5              Collecting and analyzing information

6              regarding the customer's income, assets,

7              investments or debts.

8         Mr. Lukas says no to that.  I don't know how he can say

9    no to that.  Every single plaintiff and witness that

10   Quicken Loans called indicated that absolutely the mortgage

11   bankers were doing Number 1.

12        Number 2:

13             Determining which financial products best

14             meet the customer's needs and financial

15             circumstances.

16   Mr. Lukas says no.  I don't know how he is saying no.  We

17   heard time after time that that's what they were doing.

18   They would gather information in order to see if they could

19   find loan programs that would meet the needs and goals of

20   the client.  If they can't meet the needs and goals of the

21   client, there is nothing to provide them.  So absolutely

22   Number 2.

23        Number 3:

24             Advising the customer regarding the

25             advantages and disadvantages of different

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

 1          financial products.

 2     Mr. Lukas and Mr. Nichols seem to be playing a semantic

 3     game.  This is exactly what they would do when they get back

 4     on the phone and explain the nature of the loan options and

 5     talk about what the advantages were and disadvantages

 6     between one loan program and the other loan program.  They

 7     were trying to suggest that this meant something else,

 8     disadvantages to the client.  No, it's advantages and

 9     disadvantages between the competing alternative solutions to

10     the client.

11          And, if you remember, Mr. Ortman was trying to testify

12     to that when Mr. Nichols was examining him and he was

13     talking about the pros and cons, and Mr. Nichols jumped in

14     and thought he was talking about conning someone, deceiving

15     them, but he was talking about describing the pros and cons

16     of loan options.  Now, that was Mr. Ortman, who was a

17     mortgage banker no longer employed and who came in based

18     upon subpoena.

19          The fourth item is called:

20               Marketing, servicing or promoting the

21               employer's financial products.

22     Financial products, and I think we can all agree that that

23     was part of the mortgage banker's job duties, and that is

24     what every single witness testified to.

25          So even one of these job duties would be sufficient,

1    and let's look at a few documents that would help us decide

2    whether or not I am accurately reflecting the testimony.

3        Now, in the initial and the updated employment

4    agreement there's a reference to the job function.  If we

5    could put up Board 1.

6        This is the purpose of the agreement, and this is

7    written before the lawsuit and after the lawsuit and during

8    the lawsuit.  It says:

9            Employee desires to serve and to be initially

10            employed as and/or continue to be employed by

11            the company as a loan officer, sometimes

12            referred to as loan representative, mortgage

13            banker, senior mortgage banker, loan

14            consultant, senior loan consultant or similar

15            title, and to perform those duties that the

16            company may require in direct and in

17            connection with furthering the company's

18            business and interest.

19   That's what their job was, which ironically matches up

20   exactly with the general instruction that the judge is going

21   to give to you.

22        And let's look at Paragraph 2B of the initial

23   employment agreement.  Now, this is before the lawsuit.  So

24   Mr. Lukas is talking about making changes, but here are the

25   job duties, and the plaintiffs who signed this particular

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    208

1    document were all provided documents on the first day of

2    employment.  So it says:

3              Originating mortgage loans; developing

4              referral sources to improve the company's

5              mortgage loan business; assisting with

6              processing, closing and funding of mortgage

7              loans he/she originates; overseeing the

8              mortgage loan process from origination

9              through post-closing, funding the loan;

10             achieving customer service and production

11             standards established by the company;

12             ensuring loans are originated, documented and

13             processed in compliance with all applicable

14             federal and state laws and applicable company

15             investor rules and guidelines; maintaining

16             and improving the company's mortgage loan

17             production sales; properly managing and

18             directing his or her subordinates and

19             effectively and efficiently carrying out the

20             missions and goals of the company.

21   This fits right within the general question one as to the

22   job duties and then each of the specific examples.  It

23   covers all of them.

24       And this is signed by all of the plaintiffs, at least

25   the plaintiffs that were working at that time.  There was an

1    updated one they signed, which had even more language in it.

2         So if that wasn't right, we saw there's an open door

3    policy.  We also saw there's a mandatory reporting

4    requirement.  There wasn't one plaintiff who ever suggested

5    that these were not their job duties, and when confronted

6    with this on cross-examination, absolutely they admitted

7    that they received this and that these were their job duties

8    and that they signed the document.

9         Now, there were plaintiffs who admitted to this

10   readily.  One was Mr. Lewis that Mr. Lukas highlighted.

11   Another one was Ms. Cooke.  Ms. Tittensor actually admitted

12   to that, although she always would try to tack on "oh, and

13   to make the sale."  To make the sale, like she had been

14   programmed during her meetings to prepare for her testimony.

15   Mr. Bazzi admitted to that, Mr. Lachowicz, Ms. Quinn.  All

16   of these individuals admitted to their exempt duties and

17   that these were the job function that they had as a

18   Quicken Loans mortgage banker.

19        Now, there's an exception to the exemption, and that's

20   if the primary duty of the employee was found to be sales.

21   That's something different than those four items.

22        Will you put back up the four items.

23        So if it's sales, it's something different than these

24   four items, the four examples, and the question is what does

25   it mean to have your primary duty?  Mr. Lukas referenced

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    210

1    there is an instruction.  It will say your principal, main,

2    major, most important duty.

3         You will be instructed that what the plaintiffs'

4    primary duty was as a mortgage banker, you are to consider

5    all of the facts in their job as a whole.  You will be

6    instructed that the amount of time spent performing exempt

7    duties can be a useful guide in determining whether exempt

8    work is the primary duty of an employee, and you can compare

9    that with the amount of time they spent on non-exempt

10   duties.

11        Here that's easy to decipher because we have an exhibit

12   that shows how much time they spent on the phone versus how

13   much time they contend they were working.  So, using

14   Mr. Bazzi as an example, he claims he worked 72 hours a

15   week, and he spent 8 hours and 49 minutes on the phone.  So

16   63 hours must have been something else.  And the 8 hours and

17   49 minutes he was on the phone included his personal calls.

18        And it wasn't only the sales component.  It also had

19   the educating the client, the gathering the information,

20   providing the recommendations and advice and explaining and

21   educating the client on the loan documentation.

22        What we also note from Exhibit D201, the last page,

23   what all of the plaintiffs, even these unknown bankers, how

24   much time did they spend on the phone on average?  It was 14

25   hours and 44 minutes per week on average.  23.39 percent of

1    the time.

2        So what were they doing the rest of the time?  What

3    were they doing?  Mr. Nichols and Mr. Lukas says their

4    entire job was cold calling, telemarketing, dial, dial,

5    dial, dial, and then sell them when they are on the phone,

6    sell them, use the sales process.

7        Well, they are only on the phone 23.39 percent of the

8    time.  So what are they doing the other 76 percent of the

9    time?  What are they doing?  That's what we have to ask

10   ourselves.  What were they doing?

11       And when they are on the phone, this includes their

12   personal calls, their internal calls to their directors,

13   co-workers.  This includes calls with processing.  This

14   includes calls external to lawyers and realtors.  What were

15   they doing the rest of the time, I ask you?

16       So in order to get around the administrative exemption,

17   the plaintiffs are claiming that their primary duties was

18   sales.  That's the exception.  That's what they came in here

19   and said, sales, sales, sales.

20       This is an insult to the overtime laws and what they

21   were meant to protect.  Quicken Loans pays overtime to

22   employees that are meant to be protected like the frontline

23   agent.  They work in financial services, but they do

24   prospecting and prescreening.  That's their primary duty.

25   They don't do any advising.  They don't do any consulting.

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                              212

1      They don't do any analysis, no recommending, educating,

2      problem solving or troubleshooting, and they get overtime.

3      They refer those people to the mortgage bankers to do that,

4      to do the consulting and advising, analyzing, recommending,

5      educating, problem solving, troubleshooting.  They are not

6      entitled to overtime, and even if they were entitled to

7      overtime what happened was Quicken Loans was developing a

8      compensation package that was better anyway.

9          The sales component here is the asking for the

10     business, asking for a commitment on a loan program.

11     Mr. Lukas made light of that, but that's what Ms. Lilly put

12     in her own resume in her own words.  She put a second line

13     on there.  That's what she admitted to in her own words,

14     utilize assumptive selling techniques to obtain client

15     commitment.  That's the selling.  That's the sales

16     component.  Quicken Loans has never suggested there is not a

17     sales component, but it's just one part of the job that the

18     plaintiffs are trying to suggest is the entire job.

19         Now I would like to look at Exhibit -- put up Board 3

20     in terms of some other aspects of the job here.

21         This was a position that was a fiduciary position.  It

22     was a position of trust and responsibility, special

23     governmental regulations and requirements.  There was access

24     to and utilization of confidential, proprietary information.

25     This is right in all of the employment agreements.  There

1    was a special nature to this job.  It was not just a

2    telemarketer, like Mr. Lukas was trying to suggest.

3         So let's look at what the plaintiffs said their jobs

4    were.  Now, we went through a few resumes, but there were

5    a lot more.  For example, let's look at Exhibit D7.  Can you

6    put that up?

7         Mr. Lewis, Mr. Emanuel Lewis testified, and I'll put up

8    a picture of him.  He testified that he worked 50 hours on

9    average at Quicken Loans, and he admitted to his job

10   functions falling within the exempt duties in terms of the

11   nature of the duties and he also admitted to having

12   discretion and independent judgment.  Now, the reason why he

13   admitted it was, unlike some of the other plaintiffs, he

14   wasn't going to lie.

15        Can you see the board?

16        **A JUROR:**  No.

17        **MR. JEFFREY MORGANROTH:**  So, Mr. Lewis, he

18   acknowledged that this was his resume and that he circulated

19   it.  He put it in his own words.  So what did he put?

20             Mortgage banker -- that's what he called

21             himself -- consulted with prospective clients

22             to complete a needs analysis to diagnose each

23             client's financial situation.

24   Nothing about sales.

25        And, by the way, he didn't come in here sales, sales,

1    sales quite like the other plaintiffs did.

2        Bullet Point 2, which is the next page, which are

3    interposed here, it says:

4            Presented clients with the benefits of

5            various mortgage options and rates.

6                Advised prospective clients on available

7            options in home loan financing while

8            addressing client concerns, gathering

9            documental information, and promoting loan

10           products and financial services.

11   That's what Mr. Lewis said he did in his own words, not

12   Quicken Loans' words, not in the documents that he signed

13   and acknowledged in the employment agreements, compensation

14   plan.  His own words.

15       We saw what Ms. Lilly said.

16       How about Exhibit D48, Mr. Lachowicz, another

17   plaintiff.  What did he say in his own words, other than

18   when he came into court and tried to say sales, sales,

19   sales?

20       Now, on cross-examination he admitted to this, and he

21   admitted he performed his job functions in accordance with

22   the job duties that were set forth in the employment

23   agreement.  He readily admitted to that on

24   cross-examination.

25       But here is his resume.  And what did he call himself?

1    Mortgage banker.  And he put:

2             Personalized potential client's profile and

3             developed programs that managed financial

4             situations.

5        Exactly within the general instruction or the

6    two questions, question one, and it falls within the

7    four-prong example that was shown to you.

8        What else did he say?  He said:

9             Assisted in continuous training for new

10            associates on sales techniques -- that was

11            part of his job -- and client protocol and

12            policy.

13   And then he talks about producing quality work.  So

14   Mr. Lachowicz in his own words is doing exactly, well, it's

15   all four of the items from that exhibit, but it also falls

16   within question one, directly related to the general

17   business of Quicken Loans and its customers.

18       Let's look at another one, Ms. Quinn, Exhibit D97.

19   Ms. Quinn, another plaintiff.  She put herself down, she

20   called herself a loan consultant.  Again, these are her own

21   words.  She said she would:

22            Prepare and implement strategies for clients

23            to achieve their financial goals and manage

24            their mortgage more effectively.

25   I don't see anything about sales in there.  I don't see

1    sales, sales, sales or telemarketer cold calling.  These are

2    the financial services that fit right within the

3    administrative exemption, her own words.

4         We have seen Ms. Little.  Let's move to Ms. Cooke.

5         Ms. Cooke also had -- as another example, and maybe

6    we'll make this the last one because we are running out of

7    time here.  What did Ms. Cooke put in her own words?  This

8    is what she said she did.  Ms. Cooke called herself a:

9              Mortgage banker/certified originator whom

10             speaks with clients regarding finances and

11             benefits.  With this analysis, I can

12             construct a financial plan for qualification

13             for an array of products and programs.

14        That's precisely within the general instruction you

15   will look at, and it's also precisely within all four of the

16   specific examples.  That's what she did.  I don't see

17   anything about sales in there.  I don't see anything about

18   telemarketer.  I don't see anything about cold calling.

19        Now I would like to put up Exhibit D4.  Let's, let's do

20   it with a board.  This is from the mortgage banker's duties

21   document.

22        Now, the mortgage banker's duties document was

23   Exhibit D4, then we put in a whole bunch more that was

24   signed by every plaintiff that was working during this time

25   period, and this is just one section of the duties document.

1   There is much more that goes through in great detail the job

2   duties, the expectations and the policies.

3        But focusing on this one, this one document, let's look

4   at some of the bullet points here.

5             Our mortgage bankers use their training,

6             knowledge, sound discretion and good judgment

7             to put it all together for the client in

8             terms of collecting and analyzing the

9             relevant information from our client

10            concerning their financial status, credit

11            history, financial statements, income,

12            assets, investments, debts and properties,

13            including knowing how to take a clean and

14            well-documented loan application.

15  That fits exactly within item one of the four different

16  alternatives that qualify for the administrative exemption.

17            2.  Understanding our client's objectives,

18            goals and needs in light of relevant life and

19            financial circumstances and characteristics

20            of the property involved through an in-depth

21            objective analysis.

22  Again, it falls right within the factors of the various

23  alternatives to qualify for the administrative exception.

24            Computing payments, rates, costs, break-even

25            points, payback periods, and then evaluating

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    218

1              and comparing the cost benefits and risks of

2              affordable alternative programs that meet our

3              client's needs.

4     Again, right within the examples of what would qualify for

5     the administrative exemption.  Next one:

6              Qualifying our clients for the desired loan

7              programs and conducting a credit and

8              non-credit assessment of the proposed

9              transaction.

10        Again, right within the examples of the administrative

11    exemption.  Next one:

12             Educating and advising our clients on

13             alternative programs that best meet the

14             client's objectives and explaining the terms

15             of such programs and assisting the client in

16             selecting an option that best suits their

17             needs.

18        The next one:

19             Presenting all of the above information to

20             our clients in a manner that's easy for our

21             clients to understand.

22        The next one:

23             Commencing the loan origination process by

24             initiating a loan application process and the

25             ordering of DOE's, DOD's, payoffs,

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*

219

```
1                appraisals, inspections, surveys, title
2                commitment, flood certification, other
3                documents.
4     All of these fit exactly within the examples of what would
5     qualify for the administrative exemption and the general
6     language as well.
7          Let's see the next board.
8                Educating and advising our clients with
9                respect to resolving and improving their
10               credit situation, the significance of credit-
11               and risk-based pricing in today's mortgage
12               banking market and improving their credit
13               profile so as to take advantage of more
14               favorable loan opportunities now or in the
15               future and educating and advising our clients
16               in the entire financing process and to make
17               sure our clients understand the significant
18               risks, benefits, advantages, disadvantages
19               and outcome of the alternative loan programs
20               considered.
21    And they are supposed to:
22               Use their training, knowledge and judgment to
23               lock interest rates, to price loans
24               competitively and in such a manner as to
25               achieve our clients' objectives and goals.
```

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                              220

1    And that's to benefit the company, the client and the banker

2    himself or herself.

3         All of these fit exactly within the examples of the

4    administrative exemption that you will be given and

5    instructed on by Judge Murphy and as well as the general

6    instruction.

7         Now, I would like to look very quickly at the

8    compensation plan that also has the duties reference, and

9    that would be Board 7, if you can put that up.

10        This is Exhibit D41, Mr. Lachowicz's, and there was a

11   listing in the compensation plan, too, of the job duties.

12   And we are not going to go through every line, but:

13             Interview loan applicants to determine their

14             needs and goals, analyze potential loan

15             applicant's financial situation, [this

16             one says] marketing and promoting the

17             company's loan products and services.

18        Those first three fit exactly within the top

19   three examples that were in the instruction, and all of

20   those in and of themselves would qualify the mortgage banker

21   for the exemption, but we have all of them, not just one.

22        And then it has:

23             A thorough understanding of the company's

24             mortgage loan programs.

25   Let's see the next board.

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*
221

1           Work with the loan applicants to complete the

2           loan application process and collect the

3           necessary documentation, advise them on the

4           home-buying mortgage loan process.

5    That fits specifically within that general instruction in

6    terms of directly relating them to the company business

7    operations.

8        And so do the rest of these, and if you want to look at

9    Exhibit D41, each one of them falls within the exempt duties

10   examples and you only need one.

11       Now, besides documents, we have heard from some live

12   witnesses that explained in very careful, detailed testimony

13   as to the nature of their job.

14       We heard from Ms. Booza.  Ms. Booza came in here and

15   she described precisely what she did as a mortgage banker

16   step by step:

17       What information she would gather and how she performed

18   her analysis, in processing her duties.

19       Her process of calculating the ratios.

20       How she determined which loan programs to select and

21   recommend.

22       How she determined whether the client would qualify.

23       How she examined and evaluated the various loan

24   options.

25       How she would make recommendations to her clients,

1    either float or lock interest rates or pay points to buy

2    down the interest rate.

3         How she asked for the business.  She testified that

4    that was a very short part of what she would be doing on any

5    phone call.

6         What loan documentation she processed and how she

7    managed the entire process through closing and how she would

8    investigate, problem-solve and troubleshoot.

9         Now, she described what she would do when she wasn't on

10   the phone.  And what were those types of things?

11        Certification courses, licensing exams, managing her

12   pipeline, keeping abreast of market conditions, and that

13   analysis, the processing, the evaluation so that she can

14   match up loan programs that met the clients' needs and that

15   they could qualify for.  That was all done off the phone.

16        Mr. Thompson then, if you recall him, he came in, he

17   was the second witness we called, and he took everyone

18   through an example.  He had gone through his closed loan

19   files, and one typical example he called Mr. B.

20        If you remember Mr. B, he had a goal of consolidating

21   debt, and Mr. Thompson wanted to avoid PMI and to come up

22   with a spreadsheet so he could pay off his debt, Mr. B.  So

23   Mr. Thompson, when he got off the phone, developed a

24   program, analyzed the information, the program was developed

25   so there would be a snowball effect that would help him pay

1   off debt.  Remember, Mr. Thompson explained what a snowball

2   effect was.  Initially Mr. Thompson said he could save the

3   client 600 a month, but when the appraisal came back, it was

4   higher, and the client wanted to take more money out so he

5   could pay off more debt at that time and have a bigger

6   snowball effect, which is what took place, so even more

7   money was saved.

8        Mr. Thompson also took us through some examples of what

9   he would do in terms of the loan process when loans were in

10  his pipeline.  He said problems would arise, and he gave an

11  example.

12       Mrs. T was one example.  The appraisal came in too low.

13  There were problems with the loan to value in that

14  particular case.  He investigated.  He found discrepancies

15  and errors in the appraisal report.  He then helped put

16  together a value challenge.  He also testified there were

17  problems with the flood certification insurance deductible,

18  and he helped solve that problem due to his own discretion

19  and independent judgment to get a waiver, which occurred.

20       Mr. Baumann, he took us all through an example, too.

21  His example of what he typically did was Mr. B.G.  There was

22  a father and a son who were repeat clients.  Mr. Baumann

23  became a mortgage banker for the family.  Their youngest son

24  was referred, who had a toxic loan.  He had a high interest,

25  very high, couple-digit interest rate with 100 percent loan

1    to value from a builder on a new construction.

2         So Mr. Baumann asked a lot of probing questions.  He

3    came up with a lot of information and then analyzed it.  He

4    said it was like doing algebra.  And he came up with a split

5    loan option, and the split loan option was to avoid PMI, and

6    he would also -- ultimately ran into a problem.  The client

7    was not going to be able to qualify.  So he had to educate

8    and come up with a solution and educate Mr. B.G. and his

9    fiance, and that was to add the fiance to the loan, who had

10   better credit, and then she would have to be added to the

11   title of the property.  Mr. Baumann had to go through all of

12   the analysis of the fiances also to see if it would work,

13   and it did.

14        Mr. Baumann also testified that what he did was the

15   first part of the split loan was a 30-year fixed, and the

16   way he came up with that was because Mr. B.G. had indicated

17   he had a five-year plan, and in answer to those questions,

18   he was going to get married, he had a fiance, have kids,

19   move out of that house and then sell the house -- not sell

20   the house, hold it as an investment property.  But if he

21   were to refinance when it was an investment property, it

22   would be a higher interest rate because of the nature of the

23   house.  So lock in now for 30 years, and you won't have that

24   problem in the future.

25        In addition, Mr. Baumann had to come up with a creative

1   solution of how Mr. B.G. could come to the closing with some

2   funds to pay the differential, and Mr. Baumann did that.

3         We heard from Mr. Ortman, Mr. You, Mr. Bettis.  We

4   heard from Mr. Farner, Mr. Birkmeier, Mr. Emerson,

5   Mr. Gilbert and others all about the loan officer/mortgage

6   banker's job duties.  They all fit within the exemption.

7   Their primary duty was not sales.  It was a component,

8   absolutely.  Did they get training on sales techniques?

9   Yes.  Did they get training on other things?  Absolutely.

10        We saw the indexing.  Mr. Lukas was criticizing us

11  because we didn't bring a trainer in.  Why would we need to

12  bring a trainer in?  I didn't understand.  He appeared to be

13  complaining that the trial seemed to be too long, but why

14  would we have to bring a trainer in when every plaintiff

15  admitted on cross-examination that the extent of this four-

16  to five-week training program was extensive and

17  comprehensive.  It covered the entire mortgage loan process

18  and business.  It wasn't about only sales techniques or

19  tips.

20        Why would we have to bring a trainer in when we had an

21  exhibit of the index that showed there was one category that

22  was sales?  Everything else was about loan ratios and about

23  the mortgage business, about loan to value and about terms

24  and about how to analyze and about information on the

25  market.

1          We even saw test scores.  We saw the tests that were

2     taken by Ms. Little.  There was very little, if anything, in

3     there about sales.  And we also saw the tests that Mr. Henry

4     took.  Why would we bring in a trainer on top of all of that

5     when it's undisputed other than what Mr. Lukas is

6     suggesting?

7          We also saw that there was follow-along training.  We

8     used the same type of exhibit to show that there was

9     training throughout, and we heard from various witnesses

10    throughout that there was follow-along training on how to

11    analyze, how to educate, how to evaluate various loan

12    programs and needs and the information in terms of income,

13    assets, debts.

14         There were courses that were taken to get

15    certifications.  Let me show you two of these thick

16    exhibits, Exhibit D203 and D204.  Mr. Emerson testified that

17    these are just two of the certification courses.  This was

18    Florida and Oregon.

19         And the plaintiffs were mortgage bankers, and

20    Quicken Loans was doing business in all 50 states.  They

21    were to become certified.  If we brought in all of those

22    documents, Mr. Emerson said it would be 25 boxes.

23         And he looked through these.  There was nothing about

24    sales in here.  Actually, there was one thing about sales.

25    It was about reselling mortgages on a secondary market,

1    which is not what the mortgage bankers were doing.  That's

2    Bill Banfield and his department, secondary marketing.

3         So Mr. Lukas then, he had to take a position that

4    everything was sales, everything they did was related to

5    sales.  Well, that doesn't make any sense.  That means that

6    everything that I do as a trial lawyer would relate to

7    getting a client or a retainer.

8         That means that everything Bill Banfield did in capital

9    markets would be sales because they developed the loan

10   programs and established pricing and provided information to

11   the mortgage bankers.

12        That means that the operations and processing, they

13   would be sales because everything they do is to prepare loan

14   documentation and process the closing.

15        That means Mr. Farner, everything he does as the head

16   of the web center would be sales.  Because if the web center

17   only does sales, then everything he does must be related to

18   sales even though he doesn't even communicate with clients.

19        Mr. Lukas' position is not consistent with the facts or

20   the law.  It's an insult to those workers who are really

21   entitled to overtime.  According to the law, the types of

22   things the mortgage bankers were doing falls specifically in

23   the exempt financial services duties, and it also ignores

24   the testimony that there's not even a sales component in

25   certain situations.

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    228

1       There are repeat clients.  There is no sales component

2   on a repeat client.  Mr. Baumann testified to that.

3   Ms. Booza testified to that.

4       Referral clients, there is no sales component for most

5   of those.  Mr. Baumann testified to that again, Ms. Booza.

6       And then we heard about taking over loans that were

7   already in process.  There's no sales component when you are

8   taking over a loan that's in process.  Ms. Lilly testified

9   that she did that and so did Mr. Baumann.  It was regular.

10  You would take over a loan from a different mortgage banker

11  and manage the process through closing, but there's no sales

12  component there.

13      Well, the plaintiffs' entire case is based on a single

14  word that they have, sales, and it's really -- the heart and

15  soul of their case is these emails.  None of the plaintiffs

16  received any of the emails, but they are focusing in on the

17  emails and that's what Mr. Lukas focused in on primarily

18  during his closing.

19      The emails fall within a few categories.  One is, yes,

20  there are sales techniques and sales tips that fell within

21  those emails.  But that doesn't matter.  We acknowledge

22  there was a sales component.

23      There are other emails where they are isolated events,

24  such as, if you recall, there was a Jay Farner email that

25  talked about the blackout when there was an electrical

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                                    229

1    backout in the whole power grid from the east coast.  So

2    they had what was called a "saleabration" blackout because

3    Quicken Loans had been down for several days because they

4    had no electricity.  Well, the plaintiffs were trying to use

5    that, aha, your job was sales, sales, sales, sales.  Well,

6    that was an isolated, special situation.

7         And then there is also emails that deal with generic

8    references and expressions.  In terms of the generic

9    references and expressions, there was an explanation as to

10   how that derived.  Back in the 1980's, the 1990's early,

11   there was a different model.  The model evolved.  We then

12   heard -- originally it was pound the pavement, get your own

13   leads.  There was no separate marketing division, no

14   frontline agents.  And then it evolved to Mortgage In a Box,

15   then it evolved into online web center, but in that process

16   there was developed a separate marketing division that spent

17   millions of dollars getting prospective clients, and then

18   there was a separate frontline agent, who would prescreen a

19   prospect, and only then interested clients in pursuing loans

20   with Quicken Loans would be provided to the mortgage

21   bankers, who then would provide their analysis, advice,

22   consultation, recommendation, problem-solving and all of

23   that.

24        In terms of this generic reference, listen, if we went

25   back to our emails and looked at our text messages or emails

1     going back eight, ten years like that, I'm sure that we

2     would find in all of our emails some things that could be

3     twisted and taken out of context, some things that might

4     have foul or harsh language, some things that might have a

5     sensitive tone.

6         But that doesn't mean that what the Quicken Loans

7     mortgage bankers were doing was sales.  You have to look at

8     their job as a whole, what they actually were doing, not

9     what Mr. Lukas and his team are suggesting that these emails

10    mean.

11        And addressing the emails, the small number of emails

12    compared to what the testimony was as far as how many emails

13    there were.  There were millions of emails testified to by

14    Mr. Emerson, by Mr. Farner, Mr. Gilbert and others.

15        And Mr. Lukas says, where are all of those emails?

16    Well, they want us to bring in a truckload here?  It would

17    cover this whole courtroom.  They want us to go through all

18    of these emails to show all of these different topics and

19    processing and about the market and keeping abreast of

20    market conditions and procedures and administrative issues

21    and questions regarding problem solving and qualification

22    issues and pipeline issues?  We saw some of those, we

23    absolutely did, and Bill Banfield testified there were a

24    whole host of them just from his department alone.

25        It is undisputed, no one ever disputed, no one rebutted

 1    that there were this volume of emails.  It was testified

 2    point blank that they exist.  No one came in and said, no,

 3    they don't.  No one came in and said, no, these are all of

 4    the emails.  We are going to bring in all of the emails,

 5    millions of them, into this courtroom to try to prove

 6    something that's undisputed?  I don't think so.

 7         Mr. Lukas made a big deal about the sales process.

 8    This was not a script to be used verbatim, and not even the

 9    sales process was primarily about sales, only a small

10    portion of it dealt with the sales component.

11         Mr. Baumann testified he never even used it.  His sales

12    process was a pen and a piece of paper.

13         Mr. Pellow, who was plaintiffs' witness, he testified

14    that he never used it.

15         Mr. Lukas made a big deal about the three-strike

16    policy, but no one ever heard of it except for Ms. Lacey,

17    who said she heard of it two years before there was ever a

18    voice mail.

19         I just want to move on now to discretion and

20    independent judgment.  In terms of discretion and

21    independent judgment, you will be told that that means

22    essentially being able to make judgment calls, being able to

23    choose from different possibilities or being able to make

24    decisions or recommendations.

25         Now, you will be instructed that if the employee has

1    the authority to commit the employer in matters that have

2    financial impact on the business, that's discretion and

3    independent judgment, and we know that that occurred here

4    because we heard Mr. Banfield confirm that the mortgage

5    bankers had the authority and the discretion and that

6    Quicken Loans was relying upon them to lock or float

7    interest rates and Mr. Banfield talked about the significant

8    financial impact on Quicken Loans in terms of relying upon

9    that.

10        If the employee can bind the company in significant

11   matters, then that also is independent judgment and

12   discretion.  We know that that occurred.  We heard so much

13   testimony about that, what the mortgage banker would bind in

14   terms of making recommendations and matching up loan

15   programs that would fit the client's goals,

16   prequalification, problem solving, recommendations on

17   locking and floating, plus whether to pay points or buy down

18   interest rates, the solutions that the mortgage bankers came

19   up with.  The testimony in this case is very, very strong,

20   and there's no one that could outright deny that they had no

21   discretion especially in their analysis in terms of the

22   income, assets, debts, credits of the property and personal

23   life circumstances.

24        The pricing alone, we heard about premiums, green bar.

25   It's undisputed that the mortgage banker had discretion

```
1    whether to charge more or not charge more or credit it back.

2    We incidentally also heard from Mr. Emerson that there was

3    not really a green bar overall with the company, there was

4    really a shortage, a red bar way more often than the green

5    bar, but overall there was a shortage.

6        In terms of discretion and independent judgment, we

7    heard from Mr. Baumann how he came up with a solution as far

8    as the $5,000.

9        We heard from Mr. Thompson, who testified he sent out a

10   spreadsheet and came up with a plan for a client to follow

11   in terms of paying off debt.  That was something he

12   developed on his own.  That was something that he was

13   providing to a client to rely upon.

14       Ms. Tittensor, she admitted that locking or floating

15   interest rates, she had the authority and discretion to bind

16   the company.

17       Ms. Lytle Lacy, she admitted that the mortgage banker

18   had actual discretion to credit the client in terms of a

19   premium or not to charge one at all.

20       These are just some examples.  Ms. Maull, Exhibit D12,

21   if you look at that, there's a series of emails, and in that

22   series of emails you can tell that she had discretion as

23   well as performing financial services, exempt duties.

24       Mr. Lewis, Ms. Cooke, they both acknowledged that they

25   had discretion in terms of matters of significance.
```

1          And Mr. Banfield's testimony is a perfect example that

2     confirmed that administrative exemption in its entirety.  He

3     went through the product matrix.  He went through all of the

4     examples -- that product matrix was very complicated.  It's

5     D186.  He went through all of the things that the mortgage

6     bankers needed to know and the reason why they needed to

7     know, the type of information they had to gather, the type

8     of information they needed to know in terms of the market,

9     the type of information that they needed to educate the

10    client.

11         There was Exhibit D187, which was the Rock Street

12    Journal, and how to price, price loans.  He went through and

13    explained what Quicken Loans was relying upon mortgage

14    bankers for, to understand the loan programs, understand the

15    qualification guidelines, the market conditions, so that

16    they could decide what information must be gathered so that

17    they could analyze the information so that they could make

18    recommendations as to whether to lock or float, so that they

19    could make recommendations as to whether to buy down

20    interest rates, so that they could make recommendations as

21    to what interest rate would make the most sense and how they

22    could price the loan and how to problem-solve and

23    troubleshoot.

24         I'm running out of time, so I think I just want to run

25    through the verdict form and then call it a day.

1      So if you can put the verdict form up.  And I know you

2  have seen the verdict form from Mr. Lukas.  I'll just put

3  this down.

4      So we have a little different viewpoint on the verdict

5  form.  So, question one, the administrative exemption:

6              Was plaintiffs' primary job duty the

7              performance of office or non-manual work

8              directly related to the management or general

9              business operations of Quicken Loans or its

10             customers?

11  We want you to check the box yes because that's what we

12  would hope that you would check.  I think the evidence shows

13  that.  It fits specifically within the general instructions,

14  which is this, as well as the examples.  Only one example we

15  need, not all four, but we have all four.

16             Did the plaintiffs' primary job duty include

17             the exercise of discretion and independent

18             judgment with respect to matters of

19             significance?

20  Yes.  That's relating to the financial impact on locking and

21  floating, recommending loans, telling clients that they are

22  qualified for those loans in terms of the analysis,

23  problem-solving, paying down interest rates by buying

24  points.

25      Now, that ends the case.  That would be it.  So if you

1    check yes, yes, we're done.

2         And if you don't agree and you check either one of

3    those no's, then you have to go on and answer some further

4    questions.  But if you check yes, yes, that's the end of the

5    story, the case is over, we're done, and there's nothing

6    further to do on this verdict form.

7         So if you do check a no, then you've got to go to

8    Question 2, hours worked by testifying plaintiffs.  It says:

9              Please determine the average number of

10             overtime hours worked per week during the

11             plaintiffs' employment as a mortgage banker

12             with Quicken Loans.

13   And this is any hours over 40 hours a week.

14        So what we would ask if you do get to that, you need to

15   take into consideration that there was a fluctuating

16   workweek, that not all of the plaintiffs worked more than

17   40 hours every week, that there were personal time, breaks,

18   some plaintiffs came in late, some left early, that there

19   were vacations, Quicken Loans sent some of the plaintiffs on

20   trips and paid for it, that there were the fun-time

21   activities that the individuals were taking advantage of on

22   work, during work hours and personal calls and surfing the

23   net.  That the plaintiffs acknowledged, at least most of

24   them, that they didn't work overtime in excess of 40 hours

25   during their training and that there were certain weeks that

1    they couldn't possibly work overtime because they worked

2    less than three days.

3         And the first thing that you would look at is in terms

4    of per week.  Let's go to the next page.  We do this on

5    a plaintiff-by-plaintiff basis.  So these are the

6    25 plaintiffs that came in, and there would be a separate

7    line for each one in terms of how many hours you would think

8    that they worked in excess of 40 and how many weeks, and we

9    would say that the weeks can't be the full number of weeks

10   they worked because no one worked overtime every single week

11   they were there.

12        So let's go to the next page, and these are the hours

13   worked by the non-testifying employees.  That's the unknown

14   mortgage bankers, the ones we didn't hear from, we didn't

15   see from, see of, and also there was no evidence presented

16   as to their hours or weeks.  The only thing in terms of

17   weeks that's presented is Exhibit D202 that references how

18   many weeks they were employed but not how many of those

19   weeks they actually worked overtime.

20        So here you will be getting instruction on

21   representation, whether -- first you have to determine if

22   they are fairly representative, the 25 testifying plaintiffs

23   of the non-testifying plaintiffs.  And if you think they are

24   fairly representative -- and we would suggest there should

25   be a zero in here so put a zero because we know who the

1    25 plaintiffs are, that's these people, and they either

2    admitted that they had exempt duties for their primary

3    duties and admitted to discretion or they are people that

4    just can't, can't be believed.

5         I don't know how you could believe a Mr. Semilia, who

6    not only lied to you and to us but lied to two different

7    states and lied to Quicken Loans regarding something very

8    important in terms of his employment, and that's why he was

9    fired.

10        But if you find that the 25 plaintiffs who testified

11   were not fairly represented -- now, I'm not talking about

12   the work they performed.  I'm talking about their hours.

13   Somehow you have got to figure out how many hours, and the

14   testimony is that no one kept track because everyone

15   understood that the mortgage bankers were exempt.  They

16   weren't hourly.  They were getting paid by a guaranteed

17   salary plus commission.  There was no reason to keep hours.

18   No one kept track of that.

19        And Quicken Loans couldn't reconstruct the swipe cards.

20   People would piggyback in and not swipe.  You didn't have to

21   swipe to get out.

22        People would log in and then leave their computer on

23   and not log out, so it was impossible to reconstruct.  So if

24   we could have reconstructed, we would have, but we couldn't.

25        So you have to figure out, how about these

1      non-testifying plaintiffs?  There is no evidence that came

2      in, no one has a clue, no idea as to what hours they worked.

3           And the hours that the plaintiffs testified was all

4      over the board.  We have Mr. Lewis, who testified 50 hours,

5      but he didn't take out his personal time and vacation time.

6      Then we have Mr. Kadro on the other end of the spectrum

7      saying 70, 75, 80.  So which is it for these plaintiffs?

8           What number would you give for the non-testifying

9      plaintiffs?  Well, so if they are not fairly representative

10     because there's a broad spectrum and no one has given any

11     indication they had a clue of what these non-testifying

12     plaintiffs had worked, the amount of hours, and no

13     one provided any evidence of that, then the answer still has

14     to be zero because there is not sufficient evidence to make

15     a determination, and that's that last paragraph here.

16          So here's, in summing up, here is where we are at.  You

17     are the judges of the facts.  You make the credibility

18     decisions.  You decide what's right, what's wrong.

19          Quicken Loans has been fighting this because it's about

20     right versus wrong, and they designed intentionally a

21     compensation package that was better for mortgage bankers

22     when they had the understanding that they were exempt, and

23     they were up front about this and they fully disclosed it

24     and not one plaintiff ever came through and complained or

25     objected and said that they didn't want to be paid this way.

---

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1    Not one plaintiff has offered to pay back any of the

2    commissions or guaranteed salary or to have their

3    compensation recalculated.

4        So here is where we are left, and if we can put up

5    Ms. Lacey.  Ms. Lacey was a plaintiff, and this works for

6    all of the plaintiffs, Ms. Lytle Lacey, and if you put her

7    up, it's either check -- and if you can put the first page

8    back -- check yes, yes or Ms. Lacey would be awarded

9    $102,083 versus $30,917 that she would have received had she

10   received overtime plus a salary to begin with.  That's what

11   we are left with, and are you going to give Ms. Lacey

12   overtime on top of her guaranteed salary and commission?

13       Are you going to give Ms. Lacey overtime for hours that

14   she spent on the phone talking to her boyfriend?

15       Are you going to give Ms. Lacey overtime when she was

16   sent on a vacation and paid for by Quicken Loans three

17   different times?

18       Are you going give Ms. Lacey overtime on

19   non-work-related activities, surfing the net or

20   participating in fun activities?

21       That's the question here, and it's your decision.  So

22   we would ask that you check the boxes yes, yes, and that we

23   end it there.

24       I will not get another chance to speak with you.

25   Mr. Lukas gets one final chance of 10, 15 minutes.  That's

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                                   241

1   because they have the burden of proof.  Overall, they have

2   to prove hours.  They have to prove weeks.  What we have to

3   prove is the administrative exemption.  It's our burden of

4   proof by a preponderance of the evidence, tipping the scales

5   ever so slightly, and I suggest that we have proved that

6   yes, yes.

7        But Mr. Lukas is going to get back up here and I won't

8   get a chance to respond, but I think you probably can

9   imagine and will know what I would have said in response.

10  And what I would like you to keep in mind are the exhibits

11  and the testimony that we have gone through and what's right

12  and what's wrong here, and keep that in mind throughout

13  whatever Mr. Lukas is going to suggest in the next 10,

14  15 minutes.

15       And I thank you for all of your time and your

16  attention.  I apologize that this has taken so long on the

17  closing arguments, but this is an important case to

18  everyone, especially Quicken Loans, because they have been

19  involved in this for -- in order to determine what's right

20  and wrong, and this is a situation where they think that

21  they have been extremely fair and generous to the plaintiffs

22  and all of their mortgage bankers and it's them that are

23  being taken advantage of here.  Thank you very much.

24            **THE COURT:**  Okay.  Thank you very much,

25  Mr. Morganroth.

1    Ladies and gentlemen, it's time for a bathroom break at

2  3:55.  We will return for a brief rebuttal from the

3  plaintiffs, instructions from the Court, and then we are

4  going to call it a day and send you home and get you to

5  start deliberating tomorrow morning, okay?

6    Let's all rise for the jury, please.

7    (Jury out at 3:58 p.m.)

8        **THE COURT:**  Okay.  You may all be seated.

9    Mr. Lukas, I had you at 2 hours and 15, I had

10  Mr. Morganroth at 2 hours and 35, so I will give you

11  20 minutes for your rebuttal and urge you to stay well,

12  well, well under that.  All right?

13        **MR. LUKAS:**  Sure, Judge.

14        **THE COURT:**  All right.  Now, anyone who doesn't

15  intend to stick around for the charge to the jury I would

16  recommend this would be a good time for you to exit.  We

17  don't want any mass exodus after Mr. Lukas stops talking

18  because we want to be respectful of our jurors and convey

19  the message that the instructions and their charge in the

20  case is just as important as the attorney's work.  So let me

21  make that suggestion.

22    We'll take a five-minute recess, and we'll see you in a

23  bit.  We're in recess.

24    (Recess from 3:59 p.m. to 4:08 p.m.)

25        **THE CLERK:**  Please rise.  Court is in session.

*Defendant's Closing*
*Monday/March 14, 2011/Volume 17*                    243

1           **THE COURT:**  Thank you, Carol.  The jurors are

2    chomping at the bit.

3           (Jury in at 4:08 p.m.)

4           **THE COURT:**  Okay.  Let's all rise.  Come on in,

5    folks.  I know that was a quick one, but it kept us on

6    schedule.

7           Okay.  Our jurors are all here, they are in their

8    places, and you may be seated.

9           As I mentioned -- I think I mentioned before we broke,

10   I hope I did, we are going to hear from Mr. Lukas one final

11   time, and then I'm going to go straight into your

12   instructions and then we are going to break for the day,

13   okay?

14          All right.  Mr. Lukas, the floor is yours.

15          **MR. LUKAS:**  Thank you, Judge.

16          It's been a long day.  I'll try to be brief as best as

17   a lawyer can be.  That's one of the worst things you want to

18   hear a lawyer say is just a few more things, but just a few

19   more things.

20          Mr. Morganroth asked a series of repeated questions as

21   kind of part of his theme to his closing.  One I heard was

22   what is this lawsuit about, and he suggested three things:

23   The lawsuit is about plaintiffs thinking they were somehow

24   cheated.  It's about right versus wrong.  It's about whether

25   they would have been paid more under some mythical pay plan.

1      No, actually this lawsuit is about whether Quicken

2  violated federal overtime law.  That's it.  That's what this

3  lawsuit is about, if you want to figure out what this

4  lawsuit is about.

5      You would be confused by defendants' closing and the

6  way they tried this case what the lawsuit was about, and I

7  counted 1 hour and 55 minutes before they started to talk

8  about why they didn't violate the law or at least made an

9  argument about the law.  1 hour and 55 minutes.  I have got

10  an hour and 35 minutes of pounding on the plaintiffs,

11  exactly like I told you they would do, and 20 minutes of how

12  they would have been paid -- how their witnesses would have

13  been paid under a mythical pay plan.  They pull out one

14  plaintiff, Kelly Lacey, because she happens to be one that

15  made 80 grand.  As we know from Mr. Farner's testimony, he

16  said it was about right that this group of plaintiffs, the

17  300-plus, made about 40 grand on average.

18      So what would have done.  And plaintiffs think they

19  were somehow cheated.  That's one of their things they think

20  the lawsuit was about.  Yeah, they do.  They think Quicken

21  didn't follow the law, period.

22      Right versus wrong?  It's the law that determines

23  what's right versus wrong, you and the judge, not

24  Quicken Loans.  Quicken Loans doesn't get to say we have a

25  better pay plan, we did it better or these people don't

 1   deserve it.  There is no overtime law about do people

 2   deserve it or not, were they good enough employees, were

 3   they nice people, were their resumes perfect, were they

 4   perfect people.  Do you only get overtime if you are

 5   perfect?  No.

 6       Sales.  Job duties and hours, job duties and hours.  An

 7   hour and 55 minutes before we got to that, and that's the

 8   way the whole case has gone and that's the way the whole

 9   litigation has gone.

10       What do plaintiffs want?  That's another repeated

11   question he asked.  What do plaintiffs want?  They want

12   Quicken to follow the law, period.

13       Another one.  What are you going to do?  Are you going

14   to give them overtime?  What are you going to do?  I would

15   hope you are going to follow the law as the judge gives it

16   to you.  I know you are going to follow the law.  That's

17   what you are going to do, and you are going to ignore the

18   sideshows.

19       The plaintiffs, do they deserve it?  You will know when

20   you hear the law, and you have the facts, then you will know

21   whether they deserve it.  They deserve it if Quicken

22   violated the law.  They deserve it if the law says they

23   deserve it.

24       Also, in connection with that board and all of that,

25   there was about 13 people missing from it.  If you count the

1    ones that just had personal phone calls -- you are going to

2    get a jury instruction on the 20-minute break rule.  Why are

3    we still talking about personal phone calls and surfing the

4    net?

5        And the 12 that are up there, I'm not going to go back

6    and defend those, but I would like you to remember

7    something.  When a lawyer asks a question, that doesn't make

8    it a fact.

9        Where was Jeff Perry's testimony about why Mr. Semilia

10   was fired?  Mr. Semilia said he didn't remember them saying

11   anything about fraud.  Mr. Perry, where was Mr. Perry saying

12   he was fired for fraud?  It wasn't in his termination letter

13   that he was fired for fraud.  Do you think Quicken would be

14   shy about that?  No.

15       Mr. Pellow.  I'm glad that he went through Mr. Pellow.

16   Somehow Mr. Pellow became our person in this lawsuit.

17   Mr. Pellow is their, one of their stars, who was born and

18   raised in the company under Mr. Perry.  Mr. Perry created

19   Mr. Pellow.  Mr. Perry bragged about how awesome Mr. Pellow

20   was.  Jay Farner asked Mr. Pellow for advice on how he did

21   it so that he could incorporate his sales techniques into

22   the sales process, if you remember all of that testimony a

23   month ago.

24       So who is Mr. Pellow?  Mr. Pellow, if he hadn't stole

25   from Quicken, would still be selling like crazy at Quicken,

1   but he stole from Quicken so off he goes.  Selling those

2   fools?  That gets you promoted four times.

3        Representative.  I want to go through this because this

4   is very important, the law on representative.  We are not

5   asking you for some bizarre thing.  The law allows employees

6   to pursue their overtime claims as a group.  The law doesn't

7   demand we march 325 people in so that Quicken can put them

8   on the board and do that 325 times.  There's no new defenses

9   for the people that weren't here, and you would hear the

10  same thing.

11       A broad range of hours?  Hardly.  Pretty consistent

12  really when you think about it, but if everyone had come in

13  here and said 62.5 hours, you guys would have freaked.  You

14  want to talk about, you want to talk about incredible

15  testimony.  That would have been incredible testimony.

16       But the problem is they don't have records.  See,

17  that's the problem.  That's why the law says you can make a

18  just and reasonable inference, and it can be approximate and

19  it can be average and it can be the best that you can do.

20       That's why the law is that way, so that the employers

21  can't do what they have done in here and go, oh, jeez, you

22  have never met these 300 people that we would have crucified

23  if they had been here.  That's not how the law goes.  Here

24  is how the law goes.

25            The testifying plaintiffs can only represent

1              the non-testifying plaintiffs if both groups

2              performed substantially similar work.  In

3              considering whether the work the testifying

4              and non-testifying plaintiffs performed was

5              substantially similar, you may take into

6              consideration --

7    And look at that list.  It's identical for everybody,

8    testifying and non-testifying.  Not only is it identical

9    based on plaintiffs' testimony, it's identical based on

10   every defendants' testimony.  They have all admitted it's

11   the same job duties, the same employer expectations,

12   motivations, suggested work hours, familiarity with the

13   employees' work hours, comp, firsthand knowledge of the loan

14   consultant position, time period that each plaintiff worked,

15   teams and supervisors each plaintiff worked for, clients

16   each plaintiff served.

17        It's not substantially similar.  It's identical of

18   these supposed missing question marks.  We know what these

19   people were doing, we know how they were supervised, and we

20   know what it was like on the ground.

21        Here is some more of the law on collective actions and

22   representative testimony the judge is going to give you in a

23   few minutes.

24              The plaintiffs are not required to have a

25              specific number of employees give testimony.

1          The quality of the sample rather than the

2          quantity is the overriding importance.

3    Do you feel that you heard enough to get the joke?  Of

4    course you did.

5        Here is the second one.  This is very important because

6    they keep saying -- well, let me tell you what it says

7    first.

8          Also, the testifying plaintiffs do not need

9          to have personal knowledge of the hours the

10         non-testifying plaintiffs worked, although

11         you may consider their lack of personal

12         knowledge in evaluating the credibility and

13         weight of their testimony.

14       You do not need to have personal knowledge.  So the

15   25 testifying people don't have to come in here and go, oh,

16   yeah, I knew all of the other 300.  They don't have to say

17   they knew one of them.  You saw our chart who we brought in,

18   and you think Jay Farner or Dan Gilbert or Bill Emerson or

19   Jeff Perry or Tim Birkmeier or Brian Apple or any of these,

20   Victor You, do you think any of these people treated any of

21   these people any differently the way they managed?  Do you

22   think there was some group out there that was the advising

23   and consulting group?  No, there wasn't.

24       I also wanted to talk to you about this regulation.

25   When they finally did get around to talking about the law, I

1    think he said it wrong.  He said, oh, they only have to show

2    one of the things in the white and that can't be sales.  Who

3    said?  All of those things in the white could be things you

4    do to sell.  The things you do to sell, good salespeople do

5    the things in the white.  It says:

6                    However, an employee whose primary duty is

7                    selling financial products does not qualify.

8    Just because some things up there could be exempt or could

9    be part of a sales job, all salespeople do these things in

10   the white, that doesn't make them non-sales for purposes of

11   this lawsuit.  It says however.  It's the sales piece that

12   overrides and can consume that.  They could do all of those

13   things perfectly, and it's still sales.  It's not exclusive.

14       The mortgage banker's duties statement, boy, and the

15   comp plan.  Put it back up in front of you again and try to

16   pretend like the lawyers didn't draft it after the lawsuit.

17   All that proves is that the lawyers can keep their job.  In

18   fact, he even said a few times it falls right into the

19   factors of what qualifies for administrative exemption.

20   They fit exactly, some of them.  Well, I would sure hope so.

21   It's drafted by lawyers after the lawsuit.  I would think

22   they would be smart enough to pull out this reg and copy it.

23   They literally copied it into the comp plan and into the

24   mortgage banker's duty statement after the lawsuit.

25   Literally copied it.

1          But what were they saying before the lawsuit?  We

2     showed you that, and we know what they were saying before

3     the lawsuit:  Sell, sell, sell.

4          And the sell, sell, sell, that kills me.  Plaintiffs'

5     mantra:  Sell, sell, sell?  Is that what I heard him say?

6     It's plaintiffs' mantra:  Sell, sell, sell.

7          It's not plaintiffs' mantra.  Plaintiff doesn't decide

8     who we hire and how we hire them or who we train and how we

9     train them or how you motivate them or monitor them or judge

10    them or pay them.  They did all of those things, and they

11    did all of those things based on sales, not on who was a

12    good financial adviser and consultant.

13         When you are hiring a financial adviser and a

14    consultant, don't you think the person would have some

15    financial background or at least education, a little bit?

16    No, they are looking for salespeople.  Why?  Because that's

17    the most important part of the job.

18         Real life.  That's what the emails show.  That's what

19    the voice mails show.  That's what the call clips show.

20    That's what the training documents show.  That's what all of

21    these documents that we have shown you show.  They show you

22    real life.  The voice mails, those are real.  The call

23    clips, those are real.  Standing at this thing and putting a

24    document that a lawyer drafted, that's not real, and every

25    time, the whole trial every time they wanted to tell you

 1     what the job was about, they scurried over to the Elmo and

 2     put something a lawyer drafted up and said aha.

 3          And they avoided that Exhibit 21 like it was the

 4     plague.

 5          Think about their case and what they did.  They

 6     marched -- over and over and over again marched through

 7     lawyer-drafted documents.  Well, congratulations to those

 8     lawyers.  They know how to read a reg and put it into a

 9     document and shove it in front of a newbie.  Good job.

10          It's pretty arrogant overall that their pay plan is

11     better and people would have been paid more.  Under what

12     plan?  Those boards are complete nonsense.  People pay

13     overtime on commissions and salaries.  If you are so

14     desperate, that the sales piece is so desperate and that

15     sales motivation is so desperate that you have to have

16     commission, fine, but you pay overtime.  There are ways to

17     do that.  It's not impossible.

18          This mythical pay plan of theirs, when they come up

19     with these boards and tell you what would have been.  What

20     would have been if they followed the law?

21          The judge is going to figure that out.  You will see.

22     You are not awarding anyone a dollar amount.  You've got a

23     job to do.  It's on the special verdict form.  You are

24     saying no and no, they didn't meet their burden, and then

25     you are assigning an hour estimate, an approximate one

1    because that's all we have, and that's what the law says you

2    should do, a just and reasonable one for each of the 25, and

3    then you are assigning one for the representative group.

4    That's what you are doing.

5         So what will you do?  Will you do this?

6         Well, what you will do is follow the law, I know you

7    will, and when you do, the plaintiffs will prevail.

8         Thank you, Your Honor.  That's all.

9         **THE COURT**:  Thank you very much, Mr. Lukas, and

10   thanks to both lawyers for their hard work and obvious

11   preparation.

12        Members of the jury, it is time now for me to instruct

13   all of you about the law which you must follow in deciding

14   the case.

15        I will start by explaining your duties and the general

16   rules that apply in all civil cases; then I will explain the

17   law that you must follow in this particular case; and then I

18   will explain some rules that you must use in evaluating

19   particular testimony and evidence.

20        Last, I will explain the rules that you must follow

21   during your deliberations in the jury room and the possible

22   verdicts that you may return.

23        Please listen to everything that I have to say to you

24   very carefully.

25        You have two main duties as jurors.  The first one is

1    to decide what the facts are from the evidence that you saw

2    and heard here in court.  Deciding what the facts are is

3    your job, not mine, and nothing that I have said or done

4    during this trial was meant to influence your decision about

5    the facts in any way.

6          Your second duty is to take the law that I give to you

7    and to apply it to the facts.  It's my job to instruct you

8    about the law, and you are bound by the oath that you took

9    at the beginning of the trial to follow the instructions

10   that I give to you, even if you personally may disagree with

11   them.  Now, this includes the instructions that I gave you

12   before and during the trial and the instructions that I'm

13   going over with you right now.  All the instructions are

14   important, and you should consider them together as a whole.

15         The lawyers have talked about the law during their

16   arguments, but if what they said is different from what I

17   say here, what I say is what you must follow.  What I say

18   about the law controls.

19         Now, perform these duties fairly.  Do not let any bias,

20   sympathy, prejudice that you may feel toward one side or the

21   other influence your decision in any way.

22         The fact that a corporation is involved here as a party

23   must not affect your decision in any way.  A corporation and

24   all other persons stand equal before the law and must be

25   dealt with as equals in a court of justice.  When a

1    corporation is involved, of course, it may act only through

2    people as its employees; and, in general, a corporation is

3    responsible under the law for any of the acts and statements

4    of its employees that are made within the scope of their

5    duties as employees of the company.

6        In your deliberations you should consider only the

7    evidence, which is, the testimony of the witnesses and the

8    exhibits that I have admitted into the record, but as you

9    consider the evidence, both direct and circumstantial, you

10   may make deductions and reach conclusions that reason and

11   common sense lead you to make.  "Direct evidence" is the

12   testimony of one who asserts actual knowledge of a fact,

13   such as an eyewitness.  "Circumstantial evidence" is proof

14   of a chain of facts and circumstances tending to prove or

15   disprove any fact in dispute.  The law makes no distinction

16   between direct and circumstantial evidence.

17       Now, remember that anything the lawyers say is not

18   evidence in this case.  This would include their opening

19   statements, closing arguments, and anything they said when

20   they made objections.  Lawyers have a duty to object when

21   they believe a question is improper.  You shouldn't be

22   influenced by any objection, and you should not infer from

23   any ruling I made on an objection that I have any view as to

24   how you should decide this case.

25       And except for my instructions to you on the law, you

1    should disregard anything that I may have said during the

2    trial in arriving at your decision concerning the facts.  My

3    statements aren't evidence either.  It's your collective

4    recollection and interpretation of the evidence that counts.

5        All right.  I have allowed you to take notes.  Any

6    notes you have taken during this trial are only aids to your

7    memory.  They are not evidence themselves.  If you have not

8    taken notes, you should rely on your independent

9    recollection of the evidence and not be unduly influenced by

10   the notes of other jurors.  Notes are not entitled to any

11   greater weight than the recollections or impressions of each

12   juror about the testimony.

13       When I say you must consider all of the evidence, I do

14   not mean that you must accept all of the evidence that came

15   into trial as being true or accurate.  You should decide

16   whether you believe what each witness had to say and how

17   important their testimony was.  In making that decision, you

18   may believe or disbelieve any witness, in whole or in part.

19   Also, the number of witnesses testifying concerning any

20   particular dispute is not controlling.

21       In deciding whether you believe or do not believe any

22   witness, I suggest that you ask yourself a few questions:

23       For instance, did the witness impress you as one who

24   was telling the truth?

25       Did the witness have any particular reason not to tell

*Final Jury Instructions*
*Monday/March 14, 2011/Volume 17*                    257

1    the truth?

2        Did the witness have a personal interest in the outcome

3    of the case?

4        Did the witness seem to have a good memory?

5        Did the witness have the opportunity and ability to

6    observe accurately the things that he or she may have

7    testified about?

8        Did the witness appear to understand the questions

9    clearly and answer them directly?

10       And did the witness's testimony differ from other

11   testimony or other evidence in the case?

12       You should also ask yourself whether there was evidence

13   tending to prove that the witness testified falsely

14   concerning some important fact or whether there was evidence

15   that at some other time a witness said or did something, or

16   failed to say or do something, that was different from the

17   testimony the witness gave before you during this trial.

18   You should keep in mind, of course, that a simple mistake by

19   a witness does not necessarily mean that a witness was not

20   telling the truth as he or she remembers it because people

21   naturally tend to forgot some things or remember other

22   things inaccurately.  So, if a witness made a misstatement,

23   you should consider whether that misstatement was simply an

24   innocent lapse of memory or an intentional falsehood; and

25   the significance of that may depend on whether or not it has

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1    to do with an unimportant fact or only an unimportant detail

2    in the case.

3         The weight of the evidence to prove a fact does not

4    necessarily depend on the number of witnesses who testified.

5    What is more important is how believable the witnesses were

6    and how much weight you think that their testimony deserves.

7         Now, during the trial I have asked a couple of

8    questions of some witnesses myself.  Don't assume that

9    because I asked any questions I hold any opinions on the

10   matters I asked about or on what the outcome of this case

11   should be.

12        During the trial certain testimony came in by video and

13   was presented that way.  You should give that testimony the

14   same consideration you would give it as if the witness had

15   appeared and testified right here in court.

16        Now, certain summaries of facts are in evidence, and we

17   talked about that earlier.  Summaries do not of themselves

18   constitute evidence in the case but only purport to

19   summarize documented and detailed matters that could not be

20   conveniently examined here in Court.  It is up to you to

21   decide if the summaries are accurate.

22        Now, the parties have agreed here that the following

23   facts were true:

24        Number 1, that the plaintiffs were employed by

25   Quicken Loans during the time period involved; and

1          Number 2, that the plaintiffs were employees engaged in

2     commerce or in the production of goods for commerce or were

3     employed by an enterprise engaged in commerce or in the

4     production of goods for commerce.

5          You must, therefore, treat these two facts as having

6     been proved for the purposes of this case and you are not to

7     consider them as being in dispute.

8          All right.  The case arises under the Fair Labor

9     Standards Act, which was originally passed in 1938.  A short

10    term, which I'll use interchangeably, is the FLSA,

11    all right?

12         The FLSA prohibits affected employers from employing an

13    eligible employee for a workweek longer than 40 hours unless

14    that person receives overtime compensation.  Each of the

15    plaintiffs here claims that Quicken Loans did not pay him or

16    her for overtime worked, as required by the FLSA.

17    Quicken Loans maintains that each plaintiff was an

18    administrative employee who was not eligible for overtime

19    pay under the Fair Labor Standards Act and that some of the

20    plaintiffs cannot satisfy their burden of proving the

21    elements of an overtime claim even if they had an

22    entitlement to overtime.

23         You will decide whether the administrative exemption

24    applies to each plaintiff.  To the extent that you decide

25    that the administrative exemption does not apply to any of

*Final Jury Instructions*
*Monday/March 14, 2011/Volume 17*                    260

1    the plaintiffs, you will decide whether each plaintiff has

2    satisfied its burden of proof then as to whether he or she

3    would be entitled to overtime under the Fair Labor Standards

4    Act, and if so, for how many weeks.

5        If you decide that Quicken Loans is liable to any of

6    the plaintiffs, you will then decide the number of weeks

7    each plaintiff worked such overtime hours and the number of

8    overtime hours worked each week.

9        The FLSA allows employees to pursue their overtime

10   claims as a group in one case, which is called a collective

11   action.  This case before you is a collective action brought

12   by the plaintiff Ryan Henry and 358 other former employees

13   of Quicken Loans.

14       Because this case is a collective action, not every

15   plaintiff has testified.  Rather, the plaintiffs have

16   offered testimony from a group of plaintiffs they believe to

17   be representative of the plaintiffs as a whole, along with

18   other evidence purporting to show all plaintiffs were

19   similarly situated.

20       You must decide whether the plaintiffs who testified

21   are "fairly representative" of those who did not testify.

22   This means you must determine whether or not the group of

23   plaintiffs who testified, along with all of the other direct

24   and circumstantial evidence produced at trial, establishes

25   the non-testifying plaintiffs' claims as well.

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

1    Now, if you find that the testifying plaintiffs are

2  "fairly representative" of the non-testifying plaintiffs,

3  you can then infer from the testifying plaintiffs whether or

4  not the non-testifying plaintiffs worked overtime hours

5  while employed by Quicken and the extent of the overtime

6  work the non-testifying plaintiffs performed.

7    The testifying plaintiffs can only represent the

8  non-testifying plaintiffs if both groups perform

9  substantially similar work.  Now, in considering whether the

10  work the testifying and non-testifying plaintiffs performed

11  was substantially similar, you may take into consideration

12  job duties, employer expectations, motivations, suggested

13  work hours, familiarity with other employees' work hours,

14  compensation, and first-hand knowledge of the "loan

15  consultant" position.  You may also take into consideration

16  the time periods each plaintiff work in, the teams and

17  supervisors each plaintiff worked for, and the clients each

18  plaintiff served.

19    Now, the plaintiffs are not required to have a specific

20  number of employees give testimony.  The "quality" of the

21  sample rather than the "quantity" is of overriding

22  importance.  Also, the testifying plaintiffs do not need to

23  have personal knowledge of the hours the non-testifying

24  plaintiffs worked, although you may consider their lack of

25  personal knowledge in evaluating the credibility and the

1    weight of their testimony.

2        Quicken Loans claims that the overtime pay law does not

3    apply to plaintiffs because of an exemption from these

4    requirements.  The particular exemption that Quicken Loans

5    is claiming in this case is called the administrative

6    exemption.  Quicken Loans bears the burden of proving the

7    administrative exemption defense by a preponderance of the

8    evidence.

9        I told you earlier, and I'll tell you again, a

10   "preponderance of the evidence" simply means an amount of

11   evidence that is enough to persuade you that a claim or

12   contention is more likely true than not true.  It refers to

13   the quality and persuasiveness of the evidence, not to the

14   number of witnesses or documents that were produced.

15       In determining whether a claim has been proved by a

16   preponderance of the evidence, you may consider the relevant

17   testimony of all witnesses, regardless of who may have

18   called them, and all the relevant exhibits received in

19   evidence, regardless of who may have produced them.

20       If you find that the credible evidence on a given issue

21   is evenly divided between the parties -- that it is equally

22   probable that one side is right as it is that the other side

23   is right -- then you must decide that issue against the

24   party having the burden of proving that issue.  That is

25   because the party having the burden of proof must prove more

1    than simple equality of evidence -- they must prove the

2    element at issue by a preponderance of the evidence.

3           On the other hand, the party holding the burden of

4    proof needs no more than a preponderance.  If you find the

5    scales tip, however slightly, in favor of the party with the

6    burden of proof -- that what the party claims is more likely

7    true than not true -- then that element will have been

8    proven by a preponderance of the evidence.

9           To prevail on the administrative exemption defense,

10   Quicken Loans must prove each element of the defense by a

11   preponderance of the evidence.  Quicken Loans must prove:

12          1.  That the plaintiffs' primary duty was the

13   performance of office or non-manual work directly related to

14   the management or general business operations of

15   Quicken Loans or its customers; and

16          2.  That the plaintiffs' primary duty included the

17   exercise of discretion and independent judgment with respect

18   to matters of significance.

19          Quicken Loans must prove each element of the

20   administrative exemption in order to prevail on its

21   affirmative defense.

22          Now, the term "primary duty" means the principal, main,

23   major or most important duty that the employee performs.

24   Determination of an employee's primary duty must be based on

25   all the facts in a particular case, with the major emphasis

1   on the character of the employee's job as a whole.

2        Factors to consider when determining the primary duty

3   of an employee include, but are not limited to, the relative

4   importance of the exempt duties as compared with the other

5   types of duties; the amount of time spent performing exempt

6   work; the employee's relative freedom from direct

7   supervision; and the relationship between the employee's

8   salary and the wages paid to other employees for the kind of

9   non-exempt work performed by that employee.

10       The amount of time spent performing exempt work can be

11  a useful guide in determining whether exempt work is the

12  primary duty of an employee.  Thus, employees who spend more

13  than 50 percent of their time performing exempt work will

14  generally satisfy the primary duty requirement.  But this is

15  only a general guideline, and time is not the sole test.

16  Primary duty does not mean the most time-consuming duty; it

17  instead connotes the "principal" or "chief" -- meaning the

18  most important -- duty performed by the employee.  Nothing

19  in this section requires that exempt employees spend more

20  than 50 percent of their time performing exempt work.

21  Employees who do not spend more than 50 percent of their

22  time performing exempt duties may nonetheless meet the

23  primary duty requirement if the other factors support such a

24  conclusion.

25       To qualify for the administrative exemption, an

*Final Jury Instructions*
*Monday/March 14, 2011/Volume 17*                     265

1    employee's primary duty must be the performance of work

2    directly related to the management or general business

3    operations of the employer or its customers.  The phrase

4    "directly related to the management or general business

5    operations" refers to the type of work performed by the

6    employee.

7          To meet this requirement, an employee must perform work

8    directly related to assisting with the running or servicing

9    of the business, as distinguished, for example, from working

10   on a manufacturing production line or selling a product in a

11   retail or service establishment.

12         Work directly related to management or general business

13   operations includes, but is not limited to, work in

14   functional areas such as tax, finance, accounting,

15   budgeting, auditing, insurance, quality control, purchasing,

16   procurement, advertising, marketing, research, safety and

17   health, personnel management, human resources, employee

18   benefits, labor relations, public relations, government

19   relations, computer networking, internet and database

20   administration, legal and regulatory compliance, and similar

21   activities.

22         Work that is "directly and closely related" to the

23   performance of exempt work is also considered exempt work

24   itself.  The phrase "directly and closely related" means

25   tasks that are related to exempt duties and that contribute

1    to or facilitate performance of exempt work.  Thus,

2    "directly and closely related" work may include physical

3    tasks and menial tasks that arise out of exempt duties and

4    the routine work without which the exempt employee's exempt

5    work cannot be performed properly.  Work "directly and

6    closely related" to the performance of exempt duties may

7    also include recordkeeping, monitoring and adjusting

8    machinery, taking notes, using the computer to create

9    documents or presentations, opening the mail for the purpose

10   of reading it and making decisions, and using a photocopier

11   or a fax machine.  Work is not "directly and closely

12   related" if the working is remotely related or completely

13   unrelated to the exempt duties.

14        All right.  To qualify for the administrative

15   exemption, an employee's primary duty must include the

16   exercise of discretion and independent judgment with respect

17   to matters of significance.  In general, the exercise of

18   discretion and independent judgment involves the comparison

19   and the evaluation of possible courses of conduct and acting

20   or making a decision after the various possibilities have

21   been considered.  The term "matters of significance" refers

22   to the level of importance or consequence of the work

23   performed.

24        The phrase "discretion and independent judgment" must

25   be applied in the light of all the facts involved in the

1     particular employment situation in which this question

2     arises.  Factors to consider when determining whether an

3     employee exercises discretion and independent judgment with

4     respect to matters of significance include, but are not

5     limited to, whether the employee has authority to formulate,

6     affect, interpret or implement management policies or

7     operating practices; whether the employee carries out major

8     assignments in conducting the operations of the business;

9     whether the employee performs work that affects business

10    operations to a substantial degree, even if the employee's

11    assignments are related to operation of a particular segment

12    of the business; whether the employee has authority to

13    commit the employer in matters that have significant

14    financial impact; whether the employee has authority to

15    waive or devastate from established policies or procedures

16    without prior approval; whether the employee has authority

17    to negotiate and bind the company on significant matters;

18    whether the employee provides consultation or expert advice

19    to management; whether the employee is involved in planning

20    long- or short-term business objectives; whether the

21    employee investigates and resolves matters of significance

22    on behalf of the management; and whether the employee

23    represents the company in handling complaints, arbitrating

24    disputes or resolving grievances.

25         The exercise of discretion and independent judgment

1   implies that the employee has authority to make an

2   independent choice, free from immediate direction or

3   supervision.  However, employees can exercise discretion and

4   independent judgment even if their decisions or

5   recommendations are reviewed at a higher level.  Thus, the

6   term "discretion and independent judgment" does not require

7   that the decisions made by an employee have a finality that

8   goes with unlimited authority and a complete absence of

9   review.  The decisions made as a result of the exercise of

10  discretion and independent judgment may consist of

11  recommendations for action rather than the actual taking of

12  action.  The fact that an employee's decision may be subject

13  to review and that upon occasion the decisions are revised

14  or reversed after review does not mean that the employee is

15  not exercising discretion or independent judgment.

16      Now, an employer's volume of business may make it

17  necessary to employ a number of employees to perform the

18  same or similar work.  The fact that many employees perform

19  identical work or work of the same relative importance does

20  not mean that the work of each such employee does not

21  involve the exercise of discretion and independent judgment

22  with respect to matters of significance.

23      The exercise of discretion and independent judgment

24  must be more than the use of skill in applying

25  well-established techniques, procedures and specific

1   standards described in manuals or other sources.  The

2   exercise of discretion and independent judgment also does

3   not include clerical or secretarial work, recording or

4   tabulating data or performing other mechanical repetitive

5   recurrent or routine work.

6        The use of manuals, guidelines or other established

7   procedures containing or relating to highly technical,

8   scientific, legal, financial or other similarly complex

9   matters that can be understood or interpreted only by those

10   with advanced or specialized knowledge or skills does not

11   preclude a finding that the employee is administratively

12   exempt.  Such manuals and procedures provide guidance in

13   addressing difficult or novel circumstances and thus use of

14   such reference material would not affect an employee's

15   exempt status.  Nevertheless, employees who simply apply

16   well-established techniques or procedures described in

17   manuals or other sources within closely prescribed limits to

18   determine the correct response to an inquiry or set of

19   circumstances are not exempt.

20        Employees in the financial services industry generally

21   meet the duties requirements for the administrative

22   exemption if their duties include work such as collecting

23   and analyzing information regarding the customer's income,

24   assets, investments or debts; determining which financial

25   products best meet the customer's needs and financial

1    circumstances; advising the customer regarding the

2    advantages and disadvantages of different financial

3    products; and marketing, servicing or promoting the

4    employer's financial products.  However, an employee whose

5    primary duty is selling financial products does not qualify

6    for the administrative exemption.

7        Now, if you decide that a plaintiff was not covered by

8    the administrative exemption from overtime, you then need to

9    determine the amount of uncompensated overtime work that

10   each plaintiff performed.  Just as the defendants had the

11   burden of proving the plaintiffs are administratively exempt

12   by a preponderance of the evidence, the plaintiffs also then

13   have the duty to prove their entitlement to overtime by a

14   preponderance of the evidence as well.  I described the

15   preponderance of evidence standard to you earlier, and I

16   won't repeat it now.  The plaintiffs must prove that each

17   plaintiff worked overtime hours for which Quicken Loans did

18   not compensate them.  You will not decide the hours worked

19   by any plaintiffs who you determine were covered by the

20   administrative exemption from overtime.

21       All right.  In this case there are no employment

22   records upon which a conclusive determination of whether

23   overtime hours were worked can be made.  The plaintiffs can

24   therefore satisfy their burden of proof in this case if they

25   prove that they performed work for which they were

1   improperly compensated and produced sufficient evidence to

2   show the amount and extent of that work as a matter of just

3   and reasonable inference.  You may rely on all of the

4   evidence presented at trial, including, without limitation,

5   the testimony of those plaintiffs who testified, time

6   records and business records provided by both sides, and any

7   other business records.

8        If you find that any of the plaintiffs have met this

9   burden, the responsibility shifts to Quicken Loans to come

10  forward with evidence of the precise amount of work

11  performed or with evidence to negative the reasonableness of

12  the inference to be drawn from the plaintiffs' evidence.  If

13  you find that Quicken Loans has not succeeded in producing

14  such evidence, you may find for the plaintiffs and award an

15  appropriate amount, although this result may only be

16  approximate.

17       The "hours worked" by each plaintiff means the hours

18  that each plaintiff worked at the direction or knowledge of

19  Quicken Loans and for the benefit of Quicken Loans.  You

20  should not include any periods during which a plaintiff was

21  completely relieved from duty and which were long enough to

22  enable the plaintiff to use the time effectively for his or

23  her own purposes.  Rest periods of short duration, running

24  from five minutes to about 20 minutes, should be included in

25  the hours worked.  Longer periods in which a plaintiff did

1    not perform work, such as time for meals (even if a

2    plaintiff did not actually eat a meal during some or all of

3    those periods or even leave the office) should not be

4    included in hours worked provided that the plaintiff was not

5    required to perform any duties, whether active or inactive,

6    during those period.

7         You will be asked to give an estimate of the average

8    number of hours worked per week by the non-testifying

9    plaintiffs while they were loan officers at Quicken Loans.

10   In determining the hours worked by the non-testifying

11   employees, you must decide whether the plaintiffs who

12   testified are "fairly representative" of those who did not

13   testify.  This means you must determine whether or not the

14   group of plaintiffs who testified, along with all of the

15   other direct and circumstantial evidence produced at trial,

16   establishes the non-testifying plaintiffs' claims as well.

17        You may conclude that the testifying plaintiffs are not

18   at all representative of the non-testifying plaintiffs and

19   find that, even though the testifying plaintiffs worked

20   overtime hours, there is not enough evidence to support a

21   determination of overtime hours as to the non-testifying

22   plaintiffs.  You may also conclude that the non-testifying

23   plaintiffs worked, on average, more or less hours per week

24   than the testifying plaintiffs.  The average number of hours

25   worked by the testifying plaintiffs may be helpful in making

1    your determination, but you may find, based on all of the

2    evidence presented at trial, that this average is not

3    reflective of the general experiences of mortgage bankers.

4         The mere fact that a plaintiff has signed a contract or

5    agreement stating that they will not receive overtime, or

6    was told at the time they were hired that they would not

7    receive overtime pay, is not determinative of whether or not

8    the employee is entitled to overtime.  Under the FLSA the

9    plaintiffs cannot waive or give up their right to overtime,

10   presuming that they are found to be non-exempt.  You may

11   nonetheless consider evidence of waivers or expectations of

12   overtime pay for other purposes, such as credibility.

13        All right.  Now, all eyes up here.  We are getting

14   toward the end, okay?  I read to you a number of lengthy

15   sentences with a number of lengthy words.  You will get a

16   written copy of what I am reading to you, and you can

17   scrutinize the instructions and the verdict form in light of

18   the evidence in the jury room when you begin to deliberate,

19   all right?

20        Okay.  Now, the fact that I have given you instructions

21   concerning the issue of plaintiffs' damages should not be

22   interpreted in any way as an indication that I believe that

23   the plaintiff should or should not prevail in this case.

24        Any verdict you reach in the jury room must be

25   unanimous.  In other words, to return a verdict, you must

1    all agree.

2        Your deliberations will be entirely secret.  You will

3    never have to explain your verdict to anyone.

4        It is your duty as jurors to discuss the case with

5    one another in an effort to reach treatment if you can do

6    so.  Each of you must decide the case for yourself, but only

7    after full consideration of the evidence with the other

8    members of the jury.

9        While you are discussing the case, don't hesitate to

10   re-examine your own opinion and to change your mind if you

11   become convinced that you were wrong.  But don't ever give

12   up your honest beliefs solely because the others think

13   differently or merely because you want to get the case over.

14   Remember, in if a very real way you are the judges here, the

15   judges of the facts, and your only interest in this case is

16   to seek the truth from the evidence before you.

17       Tomorrow morning when you go to the jury room the first

18   thing you should do is select one of your members to act as

19   your foreperson, all right?  Now, the foreperson will

20   preside over and guide your deliberations and speak for you

21   here in court.

22       As the lawyers told you in their closing arguments, a

23   form of verdict has been prepared for your convenience.  I

24   have it right here, and it looks just like the one that was

25   put up on the board for you to see, all right?

1    You are going to be asked to determine whether or not

2    the plaintiffs in this case are administratively exempt.

3    That's the first thing.  If you conclude that they are

4    except, your inquiry is at an end and the plaintiffs will

5    not receive back overtime pay.  If you conclude that they

6    are not exempt, you will proceed to then determine the

7    average number of overtime hours worked per week, if any, by

8    each of the testifying plaintiffs.  Finally, you will be

9    asked to determine the average number of hours worked per

10   week by all of the non-testifying plaintiffs, if you believe

11   such that there is sufficient evidence for you to conclude

12   that the non-testifying plaintiffs worked such hours.

13   You are going to take the verdict form to the jury room

14   when you start to deliberate, and when you have reached a

15   unanimous verdict, you will have your foreperson fill in the

16   verdict form, date and sign it, and then let us know you

17   have come to a verdict and you will return to the courtroom

18   here where we will announce it.

19   You should make every reasonable effort you can to

20   reach a verdict.  In doing so, consult with one another.

21   Express your own views.  Listen to the views of your fellow

22   jurors.  Discuss all of your differences with an open mind.

23   Don't hesitate to re-examine your own views and change your

24   opinions if you come to believe that they are wrong, but you

25   should never surrender your honest beliefs about the weight

1    or effect of the evidence solely because of the opinions of

2    other jurors or because there's pressure on you to return a

3    unanimous verdict.

4        If you want to communicate with me at any time during

5    your deliberations, write down any message or question that

6    you might have, press the button to send for Carol, and

7    she'll come see you and she'll bring the note to my

8    attention.  I'll respond as promptly as possible, either in

9    writing or, very less likely, by having you return to the

10   courtroom so I can address you orally, cautioning you to

11   know that after you send a message out I will have to

12   consult with the lawyers about any question and the proper

13   response.

14       Any time you send a message to me via Carol or come

15   into court before you return your verdict, don't reveal any

16   numerical division whatsoever.  Don't say we're split 8 to 1

17   or 4 to 5 or any of that stuff.  That's not for anybody to

18   know until you have reached a verdict, and you should never

19   tell anyone your numerical division at that time.

20   All right?

21       Tomorrow morning come to the jury room and report as

22   usual -- excuse me.  Come to the jury department on five,

23   report as usual and try to arrive at 8:30.  When you are all

24   here, start deliberating, all right?  We are going to send,

25   as I mentioned, a packet of the instructions I just gave to

*Final Jury Instructions*
*Monday/March 14, 2011/Volume 17*

277

1    you back.  We will send you a verdict form and all of the

2    exhibits in the case are available for your review.  And I

3    would suggest if you want to look at the exhibits, let us

4    know and we'll bring them all back there for you and you can

5    go through them so we don't have to deal with things

6    piecemeal.

7         No talking to your families or others overnight about

8    the case, all right?  No experiments, news accounts or

9    outside research.  Tomorrow we will turn the rule around,

10   and as I just read to you, we will expect you to consult and

11   talk at length, as long as you need to, about the case, but

12   not tonight, all right?

13        I'm going to discharge you momentarily.  Don't get up,

14   don't go anywhere.  I'm going to discharge you momentarily

15   with my bidding to you for a pleasant night and then have

16   you come back and when you get here tomorrow you will start

17   deliberations.  So tonight will go just like every other

18   night has, and then you will be back tomorrow morning and

19   start your deliberations and the case will be yours, okay?

20        Any objection to the charge from either lawyer?

21   Mr. Lukas?

22        **MR. LUKAS:**  Your Honor, I think there was a little

23   bit of mistake in one of the introductory ones, but I don't

24   think it's a factor and we can clean it up before we send it

25   back to the jury tomorrow.

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Final Jury Instructions*
*Monday/March 14, 2011/Volume 17*                    278

1          **THE COURT:**  Okay.  Very good.

2      Mr. Morganroth?

3          **MR. JEFFREY MORGANROTH:**  No, Your Honor.

4          **THE COURT:**  Okay.  There is a slight, maybe a

5      typographical or other error to the charge that the lawyers

6      will discuss.  We will take care of that overnight and have

7      a clean packet for you to review in the morning, all right?

8          What I want to say is that the case is finally yours.

9      It's been, I don't know, five or six weeks since I first met

10     you, but this is the point we wanted to get to.

11         Enjoy your evening, okay?  Travel safely, relax, and

12     when you get back here tomorrow morning, be prepared to get

13     down to work and deliberate as I just instructed you to.

14     You've been a great jury, and I know you will be for the

15     duration of the trial.  All right?

16         Mr. Sergeant, what's up?

17         **A JUROR:**  Someone has been asking about lunchtime.

18     Should we bring our lunch?

19         **THE COURT:**  You should bring your lunch, yeah.  It

20     will be the same as every other day except you are going to

21     have to rely upon your foreperson for breaks because you are

22     going to be back there and when you need a break or need a

23     break for lunch I am not going to be there to deal with

24     that.

25         Yes, sir.

*Final Jury Instructions*
*Monday/March 14, 2011/Volume 17*                          279

```
 1              A JUROR:  And that's -- are we going to go home

 2   Labor Day or what?

 3              THE COURT:  Memorial Day or -- no, we are going to

 4   go every day from 8:30 until 5:00 p.m., and then, you know,

 5   if there's federal holidays or other things, we will let you

 6   know, but --

 7              A JUROR:  Like St. Patrick's Day?

 8              THE COURT:  If it were up to me, we would close

 9   the federal courthouse on St. Patrick's Day, but no, we will

10   be here working very hard and we will expect you to be here

11   that day as well, okay?

12        All right.  Thanks for your questions, and I bid you a

13   very good, peaceful night, all right?

14        Let's all rise for our jurors.

15        Thank you very much.

16        (Jury out at 5:03 p.m.)

17              THE COURT:  Okay.  Everyone may be seated.

18        Okay, Mr. Lukas, you want to be heard on the charge.

19              MR. LUKAS:  Yeah.  No big deal, Judge, but on

20   Page 12, special instruction, nature of the claim, there's

21   still a little leftover number of weeks discussion in there

22   that we didn't catch in kind of our last-minute revisions to

23   the stuff.

24              THE COURT:  First or second --

25              MR. LUKAS:  Second paragraph, last two sentences.
```

*04-40346; Henry, et al. v. Quicken Loans, Inc., et al.*

*Final Jury Instructions*
*Monday/March 14, 2011/Volume 17*                    280

```
 1            THE COURT:  Wait a minute.  "And, if so, for how

 2    many weeks."  All right.  I'm taking that out.

 3            MR. LUKAS:  Yeah, you go whether he/she would be

 4    entitled to overtime under the Fair Labor Standards Act, and

 5    then we should strike "and, if so, for how many weeks."

 6        Then we are good for a little bit.  If you decide that

 7    Quicken Loans is liable to many of the plaintiffs, you will

 8    then decide -- and then we need to strike "the number of

 9    weeks each plaintiff worked such overtime hours and."

10            THE COURT:  If you decide that Quicken Loans is

11    liable to any of the plaintiffs, you will then decide the

12    number of overtime hours worked each week.

13            MR. JEFFREY MORGANROTH:  Well, they still have to

14    fill in the weeks, don't they, Judge?

15            MR. LUKAS:  The weeks isn't on the verdict form.

16            THE COURT:  No, we took that out because you have

17    agreed on our 202, and we stated that they can estimate, we

18    can estimate the weeks -- or the hours even in light of the

19    weeks that they didn't work or didn't work overtime.  That

20    was my, that was my ruling earlier, and we revised the form

21    as a result.

22            MR. LUKAS:  Right.

23            THE COURT:  All right?  So I intend to take those

24    two lines out on Page 12 because the plaintiffs are not --

25    or, excuse me, the jurors are not going to decide those
```

*Final Jury Instructions*
*Monday/March 14, 2011/Volume 17*                281

1    issues.

2         All right.  Anything else before I give you my thanks?

3              **MR. LUKAS:**  Yes, Your Honor.  We have a full set

4    of the exhibits for the jurors, and we also have, we have

5    those call clips on a finger drive up there or a thumb drive

6    up there.

7              **THE COURT:**  I don't think I have those anymore.  I

8    put all --

9              **MR. LUKAS:**  Okay.  My issue is, if they want to

10   hear those, we have been playing them off of a laptop, and

11   that's what it is.  They are just wav files.

12             **THE COURT:**  All right.  We'll figure out a way,

13   we'll figure out a way to do that.  We have an extra laptop

14   in the back that we can use if they ask to get anything

15   played, all right?

16             **MR. LUKAS:**  Okay.

17             **THE COURT:**  Anything else?

18             **MR. LUKAS:**  No, sir.

19             **THE COURT:**  Okay.  Let me congratulate you and

20   tell you it's been a real pleasure, and I don't know how

21   this is going to come out, but regardless of the outcome, I

22   hope all of the lawyers know that in the eyes of the Court

23   you performed admirably, effectively, and pursuant to the

24   normal calling of all lawyers and I'm proud of you, okay?

25        All right.  We're going to adjourn for the day.  Before

1    we do, let me meet the trial attorneys down by the witness

2    box, I'll have a brief discussion with you, and then we'll

3    go for the day.  All right?

4         (Proceedings adjourned at 5:07 p.m.)

5                              -   -   -

6                    **C E R T I F I C A T I O N**

7              I, Sheri K. Ward, official court reporter for the

8    United States District Court, Eastern District of

9    Michigan, Southern Division, appointed pursuant to the

10   provisions of Title 28, United States Code, Section 753,

11   do hereby certify that the foregoing is a correct

12   transcript of the proceedings in the above-entitled cause

13   on the date hereinbefore set forth.

14             I do further certify that the foregoing

15   transcript has been prepared by me or under my direction.

16

17   s/ Sheri K. Ward____             March 17, 2011
     Sheri K. Ward,                   Date
18   Official Court Reporter

19                              -   -   -

20

21

22

23

24

25